**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
Steven G. Storch, Esq.
Bijan Amini, Esq.
Avery Samet, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| | |
| TRANSCARE CORPORATION, et al. | |
| | Case No.: 16-10407 (SMB) |
| Debtors. | (Jointly Administered) |

--------------------------------------------------------x

| | |
|---|---|
| SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 2001-1, LIMITED, ARK INVESTMENT PARTNERS II, L.P., LD INVESTMENTS, LLC, PATRIARCH PARTNERS II, LLC, PATRIARCH PARTNERS III, LLC, PATRIARCH PARTNERS VIII, LLC, PATRIARCH PARTNERS XIV, LLC, PATRIARCH PARTNERS XV, LLC, TRANSCENDENCE TRANSIT, INC., and TRANSCENDENCE TRANSIT II, INC. | |
| Defendants. | |

--------------------------------------------------------x

Salvatore LaMonica, as Chapter 7 Trustee (the "Trustee") of the jointly-administered estates of TransCare Corporation et al.[1] (collectively, "TransCare"), hereby alleges:

## INTRODUCTION

1.      Prior to its February 2016 bankruptcy filing, TransCare provided vital emergency medical transportation services to hospitals and communities throughout the Northeast. TransCare also operated disability transportation services for municipal authorities, such as the New York City Transit Authority (the "MTA").

2.      As the sole member of TransCare's board of directors, Lynn Tilton owed TransCare her undivided and unselfish loyalty.

3.      By 2015, after years of under-investment, TransCare lacked the financial ability to fund payroll, pay vendors or obtain insurance on its own.  To safely transport patients to hospitals, TransCare's employees were forced to pay fuel and tolls out of their own pocket. Faced with this financial crisis and budding public health emergency, TransCare's executives pleaded with Tilton to allow them to recapitalize the company.  They brought her potential purchasers who were ready, willing and able to pay TransCare millions of dollars, which was more than enough to fund TransCare's growth and stabilization plans.

4.      Tilton, ignoring her fiduciary duties, rejected these offers and instead sought to strip TransCare of its most profitable business units for the benefit of herself and her companies

---

[1] The jointly-administered estates are as follows:  TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

(referred to hereafter as "Patriarch" and together with Tilton, the "Defendants"),[2] including Patriarch Partners Agency Services LLC ("PPAS"), the administrative agent on a TransCare term loan owed primarily to other Tilton-owned and Tilton-controlled entities. While TransCare's executives were pleading for funds to make payroll, Patriarch executives under her direction were advising her on plans to seize the same TransCare assets that Tilton would not let TransCare sell.

5.      On the initial petition date of February 24, 2016, Tilton – working both sides of the transaction and against TransCare's interests – purported to have Patriarch entities "foreclose" on TransCare's most profitable units and transfer them to new companies controlled by her and which as a group were called Transcendence. Tilton's ill-conceived "foreclosure" plan revealed Tilton's motivation for her otherwise inexplicable directives forbidding TransCare to recognize value from its assets. It was so outrageous that it collapsed of its own accord within hours of going live. Even so, Patriarch employees under Tilton's command continued to plot to steal TransCare's assets under cover of night.

6.      As a result of this egregious conduct, TransCare suddenly collapsed, jeopardizing public safety and leaving it without any operating business units to sell for the benefit of its creditors. TransCare's employees, who worked for weeks without pay while Tilton tried to steal the company's assets, were left with large unpaid wage claims. This ruinous scenario was

---

[2] The term "Patriarch" refers to all of the defendants other than Tilton: Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc. The relationships between these Patriarch entities will be described below.

exactly what TransCare's executives had warned Tilton would come to pass, but which Tilton ignored due to her own conflicts of interest.

7.      By this action, the Trustee seeks damages resulting from Tilton's breach of the duty of loyalty.  The Trustee also objects to Patriarch's claims and seeks to equitably subordinate them, or, in the alternative, seeks to obtain damages against Patriarch for abusing its position as lender or to recharacterize the purported loans to TransCare as equity investments.

## THE PARTIES

8.      Plaintiff is the Trustee for TransCare's jointly-administered estates: TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

9.      TransCare consisted of Delaware corporations – with the parent company being TransCare Corporation – and had its corporate headquarters in Brooklyn, New York.  TransCare provided essential public safety services, including 911 ambulance services, in New York, Pennsylvania and Maryland.  TransCare employed over 1,800 employees, including emergency medical technicians, drivers and mechanics.

10.     Lynn Tilton was the sole director of TransCare and in fact was referred to as the "Board."  She is also the sole owner, chief executive officer and principal/ manager of the Patriarch family of companies, including Patriarch Partners Agency Services LLC.  Tilton claims to be a resident of Florida.

11.    Patriarch Partners Agency Services LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  PPAS is the administrative agent for multiple lenders – including Ark II CLO 2001-1, Limited and Ark Investment Partners II, L.P. – under the Credit Agreement with TransCare dated August 4, 2003, as amended (the "Credit Agreement").

12.    Patriarch Partners Management Group, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.

13.    LD Investments, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole members of LD Investments, LLC is Tilton.

14.    Patriarch Partners, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole member of Patriarch Partners, LLC is LD Investments, LLC.  The website for Patriarch Partners, LLC describes itself as an "investment firm."

15.    Patriarch Partners II, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole member of Patriarch Partners II, is LD Investments, LLC.

16.    Ark II CLO 2001-1, Limited is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole shareholder and collateral manager of Ark II CLO 2001-1, Limited is Patriarch Partners II, LLC.  Ark II CLO 2001-1, Limited holds about a 55.7% stock interest in TransCare Corporation and is a lender under the Credit Agreement.

17.     Patriarch Partners III, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole member of Patriarch Partners III, LLC is Tilton.

18.     Ark Investment Partners II, L.P. is a Delaware limited partnership headquartered in New York City, at 1 Liberty Street, 35th Floor.  Patriarch Partners III, LLC is a limited partner in Ark Investment Partners II, L.P. and holds a 99% stock interest in Ark Investment Partners II, L.P., along with serving as its investment advisor.  Ark Investment GP II, LLC is the general partner in Ark Investment Partners II, L.P.  Ark Investment Partners II, L.P. holds about a 5.57% stock interest in TransCare Corporation.

