**PROSKAUER ROSE LLP**
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000

Nicole A. Eichberger (*pro hac vice* to be filed)
650 Poydras Street
Suite 1800
New Orleans, LA 70130-6146
Tel.: (504) 310-2024

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 7 |
| **TRANSCARE CORPORATION, *et al.*,** | Case No. 16-10407 (SMB) |
| **Debtors.**[1] | (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, <u>et al.</u>,** | |
| **Plaintiff,** | Adv. Proc. No. 18-01021 |
| v. | |
| **LYNN TILTON, <u>et al.</u>,** | |
| **Defendants.** | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS CERTAIN CLAIMS ASSERTED**
**<u>IN THE CHAPTER 7 TRUSTEE'S ADVERSARY COMPLAINT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

THE TRUSTEE'S ALLEGATIONS RELEVANT TO THIS MOTION....................................... 8

    A.  TransCare owed Principal and Interest to Its Lenders Pursuant to a Credit Agreement, and PPAS as Administrative Agent held a Senior, First Priority Lien. ........................ 8

    B.  Lowball Offers to Purchase TransCare Assets Were Not Sufficient to Pay TransCare's Debt. ................................................................................................... 9

    C.  Transcendence.................................................................................................... 11

STANDARD OF REVIEW .................................................................................................... 14

ARGUMENT .......................................................................................................................... 15

I.  The Claims in Counts I, II, and VI of the Complaint Arising From Alleged WARN Liability Should Be Dismissed Pursuant to Rule 12(b)(1) Because the Trustee Lacks Article III Standing to Assert Them. ....................................................................15

II.  Counts II and VI – IX Should Be Dismissed as to All Entity Defendants Because the Trustee's Improper Group Pleading Is Insufficient Under the Federal Rules of Civil Procedure. ...................................................................................................18

    A.  The Trustee Fails to Satisfy the Minimum Pleading Standard of Rule 8 in Counts II and VI-IX by "Lumping" all Entity Defendants Together. ........................................ 18

    B.  Counts VII and VIII Should Also Be Dismissed Because They Fail to Meet the Heightened Pleading Standard of Rule 9(b) for Claims of Actual Fraud. ................. 22

III.  Counts VII and VIII Should Be Dismissed Against All Defendants Other Than PPAS Because the Trustee Failed to Allege Facts Sufficient to Sustain These Claims Pursuant to Rule 12(b)(6). .....................................................................................25

    A.  Count VII Should Be Dismissed Against All Defendants Except PPAS Because the Trustee Failed to Plead TransCare Transferred Estate Property to These Other Defendants. ................................................................................................... 25

    B.  Count VIII of the Complaint Should Be Dismissed As to All Defendants Except PPAS Because the Trustee Has Failed to Plead Sufficient Facts Establishing that Ms. Tilton or the Other Entity Defendants Are Recipients of TransCare Property Actually Transferred to Them. ............................................................................... 27

IV.  Count III of the Complaint Should Be Dismissed Because the Trustee Failed to Allege Inequitable Conduct Sufficient to Support Equitable Subordination of the Claims of Patriarch Partners. .....................................................................................28

V.  As a Matter of Law, Count V of the Complaint Warrants Dismissal Against of Patriarch Partners and PPMG Because the Trustee Has Not Sufficiently Pleaded Avoidance Claims Against Those Defendants. .............................................................29

CONCLUSION....................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Appalachian Enters., Inc. v. ePayment Sols. Ltd.*,
   No. 01-11502 (GBD), 2004 WL 2813121 (S.D.N.Y. Dec. 8, 2004) ......................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................14, 29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...............................................................................................14

*Atuahene v. City of Hartford*,
   10 F. App'x 33 (2d Cir. 2001) ...............................................................................18, 19, 21

*Barnhill v. Johnson*,
   503 U.S. 393 (1992).............................................................................................................25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................................14

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
   90 F. Supp. 2d 401 (S.D.N.Y. 2000)...................................................................................21

*Clapper v. Amnesty Int'l USA*,
   586 U.S. 398 (2013).............................................................................................................15

*DiVittorio v. Equidyne Extractive Indus. Inc.*,
   822 F.2d 1242 (2d Cir. 1987)...............................................................................................22

*Ferro v. Ry. Express Agency, Inc.*,
   296 F.2d 847 (2d Cir. 1961).................................................................................................19

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998)...............................................................................22, 24

*In re 680 Fifth Ave. Assocs.*,
   209 B.R. 314 (Bankr. S.D.N.Y. 1997).................................................................................14

*In re AlphaStar Ins. Group, Ltd.*,
   383 B.R. 231 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) ....................................................22, 24

*In re BH S&B Holdings, L.L.C.*,
   420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 420 B.R. 112
   (Bankr. S.D.N.Y. 2009) .................................................................................................28, 29

*In re Durso Supermarkets, Inc.*,
   193 B.R. 682 (Bankr. S.D.N.Y. 1996) ...................................................................25

*In re E. End Dev., LLC*,
   No. 8-12-76181-REG, 2017 WL 1277443 (Bankr. E.D.N.Y. Apr. 4, 2017) ..........................21

*In re Flutie N.Y. Corp.*,
   310 B.R. 31 (Bankr. S.D.N.Y. 2004) .............................................................26, 27

*In re Hydrogen, L.L.C.*,
   431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...........................................................28, 29

*In re Lyondell Chem. Co.*,
   491 B.R. 41 (Bankr. S.D.N.Y. 2013) ...............................................................9

*In re Lyondell Chem. Co.*,
   567 B.R. 55 (Bankr. S.D.N.Y. 2017) ..............................................................25

*In re Mid Atlantic Fund, Inc.*,
   60 B.R. 604 (Bankr. S.D.N.Y. 1986) ..............................................................30

*In re Nat'l Bank of Anguilla (Private Banking Trust) Ltd.*,
   580 B.R. 64 (Bankr. S.D.N.Y. 2018) ...............................................................9

*In re Rhythms NetConnections Inc.*,
   300 B.R. 404 (Bankr. S.D.N.Y. 2003) .............................................................30

*In re Tronox Inc.*,
   429 B.R. 73 (Bankr. S.D.N.Y. 2010) ..............................................................22

*Kamen v. Am. Tel. & Tel. Co.*,
   791 F.2d 1006 (2d Cir.1986) .....................................................................14

*Karim v. AWB Ltd.*,
   347 F. App'x 714 (2d Cir. 2009) .................................................................16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..........................................................................14, 15

*Musso v. Ostashko*,
   468 F.3d 99 (2d Cir.2006) .......................................................................28

*Natowitz v. Mehlman*,
   542 F. Supp. 674 (S.D.N.Y.1982) .................................................................24

*Pall v. KPMG, LLP*,
   No. 3:03CV00842 AWT, 2006 WL 2800064 (D. Conn. Sept. 29, 2006) ..............................16

*Plantronics, Inc. v. United State*s,
   No. 88 CIV 1892, 1990 WL 3202 (S.D.N.Y. Jan. 9, 1990)................................................16, 17

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...................................................................................................22

*San Diego Unified Port District v. Monsanto Co.*,
   No. 15-cv-578, 2018 WL 626315 (S.D. Cal. Jan. 30, 2018) ...........................................16, 17

*Spokeo v. Robbins*,
   136 S. Ct. 1540 (2016) ..........................................................................................................15

*TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*,
   No. 16-CV-8722 (PKC), 2017 WL 2627912 (S.D.N.Y. June 16, 2017)................................19

*Thomas v. City of New York*,
   143 F.3d 31 (2d Cir.1998)......................................................................................................16

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
   216 F. Supp. 2d 198 (S.D.N.Y. 2002)....................................................................................23

*Whitney Lane Holdings, LLC v. Sgambettera & Assocs., P.C.*,
   No. 08-CV-2966 (JS)(AKT), 2010 WL 4259797 (E.D.N.Y. Sept. 8, 2010) ..........................16

*Zegelstein v. Chaudhry*,
   No. 16-CV-3090 (KBF), 2017 WL 4737263 (S.D.N.Y. Oct. 18, 2017) ................................19

## STATUTES

11 U.S.C. § 101 (54) .........................................................................................................26, 27

11 U.S.C. § 362(a) ..................................................................................................................28

11 U.S.C. § 502(d) ..................................................................................................................30

11 U.S.C. § 544 .......................................................................................................................25

11 U.S.C. § 548.................................................................................................................25, 26, 27

11 U.S.C. § 548(a)(1)(A) ...................................................................................................25, 26

11 U.S.C. § 550 .......................................................................................................................28

11 U.S.C. § 550(a) .............................................................................................................23, 27

