**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: (212) 490-4100
Steven G. Storch, Esq.
Avery Samet, Esq.
John W. Brewer, Esq.
Jaime Leggett, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re:                                                          Chapter 7

TRANSCARE CORPORATION, et al.,
                                                                Case No.: 16-10407 (SMB)
                                    Debtors.                    (Jointly Administered)
-------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7
Trustee for the Estates of TransCare                            Adv. Pro. No. 18-1021
Corporation, et al.,

                    Plaintiff,

            v.

LYNN TILTON, PATRIARCH
PARTNERS AGENCY SERVICES, LLC,
PATRIARCH PARTNERS, LLC,
PATRIARCH PARTNERS MANAGEMENT
GROUP, LLC, ARK II CLO 2001-1,                                  **PLAINTIFF'S OPPOSITION**
LIMITED, ARK INVESTMENT PARTNERS                                **TO DEFENDANTS'**
II, L.P., LD INVESTMENTS, LLC,                                  **PARTIAL MOTION TO DISMISS**
PATRIARCH PARTNERS II, LLC,
PATRIARCH PARTNERS III, LLC,
PATRIARCH PARTNERS VIII, LLC,
PATRIARCH PARTNERS XIV, LLC,
PATRIARCH PARTNERS XV, LLC,
TRANSCENDENCE TRANSIT, INC., and
TRANSCENDENCE TRANSIT II, INC.,

                    Defendants.

-------------------------------------------------------x

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Preliminary Statement............................................................................................1

Statement of Facts.................................................................................................3

    A.  Allegations Concerning TransCare and Its Relationship to Patriarch ................................3

    B.  Allegations Concerning Defendants' Scheme to Loot TransCare for Themselves .............8

    C.  Allegations Relevant to TransCare's Exposure to WARN Act Liability ..........................9

**ARGUMENT**..................................................................................................11

    **I.  THE CONSTITUTION DOES NOT STRIP THIS COURT OF JURISDICTION TO ADJUDICATE ALL DAMAGES ALLEGED TO HAVE BEEN CAUSED TRANSCARE BY THE DEFENDANTS' MISCONDUCT** ........................................11**

    **II.  "GROUP PLEADING" IS ALLOWED WHERE ALL THE ENTITY DEFENDANTS OPERATED IN CONCERT UNDER COMMON CONTROL**......17

    **III. THE LENDER-LIABILITY CAUSE OF ACTION STATES A CLAIM AGAINST ALL DEFENDANTS INVOLVED IN THE PURPORTED LOANS** ........................20

    **IV. THE FRAUDULENT TRANSFER AND TRANSFER-AVOIDANCE CAUSES OF ACTION STATE A CLAIM AGAINST ALL DEFENDANTS** ..........21

    **V.  THE COMPLAINT ADEQUATELY PLEADS AN EQUITABLE SUBORDINATION CLAIM AGAINST PATRIARCH PARTNERS**......................23

    **VI. THE COMPLAINT ADEQUATELY PLEADS GROUNDS FOR DISALLOWANCE OF THE CLAIMS OF PATRIARCH PARTNERS AND PPMG** ...............................................................................................23

    **CONCLUSION** .............................................................................................25

## TABLE OF AUTHORITIES

### Cases

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*,
    351 F.Supp.2d 79 (S.D.N.Y. 2004) ............................................................ 8

*Andrulonis v. U.S.*,
    26 F.3d 1224 (2d. Cir. 1994) .............................................................. 14,15

*Associated Indem. Corp. v. Fairchild Indus., Inc.*,
    961 F.2d 32 (2d Cir. 1992) ............................................................... 12, 13

*Atuahene v. City of Hartford*,
    10 Fed. Appx. 33 (2d Cir. 2001) ............................................................ 18

*Denney v Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) .................................................................. 12

*DiVittorio v. Equidyne Extractive Indus. Inc.*,
    822 F.2d 1242 (2d Cir. 1987) ................................................................ 18

*Dover Ltd. v. A.B. Watley, Inc.*,
    2006 WL 2987054 (S.D.N.Y. Oct. 18, 2006) ........................................... 19

*East End Dev., LLC*,
    2017 WL 1277443 (Bankr. E.D.N.Y. Apr. 4, 2017) ................................. 20

*Granite Partners*, *L.P. v. Bear, Stearns & Co. Inc.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998) ...................................................... 18

*Hamer v. Neighborhood Housing Servs. of Chicago*,
    138 S. Ct. 13 (2017) ............................................................................ 15

*Henry v. Daytop Village, Inc.*,
    42 F.3d 89 (2d Cir. 1994) ..................................................................... 22

*In re Agape*,
    467 B.R. 556 (Bankr. E.D.N.Y. 2012) .................................................... 13

*In re AlphaStar Ins. Group Ltd.*,
    383 B.R. 231 (Bankr. S.D.N.Y. 2008) .................................................... 18

*In re Arbco Capital Mgt., LLP*,
    498 B.R. 32 (Bankr. S.D.N.Y. 2013) ...................................................... 22

*In re Celotex*,
    124 F.3d 619 (4th Cir. 1997) ................................................................ 14

*In re Golden Guernsey Dairy LLC*,
    548 B.R. 410 (Bankr. D. Del. 2015) ....................................................... 16

*In re Grumman Olson, Indus., Inc.*,
    329 B.R. 411 (Bankr. S.D.N.Y. 2005) .................................................... 16

*In re KDI Holdings, Inc.*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999) ............................................................ 20, 21

*In re Motors Liquidation Co.*,
    2017 WL 3491970 (S.D.N.Y. Aug. 14, 2017) ....................................................... 13

*In re MSR Hotels & Resorts, Inc.*,
    2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013) .................................................. 7

*In re Quigley Co., Inc.*,
    361 B.R. 723 (Bankr. S.D.N.Y. 2007) .............................................................. 13

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005) ....................................................................... 23

*In re Simplexity LLC*,
    2017 WL 65069 (Bankr. D. Del. Jan. 5, 2017) ...................................................... 16

*In re WorldCom, Inc. Securities Litig.*,
    293 B.R. 308 (S.D.N.Y. 2003) ..................................................................... 14

*Jackson v. First Federal*,
    709 F. Supp. 863 (E.D. Ark. 1988) ................................................................ 19

*King Co. v. IKB Deutsche Industriebank AG*,
    863 F. Supp. 2d 288 (S.D.N.Y. 2012) .............................................................. 17

*Littlejohn v City of New York*,
    795 F.3d 297 (2d Cir. 2015) ...................................................................... 11

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*,
    312 U.S. 270 (1941) .............................................................................. 13

*Moore v. GMAC Mortg., LLC*,
    2008 WL 11348439 (E.D. Pa. Mar. 4, 2008) ........................................................ 19

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    950 F. Supp. 2d 568 (S.D.N.Y. 2013) .............................................................. 7

*Oliver Sch., Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991) ...................................................................... 11

*Pall v. KPMG, LLP*,
    2006 WL 2800064 (D. Conn. Sept. 29, 2006) ....................................................... 15

