Avery Samet
MEMBER NY BAR

212.497.8239
asamet@storchamini.com

June 28, 2018

**Via ECF and Hand Delivery**

Honorable Stuart M. Bernstein
U.S. Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, New York 10004

Re: *LaMonica, as Chapter 7 Trustee v. Tilton, et al.*, Adv. Pro. No. 18-01021-smb

Dear Judge Bernstein:

We represent the Plaintiff in this adversary proceeding. We submit this letter-brief concerning whether Tilton is "judicially estopped from arguing that [she] had no discretion, in terms of the payment of interest" due from TransCare under the Credit Agreement. (June 21, 2018 Hr'g Tr. at 40:24-41:2, enclosed herewith as Exhibit 1.)

## I. Procedural Posture

At the prior hearing, the Court challenged the plausibility of the Complaint's allegation that Tilton had discretion to modify or waive interest payments due under the Credit Agreement (Compl. ¶30), in light of the Credit Agreement's no waiver clause:

> [N]o such waiver ... or modification shall ... reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof ... without the consent of each Lender affected thereby.

(Credit Agreement § 12.1(b)(i); Credit Agreement excerpts are enclosed herewith as Exhibit 2.)

At the Rule 12(b)(6) stage, the Court need only determine if Plaintiff can point to plausible facts to support the allegations of the Complaint.[1] The Court is authorized to consider not only documents incorporated into the Complaint (such as the Credit Agreement) but also matters of public record, including the administrative decisions of federal regulatory agencies. *Singleton v. Fifth Gen., Inc.*, No. 5:15-cv-474, 2016 WL 406295, at *2 (N.D.N.Y. 2016) (collecting cases).

The Complaint states a plausible claim that Tilton had discretion to waive or modify the interest due from TransCare in light of the positions Tilton took while successfully defending the SEC enforcement action against her, reported at *Matter of Lynn Tilton, et al.*, SEC Release No. 1182, 2017 WL 4297256 (Sept. 27, 2017).

---

[1] We understand this briefing as an invocation of the Court authority to, *sua sponte*, direct the briefing of additional issues under Rule12(b)(6). *Thomas v. Scully*, 943 F.2d 259 (2d Cir. 1991).

## II. Relevant Facts Concerning the Credit Agreement

The Credit Agreement—including its 30 amendments—authorizes a series of Loans from Lenders to TransCare. Under the Credit Agreement (definition of "Loan"), "any loan made by any Lender" constitutes its own "Loan."

The Credit Agreement was amended over time to provide for a series of tranches of Loans with varying interest rates. As of December 2015, there were eight separate tranches of Loans to TransCare: (1) Tranche A: consisting of Loans from the Zohar Funds (discussed below), AIP II (a Tilton-owned entity), and Credit Suisse, and an SPE controlled by Credit Suisse; (2) Tranches B-G: consisting entirely of Loans from the Zohar Funds; and (3) Tranche H: consisting of a small Loan from Ark II (also Tilton-owned).

The Tilton-owned entities and Zohar Funds owned and controlled 83% of the total outstanding Loans. The Credit Agreement defines the term "Required Lenders" as holders of more than 50% of the total outstanding Loans (not tranches).

Sections 5.1 and 5.4 set forth TransCare's obligation to pay interest on the Loans. Failure to pay interest within five business days of its becoming due constitutes an "Event of Default" under Section 10(a). However, Section 12.1(b) permits the Required Lenders to waive any Default or Event of Default. Moreover, pursuant to Section 10 (hanging paragraph), the occurrence of an interest payment default under Section 10(a) is of no consequence, unless and until the Administrative Agent declares a default by notice to TransCare, with the consent of the Required Lenders, in which case outstanding Loans are accelerated.

## III. Relevant Facts Concerning Tilton's Discretion to Modify Interest

At all times relevant to the Complaint, Patriarch VIII, XIV, and XV served as the collateral managers for Zohar I, II, and III.[2] Tilton controlled Patriarch VIII, XIV and XV as indirect owner and CEO. 2017 WL 4297256, at *8.

