UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------X

In re:                       :          Chapter 7
                          :
TRANSCARE CORP., *et al.,*    :        Case No. 16-10407 (SMB)
                          :
            Debtors.    :        (Jointly Administered)

---------------------------------------------X

SALVATORE LAMONICA, as Trustee  :
for the Estates of TransCare Corp., *et al.,*  :
                          :
            Plaintiff,    :
                          :
          v.             :        Adv. Proc. No. 18-01021 (SMB)
                          :
LYNN TILTON, *et al.,*        :
                          :
           Defendants.  :

----------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## MOTION TO DISMISS THE COMPLAINT
## AND GRANTING LEAVE TO AMEND

**A P P E A R A N C E S :**

STORCH AMINI PC
*Attorneys for Plaintiff*
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017

      Steven G. Storch, Esq.
      Avery Samet, Esq.
      John W. Brewer, Esq.
      Jaime B. Leggett, Esq.
          Of Counsel

PROSKAUER ROSE LLP
*Attorneys for Defendants*
Eleven Times Square
New York, NY 10036-8299

      Michael T. Mervis, Esq.
      Timothy Q. Karcher, Esq.
      Nicole A. Eichberger, Esq. (*pro hac vice*)
         Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The Plaintiff, Salvatore LaMonica ("Trustee"), the trustee of the administratively

consolidated estates of TransCare Corporation and numerous debtor-affiliates

(collectively, "TransCare" or the "Estate"), commenced this adversary proceeding to

recover damages from the defendants under several theories discussed below.  The non-

individual defendants have moved to dismiss all or a portion of many of the Trustee's

claims.  (*See Memorandum of Law in Support of Motion to Dismiss*, dated May 4, 2018

("*Defendants' Memo*") (ECF Doc. # 11)[1]; *see also Defendants' Reply to Plaintiff's*

*Opposition to Defendants' Partial Motion to Dismiss Certain Claims Asserted in the*

*Chapter 7 Trustee's Adversary Complaint*, dated June 18, 2018 ("*Defendants' Reply*")

(ECF Doc. # 17.))  The Trustee opposes the motion.  (*See Plaintiff's Opposition to*

*Defendants' Partial Motion to Dismiss*, dated June 11, 2018 ("*Plaintiff's Opposition*")

(ECF Doc. # 16.))  For the reasons that follow, the motion is granted in part and denied

in part, and the Trustee is granted leave to amend.

## BACKGROUND[2]

TransCare provided emergency medical transportation services to hospitals and

municipalities throughout the Northeast and disability transportation services for

municipal authorities, such as the New York City Transit Authority ("MTA").  (¶ 1.)  The

Defendant Lynn Tilton was the sole member of TransCare's Board of Directors, (¶¶ 2,

---

[1]      "ECF" refers to the electronic docket in this adversary proceeding.

[2]      Unless otherwise stated, the facts are derived from the allegations in the unsealed *Complaint*,
dated Feb. 21, 2018 ("*Complaint*") (ECF Doc. #4.)  The parenthetical "(¶)" followed by a number refers to
paragraphs in the *Complaint*.

10), and the sole owner, chief executive officer and principal/manager of the "Patriarch" family of companies. (¶ 10; *see* ¶¶ 13-21.) As used in the *Complaint*, the term "Patriarch" refers to all of the Defendants (collectively, the "Patriarch Defendants") other than Tilton, and includes the following entities: Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC, Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001-1, Limited ("Ark II"), Ark Investment Partners II, L.P. ("Ark Partners"), LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc. (¶ 4 n. 2.) The *Complaint* alleges that Patriarch operated wholly under Tilton's control and pursuant to her directives "as a wholly-integrated entity." (¶ 34.)

## A.    The Lending Agreements

By a Credit Agreement dated August 4, 2003 ("Credit Agreement"),[3] TransCare issued debt obligations to eight lenders (collectively, the "Original Lenders"). Two of the Original Lenders were the Patriarch Defendants, Ark II and Ark Partners. (Credit Agreement § 5.4, Schedule 1.0.) The other six Original Lenders were First Dominion Funding I, First Dominion Funding II, CSAM Funding II, CSAM Funding III, Atrium CDO and Zohar CDO 2003-1, Limited. (*Id.*) Each Original Lender appointed PPAS as the Administrative Agent to act on its behalf consistent with the terms of the Credit Agreement, and to exercise the powers reasonably incidental thereto. (¶ 11; Credit

---

[3]    Excerpts from the Credit Agreement were attached as Exhibit A to the *Declaration of Nicole A. Eichberger, Esq. in Support of Defendants' Motion to Dismiss*, filed May 4, 2018 ("*Eichberger Declaration*") (ECF Doc. #12.) At the Court's request, the parties provided the complete Credit Agreement and two amendments.

Agreement § 11.1.)  According to the *Complaint*, TransCare granted PPAS a senior secured lien on all of its assets, (¶ 29), although the Credit Agreement suggests that the Original Lenders were the secured parties and PPAS was their agent with respect to their liens.  (*See* Credit Agreement §§ 11.10, 11.12.)

The Credit Agreement was amended by Amendment 22, dated as of January 25, 2013.  While the amendment did not modify the material terms of the Credit Agreement, it was signed by a different group of lenders (the "Lenders").  In addition to PPAS, which signed as Administrative Agent, the Lenders included the Defendant Ark Partners and Zohar CDO 2003-1, Limited, Zohar II 2005-1, Limited and Zohar III, Limited (collectively, the "Zohar Entities").  The Defendant Tilton signed on behalf of PPAS, Ark Partners and the Zohar Entities as manager of each Lender.  Notably, Ark II was no longer listed as one of the Lenders, and the schedule of outstanding loans as of January 8, 2013 attached to Amendment 22 did not list any outstanding loans owed to Ark II.  The form of Amendment 22 provided to the Court included signature lines for two additional lenders, First Dominion Funding I and Credit Suisse Alternative Capital, Inc., but their signatures did not appear on the document.

Under the Credit Agreement, TransCare agreed to pay principal and interest to PPAS in installments for the benefit of the Lenders according to a schedule set forth in the Credit Agreement.  (*See* Credit Agreement §§ 2.3, 5.1, 5.4, Schedule 1.0.)  All payments were to be made to PPAS "prior to 12:00 noon, New York City time, on the due date thereof" to be distributed to the Lenders on a *pro rata* basis.  (*Id.* § 5.9(a), (c).)  PPAS was authorized to waive certain conditions with the written consent of the "Required Lenders," but could not modify the time or amount of the payments due

under the Credit Agreement without the consent of each affected Lender.  The Credit

Agreement provided, in pertinent part:

> The Required Lenders may, or, with the written consent of the Required
> Lenders . . . the Administrative Agent may . . . waive, on such terms and
> conditions as the Required Lenders or the Administrative Agent, as the
> case may be, may specify in such instrument, any of the requirements of
> this Agreement or the other Loan Documents or any Default or Event of
> Default and its consequences; . . . *provided, however* . . . that no such
> waiver and no such amendment, supplement or modification shall . . .
> reduce the stated rate of any interest or fee payable hereunder or extend
> the scheduled date of any payment thereof . . .  without the consent of each
> Lender affected thereby . . . .

