**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| TRANSCARE CORPORATION, et al., | Case No. 16-10407-smb |
| Debtors.[1] | (Jointly Administered) |
| SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al., | Adv. Pro. No. 18-1021-smb |
| Plaintiff, | **AMENDED COMPLAINT** |
| - against - | |
| LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 2001-1 LIMITED, TRANSCENDENCE TRANSIT, INC., and TRANSCENDENCE TRANSIT II, INC., Defendants. | |

Salvatore LaMonica, as Chapter 7 Trustee (the "Trustee") of the jointly-administered estates of the above-named Debtors (together, "TransCare"), hereby alleges:

**INTRODUCTION**

1.      Prior to its February 2016 bankruptcy filing, TransCare provided vital emergency medical transportation services to hospitals and communities throughout the Northeast.  TransCare also operated disability transportation services for municipal authorities, such as the New York City Transit Authority (the "MTA").

---

[1] The Debtors are:  TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

2.     As the sole member of TransCare's board of directors, Lynn Tilton owed TransCare her undivided and unselfish loyalty.

3.     By 2015, after years of under-investment, TransCare lacked the financial ability to fund payroll, pay vendors, or obtain insurance on its own.  To safely transport patients to hospitals, TransCare's employees were forced to pay fuel and tolls out of their own pocket.  Faced with this financial crisis and budding public health emergency, TransCare's executives pleaded with Tilton to allow them to recapitalize the company.  They brought her potential purchasers who were ready, willing, and able to pay TransCare millions of dollars, which was more than enough to fund TransCare's growth and stabilization plans.

4.     Tilton, ignoring her fiduciary duties, rejected these offers and instead sought to strip TransCare of its most profitable business units for the benefit of herself and companies owned by her, including Patriarch Partners Agency Services, LLC ("PPAS"), the administrative agent on a TransCare term loan owed primarily to other Tilton-owned and Tilton-controlled entities.  While TransCare's executives were pleading for funds to make payroll, Patriarch executives under her direction were advising her on plans to seize the same TransCare assets that Tilton would not let TransCare sell.

5.     On the initial petition date of February 24, 2016, Tilton – working both sides of the transaction and against TransCare's interests – purported to have companies owned and controlled by her "foreclose" on TransCare's most profitable units and transfer them to new companies owned and controlled by her and which as a group were called Transcendence.  Tilton's ill-conceived "foreclosure" plan revealed Tilton's motivation for her otherwise inexplicable directives forbidding TransCare to recognize value from its assets.  It was so outrageous that it collapsed of its own accord within hours of going live.  Even so, Patriarch employees under Tilton's command continued to plot to steal TransCare's assets under cover of night.

6.      As a result of this egregious conduct, TransCare suddenly collapsed, jeopardizing public safety and leaving it without any operating business units to sell for the benefit of its creditors.  TransCare's employees, who worked for weeks without pay while Tilton tried to steal the company's assets, were left with large unpaid wage claims.  This ruinous scenario was exactly what TransCare's executives had warned Tilton would come to pass, but which Tilton ignored due to her own conflicts of interest.

7.      By this action, the Trustee seeks damages resulting from Tilton's breach of the duty of loyalty.  The Trustee also objects to claims and liens asserted by the companies controlled by Tilton, and seeks damages against certain of those entities for abusing their positions as lenders.

## THE PARTIES

8.      Plaintiff is the Trustee of the above-named Debtors, all Delaware corporations.  The parent entity, TransCare Corporation, was headquartered in Brooklyn, New York.  TransCare provided essential public safety services, including 911 ambulance services, in New York, Pennsylvania and Maryland.  TransCare employed over 1,800 employees, including emergency medical technicians, drivers, and mechanics.

9.      Lynn Tilton was the sole director of TransCare and in fact was referred to as the "Board."  She is also the principal, manager, and direct or indirect owner of the remaining Defendants, each of which are headquartered at the same office in New York City at 1 Liberty Street, 35th Floor.  Tilton claims to be a resident of Florida.

10.      Patriarch Partners Agency Services, LLC (referred to herein as PPAS) is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  PPAS served as the administrative agent under a Credit Agreement, dated as of August 4, 2003 (discussed in further detail below).  Tilton is the sole manager and owner of PPAS.

11.     Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  Tilton is the sole manager of Patriarch Partners.  Tilton owns 100% of Patriarch Partners through her ownership of Patriarch Partners' sole member.  According to its website, Patriarch Partners describes itself as an "investment firm."

12.     Patriarch Partners Management Group, LLC ("PPMG") is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.   Tilton is the sole manager and owner of PPMG.

13.     Ark II CLO 2001-1, Limited ("Ark II") is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  Ark II holds about a 55.7% stock interest in TransCare Corporation.   In February 2016, Ark II entered into the Ark II Credit Agreement with TransCare, dated as of January 15, 2016 (as discussed below).  Tilton owns 99% of Ark II, and the remaining 1% of Ark II is held in a trust for Tilton's daughter.

14.     Transcendence Transit, Inc. and Transcendence Transit II, Inc. are both Delaware corporations headquartered in New York City, at 1 Liberty Street, 35th Floor.  Tilton is the sole director of both entities, and Transcendence Transit, Inc. is the parent of Transcendence Transit II, Inc.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code").  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises, in part, under the laws of the United States.

16.     This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

17.     To the extent any portions of this complaint are non-core, the Bankruptcy Court may hear the claims and issue findings of fact and conclusions of law and the Trustee consents to the Bankruptcy Court issuing a final order on the claims asserted herein.

18.     Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this action arises in or relates to cases under the Bankruptcy Code that is pending before this Court.

## BACKGROUND

TransCare's Capital Structure

19.     TransCare was incorporated in 1993.

20.     TransCare filed prenegotiated chapter 11 bankruptcy cases in September 2002.

21.     Prior to the commencement of those cases, Ark II purchased approximately 51% of TransCare's outstanding senior secured debt.

22.     The chapter 11 plan ultimately confirmed in July 2003 provided for the issuance of approximately 51% of the shares in reorganized TransCare to Tilton-owned entities.  At all relevant times, Tilton exercised control over TransCare via her indirect ownership of said shares and later by serving as TransCare's sole director.[2]

23.     The chapter 11 plan also provided for $33.5 million in loans under a Credit Agreement, dated as of August 4, 2003, among TransCare Corporation, as borrower, PPAS, as administrative agent, and the lenders party thereto (as amended, the "PPAS Credit Agreement"), with 51% of the loans issued to two Tilton-controlled entities, Ark II and Ark Investment Partners II, L.P.

---

[2] Despite repeated requests from the Trustee, Defendants have not produced copies of all of the TransCare board resolutions, including the board resolution(s) providing for Tilton to become TransCare's sole director, and the Trustee cannot determine when exactly Tilton became the sole director.

24. TransCare granted PPAS a senior secured lien on all of its assets by the Security Agreement executed by TransCare in favor of PPAS in connection with the PPAS Credit Agreement.

25. To fund the operations of the company, TransCare entered into a revolving credit facility with Wells Fargo, N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo") dated October 13, 2006, pursuant to which TransCare granted Wells Fargo a blanket lien on substantially all of its assets. At all relevant times, Tilton controlled PPAS, and the "Required Lenders" under the PPAS Credit Agreement (at all relevant times, virtually all lenders were Tilton affiliates).

26. Pursuant to an Intercreditor Agreement, dated October 13, 2006, among Wells Fargo and PPAS, the parties agreed that Wells Fargo would have a first priority lien on all of TransCare's assets and account receivables, including TransCare's right to receive payments from the MTA pursuant to Contract No. 07H9751, as amended (the "MTA Contract"). The MTA Contract gave TransCare the right to provide paratransit services for MTA customers using vehicles leased from the MTA. It was one of TransCare's most profitable business segments. Pursuant to the Intercreditor Agreement, PPAS retained a first priority lien only on TransCare's vehicles, and miscellaneous physical assets (*e.g.*, computers). PPAS also agreed not to take any action to foreclose or otherwise enforce any lien as to which it was junior to Wells Fargo.

