**PROSKAUER ROSE LLP**
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000

Nicole A. Eichberger (*pro hac vice*)
650 Poydras Street
Suite 1800
New Orleans, LA 70130-6146
Tel.: (504) 310-2024

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ***In re*** <br><br>     **TRANSCARE CORPORATION, *et al.*,** <br><br>            **Debtors.** | Chapter 7 <br><br> Case No. 16-10407 (SMB) <br><br> (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, <u>et al.</u>,** <br><br>         **Plaintiff,** <br><br>   **v.** <br><br> **LYNN TILTON, <u>et al.</u>,** <br><br>         **Defendants.** | Adv. Proc. No. 18-01021 |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS CERTAIN CLAIMS ASSERTED**
<u>**IN THE CHAPTER 7 TRUSTEE'S AMENDED ADVERSARY COMPLAINT**</u>

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.     Count XI Should be Dismissed As Against PPAS ............................................... 3

     A.     The Mere Conduit Issue Can be Decided on a Motion to Dismiss......................... 3

     B.     PPAS is a Mere Conduit ......................................................................... 5

     C.     In Any Case, the Trustee Fails to Sufficiently Allege That the Challenged Interest Payments Lacked Fair Consideration ....................................... 10

II.     The Recharacterization Claim Against Ark II Should Be Dismissed............................... 13

III.     The Trustee's Lender Liability Claim Should Be Dismissed ............................................ 17

CONCLUSION ...................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Atlanta Shipping Corp., Inc. v. Chem. Bank*,
    631 F. Supp. 335 (S.D.N.Y. 1986),
    *aff'd*, 818 F.2d 240 (2d Cir. 1987) ................................................................. 10

*Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
    No. CV 11802-VCL, 2018 WL 3326693 (Del. Ch. July 6, 2018) .................. 17, 19

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading*,
    215 F.3d 219 (2d Cir. 2000) ...................................................................... 17

*Beal Savs. Bank v. Sommer*,
    8 N.Y.3d 318 (2007) .................................................................................. 6

*Charles Schwab & Co. v. Retrophin, Inc.*,
    No. 14 Civ. 4294 ER, 2015 WL 5729498 (S.D.N.Y. Sept. 30, 2015) ............ 19

*Depositors Tr. Co. of Augusta v. Frati Enters., Inc.*,
    590 F.2d 377 (1st Cir. 1979) ....................................................................... 9

*Excess Ins. Co. v. Factory Mut. Ins. Co.*,
    3 N.Y. 3d 577 (2004) ................................................................................. 6

*In re 360networks (USA) Inc*,
    338 B.R. 194 203 (Bankr. S.D.N.Y. 2005) ............................................... 7, 8

*In re Actrade Fin. Techs. Ltd.*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ....................................................... 10

*In re AutoStyle Plastics, Inc.*,
    269 F.3d 726 (6th Cir. 2001) ........................................................... 13, 14, 15

*In re Brooke*,
    458 B.R. 579 (Bankr. D. Kan. 2011) .......................................... 4, 5, 7, 8, 9, 10

*In re Checkmate Stereot Elecs., Ltd.*,
    9 B.R. 585 (Bankr. E.D.N.Y. 1981),
    *aff'd*, 21 B.R. 402 (E.D.N.Y. 1982) ......................................................... 11

*In re Chrysler LLC*,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009),
    *aff'd*, 576 F.3d 108 (2d Cir. 2009) ............................................................ 7

*In re Cold Harbor Assocs., L.P.*,
204 B.R. 904 (Bankr. E.D. Va. 1997) ................................................................16

*In re Columbia Data Prods., Inc.*,
892 F.2d 26 (4th Cir. 1989) ..........................................................................7, 9

*In re Consol. Props. Ltd. P'ship*,
170 B.R. 93 (Bankr. D. Md. 1994) ......................................................................7

*In re Coutee*,
984 F.2d 138 (5th Cir. 1993) ...............................................................................4

*In re Cypress Rests. of Ga., Inc.*,
332 B.R. 60 (Bankr. M.D. Fla. 2005) ..................................................................8

*In re Dreier LLP*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...............................................................10

*In re Enter. Acquisition Partners, Inc.*,
319 B.R. 629 (B.A.P. 9th Cir. 2004) ..................................................................11

*In re Eternal Enter., Inc.*,
557 B.R. 277 (Bankr. D. Conn. 2016) ...............................................................16

*In re Grumman Olson Indus., Inc.*,
329 B.R. 411 (Bankr. S.D.N.Y. 2005) ...............................................................19

*In re Incomnet, Inc.*,
463 F.3d 1064 (9th Cir. 2006) .............................................................................9

*In re KDI Holdings, Inc.*,
277 B.R. 493 (Bankr. S.D.N.Y. 1999) ...............................................................17

*In re Lenox Healthcare*,
343 B.R. 96 (Bankr. D. Del. 2006) ......................................................................8

*In re Lyondell Chem. Co.*,
544 B.R. 75 (Bankr. S.D.N.Y. 2016) .................................................................14

*In re Operations NY LLC*,
490 B.R. 84 (Bankr. S.D.N.Y. 2013) .................................................................11

*In re Personal Commc'n Devices, LLC*,
528 B.R. 229 (Bankr. E.D.N.Y. 2015) ...............................................................14

*In re Rockville Orthopedic Assocs., P.C.*,
377 B.R. 438 (Bankr. D. Conn. 2007) ...............................................................16

*In re Spitko,*
   Adv. Pro. No. 05-0258,
   2007 WL 1720242 (Bankr. E.D. Pa. June 11, 2007) ..........................................11

*In re White Metal Rolling & Stamp Corp.,*
   222 B.R. 417 (Bankr. S.D.N.Y. 1998) .................................................................12

*In re Winstar Commn'cs, Inc.,*
   348 B.R. 234 (Bankr. D. Del. 2005) ...................................................................11

*Kelly-Brown v. Winfrey,*
   717 F.3d 295 (2d Cir. 2013) ................................................................................3

