UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 7 |
| TRANSCARE CORP., *et al.*, | : | Case No. 16-10407 (SMB) |
| | : | (Jointly Administered) |
| Debtor. | : | |

-------------------------------------------------------X

| | | |
|---|---|---|
| SALVATORE LAMONICA, as Trustee | : | |
| for the Estates of TransCare Corp., *et al.* | : | Adv. Proc. No. 18-01021 (SMB) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LYNN TILTON, *et al.*, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART
## AND DENYING IN PART MOTION TO DISMISS

**A P P E A R A N C E S :**

STORCH AMINI PC
*Attorneys for Plaintiff*
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017

> Bijan Amini, Esq.
> Steven G. Storch, Esq.
> Avery Samet, Esq.
> Jaime B. Leggett, Esq.
> Of Counsel

PROSKAUER ROSE LLP
*Attorneys for Defendants*
Eleven Times Square
New York, NY 10036-8299

> Michael T. Mervis, Esq.
> Timothy Q. Karcher, Esq.
> Nicole A. Eichberger, Esq. (*pro hac vice*)
> Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Following the dismissal of his original complaint, *see LaMonica v. Tilton (In re TransCare Corp.)*, 592 B.R. 272, 287-92 (Bankr. S.D.N.Y. 2018), the Plaintiff, Salvatore LaMonica ("Trustee"), trustee of the administratively consolidated estates of TransCare Corporation and numerous debtor-affiliates (collectively, "TransCare" or the "Estate"), filed an Amended Complaint seeking to recover damages from the Defendants[1] under multiple theories.  (*See Amended Complaint*, dated Nov. 28, 2018 ("*Amended Complaint*") (ECF Doc. #53).)[2]  Certain Defendants named in Count IV (Recharacterization of Debt as Equity against Ark II), Count VI (Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control against all Defendants other than Tilton), and Count XI (Constructive Fraudulent Transfer; Recovery of Same; Claim Disallowance against PPAS) moved to dismiss those Counts.[3]  (*See Defendants' Motion to Dismiss Certain Claims Asserted in the Chapter 7 Trustee's Amended Adversary Complaint*, dated January 14, 2019 ("*Motion to Dismiss*") (ECF Doc. # 60); *see also Defendants' Reply in Further Support of Their Motion to Dismiss Certain Claims Asserted in the Chapter 7 Trustee's Amended Adversary Complaint*, dated March 15, 2019 ("*Reply*") (ECF Doc. # 68).)  The Trustee

---

[1]      The Defendants include Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001-1, Limited ("Ark II"), Transcendence Transit, Inc. ("Transcendence"), and Transcendence Transit II, Inc. ("Transcendence II").  The Defendants other than Tilton are referred to collectively as the "Entity Defendants."

[2]      "ECF" refers to the electronic docket in this adversary proceeding.

[3]      Count IV is asserted against both PPAS and Ark II.  The Trustee withdrew the claim against PPAS in response to the *Motion to Dismiss*.  Count XI is also asserted against both PPAS and Ark II but only PPAS seeks to dismiss the Count.

opposed the motion.  (*See Plaintiff's Opposition to Defendants' Partial Motion to Dismiss*, dated March 1, 2019 ("*Opposition*") (ECF Doc. # 63.))

At the March 28, 2019 hearing, the Court granted the motion to dismiss the constructive fraudulent transfer claim asserted in Count XI against PPAS and reserved decision on the balance of the *Motion to Dismiss*.  For the reasons that follow, the *Motion to Dismiss* is granted as to Count VI and denied as to Count IV.

## BACKGROUND[4]

Prior to bankruptcy, TransCare provided emergency medical transportation services, including 911 ambulance services, to hospitals and municipalities in New York, Pennsylvania and Maryland, and disability transportation services for municipal authorities, including the New York City Transit Authority ("MTA").  (¶¶ 1, 8.)  Tilton indirectly owned the majority of TransCare's equity and was the sole member of TransCare's Board of Directors.  (¶¶ 2, 9, 22.)  She also managed and directly or indirectly owned the Entity Defendants, all part of the "Patriarch" family of companies. (¶ 9; *see* ¶¶ 10-14.)  The Entity Defendants operated from the same headquarters in New York City, their employees worked together in the same office space, they shared the same email domain, documents and information (including information about TransCare), worked on matters without regard to which entity was their specific employer and held themselves out to the world as "Patriarch Partners."  (¶ 29.)  Tilton also controlled non-defendants Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., Zohar III, Ltd. (collectively, the "Zohar Entities") as their collateral managers. (¶ 30.)  Finally,

---

[4]    Unless otherwise stated, the facts are derived from the allegations in the *Amended Complaint*.  The parenthetical "(¶)" followed by a number refers to paragraphs in the *Amended Complaint*.