19.     Patriarch Partners VIII, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  At all times relevant hereto, Patriarch Partners VIII, LLC was the collateral manager for Zohar CDO 2001-1, Limited, a lender under the Credit Agreement.  Patriarch Partners VIII, LLC is indirectly owned and controlled by Tilton.

20.     Patriarch Partners XIV, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  At all times relevant hereto, Patriarch Partners VIII, LLC was the collateral manager for Zohar II 2005-1, Limited, a lender under the Credit Agreement.  Patriarch Partners XIV, LLC is indirectly owned and controlled by Tilton.

21.     Patriarch Partners XV, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  At all times relevant hereto, Patriarch Partners VIII, LLC was the collateral manager for Zohar III, Limited, a lender under the Credit Agreement.  Patriarch Partners XV, LLC is indirectly owned and controlled by Tilton.

22.     Transcendence Transit, Inc. is a Delaware corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole director of Transcendence Transit, Inc. is Tilton.  As discussed below, Tilton directed valuable TransCare assets to be transferred to Transcendence Transit, Inc. and/ or Transcendence Transit II, Inc.

23.     Transcendence Transit II, Inc. is a Delaware corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  Transcendence Transit II, Inc. is a wholly-owned subsidiary of Transcendence Transit, Inc.  As discussed below, Tilton directed valuable TransCare assets to be transferred to Transcendence Transit, Inc. and/ or Transcendence Transit II, Inc.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code").  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises, in part, under the laws of the United States.

25.     This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

26.     To the extent any portions of this complaint are non-core, the Bankruptcy Court may hear the claims and issue findings of fact and conclusions of law and the Trustee consents to the Bankruptcy Court issuing a final order.

27.     Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this action arises in or relates to a case under the Bankruptcy Code that is pending before this Court.

## BACKGROUND

28.     TransCare was incorporated in 1993.  In 2002, Tilton, through a wholly-owned fund, Ark II CLO 2001-1, Limited ("Ark II"), purchased approximately 51% of TransCare's

7

outstanding senior secured credit facility before TransCare filed its pre-negotiated bankruptcy. After filing bankruptcy in 2002, TransCare's pre-negotiated plan provided for it to emerge as reorganized entities in March 2003, to issue approximately 51% of the shares in the reorganized TransCare to entities owned by Tilton, and to replace the existing senior secured credit facility with new secured notes.   The pre-negotiated plan provided for two entities owned by Tilton (defendants Ark II and Ark Investment Partners II L.P.) to receive approximately 51% of the new secured notes, with her entities having the ability to act on behalf of the entire $33.5 million in replacement senior secured debt to be issued.

29.    By a Credit Agreement dated August 4, 2003 (the "Credit Agreement"), TransCare – as now majority-owned by the Ark II and Ark Investment Partners II L.P. – issued debt obligations to those two entities (with a minority stake held by other pre-petition senior secured creditors).   PPAS served as the administrative agent for the Credit Agreement.   Pursuant to the Credit Agreement, TransCare granted PPAS a senior secured lien on all of its assets.

30.    Among other things, the Credit Agreement provided that PPAS could waive TransCare's payment of principal or interest.   In fact, the sole person at Patriarch who could determine whether such a waiver would be granted was Tilton, the sole person in control of TransCare.   Each month Patriarch employees, acting at Tilton's direction, instructed TransCare employees to make interest payments to PPAS based upon Patriarch's needs, not TransCare's. Tilton so favored Patriarch that she ordered TransCare to make payments that were otherwise needed for essential TransCare services such as payroll and ambulance maintenance.   Patriarch employees controlled the calculation and timing of all interest payments.   Tilton prohibited TransCare from refinancing the PPAS debt obligation.   After obtaining control of the loan in

2003, TransCare paid PPAS around $3 to $4 million dollars a year, primarily at a rate of 12% interest stemming from the 2003 restructured debt obligations.

31.     Tilton controlled both PPAS/ Patriarch and TransCare at the time of the Credit Agreement and all amendments thereto, initially via her majority shareholder interest in TransCare and later pursuant to serving as the sole director.[3]  The contracts entered into between Patriarch and TransCare were not arm's-length transactions due to the control exercised by Tilton and Patriarch over TransCare, the lack of disinterested TransCare board directors, and the absence of counsel for TransCare separate from lawyers advising TransCare on Patriarch's behalf.

32.     To fund the operations of the company, TransCare entered into a revolving credit facility with Wells Fargo, N.A. dated October 13, 2006.  Pursuant to an October 13, 2006 intercreditor agreement between PPAS and Wells Fargo, Wells Fargo had a first lien on all of TransCare's assets and account receivables, including TransCare's right to receive payments from the MTA pursuant to Contract No. 07H9751, as amended (the "MTA Contract").  Under the MTA Contract, TransCare would provide paratransit services for the MTA's customers using vehicles leased from the MTA.  The MTA Contract constituted one of TransCare's most profitable business operations.

33.     PPAS took a first lien position only on TransCare's vehicles only (in addition to miscellaneous physical assets, such as computers).  PPAS agreed that it would not take any action to foreclose or otherwise enforce any lien as to which it was junior to Wells Fargo.

---

[P] Despite repeated requests from the Trustee, Patriarch has been unable to produce copies of any of the TransCare board resolutions, including the board resolution(s) providing for Tilton to become TransCare's sole director, and the Trustee cannot determine when exactly Tilton became the sole director.

34.     Patriarch operated wholly under Tilton's control and pursuant to her directives, particularly with respect to all of the acts and failures to act alleged herein.  At all relevant times, Patriarch operated as a wholly-integrated entity and – via Patriarch and her TransCare Board role – Tilton controlled TransCare and received benefits from her control of both TransCare and Patriarch.