11 U.S.C. § 550(a)(1)-(2)........................................................................................................27

N.Y. Debt. & Cred. § 276 .......................................................................................................26

Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* ................... passim

**RULES**

Fed. R. Bankr. P. 7008 ............................................................................................................1

Fed. R. Bankr. P. 7009 .......................................................................................................1, 22

Fed. R. Bankr. P. 7012 ............................................................................................................1

Fed. R. Bankr. P. 7012(b) .....................................................................................................14

Fed. R. Civ. P. 8 ............................................................................................................. passim

Fed. R. Civ. P. 8(a) ..........................................................................................................18, 19

Fed. R. Civ. P. 8(d) ................................................................................................................18

Fed. R. Civ. P. 9 ..............................................................................................................22, 23

Fed. R. Civ. P. 9(b) ........................................................................................................ passim

Fed. R. Civ. P. 12(b)(1)................................................................................................... passim

Fed. R. Civ. P. 12(b)(6)................................................................................................... passim

**OTHER AUTHORITIES**

5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1248
     (3d ed. Apr. 2018 Update) ............................................................................................19

Defendants[1] respectfully submit this motion (the "Motion") to dismiss certain claims asserted in the above-captioned adversary complaint (the "Complaint") filed by Salvatore LaMonica, the chapter 7 Trustee ("Trustee") of the jointly-administered estates of TransCare Corporation and its debtor affiliates (collectively, "TransCare").[2]   Defendants bring this Motion pursuant to Rules 8, 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") as made applicable to this adversary proceeding by Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and request that the Court dismiss the following claims on the following bases:

- Claims asserted in Counts I (Breach of Loyalty), II (Aiding and Abetting Breach of Loyalty), and VI (Lender Liability) of the Complaint against all Defendants stemming from the WARN adversary proceeding, because the Trustee lacks Article III standing to bring those claims, and thus, the Court lacks subject matter jurisdiction over such claims;

- Counts II (Aiding and Abetting Breach of Loyalty) and VI-IX of the Complaint against the Entity Defendants, because the Trustee fails to satisfy the necessary pleading standards set forth in Rule 8 and, as to Counts VII (Fraudulent Transfer) and VIII (Recovery of Avoided Transfers) of the Complaint, on the alternative basis that he fails to comply with Rule 9(b);

- Counts VII (Fraudulent Transfer) and VIII (Recovery of Avoided Transfers) of the Complaint against all Defendants except PPAS, because the Trustee fails to allege that any other Defendant was the recipient of estate property, as required under controlling law;

---

[1] The Defendants in this adversary proceeding are:  Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001-1, Limited ("ARK II"), Ark Investment Partners II, L.P. ("AIP II"), LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC , Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc. ("TT"), and Transcendence Transit II, Inc. ("TT II", and together with TT, "Transcendence").  As used herein, the term "Entity Defendants" refers collectively to all defendants except Ms. Tilton.

[2] The names of each of the debtors are set forth in footnote 1 of the Complaint ("Compl.") (Dkt. No. 1).

- Count III (Equitable Subordination) of the Complaint against Defendant Patriarch Partners, because the Trustee fails to sufficiently plead any inequitable conduct by Patriarch Partners, as required under controlling law; and

- Count V (Objections to Claims, Lien Avoidance) of the Complaint against Defendants Patriarch Partners and PPMG, because the Trustee has not sufficiently pleaded any avoidance claim against either entity, which is a prerequisite to the relief sought against them in Count V.

In support of the Motion, Defendants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      At the heart of the Trustee's Complaint is the nonsensical assertion that Defendant Lynn Tilton, aided by the Entity Defendants she controls, caused TransCare to fail in order to benefit herself and the Entity Defendants.  Nothing could be further from the truth.

2.      The lynchpin of this assertion (and indeed the entire Complaint) is the sensational (and utterly spurious) accusation that Ms. Tilton "sought to strip TransCare of its most profitable business units for the benefit of herself and her companies" through "an ill-conceived 'foreclosure' plan [that allegedly] revealed Tilton's motivation for her otherwise inexplicable directives forbidding TransCare to recognize value from its assets."  Compl. ¶¶ 4-5.

3.      The Trustee's accusation is, however, pure fiction.  The reality is, for reasons having nothing to do with any alleged "disloyalty" on the part of Ms. Tilton or any other alleged misconduct by any of the Defendants (of which there was none), in early 2015 TransCare began to suffer from liquidity issues.  Those liquidity issues negatively impacted TransCare's ability to pay its landlords and vendors, and maintain its ambulance fleet.  At this same time, Wells Fargo National Association ("Wells Fargo"), TransCare's revolving loan lender, repeatedly and without

prior notice, imposed severe restrictions on TransCare's daily funding, creating cash crisis after

cash crisis, and increasing TransCare's financial instability.[3]

4.      In the face of increasing liquidity issues and Wells Fargo's destructive actions,

throughout 2015 and into early 2016, Ms. Tilton tried mightily to turn TransCare around and

help it recover.  Indeed, despite his misguided attempt to tell a salacious story, the Trustee cannot

help but admit that Ms. Tilton undertook *extraordinary* efforts to save TransCare during this

time of distress.  Her actions speak for themselves.  For example:

- Although Ms. Tilton had no legal obligation to do so, the Trustee admits that Ms. Tilton, through her personal investment vehicles, repeatedly loaned substantial sums to TransCare so it could make payroll and meet other expenses.  *See, e.g.,* Compl. ¶¶ 49, 61.

- The Trustee acknowledges that, while she was making these loans to TransCare, Ms. Tilton pursued multiple potential solutions to TransCare's numerous problems, including developing a plan to restructure the company, which Ms. Tilton proposed to Wells Fargo.  *See, e.g.*, Compl. ¶¶ 73, 75.

5.      These actions to rescue TransCare did not occur in a vacuum, or under cover of

night as the Trustee would have the Court believe, but were part of a carefully constructed plan

developed with Wells Fargo and its chosen professional advisors.  Specifically, in early 2016,

Ms. Tilton discussed with Wells Fargo and Carl Marks Advisory Group, LLC ("Carl Marks")

(the restructuring firm retained by TransCare at Wells Fargo's insistence), a restructuring plan to

avoid a shutdown of TransCare's most profitable business lines and prevent a "fire sale"

liquidation of TransCare's assets.  Pursuant to the restructuring plan, the assets of the more

profitable business lines would be foreclosed upon and sold to new entities (*i.e.*, Transcendence),

---

[3] For example, although Wells Fargo is barely mentioned in the Trustee's Complaint, these restrictions, which reduced TransCare's funding availability, were the direct and proximate cause of TransCare's delayed payroll in July 2015.  Like so many other falsities in the Complaint, the Trustee misplaces the blame for this event on the very party who sought to rescue TransCare.

which could sustain their operations. The transition would be gradual. TransCare would continue to use the assets sold to Transcendence for a period of time in order to effectuate TransCare's orderly wind-down in chapter 11, for which Wells Fargo would provide certain funding.

6.     The benefits of the restructuring plan were many. First, it would avoid an immediate shutdown of TransCare, and preserve the value of TransCare's profitable business units. This, in turn, would save jobs (with many employees having an opportunity to continue their service with Transcendence). Moreover, vital ambulance, passenger inter-hospital and medical facility transportation services would continue to be provided pursuant to contractual arrangements already in place. Finally, the restructuring plan contemplated that the balance of TransCare's business would be placed into a Chapter 11 proceeding for an orderly wind-down. Unfortunately, despite Ms. Tilton's best efforts, the restructuring plan did not come to fruition.

7.     While the Trustee falsely alleges that the restructuring plan developed by Ms. Tilton "was so outrageous that it collapsed of its own accord within hours of going live" (Compl. ¶ 5), in reality, both the Trustee and Wells Fargo bore responsibility for such "collapse." It was Wells Fargo's eleventh-hour decision to decline to fund payroll that caused the immediate shut-down of TransCare's business and Chapter 7 filing. Further, the Trustee's own interference with the transfer of assets from TransCare to Transcendence ultimately doomed the plan Ms. Tilton worked so tirelessly to develop and implement. It is undisputed that the Trustee's and Wells Fargo's actions resulted in the immediate shutdown of all of TransCare's business lines, and directly caused the value-destructive fire-sale liquidation that followed.