*Plantronics, Inc. v. United States*,
    1990 WL 3202 (S.D.N.Y. Jan. 9, 1990) ............................................................. 15

*Providential Dev. Co. v. U.S. Steel Co.*,
    236 F.2d 277 (10th Cir. 1956) .................................................................... 14

*San Diego Unified Port District v. Monsanto Co.*,
   2018 WL 626315, (S.D. Cal. Jan. 30, 2018) ............................................................. 16

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004) ............................................................................................ 4

*S.I.P.C. v. Stratton Oakmont, Inc.*,
   234 B.R. 293 (Bankr. S.D.N.Y. 1999) ....................................................................... 22

*SR Int'l Bus. Ins. Co. v. Allianz Inc. Co., L.L.C.*,
   343 Fed. Appx. 629 (2d Cir. 2009) ............................................................................ 13

*Starr v. Sony BMG Music Entertainment*,
   592 F.3d 314 (2d Cir. 2010) ....................................................................................... 11

*TheECheck.com, LLC, v. NEMC Fin. Servs. Grp. Inc.*,
   2017 WL 2627912 (S.D.N.Y. June 16, 2017) ........................................................... 18

*Too, Inc. v. Kohl's Dept. Stores, Inc.*,
   213 F.R.D. 138 (S.D.N.Y. 2003) ................................................................................ 14

*Wall St. Assoc. v. Brodsky*,
   257 A.D.2d 526 (1st Dept. 1999) ............................................................................... 23

*Whitney Lane Holdings, LLC v. Sgambettera & Assocs., P.C.*,
   2010 WL 4259797 (E.D.N.Y. Sept. 8, 2010) ............................................................ 15

*Zegelstein v. Chaudhry*,
   2017 WL 4737263 (S.D.N.Y. Oct. 18, 2017) ............................................................ 18

**Statutes**

11 U.S.C. § 101(5) .............................................................................................................. 12

11 U.S.C. § 502(d) ............................................................................................................. 24

11 U.S.C. § 558 .................................................................................................................. 24

28 U.S.C. § 157(b)(2) ........................................................................................................ 12

28 U.S.C. § 1334 ................................................................................................................ 12

**Rules**

Fed. R. Civ. Proc. 13 ......................................................................................................... 14

Fed. R. Civ. Proc. 82 ......................................................................................................... 14

Fed. R. Bankr. Proc. 7008 ................................................................................................. 19

Fed. R. Bankr. Proc. 7009 ................................................................................................. 22

**Other Authorities**

Fed. Prac. & Proc. Civ.3d § 1785.1 (2005) ............................................................... 13, 16

Federal Practice & Procedure: Civil 2d § 1450 (1990) .................................................... 13

v

7 AA Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Fed. Prac. & Proc. Civ.3d §
1785.1 (2005) ........................................................................................................... 14

Plaintiff Salvatore LaMonica, as Chapter 7 Trustee (the "Trustee") of the jointly-administered estates of TransCare Corporation, *et al.*[1] (collectively, "TransCare") submits this Memorandum of Law in opposition to Defendants' motion (the "Motion") to dismiss some, but not all, of the claims asserted in the adversary complaint (the "Complaint" or "Compl.") herein.

## PRELIMINARY STATEMENT

1.      The Motion, ignoring the permissible scope of a Rule 12(b)(6) motion, goes on at considerable length to offer a self-serving and unsubstantiated factual narrative contradicting the well-pleaded allegations of the Complaint.  Reading more like a press release than a motion to dismiss, the Motion declares that Defendants (Lynn Tilton and a variety of defendant Patriarch entities that she completely controls, dominates, and uses interchangeably as suits her purposes) are innocent of any wrongdoing.  Instead, they blame TransCare's collapse on various third parties. In their view, TransCare's demise is everyone else's fault despite the fact that Defendants were in complete control of it up to the moment of the bankruptcy filing.  In any event, this "press release" is entirely irrelevant to the merits of the Motion.  Indeed, Defendants do not even purport to seek dismissal of most of the Complaint's causes of action against most of the Defendants, thus conceding that the core allegations state viable causes of action that cannot be resolved without trial.[2]

---

[1] The jointly-administered estates are as follows:  TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

[2] Specifically, the Motion does not seek the dismissal of: Count I, breach of fiduciary duty (except as to one facet of damages); Count III, equitable subordination (except as to one $2,500 claim); Count IV, recharacterization of loans; Count V, objection to claims (except as to two claims); Count IX, violations of the automatic stay.

2.     The Complaint alleges that Tilton held an indivisible duty of loyalty to TransCare as TransCare's sole director.  Instead, Tilton consistently, repeatedly, and deliberately abused her control of TransCare to promote her self-interest at TransCare's expense.  Even as TransCare approached financial disaster, Tilton prevented TransCare's management from monetizing TransCare's assets and used her fiduciary position to appropriate those same assets for the benefit of her wholly-owned companies.  The Complaint describes how Tilton used those entities – all wholly-owned and controlled by Tilton, all sharing the same office and the same employees – to effectuate her plan and to benefit those entities at the expense of TransCare.

3.     Defendants' Motion, while rich with invective ("non-sensical," "pure fiction," "salacious"), ignores those allegations, which for purposes of this Motion must be accepted as true. Instead, Defendants attempt to chip away at the edges of the Trustee's case based on poorly-founded technicalities:  (1) the Constitution prohibits the Court from considering a portion of the Trustee's damages because they are contingent, (2) the Trustee should not have used "Patriarch" as a defined term to describe the actions of multiple Patriarch entities working in concert via the same individuals,[3] (3) the lender liability claim should have been labeled differently, (4) a $2,500 unsecured claim should not be equitably subordinated, (5) a claims objection alleging setoff against two unsecured claims is insufficient, and (6) the Trustee may not plead fraudulent transfer in the alternative.

---

[3] These wholly-owned and Tilton-controlled entities are all of the Defendants aside from Tilton and are defined as "Patriarch": Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc.

4.     None of these objections have any merit.  The Court should deny the Motion and let this case be tried on its merits.  In the alternative, the Court should allow the Trustee to re-plead to correct any perceived deficiencies.

## STATEMENT OF FACTS

A.  Allegations Concerning TransCare and Its relationship to Patriarch

5.     TransCare provided essential public safety services, including 911 ambulance services, in New York, Pennsylvania, and Maryland.  (Compl. ¶ 9.)  TransCare's most profitable business unit was its contract with the New York MTA to provide para-transit services which generated revenues of $22 million and EBITDA of $3.7 million.  (*Id*. ¶ 41.)

6.     Tilton served as TransCare's sole director.  (*Id*. ¶ 10.)  She delegated unusually little authority to the company-level senior management team, and exercised an extraordinarily high level of control over the operations of TransCare.  (*Id*. ¶¶ 35-39.)  Tilton ignored corporate formalities, allegedly taking corporate action via board resolutions (signed by her as sole director) that Patriarch cannot locate.  (*Id*. ¶¶ 31, 31 n.3, 35, 36, 36 n.4, 37.)