In March 2015, the SEC commenced an administrative proceeding against Tilton and Patriarch VIII, XIV, and XV. *Id.* at *1. The SEC complained that Tilton violated the anti-fraud provisions of the Investment Advisors Act of 1940 by providing false and misleading values for the assets held by the Zohar Funds. *Id.* at *2.

The collateral managers were entitled to significant quarterly fees depending upon the performance of the loans which Zohar Funds had extended to Portfolio Companies. *Id.* at *13. As such, "Tilton was aware of the interest payments made by the Portfolio Companies and their financial condition. Tilton regularly received a quarterly interest projection, in which she was

---

[2] The Zohar Funds were CLO, or collateralized loan obligation, funds. "A collateral manager determines what loans to purchase or originate on behalf of the CLO fund." 2017 WL 4297256, at *8. Each collateral manager had a contract with a Zohar Fund allowing it to "select and manage the collateral to be held by the fund." *Id.* at *9. "Through the collateral managers, Tilton used the monies raised from investors to buy or make loans to primarily private, mid-sized distressed companies (Portfolio Companies)." *Id.*

notified of the amount of interest on loans that a company expected to pay that quarter." *Id.* at *17 (citations to Tilton's Answer omitted).

The SEC complained that Tilton gamed the system by modifying loans extended to Portfolio Companies through a pattern of unilateral modifications, waivers, and courses of dealing, by which she modified interest payments outright or waived defaults stemming from such non-payment.

Tilton argued, and the ALJ found, that Tilton exercised wide discretion in accepting less than the contractual rate of interest due from the Portfolio Companies:

> Tilton made the ultimate decision on when to accept less than the contractual rate of interest due from the Portfolio Companies ... In most such instances she "deferred and accrued" interest ... Indications of "amendment by course of performance" by deferring and accruing (agreeing to accept less than the contractual rate of interest and deferring the remaining interest to a later date) appear in the trustee reports, as discussed *infra*. As Tilton aptly emphasized, "You want to collect as much as you can without throwing a company into foreclosure or liquidation. ... Everyone knew what we were buying, and everyone knew what the strategy was." ....
>
> When Tilton deferred interest payments, payments were deferred until she asked for payment, which could be any point in the future or never.

*Id.* at *19 (relying on Tilton's Answer and testimony). *See also id.* at *18 ("Patriarch told Barclays: 'we have recently amended many of the credit agreements to lower interest rates to allow them to pay full interest or defer current due interest.... You are well aware that the ability to waive, amend or change interest rates to meet the current conditions of a company is an integral part of the business model.'"); *id.* at n.29 ("Tilton explained: 'It was rare that we waived or forgave interest.' ... By deferring and accruing unpaid interest, 'if a company turned around ... we could provide that interest to the loans ... also [if] we needed to take a company through bankruptcy, having that large accrued interest helped us keep the equity, because it became the unsecured class.'").

The ALJ further found that in addition to waiving or deferring Portfolio Companies' interest payment obligations by amendment of the underlying credit agreement, Tilton did so by course of performance:

> Tilton presented evidence that she amended loan agreements ... by "course of performance" to allow interest payments to be deferred and accrued or otherwise to change the terms—interest rates and maturities—of loans.

*Id.* at *45 (citing New York law which provides that "any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90-91 (2d Cir. 2013)).

As a result, the ALJ concluded that Tilton had no liability because the Zohar Funds were sufficiently apprised that interest payment obligations were being waived or deferred by Tilton through amendments and course of dealing:

> The investors knew that the [Zohar] Funds' business model was to lend to a number of distressed companies with the idea that, while some would succeed, enabling the Funds' investors to be paid, others would fail. Thus, it would be unreasonable to expect that all the borrowers would make 100% of their interest payments ... The trustee reports disclosed that the interest payments received from the Portfolio Companies were far below the amounts due based on the loans' stated interest rates, yet almost no loans were ... Defaulted Investments. [Here] there was no affirmative misrepresentation of the interest payments collected and in which the investors—large financial institutions—could ascertain the difference between the total interest payable based on the interest rates of the loans and the total actually collected by comparing information disclosed in the same document. Not only were these large financial institutions able to obtain the information from the trustee reports, it would have been unreasonable for them to expect all of the companies to pay all of their interest according to the interest rates on their loans, given the business model of loaning to distressed companies.