(*Id.* § 12.1 (emphasis in original).)

The *Complaint* avers that the Credit Agreement and the amendments to the

Credit Agreement were not the product of arm's length transactions because Tilton

controlled both Patriarch and TransCare.  (¶ 31.)  TransCare does not contend, however,

that the Original Lenders did not fund the loan or that the terms of the Credit

Agreement were unfair.[4]

---

[4]     The Trustee further argued at the hearing that Tilton should be estopped from arguing that she
was not authorized to waive or modify payments of interest under the Credit Agreement because she took
the opposite position in an SEC administrative proceeding, which was decided in her favor.  Lynn Tilton,
Exchange Act Release No. 1182, 2017 WL 4297256 (ALJ Sept. 27, 2017) ("*SEC Opinion*").  The Parties
were given leave to brief the issue.  (*See* Trustee's Letter, dated June 28, 2018 (ECF Doc. # 18);
Defendant's Letter, dated July 9, 2018 (ECF Doc. # 20).)  The respondents before the SEC were Patriarch
Partners, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC
("Patriarch Collateral Managers," together with Tilton, the "SEC Respondents").  The issue before the SEC
administrative law judge was whether the SEC Respondents had violated the antifraud provisions of the
Investment Advisers Act of 1940, § 206(1), (2) and (4), 15 U.S.C.A. § 80b-6, by making material
misrepresentations and omissions to the institutional investors in three collateralized loan obligation
funds managed by the Patriarch Collateral Mangers, namely, the Zohar Entities.  Through the Patriarch
Collateral Managers, Tilton used the monies in the Zohar Entities to buy or make loans to mid-sized
distressed companies ("Portfolio Companies").  The SEC Opinion contains findings that Tilton would
often decide to defer and accrue interest payments owed by the Portfolio Companies, and did so at times
through "amendment by course of performance" rather than by a signed document.  *SEC Opinion*, at *19.
She "made the ultimate decision on when to accept less than the contractual rate of interest due from the
Portfolio Companies."  *Id.*  However, the *SEC Opinion* does not state whether TransCare was one of the
Portfolio Companies whose interest payments were deferred, and given the allegations in the *Complaint*,
it probably was not.  Furthermore, even if Tilton, through PPAS, could defer the payment of interest

On October 13, 2006, TransCare entered into a revolving credit facility with Wells Fargo, N.A. ("Wells Fargo") to fund the operations of the company.  (¶ 32.)  The same day, Wells Fargo and PPAS entered into an inter-creditor agreement pursuant to which PPAS recognized Wells Fargo's first lien on all of TransCare's assets and accounts receivable, including TransCare's right to payment under its "MTA Contract."  (¶ 32.) The MTA Contract, under which TransCare provided paratransit services for MTA customers using vehicles leased from the MTA, was TransCare's most profitable business unit.  (¶¶ 32, 41.)  PPAS took a first lien position on TransCare's vehicles and certain miscellaneous physical assets only, and agreed it would not take any action to foreclose or otherwise enforce any liens junior to Wells Fargo.  (¶ 33.)

## B.    The Deterioration of TransCare's Financial Condition and the Defendants' Mismanagement and Self-Dealing

The gravamen of the *Complaint* concerns Tilton's response to TransCare's deteriorating financial condition, and charges mismanagement and two forms of self-dealing that overlap.  First, she continued to insist that TransCare make interest payments under the Credit Agreement even though PPAS had the authority to waive the interest payments and TransCare lacked the funds to meet its operational and employee obligations.  Second, she continued to rebuff suggestions to sell and offers to purchase TransCare's assets to meet its liquidity needs.  Third, and arguably instead, she stole a corporate opportunity by causing the most valuable TransCare's assets to be transferred to affiliates through a strict foreclosure, and then crediting TransCare's outstanding debt

---

allocable to the Lenders she controlled, PPAS could not waive the interest payments due to the unaffiliated Lenders without their consent.

under the Credit Agreement in an amount substantially less than the value of the foreclosed assets.

Between 2012 and 2014, the Debtor had net revenues of approximately $130 million and positive EBITDA, (¶ 40), and in 2012, PPAS modified the Credit Agreement to provide TransCare with an additional $2 million.  (¶ 40.)  Nevertheless, TransCare's costs grew and it lost clients because of its inability to invest in new vehicles.  (¶ 40.) TransCare's executives were told that not paying bills on time and in full was the "Patriarch way."  (¶ 40 (quotation marks in original).)  As a result, TransCare's payables grew, and critical vendors went unpaid.  (¶ 40.)  During the same period, TransCare paid over $11 million to PPAS on account of the loans.  (¶ 40.)

In early 2015, the MTA indicated its reluctance to renew the MTA Contract, scheduled to expire that summer, due to TransCare's deteriorating financial condition, and particularly, TransCare's inability to obtain replacement parts for the MTA vehicles. (¶ 41.)  On February 4, 2015, TransCare executives warned Tilton that the company lacked cash to make payroll the following day, and faced a projected $6.7 million shortfall by the end of March.  (¶ 42.)

On February 5, 2015, Glenn Leland, TransCare's CEO, advised Patriarch of a potential resolution to TransCare's financial problems.  National Express had communicated an interest in purchasing TransCare's MTA Contract and paratransit business for between $15 million and $18 million.  (¶¶ 43, 44.)[5]  National Express

---

[5]       The *Complaint* is unclear whether the purchase of the MTA Contract and the paratransit business were cumulative, and would result in as much as $18 million, or two different transactions that would produce as much as $36 million.

offered an immediate non-refundable deposit in the amount of $1.7 million to begin negotiations.  (¶ 44.)  In response, Tilton contacted Leland directly and berated him for exploring a sale option.  (¶ 45.)  Brian Stephen, a lawyer employed at Patriarch but claiming to represent TransCare's Board, (¶ 37), told Leland that he "had no authority to even discuss sale options of any assets with any company," and "claimed that TransCare would not receive any of the potential sale proceeds because 'Lynn has other debts.'" (¶ 45.)  Finally, Jean-Luc Pelissier, an Executive Managing Director of Patriarch, (¶ 38), told Leland "that under no circumstances could he attempt to raise funds by exploring potential sales."  (¶ 45.)  Around the same time, RCA Ambulance Service expressed to Tilton its interest in acquiring TransCare, but she refused to authorize TransCare executives to consider the offer.  (¶ 46.)