27. At least as of 2014 and continuing through the Petition Date, the lenders under the PPAS Credit Agreement were: Zohar CDO 2003-1, Ltd. ("Zohar I"), Zohar II 2005-1, Ltd. ("Zohar II"), Zohar III, Ltd. ("Zohar III"), Ark Investment Partners II, L.P. ("Ark Investment"),

Credit Suisse Alternative Capital LLC ("Credit Suisse"), and First Dominion Funding I ("First Dominion").[3]

Tilton's Ownership and Control Over the Lenders and the Company

28.     Tilton controlled both PPAS and TransCare at the time of the Credit Agreement and all amendments thereto, initially via her majority shareholder interest in TransCare and later pursuant to serving as the sole director. The contracts entered into between PPAS/ PPMG/ Ark II and TransCare were not arm's-length transactions due to the control exercised by Tilton and Patriarch over TransCare, the lack of disinterested TransCare board directors, and the absence of counsel for TransCare separate from lawyers advising TransCare on Patriarch's behalf. Transactions between TransCare and the Tilton-controlled entities were handled by lawyers employed at Patriarch Partners located at 1 Liberty Plaza.

29.     PPAS, Patriarch Partners, PPMG, and Ark II operated wholly under Tilton's control and pursuant to her directives. None of these entities had subsidiary officers or boards of directors and all executives reported directly to Tilton. Employees of each entity all worked together out of the same office for the common goal of furthering Tilton's interests. They all shared the same email domain and held themselves out to the world as "Patriarch Partners". They shared documents and information between them, particularly concerning TransCare. At various points, depending on the need or Ms. Tilton's directives, a multiplicity of employees at 1 Liberty Plaza worked on matters relating to TransCare without regard to which specific entity they were employed by. Tilton exploited her dual control over said Defendants and TransCare for her personal benefit.

_____

[3] In 2007, Zohar III took over Ark II's loan and Ark II ceased being a lender under the PPAS Credit Agreement.

30.     Additionally, at all points relevant hereto, Tilton controlled Zohar I, Zohar II and Zohar III as collateral manager, and controlled Ark Investment as the 99% owner (with 1% held in trust for her daughter).  Credit Suisse controlled its own loan and also served as the collateral manager for First Dominion.

31.     Tilton prohibited TransCare from refinancing the PPAS debt.  TransCare paid PPAS around $3-$4 million/ year in interest, which accrued under the PPAS Credit Agreement primarily at a rate of 12% per annum.

32.     Tilton exercised discretion over TransCare's payment of interest to PPAS in a number of different ways. First, the PPAS Credit Agreement permitted PPAS to waive Events of Default, including TransCare's failure to pay interest (Section 12.1).  Tilton exercised this right on multiple occasions in 2015 when TransCare did not pay interest or paid less interest than due. Second, in November 2015, Tilton waived interest payments owing to Zohar I, Zohar II, Zohar III, and AIP by transforming roughly $110,000 due as interest into a 0% loan.  Third, in September 2015, Tilton unilaterally reduced the amount of interest due on seven tranches owed to Zohar I, Zohar II, and Zohar III.  Fourth, in December 2015 and January 2016, Tilton claims to have paid $200,000 to the lenders she controlled (Zohar and AIP) without paying the lenders controlled by Credit Suisse.

Corporate Governance at TransCare

33.     Tilton exercised an extraordinarily high level of control and domination over the operations of TransCare.

34.     Pursuant to a July 2012 Written Consent of the Sole Director, Tilton issued an authority matrix prohibiting any TransCare officer from a wide range of activities, including, "disclos[ing] any financial or shareholder information of the Company or its subsidiaries to any third party[,]" entering into any contract not contemplated by the "Annual Plan," engaging legal

counsel, and allowing only a "Designated Executive" to undertake certain limited functions. However, at least as of 2015, Tilton had not designated any Designated Executive and had not approved an Annual Plan. As a result, all such powers remained only in the Board and, as TransCare employees well knew, was synonymous with Tilton.

35. Brian Stephen, a lawyer employed by Patriarch Partners but claiming to represent TransCare's Board, gave further gloss to these restrictions. For example, he explained to Glenn Leland, TransCare's newly appointed Chief Executive Officer, that Leland was prohibited from taking even preliminary steps to actions requiring Board approval. Considering the breadth of those categories of actions, this instruction prohibited almost all independent action by TransCare's executives.

36. Despite this level of control, Tilton regularly barred TransCare's executives, including its Chief Executive Officer, from communicating directly with her. Instead, she required them to communicate through her Patriarch employees. At the same time, she empowered her Patriarch employees to give direction to TransCare's executives. During the period preceding TransCare's bankruptcy, those employees included Stephen, Jean-Luc Pelissier (Executive Managing Director at PPMG), Michael Greenberg (Analyst at Patriarch Partners), Randy Jones (Managing Director at Patriarch Partners) and Scott Whalen (Tilton's son-in-law, Credit Analyst at Patriarch Partners until 2014/2015, and thereafter Director at PPMG). Stephen and Pelissier, in particular, enforced Tilton's desire to limit communications from Leland. They told him that his reports were too negative and that negative comments could be discoverable in future litigation.

37. Through this arrangement, Patriarch executives hired and fired employees, directed the payment or non-payment of vendors and gave direct orders to TransCare employees. On multiple occasions, Greenberg executed amendments to the PPAS Credit Agreement on behalf of *TransCare*, causing TransCare to incur additional indebtedness and liens to PPAS. For all

9

transactions between Tilton's companies (*e.g.*, PPAS, Ark II) and TransCare, Tilton executed the documents on behalf of the former and ordered TransCare executives as well as her employees at Patriarch Partners to execute the documents on behalf of TransCare. TransCare lacked independent counsel on any transaction with PPAS, PPMG, Patriarch Partners, or Ark II (or later the Transcendence entities). In short, Tilton and Patriarch exercised complete dominion and control over TransCare.

Events Leading Up to 2015 Financial Crisis

38. In 2012, 2013, and 2014, TransCare had net revenues of approximately $130 million and positive EBITDA. However, TransCare's costs grew and it began losing lucrative clients because of its inability to invest in new vehicles. TransCare's executives were advised that not paying bills on time and in full was the "Patriarch way." As a result, its accounts payable grew and critical vendors went unpaid. During the same years, TransCare paid over $11 million to PPAS for the loans. In 2012, PPAS modified the Credit Agreement to provide TransCare with an additional $2 million.

39. TransCare's most profitable business segment was the MTA Contract to provide paratransit services. This segment historically generated revenues of approximately $22 million and EBITDA of $3.7 million. However, by early 2015, the MTA indicated a reluctance to renew TransCare's contract – scheduled to expire in summer 2015 – due to TransCare's deteriorating financial condition. Among other things, TransCare was having problems obtaining replacement parts for MTA vehicles; even though the MTA paid TransCare for such parts, TransCare had such poor credit that parts suppliers would not do business with it.

In Early 2015, Tilton Refuses to Allow TransCare to Sell Assets Even as It Lacked Cash to Fund Payroll and Operations

40.     By February 4, 2015, TransCare's financial situation had become so dire that its executives warned Tilton that the company lacked the cash to make payroll the following day. They further advised that the company faced a projected $6.7 million shortfall between February 4 and the end of March 2015.  Moreover, TransCare's essential vendors, such as EZ-Pass, suspended service due to chronic non-payment.  Without the ability to pay for tolls using EZ-Pass, TransCare's emergency ambulances could not reach hospitals without the EMTs paying the tolls from their own funds after waiting in the slower cash lanes. TransCare executives recommended either further investment in TransCare or an immediate and harsh reduction in headcount.