*Labajo v. Best Buy Stores, L.P.,*
   478 F. Supp. 2d 523 (S.D.N.Y. 2007) ..............................................................3, 4

*Lymann Comm. Sols. Inc. v. Lung,*
   2015 WL 1808693 (S.D.N.Y. Apr. 20, 2015) ....................................................11

*Manley v. AmBase Corp.,*
   337 F.3d 237 (2d Cir. 2003) ................................................................................6

*Mega Personal Lines, Inc. v. Halton,*
   9 A.D.3d 553 (3d Dep't 2004) ......................................................................12, 13

*Mogil v. Bldg. Essentials, Inc.,*
   129 A.D.3d 1378 (3d Dep't 2015) .................................................................12, 13

*Paloian v. La Salle Bank, N.A.,*
   619 F.3d 688 (7th Cir. 2010) ...........................................................................9, 10

*Pashaian v. Eccelston Props., Ltd.,*
   88 F.3d 77 (2d Cir. 1996) ...................................................................................11

*Tese-Milner (In re Moon),*
   385 B.R. 541 (Bankr. S.D.N.Y. 2008) .................................................................4

*Teva Pharms. USA, Inc. v. Sandoz Inc.,*
   Nos. 09 Civ. 10112 (KBF), 10 Civ. 7246 (KMF), 2013 WL 3732867
   (S.D.N.Y. July 16, 2013) ......................................................................................3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) .........................................................................................20

N.Y. Debt & Cred. Law § 272 ................................................................................10

Defendants respectfully submit this reply to Plaintiff's Opposition to Defendants' Partial Motion to Dismiss ("Opposition" or "Opp.") [ECF No. 63] and in further support of their Motion [ECF No. 60].[1]

## PRELIMINARY STATEMENT

1.      Defendants' Motion should be granted.  First, with respect to the Trustee's claim against PPAS for constructive fraudulent conveyance, even if the Trustee had adequately alleged that PPAS was an insider (he did not), the claim should still be dismissed because it is clear from the Trustee's pleading that PPAS was a mere conduit and not an "initial transferee."  The Trustee's assertion that the mere conduit defense cannot be raised on a motion to dismiss is meritless and contrary to the applicable case law.  That PPAS is a mere conduit is clear from the face of the Credit Agreement, the terms of which clearly contradict the Trustee's allegations.  Moreover, PPAS need not demonstrate that it complied with the terms of the Credit Agreement when it comes to PPAS's dealings with the Lenders (although it did).

2.      The Trustee's emphasis on PPAS's enforcement rights under the PPAS Agreement is similarly misplaced, because the question at issue is what rights and obligations PPAS had *with regard to the challenged interest payments*.  The PPAS Credit Agreement is unequivocal on that point:  (a) the payments were received by PPAS "for the account of the Lenders" and (b) PPAS was required to distribute the payments to the Lenders.

3.      In any event, the Trustee has failed to adequately allege that PPAS is an insider – and thus that there was a lack of fair consideration.  The Amended Complaint lacks any specific allegations that PPAS controlled TransCare.  Indeed, the Trustee's only allegation of control as to PPAS (as distinct from other Entity Defendants) is entirely conclusory.

---

[1] Capitalized terms used but not defined herein have the meaning given to them in the Motion.

4.      Second, with regard to the Trustee's recharacterization claim (Count IV), he has agreed to dismiss it as against PPAS but still maintains that the Ark II debt can be recharacterized. The Trustee is wrong. Indeed, the Trustee fundamentally misapprehends the lone *AutoStyle* factor (factor 6) he invokes, ignoring the fact that Ark II is the sole lender under the Ark II Credit Agreement but does not hold all of TransCare's equity. Further, although he tries to portray the Ark II Credit Agreement as "illusory" because TransCare did not have the unilateral right to draw on the facility established under that contract, this ignores that Ark II did in fact lend the funds he seeks to recharacterize and those funds were subject to the clear and specific terms of a fully-executed loan agreement. The mere fact that a few weeks passed between the time of the loan and the time the Ark II Credit Agreement was signed does not change the overwhelming indications that the challenged debt was intended to be (and was) a loan.

5.      Finally, with regard to the Trustee's "lender liability" claim (Count VI), for the first time in this case the Trustee now says that claim is not really about any lender-borrower relationship. Rather, he says, his theory is that the Entity Defendants owed fiduciary duties to TransCare because they allegedly assumed control of TransCare. But that is simply not what the Amended Complaint says. Rather, in his pleading the Trustee alleges that it was *Ms. Tilton* who controlled TransCare and that the Entity Defendants acted *for her benefit* and *at her direction*. The Trustee does not allege (as he cannot) that the purported control person for TransCare, Ms. Tilton, was controlled by the Entity Defendants. For that reason, this claim should be dismissed.

<u>**ARGUMENT**</u>

**I.      Count XI Should be Dismissed As Against PPAS**

     **A.      The Mere Conduit Issue Can be Decided on a Motion to Dismiss**

6.      Contrary to the Trustee's contention, it is not premature for the Court to consider whether PPAS was a mere conduit.  "Affirmative defenses may be adjudicated [on a motion to dismiss] . . . where the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013).  This necessarily includes documents incorporated by reference within a complaint – in this case, the Credit Agreement. *Teva Pharmaceuticals USA, Inc. v. Sandoz Inc.*, Nos. 09 Civ. 10112 (KBF), 10 Civ. 7246 (KBF), 2013 WL 3732867, at *3 (S.D.N.Y. July 16, 2013) ("Courts may grant motions to dismiss based on an affirmative defense so long as the applicability of the defense is apparent on the face of the complaint or documents incorporated by reference within the complaint.").  Here, the "facts necessary to establish the defense," – *i.e.*, that PPAS had no legal dominion or control over the interest payments at issue – are clearly set forth in Section 5.9 of the Credit Agreement, which document is incorporated by reference within the Amended Complaint and to which this Court cited in its decision on Defendants' initial Motion to Dismiss.  ECF No. 40 at 3-5; *see* Motion at 4 n.5.