Tilton owned 99% of and controlled non-Defendant Ark Investment Partners II, L.P. ("Ark Investment").  (*Id.*)

## A.    The 2003 Credit Agreement

TransCare had previously filed pre-negotiated chapter 11 cases in 2002.  (¶ 20.) Prior to the 2002 case, Ark II had purchased approximately 51% of TransCare's outstanding senior secured debt, and it acquired approximately 51% of the shares of the reorganized TransCare under the confirmed plan in July 2003.  (¶ 22.)  The 2003 chapter 11 plan also provided for a $33.5 million credit facility for Reorganized TransCare that was memorialized in a Credit Agreement, dated Aug. 4, 2003 ("Credit Agreement").  (¶ 23.)[5]  PPAS served as administrative agent under the Credit Agreement, and approximately 51% of the loans under the Credit Agreement were held by two Tilton-controlled entities, Ark II and Ark Investment.  (*Id.*)[6]  Zohar III, Ltd. took over Ark II's loan in 2007 and Ark II ceased to be a lender under the Credit Agreement. (¶ 27 n. 3.)

From at least 2014 through the filing of TransCare's bankruptcy, the lenders under the Credit Agreement included two third party lenders, Credit Suisse Alternative Capital LLC and First Dominion Funding I, the three Zohar Entities and Ark

---

[5]        Excerpts from the Credit Agreement are attached as Exhibit 1 to the *Declaration of Michael T. Mervis in Support of Defendants' Motion to Dismiss Certain Claims Asserted in the Chapter 7 Trustee's Amended Adversary Complaint*, filed Jan. 14, 2019.  (ECF Doc. #61.)

[6]        In 2006, TransCare entered into a revolving credit agreement with Wells Fargo, N.A. ("Wells Fargo"), dated October 13, 2006 ("Wells Fargo Facility").  (¶ 25.)  Wells Fargo received a senior lien on certain of TransCare's assets and accounts receivables, including the right to receive payments from TransCare's valuable paratransit contract with the MTA ("MTA Contract").  (¶ 26.)  PPAS retained a senior lien on TransCare's vehicles and miscellaneous physical assets and agreed not to seek to foreclose on any assets subject to Wells Fargo's senior lien.  (¶ 26.)

Investment.  (¶ 27.)  At the time the Credit Agreement was executed and at the time each amendment was executed, Tilton controlled PPAS (the administrative agent), the "Required Lenders" (as defined in the Credit Agreement) and TransCare.  (¶¶ 25, 28.)

**B.    Tilton's Control of TransCare and the Entity Defendants**

The gravamen of the *Amended Complaint* is that Tilton used her control over TransCare and the Entity Defendants to breach her fiduciary duties and self-deal, all to the detriment of TransCare.  For example, she prohibited TransCare from refinancing the debt owed under the Credit Agreement, (¶ 31), and caused TransCare to pay over $11 million to PPAS on account of the loans under the Credit Agreement between 2012 and 2014.  (¶ 38.)  In a July 2012 written consent of the sole director, Tilton prohibited any TransCare officer from conducting various activities, including disclosing financial or shareholder information to any third party, entering into any contract not contemplated by the annual plan or engaging legal counsel, and restricted certain functions to a designated executive.  (¶ 34.)  As of 2015, however, Tilton had not approved an annual plan or selected a designated executive as contemplated in the 2012 written consent. (*Id.*)  Therefore, all powers remained in the board of directors, with Tilton as the sole director.  (*Id.*)  Brian Stephen, in-house counsel at Patriarch Partners who claimed to represent TransCare's board, explained to TransCare's CEO, Glenn Leland, that Leland was prohibited from taking even preliminary steps to any actions requiring board approval.  (¶ 35.)  This effectively prohibited any independent action by TransCare's executives.  (*Id.*)

Although Tilton retained complete control of TransCare, she rarely communicated directly with its executives, instead directing them to communicate

through, and take orders from, her employees at various Patriarch entities.  (¶ 36.)

These employees included Stephen, Jean-Luc Pelissier (Executive Managing Director at

PPMG), Michael Greenberg (Analyst at Patriarch Partners), Randy Jones (Managing

Director at Patriarch Partners), Brad Schneider (Analyst at Patriarch Partners), and

Scott Whalen (Tilton's son-in-law, Credit Analyst at Patriarch Partners until 2014/2015,

and thereafter Director at PPMG).  (¶¶ 35-36, 41.)  Their orders to TransCare included

the hiring and firing of TransCare's employees and the payment or non-payment of

TransCare's vendors.  (¶ 37.)  In transactions between PPAS or Ark II and TransCare,

Tilton would execute the agreements on behalf of PPAS or Ark II, and direct TransCare

executives or employees of other Patriarch entities to execute the agreements on behalf

of TransCare.  (*Id.*)  For example, Greenberg executed amendments to the Credit

Agreement on behalf of TransCare.  (*Id.*)  TransCare lacked independent counsel in any

transaction entered into with any of Tilton's companies.  (*Id.*)