Corporate Governance at TransCare

35.     Tilton exercised an extraordinarily high level of control and domination over the operations of TransCare.

36.     Pursuant to a July 2012 Written Consent of the Sole Director, Tilton issued an authority matrix prohibiting any TransCare officer from a wide range of activities, including, "disclos[ing] any financial or shareholder information of the Company or its subsidiaries to any third party[;]" entering into any contract not contemplated by the "Annual Plan," engaging legal counsel, and allowing only a "Designated Executive" to undertake certain limited functions. However, at least as of 2015, Tilton had not designated any Designated Executive and had not approved an Annual Plan.  As a result, all such powers remained only in the Board and, as TransCare employees well knew, was synonymous with Tilton.[4]

37.     Brian Stephen, a lawyer employed at Patriarch but claiming to represent TransCare's Board, gave further gloss to these restrictions.  For example, he explained to Glen Leland, TransCare's Chief Executive Officer, that Leland was prohibited from taking even preliminary steps to actions requiring Board approval.   Considering the breadth of those

---

[4] Tilton has advised the Trustee that as sole member of TransCare's board of directors she maintained no Board Minutes or Minute Book, but instead maintained all of TransCare's board resolutions in a special folder.  Tilton has been unable to produce this folder to the Trustee.

categories of actions, this instruction prohibited almost all independent action by TransCare's executives.

38.     Despite this level of control, Tilton barred TransCare's executives, including its Chief Executive Officer, from communicating directly with her.  Instead, she required them to communicate through her employees at Patriarch.  At the same time, she empowered her Patriarch employees to give direction to TransCare's executives.  During the period preceding TransCare's bankruptcy, those employees included Stephen, Jean-Luc Pelissier (an Executive Managing Director), Michael Greenberg (an analyst), Randy Jones (a Managing Director) and Scott Whalen (Patriarch's Chief Financial Officer and Tilton's son-in-law).  Stephen and Pelissier, in particular, enforced Tilton's desire to limit communications from Leland.  They told him that his reports were too negative and that negative comments could be discoverable in future litigation.

39.     Through this arrangement, Patriarch executives hired and fired employees, directed the payment or non-payment of vendors and gave direct orders to TransCare employees. On multiple occasions, Patriarch employee Michael Greenberg executed amendments to the PPAS credit facility on behalf of *TransCare*, causing TransCare to incur additional indebtedness and liens to Patriarch under a variety of putative terms.  For all transactions with Patriarch and TransCare, Tilton executed the documents on behalf of Patriarch.  TransCare lacked independent counsel on any transaction with Patriarch.  In short, Tilton and Patriarch exercised complete dominion and control over TransCare.

Events Leading Up to 2015 Financial Crisis

40.     In 2012, 2013 and 2014, TransCare had net revenues of approximately $130 million and positive EBITDA.  However, TransCare's costs grew and it began losing lucrative

clients because of its inability to invest in new vehicles. TransCare's executives were advised that not paying bills on time and in full was the "Patriarch way." As a result, its account payables grew and critical vendors went unpaid. During the same years, TransCare paid over $11 million to PPAS for the loans. In 2012, PPAS modified the Credit Agreement to provide TransCare with an additional $2 million.

41.     TransCare's most profitable business unit was its MTA Contract to provide paratransit services. This unit historically generated revenues of approximately $22 million and EBITDA of $3.7 million. However, by early 2015, the MTA had indicated a reluctance to renew TransCare's contract – scheduled to expire in summer 2015 – due to TransCare's deteriorating financial condition. Among other things, TransCare was having problems obtaining replacement parts for MTA vehicles; even though the MTA compensated TransCare for such parts, TransCare had such poor credit that parts suppliers would not do business with it.

In Early 2015, Tilton Refuses to Allow TransCare to Sell Assets Even as It Lacked Cash to Fund Payroll and Operations

42.     By February 4, 2015, TransCare's financial situation had become so dire that its executives warned Tilton that the company lacked the cash to make payroll the following day. They further advised that the company faced a projected $6.7 million shortfall between February 4 and the end of March 2015. Moreover, TransCare's essential vendors, such as its EZ-Pass account, suspended service due to chronic non-payment. Without access to tolls, TransCare's emergency ambulances could not reach hospitals without the EMTs paying the tolls out of their own funds and having to wait in the longer cash lanes. TransCare's executives recommended either further investment by Patriarch in TransCare or an immediate and harsh reduction in headcount.

43.     On February 5, 2015, Leland advised Patriarch of "a new alternative to the emergency cash request and accelerated recovery plans we put forward to the you and the Board yesterday."  Leland explained that National Express, "an international transit services leader" sought to purchase TransCare's MTA Contract with an offer estimated at $15 to $18 million.

44.     Leland explained that National Express "[has] been researching our situation and believe[s] that the hold up on our contract renewal is our unstable financial condition.  They further noted that if we do not renew the contract, the likely action of the MTA would be to distribute our business to other small vendors, which eliminates their opportunity."  Leland further explained National Express' valuation process which, based upon TransCare's paratransit financial metrics, would translate into a $17 to $18 million valuation for the paratransit business.  Finally, Leland advised that National Express had offered an immediate payment of $1.7 million as a non-refundable deposit in an option to begin negotiations towards a final transaction.

45.     In response, Tilton called Leland herself.  This was the only time that she ever contacted her CEO directly.  Tilton berated the CEO for daring to explore a sale option and then hung up on him.  Next, Stephen called the CEO to reiterate that the CEO had no authority to even discuss sale options of any assets with any company.  Stephen also claimed that TransCare would not receive any of the potential sale proceeds because "Lynn has other debts."  Finally, Pelissier called the CEO as well to reiterate that under no circumstances could he attempt to raise funds by exploring potential sales.

46.     Also in February 2015, RCA Ambulance Service also expressed interest in purchasing TransCare to Tilton and to TransCare.  Tilton similarly refused to engage or to authorize TransCare's executives to consider RCA's offer.

47.     On February 18, 2015, Leland prepared a draft Stabilization Plan for Patriarch's review.   He noted that "TransCare is **not** a viable on-going concern without immediate investment and assertive course correction." (emphasis in original).   Once again, he noted that TransCare required an immediate infusion of cash just to remain in business.   Once again, he informed Patriarch that there was alternative to total collapse; TransCare could to sell the MTA business to obtain "$14 to $17M to use for immediate financing activities for remaining ambulance service business."

48.     He further explained that "We are working this week with clarity that the payroll for this work cannot be funded from internal cash flows or credit vehicles.   I continue the operations because I am certain the company recognizes its liability and therefore will pay employees.   But there comes a point where that can no longer be a valid assumption."