4

8.    In this context, and as more fully set forth below, much of the Complaint must be dismissed as facially and/or legally deficient.[4]

9.    <u>First</u>, the Trustee lacks standing to assert certain of the central claims alleged in Counts I (Breach of Loyalty), II (Aiding and Abetting Breach of Loyalty), and VI (Lender Liability) because the Trustee has repeatedly *denied* that he has suffered any injury related to these claims.   The claims in these Counts seek damages arising from what the Trustee characterizes as "unpaid asserted claims" under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*, and the New York Worker Adjustment and Retraining Notification Act (collectively with the WARN Act, "WARN"), N.Y. Labor Law § 860, *et seq.* and are premised on speculative, contingent claims asserted in another adversary proceeding before this Court (the "*Ien* WARN Litigation").   Compl. ¶ 102.[5]   But TransCare's estate has not actually been, and will not imminently be, harmed on account of any alleged WARN violations.   On the contrary, the Trustee, who is defending TransCare's estate in the *Ien* WARN Litigation, has consistently and steadfastly *denied* any liability.   Without any actual or imminent harm, there can be no "injury in fact," and the Trustee lacks Article III standing to bring claims here.   Consequently, this Court lacks subject matter jurisdiction to entertain the Trustee's claims in Counts I, II, and VI for damages arising from the *Ien* WARN Litigation, and those claims should be dismissed against all Defendants.

---

[4] Since this is a motion to dismiss, Defendants do not address all of the myriad factual misstatements and misrepresentations that litter the Complaint and reserve all rights and defenses regarding those allegations.   Defendants further note that many of the allegations are based on mischaracterizations and misrepresentations of documents that the Trustee purportedly relies upon, but has not attached to his Complaint.   To the extent any allegations of wrongdoing by Defendants are not directly disputed in this Motion or taken as true *for the purposes of this Motion only*, Defendants' vehemently and steadfastly deny them.

[5] The *Ien* WARN Litigation is styled *Shameeka Ien v. Transcare Corp., et al.*, Case No. 16-01033 (SMB).

10.     <u>Second</u>, Counts II (Aiding and Abetting Breach of Loyalty) and VI-IX must be dismissed because the Trustee has engaged in impermissible "group pleading" with regard to the Entity Defendants.    Commencing with the fourth paragraph of the Trustee's 138-paragraph Complaint, the Trustee improperly lumps together *thirteen separate corporate entities*, conflating them into one "entity" the Trustee calls "Patriarch."    Compl. ¶ 4.    By doing so, the Trustee fails to comply with the most basic pleading requirements of Rules 8 and 9(b) (in the case of the Trustee's claims alleging actual fraudulent transfer), which mandate the Trustee *separately plead* the alleged misconduct of *each* of these *thirteen individual Entity Defendants*. Instead of complying with the Federal rules governing pleadings and providing the appropriate notice mandated to achieve a "just, speedy, and inexpensive determination" of the action, the Trustee makes repeated sweeping allegations about "Patriarch" or "Defendants" as a whole. Courts have soundly rejected the type of boilerplate, undifferentiated, white-wash allegations pleaded by the Trustee.    No different result is warranted here.    In short, Counts II and VI-IX of the Complaint violate Rules 8 and 9(b) because they fail to put each and every individual Entity Defendant on notice as to the basis for the claims asserted against it; and, accordingly, these Counts should be dismissed against the Entity Defendants.

11.     <u>Third</u>, Counts VII (Fraudulent Transfer) and VIII (Recovery of Avoided Transfers) must be dismissed as to all Defendants (except PPAS) because the Trustee has not alleged, and cannot allege, that any TransCare assets were *actually transferred* by TransCare to Ms. Tilton or any of the Entity Defendants (save for PPAS as administrative agent under the credit agreement pursuant to which TransCare's secured lenders made loans to TransCare).[6]    To

---

[6] The duplicity of Trustee's allegations renders Count VII meaningless.    On the one hand, Trustee alleges that the strict foreclosure was "ineffective" (Compl. ¶ 128), while simultaneously asserting simply that "to the extent the strict foreclosure was effective" it was merely made while TransCare was insolvent (Compl. ¶ 129).    Neither of these statements is sufficient to support the relief requested.    Worse, the

state a claim for actual or constructive fraudulent transfer, and to avoid such alleged transfers, the Trustee must specifically allege a "transfer" of TransCare assets was made to each individual Defendant. The Trustee has not alleged that any such transfer was made to any specific Defendant besides PPAS (as administrative agent); therefore, these Counts should be dismissed against all of the other Defendants.

12.    <u>Finally</u>, Counts III (equitable subordination) and V (objections to claims and liens) are legally deficient because the Trustee failed to plead the requisite facts to sustain those claims as against Patriarch Partners (with respect to Count III and Count V) and PPMG (Count V). The Trustee's claims in Count III against Patriarch Partners should be dismissed because the Complaint is devoid of any alleged facts—let alone well-pleaded facts—identifying the particular conduct (inequitable or otherwise) of Patriarch Partners that could warrant subordination of its claims. Likewise, the Trustee's claims in Count V to disallow the claims of Patriarch Partners and PPMG are legally deficient because the Trustee has not sufficiently pleaded any avoidance claim against either entity.

13.    In short, the Complaint is as overbroad as it is overblown. Worse, the Trustee's requested relief is a perfect illustration of the old maxim "no good deed goes unpunished"— rather than crediting Ms. Tilton for her (i) extraordinary efforts, (ii) well-laid plans, and (iii) millions of dollars in loans she extended to TransCare from her personal investment vehicles, the

---

allegations (that value was somehow taken from the Debtors' estates) are belied by the fact that the Trustee entered into a comprehensive stipulation with certain of the Defendants to permit the sale of the "allegedly transferred" assets at an auction conducted by the Trustee's auctioneer, with the proceeds being set aside to satisfy the Debtors' obligations to its creditors. Pursuant to that agreed order, 80% of the proceeds went to satisfy the claims of PPAS as administrative agent (the rest went to the auctioneer, Trustee, and to satisfy other costs of the Estate). *See Stipulation Respecting the Sale of Certain Personal Property*, Case. No. 16-10407 at Docket 52.

Trustee instead has engaged in character assassination and seeks to thwart the repayment of the critical emergency loans that helped keep TransCare operating for as long as it did.

## THE TRUSTEE'S ALLEGATIONS RELEVANT TO THIS MOTION[7]

14.    Set forth below are the facts relevant to Defendants' Motion as alleged by the Trustee.  Far from stating a claim, these facts support the relief requested in Defendants' Motion.

### A. TransCare owed Principal and Interest to Its Lenders Pursuant to a Credit Agreement, and PPAS as Administrative Agent held a Senior, First Priority Lien.

15.    TransCare was formed in 1993.  It provided emergency medical transportation services and disability transportation services throughout the Northeast.  Compl. ¶ 28.

16.    In 2003, TransCare, in connection with a bankruptcy reorganization proceeding, issued approximately 51% of its shares in the reorganized TransCare to Tilton-owned entities Ark II and AIP.  At that time, TransCare replaced its existing senior secured credit facility with a new credit facility memorialized by a credit agreement dated August 4, 2003 (the "Credit Agreement").  TransCare's debt obligations to Ark II and AIP, as well as other pre-petition senior secured creditors, were set forth in the Credit Agreement. Id. ¶ 3.

17.    Pursuant to the terms of the Credit Agreement, PPAS served as the administrative agent to the lenders thereunder.[8]  *Id.*

---

[7] *See*, *supra*, Fn. 4.

[8] More specifically, pursuant to sections 5.4, 5.9, and 11.1-11.12 of the Credit Agreement, PPAS, as administrative agent, accepted interest and debt payments from TransCare and applied those payments to the loans and credit commitments of the various lenders, keeping track of the debits and credits of each separate loan.  *See* Declaration of Nicole Eichberger ("Eichberger Decl."), Exhibit A, Excerpts of Credit Agreement, TRBK0000057, 0059-0060, 0091-0095.  As evidenced in the Credit Agreement, in addition to Ark II and AIP, PPAS also collected payments on behalf of the various "Zohar" funds created, owned, and until March 2016 managed, by Ms. Tilton, as well as other lenders entirely unaffiliated with Ms. Tilton or any entity she controls, including, but not limited to, First Dominion Funding I and Credit Suisse Alternative Capital, Inc.  Eichberger Decl., Ex. A, at TRBK0000116-0120, 0166.

18.     Beginning in 2003, TransCare paid PPAS, as administrative agent under the Credit Agreement, "around $3 to $4 million dollars per year" in interest stemming from TransCare's debt obligations under the Credit Agreement.  Compl. ¶¶ 29-30.

19.     PPAS was granted a senior secured lien on all of TransCare's assets and had a first lien position in TransCare's vehicles.  *Id.* ¶¶ 29, 33.