7.     Despite this control, Tilton barred TransCare's management from communicating directly with her.  (*Id*. ¶ 38.)  Instead, she directed required TransCare management to report to *Patriarch* employees who gave direction to TransCare.  (*Id*.)  *Patriarch* executives hired and fired TransCare employees, directed the payment or non-payment of vendors, executed loan documents, and managed the terms of TransCare's board reports.  (*Id*. ¶¶ 38-39.)  TransCare did not have counsel for its dealings with Patriarch.  (*Id.* ¶¶ 31, 39.)

8.     Patriarch is a family of companies for which Lynn Tilton served as the sole owner, chief executive officer, and principal/ manager.  (*Id*. ¶ 10.)  Each and every one of the Patriarch defendants is 100% owned, directed, dominated, and controlled by a single natural person, Tilton.

3

(*Id.* ¶ 10.)   The Patriarch entities share the same physical office and their employees acted at Tilton's direction.  (*Id.* ¶¶ 5, 11-23, 30, 38.)   Patriarch employees email from the same email domain, patriarchpartners.com, and sign all their emails "Patriarch Partners, LLC".[4]  With respect to TransCare, all of the Patriarch entities collectively "operated as a wholly-integrated entity."  (*Id.* ¶ 34).   In addition, "Patriarch did not typically differentiate between its various entities in its dealings with TransCare."  (*Id.* ¶ 52 n.5; *see also id.* ¶ 60 ("tell them [TransCare] is not for sale per Patriarch Partners.").)

9.    Even though the Patriarch executives failed to differentiate between corporate forms when directing TransCare's management, the Complaint nevertheless specifies the relationship of each Patriarch defendant to TransCare:

- Patriarch Partners Agency Services, LLC ("PPAS") acted as the administrative agent for a senior secured credit agreement between a syndicate of mainly Tilton controlled-lenders and TransCare (the "Credit Agreement").  (*Id.* ¶¶ 11, 29-31.)   Thus, PPAS served as agent to nine other Patriarch entity defendants who were either direct lenders or the controlling party of lenders.

- Defendants Ark II CLO 2001-1, Limited ("Ark II") and Ark Investment Partners II, L.P. ("AIP II") were direct lenders to TransCare under the Credit Agreement.  (Compl. ¶¶ 11, 16, 18.)   In addition, Ark II entered into a separate lending agreement with

---

[4] *See, e.g.*, February 25, 2015 email at p. 4 of 4 (quoted at Compl. ¶¶ 95-96), provided hereto as Exhibit A.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (documents relied upon by complaint are incorporated by reference therein).  Similarly, the proofs of claim filed by all of the disparate Patriarch entities (including Ark II) are signed by Kathleen M. Patrick, with the same the vague title "Authorized Signatory" for all four entities, and the same Patriarch Partners email address. (Claim Nos. 584, 585, 586, 587.)  However, the Complaint alleges that Jean-Luc Pelissier emailed from a non-Patriarch address when attempting to effectuate the strict foreclosure.  (Compl. ¶ 86.)

TransCare on January 15, 2016 (less than two months before the petition-date) pursuant to which it committed to loan TransCare $6.5 million (the "Ark Credit Agreement"). "Ark II was controlled by Tilton and operated as part of the integrated Patriarch entities." (*Id.* ¶ 77.)

- Tilton controlled and acted for Ark II and AIP through two wholly-owned entities: Defendant Patriarch Partners II, LLC (collateral manager for Ark II) and Defendant Patriarch Partners III, LLC (collateral manager for AIP II). (*Id.* ¶¶ 15-18.) Defendant LD Investments LLC, wholly-owned by Tilton, is the sole member of Patriarch Partners II, LLC. (*Id.* ¶¶ 13, 15.)

- Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC were each collateral managers for non-party lenders to TransCare under the Credit Agreement. (*Id.* ¶¶ 19, 20, 21.) In that capacity, those entities, via Tilton's signature, bound those non-party lenders to the various credit agreements with TransCare referenced in the Complaint. (*Id.* ¶¶ 11, 19, 20, 21, 31, 39.)

10.    Moreover, Tilton used her control of TransCare's lenders simultaneously with her managerial control over TransCare – representing, as it were, her left hand and her right hand operating in tandem to carry out her bidding.[5]  That management control was exercised through: PPMG which purportedly provided management services to TransCare (Claim No. 585), and Patriarch Partners, LLC itself, which Tilton used as the key conduit through which to exercise her control over TransCare regardless of the formalities of the organization chart. (*See* supra ¶ 8, ¶ 8

---

[5] The only Patriarch entity defendants not involved in the control of TransCare either via equity or via debt are the two Transcendence entities, formed late in the process to be the holders of the assets the other defendants sought to loot from TransCare, as described below (at ¶ 15).

5

n.4*; see also*, *e.g.* Compl. at ¶ 60 (Patriarch Partners LLC CFO and Tilton's son-in law, Scott Whalen, confirming that TransCare should tell potential acquirer that TransCare was "'not for sale' per Patriarch Partners.")[6]

11.     The Complaint also alleges that Patriarch employees themselves play fast and loose with their own corporate identities.  (*See id.* ¶ 78 n.6 (PPAS apparently transferred $800,000 of estate proceeds to satisfy Ark II's separate loan and not the PPAS loan, despite representing to the Court that PPAS held the first priority lien); *compare id.* ¶ 52 ("TransCare must pay interest today as PPMG is not the only lender.") *with* Motion at p. 21 n.14 ("PPMG had no lending relationship with TransCare. . .").)  Jean-Luc Pelissier, a Patriarch employee, when attempting to "foreclose" on TransCare's most valuable asset, the MTA Contract, purportedly on behalf TransCare's lenders, misleadingly told the MTA "I am working with the *ownership representative* of TransCare." (Compl. ¶ 79) (emphasis added).  Brian Stephen, a lawyer employed by Patriarch Partners, claimed to represent the Board of TransCare (*id.* ¶ 37) and directed TransCare's bankruptcy lawyers, but simultaneously oversaw Patriarch's "foreclosure" of TransCare's assets.  (*Id.* ¶ 87.)  When that plan failed Stephen – from his Patriarch Partners email account and with his Patriarch Partners, LLC signature line – instructed TransCare to remove "the most valuable assets" from the estate. (*See* Ex. A at pp. 3-4 of 4.)   Similarly, Stephen claimed that TransCare would not receive any sale proceeds from a sale of its assets because "Lynn [Tilton] has other debts."  (Compl. ¶ 45.)

12.     Finally, none of these allegations should come as a surprise to Patriarch as Patriarch has adopted the integrated nature of the Patriarch companies in other pleadings:   "Patriarch

---

[6] *See also* Compl. ¶ 38 (detailing Whalen's position at Patriarch).  Whalen has admitted the same in a December 29, 2015 before this Court "I have been employed by Patriarch Partners, LLC . . . for approximately seven years."  [Dkt. No. 9 at ¶ 2 in Case No. 15-23682 (Bankr. S.D.N.Y.).]