*Id.* at *45-46. These facts and conclusions form the plausible basis for the Trustee's allegation that Tilton could waive the contractually mandated interest owed the Zohar Funds and any default arising from any nonpayment of interest, through the Zohar Funds' control of more than 50% of the outstanding Loans under the Credit Agreement.

### IV. Legal Argument

Tilton may not argue on this motion to dismiss that she lacked discretion to waive interest payments due from TransCare, given her successful arguments to the ALJ.

Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001), quoting 18 C. Wright, A. Miller, & E. Cooper, Fed. Practice & Proc. § 4477, p.782 (1982) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory").

Although "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle[,]" the Supreme Court identified three "typical" factors: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded on its earlier position; and (3) the party would derive an unfair advantage if not estopped. *New Hampshire v. Maine*, 532 U.S. at 750. These factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." *Id.* Applying those criteria, judicial estoppel is appropriate here, or at a minimum there is a material issue of fact as to whether it should be applied.

*First Factor.* Tilton's position that she lacked discretion to waive interest due to the Zohar Funds themselves, or discretion to waive any default (through her control of the Zohar Funds), is clearly inconsistent with her prior position that such discretion was an integral and disclosed component of her arrangement with the Zohar Funds. That position constituted the core of her argument against the SEC. *See* p.3, *supra* (Tilton was clear with Zohar Fund noteholders that she regularly "waive[d], amend[ed], or change[ed] interest rates to meet the current conditions of a company," to avoid "throwing a company into foreclosure or liquidation" when it was unable to pay interest as it became due).

*Second Factor.* The ALJ accepted those facts as true, and so declined to ascribe liability to Tilton and Patriarch VIII, XIV and XV for misleading the Zohar Fund noteholders.

*Third Factor.* Allowing Tilton to take the contrary position herein, that she lacked discretion to waive or modify interest payments owed by TransCare and so needed to liquidate its assets, would certainly be unjust and allow her to prevail on contradictory theories. We remind the Court that on this motion it is unnecessary to *conclude* that Tilton had such discretion. Instead, the Court must determine only that the Complaint plausibly alleges that she did.

In a similar vein, under Rule 12(b)(6), it is not even necessary to reach judicial estoppel, as the related doctrine of judicial admission will suffice. Under this doctrine, a Court may consider assertions of fact made in one action as evidence in a different proceeding. *CBRE Inc. v. The Pace Gallery LLC*, No. 17-cv-2452, 2018 WL 740994, at *2 (S.D.N.Y. Feb. 6, 2018); *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F.Supp.3d 17, 37-38 (S.D.N.Y. 2015). Here, the assertions made by Tilton before the ALJ provide sufficient basis to uphold the Complaint's allegations.[3]

The Trustee acknowledges that Tilton could not directly waive the interest due to Credit Suisse and its affiliate. However, as discussed above, Tilton could elect not to accelerate the Loans, or waive any Event of Default, due to her control of the Required Lenders under the Credit Agreement. As argued to and adopted by the ALJ, Tilton had discretion to waive any defaults for the benefit of the Portfolio Companies so that they could avoid liquidation. Indeed, during the three months preceding TransCare's bankruptcy, TransCare did not make interest payments and no default was called.[4]

The Court should conclude that the Complaint plausibly alleges that Tilton had discretion to waive or modify TransCare's interest payments.

Respectfully submitted,

/s/ Avery Samet

Enclosures

---

[3] To the extent that Defendants argue that the intervening Supreme Court decision in *Lucia v. S.E.C.*, 2018 WL 3057893 (June 21, 2018) (finding SEC administrative law judges to be unconstitutional) affects the judicial estoppel nature of *Matter of Tilton* (which it does not), the Court can rely on these judicial admission line of cases.

[4] Under Rule 12(b)(6), the Court may consider assertions of facts in briefs consistent with the allegations of the Complaint, "especially where ... those factual allegations are directly responsive to a defense first raised in the motion itself." *Torrico v. IBM Corp.*, 213 F.Supp.2d 390, 399 n.4 (S.D.N.Y. 2002).