On February 18, 2015, Leland drafted a stabilization plan, noted that TransCare was not a viable ongoing concern without an immediate cash infusion and repeated the prospect of a sale of the MTA business for between $14 million and $17 million as a source of immediate financing.  (¶¶ 47, 48.)  Tilton again refused to allow TransCare to explore a sale, but nevertheless authorized Patriarch to lend funds to TransCare so that it could make payroll.  (¶ 49.)

In June 2015, TransCare's executives again warned Tilton that the company risked missing payroll and needed to recapitalize immediately, suggested borrowing, and warned that it lacked the funds needed to pay PPAS, make payroll and pay other expenditures.  (¶¶ 50, 51.)  TransCare was informed that Tilton, as sole member of TransCare's board, insisted that TransCare make the interest payment to PPAS, and reminded TransCare that PPMG was not the only lender.  (¶¶ 51, 52.)  In response,

8

Leland advised Patriarch that TransCare could not maintain its critical supply chain and insurance if it had to pay the interest and continue to postpone back payroll tax deposits.  (¶ 53.)

In July 2015, TransCare missed payroll after bouncing a check to pay for insurance, and was warned by the New York Department of Health that the failure to provide immediate assurances to fund payroll would result in the shutdown of TransCare's operations.  (¶ 54.)  Leland informed Patriarch of offers to buy all or parts of TransCare from two separate national ambulance companies, as well as a "Letter of Intent" from National Express offering to buy the MTA business for $6 million to $7 million and a $2 million assumption of liabilities, but was instructed by Tilton's son-in-law, Scott Whalen, to make it "clear" that TransCare was not for sale.  (¶¶ 55-60.)  On July 8 and 16, Tilton caused "Patriarch" to lend over $1.3 million to TransCare to fund payroll, bounced checks, and immediate needs.  (¶ 61.)

Leland's warnings, and Patriarch's demand for interest payments and rejection of sale proposals, as well as Patriarch's other cash flow initiatives, such as forcing the employees to pay for their own fuel and withholding the payment of payroll taxes to the IRS, continued throughout the summer and into the late fall.  (*See* ¶¶ 63-71.)

By December 16, 2015, Tilton advised Wells Fargo that she had determined to sell TransCare.  (¶ 73.)  Two days later, Patriarch analyst Michael Greenberg advised Tilton that the MTA Contract was worth between $22 million and $36 million, a figure "vastly more" than the amount needed to pay employees and recapitalize TransCare.  (¶ 74.)  In January 2016, Leland quit, and Tilton hired Carl Marks & Co. ("Carl Marks") as

restructuring advisors to TransCare, and told Carl Marks to report directly to her.

(¶ 76.)  By a credit agreement dated January 15, 2016 (the "Ark Credit Agreement"),

Ark II committed to make $6.5 million available to TransCare Corporation for working

capital and general corporate purposes, but did not make the promised amount

available.  (¶¶ 77-78.)  TransCare provided guarantees and liens to Ark II in connection

with the Ark Credit Agreement.  (¶ 77.)

## C.     The Strict Foreclosure and the Bankruptcy

On February 9, 2016, Tilton's personal attorneys contacted the firm of Curtis

Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") about the need to immediately file

chapter 11 bankruptcy cases for TransCare.  (¶ 80.)  In the meantime, also on February

9, 2016, Pelissier contacted the MTA and represented that the owner of TransCare

wished to transfer the MTA Contract to a different entity.  (¶ 79.)

The next day, February 10, Tilton incorporated two new Delaware entities:

Transcendence Transit, Inc., and a wholly-owned subsidiary called Transcendence

Transit II, Inc. ("Transcendence II").  Transcendence II would take over TransCare's

MTA Contract and other paratransit operations.  (¶¶ 81, 83.)  That same day, Carl Marks

provided Patriarch with financial projections showing that with TransCare's assets,

Transcendence II would earn $22.7 million in revenue and $1.5 million in EBIDTA.

(¶ 82.)  Greenberg, the Patriarch analyst, pegged the revenues at $25 million from the

MTA Contract and $31 million from its other paratransit operations.  (¶ 83.)

Tilton's plan was to be effectuated through a secret foreclosure of TransCare's

assets.  (*See* ¶¶ 84-85.)  On February 14, 2016, Pelissier submitted a detailed plan to

TransCare's executives to prepare to transfer TransCare's lucrative MTA paratransit business as well as several other lucrative ambulance divisions.  (¶ 86.)  On February 18, 2016, TransCare signed an engagement agreement with Curtis Mallet to file the chapter 7 cases.  (¶ 87.)  All the while, Patriarch refused to fund TransCare's payroll taxes or reserve for them, and by February 24, 2016, TransCare owed approximately $1.148 million in payroll taxes for 2016, plus at least $172,000 in penalties and interest.  (¶ 88.) When Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations, and outstanding payroll taxes from earlier pay dates as well as other critical expenses, Tilton chastised Carl Marks for seeking her direction and instead told Carl Marks to "make decisions on what needs to be paid."  (¶ 88.)

On February 24, 2016, Patriarch, through a process controlled by Tilton, purported to strictly foreclose on TransCare's assets and assume TransCare's rights and obligations under the MTA Contract in satisfaction of $10 million of the amounts owed under the Credit Agreement.  (¶¶ 90-93.)  Ultimately, however, Tilton's rescue plan fell apart.  (¶ 94.)  On February 24, 2016, she directed TransCare to file for chapter 7 bankruptcy, (¶ 89), and it did that same day.

One day later, and notwithstanding the automatic stay, Stephen advised TransCare executives to secure the assets.  (¶ 95.)  Later that evening, Pelissier instructed TransCare's executives to transfer TransCare's accounts receivable server out of TransCare's warehouse, but TransCare's vice president refused, rejected Patriarch's offer to join Transcendence, and alerted the Trustee.  (¶ 96.)

### D.   The Proofs of Claim

Four Patriarch Defendants filed proofs of claim.[6]  PPAS filed a secured claim in the sum of $35,090,492.76 based on the Credit Agreement.  The claim reflects a $10 million credit relating to the acceptance of collateral resulting from the strict foreclosure.  PPMG filed an unsecured claim in the sum of $2,038,515.87 owed under a Management Services Agreement.  Ark II filed a secured claim in the sum of $1,077,966.97 based on outstanding indebtedness under the Ark Credit Agreement.  The amount of the claim reflects a $789,457.00 credit representing the proceeds of collateral sales by the Trustee.  Patriarch Partners, LLC filed an unsecured claim in the sum of $2,587.98 based on unpaid expenses.