41.     On February 5, 2015, Leland advised Pelissier and Brad Schneider (Analyst at Patriarch Partners) of "a new alternative to the emergency cash request and accelerated recovery plans we put forward to you and the Board yesterday."  Leland explained that National Express, "an international transit services leader," sought to purchase the MTA Contract with an offer estimated at $15 to $18 million.

42.     Leland explained that National Express "[has] been researching our situation and believe[s] that the hold up on our contract renewal is our unstable financial condition.  They further noted that if we do not renew the contract, the likely action of the MTA would be to distribute our business to other small vendors, which eliminates their opportunity."  Leland further explained National Express' valuation process which, based upon TransCare's paratransit financial metrics, would translate into a $17 to $18 million valuation for the paratransit business.  Finally, Leland advised that National Express had offered an immediate payment of $1.7 million as a non-refundable deposit in an option to begin negotiations towards a final transaction.

43.     In response, Tilton spoke with Leland herself.  This was the only time that she ever contacted her CEO directly.  Tilton berated the CEO for daring to explore a sale option.  Next, Stephen called the CEO to reiterate that the CEO had no authority to even discuss sale options of any assets with any company.  Stephen also claimed that TransCare would not receive any of the potential sale proceeds because "Lynn has other debts."  Finally, Pelissier called the CEO as well to reiterate that under no circumstances could he attempt to raise funds by exploring potential sales.

44.     Also in February 2015, RCA Ambulance Service also expressed interest in purchasing TransCare to Tilton and to TransCare.  Tilton similarly refused to engage or to authorize TransCare's executives to consider RCA's offer.

45.     On February 18, 2015, Leland prepared a draft Stabilization Plan for Tilton's review and sent it to Pelissier, Greenberg, and Schneider.  He noted that "TransCare is **not** a viable on-going concern without immediate investment and assertive course correction" (emphasis in original).  Once again, he noted that TransCare required an immediate infusion of cash just to remain in business.  Once again, he stated that there was alternative to total collapse; TransCare could sell the MTA business to obtain "$14 to $17M to use for immediate financing activities for remaining ambulance service business."

46.     Leland further explained that "[w]e are working this week with clarity that the payroll for this work cannot be funded from internal cash flows or credit vehicles.  I continue the operations because I am certain the company recognizes its liability and therefore will pay employees.  But there comes a point where that can no longer be a valid assumption."

47.     Tilton still refused TransCare permission to explore the sale of any assets.  Nevertheless, she authorized additional funding to TransCare in order to make payroll.

48.     In June 2015, TransCare's executives once again warned Tilton that the company risked missing payroll and needed to either recapitalize or sell assets immediately:

- "TransCare continues to operate on a very thin line of cash and is only paying bills essential to its immediate operation."

- "We propose to accelerate the business plan into Phase 2 with an immediate loan of $5M. If Patriarch Partners is unable or unwilling to provide these funds, we request permission to seek alternative sources of financing."

- "Under normal circumstances a company like TransCare with threats to on-going operations, would seek protection from creditors thru bankruptcy. We are told that is not an option within the Patriarch portfolio, which leaves a *debt consolidation loan* to satisfy critical vendors, remain viable, refocus leadership on improved positioning and resolve reputation deficits."

- "If TransCare were to shut down suddenly because of loss of key suppliers and facilities, it faces a liability of as much as $15.45M in wages and benefits. About 70% of TransCare payroll is for New York employees which have a 90-day WARN act liability as compared to the 60-day standard in other markets."

49.     On June 5, 2015, TransCare's executives warned that they lacked the necessary funds to pay PPAS and make payroll and fund necessary disbursements. In response, Greenberg told TransCare's CFO that Tilton, as TransCare's sole director, was specifically ordering the payment of interest to PPAS despite TransCare's financial situation: "The Board directed that I advise you that interest must be paid today."

50.     After further pleading by TransCare's executives, Pelissier informed TransCare that "we have re-approached the subject of interest payment today with the board. TransCare must pay interest today as PPMG is not the only lender."[4]

---

[4] Patriarch executives did not typically differentiate between the various Patriarch entities when dealing with TransCare.

51.    Later that evening, Leland again advised Pelissier and Greenberg:

we are highly skeptical that TransCare can sustain its critical supply chain and insurance if it makes the required interest payment and continues to postpone back payroll tax deposits. … [W]ant to be certain the Board is fully advised that this action could force either a substantial loan, as we have requested, or force cessation of operations.

52.    On July 3, 2015, TransCare missed payroll after bouncing a check to pay for necessary insurance immediately following Wells Fargo's decision to suspend TransCare's credit line.   Wells Fargo had just discovered a $1.5 million discrepancy in TransCare's reported receivables reports, and sought Lynn Tilton to assure them the matter would be addressed.  Tilton's employees were, however, unable to contact Tilton.  Shortly thereafter, the New York Department of Health warned TransCare that failure to provide immediate assurances to fund payroll would cause the Department to issue a Public Safety Emergency alert and direct the regional emergency medical services to seek alternative means of ensuring emergency ambulance services, effectively shutting TransCare out of its New York medical operations.

53.    On July 6 and 9, 2015, TransCare's CEO again raised the National Express offer with Pelissier, Greenberg, Whalen, and Jones:

TransCare is running out of fuel.  Literally.  All of our fuel accounts have been frozen, our EZ Pass toll is depleted and we do not have money to turn th[e] accounts back on.  We consumed about $2k of employee personal funds and other cash on hand last night to sustain operations.  We are literally hours away from wide spread gasoline and EZ Pass outage. … We have been re approached by National Express which is interested in acquiring the MTA contract, as I have reported in the past…. Am I authorized to accept the deposit and continue operations?

54.    On July 10, 2015, Leland informed Pelissier and Greenberg that he had received offers to buy all or parts of TransCare from two separate national ambulance companies in addition to National Express.

55.     Also on July 10, 2015, National Express delivered a signed Letter of Intent to TransCare offering to buy TransCare's MTA paratransit business for $6 to $7 million plus the assumption of $2 million in related liabilities.  Leland forwarded the offer to Pelissier, Whalen, and Greenberg.

56.     Minutes later, Tilton's son-in-law, Scott Whalen, denied Leland permission: "LOI is way premature.  We have yet to review the business strategy. … [T]his will have to be made clear to them that the business is not for sale at this time."

57.     On July 13, 2015, Whalen again wrote to Leland seeking to prevent any public acknowledgment that TransCare or portions of TransCare might be for sale: "I would hate to have the LOI hanging out there and for National Express to tell people they are 'buying TransCare' is the issue."

58.     Leland confirmed in writing: "to be clear … you want me to: … contact National Express and tell them 'TCP is not for sale' per Patriarch Partners."  Whalen confirmed, despite the dire straits that TransCare was in, that this was exactly what Patriarch Partners and his mother-in-law Tilton were ordering.

59.     On July 8 and 16, 2015, after agreeing with Wells Fargo to extend $2.5 million in new capital to TransCare in return for restoration of the Company's credit line, Tilton caused PPAS to lend over $1.3 million to TransCare to fund payroll, bounced checks, and immediate needs.

TransCare's Financial Condition Deteriorates

60.     Tilton's refusal to recapitalize the company jeopardized TransCare's ability to perform its safety mission and eroded the operational capabilities which TransCare could have monetized in a sale to a third-party.  All the while, Tilton insisted that TransCare make its monthly interest payments to PPAS.

61.     For example, on July 14, 2015, the head of TransCare's paratransit division reported:

> We are in dire straits right now, as you are aware, with ordering parts, tires, doing employee finger printing, getting uniforms. [TransCare paratransit] shop has been cannibalizing parts from vehicles that are out waiting for engines to be shipped (we can't place orders since we have been shut off by CADI [TransCare's auto parts supplier])

62.     When Leland explained to Patriarch that the ambulances needed to be replaced every few years in order to run safely and profitably, Pelissier responded that he owned a private airplane that was fifty years old, such that the vehicle's age did not matter.