7.      The Trustee argues that this Court should focus on his allegations that PPAS purportedly "played favorites" among the Lenders and distributed interest payments "as it saw fit," and can ignore the plain terms of the Credit Agreement.  Opp. at 17-18.  Thus, the Trustee argues, if the Court simply focuses on the "facts" as alleged in the Amended Complaint, the mere conduit defense would not be evident on the face of his pleading.  *Id.*  But, "[w]here a plaintiff's conclusory allegations are clearly contradicted by documentary evidence incorporated into the pleadings by reference, the court is not required to accept them." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp.

2d 523, 528 (S.D.N.Y. 2007). By the clear terms of the Credit Agreement, TransCare was required to make interest payments "to [PPAS] for the account of the Lenders." Credit Agreement § 5.9. Upon receipt, PPAS was required to "distribute such payments to the Lenders promptly . . . in like funds as received." *Id.* Since the terms of the Credit Agreement "clearly contradict[ ]" the Trustee's conclusory allegations, those contrary allegations can and should be disregarded. *Labajo*, 478 F. Supp. 2d at 528.

8. Moreover, PPAS need not establish that it in fact distributed the interest payments it received to the Lenders to rely upon the mere conduit defense, as the Trustee appears to argue in his Opposition. Opp. at 18-19 and n.12. The Trustee misconstrues the *Bonded* test, which is one of "legal dominion or control." *In re Brooke*, 458 B.R. 579, 586 (Bankr. D. Kan. 2011) (citation omitted). "The *Bonded* definition of initial transferee has been held to mean that if the entity receiving the funds is not permitted—by law, contract, or otherwise—from using the funds as it desires, it is a mere conduit and not an 'initial transferee.'" *Id.* at 586-87 (quoting *Tese-Milner v. Moon* (*In re Moon*), 385 B.R. 541, 552 (Bankr. S.D.N.Y. 2008)). Put otherwise, whether PPAS actually complied with its contractual obligations to *the Lenders* under the Credit Agreement is irrelevant to the analysis. *Brooke* illustrates the point well: "Stockton would have been subject to contractual liability if it had attempted to use the Participants' portion of the funds for its own purposes. Since dominion means legal dominion and control, *the fact that Stockton could have violated its contractual duty to the Participants by taking the payments and spending them as it pleased makes 'no difference in the analysis.'*" *Id.* at 590 (emphasis added) (quoting *In re Coutee*, 984 F.2d 138, 141 n.4 (5th Cir. 1993)). Here too, the fact that PPAS could have violated its contractual duties to the Lenders under the Credit Agreement should make "no difference in the analysis." *Id.* To the extent the Trustee alleges that PPAS did not distribute the payments *among*

*the Lenders* in the manner provided for under the Credit Agreement, it would only be an issue

between PPAS and the Lenders. Such allegations *do not* alter the fact that under the clear terms

of the Credit Agreement, PPAS had no legal dominion or control over the payments.

### B. PPAS is a Mere Conduit

9. The Trustee's arguments on the merits fare no better than his procedural argument.

This is due, in large part, to his conflating PPAS's rights as the administrative agent under the

Credit Agreement with its duty to distribute interest payments to the Lenders under that same

contract. The admittedly broad enforcement rights bestowed on PPAS for the benefit of the

Lenders under the Credit Agreement have no bearing on whether it had control over the interest

payments the Trustee seeks to avoid.

10. *Brooke* is particularly instructive on this point. There, the plaintiff argued that

because the intermediary "could administer the Loan using its sole judgment" and had wide

discretion to take actions to "enforce or protect the Loan and any Property securing the Loan," the

intermediary had control over transferred funds. *In re Brooke*, 458 B.R. at 587. The *Brooke* court

rejected the argument:

> [Stockton's] discretion does not equate to control under the *Bonded* conduit test.
> *Stockton's discretion is related to the administration of the Loan, not to the*
> *distribution of Loan payments, which is the focus of the dominion test.* Stockton
> had no discretion regarding the distributions; they were governed by specific terms
> of the Agreements stating the duty to make distributions, the time distributions were
> to be made, and imposing a penalty if payments were not timely . . . The
> Participants' argument that Stockton had dominion and control of the Loan
> payments because it had administrative discretion ignores the mandatory, specific
> terms of the Agreements under which Stockton acted when making the distributions
> to the Participants.

*Id.* (emphasis added).

11. Like the Participants in *Brooke*, the Trustee ignores "mandatory, specific terms" of

the Credit Agreement requiring PPAS to distribute payments to the Term Loan Lenders. *See, e.g.,*

Credit Agreement § 5.9(c) (emphasis added) (providing that interest payments shall be paid "*to [PPAS] for the account of the Lenders*, at the 'Funding and Payment Office' . . . in Dollars and in immediately available funds. [PPAS] shall distribute such payments to the Lenders promptly upon receipt in like funds as received . . . ."); § 2.3 (Repayment of Term Loans) (emphasis added) ("[TransCare] shall pay to [PPAS] *for the account of the Term Loan Lenders,* the principal amount of the Term Loans in nine consecutive quarterly installments . . . upon receipt of thereof [PPAS] will distribute to each Term Loan Lender its Term Loan Percentage of each such payment . . . ."). It is precisely these specific provisions that control the analysis. As a matter of fundamental contract construction, courts are to "construe the agreements so as to give full meaning and effect to the material provisions" – a principle at odds with the Trustee's argument. *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 3 N.Y. 3d 577, 582 (2004). *See also Manley v. AmBase Corp.*, 337 F.3d 237, 249-50 (2d Cir. 2003) (court should avoid contract interpretations that would render any provision meaningless).

12.     As a result of this improper conflation of PPAS's administrative rights with its obligations with respect to specific payments, the Trustee ultimately devotes a substantial part of his Opposition to a discussion of irrelevant case law. For example, the Trustee relies on *Beal Savings Bank v. Sommer*, 8 N.Y.3d 318 (2007), to support his argument that a broad grant of power to an administrative agent for a syndicated loan somehow means the agent was not a mere conduit under the *Bonded* test. But *Beal* was not a mere conduit case. Instead, the court was tasked with determining whether a particular lender in a syndicated loan arrangement had standing to sue where the applicable contractual provisions reflected that the lenders contemplated only unified action by the administrative agent.