## C.    TransCare's Financial Decline and Potential Purchasers

From 2012 through 2014, TransCare operated profitably with revenues of

approximately $130 million and positive EBITDA.  (¶ 38.)  The MTA Contract was

TransCare's most lucrative business segment, historically generating $22 million in

revenue and $3.7 million in EBITDA.  (¶ 39.)  By 2015, however, TransCare's costs grew

and it began losing clients because it was not investing in new vehicles.  (¶ 38.)  Years of

under-investment left TransCare without the financial ability to fund payroll, pay

vendors, or obtain insurance in the ordinary course.  (¶ 3.)  TransCare's accounts

payable grew and its critical vendors went unpaid.  (¶ 38.)  TransCare's executives were

told that "not paying bills on time and in full was the 'Patriarch way.'"  (*Id.*)  TransCare's

6

business was in such distress that the MTA indicated that it might not renew the MTA Contract, which was set to expire in mid-2015, due to TransCare's deteriorating financial condition. (¶ 39.) TransCare had such poor credit that suppliers were refusing to supply parts for the MTA vehicles even though the MTA reimbursed TransCare for the parts. (*Id.*)

Throughout 2015, TransCare's financial distress resulted in nearly missing or actually missing critical payments such as payroll and payroll taxes, failing to pay essential vendors, such as EZ-Pass, and lacking sufficient cash on hand to pay necessary expenses like gasoline, uniforms, and replacement engine parts. (¶¶ 3, 40, 45-46, 48-53 & 61-65.) Regulators threatened to shut down the MTA business, (¶ 52), and key suppliers were refusing to continue doing business. (¶¶ 39, 61.) TransCare employees were forced to pay for tolls and gas out of pocket. (¶ 53.) On February 4, 2015, TransCare executives warned Tilton that the company lacked cash to make payroll the following day and faced a projected $6.7 million shortfall by the end of March. (¶ 40.) By the end of the year, employees were leaving in frustration, including the head of the MTA paratransit division. (¶ 63, 66.)

In 2015, the CEO of TransCare received multiple offers from competitors to purchase TransCare or portions of TransCare's business. (¶¶ 41-44, 53-55, 66, 68.) These offers were rebuffed. For example, on February 5, 2015, Glenn Leland, TransCare's CEO, advised Pelissier and Schneider that National Express offered to purchase TransCare's MTA Contract for approximately $15-18 million and to immediately deliver a non-refundable deposit in the amount of $1.7 million to begin negotiations. (¶¶ 42-42.) Around the same time, RCA Ambulance Service expressed

an interest in purchasing TransCare to Tilton and TransCare. (¶ 44.) On February 18, 2015, Leland sent a draft stabilization plan for TransCare to Pelissier, Schneider and Greenberg noting that TransCare was "**not** a viable on-going concern without immediate investment and assertive course correction" (emphasis in original). (¶ 45.) He presented the sale of the MTA Contract as an alternative to the complete collapse of TransCare's business. (*Id.*)

National Express approached TransCare again in July 2015, along with two other national ambulance companies interested in purchasing all or parts of TransCare. (¶¶ 53-54.) National Express delivered a signed letter of intent to TransCare on July 10, 2015, offering to purchase the MTA Contract for $6-7 million, plus the assumption of $2 million in related liabilities. (¶ 55.) Leland sent the offer on to Pelissier, Greenberg and Whalen. (*Id.*) Whalen responded to Leland immediately, denying him permission to engage the offer and stating that a letter of intent was "way premature." (¶ 56.) National Express reached out again in December 2015, offering to purchase the MTA Contract for approximately $6-8 million. (¶ 66.) Leland again relayed the offer to Pelissier, Greenberg and Stephen recommending that TransCare immediately begin negotiations of the sale of the MTA Contract to avoid a complete shutdown. (¶¶ 66-69).

Tilton and her employees refused to let TransCare's executives consider any of these offers, and instead, provided cash infusions to the company throughout the year. (¶¶ 43-44, 47, 56-59, 67-69.) The only time Tilton spoke with Leland directly was to berate TransCare's CEO "for daring to explore a sale option." (¶ 43.) Stephen told Leland that he "had no authority to even discuss sale options of any assets with any company," and "claimed that TransCare would not receive any of the potential sale

proceeds because 'Lynn has other debts.'" (*Id.*)  Pelissier told Leland "that under no circumstances could he attempt to raise funds by exploring potential sales."  (*Id.*)  Whalen told Leland to make clear "that the business is not for sale at this time."  (¶ 56.)  Leland confirmed that despite TransCare's desperate financial situation, he was being instructed to tell National Express that "per Patriarch Partners," TransCare was not for sale. (¶ 58.)