49.     Tilton still refused TransCare permission to explore the sale of any assets. Nevertheless, she was forced to authorize Patriarch to lend additional funds to TransCare in order to make payroll.

<u>In Summer 2015, Tilton Again Refuses to Sell Assets to Fund Payroll and Operations</u>

50.     In June 2015, TransCare's executives once again warned Tilton that the company risked missing payroll and needed to either recapitalize or sell assets immediately:

- "TransCare continues to operate on a very thin line of cash and is only paying bills essential to its immediate operation."

- "We propose to accelerate the business plan into Phase 2 with an immediate loan of $5M.  If Patriarch Partners is unable or unwilling to provide these funds, we request permission to seek alternative sources of financing."

- "Under normal circumstances a company like TransCare with threats to on-going operations, would seek protection from creditors thru bankruptcy. We are told that is not an option within the Patriarch portfolio, which leaves a *debt*

> *consolidation loan* to satisfy critical vendors, remain viable,
> refocus leadership on improved positioning and resolve
> reputation deficits."

- "If TransCare were to shut down suddenly because of loss of
  key suppliers and facilities, it faces a liability of as much as
  $15.45M in wages and benefits.  About 70% of TransCare
  payroll is for New York employees which have a 90-day
  WARN act liability as compared to the 60-day standard in
  other markets."

51.     On June 5, 2015, TransCare's executives warned that they lacked the necessary

funds to pay PPAS and make payroll and fund necessary disbursements.  In response, Michael

Greenberg of Patriarch told TransCare's CFO that Tilton, as sole member of TransCare's board

of directors, was specifically ordering the payment of interest to PPAS despite TransCare's

financial situation: "The Board directed that I advise you that interest must be paid today."

52.     After further pleading by TransCare's executives, Pelissier informed TransCare

that "we have re-approached the subject of interest payment today with the board.  TransCare

must pay interest today as PPMG is not the only lender."[5]

53.     Later that evening, Leland again advised Patriarch:

> we are highly skeptical that TransCare can sustain its critical
> supply chain and insurance if it makes the required interest
> payment and continues to postpone back payroll tax deposits. …
> [W]ant to be certain the Board is fully advised that this action
> could force either a substantial loan, as we have requested, or
> force cessation of operations.

54.     On July 3, 2015, TransCare missed payroll after bouncing a check to pay for

necessary insurance.  Shortly thereafter, the New York Department of Health warned TransCare

that failure to provide immediate assurances to fund payroll would cause the Department to issue

---

[5] PPMG is another Patriarch entity, Patriarch Partners Management Group, LLC.  Patriarch did
not typically differentiate between its various entities in its dealings with TransCare.

a Public Safety Emergency alert and direct the regional emergency medical services to seek alternative means of ensuring emergency ambulance services, effectively shutting TransCare out of its New York medical operations.

55.    On July 6 and 9, 2015, TransCare's CEO again raised the National Express offer with Patriarch: "TransCare is running out of fuel.  Literally.  All of our fuel accounts have been frozen, our EZ Pass toll is depleted and we do not have money to turn th[e] accounts back on. We consumed about $2k of employee personal funds and other cash on hand last night to sustain operations.  We are literally hours away from wide spread gasoline and EZ Pass outage. … We have been re approached by National Express which is interested in acquiring the MTA contract, as I have reported in the past…. Am I authorized to accept the deposit and continue operations?"

56.    On July 10, 2015, Leland informed Patriarch that he had received offers to buy all or parts of TransCare from two separate national ambulance companies in addition to National Express.

57.    Also on July 10, 2015, National Express delivered a signed Letter of Intent to TransCare offering to buy TransCare's MTA paratransit business for $6 to $7 million plus the assumption of $2 million in related liabilities.  Leland forwarded the offer to Patriarch.

58.    Minutes later, Tilton's son-in-law, Scott Whalen, denied Leland permission: "LOI is way premature.  We have yet to review the business strategy. … [T]his will have to be made clear to them that the business is not for sale at this time."

59.    On July 13, 2015, Whalen again wrote to Leland seeking to prevent any public acknowledgment that TransCare or portions of TransCare might be for sale: "I would hate to have the LOI hanging out there and for National Express to tell people they are 'buying TransCare' is the issue."

60.     Leland confirmed in writing: "to be clear … you want me to: … contact National Express and tell them 'TCP is not for sale' per Patriarch Partners."  Whalen confirmed, despite the dire straits that TransCare was in, that this was exactly what Patriarch and his mother-in-law Tilton were ordering.

61.     On July 8 and 16, 2015, Tilton caused Patriarch to lend over $1.3 million to TransCare to fund payroll, bounced checks and immediate needs.

<u>TransCare's Financial Condition Deteriorates as Tilton Refuses Sale</u>

62.     Tilton's refusal to recapitalize the company jeopardized TransCare's ability to perform its safety mission and eroded the operational capabilities which TransCare could have monetized in a sale to a third-party.  All the while, Tilton insisted that TransCare make its monthly interest payments to PPAS.

63.     For example, on July 14, 2015, the head of TransCare's paratransit division reported:

> We are in dire straits right now, as you are aware, with ordering parts, tires, doing employee finger printing, getting uniforms. [TransCare paratransit] shop has been cannibalizing parts from vehicles that are out waiting for engines to be shipped (we can't place orders since we have been shut off by CADI [TransCare's auto parts supplier])

64.     When Leland explained to Patriarch that the ambulances needed to be replaced every few years in order to run safe and profitably, Pelissier responded that he owned a private airplane that was fifty years old, such that the vehicle's age did not matter.

65.     On August 10, 2015, Leland warned Patriarch that operating the company on fumes was causing a breakdown in employee morale:

> Massive amount of employees have either resigned or given notice. Project Mgr., OPS mgr, disp mgr, 2 disp sups, 6 dispatchers, 20 drivers have resigned in last 10 days. Unsuccessful in recruiting due to our past delayed payroll problems (word is out on the street)

> – working on doing some in-house promotions on a trial basis just
> to fill open slots at lesser money.

66.    On October 7, 2015, Leland again pleaded with Patriarch that TransCare could

not afford to both continue operations and pay Patriarch:

> I understand that the Board has directed TransCare to issue the
> interest payment to Patriarch today.  This despite the fact that the
> company will not have adequate funds to make its payroll
> tomorrow.