**B.  Lowball Offers to Purchase TransCare Assets Were Not Sufficient to Pay TransCare's Debt.**

20.     By early 2015, TransCare was under severe financial pressure.  *Id.* ¶ 42.

21.     According to the Complaint, to address TransCare's liquidity issues, then-CEO Glenn Leland ("Leland") encouraged Ms. Tilton to sell TransCare's contract with the Metropolitan Transportation Authority (the "MTA") under which TransCare provided certain paratransit services (the "MTA Contract").  Compl. ¶ 43.

22.     However, the MTA Contract was "TransCare's most profitable business unit," and the paratransit services offered through the MTA Contract historically generated revenues of more than $20 million and EBITDA ranging from $2.2 million to $3.7 million.  *Id.* ¶¶ 41, 74.

23.     The MTA Contract had, based on revenue and EBITDA multiples, an implied value of between $22 and $36 million.  *Id.* ¶74

24.     The Trustee alleges that in February 2015 Leland advised "Patriarch" of an opportunity to sell the MTA Contract to National Express, another transit company, for an estimated offer of $15 to $18 million.  *Id.* ¶¶ 43, 74.

---

The Credit Agreement and all amendments thereto are 1305 pages in length in total, and were produced to the Trustee and Trustee's counsel in the course of this bankruptcy proceeding on December 11, 2017, at TRBK0000001-1305.  The Trustee cites to and relies upon the Credit Agreement.  *See, e.g.,* Compl. ¶ 11. Therefore, Defendants may refer to the Credit Agreement in their motion to dismiss without the motion converting to one for summary judgment.  *See, e.g., In re Nat'l Bank of Anguilla (Private Banking Trust) Ltd.*, 580 B.R. 64, 71 (Bankr. S.D.N.Y. 2018) (holding that the Court may consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); *In re Lyondell Chem. Co.*, 491 B.R. 41, 50 (Bankr. S.D.N.Y. 2013) (same).

25.     The Trustee further alleges that:

- Leland continued to explore the sale of the MTA Contract business and other TransCare assets throughout 2015.  Compl. ¶¶ 55-60, 68-71.

- Leland informed "Patriarch" in July 2015 that he had received offers to buy all or parts of TransCare, including the MTA Contract.  *Id.* ¶¶ 55-56.

- In July 2015, Leland forwarded to "Patriarch" a letter of intent from National Express to purchase the MTA Contract for $6 to $7 million plus the assumption of $2 million in related liabilities, approximately half of National Express' prior offering price.  *Id.* ¶¶ 44, 57.

- In December 2015, Leland again advised "Patriarch" National Express was interested in purchasing the MTA Contract for $6 to $8 million.  *Id.* ¶ 68.

26.     As to each of these allegations, the Trustee claims Ms. Tilton refused to allow Leland to engage in discussions to sell the MTA Contract.  *Id.* ¶¶ 58–60, 69.

27.     However, nowhere in the Complaint does the Trustee allege that any sale of the MTA Contract would have generated value sufficient to satisfy TransCare's outstanding debt obligations.

28.     Within this same time period, the Trustee claims that Ms. Tilton directed that interest payments be made to TransCare's lenders instead of allocating those funds to payroll or other TransCare obligations.  Compl. ¶¶ 53, 60, 67.

29.     For example, the Trustee alleges that:

- Ms. Tilton authorized TransCare to make interest payments to PPAS in June 2015 despite concerns expressed by Leland.  *Id.* ¶¶ 51 – 53.

- The Trustee further alleges that TransCare had multiple lenders, all of whom were due interest payments from TransCare.  *Id.* ¶ 52.

30.     However, as the Trustee surely understands, pursuant to the Credit Agreement the failure to pay interest was an event of default, and such default could not be waived by PPAS if TransCare failed to make the interest payments that PPAS collected and remitted to TransCare's lenders.  Eichberger Decl., Ex. A, Section 12.1, at TRBK0000096.[9]

31.     Accordingly, as acknowledged by the Trustee, Ms. Tilton caused "Patriarch" entities to lend funds to TransCare throughout 2015 to keep it afloat.  Compl. ¶ 49 (Tilton "was forced to authorize Patriarch to lend additional funds to TransCare in order to make payroll");[10] id. ¶ 61 ("On July 8 and 16, 2015, Tilton caused "Patriarch" to lend over $1.3 million to TransCare to fund payroll, bounced checks and immediate needs.").

### C. Transcendence

32.     The Trustee alleges that by late 2015, Ms. Tilton and "Patriarch" decided to take the MTA Contract, among other TransCare assets, for themselves and then fraudulently convey them to Transcendence.  Compl. ¶¶ 72-75.[11]   While acknowledging that the plan to sell TransCare was disclosed to Wells Fargo and that Wells Fargo had received a "proposal" from Tilton and "Patriarch" (Compl. ¶¶ 73 and 75), the Trustee claims this alleged plan by Ms. Tilton

---

[9] See also, Compl. ¶ 52 ("we have re-approached the subject of interest payment today with the board. TransCare must pay interest today *as [Patriarch Partners Management Group LLC] is not the only lender.*") (emphasis added).

[10] "Forced" is a misleading word choice.  Nowhere in the Complaint does the Trustee allege that Ms. Tilton or any of the Entity Defendants or any other lender had any contractual or other obligation to make these loans.  Such loans were made at TransCare's request and were in TransCare's best interests.

[11] The Trustee rarely specifies in his pleading which of the Entity Defendants assisted Ms. Tilton with this allegedly illicit plan or with whom certain identified individuals were affiliated or employed.  (*See, e.g.*, id. ¶ 78 ("Patriarch . . . decided to take TransCare's most valuable assets for themselves and cause TransCare to file for bankruptcy . . . ."); id. ¶ 84 ("[P]atriarch caused TransCare's employees to work on projects on Patriarch's behalf in support of the Transcendence plan rather than for TransCare's business operations."); id. ¶ 85 ("Patriarch endeavored to keep [the Transcendence plan] secret even while it directed TransCare's remaining executives to prepare the transition . . . .")).

and "Patriarch" would ensure valuable assets would not be available to satisfy claims of TransCare's creditors when Ms. Tilton caused TransCare to file for bankruptcy. *Id.* ¶ 78.

33.    On February 10, 2016, the Trustee alleges, Ms. Tilton caused Transcendence to be incorporated. *Id.* ¶ 81.

34.    The Trustee also alleges that on February 24, 2016, the same day TransCare filed for bankruptcy protection, PPAS effectuated an Article 9 strict foreclosure of certain of TransCare's assets, including the assets necessary to conduct the MTA Contract business, in satisfaction of $10 million of the amount owing under the Credit Agreement. *Id.* ¶ 90.

35.    Further, the Trustee alleges that on February 24, 2016, Ms. Tilton signed a written consent on behalf of Transcendence authorizing it to enter into transactions transferring and assigning property from TransCare to Transcendence. *Id.* ¶¶ 92-93.

36.    The Trustee acknowledges, however, that this supposedly nefarious plan was effectuated in plain sight with the assistance of TransCare employees and third-party advisors. *See, e.g.,* Compl. ¶¶ 73, 79, 82.  For example,

- The Trustee alleges that Carl Marks (the restructuring advisor TransCare retained at the direction of Wells Fargo) prepared profit and loss statements for Transcendence based upon the TransCare business to be transferred. *Id.* ¶ 82.

- The Trustee also claims that TransCare executives modeled which TransCare business units would be transferred to Transcendence, how those units would be transferred, and the amount of revenue they could be expected to generate for Transcendence. *Id.* ¶ 84.

- Further, the Trustee contends that one of Ms. Tilton's colleagues engaged in discussions with the MTA, a public authority, about transferring the MTA Contract to a different entity. *Id.* ¶ 79.

37.    Notwithstanding these acknowledgements that TransCare executives, Carl Marks and Wells Fargo all knew of the restructuring plan, the Trustee flatly contradicts himself by also

alleging that the plan to move assets to Transcendence was conducted in secret and "Patriarch employees" under Ms. Tilton's command plotted to take TransCare's assets "under cover of night." Compl. ¶¶ 5, 85.

38.     While the Trustee alleges that the strict foreclosure was effectively an attempt to "steal" TransCare's assets[12] (Compl. ¶¶ 5-6), the Trustee also acknowledges that PPAS – the entity who is alleged to have effectuated the foreclosure – had a security interest in the very TransCare assets Ms. Tilton and "Patriarch" allegedly attempted to "steal."  In other words, despite the Trustee's contradictory allegations, it is indisputable that *PPAS had a right to foreclose on the TransCare assets in which it possessed a security interest when TransCare defaulted to its lenders.  Id.* ¶¶ 29, 33.