Partners is an investment firm owned and directed by Ms. Tilton that invest in and restructures distressed companies. . . ;"[7] admitting that "Patriarch Partners[, LLC] and Ms. Tilton owned and/or controlled the Patriarch Managers [Patriarch Partners VIII, LLC, Patriarch Partners XIV LLC, and Patriarch Partners XV, LLC], directed their actions, and/or acted on their behalves;"[8] and "[The Patriarch Managers'] business functions are delegated to Patriarch Partners[, LLC]."[9]    In a Declaration filed after the Complaint, Tilton even boasted of the commingling of the Patriarch roles:  "[Tilton's] multiple roles . . . ultimately benefitted the [lenders] by ensuring that the Portfolio Companies continued to pay their debts to the greatest extent possible, even when faced with short-term liquidity shortfalls."[10]    Judicial rulings have found the same:  "Patriarch Partners, LLC operates its business using a series of affiliated special purpose entities, including [Patriarch Partners VIII, LLC], that have no employees of their own." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 572 (S.D.N.Y. 2013); *see also In the Matter of Lynn Tilton, et al.*, SEC Release No. 1182, 2017 WL 4297256, *8 (Sept. 27, 2017) ("[Patriarch Partners, LLC's] employees, including Tilton, run the business of Respondents Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC, which have no employees of their own.")[11]

---

[7] Answer, Counterclaims, and Third-Party Complaint of Patriarch Partners, LLC *et al.* (1:17-cv-00307-WHP (S.D.N.Y.) [Dkt. No. 79] at p. 17 of 181.

[8] *Id*. at p. 67 of 181.

[9] March 16, 2016 Declaration of Lynn Tilton at ¶ 4, submitted to this Court at Dkt. No. 58, Ex. 5 in Case No. 15-23682.

[10] March 12, 2018 First-Day Declaration of Lynn Tilton at ¶ 37 [Dkt. No. 5 in Case No. 18-10512] (Bankr. D. Del.).

[11] Although unnecessary, as the Complaint alleges the same thing, the Court is authorized to take judicial notice of these representations and findings. *See In re MSR Hotels & Resorts, Inc.*, Case

B.  Allegations Concerning Defendants' Scheme to Loot TransCare for Themselves

13.    In 2015, as a result of Patriarch's mismanagement, TransCare's executives warned

Tilton that its business was unsustainable absent either significant new capital or the raising of

funds via selected asset sales, which might raise enough in proceeds to enable the remaining lines

of business to be stabilized.  (Compl. ¶¶ 40-43.)  These cash shortages led TransCare to miss

payroll and miss payments to key vendors for gasoline, tolls, and spare parts, all mission-critical

resources for an ambulance company, causing a serious threat to public safety as well as to

TransCare's viability.  (*Id.* ¶¶ 42, 48, 50, 53, 54, 55, 63, 67.)  Nevertheless, Patriarch still required

TransCare to make interest payments on the PPAS loan, despite Patriarch's ability to waive such

payments.  (*Id.* ¶¶ 30, 31, 51-53, 62, 66-67.)

14.    At the same time, when TransCare's executives received significant offers for just

some of TransCare's assets, Tilton and the other Patriarch executives refused to allow those

executives to even consider, let alone negotiate, with those counterparties.  (*Id.* ¶¶ 43-44, 45

("Tilton berated the CEO for daring to explore a sale option and then hung up on him"), 46-49,

55-60, 68-71, 74.)  Similarly, Tilton refused TransCare permission to explore alternative sources

of financing to Patriarch.  (*Id.* ¶¶ 50, 125.)

15.    Instead, Tilton directed her subordinates to acquire TransCare for Patriarch. The

Complaint describes, how working both sides of the transaction, Tilton arranged for PPAS[12] to

---

No. 13-11512, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) ("A court is empowered
to take judicial notice of public filings, including, in an adversary proceeding, those filed on its
own dockets in the underlying bankruptcy case."); *American Tissue, Inc. v. Donaldson, Lufkin &
Jenrette Sec. Corp.*, 351 F.Supp.2d 79, 95 n.17 (S.D.N.Y. 2004) ("The Court can take judicial
notice of matters of public record . . . including filings in related lawsuits. . . .")

[12] PPAS was acting on behalf of certain of Tilton's other companies; namely, AIP II, LD
Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners, III, LLC, Patriarch Partners,
VIII, LLC, Patriarch Partners, XIV, LLC, and Patriarch Partners, XIV, LLC.  (Compl. ¶ 91.)

"foreclose" on TransCare's most valuable assets by transferring them to a company wholly-owned by Tilton:  Transcendence and Transcendence II.  (*Id.* ¶¶ 79, 81-96.)  The Complaint alleges that while Patriarch cannot even locate the documents underlying the purported "strict foreclosure." (*Id.* ¶ 91 n.8.)  Nevertheless, according to a document entitled, "Notice of Acceptance of Subject Collateral," PPAS, AIP II, Patriarch Partners VII, LLC, Patriarch Partners XIV LLC, Patriarch XV, LLC all signed the purported "strict foreclosure" notice.  (*Id.* ¶ 91.)

16.    Internally, Patriarch valued just TransCare's MTA business at no less than $22 to $36 million, vastly more than the amount needed to pay employees and recapitalize TransCare. Yet when effectuating the "strict foreclosure", Patriarch claims to have credited TransCare just $10 million off of the loan.  (*Id.* ¶ 92.)

17.    Moreover, even after the bankruptcy filing, in overt violation of the automatic stay, Tilton's henchmen Stephen and Pelissier gave directions to steal TransCare assets ranging from ambulances to the physical computer server where TransCare's accounts receivable were stored. (*Id.* ¶¶ 95-96.)

C.    Allegations Relevant to TransCare's Exposure to WARN Act Liability

18.    In June 2015, TransCare's senior management team warned Tilton that continuing cash flow problems raised the risk of a sudden and uncontrolled shutdown of operations, which could give rise to liability to employees (including liability under the federal WARN Act and the New York state equivalent, the "NY WARN Act,") in an amount estimated as in excess of $15 million:

> If TransCare were to shut down suddenly because of loss of key suppliers and facilities, it faces a liability of as much as $15.45M in wages and benefits. About 70% of TransCare payroll is for New York employees which have a 90-day WARN act liability as compared to the 60-day standard in other markets."

(*Id.* ¶ 50.)

19.     TransCare executives warned Tilton and others at Patriarch throughout 2015 that TransCare was on the verge of missing payroll (*id.* ¶¶ 42, 51-52, 66) and could not timely fund payroll taxes (*id.* ¶¶ 53, 88).  Tilton allowed TransCare to miss payroll entirely on July 3, 2015 (*id.* ¶ 54) and February 19, 2016 (*id.* ¶ 88).