### E.   The *Ien* Adversary Proceeding

On the heels of the bankruptcy filing, one of TransCare's former employees commenced an adversary proceeding alleging violations of the federal and New York WARN Acts.  (*See Complaint* in *Ien v. TransCare Corp. et al.* ("*Ian*"), dated March 1, 2016 ("*Ien Complaint*") (ECF Adv. Proc. No. 16-01033 Doc. # 1).)  The defendants included TransCare, Tilton, and several Patriarch Defendants: Patriarch Partners, LLC, ARK CLO 2001-1 Limited, Ark Partners and Patriarch Partners III, LLC.  The *Ien Complaint* charged that the non-individual defendants, under the *de facto* control of Tilton, caused the shutting down of TransCare and the termination without warning or cause of approximately 1,700 employees by refusing to fund TransCare's operations and attempting to transfer those operations to newly created entities.  (*Ien Complaint* ¶¶ 47-

---

[6]        Copies of the four proofs of claim are attached as Exhibit B to the *Plaintiff's Opposition*.

49.)  The *Ien Complaint* also asserted claims against all defendants for unpaid wages under New York, Maryland and Pennsylvania law.  (*Id.* ¶¶ 101-14.)

In his *Answer to Adversary Class Action Complaint*, dated June 3, 2016 ("*Trustee Answer*") (ECF Adv. Proc. No. 16-01033 Doc. # 24), the Trustee generally denied the material allegations in the *Ien Complaint* and asserted several affirmative defenses.  These included that "the Debtors were unable to give such notice because, pursuant to 29 U.S.C. § 2102(b)(2)(A) and upon information and belief, the terminations were caused by business circumstances that were not reasonably foreseeable at the time that notice would have been required," (*Trustee Answer*, pp. 18-19; *accord* pp. 19-20), and "as of the time notice would have been required, the Debtors were actively seeking capital and/or business which, if obtained, would have enabled the Debtors to avoid or postpone the closing or layoff and the Debtors reasonably and in good faith believed that giving the required notice would have precluded them from obtaining the needed capital and/or business."  (*Id.*, p. 19; *accord id.*, p. 20.)

Other WARN Act class actions were subsequently filed but were dismissed in light of the pendency of *Ien*, (*see Memorandum Decision Granting Motion to Dismiss Subsequently Filed Adversary Proceeding and Appointing Interim Class Counsel*, dated May 23, 2016 (ECF Adv. Proc. No. 16-01033 Doc. # 22)), or leave to intervene in *Ien* was denied.  (*Order*, dated Oct. 11, 2016 (ECF Adv. Proc. No. 16-01033 Doc. # 45).) Three classes were certified in *Ien*, Shameeka Ien was appointed Class Representative for each class, and Outten & Golden, LLP, was appointed Class Counsel for each class. (*Order Certifying Classes and Granting Related Relief*, dated Oct. 24, 2016 (ECF Adv.

Proc. No. 16-01033 Doc. # 46).)  Since then, the parties have been engaging in discovery and preparing for trial.

## F.     This Adversary Proceeding

Approximately two years later, on February 22, 2018, the Trustee filed the *Complaint* commencing this adversary proceeding.  The *Complaint* asserts the following nine claims for relief:

| Count | Defendants | Nature of Claim |
|---|---|---|
| 1 (¶¶ 97-102) | Tilton | Tilton breach her fiduciary duties of loyalty and good faith by "actively impeding" TransCare's attempts to monetize its assets, stripping TransCare of assets for the benefit of Tilton, Patriarch, and her other companies, and subjectively or objectively knowing that her actions exposed TransCare to liability under the federal and New York WARN Acts. |
| 2 (¶¶ 103-105) | Patriarch | Patriarch aided and abetted Tilton's breaches of her fiduciary duties. |
| 3 (¶¶ 106-111) | PPAS, Ark II, PPMG, Patriarch Partners, LLC | These defendants' claims should be equitably subordinated on the grounds that they participated in and benefited from Patriarch's inequitable conduct causing injury to the creditors of TransCare and giving Patriarch an unfair advantage. |
| 4 (¶¶ 112-116) | PPAS, Ark II | These defendants' claims should be recharacterized on the grounds that loans they advanced were in fact and should be deemed to be capital contributions and not debt. |
| 5 (¶¶ 117-121) | PPAS, Ark II, PPMG, Patriarch Partners, LLC | These defendants' claims and liens are subject to set-off and should be disallowed, *inter alia*, under Bankruptcy Code § 502(d) on the ground that they are not properly documented. Additionally, to the extent their liens are avoided, subject to set off or invalidated, the estates are entitled to disgorgement of all post-petition |

| | | payments, retention of all funds that would otherwise be subject to the liens and the preservation of the liens for the estate. |
|---|---|---|
| 6 (¶¶ 122-126) | Patriarch | Lender liability, common law breach of fiduciary duty and common law assumption of control based on Patriarch's "complete domination of the finances, policy, and business practices of TransCare," including causing TransCare to make decisions that, *inter alia*, denied TransCare the ability to explore asset sales, resulting in unpaid claims, the loss of proceeds, and inability to continue TransCare as a going concern. |
| 7 (¶¶ 127-131) | Tilton and Patriarch | Actual fraudulent transfer under the Bankruptcy Code and New York law based on the purported strict foreclosure of certain of TransCare's assets. |
| 8 (¶¶ 132-135) | Tilton and Patriarch | Recovery of avoided transfers from all defendants as initial transferees, immediate or mediate transferees, or the entities for whose benefit the avoided transfers were made. |
| 9 (¶¶136-138) | Tilton and Patriarch | Civil contempt based on violations of automatic stay relating to the post-petition attempts to consummate the strict foreclosure and to obtain TransCare's property. |

The Defendants seek dismissal of all or part of several Counts in the *Complaint* based on lack of standing under Article III of the United States Constitution, failure to state a claim based on improper group pleading, failure to allege a legally sufficient claim, failure to allege inequitable conduct, and failure to sufficiently plead avoidance and recovery claims.[7]  The Trustee opposes the motion.