63.     On August 10, 2015, Leland warned Pelissier, Greenberg, Stephen, Jones, and John Pothin (Managing Director at Patriarch Partners) that operating the company on fumes was causing a breakdown in employee morale:

> Massive amount of employees have either resigned or given notice. Project Mgr., OPS mgr, disp mgr, 2 disp sups, 6 dispatchers, 20 drivers have resigned in last 10 days. Unsuccessful in recruiting due to our past delayed payroll problems (word is out on the street) — working on doing some in-house promotions on a trial basis just to fill open slots at lesser money.

64.     On October 7, 2015, Leland again pleaded with Pelissier and Greenberg that TransCare could not afford to both continue operations and pay PPAS:

> I understand that the Board has directed TransCare to issue the interest payment to Patriarch today.  This despite the fact that the company will not have adequate funds to make its payroll tomorrow.

65.     Thereafter, Pelissier and Greenberg – acting as Tilton's representatives – instructed Leland to make interest payments to PPAS, having previously instructing Leland to (a) have employees pay for fuel themselves and (b) cease paying employee payroll taxes to the Internal Revenue Service.

66.     On December 8, 2015, Leland advised Pelissier and Greenberg that the head of TransCare's MTA paratransit division was resigning due to frustration with the lack of resources. Leland also advised that National Express had again contacted him "to see if there is any interest in selling." Leland recommended immediate discussions with National Express and to use the proceeds from the sale (or solely the deposit) to fund a plan to save as much of the ambulance business as possible. At this point, Leland advised Pelissier and Greenberg that TransCare could receive $6 to $8 million dollars from the sale.

67.     Stephen wrote back to Leland the next day, reminding him that he needed approval from the Board prior to entering into any discussions.

68.     On December 16, 2015, Leland told Pelissier, Greenberg, and Stephen:

> National Express Called a few times yesterday … They reiterate that the letter they sent before, offering to buy the TC Paratransit contract, is 'still out there.' I am awaiting direction. My recommendation is to immediately respond and negotiate a sale of the contract. … Waiting further does not seem to be in best interest of company.

69.     On December 17, 2015, Leland told Pelissier, Greenberg, and Stephen that "to avoid a shutdown we should reopen selling the MTA contract to National Express." Greenberg and Stephen told Leland that they were working on a number of issues but would pass it on.

Tilton's Plan to Acquire TransCare's Valuable Assets

70.     While TransCare was pleading to monetize its valuable assets so as to fund payroll and life-saving operations, Tilton was working on a plan to acquire that same assets to benefit herself.

71.     By December 16, 2015, Tilton had advised Wells Fargo that it had determined to sell TransCare. In further discussions with Wells Fargo, Tilton told them that she would present

an integrated plan pursuant to which the Company's principal assets would be sold as a going concern.

72.     On December 18, 2015, Greenberg emailed Tilton his research on recent comparable sales of ambulance companies and which investment firms could assist Patriarch in selling TransCare.  Greenberg reported that similarly situated companies had sold for average multiple of 1.8 times revenue and 10.1 times EBITDA.  At this point, TransCare's MTA paratransit unit had revenues of more than $20 million and EBITDA of more than $2.2 million.  Had Tilton allowed TransCare to sell the paratransit business, these numbers would imply a valuation of between $22 and $36 million, vastly more than the amount needed to pay employees and recapitalize TransCare.  Greenberg also recounted how Leland had received numerous offers from industry players to sell all or part of TransCare.

73.     In late December, Greenberg, with Tilton's approval, submitted a proposal to Wells Fargo to sell TransCare's assets by September 2016.

74.     On January 9, 2016, Leland quit as CEO of TransCare.

75.     On January 11, 2016, Tilton hired Carl Marks & Co., Inc. ("Carl Marks") to serve as restructuring advisors for TransCare and report to Tilton.  During this period, TransCare's last remaining C-level officer—its Chief Operating Officer—lacked authority to make any business decisions without approval from Tilton or the Patriarch executives overseeing TransCare.

76.     On or about January 15, 2016, Tilton agreed to pay certain of TransCare's insurance creditors.  Although the Defendants have been unable to produce records confirming all of these payments, e-mails produced by the Defendants suggest that PPAS paid approximately $.81 million on January 15, 2016 and the produced financial records show PPAS paid roughly $.69 million on January 29, 2016.

77.     Tilton subsequently papered these advances as a loan from Ark II in an attempt, among other things, to improve her position vis-à-vis TransCare's other creditors, and to insulate this infusion from claims made by third parties, including some of the lenders under the PPAS Credit Agreement and to ensure that she would own the assets transferred to Transcendence Transit and Transcendence Transit II.

78.     On January 29, 2016 Ark II filed a UCC Financing Statement with respect to TransCare with the Delaware Department of State.

79.     On February 9, 2016, Pelissier contacted the MTA, representing that the owner of TransCare wished to transfer the MTA Contract to a different entity: "I am working with the ownership representative of TransCare."

80.     Also, on or about February 9, 2016, Tilton's personal lawyers at Skadden, Arps, Slate, Meagher & Flom LLP contacted the law firm of Curtis Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") about the need to for an immediate chapter 11 bankruptcy filing for TransCare. Curtis Mallet submitted a draft engagement letter that day to advise on an out-of-court restructuring or chapter 11 filing, and TransCare executed it on February 10.  Brian Stephen served as the principal contact for TransCare for Curtis Mallet, advising Curtis Mallet on TransCare's assets/ liabilities and bankruptcy strategy.

81.     On February 10, 2016, Tilton caused two new Delaware entities to be incorporated: Transcendence Transit, Inc., and a wholly-owned subsidiary thereof, Transcendence Transit II, Inc.  Defendants cannot produce a stock register for Transcendence.  Nevertheless, Tilton claims that Ark II owns approximately 55% of Transcendence and that Ark II has a senior claim to Transcendence's assets (as discussed below, even ahead of PPAS).

82.     The same day, Carl Marks, ostensibly engaged by TransCare at Tilton's direction to analyze and evaluate TransCare's finances, if not to aid in restructuring it, used TransCare's

internal financial information to provide Greenberg with a P&L statement for the new entities based upon the projected assets of TransCare to be transferred. The P&Ls include projections of $22.7 million in revenue for TransCare's MTA paratransit division and $1.5 million of EBITDA.

83.     Also on February 10, 2016, Greenberg told TransCare's Vice President, Glen Youngblood, that the Transcendence Transit II entity would be taking over TransCare's MTA Contract with an estimated $25 million in revenue and its other paratransit operations with an estimated $31 million in revenue. Greenberg noted that the division operating under the MTA Contract currently ran 168 routes but previously ran as many as 228 routes.

84.     Also on February 10, 2016, Michael Greenberg, at Tilton's direction, provided TransCare with documents to sign related to a new credit facility with Ark II, all back-dated as of January 15, 2016:

> (1) a Credit Agreement, between Ark II, as lender, TransCare Corporation, as borrower, and additional TransCare entities, as guarantors (the "Ark II Credit Agreement");
>
> (2) a Security Agreement granting Ark II a blanket lien on all of TransCare's assets;
>
> (3) a Guaranty whereby the TransCare entities (other than TransCare Corporation, as borrower) entered into a separate Guaranty of obligations under the Ark II Credit Agreement; and
>
> (4) an Intercreditor Agreement between Ark II and PPAS ("2016 Intercreditor Agreement"), providing for the subordination of PPAS's lien and right to payment to Ark II's lien and right to payment (Section 2.2).

The 2016 Intercreditor Agreement was signed by Tilton as Manager of both Ark II and PPAS. Each of the foregoing agreements are dated "as of January 15, 2016."

85.     The Ark II Credit Agreement that Tilton ordered TransCare enter into authorized Ark II to make term loans totaling up to $6.5 million to TransCare Corporation, for working capital

and general corporate purposes. From the start that "loan" violated TransCare's and PPAS's covenants to the other lenders and equity holders of TransCare, and was illusory as well by its assertion of a $6.5 million loan when in fact no such amount was ever actually made available to TransCare.