13.     Many of the other cases on which the Trustee relies miss the mark for a similar reason:  that is, they address generally an agent's or lead bank's standing to assert rights on behalf of a lender group or to take action on behalf of individual investors – not the obligation to distribute payments to loan participants.  *See, e.g.*, *In re Chrysler LLC*, 405 B.R. 84, 102 (Bankr. S.D.N.Y. 2009) (considering rights of administrative agent vested with exclusive right to pursue the lenders' rights and remedies concerning secured collateral in context of sale of assets under section 363 of the Bankruptcy Code), *aff'd*, 576 F.3d 108 (2d Cir. 2009); *In re Consol. Props. Ltd. P'ship*, 170 B.R. 93, 96 (Bankr. D. Md. 1994) (considering whether lead lender, the only secured party in a participation agreement, was entitled to vote on debtor's plan under § 502 of the Bankruptcy Code).[2]  These cases are not germane to the determination of whether PPAS had such "legal dominion and control" of the interest payments under the *Bonded* test to qualify as an initial transferee rather than a mere conduit.   *In re Brooke*, 458 B.R. 586-87. [3]

14.     The Trustee's remaining arguments also lack merit.  First, the Trustee plucks language from *In re 360networks (USA) Inc*, 338 B.R. 194, 203 (Bankr. S.D.N.Y. 2005) and *In re Columbia Data Prods., Inc.*, 892 F.2d 26, 28 (4th Cir. 1989) to argue for a bright-line rule that any creditor of a debtor cannot be a mere conduit.  The cases on which the Trustee relies, however, do

---

[2] Relatedly, PPAS's filing a proof of claim on behalf of the Lenders does not transform PPAS from a mere conduit into an initial transferee.  PPAS filed the proof of claim as part of the irrevocable authority the Lenders granted it "as the agent of such Lender" to exercise power and perform duties necessary in administering the TransCare term loan. Credit Agreement § 11.1.  *See In re Brooke*, 458 B.R at 590 (emphasis added) ("The fact that Stockton filed a proof of claim for the full amount owed by Brooke on the Note does not evidence that Stockton could legally exercise dominion and control over the Brooke payments.  The proof of claim was filed by Stockton to fulfill its duty to the Participants to administer the Loan *as though* it were the sole owner and holder thereof.").

[3] The Trustee also attempts to distinguish *Brooke* from the instant case by focusing on language in the *Brooke* loan agreement providing that the individual loan participants would be "considered for all purposes the legal and equitable owner . . . and will possess all applicable rights, privileges and remedies."  Opp. at 25.  The Trustee argues that the Credit Agreement does not contain similar language and is thus distinguishable.  But the court's decision in *Brooke* did not turn on this language.  *See supra* ¶ 10.  In any case, under the terms of the Credit Agreement, PPAS possessed no legal or equitable ownership rights, whether or not that contract expressly says so in those words.

not support such a broad reading. Instead, the courts determined only that the intermediary was a "creditor" because it received a transfer that it applied *to its own debt*. In other words, the funds were conveyed to the transferee "in payment of an expense that the transferee ha[d] already advanced on the credit of the debtor." *In re 360networks,* 338 B.R. at 203; *In re Columbia Data*, 892 F.2d at 28 (finding intermediary was initial transferee where "[i]t supplied [the debtor] with computer components, and the transfers from [the debtor] to [the intermediary] . . . were payments for the components."). *See also In re Brooke*, 458 B.R. at 588-59 (finding that principle articulated in *Columbia Data* "applies only to the portion of the Loan held by Stockton. Here Stockton received money in payment of the Brooke Note, but only 5.56% of the payment was applied to Stockton's interest in the Note. Stockton was not a creditor of Brooke as to the interests sold to the Participants."). PPAS did not own any portion of the loan at issue, was not entitled to any portion of the interest payments in dispute, and had no contractual ability to control the disposition of the interest payments it received.

15. Next, the Trustee relies on cases in which the intermediary entity was expressly permitted to use the funds it received at its discretion and/or for its own purposes by agreement or otherwise, and are distinguishable on that basis. *See In re Lenox Healthcare*, 343 B.R. 96, 104 (Bankr. D. Del. 2006) (transfers "were payments from the Debtor to reimburse Guardian[, the intermediary,] for its advance payment of employee claims. The Transfers did not merely flow through Guardian to the health care providers . . . Guardian was not under any obligation to use the Transfers for the benefit of the Plans' claimants and could use the Transfers for 'whatever purpose [it wished].'"); *In re Cypress Rests. of Ga., Inc.*, 332 B.R. 60, 65 (Bankr. M.D. Fla. 2005) ("Once the debtor's funds were transferred, TMG had dominion and control over the funds. Like any other supplier, TMG could retain the balance of the debtor's funds as profits or to use the

monies to pay the leased employees' wages. The choice was up to TMG alone."); *In re Columbia Data*, 892 F.2d at 29 ("Logan used the funds for its own purpose-to reduce its debt to Security Pacific."); *In re Incomnet, Inc.,* 463 F.3d 1064, 1076 (9th Cir. 2006) ("USAC, as administrator of the USF, decides, if, when, and how it disburses funds on behalf of the USF's beneficiaries.")[4]; *Depositors Tr. Co. of Augusta v. Frati Enters., Inc.*, 590 F.2d 377, 379 (1st Cir. 1979) ("Augusta had the legal power to collect the note and to compromise or adjust its terms.").

16.     Finally, the Trustee's reliance on *Paloian v. La Salle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010), is misplaced. *Paloian* concerned whether a securitized asset pool trustee that received funds in payment of notes held in the trust, and was contractually bound to disperse the trust's property to investors, was a mere conduit or an initial transferee. The court's analysis focused on the fact that the recipient of the funds, LaSalle Bank, was the trustee of the securities pool. As the trustee, the court explained, it was "the legal owner of the trust's assets." *Id.* at 691. Because the trustee owned the assets held in trust, the court reasoned, "[i]f LaSalle Bank must hand $10 million over to the bankruptcy estate, it will draw that money from the corpus of the trust, not from the [its own] corporate assets." The effect of drawing on the trust "means that the money really comes from the trust's investors . . . ." *Id.* at 691-92.