A complicating factor in TransCare's financial situation occurred in July 2015, when Wells Fargo discovered a $1.5 million discrepancy in TransCare's reported receivables and promptly suspended TransCare's credit line.  (¶ 52.)  This suspension caused a bounced insurance check and missed payroll.  (*Id.*)  In mid-December 2015, Tilton began exploring sale options for TransCare.  (¶ 71.)  Greenberg delivered research on comparable sales of ambulance companies to Tilton in December 2015, which implied a valuation for the MTA Contract of $22-36 million.  (¶ 72.)  In late December 2015, Tilton sent a proposal to Wells Fargo to sell TransCare's assets by September 2016.  (¶ 73.)

On or about January 15, 2016 and January 29, 2016, PPAS paid approximately $810,000 and $690,000 (the "January Advances") to insurance companies on behalf of TransCare.  (¶ 76.)

**D.    Events Surrounding the Filing**

According to the *Amended Complaint*, February 9, 2016 marks the date that Tilton began to execute her plan to acquire TransCare's most valuable assets and scuttle TransCare.  On February 9, 2016, Pelissier informed the MTA that the owner of TransCare wished to transfer the MTA Contract to a different entity, (¶ 79), Tilton's

9

18-01021-smb    Doc 78    Filed 04/30/19    Entered 04/30/19 07:21:33    Main Document
Pg 10 of 24

personal lawyers at Skadden, Arps, Slate, Meagher & Flom LLP contacted attorneys at
Curtis Mallet-Prevost, Colt & Mosle LLP about the need to file chapter 11 cases for
TransCare immediately, and TransCare signed an engagement letter the following day.
(¶ 80.)  On February 10, 2016, Tilton also incorporated Transcendence and its wholly-
owned subsidiary Transcendence II. (¶ 81.)  The same day, Greenberg told TransCare's
vice president, Glen Youngblood, that Transcendence II would be taking over
TransCare's MTA Contract, which then had an estimated $25 million in revenue, and its
paratransit operations, which had an estimated $31 million in revenue.  (¶ 83.)

        Also on February 10, 2016, nearly four weeks after the initial January Advance,
Tilton sought to convert the January Advances into a new loan.  At her direction,
Greenberg provided documents to TransCare related to a new credit facility between
TransCare and Ark II, including a loan agreement ("Ark II Credit Agreement"), dated
"as of January 15, 2016," a security agreement, a guaranty, and an intercreditor
agreement between Ark II and PPAS.  The latter subordinated the lenders lien and right
to payment under the Credit Agreement to the lien and right to payment granted to Ark
II under the Ark II Credit Agreement.  (¶ 84.)  The intercreditor agreement was signed
by Tilton on behalf of both Ark II and PPAS.  (*Id.*)  The Ark II Credit Agreement
contemplated loans of up to $6.5 million, but this amount was never made available to
TransCare.[7]  (¶ 85.)

---

[7]        In February 2016, TransCare failed to pay payroll taxes, and it owed approximately $1.148 million
in back payroll taxes by February 24, plus $172,000 in penalties and interest.  (¶ 92.)  In addition,
TransCare lacked the funds to make payroll, pay 401(k) obligations and other critical expenses, and Tilton
refused to allow additional draws on the Ark II Credit Agreement to cover these payments.  (¶¶ 92-93.)

For the Transcendence plan to succeed, Tilton needed to convince employees, vendors, insurers, and governmental agencies to accept the substitution of Transcendence for TransCare.  (¶ 88.)  Tilton held meetings with TransCare's executives in Patriarch's offices to model out which business units would be transferred to Transcendence and estimate the amount of revenue they could be expected to bring to the new company.  (¶ 88.)  On February 11, 2016, Randy Jones told TransCare executives who were working on the plan and being offered positions in the new Transcendence company that they "cannot breath[e] a word until we have the overall deal finalized." (¶ 89.)

On February 24, 2016, PPAS purported to effectuate a strict foreclosure under Article 9 on certain of TransCare's assets, including its ambulances and paratransit division.  (¶¶ 94-95 & n. 6 & 7.)  Apparently, PPAS accepted the MTA Contract, the stock of three TransCare subsidiaries, two vendor contracts, and certain of TransCare's personal property in exchange for the satisfaction of $10,000,000 under the Credit Agreement.  (¶ 95.)  The documentation did not provide notice to Wells Fargo or explain the basis for the $10 million figure.  (¶ 96.)  Tilton signed a written consent as the sole director of Transcendence II to authorize it to enter into an assignment agreement for the MTA Contract.  (¶ 98.)  In addition, pursuant to a bill of sale and other documents dated February 24, 2016, Transcendence received other foreclosed assets of TransCare, including the equity of debtors TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp. and TC Ambulance Corporation.  (¶ 99.)  Although PPAS executed the foreclosure, Tilton took the position that Ark II was the senior secured lender and distributed the proceeds to Ark II rather than PPAS.  (¶ 100.)