67.    Patriarch instructed Leland to make interest payments to PPAS, while also

instructing Leland to (a) have employees pay for fuel themselves and (b) to cease paying

employee payroll taxes to the Internal Revenue Service.

68.    On December 8, 2015, Leland advised Patriarch that the head of TransCare's

MTA paratransit division was resigning due to frustration with the lack of resources.  Leland also

advised that National Express had again contacted him "to see if there is any interest in selling."

Leland recommended immediate discussions with National Express and to use the proceeds from

the sale (or solely the deposit) to fund a plan to save as much of the ambulance business as

possible.  At this point, Leland advised Patriarch that TransCare could receive $6 to $8 million

dollars from the sale.

69.    Stephen wrote back to Leland the next day, reminding him that he needed

approval from the Board prior to entering into any discussions.

70.    On December 16, 2015, Leland told Patriarch that "Nat'l Express Called a few

times yesterday. … They reiterate that the letter they sent before, offering to buy the TC

Paratransit contract, is 'still out there.'  I am awaiting direction.  My recommendation is to

immediately respond and negotiate a sale of the contract…. Waiting further does not seem to be

in best interest of company."

18

71.    On December 17, 2015, Leland told Patriarch that "to avoid a shutdown we should reopen selling the MTA contract to National Express."  Greenberg and Stephen told Leland that they were working on a number of issues but would pass it on.

Patriarch's Plan

72.    While TransCare was pleading to monetize its valuable asset so as to fund payroll and life-saving operations, Tilton was working on a plan to acquire that same asset for Patriarch.

73.    By December 16, 2015, Tilton had advised Wells Fargo that it had determined to sell TransCare.

74.    On December 18, 2015, Greenberg emailed Tilton his research on  and Greenberg reported that At this point, TransCare's MTA paratransit unit had revenues of more than $20 million and EBITDA of more than $2.2 million. Had Tilton allowed Patriarch to sell the paratransit business, these numbers would imply a valuation of between and million, vastly more than the amount needed to pay employees and recapitalize TransCare.  Greenberg also recounted how

75.    In late December, Tilton and Patriarch submitted a proposal to Wells Fargo to sell TransCare's assets by September 2016.

76.    On January 9, 2016, Glenn Leland quit as CEO of TransCare.  On January 11, 2016, Tilton hired Carl Marks & Co., Inc. ("Carl Marks") to serve as restructuring advisors for TransCare and to report to Tilton.  During this period, TransCare's last remaining C-level officer

– its Chief Operating Officer – lacked authority to make any business decisions without Patriarch's approval.

77.     By a Credit Agreement dated January 15, 2016, Ark II committed to make $6.5 million available to TransCare Corporation for working capital and general corporate purposes (the "Ark Credit Agreement").  TransCare provided guarantees and liens to Ark II in connection with the Ark Credit Agreement.  Ark II was controlled by Tilton and operated as part of the integrated Patriarch entities.

78.     Ark II filed a proof of claim alleging that it had lent $1,862,925.77 to TransCare, but the Trustee's investigation has not uncovered proof that the funds were paid to TransCare and Patriarch has been unable to provide such proof to the Trustee, despite requests to do so.[6] Regardless, Ark II ultimately did not make the promised $6.5 million amount available to TransCare, and Patriarch and Tilton instead decided to take TransCare's most valuable assets for themselves and cause TransCare to file for bankruptcy in order to ensure that the assets would not be available to satisfy claims against TransCare's bankruptcy estates.

79.     On February 9, 2016, Pelissier contacted the MTA, representing that the owner of TransCare wished to transfer the MTA Contract to a different entity: "I am working with the ownership representative of TransCare."

---

[6] This proof of claim also states that Ark II received $800,000.00 in connection with the Trustee's sale of assets.  The Trustee paid out $800,000.01 to PPAS – not Ark II – pursuant to a court order dated March 25, 2016 [Dkt. No. 52].  PPAS failed to disclose to the Court or the Trustee that these funds would be forwarded to Ark II.  In fact, PPAS represented that it held "first-priority security interests" in the property to be sold and was entitled to "gift" part of its proceeds for the benefit of an employee wage claim fund on account of its lien position [Dkt. No. 49 at ¶¶ 9, 19].  Additionally, the March 25, 2016 stipulation agreed to by PPAS and the Trustee – and so-ordered by the Court – disclosed the existence of the intercreditor agreement between PPAS and Wells Fargo, while failing to disclose the intercreditor agreement between PPAS and Ark II or the existence of liens in Ark II's favor separate from those of PPAS [Dkt. No. 52-1 at Recitals, ¶ 4].

80.    On or about February 9, 2016, Tilton's personal lawyers at Skadden, Arps, Slate, Meagher & Flom LLP contacted the law firm of Curtis Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") about the need to for an immediate Chapter 11 bankruptcy filing for TransCare. Curtis Mallet submitted a draft Chapter 11 engagement letter that day and TransCare executed it on February 10.  Brian Stephen served as the principal contact for TransCare for Curtis Mallet, advising Curtis Mallet on the assets, liabilities and strategy of TransCare's bankruptcy filing.

81.    On February 10, 2016, Tilton caused two new Delaware entities to be incorporated: Transcendence Transit, Inc., and a wholly-owned subsidiary Transcendence Transit II, Inc.

82.    The same day, Carl Marks, using ███████████████████████████████████ provided Patriarch with ████████████████████████████████████████████████ ██████████████████████    ████████████████████████████████████ ██████████████████████████████████

83.    Also on February 10, 2016, Greenberg told TransCare's Vice President, Glen Youngblood that ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████    Greenberg noted that █████████████████ ████████████████████████████████████████

84.    However, Patriarch was unable to simply "foreclose" on TransCare's ongoing business operations as one might repossess a vehicle or a piece of real estate.  Tilton needed to convince employees to switch employers, convince vendors and insurers to substitute Transcendence for TransCare, obtain governmental authority to provide critical safety services through a new corporation, and switch bank accounts, among numerous other complex

transactions. To effectuate this plan, Tilton held meetings at Patriarch's offices with TransCare's executives to model out which TransCare business units would be transferred to Transcendence and how, and the amount of revenue they could be expected to bring in for the new company. None of these actions were consistent with Tilton's duty of loyalty to TransCare. Tilton and Patriarch caused TransCare's employees to work on projects on Patriarch's behalf in support of the Transcendence plan rather than for TransCare's business operations.