39.     In any event, the Trustee ultimately contends that the efforts to transfer assets to Transcendence were unsuccessful:

- "TransCare's paratransit and other business operations" would not continue "under the Transcendence label."  Compl. ¶ 94.

- "[T]he Transcendence plan would not succeed."  *Id.* ¶ 95.

- TransCare executives refused to transfer assets to Transcendence. *Id.* ¶¶ 95-96.

- The strict foreclosure was "ineffective."  *Id.* ¶ 128.

40.     In sum, the simple facts, *as alleged by the Trustee*, are that:  (i) TransCare owed money to its secured lenders under a Credit Agreement, pursuant to which PPAS served as administrative agent, (ii) repeated lowball offers to purchase the company or its key contract

---

[12] In asserting these allegations, the Trustee badly misrepresents the very email he cites in support, as well as the context in which it was sent.  He falsely alleges that a "Patriarch" employee "directed [employees] to steal assets from TransCare."  Compl. ¶ 95.  But the text of the email he references to support that allegation says no such thing, rather it merely asks the recipient to "*secure* as many assets (ambulances, equipment, etc.) as possible…."  (emphasis added).

were not enough to rescue the company, so Tilton arranged for loans from her personal investment vehicles to be made to cover TransCare's operating expenses, (iii) Tilton disclosed to TransCare executives, Wells Fargo and Carl Marks the "proposal" to restructure TransCare, but (iv) the restructuring was not successfully effectuated.

## **STANDARD OF REVIEW**

41.     A complaint will be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction if plaintiff lacks standing to bring the claims alleged in his complaint.[13]  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  If subject matter jurisdiction is at issue, the court may consider evidence presented by affidavit or otherwise.  *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986).

42.     A complaint will also be dismissed under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted," and the claims do not rest on factual allegations sufficiently plausible to support the material elements of the claim and raise a right to relief above the speculative level.  Fed. R. Civ. P. 12(b)(6); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 667-78 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555).

---

[13] Rule 12(b)(1) is made applicable to bankruptcy proceedings by Bankruptcy Rule 7012(b).  *In re 680 Fifth Ave. Assocs.*, 209 B.R. 314, 320 (Bankr. S.D.N.Y. 1997).

## **ARGUMENT**

I.    **The Claims in Counts I, II, and VI of the Complaint Arising From Alleged WARN Liability Should Be Dismissed Pursuant to Rule 12(b)(1) Because the Trustee Lacks Article III Standing to Assert Them.**

43.    To satisfy the "irreducible constitutional minimum" of Article III standing, the United States Supreme Court has held that the plaintiff bears the burden of establishing (i) an "*injury in fact*," (ii) a "causal connection" between that injury and the complained-of conduct, and (iii) a likelihood "that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (emphasis added). To establish an injury in fact, the plaintiff must show the stated injury is "actual or imminent, not conjectural or hypothetical." *Spokeo v. Robbins*, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 560). An allegation of future injury may be sufficient to confer standing, provided that the threatened injury is "certainly impending" or there is a "substantial risk" the alleged injury will occur. *Clapper v. Amnesty Int'l USA*, 586 U.S. 398, 414 n.5 (2013).

44.    By his own admission, the Trustee lacks constitutional standing to bring certain claims in Counts I, II, and VI. Specifically, the Trustee asserts a claim for damages in Count I (against Ms. Tilton), and in Counts II and VI (against the Entity Defendants), on the basis that "TransCare's estates have suffered unpaid asserted claims" for WARN liability resulting from the alleged actions of Ms. Tilton and the Entity Defendants. *See, e.g.*, Compl. ¶ 102.

45.    At the same time, the Trustee concedes that TransCare's estates currently face only "*potential* liability under the WARN Act and the NY WARN Act" because liability has not yet been found or damages assessed against TransCare. *Id.* ¶ 101 (emphasis added). In other words, there is no "injury in fact," and, worse, there is no "impeding" or "imminent" injury on the horizon. On these facts alone, the Trustee lacks Article III standing to assert his claims.

15

46.    There's more.  Fatal to the Trustee's assertion is the fact that the Trustee, in his

capacity as the representative of TransCare's estate, _denied any WARN liability_ in his Answer in

the _Ien_ WARN Litigation and has asserted numerous defenses to liability in that case.  _Ien_

WARN Litigation, Dkt. 24, Trustee's Answer, p. 17 ("the Trustee of the Debtors' Estates denies

that Plaintiff or any putative class members are entitled to any relief . . . .").

47.    Courts have routinely held that a claim for damages dependent upon an outcome

in a separate litigation constitutes a "nebulous future event," which does not rise to actual or

imminent injury to confer Article III standing.  _See, e.g., Karim v. AWB Ltd_., 347 F. App'x 714,

715–16 (2d Cir. 2009) (dismissing claim because damages allegation too "conjectural or

hypothetical" to show injury-in-fact); _Plantronics, Inc. v. United State_s, No. 88 CIV 1892, 1990

WL 3202, at *1 (S.D.N.Y. Jan. 9, 1990) (dismissing case for lack of subject matter jurisdiction

because damages were "speculative until such time as the underlying products liability claims

against [plaintiff] Plantronics [were] decided in state court"); _Whitney Lane Holdings, LLC v.

Sgambettera & Assocs., P.C._, No. 08-CV-2966 (JS)(AKT), 2010 WL 4259797, at *5 (E.D.N.Y.

Sept. 8, 2010) (dismissing claim for lack of ripeness where liability was contingent on outcome

of pending litigation); _Pall v. KPMG, LLP_, No. 3:03CV00842 AWT, 2006 WL 2800064, at *2-3

(D. Conn. Sept. 29, 2006) (dismissing a claim for damages contingent on the results of a separate

litigation and holding "because there has been no determination of liability and damages in the

related actions, the injury remains speculative") (quoting _Thomas v. City of New York_, 143 F.3d

31, 34 (2d Cir.1998)).

48.    _San Diego Unified Port District v. Monsanto Co_., No. 15-cv-578, 2018 WL

626315, (S.D. Cal. Jan. 30, 2018), is instructive.    There, the defendant filed several

counterclaims against the plaintiff related to contamination of the San Diego Bay.  The defendant

16

alleged plaintiff's discharge of pollutants created "significant contingent liability" for defendant, including liability that could arise from the pending lawsuit, as well as potential future, federal, state or local regulatory actions. *Id.* at *2. The court found these contingent liabilities insufficient to constitute an injury-in-fact, and held the defendant had no standing to assert its counterclaims:

> In this case, [defendant's] alleged contingent liability is premised on liability that "may arise" in this action and pending and future litigation and regulatory action over [defendant's] responsibility for the presence of [pollutants] in the Bay . . . [Defendant] has failed to set forth factual allegations to demonstrate a "significant immediate injury" that is "directly" affecting [defendant]. The threat that [Defendant] may be found liable in this action, the action brought by the City of San Diego, or future actions remains speculative . . . . [Defendant] fails to allege facts sufficient to permit a reasonable inference that its purported contingent liability constitutes an "actual or imminent" injury-in-fact sufficient to confer Article III standing.

*Id.* at *9 (internal quotations and citations omitted).

49. Similarly, in *Plantronics*, the plaintiff (Plantronics) brought a federal claim for indemnification against the United States for the *potential* damages it *might* incur in a product liability action pending in state court in which Plantronics was a defendant. *Plantronics, Inc.*, 1990 WL 3202, at *1. The underlying state court action had not been adjudicated and no liability assessed; therefore, the court ruled the damages were too speculative and dismissed Plantronics' indemnification claim for lack of subject matter jurisdiction. *Id.*

50. Like *Monsanto* and *Plantronics*, the Trustee seeks to recover damages based on *possible* future liability in the pending WARN Litigation, where such an outcome is far from certain and not at all imminent. *Monsanto Co.*, 2018 WL 626315, at *9; *Plantronics, Inc.*, 1990 WL 3202, at *1. Like the courts in *Monsanto* and *Plantronics*, this Court should dismiss the

17

claims for lack of Article III standing and the Trustee's inability to establish subject matter

jurisdiction.

51.    In short, the Trustee has no Article III standing to assert his claims for damages

based on *potential* WARN liability in Counts I, II, and VI, and those claims should be dismissed

for lack of subject matter jurisdiction.

## II.    Counts II and VI – IX Should Be Dismissed as to All Entity Defendants Because the Trustee's Improper Group Pleading Is Insufficient Under the Federal Rules of Civil Procedure.