20.     Tilton and the other Defendants ignored these warnings.  (*Id.* ¶ 6.)  As a result, the Complaint alleges "TransCare's employees, who worked for weeks without pay while Tilton tried to steal the company's assets, were left with large unpaid wage claims.  This ruinous scenario is exactly what TransCare's executives had warned Tilton would come to pass, but which Tilton ignored due to her own conflicts of interest."  (*Id.* ¶ 6.)

21.     Tilton (and the other Defendants) knew or should have known of the requirements of the WARN Act and NY WARN Act and likewise knew or should have known that their acts and omissions would create potential liability for TransCare under those statutes.  (*Id.* ¶ 101.)

22.     TransCare has in fact been sued in a class action (along with Tilton and certain Patriarch entities) pending in this Court (Adv. Proc. No. 16-1033) (the "WARN Act Proceeding"), which alleges, among other things, liability under both the WARN Act and NY WARN Act.  The current scheduling order in the WARN Act Proceeding [Adv. Proc. Dkt. No. 66] provides for fact discovery to be completed by July 31, 2018.  The Trustee has already incurred out-of-pocket defense costs (*see* First Interim Application for Compensation of Fees and Reimbursement of Expenses of LaMonica Herbst & Maniscalco, LLP at p. 12 [Dkt. No. 379]) defending TransCare's estates in connection with the WARN Act Proceeding.  Moreover, hundreds of TransCare's former employees have filed proofs of claim against the estate alleging similar claims.

10

## **ARGUMENT**

23.      "On a motion to dismiss, all factual allegations in the complaint are accepted as true

and all inferences are drawn in the plaintiff's favor." *Littlejohn v City of New York*, 795 F.3d 297,

306 (2d Cir. 2015).  A "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations." *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir.

2010) (internal quotations omitted).  It need only allege enough "to raise a right to relief above the

speculative level." *Id*.  To the extent an initial complaint is thought insufficiently detailed, the

proper course is to allow a plaintiff leave to amend to provide additional detail.  *See*, *e.g.*, *Oliver

Sch., Inc. v. Foley*, 930 F.2d 248, 252 (2d Cir. 1991) ("To the extent that the court felt it would be

unfair to require the defendants to respond to a complaint that did not more precisely state the basis

for the claims against them in their personal capacities, the court should at least have granted Oliver

leave to amend the complaint to provide greater specificity.").

## I.      **THE CONSTITUTION DOES NOT STRIP THIS COURT OF JURISDICTION TO ADJUDICATE ALL DAMAGES ALLEGED TO HAVE BEEN CAUSED TRANSCARE BY THE DEFENDANTS' MISCONDUCT**

24.      Defendants' claim that Article III of the United States Constitution deprives this

Court of subject matter jurisdiction to hear contingent damage theories is simply wrong.

Defendants seek to "blue-pencil" out the damages associated with exposing TransCare to WARN

Act liability from the other damages sought by the Trustee.[13]  Defendants assert that these damages

are *contingent* on the outcome of the WARN Act Proceeding because it is possible that this Court

---

[13] *See* Compl. ¶ 102 ("As a direct and proximate [result] of Tilton's breaches of the duty of loyalty and good faith, TransCare's estates have suffered unpaid asserted claims (including employee claims, WARN Act claims, NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/or Tilton (along with the associated payroll taxes), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages."); *see also id*. ¶¶ 105, 126.

will determine there is no WARN Act liability. However, the fact that the amount of these damages is contingent on the resolution of claims pending before *this* Court in *this* bankruptcy case does not deprive the Court of jurisdiction.

25.     The test for Article III standing in the Second Circuit is whether the Plaintiff has suffered an injury-in-fact, "irrespective of whether the[] injuries are sufficient to sustain any cause of action." *Denney v Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006). "An injury-in-fact may simply be the fear or anxiety of future harm. For example, exposure to toxic or harmful substances has been held sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure. . . ." *Id*. citing numerous authorities including 7 AA Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Fed. Prac. & Proc. Civ.3d § 1785.1 (2005) ("If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied.") In *Denney*, the Second Circuit rejected the argument that members of the plaintiff class who had not yet been assessed tax penalties by the Internal Revenue Service lacked Article III standing to sue their financial advisors for improper tax counseling. *Id*. at 264-65. It held that even class members who had not been audited had standing because they were still in a position where they plausibly needed to incur costs to rectify the situation to mitigate the future risk of such penalties, and were accordingly held to have Article III standing. *Id*. at 265.

26.     Where a lawsuit has already been filed presents a far easier case for Article III standing than where one has not even begun. For example, federal courts often hear insurance coverage disputes where the underlying litigation is still pending and no party has conceded liability. *See Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) ("That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory

12

judgment action. . . . Indeed, litigation over litigation over insurance coverage has become the paradigm for asserting jurisdiction despite future contingencies that will determine whether a controversy ever actually becomes real."); *see also Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (case in controversy over coverage existed even though underlying dispute still pending in separate litigation); *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co., L.L.C.*, 343 Fed. Appx. 629, 631-32 (2d Cir. 2009). The test is not one of constitutional standing but instead the Court must assess "the practical likelihood that the contingencies will occur." *Associated Indem.*, 961 F.2d at 35. As discussed above (at ¶ 22), the WARN Act Proceeding and numerous related employee claims have been filed against the TransCare estates. As the Court is presiding over those claims and has presided over numerous other large bankruptcies with asserted WARN Act claims filed, the Court can assess the "practical likelihood" that some settlement or judgment will occur.

27.    Bankruptcy courts in particular are often called upon to resolve contingent claims which may *never* come into being. *See In re Motors Liquidation Co.*, No. 09-50026 (MG), 2017 WL 3491970, at *6 (S.D.N.Y. Aug. 14, 2017) ("[i]t is possible that any determination by the bankruptcy court as to either sides' entitlement to such funds would ultimately have no effect. However, the simple fact that the dispute is over a contingent claim does not render the dispute beyond the scope of an Article III case or controversy."); *In re Quigley Co., Inc.*, 361 B.R. 723, 737 (Bankr. S.D.N.Y. 2007) (finding subject matter jurisdiction where it was likely that insurance coverage would be sought, although it had not yet been); *In re Agape*, 467 B.R. 556, 580 (Bankr. E.D.N.Y. 2012) (denying motion to dismiss contribution claim because the filed proofs of claim meant that the estates had been "subjected to" potential liability).

28.    Moreover, bankruptcy courts are expressly authorized to hear contingent claims (*see* 11 U.S.C. § 101(5); 28 U.S.C. § 1334; 28 U.S.C. § 157(b)(2)), including such as contribution and indemnification claims, that are contingent about the outcome of separate litigation not pending before the Bankruptcy Court. *See In re WorldCom, Inc. Securities Litig.*, 293 B.R. 308, 322-323 (S.D.N.Y. 2003) (denying motion to remand contribution claims to state court), *aff'd* 368 F.3d 86 (2d Cir. 2004). *Accord In re Celotex*, 124 F.3d 619, 625-27 (4th Cir. 1997) (upholding bankruptcy jurisdiction over claims contingent on the outcome of separate litigation against non-debtors); 1 Lawrence P. King, Collier on Bankruptcy § 3.01[4][c] at 3–26 (15th ed. 1998) ("'Automatic' liability of the estate is not the sine qua non for related to jurisdiction; all that is necessary is that there could 'conceivably' be some effect upon the estate as a consequence of the litigation in question."). Indeed, a creditor's failure to file such a contingent claim by the bar date (far from being barred by the Constitution) will result in the creditor being forever denied the possibility of recovering on such claim. Under Defendants' logic, this fundamental premise of bankruptcy law is violative of the United States Constitution as courts should have no jurisdiction to consider such contingent claims.