---

[7]    At times, the *Defendants' Memo* goes outside the "four corners" of the *Complaint* and includes additional facts that challenge the Trustee's theory of the case, and in particular, attributes TransCare's financial failure to Wells Fargo's "destructive actions" and extols Tilton's "extraordinary efforts" to

# DISCUSSION

## A.    Lack of Standing

The party invoking federal jurisdiction bears the burden of establishing its standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Constitutional, or Article III standing, "imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560); *accord Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). If the alleged injury is too hypothetical, abstract or speculative, there is no case or controversy. *See Baur v. Veneman*, 352 F.3d 625, 631-32 (2d Cir. 2003). The Second Circuit has described the burden of pleading an injury-in-fact as a "low threshold." *John v. Whole Foods Market Group, Inc.*, 858 F.3d 732, 736 (2d Cir. 2017); *W.C. Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013) (quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). The plaintiff does not have to show the certainty of harm; standing may be "based on a 'substantial risk' that the harm will occur, which may prompt

---

prevent a shutdown of TransCare's most profitable business lines or a fire sale of its assets. The Court will disregard these additional alleged facts in assessing the legal sufficiency of the *Complaint*.

plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010)).

The Defendants argue that the Trustee has failed to demonstrate Article III standing with respect to Count I (Breach of the Fiduciary Duty of Loyalty and Good Faith), Count II (Aiding and Abetting Breach of the Fiduciary Duty of Loyalty), and Count VI (Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control) to the extent the claims are premised on alleged WARN Act liability.[8]  As discussed, the Estate is currently a defendant in WARN Act litigation pending before me in *Ien*.  The *Complaint* in this adversary proceeding alleges that the Defendants' actions have subjected the estate only to "potential" WARN Act liability under federal and New York law, (¶ 101, "TransCare's estates currently face only '*potential* liability under the WARN Act and NY WARN Act,'" *Defendants' Memo* at ¶ 45 (quoting *Complaint* at ¶ 101) (emphasis in *Defendants' Memo*)), and in addition, the Trustee has explicitly denied WARN Act liability in *Ien*.  (*Defendants' Memo* at ¶ 46.) The Defendants also contend that where damages are dependent upon an outcome in separate pending litigation, the plaintiff must show that liability in that action is "certainly impending" or there is a "substantial risk" the alleged injury will occur.

---

[8]    Prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984))); *accord Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002).  The Defendants do not contest the Trustee's prudential standing, and I conclude that he has shown it.  He seeks to redress injuries to the Estate caused by the allegedly wrongful acts of the Defendants.

The Defendants' argument lacks merit. The Trustee asserts the Estate's potential WARN Act liability to its former employees as an element of the Estate's damages. Similarly, he alleges additional injuries proximately caused by the Defendants' misuse of the Estate's employees, their mismanagement of TransCare, the theft of TransCare's corporate opportunity, and ultimately, TransCare's descent into bankruptcy. All of the acts giving rise to the Defendants' liability have occurred and the Trustee's claims have accrued, making their liability disputed rather than contingent. *See* BLACK'S LAW DICTIONARY 302 (10th ed. 2014) (defining a contingent claim as "[a] claim that has not yet accrued and is dependent on some future event that may never happen"). Like the WARN Act claims, the Defendants' liability for the accrued, disputed claims asserted in the *Complaint* will be determined by this Court.

But even if the Estate's disputed WARN Act claims are contingent on the outcome of *Ien*, a contingent liability can constitute a concrete, injury-in-fact, *Clinton v. City of New York*, 524 U.S. 417, 430-31 (1998); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016); *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992), including a disputed liability that is dependent on the outcome of litigation involving the legal consequences of events that have already occurred. *See Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 269 (S.D.N.Y. 2014). "[T]he difference between an abstract question and a 'controversy' is one of degree." *Am. Mach. & Metals v. De Bothezat Impeller Co.*, 166 F.2d 535, 536 (2d Cir. 1948) (citation omitted). In discussing whether a case or controversy exists under the Declaratory Judgment Act, the Supreme Court has explained that

> [T]he question in each case is whether the facts alleged, under all the
> circumstances, show that there is a substantial controversy, between

18

> parties having adverse legal interests, of sufficient immediacy and reality
> to warrant the issuance of a declaratory judgment.

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Where liability depends on a contingency, a court must focus on "the practical likelihood that the contingencies will occur." *Associated Indem. Corp.*, 961 F.2d at 35 (internal quotation marks and citation omitted). If all the acts giving rise to liability have already occurred, *i.e.,* the claim has accrued, it is more likely that the dispute will be sufficiently concrete to present an actual case or controversy. *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406-07 (S.D.N.Y. 2002) ("[A] touchstone to guide the probe for sufficient immediacy and reality is whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass."), *aff'd*, 346 F.3d 357 (2d Cir. 2003). Here, the *Complaint* alleges facts regarding the abrupt cessation of TransCare's operations and the termination of its approximately 1,700 employees on February 24, 2016. All of the events giving rise to the Defendants' liability, if any, have already occurred, and as noted, the Trustee's claims have accrued. Moreover, the *Complaint* paints a picture of a "substantial risk" that the Estate will face WARN Act liability neither conjectural nor speculative.

The Defendants have cited several cases for the proposition that a case or controversy does not exist where the plaintiff's claim is contingent on the outcome of litigation pending in a different court. (*Defendant's Brief* ¶ 47-48); *San Diego Unified Port District v. Monsanto Co.*, 309 F. Supp. 3d 854 (S.D. Cal. 2018); *Whitney Lane*

*Holdings, LLC v. Sgambettera & Assocs., P.C.*, No. 08-CV-2966 (JS)(AKT), 2010 WL 4259797 (E.D.N.Y. Sept. 8, 2010); *Pall v. KPMG, LLP*, Civ. No. 3:03CV00842(AWT), 2006 WL 2800064 (D. Conn. Sept. 29, 2006); *Plantronics, Inc. v. United States*, No. 88 Civ. 1892, 1990 WL 3202 (S.D.N.Y. Jan. 9, 1990).  This is not, however, a hard and fast rule; as noted, the fact that liability is contingent on a future determination by a governmental authority does not automatically mean that there is no case or controversy.  For example, in *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), the plaintiffs brought a class action against defendants who designed and marketed an allegedly fraudulent tax strategy.  Certain defendants contended that the class included members who had not suffered any assessments or adverse consequences, and therefore, lacked Article III standing.  *Id.* at 262.  In rejecting this argument, the Court observed that an injury-in-fact is not the same as a cause of action:

> [A]n injury-in-fact differs from a "legal interest"; an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law.  An injury-in-fact may simply be the fear or anxiety of future harm. For example, exposure to toxic or harmful substances has been held sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure, and even though exposure alone may not provide sufficient ground for a claim under state tort law.

*Id.* at 264-65.

The Court held that the risk of a tax assessment coupled with the expenses incurred in avoiding adverse tax consequences were sufficient to support standing:

> Additionally, those members who completed a tax transaction but have not yet been audited still run the risk of being assessed a penalty under an exception to the statute of limitations. . . .  They have also taken costly and time-consuming steps to rectify errors in their past or future tax filings, and paid fees for the advice; these costs are not offset (for standing purposes) by the taxes saved by implementing the tax strategies challenged by the IRS.  Similarly, those members who did not complete a

20

tax transaction nonetheless took some steps in reliance on the advice, which—as per the complaint—entailed time and money. Accordingly, each Denney class member has suffered an injury-in-fact.