86. Sometime between February 10 and February 11, 2016, TransCare executed the Ark II Credit Agreement.

87. On February 12, 2016, TransCare – at Greenberg's direction – executed direction letters back-dated to January 15 and January 29, 2016, retroactively directing Ark II to make the payments that PPAS had made on those dates.

88. Despite these preparations, Tilton was unable to simply "foreclose" on TransCare's ongoing business operations as one might repossess a vehicle or a piece of real estate. Tilton needed to convince employees to switch employers, convince vendors and insurers to substitute Transcendence for TransCare, obtain governmental authority to provide critical safety services through a new corporation, and switch bank accounts, among numerous other complex transactions. To effectuate this plan, Tilton held meetings at Patriarch's offices with TransCare's executives to model out which TransCare business units would be transferred to Transcendence and how, and the amount of revenue they could be expected to bring in for the new company. None of these actions were consistent with Tilton's duty of loyalty to TransCare. Tilton, with the assistance of her Patriarch executives, caused TransCare's employees to work on projects in support of the Transcendence plan rather than for TransCare's business operations.

89. Patriarch executives endeavored to keep this plan secret even while it directed TransCare's remaining executives to prepare the transition, including talking points to sell the union and the MTA on the Transcendence plan. "Obviously, we cannot breath a word until we have the overall deal finalized. Until then it must be business as usual[,]" Randy Jones of Patriarch

Partners wrote on February 11, 2016 to TransCare's Vice President of Transit Services Thomas Fuchs and Chief Operating Officer Peter Wolf, both of whom together with Youngblood were being promised positions in Tilton's new venture.

90.      On February 14, 2016, Pelissier, from a non-Patriarch e-mail address, submitted a detailed plan to TransCare's executives to prepare to transfer TransCare's lucrative MTA paratransit business, as well as several other lucrative ambulance divisions.

91.      On February 18, 2016, TransCare signed a revised engagement agreement with Curtis Mallet to file a Chapter 7 bankruptcy case for all the TransCare entities.  Stephen continued to serve as the main point of contact for Curtis Mallet in planning TransCare's bankruptcy, even as he was handling PPAS's "foreclosure" of TransCare's assets.

92.      At the same time as Tilton sought to obtain TransCare's assets, she declined to pay the payroll taxes for TransCare's employees.   By February 24, 2016, TransCare owed approximately $1.148 million in payroll taxes for 2016, plus at least $172,000 in penalties and interest.[5]  Tilton allowed TransCare to operate without paying payroll taxes or reserving for them. For example, on February 19, 2016, when Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations, and outstanding payroll taxes from earlier pay dates, as well as other critical expenses, Tilton chastised Carl Marks for seeking her direction and instead told Carl Marks to "make decisions on what needs to be paid."

93.      TransCare had a contractual right to obtain funding for these ongoing obligations, but Tilton refused to request funding under the Ark II Credit Agreement.  Rather, Tilton decided

---

[5] Proofs of claim filed by the Internal Revenue Service affirm that TransCare owed $1.474 million in payroll taxes plus $.826 million in penalties and $.124 million in interest.

to ignore her fiduciary obligations to TransCare (or the statutes requiring payment of those amounts) and focus on her efforts to strip TransCare's assets for herself.

94.     PPAS, Transcendence Transit, Inc., and Transcendence Transit II, Inc. have represented in filings with the Bankruptcy Court for the Southern District of New York that PPAS effectuated an Article 9 "strict foreclosure" of certain of TransCare's assets, including its paratransit division and its ambulances.[6]

95.     On February 24, 2016 at 12:07 a.m., Stephen e-mailed a three-paragraph "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" dated February 24, 2016 to TransCare's Chief Operating Officer Peter Wolf.  There is no documentation showing when TransCare signed this document.[7]  This document was signed by Tilton for PPAS, Zohar I, Zohar II, Zohar III, and Ark Investment.  The document states that PPAS was accepting certain collateral – including (i) the MTA Contract, but not the stock of the performing party thereunder, TransCare New York, Inc., (ii) the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation, (iii) two vendor contracts, and (iv) all of TransCare's personal property (excluding account receivables, non-enumerated contracts/ leases, and the stock of the other TransCare entities) – pursuant to section 9-620 of the Uniform Commercial Code in satisfaction of $10,000,000 owed under the PPAS Credit Agreement.

---

[6] Tilton and various of her entities (including Patriarch Partners, LLC, PPAS, Ark II, and Ark Investment) have similarly represented in filings with the District Court for the Eastern District of New York that "TransCare's term loan lenders" foreclosed on the MTA Contract.  National Labor Relations Board v. Transcendence Transit II, Inc. et al., Case No. 1:17-mc-00913-SJ (E.D.N.Y.).

[7] Defendants have not provided a document showing any communication of TransCare's acceptance of the February 24, 2016 "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation."  Further, Defendants have similarly failed to produce the documents showing the ownership of Transcendence Transit, Inc. and the allocation of the foreclosed assets to the outstanding loans.

96.     However, the document does not provide notice to any of the other creditors secured by the same collateral (*i.e.*, Wells Fargo), or explain the basis for the $10,000,000 valuation of the collateral (which Patriarch had internally stated related to tens of millions of dollars of annual revenues).  Further, Tilton controlled TransCare by serving as its sole director (including at the time of the "strict foreclosure"), and the signatory for TransCare on this document (Peter Wolf) testified at TransCare's Meeting of Creditors under Bankruptcy Code section 341 that he was asked by Patriarch and/ or Tilton to sign backdated documents.

97.     Also on February 24, 2016, Tilton issued a number of board resolutions as the sole member of Transcendence's board of directors purporting to (a) exercise control over TransCare's assets, including borrowing an additional $10 million from an entity owned and controlled by Tilton and granting PPAS security interests in Transcendence's assets, and (b) authorize Transcendence to enter into transactions transferring and assigning leases and contracts from TransCare to Transcendence.

98.     For example, on February 24, 2016, Tilton signed a written consent of the sole director of Transcendence Transit II, Inc. authorizing Transcendent Transit II to enter into an Assignment Agreement with TransCare New York, Inc., whereby TransCare New York, Inc. would assign its Access-A-Ride Transportation Service Agreement with the MTA to Transcendence Transit II.  Tilton's written consent stated that "TransCare desires to transfer and assign the [MTA] Agreement."  By contrast, PPAS', Transcendence Transit's, and Transcendence Transit II's filings with the Bankruptcy Court claimed that PPAS foreclosed on TransCare's MTA contract and took it from TransCare.  The written consent also stated that "the MTA has heretofore provided TransCare with its consent to the Assignment."  This statement is inconsistent with the affidavit, made under penalty of perjury by Brian Stephen, stating that the MTA never approved

the assignment: "Transcendence II could not operate without being assigned the Access-A-Ride contract, and NYC Transit never approved its transfer."[8]

99.    In addition, pursuant to a Bill of Sale, Agreement to Pay and Transfer Statement dated February 24, 2016, TransCare's foreclosed assets and the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation were transferred to Transcendence Transit, Inc.

100.    Although PPAS executed the foreclosure, Tilton took the position that Ark II was the senior secured lender in the foreclosed assets and distributed proceeds received on account of the same to Ark II and not to PPAS.

101.    In October 2017, Ark II filed proofs of claim against TransCare stating that as of the petition date it was owed $1,867,423.97 under the Ark II Credit Agreement, and also that the resulting claim is secured.  These proofs of claim also state that Ark II received $800,000.00 in connection with the Trustee's sale of assets, reducing the claimed amount to $1,077,966.97.