17.     PPAS's relationship to and with the Lenders is plainly distinguishable from LaSalle Bank's relationship to and with the trust's investors in *Paloian*. First, PPAS is an administrative agent – not a trustee. Next, PPAS had no legal title to the interest payments (*see, e.g.*, Credit Agreement §5.9(c)). Third, there is no pool of assets, much less a pool of assets that PPAS can draw on, from which PPAS could deduct any amounts for which it might be found liable to the

---

[4] In *In re Incomnet*, there was also no "binding legal relationship between [the USF] and any of the USF's beneficiaries." 463 F.3d at 1075. In contrast, PPAS obviously has a binding contract with the Lenders.

Trustee.  *See In re Brooke*, 458 B.R. at 591 (rejecting Participants' reliance on *Paloian* where, like PPAS, defendant intermediary was an agent (as opposed to a trustee) and did not hold assets for the benefit of the ultimate transferees.)[5]

C.     **In Any Case, the Trustee Fails to Sufficiently Allege That the Challenged Interest Payments Lacked Fair Consideration**

18.     Even assuming *arguendo* that the Trustee had alleged facts sufficient to render the mere conduit defense inapplicable (and he did not), the fraudulent conveyance claim against PPAS should still be dismissed because the Trustee has not adequately alleged a lack of fair consideration.  Under DCL § 272, a conveyance cannot be deemed constructively fraudulent if it is made for "fair consideration."  That is, to survive a motion to dismiss, the Trustee must adequately plead either a lack of fair equivalent value or a lack of good faith.  *See In re Dreier LLP*, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011).  "Generally, a transfer for antecedent debt is deemed a good faith transfer."  *Atlanta Shipping Corp., Inc. v. Chem. Bank,* 631 F. Supp. 335, 346 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987).  The Trustee bears the burden to prove lack of good faith.  *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005).

19.     Here, the Trustee does not dispute that TransCare's payment of interest to PPAS pursuant to the Credit Agreement was in repayment of an antecedent debt.  Instead, he argues that the transfers should nevertheless be avoided because PPAS is a purported insider.

---

[5] The Trustee focuses on the potential administrative burden a trustee or debtor may face in recovering avoided transfers from the transferees who actually have dominion and control over the transferred funds, as was touched upon in *Paloian*, 619 F.3d at 692. However, as discussed above, the crux of the *Paloian* court's analysis of *Bonded* centers on the fact that LaSalle Bank, as the trustee, *owned the assets held in trust* – not on potential administrative inefficiencies.  *Id.* at 691-92.  Moreover, the administrative burden contemplated in *Paloian* (*i.e.*, collection from thousands of investors) is far greater than the burden the Trustee may have here (*i.e.*, collection from at most six entities).  Indeed, the rule the Trustee posits would be fundamentally unfair to administrative agents, who would be required to *use its own funds* (rather than funds held in a trust) to "repay" a trustee or debtor amounts that it never obtained any benefit from and then seek reimbursement from the lenders for which it acts as agent.  That unfairness was not present in *Paloian*, where LaSalle Bank could draw the required repayment directly from the corpus of the trust.

20.     The cases cited in the Opposition do not support the Trustee's argument.  First,

several of the cases upon which the Trustee relies involved situations in which an individual sought

to insulate itself from liability through a "facile stratagem of forming a corporation" or transferred

assets through a series of sham transactions.  *See* Opp. at 13 (citing *Pashaian v. Eccelston Props.,*

*Ltd.*, 88 F.3d 77, 81 (2d Cir. 1996) and *Lymann Comm. Sols. Inc. v. Lung*, 2015 WL 1808693, at

*11 (S.D.N.Y. Apr. 20, 2015)).  But the Amended Complaint and Credit Agreement make clear

that is not what happened here.  As the Credit Agreement indicates, the interest payments were

owed to a syndicate of lenders pursuant to a thirteen-year old contract executed when TransCare

emerged from a prior bankruptcy, and under which PPAS served as the administrative agent.  The

Amended Complaint contains no allegation that the syndicate was formed, or PPAS appointed as

agent, in order for Ms. Tilton to insulate herself from fraudulent transfer liability.

21.     Nor does the fact that Ms. Tilton is alleged to have controlled PPAS make it an

insider.  As this Court has previously held in considering a transferee's status as an insider under

the Bankruptcy Code, a corporation owned by an insider is not a *per se* insider.  *See In re*

*Operations NY LLC*, 490 B.R. 84, 101 (Bankr. S.D.N.Y. 2013) (Bernstein, J.).  Instead, courts are

to focus on whether the transferee has "control over the corporation's finances" or whether the

transaction was an "arm's-length bargain."  *In re Checkmate Stereo & Elecs., Ltd.*, 9 B.R. 585,

617-618 (Bankr. E.D.N.Y. 1981), *aff'd*, 21 B.R. 402 (E.D.N.Y. 1982).  *See also In re Enter.*

*Acquisition Partners, Inc.,* 319 B.R. 626, 633 (B.A.P. 9th Cir. 2004) (demonstrating insider status

"requires some showing of control of the debtor") (cited with favor in *In re Operations*); *In re*

*Spitko*, Adv. Pro. No. 05-0258, 2007 WL 1720242, at *8-9 (Bankr. E.D. Pa. June 11, 2007) ("There

must be day-to-day control, rather than some monitoring or exertion of influence regarding

financial transactions in which the creditor has a direct stake" (quoting *In re Winstar Commn'cs, Inc.*, 348 B.R. 234, 279 (Bankr. D. Del. 2005))) (cited with favor in *In re Operations*).