**E.      The Unraveling of the Strict Foreclosure and the Bankruptcy**

On February 24, 2016, Tilton directed TransCare and ten subsidiaries to file for chapter 7 relief. (¶ 103.)  Late in the evening on February 25, 2016, individuals at Patriarch realized that the Transcendence plan would not succeed.  (¶ 105.)  At 10:53 p.m., Stephen sent an email directing TransCare executives to "secure" as many assets as possible, targeting the most valuable, portable assets first, including TransCare's accounts receivable server.  (¶¶ 105-06.)  TransCare's vice president refused and contacted the Trustee.  (¶ 106.)  On February 25, 2016, PPAS advised the Trustee that it had conducted a strict foreclosure of certain assets that were not part of the Estate.  (¶ 107.)  On April 25, 2016, the three TransCare entities whose assets were part of the strict foreclosure filed chapter 7 petitions.  (¶ 107.)

**F.      This Adversary Proceeding**

The Trustee filed the original complaint on February 22, 2018, (ECF Doc. # 1), and the Defendants moved to dismiss several counts.  (ECF Doc. # 10.)  The Court partially granted and partially denied the motion and granted the Trustee leave to file the *Amended Complaint.  See TransCare*, 592 B.R. at 292.

The *Amended Complaint* includes fourteen counts but the *Motion to Dismiss* only targets Counts IV (Recharacterization), Count VI (Lender Liability and Breach of Fiduciary Duty) and Count XI (Constructive Fraudulent Transfer).  As noted, the Court dismissed Count XI as to PPAS from the bench and reserved decision on the balance of the motion.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323-24 (2d Cir. 2011), *cert. denied*, 565 U.S. 1241 (2012). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ideal Steel Supply Corp.*, 652 F.3d at 324 (quoting *Ashcroft v. Iqbal*, 556 U.S. at 678. In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is deemed to include any written instrument attached to it as an exhibit, documents incorporated in it by reference, and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *accord Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).

### A.    Count IV: Recharacterization

Count IV seeks to recharacterize as equity all claims asserted against the Estate by Ark II for funds "purportedly loaned" to the Debtors. (¶ 121.) Ark II maintains that the Trustee has failed to plead facts sufficient to trigger the so-called '*AutoStyle* factors'

13

or 'a meaningful subset of them.'" (*Motion to Dismiss* ¶ 4 (citing *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 94 (Bankr. S.D.N.Y. 2016).)   In essence, Ark II contends that the January 2016 loan looks, walks and talks like a loan, not an equity infusion.   (*See Motion to Dismiss* ¶¶ 53-65.)   The Trustee responds, primarily pointing out that at the time the funds were actually advanced, there was no loan documentation.   (*Opposition* at 26-28.)

Bankruptcy courts are courts of equity, and as such, they have the equitable power to recharacterize claims asserted against a debtor so that "substance will not give way to form."   *Pepper v. Litton*, 308 U.S. 295, 305 (1939); *see also Lyondell*, 544 B.R. at 92-92.   Recharacterization of a claim from debt to equity "is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio.*"   *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001) (citing *In re Cold Harbor Assoc., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (internal quotes omitted)).   Courts have adopted a variety of multi-factor tests, borrowed from non-bankruptcy law, to help give shape to a recharacterization analysis.   *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir. 2006).

The test adopted by courts in this District is the eleven-factor analysis set forth in *Auto-Style*. *See, e.g.*, *In re Aéropostale, Inc.*, 555 B.R. 369, 420-21 (Bankr. S.D.N.Y. 2016); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016), *appeal dismissed*, No. 16-2187 (2d Cir. Nov 22, 2016); *Lyondell*, 544 B.R. at 93-94; *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 157-58 (Bankr S.D.N.Y.

14

2009); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007). Under this test, the Court considers: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *AutoStyle*, 269 F.3d at 749-50.

"No one factor is controlling or decisive [and] [t]he factors must be considered within the particular circumstances of each case." *Id.*; *accord In re Aéropostale*, 555 B.R. at 423; *In re BH S & B Holdings*, 420 B.R. at 157. A bankruptcy court can recharacterize a claim as equity even if fewer than all of the factors weigh in favor of recharacterization. *Lyondell*, 544 B.R. at 94. The ultimate question for the court is "whether the parties called an instrument one thing when in fact they intended it as something else. . . . Answers lie in facts that confer context case-by-case." *In re SubMicron*, 432 F.3d at 456.