85.      Patriarch endeavored to keep this plan secret even while it directed TransCare's remaining executives to prepare the transition, including talking points to sell the union and the MTA on the Transcendence plan. "Obviously, we cannot breath a word until we have the overall deal finalized. Until then it must be business as usual[,]" Randy Jones of Patriarch wrote on February 11, 2016 to TransCare's Vice President of Transit Services Thomas Fuchs and Chief Operating Officer Peter Wolf.

86.      On February 14, 2016, Pelissier, from a non-Patriarch email address, submitted a detailed plan to TransCare's executives to prepare to transfer TransCare's lucrative MTA paratransit business, as well as several other lucrative ambulance divisions.

87.      On February 18, 2016, TransCare signed an engagement agreement with Curtis Mallet to file a Chapter 7 bankruptcy case for all the TransCare entities. Stephen continued to serve as the main point of contact for Curtis Mallet in planning TransCare's bankruptcy, even as he was handling Patriarch's "foreclosure" of TransCare's assets.

88.      At the same time as Patriarch sought to obtain its assets, it declined to pay the payroll taxes for those employees. By February 24, 2016, TransCare owed approximately $1.148 million in payroll taxes for 2016, plus at least $172,000 in penalties and interest. Tilton allowed TransCare to operate without paying payroll taxes or reserving for them. For example,

22

on February 19, 2016, when Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations, and outstanding payroll taxes from earlier pay dates, as well as other critical expenses, Tilton chastised Carl Marks for seeking her direction and instead told Carl Marks to "make decisions on what needs to be paid."

89.    On February 24, 2016, Tilton directed TransCare to file for Chapter 7 bankruptcy protection.

90.    PPAS and Transcendence Transit, Inc. have represented in filings with the Bankruptcy Court for the Southern District of New York that PPAS effectuated an Article 9 "strict foreclosure" of certain of TransCare's assets, including its paratransit division.[7] Despite numerous requests, Patriarch has been unable to produce a copy of any of the documents constituting or underlying this "foreclosure."

91.    The Trustee obtained a copy of a three-paragraph "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" dated February 24, 2016 from a third party.[8] This document was signed by Tilton for PPAS, Ark Investment GP II, L.P., Patriarch Partners VII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC.    The

---

[7] Tilton and various of her Patriarch entities (including Patriarch Partners, LLC, PPAS, Patriarch Partners III, LLC, Ark II, and Ark Investment Partners II, L.P.) have similarly represented in filings with the District Court for the Eastern District of New York that "TransCare's term loan lenders" foreclosed on the MTA Contract.  National Labor Relations Board v. Transcendence Transit II, Inc. et al., Case No. 1:17-mc-00913-SJ (E.D.N.Y.).

[8] This document was obtained from a third party as Patriarch was unable to produce it despite repeated requests from the Trustee.  Likewise, Patriarch still has not provided a copy of the February 24, 2016 Notice of Default, even though PPAS represented to the Court that the two documents exist [Dkt. No. 49 at ¶¶ 10, 11; see also Dkt. Nos. 521 at ¶ 8, 522 at ¶ 11].  Further, Transcendence Transit, Inc. represented to the Court and Stephen submitted a supporting affidavit affirming that February 24, 2016 Bill of Sale, Agreement to Pay and Transfer Statement documents between PPAS and Transcendence Transit, Inc. existed with respect to the Transcendence transaction [Dkt. Nos. 521 at ¶ 9, 522 at ¶ 12], but Patriarch has similarly failed to produce these documents.

document states that PPAS was accepting certain collateral – including the MTA Contract, but not the stock of the performing party thereunder, TransCare New York, Inc. – pursuant to Section 9-620 of the Uniform Commercial Code in satisfaction of $10,000,000 of the amounts owing under the Credit Agreement. However, the document does not specify what default(s) had occurred, provide notice to any of the other creditors secured by the collateral (namely, Wells Fargo Bank, N.A.), or explain the basis for the $10,000,000 valuation of the collateral (which Patriarch had internally stated related to ███████████████ revenues). Further, Tilton controlled TransCare by serving as its sole director (including at the time of the "strict foreclosure"), and the signatory for TransCare on this document (Peter Wolf) testified at TransCare's 341 Meeting of Creditors that he was asked by Patriarch and/ or Tilton to sign backdated documents.

92.    Also on February 24, 2016, Tilton issued a number of board resolutions as the sole member of Transcendence's board of directors purporting to (i) exercise control over TransCare's assets, including borrowing an additional $10 million from Patriarch and granting Patriarch security interests in Transcendence's assets, and (ii) authorize Transcendence to enter into transactions transferring and assigning leases and contracts from TransCare to Transcendence.

93.    For example, on February 24, 2016, Tilton signed a written consent of the sole director of Transcendence Transit II, Inc. authorizing Transcendent Transit II to enter into an Assignment Agreement with TransCare New York, Inc., whereby TransCare New York, Inc. would assign its Access-A-Ride Transportation Service Agreement with the MTA to Transcendence Transit II. Tilton's written consent stated that "TransCare desires to transfer and assign the [MTA] Agreement." This statement is inconsistent with Patriarch's filings with the

Bankruptcy Court claiming that PPAS foreclosed on TransCare's MTA contract and took it from TransCare. The written consent also stated that "the MTA [defined as the New York City Transit Authority] has heretofore provided TransCare with its consent to the Assignment." This statement is inconsistent with the affidavit, made under penalty of perjury by Brian Stephen, stating that the MTA never approved the assignment: "Transcendence II could not operate without being assigned the Access-A-Ride contract, and NYC Transit never approved its transfer."[9]

94.      According to Patriarch "insurmountable logistical issues" prevented it from continuing TransCare's paratransit and other business operations under the Transcendence label and that such issues "outmatched" Patriarch's "desire and commitment to continue without those business lines."