### A.    The Trustee Fails to Satisfy the Minimum Pleading Standard of Rule 8 in Counts II and VI-IX by "Lumping" all Entity Defendants Together.

52.    Rule 8 of the Federal Rules of Civil Procedures is entitled "General Rules of

Pleading" and sets forth the minimum requirements for a pleading.

53.    To comply with Rule 8, a pleading must contain:

1.    a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

2.    a short and plain statement of the claim showing that the pleader is entitled to relief; and

3.    a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

54.    To comply with Rule 8 "each allegation must be simple, concise, and direct."

Fed. R. Civ. P. 8(d).

55.    In the Second Circuit, a plaintiff violates Rule 8 when it engages in "group

pleading"—i.e., making allegations against a group of defendants generally instead of pleading

the specifics of a claim against each of the defendants individually.  *Atuahene v. City of*

*Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (affirming dismissal of claims against individual

defendants based on the complaint's group pleading allegations) (internal quotation marks omitted); *TheECheck.com, LLC v. NEMC Fin. Servs. Grp. Inc.*, No. 16-CV-8722 (PKC), 2017 WL 2627912, at *2 (S.D.N.Y. June 16, 2017) (same); *Zegelstein v. Chaudhry*, No. 16-CV-3090 (KBF), 2017 WL 4737263, at *1 (S.D.N.Y. Oct. 18, 2017) (same).

56.    Group pleading is improper because a plaintiff must give each defendant "'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Atuahene*, 10 F. App'x at 34 (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)). A complaint fails to give fair notice when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct . . . ." *Id.*; 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1248 (3d ed. Apr. 2018 Update) (Rule 8(a) requires at a minimum, "actions brought against multiple defendants must clearly specify the claims with which each particular defendant is charged.") A complaint must be dismissed when it indiscriminately lumps all defendants together. *See Appalachian Enters., Inc. v. ePayment Sols. Ltd.*, No. 01-11502 (GBD), 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8, 2004) (dismissing complaint where plaintiff "lump[ed] all the defendants together and fail[ed] to distinguish their conduct") (internal quotation marks omitted).

57.    As set forth below, much of the Trustee's Complaint is one, big group pleading. In particular, throughout Counts II (aiding and abetting breach of duty) and Counts VI-IX, the Trustee casually (and improperly) alleges claims against "Patriarch," which is the Trustee's shorthand for some or all of the *thirteen individual* Entity Defendants. In so doing, the Trustee violates Rule 8, which requires the Trustee to separately assert each of his claims and the basis for each claim against each individual Entity Defendant.

58.    For example, in Count II, the Trustee alleges an aiding and abetting claim against
"Patriarch":

> *Patriarch* knowingly and in bad faith assisted Tilton's breaches of fiduciary
> duties of loyalty and good faith in connection with her acts to impede TransCare's
> attempts to monetize its assets, to strip TransCare of those same assets, and to
> make decisions for the benefit of herself, *Patriarch* and her other companies.
> *Patriarch* sought to benefit itself – and did in fact benefit – from Tilton's breaches
> of her fiduciary duties.  Without such aid from *Patriarch*, Tilton's fiduciary
> breaches would not have occurred.

Compl. ¶ 104 (emphasis added).  The Trustee's impermissible use of "Patriarch" as a shorthand

for *thirteen* different companies (as well as their officers, agents and employees), while failing to

identify what each separate entity supposedly did to assist or aid Ms. Tilton's alleged breach of

fiduciary duty, violates Rule 8.

59.    In addition, the Trustee similarly fails to identify how each of the thirteen

individual entities benefitted from these alleged breaches.  Instead of complying with Rule 8, the

Trustee offers a litany of undifferentiated allegations against the Entity Defendants as a group

throughout the Complaint.  For instance, the Complaint alleges that

- "Patriarch" decided to "take TransCare's most valuable assets for
  themselves and cause TransCare to file for bankruptcy . . . ." (*Id.* ¶
  78);

- ". . . Patriarch caused TransCare's employees to work on projects
  on Patriarch's behalf in support of the Transcendence plan rather
  than for TransCare's business operations" (*Id.* ¶ 84); and

- "Patriarch endeavored to keep [the Transcendence plan] secret
  even while it directed TransCare's remaining executives to prepare
  the transition . . . ." (*Id.* ¶ 85).

60.    These statements do not allege any specific act taken by any of the thirteen

individual Entity Defendants to aid Ms. Tilton's purported breach of her fiduciary duties to

TransCare.  Such "lumping" of allegations is precisely what courts in the Second Circuit have

consistently found to be insufficient to comply with Rule 8's notice pleading requirements, and

Count II should be dismissed on that basis.  *See Atuahene*, 10 F. App'x at 34.

61.    Likewise, the Trustee's claim for "Lender Liability, Common Law Breach of

Fiduciary Duty, and Common Law Assumption of Control" in Count VI of the Complaint is

similarly deficient.  In that Count, the Trustee alleges that:

> *Patriarch* was in complete domination of the finances, policy, and business
> practices of TransCare . . . This control was used by *Patriarch* to cause TransCare
> to make transfers and decisions that rendered TransCare unable to pay employees
> and critical vendors (including vendors necessary for the maintenance of the
> TransCare's ambulance fleet), to engage in the failed Transcendence scheme, and
> to deny TransCare the ability to explore refinancing or asset sales.

Compl. ¶ 123, 125 (emphasis added).  These conclusory allegations are asserted only against

"Patriarch" as a group, without putting any of the individual thirteen Entity Defendants on

specific notice of each entity's particular alleged wrongdoing.[14]

62.    The Trustee also resorts to impermissible group pleading in his claims for actual

fraudulent transfer and violation of the automatic stay in Counts VII, VIII, and IX.  In that

regard, the Trustee simply alleges: "*Patriarch* and Tilton – via PPAS – purported to conduct a

'strict foreclosure' of certain valuable assets of TransCare for their own benefit," and

"Defendants," including each of the Entity Defendants, attempted to obtain property of

TransCare post-bankruptcy petition in violation of the automatic stay.  *Id*. ¶¶ 128 (emphasis

added), 137.

---

[14] The Trustee's claim for "Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law
Assumption of Control" should be dismissed as against the Entity Defendants other than the Ark entities
(Ark II and AIP II) for additional reasons.  As an initial matter, a claim for "Lender Liability" is not
recognized under New York law.  *In re E. End Dev., LLC*, No. 8-12-76181-REG, 2017 WL 1277443, at
*3 (Bankr. E.D.N.Y. Apr. 4, 2017); *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 418
(S.D.N.Y. 2000) ("Lender liability is not an independent cause of action, but a term that refers to the
imposition of traditional contract or tort liability on a bank or other financial institution.").  Moreover, the
Trustee does not even allege a lender-borrower relationship for any of the named defendants with the
exception of the Ark entities and PPMG.  The Trustee is well aware, however, that PPMG had no lending
relationship with TransCare, and that claim should be voluntarily withdrawn and/or dismissed as to it.

63.    For the reasons discussed above, the Trustee's sweeping references to "Patriarch"

and "Defendants" as a single monolithic unit violate Rule 8 as a matter of law, and all Counts

containing such impermissible group pleading should be dismissed on that basis.

**B.    Counts VII and VIII Should Also Be Dismissed Because They Fail to Meet the Heightened Pleading Standard of Rule 9(b) for Claims of Actual Fraud.**

64.    Rule 9, entitled "Pleading Special Matters," sets forth specific requirements for

claims alleging actual fraud.    In particular, the Rule requires,

> (B) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party
> must state with particularity the circumstances constituting fraud or mistake.
> Malice, intent, knowledge, and other conditions of a person's mind may be alleged
> generally.

Fed. R. Civ. P. 9(b).

65.    The heightened pleading standards imposed by Rule 9(b), made applicable here

by Bankruptcy Rule 7009, also do not permit group pleading when a plaintiff alleges that

multiple defendants have engaged in fraud.  *In re AlphaStar Ins. Group, Ltd.*, 383 B.R. 231, 257-

58 (Bankr. S.D.N.Y. 2008) (Bernstein, J.).  Rule 9(b) applies to all claims based on purported

fraud.  *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir. 2004).  "Where multiple defendants are

asked to respond to allegations of fraud, the complaint should inform each defendant of the

nature of his alleged participation in the fraud."  *DiVittorio v. Equidyne Extractive Indus. Inc.*,

822 F.2d 1242, 1247 (2d Cir. 1987).  "The pleading must give notice to *each* opposing party of

its alleged misconduct.  Thus, a claim may not rely upon blanket references to acts or omissions

by all the defendants, for each defendant named is entitled to be apprised of the circumstances

surrounding the fraudulent conduct with which he is individually charged."  *Granite Partners,*

*L.P. v. Bear, Stearns & Co. Inc.,* 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998) (emphasis added).