29.    In fact, the federal courts often hear claims contingent on the outcome of litigation under the guise of Rules 13 (crossclaims) and 14 (third-party claims).[14] In *Andrulonis v. United States*, 26 F.3d 1224, 1233 (2d. Cir. 1994), the Second Circuit held that the third-party contribution claims brought under Fed. Civ. R. P. 14(a) may be brought "even though the defendant's claim is purely inchoate – *i.e.*, has not yet accrued under the governing substantive law – so long as the

---

[14] For Rule 14 *see*, *e.g.*, *Too, Inc. v. Kohl's Dept. Stores, Inc.*, 213 F.R.D. 138, 140 (S.D.N.Y. 2003). For Rule 13, *see generally*, *Providential Dev. Co. v. U.S. Steel Co.*, 236 F.2d 277, 281 (10th Cir. 1956) (Rule 13(g) "is not limited by text or purpose to definite or matured claims or causes of action[;]" rather, the rule "is broad enough to include a claim of a contingent nature, the ultimate outcome of which depends upon the determination of other features or issues in the case").

third-party defendant may become liable for all or part of the plaintiff's judgment." *Andrulonis*, 26 F.3d at 1233. This is so even though the claim is "properly characterized as 'contingent.'" *Id.* at 1234. Indeed, the court 's judgment on such claim "should reflect this contingency." *Id.* (relying on Charles A. Wright, Federal Practice & Procedure: Civil 2d § 1450 (1990) at 410-11 ("The court is free to shape the relief on an accelerated or contingent claim to reflect the limitations of substantive state law.")). Under Defendants' logic, this rule is also violative of the Constitution as Courts should have no jurisdiction to consider contingent claims.[15]

30.     Defendants rely entirely on cases where *no* compensable damages of *any* kind had yet accrued for the relevant cause of action alleged in the relevant pleading. *See*, *e.g*., *Whitney Lane Holdings, LLC v. Sgambettera & Assocs., P.C.*, No. 08-CV-2966, 2010 WL 4259797 (E.D.N.Y. Sept. 8, 2010) (dismissing malpractice claim as premature because of state law rule requiring resolution of the underlying action before a malpractice can proceed); *Plantronics, Inc. v. United States*, No. 88 CIV 1892, 1990 WL 3202 (S.D.N.Y. Jan. 9, 1990) (plaintiff in indemnity action had not yet suffered any alleged damages at all and would not suffer damages unless and until separate lawsuit was concluded adversely to it); *Pall v. KPMG, LLP,* No. 3:03-CV-00842, 2006 WL 2800064 (D. Conn. Sept. 29, 2006) (no damages at all yet suffered in connection with

---

[15] There is no Constitutional difference between a stand-alone action versus a claim brought pursuant to Federal Rules 13 or 14, as "[i]t is axiomatic that the Federal Rules of Civil Procedure do not create or withdraw federal jurisdiction." *Hamer v. Neighborhood Housing Servs. of Chicago*, 138 S. Ct. 13, 17 (2017). *See also* Fed. R. Civ. Proc. 82 (the Federal Rules do not extend the jurisdiction of the courts). To put in another way, to the extent Bankruptcy Rule 7013 permissively allowed the Trustee to *crossclaim* against Patriarch in the Warn Act Proceeding, the Trustee has the same ability to file suit in a separate action. *See* Bankruptcy Rule 7013(g).

contribution claim and none would be suffered in future unless separate lawsuit was concluded in particular way). There is no such limitation for the Trustee's common-law claims asserted here.[16]

31.    None of these cases have any application to a case where some damages have already been incurred, and the only uncertainty is how much in additional damages will or will not be incurred before trial.  (*See* Compl. ¶¶ 102, 105, 126.)  Nor do any have applicability to a Bankruptcy Court which is currently presiding over the underlying WARN claim. *See, e.g.*, *In re Simplexity LLC*, 2017 WL 65069 at *9 (Bankr. D. Del. Jan. 5, 2017) (allegations that the officers and controlling entities exposed the estate to potential WARN liability satisfied motion to dismiss); *In re Golden Guernsey Dairy LLC*, 548 B.R. 410, 413 (Bankr. D. Del. 2015) (allegations that debtor's president and managing member exposed the debtor to potential WARN liability stated a claim for breach of the duty of loyalty).  Whatever the ultimate outcome of the WARN Act Proceeding, the estates have already suffered damage because the Trustee has been obligated to defend the proceeding and has already spent money from the estates' limited resources on legal fees and other defense costs (*see* supra at ¶ 22) that could otherwise have been used in satisfying valid creditor claims.[17]  Also, the estates already face substantial potential liability on account of the hundreds of claims filed by former employees (as discussed supra at ¶ 22).

---

[16] Defendants do not contest that the Complaint states a claim for breach of fiduciary duty.  Even if they did, such an attack would be futile at this stage. *See In re Grumman Olson, Indus., Inc.*, 329 B.R. 411, 432 (Bankr. S.D.N.Y. 2005) (upholding fiduciary duty claims where the defendants attacked the damages as "speculative, conclusory and imaginary.")

[17] *Cf. San Diego Unified Port District v. Monsanto Co.,* No. 15-cv-578, 2018 WL 626315, (S.D. Cal. Jan. 30, 2018) where plaintiff's litigation costs were not recoverable under the provisions of the specific federal environmental statute at issue.

## II.    "GROUP PLEADING" IS ALLOWED WHERE ALL THE ENTITY DEFENDANTS OPERATED IN CONCERT UNDER COMMON CONTROL

32.    Defendants claim (Motion ¶¶ 52-63) that the Complaint's shorthand references to the concerted actions of all of the Patriarch entity defendants as actions of "Patriarch" (as a defined term) violates some supposed per se rule against "group pleading."   However, the Complaint alleges that all of the Patriarch entities operated in concert with each other as an integrated whole, and operated through the same narrow cast of human beings, *e.g.*: Tilton, Jean Luc-Pelissier, Brian Stephen, Scott Whalen, Michael Greenberg, and Randy Jones.  (*See* supra ¶¶ 7-8; Compl. ¶ 38.) In addition, the Complaint specifies the role of each entity, its relation to TransCare, and most importantly, how Tilton sought to benefit each entity through her breaches of fiduciary duty owed to TransCare.  (*See* supra at ¶¶ 9-11.)