*Id.* at 265; *accord* 7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1785.1 (3d ed. 2018) ("If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied.")

The contingent nature of a judicial determination of liability is not different from a possible tax assessment by the IRS. Furthermore, the estate has already expended funds as a result of the potential WARN Act liability by defending *Ien*. In its first (and only) interim fee application covering the period February 25, 2016 to December 31, 2016 (ECF Case No. 16-10407 Doc. # 379), the Trustee's counsel, LaMonica Herbst & Maniscalco, LLP, sought an award of interim compensation in the sum of $806,732.75, (*id.* at 1), of which $12,410.50 was attributable to WARN Act litigation. (ECF Case No. 16-10407 Doc. # 379-1, at ECF pp. 18-22 of 370.)[9] Additional services relating to the WARN Act litigations were interspersed throughout the firm's time records. (*Id.* ECF pp. 22, 61, 125, 292, and 293 of 370.) The Trustee's counsel reduced the request to $779,711.50, and the Court awarded $623,769.20, or 80%, and authorized the Trustee to pay it. (*Order Granting Applications for Allowance of the Interim Compensation and Reimbursement of Expenses of the Chapter 7 Trustee and His Retained Professionals*, dated Mar. 8, 2017 (ECF Case No. 16-10407 Doc. # 412).) Thus, some portion of the fees sought in connection with the WARN Act litigation have already been paid on an interim

---

[9]    "ECF pp." refers to the numbers imprinted at the top of each page by the Court's CM/ECF system.

basis, and additional proceedings requiring additional legal services have occurred in *Ien* after December 31, 2016.

The Defendants cite *San Diego Unified Port District v. Monsanto Co.*, 309 F. Supp. 3d 854, for the proposition that the payment of litigation expenses cannot provide the concrete injury necessary for Article III standing. (*Defendants' Reply* ¶ 24.) This overstates *Monsanto*'s holding. *Monsanto* stands for the proposition that litigation expenses cannot be used to *manufacture* standing. *Monsanto*, 309 F. Supp. 3d at 866 ("An organization suing on its own behalf . . . cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010))). Conversely, litigation expenses can confer Article III standing where the litigation is not manufactured to create standing. *Nnebe v. Daus,* 644 F.3d 147, 157 (2d Cir. 2011); *see Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 716 (2d Cir. 2013) (summary order) ("[A]n organization is not deprived of standing solely because some of the expenses that provide a basis for standing were dedicated to litigating the very action in which the defendant challenges the organization's standing.") Here, the Trustee has been compelled to expend Estate resources to defend against WARN Act liability allegedly resulting from the Defendants' conduct.

## B.    Group Pleading

The Patriarch Defendants seek to dismiss Count II (aiding and abetting), Count VI (lender liability), Count VII (actual fraudulent transfer), VIII (recovery of avoided

transfers) and Count IX (violation of the automatic stay)[10] for failure to comply with

Rule 8 of the Federal Rules of Civil Procedure[11] or plead fraud with particularity as

required by Rule 9(b) of the Federal Rules of Civil Procedure on the ground that these

claims lump the Patriarch Defendants through group pleading and fail to specify which

one did what.  (*Defendants' Memo* ¶¶ 52-63.)  "The group pleading doctrine is an

exception to the requirement that the fraudulent acts of each defendant be identified

separately in the complaint."  *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 354

(S.D.N.Y. 2000), *aff'd*, 26 F. App'x 83 (2d Cir. 2002); *accord Goldin Assocs., L.L.C. v.

Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00 Civ. 8688(WHP), 2003 WL 22218643,

*4 (S.D.N.Y. Sept. 25, 2003).  It was developed to meet "the rigors of Rule 9(b), which

requires that averments of fraud be made with particularity."  *In re BISYS Sec. Litig*, 397

F. Supp. 2d 430, 438 (S.D.N.Y. 2005), *reconsideration denied*, No. 04 Civ. 3884(LAK),

2005 WL 3078482 (S.D.N.Y. Nov. 16, 2005).  Courts allow group pleading where the

plaintiffs charge that the officers and directors with day-to-day responsibility for a

corporation's operations committed fraud through the utterance of corporate group

statements such as SEC filings and press releases.  *Id.* at 438, 440-41; *accord DeAngelis

v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014); *Polar Int'l Brokerage Corp. v.

---

[10]    Count IX also includes a request to avoid the post-petition transfers through the alleged strict foreclosure.  (¶¶ 137-38.)  The *Complaint* does not, however, assert a separate claim under Bankruptcy Code § 549.

[11]    Rule 8 provides in pertinent part:

    **(a) Claims for Relief.**  A pleading that states a claim for relief must contain:

. . . .

        (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . .

    **(d) Pleading to be Concise and Direct; Alternative Statements; Inconsistency.**

        **(1) In General.** Each allegation must be simple, concise, and direct. . . .

*Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000); *In re Oxford Health Plans, Inc.*, 187

F.R.D. 133, 142 (S.D.N.Y. 1999). To invoke the doctrine, the complaint must allege facts

showing that the defendant was "a corporate insider with direct involvement in day-to-

day affairs, within the entity issuing the statement." *DeAngeles v. Corzine*, 17 F. Supp.

3d at 281; *see also BISYS*, 397 F. Supp. 2d at 440-41.

As such, the group pleading doctrine is extremely limited in scope and only

applies to group-published documents. *DeAngeles v. Corzine*, 17 F. Supp. 3d at 281;

*Camofi Master LDC v. Riptide Worldwide, Inc.,* No. 10 Civ. 4020(CM), 2011 WL

1197659, at *6 (S.D.N.Y. Mar. 25, 2011); *Goldin Assocs.*, 2003 WL 22218643, at *5;

*Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d at 354. Group pleading does not allow a

plaintiff to circumvent the requirement of Rule 8 that the complaint give a defendant

"fair notice of what the plaintiff's claim is and the ground upon which it rests."

*Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (internal quotation

marks and citation omitted) (summary order). "By lumping all the defendants together

in each claim and providing no factual basis to distinguish their conduct," a complaint

fails to satisfy the minimum pleading standard required by Rule 8. *Id.*; *accord Genesee*

*Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082,

1202 (D.N.M. 2011) ("A plaintiff has an obligation to 'make clear exactly *who* is alleged

to have done *what* to *whom,* to provide each individual with fair notice as to the basis of

the claims against him or her, as distinguished from collective allegations against' all the

bad actors." (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008))

(emphasis in original)).