102.    The Trustee paid out $800,000.01 to PPAS – not Ark II – pursuant to a court order dated March 25, 2016 [Dkt. No. 52].  PPAS failed to disclose to the Court or the Trustee that these funds would be forwarded to Ark II.  In fact, PPAS represented that it held "first-priority security interests" in the property to be sold and was entitled to "gift" part of its proceeds for the benefit of an employee wage claim fund on account of its lien position [Dkt. No. 49 at ¶¶ 9, 19].  Additionally, the March 25, 2016 stipulation agreed to by PPAS and the Trustee – and so-ordered by the Court – disclosed the existence of the intercreditor agreement between PPAS and Wells Fargo, while

---

[8] The Trustee has discovered at least one TransCare board resolution corresponding to the Transcendence board resolutions:  one authorizing TransCare to transfer and assign a medical equipment lease to Transcendence (again stating that "the Corporation desires to transfer and assign the Agreement.").

failing to disclose the intercreditor agreement between PPAS and Ark II or the existence of liens in Ark II's favor separate from those of PPAS [Dkt. No. 52-1 at Recitals, ¶ 4].

The Bankruptcy Filing

103.     On February 24, 2016, Tilton directed 11 of the 14 TransCare entities to file for chapter 7 bankruptcy protection, excluding those three entities holding the assets she sought to obtain via the strict foreclosure (TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation).

104.     According to PPAS, "insurmountable logistical issues" subsequently prevented it from continuing TransCare's paratransit and other business operations under the Transcendence label and that such issues "outmatched" PPAS's "desire and commitment to continue without those business lines."

105.     Late at night on February 25, Patriarch, and in particular Stephen (still purportedly the lawyer for TransCare's board of directors), realized that the Transcendence plan would not succeed.  At 10:53 p.m., despite the automatic stay having gone into effect the day before, Stephen e-mailed TransCare executives and directed them to steal assets from TransCare:  "As a result, we need to try and secure as many assets (ambulances, equipment, etc.) as possible as quickly as we can. … I am not entirely sure where the most valuable assets are, but it makes sense to target those first – if those assets can be moved."

106.     Later that evening, Pelissier followed up on Stephen's directive, instructing the TransCare executives to transfer TransCare's account receivables server out of the Debtors' warehouse.  Uncomfortable with this activity, TransCare's vice president refused and rejected Tilton's offer to join Transcendence, instead properly alerting the Trustee to the ongoing unlawful activity.

107. At a meeting of interested parties, including the Trustee and a representative of PPAS on February 25, 2016, the Trustee was advised that PPAS had conducted a strict foreclosure of the paratransit, Pittsburgh, and Hudson Valley divisions and told that those divisions' assets were not part of the bankruptcy estates. It was only long after ceasing their operations, on or about April 25, 2018, that Tilton caused those entities to also file for Chapter 7, and they were assigned to the Trustee.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty of Loyalty and Good Faith

#### (Against Lynn Tilton)

108. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

109. While she served as the sole board member of the Debtors, Tilton owed an undivided duty of loyalty and good faith to the Debtors.

110. Tilton lacked independence because she also was the principal of TransCare's lenders PPAS and Ark II, the collateral manager for three of the lenders in the PPAS Credit Agreement, and the owner of Ark II.

111. Tilton breached her duty of loyalty by actively impeding TransCare's attempts to monetize its assets and by instead working to strip TransCare of the same assets. Tilton made decisions for the benefit of herself, PPAS, Ark II, and her other companies, as opposed to the benefit of TransCare.

112. Tilton knew or should have known of the requirements of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 et seq. and the New York Worker Adjustment and Retraining Notification Act (the "NY WARN Act"), N.Y. Labor Law §

860 et seq. Further, Tilton knew or should have known that her actions and/ or inaction would create potential liability under the WARN Act and the NY WARN Act.

113.     As a direct and proximate cause of Tilton's breaches of the duty of loyalty and good faith, TransCare's estates have suffered: (a) unpaid asserted claims (including employee claims, WARN Act claims, NY WARN Act claims, and claims for payroll taxes, tax penalties, and interest); (b) loss of proceeds from the potential sale offers; (c) loss of employee wages for work performed by TransCare for PPAS, Ark II, Transcendence Transit, Transcendence Transit II, and/ or Tilton (along with the associated payroll taxes); and (d) loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty of Loyalty

**(Withdrawn)**

## THIRD CLAIM FOR RELIEF

### Equitable Subordination of All Claims Asserted by Patriarch

**(Against Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1, Limited, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC)**

114.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

115.     The Trustee seeks to equitably subordinate all claims asserted by PPAS, Ark II, PPMG, and Patriarch Partners against TransCare and its estates pursuant to Bankruptcy Code sections 105(a) and 510(c) because these Defendants engaged in inequitable conduct, causing injury to the creditors of TransCare and conferring an unfair advantage on these Defendants.

Claims have been filed against TransCare and its estates by insiders PPAS, Ark II, PPMG, and Patriarch Partners, LLC, all of whom participated in and benefitted from the inequitable conduct. Equitable subordination here is consistent with the Bankruptcy Code.

116.     Tilton, on behalf of these entities, utilized her role as the Debtors' sole board member to direct the Debtors' conduct to the detriment of and in breach of Tilton's fiduciary obligations to TransCare and their estates.

117.     The conduct of PPAS, Ark II, PPMG, and Patriarch Partners injured TransCare's estates by, among other things, (i) preventing the Debtors from selling their assets, (ii) causing the Debtors to pay millions of dollars to PPAS while TransCare was insolvent, and (iii) attempting to strip TransCare of its profitable assets – with the directed assistance of TransCare's employees – on the eve of its bankruptcy filings and even afterwards in violation of the automatic stay.

118.     In these circumstances, subordinating the claims of PPAS, Ark II, PPMG, and Patriarch Partners is consistent with the provisions of the Bankruptcy Code.

119.     Therefore, the Trustee requests that the claims asserted by PPAS, Ark II, PPMG, and Patriarch Partners be subordinated below general unsecured claims and that the liens associated with such claims be transferred to TransCare's estates pursuant to Bankruptcy Code section 510(c)(2).

**FOURTH CLAIM FOR RELIEF**

**<u>Recharacterization of Debt as Equity</u>**

**(Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)**

120.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

121.     In the alternative to equitably subordinating PPAS', Ark II's, PPMG's, and Patriarch Partners' claims, the Trustee seeks to recharacterize as equity all claims asserted against

TransCare and its estates by PPAS and Ark II for funds purportedly loaned pursuant to Bankruptcy Code sections 105(a) and 502(a).

122. The purported funds advanced by PPAS and Ark II that are documented as loans under the PPAS and Ark II Credit Agreements, respectively, were in fact and should be deemed to have been capital contributions or equity investments.

123. The circumstances of the purported funds advanced by PPAS and Ark II indicate that the parties did not intend to create an unconditional obligation for TransCare to repay such funds. Among the *indicia* evidencing that such funds were capital contributions/equity investments, not loans, include: (i) TransCare was severely undercapitalized at all relevant times; (ii) PPAS and Ark II were insiders of TransCare when such funds were advanced; (iii) repayment of the funds depended on the prospective financial success of TransCare; (iv) PPAS' and Ark II's equity and purported debt investments in TransCare were roughly proportional; (v) no sinking fund (or other accumulated funds set aside to repay the purported debts) was ever established when such funds were advanced; (vi) TransCare's assets were wholly encumbered when such advances were made; (vii) the advances were subordinated to the claims of lender Wells Fargo with respect to TransCare's valuable contract rights and certain other intangible property; and (viii) Patriarch rejected consideration of offers for all or part of TransCare's assets in an attempt to arrogate the value of those assets for itself.

124. The Trustee seeks a judgment recharacterizing as equity PPAS's and Ark II's claims for amounts purportedly loaned under the 2003 and Ark II Credit Agreements, disallowing their respective claims pursuant to Bankruptcy Code section 502, and transferring their liens to TransCare's estates or voiding their respective liens under Bankruptcy Code section 506(d).

## FIFTH CLAIM FOR RELIEF

### Replaced – Objection to Claims, Liens and Security Interests

125.     The Fifth Claim for Relief objecting to claims, liens and security interests has been

replead within the Third, Fourth, Seventh, Tenth, Eleventh, and Fourteenth Claims for Relief.