22. Here, the Trustee does not allege in the Amended Complaint that PPAS exercised day-to-day control over TransCare or otherwise controlled its finances (nor could he). Instead, such control is attributed solely to Ms. Tilton, Patriarch Partners and PPMG. *See* Am. Compl. ¶ 33 ("Tilton exercised an extraordinarily high level of control and domination over the operations of TransCare"); *see id.* ¶ 37 (alleging that for all transactions between PPAS and TransCare, Ms. Tilton directed her employees at *Patriarch Partners* (*not* PPAS) to execute the documents on behalf of TransCare); *see id.* ¶ 36 (alleging that a PPMG employee (*not* a PPAS employee) managed and controlled TransCare's CEO communications with Ms. Tilton); Opp. at 9 (describing how Ms. Tilton allegedly employed her executives at "Patriarch Partners and PPMG" (*not* PPAS) to oversee management of TransCare). At best, the Amended Complaint contains one allegation that the contracts entered into between PPAS and TransCare were not "arm's-length transactions." Am. Compl. ¶ 28. This conclusory and general allegation is insufficient to raise a plausible inference that TransCare's payments of interest to PPAS – made for many years pursuant to a longstanding and valid loan agreement and to be distributed to a syndicate of Lenders (including two who were not affiliated with Ms. Tilton at all) – were not arm's length transactions.

23. The Trustee relies on three other cases to support his argument that an entity affiliated with the debtor or owned by an insider may be *per se* deemed an insider. *See In re White Metal Rolling & Stamp Corp.*, 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998); *Mega Personal Lines, Inc. v. Halton*, 9 A.D.3d 553, 555 (3d Dep't 2004); *Mogil v. Bldg. Essentials, Inc.*, 129 A.D. 3d 1378, 1379 (3d Dep't 2015). But these cases actually reinforce the point that the critical question in determining whether an entity or individual can be deemed an insider is control *over the debtor*

(or lack thereof). In *White Metal*, the court determined that certain transfers were insider preferences when such transfers were made to entities that wholly owned the debtor. 222 B.R. at 420. Here, although PPAS is a related entity, it did not have (and is not alleged to have had) an ownership stake in TransCare. *See also Mega*, 9 A.D.3d at 555-56 (denying plaintiff's summary judgment motion where transferee owned a 40% interest in the transferor); *Mogil*, 129 A.D.3d at 1379 (determining that the direct and indirect holders of *all* shares of the transferor were insiders).[6]

## II. The Recharacterization Claim Against Ark II Should Be Dismissed

24. Defendants argued in their Motion that the Amended Complaint failed to plead facts sufficient to trigger a "meaningful subset" of the *AutoStyle* factors, as is required in this district to survive a motion to dismiss. Motion at ¶ 43. Nothing in the Opposition alters that conclusion.

25. The Opposition focuses primarily on *one* of the *eleven* factors set forth in *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001), as support for recharacterizing Ark II's secured loan: the "identity of interest between the creditor and the stockholder" (*i.e.*, factor 6). *See* Opp. at 28. The Trustee argues that "Ark II owned 55% of Transcare's equity and the Ark II Credit Agreement allowed Ark II to preserve that identical 55% interest when Tilton transitioned Transcare's profitable assets to Transcendence." Opp. at 2; *see also id.* at 28. According to the Trustee, these "facts" overwhelmingly support his recharacterization claim. *Id.* at 28. He is wrong.

26. Even taking the allegations as true (and they are not), the Trustee's argument fundamentally misrepresents the appropriate analysis of *AutoStyle* factor 6. As discussed in the

---

[6] Because PPAS is not alleged to have had the requisite control over TransCare to render it an "insider," this Court need not reach the "exception to the insider exception" discussed in the Motion in order to dismiss the fraudulent conveyance claim against PPAS. *See* Motion ¶¶ 27-29. For this reason, and in light of the arguably fact-intensive nature of the "exception to the exception" analysis, Defendants have determined not to continue pressing that point on this Motion.

Motion, *see* Motion at 23-24, this *AutoStyle* factor applies most clearly "when several stockholders extend the funds, and one can measure the proportion of the contribution of each against the stock ownership of each." *In re Lyondell Chem. Co*., 544 B.R. 75, 98 (Bankr. S.D.N.Y. 2016); *see also AutoStyle*, 269 F.3d at 751 (holding that factor 6 weighs in favor of debt where not all of the shareholders were participants in the relevant credit facility, and therefore, "the defendants' participation interests [in the loan] did not exactly correlate to their ownership interests in AutoStyle"). Here, no other beneficial or record equity-holder of TransCare is alleged to have advanced the funds that are the subject of Ark II's proof of claim (because Ark II was the sole lender under Ark II Credit Agreement), rendering factor 6 irrelevant to the recharacterization analysis.

27.     Moreover, nowhere in the Amended Complaint does the Trustee allege that the funds Ark II advanced to TransCare were made in proportion to its equity investment in TransCare. Courts within the Second Circuit have explained that *AutoStyle* factor 6 must be pleaded in terms of "precise proportionality," *see Lyondell Chem. Co.*, 544 B.R. at 98, and have dismissed recharacterization claims where the plaintiff has failed to so. For example, in *In re Personal Communication Devices, LLC*, the court found that this factor weighed against recharacterization, and dismissed the claim, where there was a disparity between the amounts of the funds advanced and the equity interests received in exchange for those advances. 528 B.R. 229, 239 (Bankr. E.D.N.Y. 2015) ("[A]s for the identity of interest between the creditor and the stockholder, it is evident that DLJ did not make loans in proportion to their equity investments; DLJ received 10% of the equity for a $5,000,000 investment but provided 62% of the second lien financing, whereas the PineBridge Defendants provided 38% of the second lien financing and received 71.44% of the equity in consideration of their $34,000,000 equity investment . . . .").