Here, the factual issues cannot be resolved on the *Motion to Dismiss*. On the one hand, the Ark II Credit Agreement looks like a loan. It described itself as a loan (Factor #1), it contained a fixed maturity date and schedule of quarterly payments (Factor #2),

it included a fixed rate of interest and interest payments (Factor #3), and it was secured by a lien on certain assets (Factor #7).  In addition, the loan was not subordinated to creditors; rather, the Ark II lien primed the existing lien of the lenders under the 2003 Credit Agreement (Factor # 9), and the funds were used to pay ongoing, insurance expenses and not to acquire capital assets (Factor # 10).

On the other hand, the January Advances were made by a different entity several weeks before the Ark II Credit Agreement was executed, and viewed in that light, the same factors line up in favor of an equity infusion.  In other words, the *Amended Complaint* implies that at the time of the January Advances, the parties did not intend the funds to be a loan from Ark II to TransCare: there was no loan agreement (Factor #1), no repayment terms, maturity date, or regular payments, (Factor #2), no agreed rate of interest or interest payments, (Factor #3), and no documentation of a security interest or lien (Factor # 7).[8]

Other *AutoStyle* factors also weigh in favor of recharacterization.  At the time of the January Advances and even when they were documented, there is no indication that the parties had any expectation that the loan would be repaid or the source of that repayment (Factor # 4).  The Ark II Credit Agreement moved in lock step with Tilton's plan under which PPAS would foreclose on TransCare's assets, assign them to one of the Transcendence defendants and place TransCare into a liquidating chapter 7 bankruptcy. Tilton could not have reasonably expected that TransCare could ever repay the Ark II

---

[8]      The *Amended Complaint* alleges that Ark II filed a UCC-1 Financing Statement on January 29, 2016.  (¶ 78.)  At that time, however, there was no security agreement granting Ark II a lien.  Furthermore, the filing occurred two weeks *after* the initial January Advance.

loan.  Furthermore, the *Amended Complaint* alleges that by 2015, TransCare lacked the funds to pay its bills or fix its vehicles and in July, Wells Fargo suspended TransCare's line of credit.  These allegations imply that TransCare was undercapitalized (Factor # 5) and unable to obtain third party financing (Factor # 8).  If there is no outside financing, and no reasonable creditor would have acted in the same manner,[9] this is strong evidence that the advances were capital contributions rather than loans.  *AutoStyle*, 269 F.3d at 752.

Under the facts and circumstances as pled by the Trustee, the Ark II loan looks like part of a corporate reorganization.  Ark II owned 55.7% of insolvent TransCare's stock, (¶ 13), and approximately 55% of Transcendence's stock.  (¶ 81.)  Through the strict foreclosure and related transactions, Tilton swapped Ark II's valueless equity in TransCare for the same interest in Transcendence's more valuable equity.  While Wells Fargo's liens still encumbered some of the TransCare assets that would ultimately be transferred to Transcendence, Ark II jumped ahead of the secured lenders under the Credit Agreement and primed them.  Furthermore, Ark II was not liable for any of TransCare's unsecured debt.  The allegations suggest that the January Advances used to pay insurance were intended to keep the TransCare vehicles operating long enough to effectuate this reorganization.

---

[9]    Moreover, it is more plausible that a prospective lender in these circumstances would require TransCare to enter bankruptcy first, make a post-petition loan and obtain the liens and administrative priorities that typically accompany post-petition financing.

In conclusion, the recharacterization question is intensely factual, and the *Amended Complaint* plausibly alleges that the Ark II "loan" was part of a corporate reorganization pursuant to which Ark II would exchange its worthless interest in TransCare for a more valuable interest in Transcendence. Moreover, the timing of the January Advances, which were made by a different entity and preceded the Ark II Credit Agreement by up to nearly four weeks, imply that the Ark II Credit Agreement was intended to paper over a transaction that was not a loan at the time of the January Advances. Accordingly, the motion to dismiss Count IV is denied.

## B.    Count VI: Assumption of Control

Count VI asserts claims against "Patriarch" on the theory that "Patriarch" dominated and controlled TransCare to such an extent that "Patriarch" undertook fiduciary duties to TransCare and breached those and other duties all to TransCare's disadvantage. (¶¶ 126-30.) The *Amended Complaint* does not define "Patriarch," a name shared by several defendants, and the only identification of the defendants targeted by Count VI is to the Entity Defendants listed in the heading. The parties have operated under this belief and I will too.

The Entity Defendants have moved to dismiss Count VI in its entirety on two separate grounds. First, the Trustee continues to violate the group pleading rules that resulted in the dismissal of portions of the original complaint. (*Motion to Dismiss* ¶¶ 74-76.) Second, a claim for "lender liability" can only be asserted against a lender and since the only lender included in Count VI is Ark II, this claim must be dismissed as to the other Entity Defendants. (*Id.* ¶¶ 77-78.)