95.      Late at night on February 25, Patriarch, and in particular Stephen (purportedly the lawyer for TransCare's board of directors), realized that the Transcendence plan would not succeed. At 10:53 p.m., despite the existence of the Bankruptcy Court's automatic stay, Brian Stephen emailed TransCare executives and directed them to steal assets from TransCare. "As a result, we need to try and secure as many assets (ambulances, equipment, etc.) as possible as quickly as we can. … I am not entirely sure where the most valuable assets are, but it makes sense to target those first – if those assets can be moved."

---

[9] As noted above, Tilton has failed to produce the "folder" containing TransCare's board resolutions. Nevertheless, the Trustee has discovered at least one TransCare board resolution corresponding to the Transcendence board resolutions: one authorizing TransCare to transfer and assign a medical equipment lease to Transcendence (again stating that "the Corporation desires to transfer and assign the Agreement.").

96.     Later that evening, Pelissier followed up on Stephen's directive, instructing the TransCare executives to transfer TransCare's account receivable server out of the debtor's warehouse.  Uncomfortable with this activity, TransCare's vice president refused and rejected Patriarch's offer to join Transcendence, instead properly alerting the Trustee to the ongoing unlawful activity.

## FIRST CLAIM FOR RELIEF

### Breach of the Fiduciary Duty of Loyalty and Good Faith

### (Against Lynn Tilton)

97.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

98.     While she served as the sole board member of the Debtors, Tilton owed an undivided duty of loyalty and good faith to the Debtors.

99.     Tilton lacked independence because she also was the principal of TransCare's lenders PPAS and Ark II and the collateral managers (Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC and Patriarch Partners XV, LLC) for other lenders to TransCare.

100.     Tilton breached her duty of loyalty by actively impeding TransCare's attempts to monetize its assets and by instead working to strip TransCare of the same assets.  Tilton made decisions for the benefit of herself, Patriarch and her other companies, as opposed to the benefit of TransCare.

101.     Tilton knew or should have known of the requirements of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 et seq. and the New York Worker Adjustment and Retraining Notification Act (the "NY WARN Act"), N.Y. Labor Law § 860 et seq.  Further, Tilton knew or should have known that her actions and/ or inaction would create potential liability under the WARN Act and the NY WARN Act.

26

102.    As a direct and proximate cause of Tilton's breaches of the duty of loyalty and good faith, TransCare's estates have suffered unpaid asserted claims (including employee claims, WARN Act claims, NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/ or Tilton (along with the associated payroll taxes), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Breach of the Fiduciary Duty of Loyalty

**(Against Patriarch (Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc.))**

103.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

104.    Patriarch knowingly and in bad faith assisted Tilton's breaches of fiduciary duties of loyalty and good faith in connection with her acts to impede TransCare's attempts to monetize its assets, to strip TransCare of those same assets, and to make decisions for the benefit of herself, Patriarch and her other companies.  Patriarch sought to benefit itself – and did in fact benefit – from Tilton's breaches of her fiduciary duties.  Without such aid from Patriarch, Tilton's fiduciary breaches would not have occurred.

105.    As a direct and proximate cause of Patriarch's aiding and abetting of Tilton's breach of the duty of loyalty and good faith, TransCare's estates have suffered unpaid asserted

claims (including employee claims, WARN Act claims, and NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/ or Tilton (along with the associated payroll taxes), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

**THIRD CLAIM FOR RELIEF**

**<u>Equitable Subordination of All Claims Asserted by Patriarch</u>**

**(Against Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1, Limited, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC)**

106.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

107.    The Trustee seeks to equitably subordinate all claims asserted by Patriarch against TransCare and its estates pursuant to Bankruptcy Code Sections 105(a) and 510(c) because Patriarch engaged in inequitable conduct, causing injury to the creditors of TransCare and conferring an unfair advantage on Patriarch. Claims have been filed against TransCare and its estates by insiders PPAS, Ark II, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC, all of whom participated in and benefitted from the inequitable conduct. Equitable subordination here is consistent with the Bankruptcy Code.

108.    Patriarch and Tilton utilized Tilton's role as the Debtors' sole board member to direct the Debtors' conduct to the detriment of and in breach of Tilton's fiduciary obligations to TransCare and their estates.

109.    Patriarch's conduct injured TransCare's estates by, among other things, (i) preventing the Debtors from selling their assets, (ii) causing the Debtors to pay millions of dollars to PPAS while TransCare was insolvent, and (iii) attempting to strip TransCare of its

profitable assets – with the directed assistance of TransCare's employees – on the eve of its bankruptcy filings and even afterwards in violation of the automatic stay.

110.    In these circumstances, subordinating Patriarch's claims is consistent with the provisions of the Bankruptcy Code.

111.    Therefore, the Trustee requests that the claims asserted by Patriarch be subordinated below general unsecured claims and that the liens associated with such claims be transferred to TransCare's estates pursuant to Bankruptcy Code Section 510(c)(2).

## FOURTH CLAIM FOR RELIEF

### Recharacterization of All Claims Asserted by Patriarch

**(Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)**

112.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

113.    In the alternative to equitably subordinating Patriarch's claims, the Trustee seeks to recharacterize as equity all claims asserted against TransCare and its estates by PPAS and Ark II for funds purportedly loaned pursuant to Bankruptcy Code Sections 105(a) and 502(a).

114.    The purported funds advanced by PPAS and Ark II, purportedly as loans under the Credit Agreement or the Ark Credit Agreement, respectively, were – in fact and should be deemed to have been – capital contributions by PPAS and Ark II, and not debt.

115.    The circumstances of the purported funds advanced by PPAS and Ark II indicate that the parties did not intend to create an unconditional obligation for TransCare to repay such funds.  Among the *indicia* evidencing that such funds were capital/ equity investments – and not loans – are, without limitations, the following: (i) the TransCare was severely undercapitalized at all relevant times; (ii) PPAS and Ark II were insiders of TransCare when such funds were advanced; (iii) the repayment of the funds was dependent on the prospective financial success of

TransCare's business; (iv) Patriarch's equity and purported debt investments in TransCare were roughly proportional; (v) there was never any sinking fund established (or other accumulated funds set aside to repay the purported debts) established when such funds were advanced; (vi) TransCare's assets were wholly encumbered when such advances were made; (vii) the advances were subordinated to the claims of lender Wells Fargo Bank, N.A. with respect to TransCare's valuable contract rights and certain other intangible property; and (viii) Patriarch rejected consideration of offers for all or part of TransCare's assets in an attempt to arrogate the value of those assets for itself.