66.    The heightened pleading standard of Rule 9 has been applied to claims alleging

actual fraudulent transfer.  *In re Tronox Inc.*, 429 B.R. 73, 91-92 (Bankr. S.D.N.Y. 2010).  To

state an actual fraudulent transfer claim with the particularity that Rule 9(b) requires, a party

must ordinarily allege: (1) the property that was conveyed; (2) the timing and, if applicable,

frequency of the transfer; and (3) the consideration paid for the transfer. *See United Feature*

*Syndicate, Inc. v. Miller Features Syndicate, Inc*., 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002).

Here, the Trustee was required to plead with some specificity the property conveyed, the timing

and frequency of that transfer, and the consideration paid with respect to his claims against each

of the thirteen individual Entity Defendants.

67.    Because the Trustee has failed to satisfy the heightened pleading standard of Rule

9(b), Counts VII (Actual Fraudulent Transfer) and VIII (Recovery of Avoided Transfers) of the

Complaint should be dismissed against the Entity Defendants.

- For example, as discussed, *supra* at Fn. 6, the Trustee alleges in Count VII that "*Patriarch* and Tilton – via PPAS – purported to conduct a 'strict foreclosure' of certain valuable assets of TransCare for their own benefit." Compl. ¶ 128 (emphasis added).

- In Count VIII, the Trustee states "*All of the Defendants* were the initial transferees of the Avoided Transfers, the immediate or mediate transferees of such initial transferees, or the entities for whose benefit the Avoided Transfers were made." Compl. ¶ 134. and, "Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiffs are entitled to recover the Avoided Transfers for the benefit of the estates from *all of the Defendants*, plus interest thereon to the date of payment and the costs of this action." Compl. ¶ 135 (emphasis supplied).

68.    In sum, the Trustee alleges that *all of the Entity Defendants*, summarily referred to

as "Patriarch" in the Complaint, engaged in an actual fraudulent transfer of TransCare's assets,

and that "all of the Defendants" must turn over the transferred assets.[15]

---

[15] As discussed above, the Trustee also denies that the strict foreclosure was effective, thereby undercutting his own argument that a transfer occurred.

69.     As a matter of law, the Trustee's allegations related to the purported fraudulent transfer must satisfy Rule 9(b)'s heightened pleading requirements.  However, these allegations fail to specify what role each of the Entity Defendants played in the alleged fraud and are nothing more than "blanket references to acts . . . by all the [Entity] [D]efendants." *Granite Partners, L.P.*, 17 F. Supp. at 286.

70.     Claims like those alleged by the Trustee in Counts VII and VIII against "Patriarch" and "all Defendants" have soundly been rejected by the Second Circuit for failure to meet Rule 9(b)'s pleading standard by lumping all of the defendants together, and Counts VII and VIII should be dismissed as to all Entity Defendants.  *See Natowitz v. Mehlman,* 542 F. Supp. 674, 676 (S.D.N.Y.1982) ("When a plaintiff sues sixteen defendants, he or she has an obligation to allege specifically the fraud perpetrated by each defendant . . . .  The complaint is replete with vague accusations against 'the defendants' without reference to the specific parties or the specific acts."); *Alphastar*, 383 B.R. at 271 (dismissing trustee's claims against individual defendants because trustee "fail[ed] to identify which Individual Defendant committed any particular act.").

71.     Finally, as discussed above at Fn. 6, these fraudulent transfer Counts fall apart when viewed in the light of the Trustee's comprehensive stipulation with certain of the Defendants, which permitted the sale of the "allegedly transferred" assets at an auction conducted by the Trustee's auctioneer.  Pursuant to that stipulation, 80% of the auction proceeds went to satisfy the claims of PPAS (the rest went to the auctioneer, Trustee, and to satisfy other administrative costs of the Estate related to the sale).  *See Stipulation Respecting the Sale of Certain Personal Property*, Case. No. 16-10407 at Docket 52 (the "Stipulation").  This Stipulation, executed by the Trustee, establishes that (i) the assets remained in the custody of the

Trustee, and (ii), the Trustee could not liquidate them without an agreement with PPAS, as PPAS

had *at least* an 80% interest in them (if not more).

**III.    Counts VII and VIII Should Be Dismissed Against All Defendants Other Than PPAS Because the Trustee Failed to Allege Facts Sufficient to Sustain These Claims Pursuant to Rule 12(b)(6).[16]**

72.      In addition to the reasons set forth in Section II, *supra*, Counts VII and VIII of

the Trustee's Complaint should be dismissed against all Defendants except PPAS because, with

respect to each claim as to each of the Defendants (other than PPAS), the Trustee failed to allege

(i) an actual transfer occurred, and (ii) each of these Defendants received any assets from

TransCare.  Both facts are required to sustain a claim under Sections 548 and 544 of the

Bankruptcy Code and N.Y. Debtor and Creditor Law Section 276.

**A.    Count VII Should Be Dismissed Against All Defendants Except PPAS Because the Trustee Failed to Plead TransCare Transferred Estate Property to These Other Defendants.**

73.      Section 548(a)(1)(A) of the Bankruptcy Code permits the trustee to avoid a

transfer if he can establish: (1) the debtor had an interest in the property transferred; (2) *a*

*transfer of that interest occurred* within two years of the filing of the bankruptcy petition; and (3)

the transfer was incurred with actual intent to hinder, delay, or defraud present or future

creditors.  *In re Lyondell Chem. Co.*, 567 B.R. 55, 116 (Bankr. S.D.N.Y. 2017); 11 U.S.C. §

548(a)(1)(A).  For purposes of Section 548, federal law determines "what constitutes a transfer

and when it is complete."  *In re Durso Supermarkets, Inc.*, 193 B.R. 682, 696 (Bankr. S.D.N.Y.

1996) (quoting *Barnhill v. Johnson*, 503 U.S. 393 (1992)).  The Bankruptcy Code defines

---

[16] All Defendants reserve and do not waive all other defenses they may have with respect to Counts VII and VIII of the Complaint.  In particular, but without limitation, PPAS reserves and does not waive any defenses it may have to any actual or constructive fraudulent transfer claims asserted against it by the Trustee, including that any alleged transfer to PPAS was for reasonably equivalent value.  PPAS contends that these claims wholly lack merit.

"transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of *disposing of or parting with* . . . property or . . . an interest in property." 11 U.S.C. § 101 (54) (emphasis added).

74.     Similarly, under New York Debtor & Creditor Law § 276, "[e]very conveyance *made* and every obligation incurred with actual intent . . . to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276 (emphasis added). "To prevail on a claim under section 276 of the New York Debtor and Creditor law, the Trustee must establish (1) the thing transferred has value out of which the creditor could have realized a portion of its claim; (2) that *this thing was transferred or disposed of by debtor*; and (3) the transfer was done with actual intent to defraud." *In re Flutie N.Y. Corp.*, 310 B.R. 31, 56 (Bankr. S.D.N.Y. 2004) (emphasis added) (citation omitted).

75.     Here, the Trustee has failed to plead any facts to satisfy the second element of a fraudulent transfer claim under 11 U.S.C. § 548 and N.Y. Debt. & Cred. Law § 276 as to Ms. Tilton or the Entity Defendants except PPAS because the Trustee does not allege any transfer to any of these Defendants was actually made, *i.e.*, a transfer actually occurred either directly through TransCare or indirectly through PPAS. Indeed, as for Transcendence, the Trustee affirmatively asserts any efforts to transfer assets were unsuccessful. *See* Compl. ¶ 94 (noting that "TransCare's paratransit and other business operations" would not continue "under the Transcendence label"); ¶ 95 (noting it became clear "the Transcendence plan would not succeed"); *id.* ¶ 128 (describing the strict foreclosure as "ineffective").

76.     Taking the allegations in the Complaint as true for purposes of this Motion, the Trustee alleges there was a *failed* attempt to transfer assets to Transcendence. *See, e.g.*, *id.* ¶¶ 24-25 (alleging that Ms. Tilton "directed" TransCare assets be transferred to Transcendence but

failing to allege the transfer actually occurred); *id.* ¶ 95-96 (alleging TransCare executives were

directed to transfer assets to Transcendence, but TransCare personnel refused to comply with the

request).  An *attempt* to transfer assets is simply that, an attempt.  The Trustee states in the

Complaint no interest in TransCare's property was ever "dispos[ed] of or part[ed] with" to

Transcendence.  11 U.S.C. § 101 (54); *Flutie*, 310 B.R. at 56.  The Trustee similarly fails to

allege any interest in TransCare property was ever "dispos[ed] of or part[ed] with to Ms. Tilton"

or the Entity Defendants except PPAS.  As the Trustee concedes in his Complaint, an actual

transfer of TransCare property to Ms. Tilton or the other Entity Defendants never occurred.