33.    The Trustee is not required to repeat the name of each Patriarch defendant when describing the actions taken by Tilton and her subordinates.  For example, in *King Co. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 316 (S.D.N.Y. 2012), *rev'd in part on other grounds*, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012), the plaintiff sued three separate ratings agencies (competitors not alleged to have been under common ownership or control, unlike the situation here) and referred to them collectively by a defined term in certain allegations.  The court held that "plaintiffs are not required to copy and paste their allegations for each rating agency . . . [it] is sufficient to define the three rating agency defendants collectively as the 'Rating Agencies' . . . and then use that collective term in all allegations that apply equally to those three defendants." *King*, 863 F. Supp. 2d at 316.  Using a defined term that refers to multiple defendants is not impermissible when its purpose is to give each defendant fair notice that it is alleged to have done the same thing.

17

34.     None of the cases cited by Defendants involve a group of defendants that: (a) all have a common single owner; (b) all have a common single decision maker; and (c) all operated in concert as an integrated whole.  For example, in *Granite Partners*, *L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998), the defendants included multiple broker-dealers that were competitors with one another rather than under common control, and multiple individual defendants as well.  *Zegelstein v. Chaudhry*, No. 16-CV-3090, 2017 WL 4737263 (S.D.N.Y. Oct. 18, 2017) involved claims against a wide variety of physicians, medical practice groups, and insurers, not under common control and unrelated to each other, with no credible allegation of any connection between them.  *TheECheck.com*, *LLC, v. NEMC Fin. Servs. Grp. Inc.*, No. 16-CV-8722, 2017 WL 2627912 (S.D.N.Y. June 16, 2017), rejected group pleading against multiple individual defendants who were all affiliated with the corporate defendant (not sufficiently alleged to be an alter ego of the individuals) where it was not clear which individual had or had not participated in which alleged misconduct.[18]  Similarly, the "Individual Defendants" in *In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 271 (Bankr. S.D.N.Y. 2008) were just that, individuals who potentially had separate knowledge, goals, and motivations, and, even more to the point, had in many cases not even been members of the debtor's board of directors during a portion of the time during which the board had allegedly engaged in misconduct.

35.     Finally, the grievance (Motion ¶ 65, quoting *DiVittorio v. Equidyne Extractive Indus. Inc*., 822 F.2d 1242 (2d Cir. 1987)) that the Complaint allegedly does not "inform each defendant of the nature of his [sic] alleged participation in the fraud" rings hollow, given that the

---

[18] The brief unpublished opinion in *Atuahene v. City of Hartford*, 10 Fed. Appx. 33 (2d Cir. 2001) does not explain the relationships among the various defendants, but since one was an auto-repair shop and another a Connecticut municipality, it is clear there was no allegation that they were under common ownership and operated as an integrated whole.

Patriarch defendants are all artificial entities whose knowledge in each case is ultimately that of Tilton. Tilton herself arranged her affairs through a byzantine maze of wholly-owned corporations with the same name, office, and employees. Federal Rule 8, as incorporated by Federal Rule of Bankruptcy Procedure 7008, does not require the Trustee to tell Tilton what herself already knows, namely which entity she used to carry out which facet of the scheme. A "plaintiff may not be able to plead the precise role of each defendant when a group of defendants has acted in concert to cause the complained of injury. Under those circumstances, it is appropriate to plead the actions of the group and leave development of individual liability questions until some discovery has been undertaken." *Jackson v. First Federal*, 709 F. Supp. 863, 878 (E.D. Ark. 1988). *See also*, *e.g.*, *Moore v. GMAC Mortg., LLC*, No. CV 07-4296, 2008 WL 11348439, at *2 (E.D. Pa. Mar. 4, 2008) (denying motion to dismiss when "[d]espite Plaintiff's failure to distinguish between the separate GMAC corporate entities in her Complaint, it is clear that she has alleged that both GMAC Bank and GMAC Mortgage participated in the alleged conspiracy to disguise kickbacks"); *Dover Ltd. v. A.B. Watley, Inc.*, No. 04 Civ. 7366, 2006 WL 2987054, at *10 (S.D.N.Y. Oct. 18, 2006) (denying motion to dismiss because "[w]hile the evidence ultimately may establish that Group and Direct observed corporate formalities and played no role in ABW's fraud or the conversion of the Plaintiffs' funds, the Plaintiffs certainly have alleged enough of an interrelationship between ABW and the other ABW Companies to permit this fraud case to proceed against all of the Defendants").

36.    Under the notice pleading standards of Rule 8(a), especially as applied to the Trustee, a stranger to these transactions, the Complaint more than adequately pleads facts that Tilton employed the Defendant Patriarch entities to carry out the acts described in the Complaint.

19

### III.    THE LENDER-LIABILITY CAUSE OF ACTION STATES A CLAIM AGAINST ALL DEFENDANTS INVOLVED IN THE PURPORTED LOANS

37.    Defendants claim in a footnote (Motion at p. 21 n.14) that "a claim for 'Lender Liability' is not recognized under New York law."  This is a disingenuous quibble over labels, because as the very cases Defendants cite show, New York *does* recognize the cause of action asserted in the Trustee's sixth claim for relief (which the Complaint labels "Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control," precisely to avoid such quibbling over terminology).  For example, *In re East End Dev., LLC*, No. 8-12-76181-REG, 2017 WL 1277443, at *3 (Bankr. E.D.N.Y. Apr. 4, 2017), cited by Defendants, states that "lender liability" is not a cause of action as such but is a common way of referring to the imposition of "liability on a lender outside of the contract terms under theories of common law breach of fiduciary duty, common law assumption of control, and equitable subordination."

38.    That assumption of control, and the subsequent breach of the fiduciary duty that comes with that assumption of control, is precisely what is alleged here.  The allegations here mirror those found sufficient in *In re KDI Holdings, Inc.*, 277 B.R. 493, 516 (Bankr. S.D.N.Y. 1999), where the lender defendants were alleged to have used the leverage provided by their loans to gain actual control and after they "took over the day-to-day management of Debtors . . . directed the payment of certain debts to corporations in which [they] had an interest."

39.    Moreover, in the very same footnote (Motion at p. 21 n.14), Defendants *concede* that the elements of the lender liability claim have been pleaded as to Ark II and AIP II, the two defendants they do not dispute were lenders to TransCare.  But as shown above, the vast majority of the Patriarch entity defendants were lenders, agents of lenders, collateral managers of lenders, and/ or control persons of lenders.  (*See* supra at ¶ 9.)  Further, Defendants mixed and matched their lending and management roles when it suited them.  (*See* supra at ¶ 11.)  Defendants cite no

20

authority by which these other defendants – who likewise exercised improper control over TransCare via the leverage afforded by the loans – can avoid liability for the misuse of that authority.  Indeed, in *KDI Holdings*, one of the defendants was not, himself, a lender to the debtors but the chairman of the board of the corporate entity that had made the loans, and that was no defense to his individual liability for having assumed control of the debtors and abused that control for the benefit of other entities he controlled.  *KDI Holdings*, 277 B.R. at 516-17.