24

The group pleading doctrine is inapplicable in this case.  Tilton is the only
individual defendant; the *Complaint* does not name any other officers and directors.
Furthermore, the *Complaint* does not plead a common law fraud claim or base any
claim on a group statement issued by any entity.  The Trustee nevertheless asserts that
group pleading is appropriate because the *Complaint* alleges that all of the Patriarch
entities "operated in concert with each other as an integrated whole, and operated
through the same narrow cast of human beings." (*Plaintiff's Opposition* ¶ 32.)  This
conclusory assertion essentially alleges that the Patriarch Defendants were alter egos of
Tilton.[12]  "Generally . . . piercing the corporate veil requires a showing that: (1) the
owners exercised complete domination of the corporation in respect to the transaction
attacked; and (2) that such domination was used to commit a fraud or wrong against the
plaintiff which resulted in plaintiff's injury."  *Morris v. N.Y. State Dept. of Taxation &
Fin.,* 623 N.E.2d 1157, 1160-61 (N.Y. 1993); *accord Am. Federated Title Corp. v. GFI
Mgmt. Servs., Inc.* 716 F. App'x 23, 28 (2d Cir. 2017) (summary order).  At oral
argument, however, the Trustee acknowledged that he was not contending that Tilton
and the Patriarch Defendants were alter egos.  (*Hr'g Tr.* 30:19-25, June 21, 2018 (ECF
Doc. # 21).)

The Trustee's authorities do not support a different result.  In *Jackson v. First
Fed. Sav. of Ark., F.A.*, 709 F. Supp. 863 (E.D. Ark. 1988), the Court permitted group

---

[12]    The Trustee also argues that Tilton's knowledge is imputed to all of the Patriarch entities, and the
Federal Rules do not require Plaintiff "to tell Tilton what [Tilton] already knows, namely which entity she
used to carry out which facet of the scheme." (*Plaintiff's Opposition* ¶ 35.)  The question of imputation of
knowledge aside, the argument makes no sense.  On that theory, every defendant knows what he or she
did wrong, and the complaint does not have to tell the defendant what the defendant already knows.
Nevertheless, it is the plaintiff's burden to give the defendant fair notice of the claim and the ground on
which it is based.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

pleading where plaintiff-acquirers of bank stock brought federal securities law and state claims against the officers and directors of the bank based on the issuance of false and misleading proxy statements and circulars. *Id.* at 867 ("The gravamen of these actions is that the proxy statements and offering circulars failed to disclose material facts concerning problem real estate loans and other difficulties.") The use of group pleading was consistent with the rule that permits the use of the doctrine when the plaintiff sues corporate officers and directors based on group-issued statements by the corporation.

In *Dover Ltd. v. A.B. Watley, Inc.*, No. 04 Civ. 7366(FM), 2006 WL 2987054 (S.D.N.Y. Oct. 18, 2006), the District Court denied a motion to dismiss an alter ego claim asserted against several defendants based on allegations of inter-relatedness and common control. *Id.* at *10. As just stated, however, the Trustee is not asserting that the Tilton/Patriarch corporate veil should be pierced.

Finally, in *Moore v. GMAC Mortg., LLC*, Civ. A. No. 07-4296, 2008 WL 11348439 (E.D. Pa. Mar. 4, 2008), the plaintiff alleged that the two corporate defendants, referred to collectively as "GMAC," engaged in an illegal kickback scheme. One of the defendants moved to dismiss, contending that the complaint did not sufficiently allege that it, as opposed to the other defendant, should be held liable for the alleged conduct. *Id.* at *1. The Court denied the motion, observing that although the plaintiff failed to distinguish between the two defendants, it clearly alleged that both participated in the alleged conspiracy to disguise kickbacks. *Id.* at *2. Here, however, the *Complaint* does not attribute any specific acts to any Patriarch Defendant other than PPAS and Transcendence II, and it is not clear from the face of the Complaint what the other Patriarch Defendants supposedly did wrong.

Although the Trustee may not use group pleading, the *Complaint* alleges specific conduct by or attributable to Patriarch Defendants PPAS, Ark Partners and Transcendence II.  As noted, the gravamen of the *Complaint* is that Tilton breached her fiduciary duties by failing to waive the payment of interest under the Credit Agreement, at least on behalf of the Lenders she controlled, mismanaging TransCare and its finances, and ultimately, seizing a corporate opportunity by causing the strict foreclosure of its assets rather than selling those assets to a third party at a higher price. Specifically, the *Complaint* alleges that Tilton, through PPAS, insisted on the payment of interest from TransCare and collected substantial sums under the Credit Agreement at times when TransCare was unable to meet its obligations.  (¶¶ 30, 40, 51, 62.)  In addition, the *Complaint* alleges that PPAS strictly foreclosed its security interest in certain TransCare assets, (¶¶ 90-93), and its proof of claim credited TransCare in the amount of $10 million as a result of the strict foreclosure.  (*Plaintiff's Opposition*, Ex. B, ECF pp. 5-10 of 32.)  Under the Credit Agreement, and not later than January 8, 2013, PPAS acted as the Administrative Agent for Ark Partners, and presumably collected interest and foreclosed on TransCare's assets as its agent as well as agent for the other Lenders.[13]  The *Complaint* also suggests that Transcendence II took an assignment of TransCare's MTA contract as part of Tilton's plan to assume control of TransCare's business.  (*See* ¶¶ 83, 92-93.)

Accordingly, the Complaint fails to state a claim for relief against the Patriarch Defendants, other than PPAS, Ark Partners and Transcendence II, to the extent it lumps

---

[13]    The *Complaint* does not allege any facts implying wrongful conduct relating to the Credit Agreement at the time that Ark II was one of the Original Lenders.

the Patriarch Defendants together without informing each defendant of the conduct that renders it liable.  Accordingly, Counts II and VI through IX are dismissed as to these other Patriarch Defendants.  This is not meant to imply that the *Complaint* otherwise states a legally sufficient claim against PPAS, Ark Partners or Transcendence II under these Counts.