## SIXTH CLAIM FOR RELIEF

### Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control

### (Against Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Transcendence Transit, Inc., and Transcendence Transit II, Inc.)

126.     The Trustee realleges and incorporates the allegations of the preceding paragraphs

as if fully set forth herein.

127.     Patriarch was in complete domination of the finances, policy, and business practices

of TransCare.  Tilton's role as sole director placed Patriarch in a position of trust and unusual

advantage vis-à-vis TransCare.

128.     Patriarch's domination over TransCare resulted in TransCare having no separate or

independent mind, will, or existence of its own.

129.     Patriarch exploited this control to cause TransCare to make transfers and decisions

that rendered TransCare unable to pay employees and critical vendors (including vendors

necessary for the maintenance of its ambulance fleet), to engage in the failed Transcendence

scheme, and to deny TransCare the ability to explore refinancing or asset sales.

130.     As a direct and proximate cause of Patriarch's wrongful acts, TransCare's estates

have suffered: (a) unpaid asserted claims (including employee claims, WARN Act claims, NY

WARN Act claims, and claims for payroll taxes, tax penalties, and interest); (b) loss of proceeds

from the potential sale offers; (c) loss of employee wages for work performed by TransCare for

PPAS, Ark II, Transcendence Transit, Transcendence Transit II, and/ or Tilton (along with the associated payroll taxes); and (d) loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## SEVENTH CLAIM FOR RELIEF

### Actual Fraudulent Transfer; Recovery of Same; Claim Disallowance

**(Against Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1, Limited, Transcendence Transit, Inc., and Transcendence Transit II, Inc.)**

131.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

132.    On February 24, 2016, Patriarch and Tilton – via PPAS – purported to conduct a "strict foreclosure" of certain valuable assets of TransCare for their own benefit. This "strict foreclosure" was ineffective and commercially unreasonable, constituted an attempt to defraud TransCare and its creditors, and did in fact defraud TransCare and its creditors.

133.    The "strict foreclosure" purporting to transfer property from TransCare to (i) PPAS (as provided by the February 24, 2016 Notice of Acceptance of Subject Collateral), (ii) Transcendence Transit (provided by the February 24, 2016 Bill of Sale, Agreement to Pay and Transfer Statement), and (iii) Transcendence Transit II (provided by the February 24, 2016 Assignment Agreement), was ordered by Tilton and executed by Patriarch while TransCare was insolvent and unable to pay millions owing to other vendors, including vendors critical to the maintenance of the TransCare's ambulance fleet. Tilton and Patriarch's acts in ordering and conducting the strict foreclosure materially damaged the subject assets, effectively destroying even the possibility of realizing the value all parties had agreed existed.

134. These transfers further caused TransCare not to be able to operate as a going concern, to the detriment of TransCare's estates.

135. Therefore, the Trustee seeks damaged suffered by TransCare for these fraudulent transfers of TransCare's property to PPAS, Transcendence Transit, or Transcendence Transit II as actual fraudulent transfers pursuant to Bankruptcy Code sections 548(a)(1)(A) and N.Y. Debtor & Creditor Law sections 276 and 276-a, made applicable by Bankruptcy Code section 544(b).

136. Because the "strict foreclosure" substantially damaged the value of TransCare's assets, the Trustee seeks to recover their value immediately prior to the transfers pursuant to Bankruptcy Code section 550(a).

137. As noted above, PPAS and Ark II have filed claims against TransCare. The Trustee also seeks a judgment disallowing their respective claims, pursuant to Bankruptcy Code section 502(d), unless they have paid to the Trustee the amount for which they are determined to be liable under section 550(a).

## EIGHTH CLAIM FOR RELIEF

### Replaced – Recovery of Avoided Transfers

#### (Against All Defendants)

138. The Eighth Claim for Relief has been replead within the Seventh, Tenth, Eleventh, and Fourteenth Claims for Relief.

## NINTH CLAIM FOR RELIEF

### Violation of the Automatic Stay

#### (Against All Defendants)

139. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

140. Defendants' conduct in attempting to obtain property of TransCare postpetition, including – without limitation – negotiations to obtain the MTA Contract, efforts to consummate the "strict foreclosure," and efforts to obtain estate property, constituted violations of the automatic stay provided for in section 362(a) of the Bankruptcy Code.

141. The Defendants are guilty of civil contempt for the above transfers.

## TENTH CLAIM FOR RELIEF

### Preferential Transfer; Avoidance of Same; Preservation of Lien

**(Against Ark II CLO 2001-1, Limited)**

142. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

143. Ark II asserts in its proofs of claim that it has a valid lien on substantially all of the Debtors' assets as of the petition date, and proceeds thereof, by virtue of the security interest granted to Ark II under the Security Agreement, dated as of January 15, 2016, and Ark II's filing of a UCC-1 Financing Statement on January 29, 2016.

144. The Trustee seeks the avoidance of said lien, pursuant to Bankruptcy Code section 547(b).

145. Each of the grant of a security interest to Ark II and Ark II's perfection of the same, constitutes a "transfer of an interest of the debtor in property ... to or for the benefit of a creditor" (Ark II), under section 547(b)(1).

146. Said transfers were "for or on account of an antecedent debt owed by the debtor before such transfer was made" under section 547(b)(2). Virtually all, if not all, of the transfers which are the subject of Ark II's proofs of claim, were made before the Ark II Credit Agreement was entered into; accordingly, if not recharacterized as an equity investment, the transfer to Ark II

of a lien on TransCare's property was on account of an antecedent unjust enrichment or other quasi-contract claim of Ark II.

147.     Said transfers were "made while the debtor was insolvent," under section 547(c)(3) and Bankruptcy Code section 101(32)(A).  The Debtors were also presumptively insolvent at the time of the subject transfers under section 547(f).

148.     The subject transfers were made within a month prior to the petition date, well within the preference period under section 547(b)(4)(A).

149.     The transfer of the lien would enable Ark II to be treated as a secured creditor, and therefore receive more than it would receive had the transfer not been made, under section 547(b)(5)(B).

150.     The Trustee requests a judgment avoiding Ark II's lien, pursuant to section 547. The Trustee also seeks relief under Bankruptcy Code section 551 with respect to the Ark II lien avoided; specifically, a judgment that said lien is preserved for the benefit of the Debtors' estates, and that the Trustee succeeds to the priority that Ark II's lien enjoyed over PPAS's lien, pursuant to Section 2.2 of the 2016 Intercreditor Agreement, which as noted above provides for the subordination of PPAS's lien and right to payment to Ark II's lien and right to payment.

151.     As noted above, Ark II has filed claims against TransCare.  The Trustee also seeks a judgment disallowing its claims, pursuant to Bankruptcy Code section 502(d), unless it has paid to the Trustee the amount for which it is determined to be liable under section 550(a).

## ELEVENTH CLAIM FOR RELIEF

### Constructive Fraudulent Transfer; Recovery of Same; Claim Disallowance

### (Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)

152.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

153.    In 2015, Tilton and Patriarch caused TransCare to pay over $3.38 million as interest payments to PPAS under the PPAS Credit Agreement: (a) $269,399.96 on January 2, 2015; (b) $286,690.23 on January 30, 2015; (c) $39,000 on February 5, 2015; (d) $294,561.54 on March 4, 2015; (e) $56,306.41 on April 3, 2015; (f) $269,399.96 on April 6, 2015; (g) $326,672.04 on May 6, 2015; (h) $334,905.69 on June 8, 2015; (i) $225,811.02 on July 8, 2015; (j) $170,763.52 on August 3, 2015; (k) $164,040.67 on August 4, 2015; (*l*) $349,797.54 on September 4, 2015; (m) $291,565.72 on October 7, 2015; (n) $100,000 on October 30, 2015; and (o) $201,209.61 on November 4, 2015.

154.    In addition, on February 10, 2016, TransCare transferred a security interest to Ark II on account of purported antecedent debts.

155.    These payments were made at a time when TransCare was insolvent with unreasonably small capital and an awareness of its inability to pay its creditors.

156.    The payments to PPAS and the lien transfer to Ark II were not made in good faith and without receipt of fair consideration because PPAS, Ark II, and Tilton were insiders of TransCare.

157.    Additionally, the payments were made in part or wholly on account of loans which were actually equity contributions, and as a consequence, TransCare did not receive reasonably equivalent value in exchange for these payments.

158.    The Trustee seeks a judgment avoiding these transfers of TransCare's property to PPAS and Ark II as constructive fraudulent transfers pursuant to N.Y. Debtor & Creditor Law sections 273, 274, and 275, made applicable by Bankruptcy Code section 544(b).

159.    The Trustee also seeks a judgment recovering the same transfers, pursuant to Bankruptcy Code section 550(a).

160.     As noted above, PPAS and Ark II have filed proofs of claim against TransCare. The Trustee also seeks a judgment disallowing these claims pursuant to Bankruptcy Code section 502(d), unless they have paid to the Trustee the amount for which they are determined to be liable under section 550(a).

### TWELFTH CLAIM FOR RELIEF

#### Payment Subordination

#### (Against Patriarch Partners Agency Services, LLC)

161.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

162.     PPAS filed proofs of claim against TransCare stating that it is owed over $44 million under the PPAS Credit Agreement as of the petition date, and that the subject claims are secured.

163.     As noted above, Section 2.2 of the 2016 Intercreditor Agreement provides for the subordination of PPAS's lien and right to payment to Ark II's lien and right to payment.

164.     Specifically, Section 2.2 provides:

> Priority of Liens.  [T]he Liens upon the Ark Facility Priority Collateral of [Ark II] have and shall have priority over the Liens upon [said] Collateral of [PPAS] and such Liens of [PPAS] in the Ark Facility Priority Collateral are and shall be, in all respects, subject and subordinate to the Liens of [Ark II] in [said] Collateral.

> (a) Payments.  The proceeds of any Collateral shall be [distributed] in the following order of priorities:

> (i)    first, to the payment in full … of the expenses of the collection … of the Ark Facility Obligations [defined by reference to Ark II Credit Agreement]

> (ii)   second, to the payment in full … of the expenses of the collection of the … [PPAS] Obligations [similar definition]

> (iii)  third, to the payment in full … of all of the Ark Facility Obligations … and

(iv) <u>fourth</u>, to the payment in full … of all of the [PPAS] Obligations.

165. "Payment in full," in turn, is defined as including "all interest accrued or accruing … after the commencement of an Insolvency Proceeding in accordance with and at the rate specified in the applicable agreement whether or not the claim for such interest is allowed."

166. If Ark II's lien is successfully avoided, and the value of the same is preserved for the benefit of the Debtors' estates as a result under sections 547 and 551, then Ark II's claim is unsecured and afforded the same priority as Debtors' other unsecured claims under Bankruptcy Code section 726.

167. The Trustee requests a judgment that PPAS is not entitled to any payment on account of its claims arising under the PPAS Credit agreement, by operation of Section 2.2(a) of the 2016 Intercreditor Agreement and Bankruptcy Code section 510(a), unless and until Ark II has been paid in full on account of its claim.

## THIRTEENTH CLAIM FOR RELIEF

### <u>Limitation on Liens</u>

### (Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)

168. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

169. Pursuant to the Security Agreements executed by TransCare in favor of each of Ark II and PPAS, Ark II and PPAS were each granted a blanket security interest in all property TransCare then had or would thereafter acquire.

170. The security interest covered proceeds, products, and offspring of each category or type of property identified in the Security Agreement (*e.g.*, chattel paper, equipment, etc.).

171. Pursuant to Bankruptcy Code section 552(b), if a security interest extends to property of the debtor acquired prepetition and to proceeds, products, and offspring of the same,

then the security interest extends to such proceeds, products, and offspring acquired by the debtor's estate postpetition, "except to the extent that the court ... after notice and a hearing and based on the equities of the case, orders otherwise."

172. Postpetition the Trustee sold substantially all of the Debtors' property in several Bankruptcy Code section 363 sales. Cash proceeds of said sales constitutes proceeds, products, and offspring of Ark II's and PPAS's prepetition collateral under section 552(b).

173. The Trustee seeks a judgment applying the "equities of the case" exception in section 552(b) for reasons set forth herein, and concluding that Ark II's and PPAS's security interests do not extend to cash proceeds of section 363 sales consummated in these cases.

## FOURTEENTH CLAIM FOR RELIEF

### Turnover of Estate Property; Avoidance of Postpetition Transfer

**(Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)**

174. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

175. By Order, entered March 25, 2016, the Court approved a carveout stipulation, dated March 10, 2016, among the Trustee, PPAS, and Transcendence.

176. The recitals to the agreement explained that a dispute existed between the Trustee, on the one hand, and PPAS and Transcendence, on the other, concerning the validity of the alleged strict foreclosure by PPAS and transfer of foreclosed property to Transcendence.

177. By the stipulation, PPAS and Transcendence consented to the sale of the subject property at auction, and the parties further agreed that their liens "if any" on said property would attach to the sale proceeds. The parties also agreed to the establishment of a carveout from the sale proceeds in an amount needed to pay property preservation- and sale-related professional fees

and costs, and that 20% of net sale proceeds would be distributed to the Trustee and the 80% balance would be distributed to PPAS.

178.    The parties further agreed that nothing in the stipulation constitutes a waiver of the Trustee's right to challenge any party's claims, or interests in the property sold.

179.    PPAS was paid $800,000.01 on an interim basis, pursuant to the stipulation.

180.    Ark II later filed proofs of claim indicating that the same $800,000.01 was then transferred to Ark II.  PPAS never disclosed that these funds would be transferred from PPAS in connection with the negotiation of the March 10, 2016 stipulation or the approval of the March 25, 2016 court order.

181.    By this action, the Trustee has challenged PPAS's and Ark II's claims against TransCare, and liens on the subject property.

182.    In the event that the Trustee prevails on its causes of action challenging said claims and/ or liens, PPAS will not have had any entitlement to any portion of the sale proceeds on account of its alleged claim.

183.    Judgment should then be entered determining that PPAS owes a debt to the Trustee in the amount of $800,000.01, and directing the turnover of said funds to the Trustee, pursuant to Bankruptcy Code section 542(b).

184.    Judgment should also then be entered avoiding the postpetition transfer to PPAS of the $800,000.01, and directing the recovery of the same from PPAS and Ark II, pursuant to section 550(a).  Alternatively, judgment should be entered avoiding the postpetition transfer to Ark II of the $800,000.01 as a transfer not authorized by the Court's March 25, 2016 order, and directing recovery of the same from Ark II pursuant to section 550(a).

185. Judgment should also then be entered disallowing PPAS's and Ark II's claims, pursuant to Bankruptcy Code section 502(d), unless they have paid to the Trustee the amount for which they are determined to be liable under section 550(a).

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in the Trustee's favor against the Defendants to each claim for relief, in the amount requested by each claim for relief, plus attorneys' fees and costs, punitive damages, prejudgment interest, where applicable, together such other and further relief as this Court deems just and proper.

Dated: New York, New York        Respectfully submitted,
     November 28, 2018

                              /s/ Bijan Amini
                              Bijan Amini
                              Steven G. Storch
                              Avery Samet
                              STORCH AMINI PC
                              2 Grand Central Tower
                              140 East 45th Street, 25th Floor
                              New York, New York 10017
                              Tel: (212) 490-4100
                              Fax: (212) 497-4208
                              bamini@storchamini.com
                              sstorch@storchamini.com
                              asamet@storchamini.com

                              *Special Counsel to Plaintiff Salvatore LaMonica, as Chapter 7 Trustee*