28.     In a further attempt to salvage his deficient claim, the Trustee argues that although the funds Ark II advanced to TransCare were governed by the terms of a formal loan agreement, the existence of that agreement should be ignored because the contract is supposedly "illusory." *See* Opp. at 26-27.   This argument fails for several reasons.   First, it is not determinative that TransCare had no unilateral right to draw on the Ark II facility.   That is because the existence of conditions to securing funding does not mean that no funding was intended to be or was in fact advanced (as it was here).   Indeed, when Ark II advanced the funds at issue to TransCare, the terms that would govern that advance were clearly set forth in the Ark II Credit Agreement: (i) the loan would mature by a date certain (Ark II Credit Agreement § 1.1); (ii) TransCare was obligated to "repay the entire unpaid principal amount of the Loan, all unpaid interest accrued thereon and all other Obligations then accrued on the Maturity Date" (*id.* § 2.6); (iii) interest would accrue and be payable "in arrears on the first day of each of March, June, September, and December" (*id.* § 2.4(c))[7]; (iv) advances would be secured through priority interests in certain TransCare collateral (*id.* § 1.1 (defining "Security Agreement" as "the Security Agreement. . . pursuant to which the Borrower grants to the Lender a lien on substantially all of its assets")), which security interests the Trustee alleges were perfected through the filing of UCC statements on January 29, 2016 (Am. Compl. ¶ 78); and (v) advances would be used for working capital and general corporate purposes (Am. Compl. ¶ 85; Ark II Credit Agreement § 2.2 (stating that "[t]he proceeds of the Loan shall be used by the Borrower solely for working capital and general corporate purposes")).   These features of the Ark II Credit Agreement, which are undeniably relevant to the *AutoStyle* analysis,

---

[7] To the extent the Trustee argues that interest was not paid, that does not refute the fact that the plain terms of the Ark II Credit Agreement demonstrate an *expectation* that interest payments would be paid, beginning in March 2016, a date subsequent to TransCare's bankruptcy filing.   *See* Ark II Credit Agreement § 2.4(c).

weigh strongly against a finding of recharacterization. *See* Motion at 20-27 (discussing *AutoStyle* Factors 2-3, 7, and 10).

29.     Second, the fact that the Ark II Credit Agreement was not executed simultaneously with the challenged advance of funds to TransCare does not render the loan illusory. Although the Court must look at the parties' intent at the time of the transaction at issue, *see In re Rockville Orthopedic Assocs., P.C.*, 377 B.R. 438, 444 (Bankr. D. Conn. 2007), the timing of the documentation alone is not determinative of the parties' intent, particularly given that the gap between the time of the advance and the time loan documents were executed was no more than three weeks. *Cf. In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 916-17 (Bankr. E.D. Va. 1997) (stating that *seven month* delay in papering certain loans, together with other indicia of equity— including the lack of security for the advances, the fact that the funds were used to purchase a capital asset, the borrower's inability to obtain outside financing, and the non-existent repayment schedule—warranted recharacterization).

30.     Third, the Trustee's reliance on *In re Eternal Enterprise, Inc.* for the proposition that the Ark II Credit Agreement and its terms can be ignored is misplaced. *See* Opp. at 27 (citing *In re Eternal Enter., Inc.*, 557 B.R. 277, 287 (Bankr. D. Conn. 2016)). Indeed, the facts in *Eternal* are entirely distinguishable from the facts at hand. For example, in *Eternal*, there was: (i) no formal loan documentation, only a check with the word "loan" written on it; (ii) no terms setting forth a maturity date or repayment schedule; and (iii) no expectation that interest would be paid. *See In re Eternal*, 557 B.R. at 289-92. Moreover, the only anticipated source of repayment was the proceeds of a sale of some of the debtor's property; the funds were advanced on an unsecured basis; and the funds were used to acquire capital assets. *Id.*

## III. The Trustee's Lender Liability Claim Should Be Dismissed

31. In his Opposition, for the very first time (and one year after the filing of his initial Complaint), the Trustee now argues that a lender-borrower relationship is not a predicate to his "lender liability" claim. Rather, he contends that the Entity Defendants owed fiduciary duties to TransCare under an assumption of control theory, regardless of whether the Entity Defendant had a lender-borrower relationship with TransCare.[8] *See* Opp. at 31-34. Defendants do not dispute the general proposition that fiduciary duties may be imposed on one who "exercises control over the business and affairs of the corporation." *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs LLC*, No. 11802-VCL, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018). Here, however, the Amended Complaint does not allege facts sufficient to show that any of the Entity Defendants assumed the requisite level of control over TransCare to find the existence of a fiduciary relationship; rather, according to the Trustee's own allegations, control of TransCare was always with Lynn Tilton.[9]

32. Indeed, every "control" allegation the Trustee advances in the Amended Complaint reinforces his core theme that each of the Entity Defendants acted, not independently or in its own self-interest, but on behalf of Ms. Tilton and/or at her explicit direction:

---

[8] The Trustee engages in revisionist history on this point. Opp. at 31 (arguing that "[i]t is irrelevant whether the Entity Defendants were lenders" with respect to the "Lender Liability" claim). Until now, the Trustee based his allegations and arguments on an alleged abuse of the lender-borrower relationship. *See* Plaintiff's Opposition to Defendants' Partial Motion to Dismiss the Complaint ¶ 39, ECF No. 16 (emphasis added) (arguing against dismissal of Sixth Claim for Relief because "the vast majority of the Patriarch entity defendants were *lenders, agents of lenders, collateral managers of lenders, and/or control persons of lenders*"). In addition, the Trustee argued that there were substantial similarities between the facts alleged in his initial Complaint and the facts presented in *In re KDI Holdings, Inc.*, 277 B.R. 493, 516-17 (Bankr. S.D.N.Y. 1999), because the "*lender defendants* were alleged to have used the *leverage provided by their loans* to gain actual control and after they 'took over the day-to-day management of Debtors . . . directed the payment of certain debts to corporations in which [they] had an interest.'" *Id.* ¶ 38 (emphasis added).

[9] In this Circuit, "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway Ref. Co. v. Oxygenated Mktg. & Trading*, 215 F.3d 219, 226-27 (2d Cir. 2000) (citation omitted).

- "PPAS, Patriarch Partners, PPMG, and Ark II *operated wholly under Tilton's control and pursuant to her directives*." Am. Compl. ¶ 29 (emphasis added).

- "*[Tilton] empowered her Patriarch employees* to give direction to TransCare's executives." *Id.* ¶ 36 (emphasis added).

- "Stephen and Pelissier . . . enforced *Tilton's* desire to limit communications from Leland." *Id.* (emphasis added).

- "[G]reenberg told TransCare's CFO that *Tilton, as TransCare's sole director, was specifically ordering the payment of interest to PPAS . . . .*" *Id.* ¶ 49 (emphasis added).

- "[P]elissier informed TransCare that 'we have reapproached the subject of interest payment today *with the board*. TransCare must pay interest today . . . .*" *Id.* ¶ 50 (emphasis added).

- Alleging, with respect to the July 2015 "offer" from National Express, that Scott Whalen confirmed that "his mother-in-law Tilton" was ordering that TransCare reject the offer. *Id.* ¶ 58.

- Alleging that "Pelissier and Greenberg – *acting as Tilton's representatives* – instructed Leland to make interest payments" after instructing Leland not to pay other creditors. *Id.* ¶ 65 (emphasis added).

- Alleging that Pelissier, as an employee of PPMG, "contacted the MTA, representing that the owner of TransCare wished to transfer the MTA contract to a different entity" and that he was "working with the *ownership representative* of TransCare." *Id.* ¶ 79 (emphasis added).

33. Put otherwise, according to the Trustee's own pleading, at all relevant times the same person who allegedly controlled TransCare as the sole director is also alleged to have been in control of the Entity Defendants: Lynn Tilton. *See, e.g.*, Am. Compl. ¶ 29 (emphasis added) ("Tilton exploited her *dual control* over said Defendants and TransCare for *her personal benefit*."); *see also id.* ¶¶ 10-14 (alleging that Ms. Tilton was the sole manager, owner, and/or director of the six Entity Defendants). Because the Amended Complaint does not allege facts that, if proven, would establish that the Entity Defendants exercised independent control over TransCare, the allegations cannot justify conferring fiduciary status on the Entity Defendants, and the Sixth Claim for Relief should be dismissed.

34.    None of the cases the Trustee relies on compels a different conclusion.    For

example, in *Grumman Olson*, the creditors committee brought breach of fiduciary duty claims

against HIG/SVC, the intended buyers of the debtor's assets.  *See In re Grumman Olson Indus.,

Inc.*, 329 B.R. 411, 418-19 (Bankr. S.D.N.Y. 2005).    The court found that "[t]he Amended

Complaint allege[d] a scheme through which HIG/SVC bought off McConnell [Grumman's

former president and CEO] and acquired complete domination and control over both sides of the

deal."  *Id.* at 420.    Central to the court's finding that the plaintiff adequately alleged a fiduciary

duty claim against HIG/SVC was the fact that these buyers "co-opted McConnell" and effectively

"called the shots" at Grumman:

> At the same time that HIG/SVC co-opted McConnell, all of Grumman's other board
> members resigned, leaving McConnell as Grumman's sole director.  In addition,
> HIG/SVC acquired a call option on the interests of all but two of the members of
> Holdings and an irrevocable proxy to vote the member interests.  Finally, it directed
> McConnell to hire A & M as a crisis management firm to represent Grumman in
> the negotiations with HIG/SVC.

*Id.* 431-32.  *See also Basho Techs. Holdco B, LLC*, 2018 WL 3326693, at *1, *35 (describing a

takeover of the company's board through a series of self-dealing transactions).

35.    Here, in contrast, not once does the Trustee allege in the Amended Complaint that

the Entity Defendants obtained control over Ms. Tilton as the sole director of TransCare, caused

her to carry out a scheme against her will (and to the Entity Defendants' benefit), or otherwise

usurped Ms. Tilton's control over TransCare.[10]  Indeed, the opposite is alleged:  according to the

---

[10] The Trustee also argues, in conclusory fashion, that "even though Tilton was nominally in charge, she delegated the day-to-day decision making . . . to her employees at Patriarch Partners . . . and PPMG."  Opp. at 33.  The Trustee cannot reconcile this statement with his allegations in the Amended Complaint that the Entity Defendants acted as Ms. Tilton's agents, employees, and/or representatives at all relevant times, but otherwise had no independent authority with respect to TransCare.  *See, e.g.*, Am. Compl. ¶¶ 29, 49, 50.  This Court need not consider this new, and contradictory, repackaging of the Trustee's allegations.  *See, e.g., Charles Schwab & Co. v. Retrophin, Inc.*, No. 14 CIV. 4294 ER, 2015 WL 5729498, at *13 (S.D.N.Y. Sept. 30, 2015) (dismissing claim where assertions raised for the first time in opposition to motion to dismiss were "conclusory, lack[ed] explanation, and contradict[ed] the[] actual allegations" in the complaint).

Trustee, "*Tilton* could not have accomplished this scheme without each of the six Entity Defendants." Opp. at 34 (emphasis added).

## **CONCLUSION**

For the reasons stated herein, and in the Motion, Defendants respectfully request that the Court enter an order:

(i)      Dismissing the Trustee's claims in Count XI of the Complaint as against PPAS pursuant to Fed. R. Civ. P. 12(b)(6);

(ii)     Dismissing the Trustee's claims in Count IV of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6);

(iii)     Dismissing the Trustee's claims in Count VI of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6); and

(iv)     Granting such other and further relief as the Court deems just and proper.

Dated: March 15, 2019

PROSKAUER ROSE LLP

By: *Michael T. Mervis*
    Michael T. Mervis
    Timothy Q. Karcher
    Eleven Times Square
    New York, NY 10036-8299
    Tel.: (212) 969-3000
    Fax: (212) 969-2900
    Email: mmervis@proskauer.com
         tkarcher@proskauer.com

    Nicole A. Eichberger (*pro hac vice*)
    650 Poydras Street
    Suite 1800
    New Orleans, LA 70130-6146
    Tel.: (504) 310-2024
    Fax: (504) 310-2022
    Email: neichberger@proskauer.com
    *Attorneys for Defendants*