The Trustee's *Opposition* shifted gears.  He contends that each Entity Defendant owed fiduciary duties to TransCare (regardless of whether it was a lender) under the same domination and control theory and breached those duties.  (*Opposition* at 31-32.) While the Entity Defendants concede "the general proposition that fiduciary duties may be imposed on one who 'exercises control over the business and affairs of the corporation,'" (*Reply* ¶ 31 (citation omitted)),  they argue that the Trustee's *Amended Complaint* "does not allege facts sufficient to show that any of the Entity Defendants assumed the requisite level of control over TransCare to find the existence of a fiduciary relationship."  (*Id.*)   Instead, the *Amended Complaint* pleads only that "control of TransCare was always with Lynn Tilton."  (*Id.*)

Claims for breach of fiduciary duty may be brought against any persons "who exercise *de facto* control of the corporation during the relevant times."  *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1306 (S.D.N.Y. 1989) (citation omitted); *see also Quadrant Structured Prod. Co., Ltd. v. Vertin*, 102 A.3d 155, 183-84 (Del. Ch. 2014) ("Delaware law imposes fiduciary duties on those who effectively control a corporation.").[10]  Such control persons "owe exacting fiduciary duties to the controlled corporation."  *Banco De Desarrollo*, 709 F. Supp. at 1306 (citing *Pepper v. Litton*, 308 U.S. at 305-07).  "If a defendant wields control over a corporation, then the defendant takes on fiduciary duties . . . ."  *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, No. 11802-VCL, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018);

---

[10]     The parties cite to both New York and Delaware case law in their pleadings.  Since New York and Delaware courts have adopted similar standards, there is no conflict and the Court need not decide which law applies.  *See Limor v. Buerger (In re Del-Met Corp.)*, 322 B.R. 781, 809 (Bankr. M.D. Tenn. 2005) (noting that under both New York and Delaware law, a fiduciary relationship arises upon the exercise of control over a corporation).

*see also Harriman v. E. I. DuPont De Nemours & Co.*, 372 F. Supp. 101, 106 (D. Del. 1974) ("It is only when a person affirmatively undertakes to dictate the destiny of the corporation that he assumes such a fiduciary duty."); *Official Comm. of Unsecured Creditors v. McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005) ("A fiduciary duty relationship arises under New York law when . . . one assumes control and responsibility over another.") (citation omitted). The requisite degree of control required for a claim for breach of fiduciary duty "can be shown to exist generally or 'with regard to the particular transaction that is being challenged.'" *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (citation omitted), *abrogated on other grounds by El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016). "To show that the requisite degree of control exists generally, a plaintiff may establish that a defendant or group of defendants exercised sufficient influence 'that they, as a practical matter, are no differently situated than if they had majority voting control'" of the corporation. *Basho Techs.*, 2018 WL 3326693, at *25 (citation omitted).

As the Entity Defendants contend, Count VI suffers from the same group pleading deficiencies that led to the dismissal of several claims alleged in the original complaint. *See TransCare*, 592 B.R. at 287-90. Count VI alleges that "Patriarch" dominated and controlled TransCare and exploited its domination and control to the detriment of TransCare. (¶¶ 127-30; *see also* ¶ 4 ("While TransCare's executives were pleading for funds to make payroll, Patriarch executives under her direction were advising her on plans to seize the same TransCare assets that Tilton would not let TransCare sell."); ¶ 37 ("In short, Tilton and Patriarch exercised complete dominion and

20

control over TransCare.").) "Patriarch" refers to all of the Entity Defendants without distinction. In addition, the contention that the Entity Defendants dominated and controlled TransCare ignores the Trustee's fundamental contention that Tilton, not the Entity Defendants, dominated and controlled TransCare. (¶ 29 ("PPAS, Patriarch Partners, PPMG, and Ark II operated wholly under Tilton's control and pursuant to her directives."); (¶ 33 ("Tilton exercised an extraordinarily high level of control and domination over the operations of TransCare.")

Count VI does incorporate by reference allegations describing how certain employees of Patriarch Partners (*e.g.*, Stephen, Greenberg, Schneider and Jones) and PPMG (*e.g.*, Pelissier and Whalen) prohibited TransCare from negotiating a sale with third parties, (*e.g.,* ¶¶ 35-36, 41-44, 56-58, 67), facilitated the transfer of TransCare's assets to Transcendence and Transcendence II and initiated TransCare's bankruptcy. (*E.g.*, ¶¶ 80, 83-84, 87, 89-91, 95, 98, 105-06.) However, the *Amended Complaint* also alleges that "Patriarch executives did not typically differentiate between the various Patriarch entities when dealing with TransCare." (¶ 50, n. 4.; ¶ 5 ("Patriarch employees under Tilton's command continued to plot to steal TransCare's assets under cover of night.") Read in its entirety, the gravamen of the *Amended Complaint* is that Tilton dominated and controlled TransCare, the Entity Defendants and their employees and used the Entity Defendants' employees as her own agents without regard to their duties as employees of any particular Entity Defendant.[11] Although an employee of a particular Entity Defendant may have been an agent of that entity and also directed TransCare's

---

[11]    The Trustee has not asserted an alter ego theory of liability against the Entity Defendants.

affairs, the *Amended Complaint* does not imply that he acted as an agent of the Entity Defendant, as opposed to Tilton, when he exercised control over TransCare.

Even assuming that the *Amended Complaint* alleged the necessary domination and control to support breach of fiduciary duty claims against Patriarch Partners and PPMG, it does not allege that the other Entity Defendants dominated or controlled TransCare.  PPAS served as an administrative agent for a group of lenders under the 2003 Credit Agreement and Ark II was a purported lender under the Ark II Credit Agreement.  The Trustee has proposed a separate theory of lender liability to hold them liable for TransCare's various injuries.[12]  To impose liability against a lender under this theory, the plaintiff must allege facts showing that "the lender was: (1) in complete domination of finances, policy, and business practices of the borrower in respect to the attacked transaction; (2) the control was used by the lender to commit fraud or perpetuate the violation of a statutory or other positive legal duty; and (3) the control and breach of duty must have proximately caused the injury or unjust loss."  *Post-Effective Date Comm. of the Estate of East End Dev., LLC v. Amalgamated Bank* (*In re East End Dev., LLC*), Adv. Proc. No. 13-8081-reg, 2017 WL 1277443, at \* 4 (Bankr. E.D.N.Y. Apr. 4, 2017); *accord Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*, No. 08-CV-6227T, 2015 WL 1924924, at \*10 (W.D.N.Y. Apr. 28, 2015); *Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999) (citing *Fisser v. Int'l Bank*, 282 F.2d

---

[12]    The Trustee had initially argued that all of the Entity Defendants were liable under a lender liability theory, but the claims against the non-lenders are now limited to claims based on breach of fiduciary duty.  PPAS was an administrative agent for lenders, not a lender itself.  Nevertheless, the Court will treat it as a lender for purposes of analysis.

231, 238 (2d Cir. 1960)). "Actual, participatory and total control over the debtor is the level of control necessary under the instrumentality theory or the alter ego theory." *East End Dev.*, 2017 WL 1277443, at *5 (citing *KDI Holdings*, 277 B.R. at 516). "The level of control required is often characterized as total or complete domination." *Id.* (citing *Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995)).

Whatever else it alleges they did, the *Amended Complaint* does not allege facts suggesting that either PPAS or Ark II dominated or controlled TransCare's policies or decision-making. Throughout the *Amended Complaint*, PPAS acted as administrative agent for a group of lenders, including with respect to the collection of interest and the exercise of remedies under the Credit Agreement. Ark II made a purported loan in January or February 2016. While PPAS may have enjoyed the leverage over TransCare that comes with its status as administrative agent for secured lenders owed an amount north of $40 million, and Ark II may have enjoyed similar though lesser leverage, the exercise of remedies under a loan agreement to foreclose or collect the debt, without more, does not render either in control under theories of lender liability or breach of fiduciary duty. *East End Dev.*, 2017 WL 1277443, at *5 ("A lender exercising its rights under the parties' loan agreements, without more, does not rise to the level of dominance necessary to impose lender liability.")

Finally, the contention that either of the Transcendence entities dominated and controlled TransCare is also without merit. The *Amended Complaint* alleges that Transcendence and Transcendence II were formed by Tilton as part of her plan to strip TransCare of its assets and reorganize the business around Transcendence. Again,

23

whatever else the *Amended Complaint* alleges they did, it does not allege that they dominated or controlled TransCare's business or policies.

Accordingly, Count VI is dismissed.

## C.      Leave to Amend

Lastly, the Court denies the Trustee's request for leave to amend (again) inserted at the very end of the *Opposition* without legal discussion or any effort to justify the request. While leave to amend should be freely granted, any amendment would be futile. For the reasons stated at the hearing, PPAS was not a transferee of the transfers alleged in Count XI and Count XI cannot be amended to make PPAS something it was not. Furthermore, the Trustee cannot assert a plausible claim that the Entity Defendants dominated and controlled TransCare in light of his theory that Tilton directly dominated and controlled everyone.

In addition, any further amendments will unduly delay the resolution of this case. The joint pre-trial order is due May 3, 2019 and the final pre-trial conference is scheduled for May 14, 2019. (*Order*, dated Apr. 2, 2019 (ECF Doc. # 73).) The case is on target to be tried this summer.

The Court has considered the parties' remaining arguments and concludes that they lack merit. The parties are directed to submit a consensual order, or in the absence of consent, to settle an order consistent with this opinion.

Dated:  New York, New York
         April 30, 2019                         /s/ *Stuart M. Bernstein*
                                                STUART M. BERNSTEIN
                                                United States Bankruptcy Judge

24