116.    Therefore, the Trustee requests that the claims asserted by PPAS and Ark II be deemed to be capital contributions rather than loans and disallowed as claims pursuant to Bankruptcy Code Section 502(b).  The Trustee further requests that the liens associated with such claims be transferred to TransCare's estates and/ or voided pursuant to Bankruptcy Code Sections 506(d) and 105(a).

**FIFTH CLAIM FOR RELIEF**

**<u>Objection to Claims, Liens and Security Interests</u>**

**(Against PPAS, Ark II CLO 2001-1, Limited, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC)**

117.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

118.    The Trustee objects to any claims and liens asserted by Patriarch pursuant to Bankruptcy Code Section 502(d) and because they are subject to setoff.  Claims have been filed against TransCare and its estates by PPAS, Ark II, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC.

119.    The Trustee objects to the claims and liens asserted by PPAS and Ark II in so far as the agreements incurring those claims and liens were only executed by PPAS or Ark II and not by TransCare.

120.    Further, the Trustee objects to the claims and liens asserted by PPAS and Ark II on the grounds of insufficient documentary evidence as Patriarch has been unable to produce proof of the amount, ownership and funding for the underlying loans.

121.    Additionally, to the extent the claims and liens held by PPAS and Ark II are invalidated and/ or determined to be subject to setoff and/ or avoidance, the Trustee seeks (i) disgorgement of any funds paid by the Trustee post-petition to PPAS (including those funds forwarded by PPAS to Ark II pursuant to an arrangement not disclosed to the Trustee or the Court), (ii) retention of any and all funds in TransCare's estates that could be deemed subject to the liens of PPAS or Ark II with such liens preserved for the benefit of the estates and (iii) voiding of the liens of PPAS and Ark II and/ or transfer of such liens to TransCare's estates pursuant to Bankruptcy Code Sections 506(d), 105(a), 544(b), 550(a), and/ or 551.

## SIXTH CLAIM FOR RELIEF

### Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control

**(Against Patriarch (Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc.))**

122.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

31

123.    Patriarch was in complete domination of the finances, policy, and business practices of TransCare.  Tilton's role as the sole board member placed Patriarch in a position of trust and unusual advantage vis-à-vis TransCare.

124.    The domination of Patriarch over TransCare resulted in TransCare having no separate or independent mind, will or existence of its own.

125.    This control was used by Patriarch to cause TransCare to make transfers and decisions that rendered TransCare unable to pay employees and critical vendors (including vendors necessary for the maintenance of the TransCare's ambulance fleet), to engage in the failed Transcendence scheme, and to deny TransCare the ability to explore refinancing or asset sales.

126.    As a direct and proximate cause of Patriarch's wrongful acts, TransCare's estates have suffered unpaid claims (including employee claims, WARN Act claims, and NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/ or Tilton (along with the associated payroll taxes)), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

### SEVENTH CLAIM FOR RELIEF

### Actual Fraudulent Transfer Under the Bankruptcy Code and New York Law

### (Against All Defendants)

127.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

128.    On February 24, 2016, Patriarch and Tilton – via PPAS – purported to conduct a "strict foreclosure" of certain valuable assets of TransCare for their own benefit.  This "strict

foreclosure" was ineffective and commercially unreasonable, constituted an attempt to defraud TransCare and its creditors, and did in fact defraud TransCare and its creditors.

129.    To the extent the "strict foreclosure" was effective in transferring property from TransCare, Patriarch and Tilton caused the transfers to be made while Patriarch was insolvent and unable to pay millions owing to other vendors, including vendors critical to the maintenance of the TransCare's ambulance fleet.

130.    These transfers further caused TransCare not to be able to operate as a going concern, to the detriment of TransCare's estates.

131.    Therefore, to the extent Patriarch and Tilton's scheme was successful, the Trustee seeks to avoid these transfers of TransCare's property to the Defendants as actual fraudulent transfers pursuant to Bankruptcy Code Sections 548(a)(1)(A) and 544(b) and N.Y. Debtor & Creditor Law Section 276.

**EIGHTH CLAIM FOR RELIEF**

**<u>Recovery of Avoided Transfers</u>**

**(Against All Defendants)**

132.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

133.    The Trustee is entitled to avoid any actual fraudulent transfers and/ or post-petition transfers pursuant to Sections 544, 548 and 549 of the Bankruptcy Code and/ or N.Y. Debtor & Creditor Law Section 276 (collectively, the "<u>Avoided Transfers</u>").

134.    All of the Defendants were the initial transferees of the Avoided Transfers, the immediate or mediate transferees of such initial transferees, or the entities for whose benefit the Avoided Transfers were made.

135.     Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiffs are entitled to recover the Avoided Transfers for the benefit of the estates from all of the Defendants, plus interest thereon to the date of payment and the costs of this action.

## NINTH CLAIM FOR RELIEF

### Violation of Automatic Stay

### (Against All Defendants)

136.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

137.     The conduct of the Defendants in their attempts to obtain the property of TransCare post-petition, including – without limitation – the negotiations to obtain the MTA contract, any efforts to consummate the "strict foreclosure," and any efforts to obtain property of TransCare's estates, constituted violations of the automatic stay provided for in Section 362(a) of the Bankruptcy Code.

138.     Therefore, any successful transfers of TransCare's property post-petition should be avoided, and all of the Defendants are guilty of civil contempt.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in the Trustee's favor against the Defendants to each claim for relief, in the amount requested by each claim for relief, plus attorneys' fees and costs, punitive damages, pre-judgment interest, where applicable, together such other and further relief as this Court deems just and proper.

Dated: New York, New York
       February 21, 2017

Respectfully submitted,

/s/ Steven Storch
Steven G. Storch
Bijan Amini
Avery Samet
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 490-4100
Fax: (212) 497-4208
sstorch@storchamini.com
bamini@storchamini.com
asamet@storchamini.com

*Special Counsel to Chapter 7 Trustee Salvatore LaMonica*