77.     Absent any allegations an actual transfer occurred, which the Trustee has not

pleaded and cannot plead, the Trustee's claims in Count VII of the Complaint against Ms. Tilton

and the Entity Defendants except PPAS should be dismissed.

**B.     Count VIII of the Complaint Should Be Dismissed As to All Defendants Except PPAS Because the Trustee Has Failed to Plead Sufficient Facts Establishing that Ms. Tilton or the Other Entity Defendants Are Recipients of TransCare Property Actually Transferred to Them.**

78.     "[T]o the extent a transfer is avoided" under Section 548, Section 550(a) of the

Bankruptcy Code permits a trustee to recover, "for the benefit of the estate, the property

transferred, or, if the court so orders, the value of such property" from either "the initial

transferee of such transfer or the entity for whose benefit such transfer was made" or "any

immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550(a)(1)-(2).

Therefore, to sustain a claim, a plaintiff must sufficiently allege an actual transfer of estate

property occurred *and* the transferee actually received the property.

79.     As discussed directly above, the Trustee fails to allege that an actual transfer of

TransCare estate property occurred, and that Ms. Tilton or the Entity Defendants other than

PPAS were in receipt of TransCare property.  The Trustee also fails to allege that an initial

transferee transferred TransCare property to any of these Defendants.  Because the grounds for

avoiding the relevant transfers have not been sufficiently pleaded, the Trustee's turnover claim

under Section 550 of the Bankruptcy Code in Count VIII of the Complaint should be dismissed

against all Defendants except PPAS.[17]

## IV.    Count III of the Complaint Should Be Dismissed Because the Trustee Failed to Allege Inequitable Conduct Sufficient to Support Equitable Subordination of the Claims of Patriarch Partners.

80.    The Trustee requests the Court equitably subordinate the claims of Patriarch

Partners, PPAS, Ark II, and PPMG.  To obtain such relief, the Trustee must allege inequitable

conduct undertaken by each of these Entity Defendants.  He has not: he has entirely failed to

plead any inequitable conduct on the part of Patriarch Partners.  Accordingly, Count III of the

Complaint should be dismissed as to Patriarch Partners.

81.    The doctrine of equitable subordination permits a bankruptcy court to

"subordinate a particular claim if it finds that the creditor's claim[], while not lacking a lawful

basis nonetheless results from inequitable behavior on the part of that creditor."  *Musso v.*

*Ostashko*, 468 F.3d 99, 109 (2d Cir.2006) (internal quotations omitted).  Courts routinely dismiss

equitable subordination claims when the plaintiff fails to sufficiently plead the requisite

inequitable conduct.  *See In re Hydrogen, L.L.C.*, 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010)

(dismissing equitable subordination claim, even though defendants were insiders, "given the

deficient or entirely absent pleadings" with respect to inequitable conduct); *In re BH S&B*

---

[17]    Relatedly, the Trustee alleges in Count IX of the Complaint: "Defendants in their attempts to obtain the property of TransCare post-petition…constituted violations of the automatic stay provided for in Section 362(a) of the Bankruptcy Code" makes no sense.  Either there was an effective strict-foreclosure prior to the commencement of the bankruptcy, in which case the "property" at issue never became property of the estate, or there was no transfer of property without the consent of TransCare.  As with the other allegations in the Complaint, Defendants deny the allegations in Count IX and reserve all of their rights with respect thereto.

*Holdings, L.L.C.*, 420 B.R. 112, 156-57 (Bankr. S.D.N.Y. 2009) (dismissing equitable subordination claim because plaintiff had not pled that defendant engaged in inequitable conduct or was an insider), *aff'd as modified*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009).

82.     In Count III of the Complaint, the Trustee asks this Court to equitably subordinate the claims of Patriarch Partners.  However, the Trustee fails to sufficiently plead the requisite inequitable conduct against Patriarch Partners.  Count III of the Complaint contains only a cursory allegation that "Patriarch Partners, LLC . . . participated in and benefitted from [] inequitable conduct."  Compl. ¶ 107.  The remaining 137 paragraphs of the Trustee's Complaint do not allege any specific wrongdoing: (i) on the part of Patriarch Partners, (ii) resulting in an injury to creditors, or (iii) which conferred an unfair advantage on Patriarch Partners.  These "naked assertion[s] devoid of further factual enhancement" in Count III of the Complaint do not satisfy Rule 8's requirements, *see Ashcroft v. Iqbal*, 556 U.S. 662,  678 (2009) (internal citation and quotations marks omitted); *In re Hydrogen,* 431 B.R. at 361; *In re BH S&B Holdings,* 420 B.R. at 156-57.  Accordingly, the Trustee's equitable subordination claim should be dismissed against Patriarch Partners.

**V.     As a Matter of Law, Count V of the Complaint Warrants Dismissal Against of Patriarch Partners and PPMG Because the Trustee Has Not Sufficiently Pleaded Avoidance Claims Against Those Defendants.**

83.     In Count V of the Complaint, the Trustee alleges that the Court should disallow the Section 502(d) claims of certain of the Entity Defendants, including Patriarch Partners and PPMG.  To obtain such relief, the Trustee is required to plead sufficient facts under the Bankruptcy Code as to each such Defendant; he has entirely failed to do so with respect to Patriarch Partners and PPMG.

84.     Section 502(d) "preclude[s] entities which have received voidable transfers from sharing in the distribution of the assets of the estate unless and until the voidable transfer has

been returned to the estate." *In re Rhythms NetConnections Inc.*, 300 B.R. 404, 409 (Bankr.

S.D.N.Y. 2003) (quoting *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y.

1986)).  Therefore, a plaintiff bringing a claim Section 502(d) is required to sufficiently allege

that each defendant is an actual "transferee" of an actual transferred asset. *Id.*

85.    The Trustee, however, has not sufficiently pleaded an avoidance claim against

Patriarch Partners and PPMG because he has not asserted any specific allegation that either

Patriarch Partners or PPMG is a "transferee of a transfer avoidable under section . . . 544 . . .

547, [or] 548" of the Code.  11 U.S.C. § 502(d).  Instead, Patriarch Partners and PPMG are

lumped together with eleven other Entity Defendants in sweeping allegations made against

"Patriarch" as a whole. *See, e.g.* Compl. ¶¶ 4, 118.  Therefore, as a matter of law, Count V

should be dismissed as to Patriarch Partners and PPMG.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court enter an

order:

(i)    Dismissing the claims for damages arising from the *Ien* WARN
       Litigation alleged by the Trustee in Counts I, II, and VI of the
       Complaint as to all Defendants pursuant to Fed. R. Civ. P.
       12(b)(1);

(ii)   Dismissing the Trustee's claims in Counts II and VI-IX of the
       Complaint as to the Entity Defendants for failure to comply with
       Fed. R. Civ. P. 8;

(iii)  Dismissing the Trustee's claims in Counts VII and VIII of the
       Complaint as to the Entity Defendants for failure to comply with
       Fed. R. Civ. P 9(b);

(iv)   Also dismissing the Trustee's claims in Counts VII and VIII of the
       Complaint against Ms. Tilton and the Entity Defendants other than
       PPAS pursuant to Fed. R. Civ. P. 12(b)(6);

(v)     Dismissing the Trustee's claims in Count III of the Complaint against Patriarch Partners pursuant to Fed. R. Civ. P. 12(b)(6);

(vi)    Dismissing the Trustee's claims in Count V of the Complaint against Patriarch Partners and PPMG pursuant to Fed. R. Civ. P. 12(b)(6); and

(vii)   Granting such other and further relief as the Court deems just and proper.

Dated: May 4, 2018                    PROSKAUER ROSE LLP

By:  *Michael T. Mervis*
     Michael T. Mervis
     Timothy Q. Karcher
     Eleven Times Square
     New York, NY  10036-8299
     Tel.: (212) 969-3000
     Fax: (212) 969-2900
     Email: mmervis@proskauer.com
        tkarcher@proskauer.com

     Nicole A. Eichberger (*pro hac vice* to be filed)
     650 Poydras Street
     Suite 1800
     New Orleans, LA 70130-6146
     Tel.: (504) 310-2024
     Fax: (504) 310-2022
     Email: neichberger@proskauer.com


     *Attorneys for Defendants*