## IV.    THE FRAUDULENT TRANSFER AND TRANSFER-AVOIDANCE CAUSES OF ACTION STATE A CLAIM AGAINST ALL DEFENDANTS

40.    Defendants claim (Motion ¶¶ 72, 79) that only PPAS may be subject to liability for fraudulent or post-petition transfers because only PPAS is alleged to have received any such transfer.  But PPAS' key role was as *agent* for numerous other defendants.  (Compl. ¶¶ 11, 91.)  It is thus more than a plausible inference that it accepted transfers of TransCare's property on behalf of its principals, who directly or indirectly constituted virtually all of the other Patriarch entities (as shown supra at ¶¶ 8-11).  The other defendants are not entitled to a conclusive presumption that PPAS failed to pass through any such transfers to those on whose behalf PPAS acted, or that those principals failed to pass such transfers through to their own principals or control persons.  In fact, Ark II claims that PPAS transferred $800,000 in proceeds to it from the Trustee's sale of collateral.  (Compl. ¶ 78 n.6.)  Both Transcendence Transit, Inc. and Transcendence Transit II, Inc. assert that *they* actually received TransCare's assets, including TransCare's paratransit division.  (Id. ¶¶ 90, 92, 93.)  Finally, the Complaint alleges that Patriarch executives, Stephen and Pelissier, directed TransCare employees to steal as many movable assets as they could the day after TransCare's bankruptcy filing.  (*Id*. ¶ 95.)

41.    Defendants treat the Trustee allegation that the strict foreclosure was ineffective (*id*. ¶ 128) as a fatal concession.  But Federal Rule 8(e)(2) expressly permits pleading in the

21

alternative "regardless of consistency."  Subject to discovery, the Trustee is allowed both to plead

that the attempted theft of assets Tilton instructed her minions to execute failed and, in the

alternative, to seek recoupment of any assets that discovery may reveal the scheme did succeed in

diverting to Transcendence or any other Patriarch entity.  *See Henry v. Daytop Village, Inc*., 42

F.3d 89, 95 (2d Cir. 1994) ("Pursuant to Rule 8(e)(2), therefore, we may not construe [plaintiff's]

first claim as an admission against another alternative or inconsistent claim.")  As Defendants

themselves claim to have obtained $10 million in assets from TransCare through the purported

"strict foreclosure" and they can hardly object to the Trustee, at least in the alternative, taking them

at their word.

42.     To the extent Rule 9(b) – as incorporated by Federal Rule of Bankruptcy Procedure

7009 – applies to these claims, the particularity requirements of Rule 9(b) are applied in a less

stringent fashion in cases, like this one, brought by bankruptcy trustees who were not yet at the

scene when the allegedly fraudulent transfers occurred.  *SIPC v. Stratton Oakmont, Inc*., 234 B.R.

293, 310 (Bankr. S.D.N.Y. 1999) ("Greater liberality in the pleading of fraud is particularly

appropriate in bankruptcy cases, because, as here, it is often the trustee, a third party outsider to

the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of

the estate and all of its creditors."); *In re Arbco Capital Mgt., LLP*, 498 B.R. 32, 40 (Bankr.

S.D.N.Y. 2013) (internal quotation omitted) ("where the actual fraudulent transfer claim is asserted

by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more

liberal view" to Rule 9(b)).

43.     Here, the requirements of Rule 9(b) have been satisfied.  "Due to the difficulty of

proving actual intent to hinder, delay or defraud creditors, the [plaintiff] is allowed to rely on

'badges of fraud' to support his case, i.e. circumstances so commonly associated with fraudulent

transfers that their presence gives rise to an inference of intent." *Wall St. Assoc. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dept. 1999) (quotation and citation omitted) (quoted in *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005)).   Such badges of fraud may include "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business . . . and the secrecy, haste, or unusualness of the transaction." *Sharp Int'l*, 403 F.3d at 56 (citations and quotations omitted).   All of those badges have been pleaded in detail with respect to Defendants' scheme (which continued after the bankruptcy filing in violation of the automatic stay) to loot TransCare's most valuable assets and transfer them to Transcendence in an attempt to keep them under Tilton's dominion and out of the reach of TransCare's creditors. (Compl. ¶¶ 81-96.)

## V.    THE    COMPLAINT    ADEQUATELY    PLEADS    AN    EQUITABLE SUBORDINATION CLAIM AGAINST PATRIARCH PARTNERS

44.    Patriarch Partners has filed a claim for only $2,587.98.   (Claim No. 587.)   It nonetheless spends an entire section of the Motion (¶¶ 80-82) alleging that the claim (unlike the multi-million dollar claims of the other Patriarch defendants named in the third claim for relief) should be dismissed because insufficient allegations of inequitable conduct by Patriarch Partners have been alleged.   But as shown above (at ¶¶ 8-11), the Complaint pleads that the Defendants all acted together to effectuate the scheme.

## VI.    THE    COMPLAINT    ADEQUATELY    OBJECTS    TO    THE    CLAIMS    OF PATRIARCH PARTNERS AND PPMG

45.    The Motion asserts (¶¶ 83-85) that the fifth claim for relief objecting to claims, liens, and security interests is viable only against PPAS and Ark II (whose claims against TransCare's estates total over $36 million), but not against Patriarch Partners and PPMG (whose claims against TransCare's estates total slightly over $2 million), contending that because no viable avoidance claim has been pled against the latter two defendants, the defense of Bankruptcy

Code Section 502(d) is unavailable.  This is wrong for two different reasons: (1) the Complaint pleads valid avoidance claims against those two defendants (as discussed supra at ¶¶ 40-43) and (2) the Complaint does not rely on Section 502(d) as its sole basis for disallowance.

46.    Rather, the Complaint makes clear (Compl. ¶ 118) that the Trustee objects to the claims and any liens of Patriarch Partners and PPMG "pursuant to Bankruptcy Code Section 502(d) and because they are subject to setoff."  Defendants ignore the second half of this sentence, but Section 558 of the Bankruptcy Code fully preserves the Trustee's right to assert all of TransCare's common-law setoff defenses.  Defendants do not dispute that setoff is available here because of, among other things, the second, sixth, and ninth claims for relief asserted against Patriarch Partners and PPMG in the Complaint.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied. In the alternative, should the Court think it desirable for more detail to be provided at the pleading stage, the Trustee respectfully requests leave to amend in order to do so.

Dated: New York, New York
      June 11, 2018

                                        Respectfully submitted,

                                        /s/ Avery Samet
                                        Steven G. Storch
                                        Avery Samet
                                        John W. Brewer
                                        Jaime B. Leggett
                                        STORCH AMINI PC
                                        2 Grand Central Tower
                                        140 East 45th Street, 25th Floor
                                        New York, New York 10017
                                        Tel: (212) 490-4100
                                        Fax: (212) 497-4208
                                        sstorch@storchamini.com
                                        asamet@storchamini.com
                                        jbrewer@storchamini.com
                                        jleggett@storchamini.com

                                        *Special Counsel to Chapter 7 Trustee Salvatore LaMonica*