## C.    Avoidance, Recovery and Disallowance

The Defendants seek to dismiss the avoidance and recovery counts (Counts VII and VIII, respectively) arising from the strict foreclosure as against all Defendants except PPAS because the *Complaint* fails to identify any other initial or subsequent transferees.  In addition, PPMG and Patriarch Partners, LLC request dismissal of Count V, which seeks to disallow their claims under 11 U.S.C. § 502(d), on the ground that the *Complaint* does not allege a legally sufficient avoidance claim against these Defendants.[14]  The *Complaint* alleges that a transfer of TransCare's property occurred on February 24, 2016 as a result of the strict foreclosure.[15]  As noted, the *Complaint* also implies that Transcendence II received an assignment of the MTA contracts in connection with the strict foreclosure.  Accordingly, Counts VII and VIII will be dismissed as to all Defendants other than PPAS, Ark Partners and Transcendence II,

---

[14]    Count V also seeks to disallow these claims on the ground that they are subject to set off.  (¶ 118.) It is not clear whether the *Complaint* is referring to set off under 11 U.S.C. § 553, which would trigger disallowance under 11 U.S.C. § 502(d), or a state law defense of set off, which might reduce the allowed amount of the secured claim and the corresponding voiding of the amount of its lien, 11 U.S.C. § 506(d), but would not result in a disallowance under 11 U.S.C. § 502(d).

[15]    The Trustee questions whether a strict foreclosure actually occurred.  (¶ 128; *see* ¶ 90.)  Count VII pleads that if the strict foreclosure resulted in a transfer of TransCare's assets, the transfer was fraudulent. (¶ 131) ("Therefore, to the extent Patriarch and Tilton's scheme was successful, the Trustee seeks to avoid these transfers of TransCare's property to the Defendants as actual fraudulent transfers pursuant to Bankruptcy Code Sections 548(a)(1)(A) and 544(b) and N.Y. Debtor & Creditor Law Section 276.")

and Count V will be dismissed as to PPMG and Patriarch Partners, LLC because it does not state a basis to disallow their claims.

## D.    Lender Liability

Count VI (Lender Liability, Common Law Breach of Fiduciary Duty, Common Law Assumption of Control) asserts that Patriarch dominated and controlled TransCare, Patriarch used its control to make transfers and decisions that rendered TransCare unable to pay its expenses, including wages, and prevented TransCare from continuing in business, resulting in at least $10 million in damages.  The Court has already dismissed this Count as to all Patriarch Defendants other than PPAS, Ark Partners and Transcendence II.

The Defendants argue, in a footnote, that the entire claim should be dismissed because New York does not recognize a claim for lender liability.  (*Defendants' Memo* ¶ 61 n.14 (citing *Post-Effective Date Comm. of the Estate of E. End Dev., LLC v. Amalgamated Bank (In re E. End Dev., LLC)*, Adv. Proc. No. 13-8081-reg, 2017 WL 1277443, at *3 (Bankr. E.D.N.Y. Apr. 4, 2017); *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 418 (S.D.N.Y. 2000) ("Lender liability is not an independent cause of action, but a term that refers to the imposition of traditional contract or tort liability on a bank or other financial institution.").)  The Trustee responds that the Defendants are quibbling, as "lender liability" is a common way of referring to imposition of liability on a lender under theories of breach of fiduciary duty and assumption of control.  (*Plaintiff's Opposition* ¶ 37 (citing *In re E. End Dev.*, 2017 WL 1277443; *Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc.* (*In re KDI Holdings, Inc.*), 277 B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999)); *see also Indus. Tech.*

*Ventures LP v. Pleasant T. Rowland Revocable Trust*, 688 F. Supp. 2d 229, 239
(W.D.N.Y. 2010).)

A Court need not consider arguments relegated to a footnote. *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled . . . that a court need not consider arguments relegated to footnotes . . . ."); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 256 n.4 (S.D.N.Y. 2009) ("Because the argument is made wholly in a footnote . . . , the [c]ourt may choose to disregard it."). Given the unsettled nature of the issue and its relegation to a footnote, the Court declines to consider it, and the Defendants' motion to dismiss Count VI as to the remaining Patriarch Defendants is denied.[16]

## E.    Equitable Subordination

Count III seeks to equitably subordinate the claims filed by PPAS, Ark II, PPMG and Patriarch Partners, LLC. Patriarch Partners, LLC moves to dismiss the latter claim on the ground that the *Complaint* fails to allege inequitable conduct. (*Defendants' Memo* ¶ 82.) I agree.

Bankruptcy Code § 510(c) authorizes a bankruptcy court to equitably subordinate a valid claim, *viz.*, reorder its priority, where "the conduct of the claimant in relation to other creditors is or was such that it would be unjust or unfair to permit the claimant to share *pro rata* with the other claimants of equal status." *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.),* 277 B.R. 520, 563 (S.D.N.Y. 2002); *see also Enron Corp. v.*

---

[16]    For the same reason, the Court declines to consider the separate request to dismiss Count IX, which alleges a violation of the automatic stay, in its entirety. The Defendants' argument is relegated to a footnote. (*See Defendants' Memo* ¶ 79 n.17.)

*Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 217-21 (Bankr. S.D.N.Y. 2005).  The party seeking equitable subordination must show that (1) the claimant engaged in inequitable conduct, (2) the conduct injured creditors or conferred an unfair advantage and (3) equitable subordination of the claim is consistent with bankruptcy law.  *Lehman Bros. Holdings, Inc. v. JP Morgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings, Inc.*), 541 B.R. 551, 582 (S.D.N.Y. 2015); *Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C.* (*In re Vargas Realty Enters., Inc.*), 440 B.R. 224, 240 (S.D.N.Y. 2010); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).

The Court has already dismissed this claim as to Patriarch Partners, LLC based on the Trustee's misuse of the group pleading doctrine.  Many of the Patriarch Defendants have "Patriarch Partners" as part of their names, (*see* ¶ 4 n.2), and references in the *Complaint* to Patriarch Partners do not indicate which defendant was intended by the Trustee.  The only specific allegations in the *Complaint* regarding Patriarch Partners, LLC are that it is a Delaware limited liability company whose website describes it as an "investment firm," (¶ 14), and along with several other Patriarch Defendants made representations in the United States District Court for the Eastern District of New York that "'TransCare's term loan lenders' foreclosed on the MTA Contract." (¶ 90 n. 7.)  Since the *Complaint* does not identify any inequitable conduct by Patriarch Partners, LLC, the motion to dismiss Count III as to Patriarch Partners, LLC is granted for this additional reason.

**F.    LEAVE TO AMEND**

At the end of his opposition memorandum, the Trustee requests leave to amend "should the Court think it desirable for more detail to be provided at the pleading stage." (*Plaintiff's Memo* p. 25.)  Rule 15 directs that "[t]he court should freely give leave [to amend] when justice so requires."  FED. R. CIV. P. 15(a)(2); *accord Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Court has concluded for various reasons that the *Complaint* fails to state claims against the majority of the Patriarch Defendants, and the Trustee may be able to cure these deficiencies through an amendment of the *Complaint*.  In addition, the Defendants have not opposed his request.  Accordingly, the Trustee is granted thirty days from the date of this order to serve and file his amended complaint.

So ordered.

Dated:   New York, New York
         October 18, 2018

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge