**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>TRANSCARE CORPORATION, et al.,<br><br>Debtors. | Chapter 7<br>Case No. 16-10407 (SMB)<br>(Jointly Administered) |
| SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al.,<br><br>Plaintiff,<br><br>- against -<br><br>LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 2001-1 LIMITED, TRANSCENDENCE TRANSIT, INC., and TRANSCENDENCE TRANSIT II, INC.,<br><br>Defendants. | Adv. Proc. No. 18-1021 (SMB)<br><br>JOINT PRETRIAL ORDER (PROPOSED) |

The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.

I. NATURE OF THE CASE

A. Plaintiff's Statement and Relief Sought

This is a breach of fiduciary action against Lynn Tilton, the debtor's sole director, brought by the Chapter 7 Trustee of TransCare Corporation and its wholly-owned subsidiary debtors ("TransCare" or "Debtors"). The Trustee also brings nine additional claims and claim objections

against six entities owned and controlled by Tilton: PPAS, Ark II, Patriarch Partners, PPMG, Transcendence and Transcendence II (the "Entity Defendants" and, collectively with Ms. Tilton, "Defendants").[1] Tilton engaged in self-dealing when confronted with TransCare's liquidity crisis in 2015 and early 2016: instead of restructuring TransCare for the benefit of all stakeholders, she transferred TransCare's valuable assets to a new company, controlled by her, and sought to have the remainder liquidated in bankruptcy. As a result, TransCare received less in liquidation sales than it should have had it been restructured appropriately. Tilton used the Entity Defendants to facilitate the Transcendence transaction. The Trustee seeks the following relief:

Tilton: Damages for breaching her fiduciary duty of loyalty and good faith (Claim 1) and sanctions for acts taken in violation of the automatic stay (Claim 9). The Trustee seeks no less than approximately $17 million in damages based upon Tilton's own analysis as to the value of TransCare's assets when conducting the Transcendence transaction.

PPAS: Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7), equitable subordination of claims (Claim 3), contractual payment subordination (Claim 12), equitable limitation on liens (Claim 13), turnover and avoidance of $800,000 postpetition transfer (claim 14), sanctions for acts taken in violation of the automatic stay (Claim 9) and disallowance of claims pursuant to 11 U.S.C. §502(d) (Claims 7, 11 and 14).

Ark II: Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7), equitable subordination of claims (Claim 3), recharacterization of claims as equity (Claim 4), avoidance of grant of security interest

[1] The full names of the Entity Defendants are as follows: Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1 Limited, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Transcendence Transit, Inc. and Transcendence Transit II, Inc.

as preference or constructive fraudulent transfer and preservation of lien for the benefit of the estate (Claims 10 and 11), equitable limitation on liens (Claim 13), turnover and avoidance of $800,000 postpetition transfer (Claim 14), sanctions for acts taken in violation of the automatic stay (Claim 9) and disallowance of claims pursuant to 11 U.S.C. §502(d) (Claims 7, 10, 11 and 14).

Patriarch Partners: Sanctions for acts taken in violation of the automatic stay (Claim 9).

PPMG: Sanctions for acts taken in violation of the automatic stay (Claim 9).

Transcendence: Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7) and sanctions for acts taken in violation of the automatic stay (Claim 9).

Transcendence II: Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7) and sanctions for acts taken in violation of the automatic stay (Claim 9).

B. Defendants' Statement and Relief Sought

TransCare faced liquidity constraints throughout 2015 and early 2016. Throughout 2015, TransCare's management provided Ms. Tilton, TransCare's sole director, with turnaround or stabilization plans that required millions in capital investment or debt financing that (i) TransCare could not otherwise obtain and (ii) Ms. Tilton had no legal duty to provide. Ms. Tilton did not believe that any of these plans were likely to succeed. Nevertheless, during the time period relevant to this adversary proceeding, Ms. Tilton authorized the advancement of over $9 million

to TransCare through several investment vehicles she owned and controlled in order to continue TransCare as a going concern.

By December 2015, TransCare's relationship with Wells Fargo, TransCare's asset based lender, had deteriorated significantly. This was due, in large part, to Wells Fargo's stated concerns about the reliability of financial information produced by TransCare's management. At that time, the Wells Fargo Credit Facility (as defined below) was due to expire and Ms. Tilton had lost confidence in TransCare management's ability to effectuate a successful turnaround.

At that point Ms. Tilton considered several alternatives, including selling TransCare through a formal sale process. In February 2016, Ms. Tilton ultimately came up with a restructuring plan that she believed would save jobs and satisfy TransCare's obligations to Wells Fargo. The idea was to (a) separate TransCare's more profitable business lines from its unprofitable business lines (by causing the Term Loan Lenders to foreclose on those business lines), (b) operate the more profitable business lines through a "Newco" (*i.e.*, Transcendence) and (c) work with Wells Fargo to effectuate an orderly wind down of TransCare's unprofitable businesses in bankruptcy. This restructuring plan was discussed and negotiated with and among Ms. Tilton and her team, Wells Fargo, and their respective legal and financial advisors, among others, and was intended to be consensual. Unfortunately, Wells Fargo refused to extend the credit facility and TransCare filed for bankruptcy. Even then, Ms. Tilton still tried to save jobs for TransCare employees through the operation of Transcendence. However, interference by the Trustee caused that portion of the plan to fail and Transcendence never operated. Thus, while, on paper, the foreclosure about which the Trustee complains took place, the assets were never

ultimately transferred to Transcendence. Indeed, Ms. Tilton was personally prepared to commit millions of dollars in additional financing for Transcendence, had the plan come to fruition.

No harm befell TransCare as a result of Ms. Tilton's conduct or the conduct of any of the Entity Defendants. The Trustee's theory of damages rests on the underlying assumption that, but for Ms. Tilton and the Entity Defendants' conduct, TransCare would likely have achieved certain lofty values calculated by the Trustee's expert witness. But it is entirely speculative and counterfactual that TransCare's assets would have been worth more but for the attempts to restructure through Transcendence. To the contrary, the evidence will show that TransCare had no prospect or ability to continue as a going concern at the time the restructuring plan was developed and attempts were made to implement it. The disputed foreclosure had no impact on TransCare or its value.

The claims asserted against the Entity Defendants are similarly meritless: none of the Entity Defendants engaged in inequitable conduct or otherwise took action inconsistent with, or in contravention of, the Bankruptcy laws. Because the Trustee cannot prove any of the claims for relief asserted in the Amended Complaint, judgment should be entered in favor of Defendants.

## II. BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR JUDGMENT

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code") and pursuant to 28 U.S.C. § 1331 as it arises in part under the laws of the United States.

Plaintiff contends that this is a core proceeding as defined in 28 U.S.C. § 157(b)(2) and consents to the Bankruptcy Court issuing a final order on the claims asserted herein. Plaintiff contends that Defendants have waived any objections to the jurisdiction of the Bankruptcy Court

pursuant to, among other things, Federal Rule of Bankruptcy Procedure 7012 and their filing of proofs of claim.

Defendants contend that the Amended Complaint contains both core and non-core claims. Defendants do not consent to the Bankruptcy Court issuing a final order on the non-core claims.

III. STIPULATED FACTS

**A. The Parties[2]**

1. Plaintiff Salvatore LaMonica ("LaMonica" or "Trustee") is the chapter 7 trustee of the jointly-administered bankruptcy estates of TransCare Corporation and its wholly-owned subsidiaries[3]. TransCare was founded in 1993 and is incorporated under the laws of Delaware. TransCare provided paratransit services for both emergency and non-emergency patients and individuals with disabilities to healthcare facilities, municipalities and transit authorities in the mid-Atlantic region. TransCare was headquartered at 1 Metrotech Center, Brooklyn, New York.

2. Defendant Lynn Tilton was the sole director of TransCare.

3. Defendant Patriarch Partners Agency Services, LLC ("PPAS") is a Delaware limited liability company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York. Ms. Tilton is the sole manager and ultimate indirect owner of PPAS.

---

[2] Unless otherwise noted, the facts below relate to the time period from November 1, 2014 through February 24, 2016 (the "Relevant Time Period").

[3] TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation and TC Hudson Valley Ambulance Corp. (the "TransCare Subsidiaries").

4. Defendant Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York. Ms. Tilton is the sole manager and ultimate indirect owner of Patriarch Partners.

5. Defendant Patriarch Partners Management Group, LLC ("PPMG") is a Delaware limited liability company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York. Ms. Tilton is the sole manager and ultimate indirect owner of PPMG.

6. Defendant Ark II CLO 2001-1, Limited ("Ark II") is a Cayman Islands company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York. Ark II owns a 55.7% direct interest in TransCare. Ms. Tilton owns 99% of Ark II.

7. Defendant Transcendence Transit, Inc. ("Transcendence Transit") and Transcendence Transit II, Inc. ("Transcendence II" and, together with Transcendence Transit, "Transcendence") are both Delaware corporations. Transcendence has a mailing address at 1 Liberty Street, 35th Floor, New York, New York. Ms. Tilton is the sole director of both entities, and Transcendence is the parent of Transcendence II.

**B. TransCare's Ownership Structure**

8. Ark II owns 55.7% of TransCare's shares.

9. Ark Investment Partners II, L.P. ("AIP") owns 5.6% of TransCare's shares.

**C. TransCare's Debt Structure**

PPAS Credit Agreement

10. TransCare Corporation, as borrower, the Term Loan Lenders (as defined below), as lenders, and PPAS, as Administrative Agent, are parties to a Credit Agreement, dated as of August 4, 2003, and as amended (the "PPAS Credit Agreement"). During the Relevant Time Period, the lenders under the PPAS Credit Agreement were: (i) AIP, (ii) Zohar CDO 2003-1, Ltd.,

Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"); (iii) Credit Suisse Alternative Capital, Inc. ("Credit Suisse"); and (iv) First Dominion Funding I ("First Dominion" and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").

11. The PPAS Credit Agreement is governed by New York law.

12. In connection with the PPAS Credit Agreement, TransCare Corporation executed a Security Agreement, dated as of August 4, 2003, and as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders.

13. In addition to the Security Agreement, the TransCare Subsidiaries also executed a Subsidiaries' Guarantee, dated as of August 4, 2003, as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders.

The Wells Fargo Credit Facility

14. TransCare Corporation, TransCare New York, Inc., TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc., as Borrowers and TC Ambulance Group, Inc. and TC Ambulance North, Inc., as Guarantors, entered into a Loan and Security Agreement with Wells Fargo N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo"), dated October 13, 2006 (as amended, the "Wells Fargo Credit Facility"). The Wells Fargo Credit Facility is a syndicated asset-backed revolving credit facility.

15. The Wells Fargo Credit Facility is governed by New York law.

16. In connection with the Wells Fargo Credit Facility, Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "2006 Intercreditor Agreement").

The Ark II Credit Agreement

17. TransCare Corporation and Ark II entered into a Credit Agreement, dated as of January 15, 2016 (the "Ark II Credit Agreement").

18. The Ark II Credit Agreement is governed by New York law.

19. In connection with the Ark II Credit Agreement, TransCare Corporation executed a Security Agreement, dated as of January 15, 2016, in favor of Ark II (the "Ark II Security Agreement").

20. In addition to the Ark II Security Agreement, the TransCare Subsidiaries also executed a Guaranty, dated as of January 15, 2016, in favor of Ark II (the "Ark II Guaranty").

21. The Ark II Agreement, Ark II Security Agreement, and Ark II Guaranty were executed by Ark II and TransCare on or about February 10-11, 2016.

22. In connection with the Ark II Credit Agreement, Ark II and PPAS entered into an intercreditor agreement, dated as of January 15, 2016 (the "2016 Intercreditor Agreement"), for which TransCare executed an acknowledgment. The 2016 Intercreditor Agreement was executed on or about February 10-11, 2016.

23. On January 29, 2016, Ark II filed separate UCC-1 financing statements with the Delaware Department of State for TransCare Corporation and the TransCare Subsidiaries. Each UCC-1 financing statement provided that Ark II held a security interest in "All assets of the debtor . . ."

## D. TransCare's Operations and Events Leading to Bankruptcy

24. Glenn Leland served as TransCare's Chief Executive Officer from on or about January 12, 2015 through on or about January 8, 2016.

25. Mark Bonilla served as TransCare's Chief Financial Officer from on or about April 14, 2014 through on or about September 29, 2015. After resigning in September 2015, Bonilla served as a consultant to TransCare through on or about January 8, 2016.

26. Peter Wolf served as TransCare's Chief Operating Officer from on or about November 16, 2015 through on or about February 24, 2016.

27. Throughout the Relevant Time Period, TransCare experienced difficulties in funding employee payroll and paying vendors.

28. Throughout the Relevant Time Period, TransCare was delayed in transmitting monthly financial statements to its lenders.

29. During the Relevant Time Period, TransCare provided paratransit services to the New York City Transit Authority (the "MTA"). These services were provided pursuant to Contract No. 07H9751T, dated February 27, 2009, between the MTA and TransCare New York, Inc., as amended (the "MTA Contract"). Under the MTA Contract, TransCare provided paratransit services for MTA customers using vehicles leased from the MTA.

30. On July 13, 2015, TransCare New York, Inc. and the MTA executed Modification No. 7 to the MTA Contract ("Modification No. 7"). Pursuant to Modification No. 7, effective August 1, 2015, the MTA Contract was extended through October 31, 2019.

31. On or about July 2, 2015, Wells Fargo informed TransCare that Wells Fargo was in an over-advanced position under the Wells Fargo Credit Facility. Wells Fargo also informed TransCare management that it would not provide TransCare with funding for payroll for the week ending July 4, 2015.

32. On July 3, 2015, TransCare missed payroll.

33. The Wells Fargo Credit Facility was set to renew on January 31, 2016 unless terminated by a date certain prior to that date.

34. On October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"). The Non-Renewal Notice indicated that the Wells Fargo Credit Facility would expire on January 31, 2016.

35. On December 23, 2015, Wells Fargo transmitted a summary of proposed terms for a longer-term forbearance of the Wells Fargo Credit Facility to Jean-Luc Pelissier and Michael Greenberg. The proposed terms included the engagement by TransCare of a third-party financial advisor and a budget for TransCare.

36. On January 7, 2016, TransCare and Carl Marks Advisory Group LLC ("Carl Marks") entered into a consulting agreement.

37. On February 10, 2016, Transcendence Transit and Transcendence II were incorporated under the laws of Delaware.

38. By letter agreement dated February 10, 2016, TransCare engaged the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to advise on an out-of-court restructuring or in-court proceeding.

39. By letter agreement dated February 18, 2016, TransCare engaged Curtis Mallet to assist the Initial-Filed Debtors (as defined below) in commencing a filing under Chapter 7 of the Bankruptcy Code.

40. On the morning of February 24, 2016, PPAS, as Administrative Agent, the Zohar Funds and AIP issued a Notice of Default and Acceleration, dated February 24, 2016, to TransCare (the "Notice of Default").

41. In connection with the Notice of Default, on the morning of February 24, 2016, PPAS, as Administrative Agent, the Zohar Funds and AIP issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, to TransCare (the "Notice of Acceptance"). TransCare signed the Notice of Acceptance.

42. The Notice of Acceptance covered certain personal property, including equipment, inventory, vehicles and certain contracts (defined as, the "Subject Collateral") in which PPAS, as Administrative Agent, the Zohar Funds and AIP held a security interest.

43. On the morning of February 24, 2016, PPAS, as Administrative Agent, and Transcendence, entered into a Bill of Sale, Agreement to Pay and Transfer Statement, dated February 24, 2016.

**E. TransCare's Bankruptcy Filings**

44. TransCare Corporation and certain affiliated subsidiaries (the "Initial Debtors") filed voluntary Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on the evening of February 24, 2016.

a. *In re TransCare Corp.* (16- bk-10407-smb)

b. *In re TransCare New York, Inc.* (16- bk-10408-smb)

c. *In re TransCare ML, Inc.* (16- bk-10409-smb)

d. *In re TC Ambulance Group, Inc.* (16- bk-10410-smb)

e. *In re TransCare Management Services, Inc.* (16- bk-10411-smb)

f. *In re TCBA Ambulance, Inc.* (16- bk-10412-smb)

g. *In re TC Billing and Services Corporation* (16- bk-10413-smb)

h. *In re TransCare Westchester, Inc.* (16- bk-10414-smb)

i. *In re TransCare Maryland, Inc.* (16- bk-10415-smb)

j. *In re TC Ambulance North, Inc.* (16- bk-10416-smb)

k. *In re TransCare Harford County, Inc.* (16- bk-10417-smb)

45. On February 25, 2016, LaMonica was appointed as the interim Chapter 7 Trustee of the Initial Debtors' cases.

46. On or about February 25, 2016, Ms. Tilton and Wells Fargo were unable to agree on terms for providing payroll funding to pay TransCare's employees for the week of February 19, 2016.

47. On March 1, 2016, Shameeka Ien filed an adversary class action complaint captioned as *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033 (the "WARN Proceeding") in the Bankruptcy Court against all of the TransCare entities, Tilton, Patriarch Partners, Ark II, AIP and Patriarch Partners III, LLC, asserting damages under the WARN Act and the N.Y. WARN Act (collectively, the "WARN Acts"),[4] along with unpaid wages, vacation time, and attorneys' fees and costs.

48. On March 10, 2016, the Trustee, PPAS, and Transcendence Transit entered into a Stipulation Respecting the Sale of Certain Personal Property (the "Personal Property Stipulation"). The Personal Property Stipulation provided for the sale of certain property, including the "Subject Collateral" identified in the Notice of Acceptance discussed above, with the proceeds of such sale (net of the costs of sale) to be divided 20% for the benefit of TransCare's estates and 80% to PPAS, as Administrative Agent.

[4] Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 et seq.; New York Worker Adjustment and Retraining Notification Act, N.Y. Labor Law §860 et seq.

49. On March 25, 2016, the Bankruptcy Court entered an order approving the Personal Property Stipulation [Dkt. 52]. As a result of the Trustee's sale efforts, the Trustee distributed $800,000.01 to PPAS in accordance with the Personal Property Stipulation.

50. TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation (the "Later-Filed Debtors") filed voluntary Chapter 7 bankruptcy petitions in the Bankruptcy Court on April 25, 2016.

a. *In re TransCare Pennsylvania, Inc.* (16- bk-11057-smb)

b. *TC Hudson Valley Ambulance Corp.* (16- bk-11058-smb)

c. *TC Ambulance Corporation* (16- bk-10410-smb)

51. The Initial Debtors' and the Later-Filed Debtors' cases are being jointly-administered [Dkt. 17, Dkt. 189]. LaMonica serves as the Chapter 7 Trustee for both the Initial and Later-Filed Debtors.

52. By letters dated June 14, 2016, Ms. Tilton resigned as director of TransCare.

53. On October 9, 2017, Ark II filed proofs of claim against TransCare asserting a secured claim for $1,077,966.97 in connection with the Ark II Credit Agreement.[5]

54. On October 9, 2017, PPAS, on behalf of itself and as the Administrative Agent for the Term Loan Lenders, filed proofs of claim against TransCare asserting a secured claim for $35,090,492.76 in connection with the PPAS Credit Agreement.[6]

---

[5] Claim No. 8 in Case No. 16-11058, Claim No. 8 in Case No. 16-10410, Claim No. 8 in Case No. 16-10416, Claim No. 8 in Case No. 16-10412, Claim No. 9 in Case No. 16-10411, Claim No. 11 in Case No. 16-10414, Claim No. 14 in Case No. 16-10417, Claim No. 14 in Case No. 16-10409, Claim No. 18 in Case No. 16-11047, Claim No. 23 in Case No. 16-10415, Claim No. 31 in Case No. 16-10413, Claim No. 75 in Case No. 16-10408, and Claim No. 18 in Case No. 16-11059.

[6] Claim No. 6 in Case No. 16-11058, Claim No. 6 in Case No. 16-10410, Claim No. 6 in Case No. 16-10416, Claim No. 6 in Case No. 16-10412, Claim No. 7 in Case No. 16-10411, Claim No. 9 in Case No. 16-10414, Claim No. 12 in Case No. 16-10417, Claim No. 12 in Case No. 16-10409,

55. On October 9, 2017, Patriarch Partners filed a proof of claim against TransCare asserting an unsecured claim for $2,587.98 in advanced expenses.[7]

56. On October 9, 2017, PPMG filed proofs of claim against TransCare asserting an unsecured claim for $2,038,515.87 in management fees.[8]

57. The Internal Revenue Service (the "IRS") filed proofs of claim against TransCare.[9]

58. On July 6, 2017, the state taxing authorities filed proofs of claim against TransCare.[10]

## IV. PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

---

Claim No. 16 in Case No. 16-11057, Claim No. 21 in Case No. 16-10415, Claim No. 29 in Case No. 16-10413, Claim No. 73 in Case No. 16-10408 and Claim No. 16 in Case No. 16-11059.

[7] Claim No. 587 in Case No. 16-10407.

[8] Claim No. 7 in Case No. 16-11058, Claim No. 7 in Case No 16-10410, Claim No. 7 in Case No. 16-10416, Claim No. 7 in Case 16-10412, Claim No. 8 in Case No. 16-10411, Claim No. 10 in Case No. 16-10414, Claim No. 13 in Case No. 16-10417, Claim No. 7 in Case No 16-10410, Claim No. 17 in Case No. 16-11059, Claim No. 17 in Case No. 16-11057, Claim No. 22 in Case No. 16-10415, Claim No. 30 in Case No. 16-10413, Claim No. 74 in Case No. 16-10408 and Claim No. 13 in Case No. 16-10409.

[9] Claim No. 246 in Case No. 16-10407, Claim No. 31 in Case No. 10408, Claim No. 3 in Case No. 10409, Claim No. 3 in Case No. 10410, Claim No. 4 in Case No. 10411, Claim No. 3 in Case No. 10412, Claim No. 4 in Case No. 10413, Claim No. 5 in Case No. 10414, Claim No. 9 in Case No. 10415, Claim No. 3 in Case No, 10416, Claim No. 4 in Case Number 10417, Claim No. 1 in Case No. 11057, Claim No. 1 in Case No. 11058 and Claim No. 1 in Case No. 11059.

[10] Claim No. 58 in Case No. 16-10408, Claim No. 5 in Case No. 16-10413 and Claim No. 1 in Case No. 16-11059.

A. Plaintiff's Contentions

1. Contentions as to Background Facts

a. Contentions as to Ownership of Transcendence and Ark II

1. There is no stock register for Transcendence.

2. Tilton is the direct or indirect owner of Transcendence.

3. Transcendence is owned approximately 55% by Ark II, per Tilton's deposition testimony.

4. The remaining 1% of Ark II not directly owned by Tilton is controlled by Tilton for a family member.

b. Contentions as to TransCare's Equity Structure

5. Hampshire TC Holdings LLC owned 8.6% of TransCare's shares.

6. First Dominion owned 8.2% of TransCare's shares.

7. Credit Suisse owned 6.8% of TransCare's shares.

8. TransCare's remaining 20.7% of shares were owned by a variety of entities and individuals, with none of these other shareholders holding more than 3.5% of the shares.

c. Contentions as to TransCare's Business

9. TransCare employed over 1,800 employees, including emergency medical technicians, drivers and mechanics.

10. By 2015, TransCare owned a fleet of over 600 ambulances, buses, vans and paratransit vehicles and provided ambulance, paratransit and critical care transfer services in New York, Pennsylvania and Maryland, including 911/ EMS services, basic life support, advanced life support, critical care transport, ambulette and wheelchair van services, non-emergency response services and special venue transportation services.

11. As of at least 2015, TransCare had five main business segments:

a. paratransit services provided to the New York City Transit Authority (the "MTA"),

b. 911 services provided in New York City,

c. emergency, 911 and non-emergency transport services provided in Hudson Valley, New York,

d. emergency and non-emergency transport services provided in Pittsburg, Pennsylvania, and

e. emergency and non-emergency transport services provided in Maryland.

12. The MTA Contract was TransCare's most profitable business segment.

13. Within New York, TransCare provided services in accordance with seven Certificates of Need issued to TransCare by the New York State Department of Health (the "CONs").[11]

14. In New York, ambulance operators are required to hold a CON for a specific market in order to provide ambulance services in that market.

15. TransCare reported the following revenues from 2009 to October 2015: (i) $138.3 million in 2009, (ii) $152.1 million in 2010, (iii) $143.5 million in 2011, (iv) $137.7 million in

[11] The CONs are identified as follows: (i) No. 0164 issued to TransCare New York, Inc. d/b/a TransCare for Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester counties; (ii) No. 0470 issued to TransCare Westchester, Inc. for Westchester county; (iii) No. 0508 issued to TC Ambulance Group, Inc., d/b/a Mount Sinai Beth Israel for Kings, Queens, Richmond, Bronx and New York counties; (iv) No. 0509 issued to TC Ambulance North, Inc., d/b/a TransCare for Bronx, New York, Queens, Kings and Richmond counties; (v) No. 510 issued to TC Ambulance Corp. d/b/a Metro EMS for Bronx, New York, Queens, Kings, Richmond and Westchester counties; (vi) No. 0574 issued to TCBA Ambulance, Inc., d/b/a St. Barnabas Hospital Emergency Services for Bronx, Kings, New York, Queens and Richmond counties; and (vii) No. 667 issued to TC Hudson Valley Corp. d/b/a TransCare for Rockland, Orange, Ulster, Sullivan, Dutchess, Putnam, Westchester and Delaware counties.

2012, (v) $127.4 million in 2013, (vi) $131.1 million in 2014 and (vii) $118.9 million for the 12 months ending October 2015.

16. TransCare reported the following EBITDA for 2009 to October 2015: (i) $9.1 million in 2009, (ii) $7.7 million in 2010, (iii) $.9 million in 2011, (iv) $8.9 million in 2012, (v) $7.2 million in 2013, (vi) $.5 million in 2014 and (vii) $1.4 million for the 12 months ending October 2015.

17. On June 29, 2015, Bonilla wrote to Leland that TransCare's Board had ordered the payment of interest that week despite his warning that doing so would place TransCare at high risk of being unable to make payroll, as shown by PX 67.

18. On July 7, 2015, the Journal News in the New York City area published an article titled "TransCare Ambulance Service Facing 'Payroll Crisis'" stating that TransCare had missed payroll.

19. On July 6, 2015, as shown by PX 68 Leland emailed a turnaround plan dated June 7, 2015 to Greenberg and Whalen, which stated:

a. "We propose … an immediate loan of $5M. If Patriarch Partners is unable or unwilling to provide these funds, we request permission to seek alternative sources of financing;"

b. "Under normal circumstances a company like TransCare with threats to on-going operations, would seek protection from creditors thru bankruptcy. We are told that this is not an option in the Patriarch portfolio…;"

c. "Management has squeezed almost all the profit improvement possible from current operations;" and

d. "In the absence of financing to accelerate plan execution, the only remaining options are bleak. If TransCare fails to find a way to continue operations and instead loses insurance, is evicted from critical facilities or otherwise forced to cease operations, the WARN act liability is approximately $19.4M."

20. On about July 8, 2015, EZ-Pass – which provided a toll service allowing TransCare to operate its vehicles without delay through tolls – suspended service to TransCare due to chronic non-payment.

21. Between November 13 and November 16, 2015, Greenberg, Pelissier, Leland and Bonilla prepared a presentation with fourth quarter 2015 and 2016 projected financials for TransCare for a November 16, 2015 meeting with Wells Fargo, as shown by PX 101.

22. On November 16, 2015, Greenberg, Pelissier, Leland and Bonilla met with Wells Fargo to provide the presentation and discuss an extension of the December 31, 2015 maturity date of the Wells Fargo Credit Facility. On November 21, 2015, Leland reported on the meeting to Tilton, as shown by JX 52.

23. Following the meeting with Wells Fargo, Leland, Bonilla, Pelissier and Greenberg continued revising the 2016 financial projections for TransCare.

24. Throughout December 2015, Wells Fargo and Defendants engaged in discussions concerning Wells Fargo and TransCare entering into a longer-term forbearance with regard to the Wells Fargo Credit Facility.

25. On December 11, 2016, Bonilla provided Greenberg with the updated 2016 financial projections for TransCare, as shown by PX 119.

2. Contentions as to TransCare's Debt Structure

a. The PPAS Credit Agreement

26. Tilton owns and manages AIP.

27. Tilton was the collateral manager for the Zohar Funds until March 3, 2016.

28. Credit Suisse served as the collateral manager for First Dominion.

29. AIP and the Zohar Funds together constituted the "Required Lenders", under Section 1.1 of the Credit Agreement.

30. The PPAS Credit Agreement provided for varying rates of interest across eight tranches of debt. The largest tranche, comprising 60% of the total debt, accrued interest at a rate of 12% per annum.

31. In 2015, TransCare wired interest payments to PPAS under the PPAS Credit Agreement totaling $3,380,123.91.

32. Under Section 10 (hanging paragraph) of the PPAS Credit Agreement, PPAS as Administrative Agent, upon the occurrence of an Event of Default, "with the consent of the Required Lenders … may … declare Loans hereunder … to be due and payable forthwith…." PPAS was not required to accelerate the loans except "upon the request of the Required Lenders."

33. Pursuant to Section 11.5 of the PPAS Credit Agreement, the Administrative Agent "may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders" unless the Administrative Agent has been "reasonably directed by the Required Lenders."

34. Pursuant to Amendment No. 17 and Waiver dated June 2, 2011, the PPAS Credit Agreement was amended to insert section 11.13, which provided, among other things, that "all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Lenders in accordance with the terms hereof."

b. The Wells Fargo Credit Facility

35. The Wells Fargo Credit Facility provided for a maximum credit availability of $20,000,000. Pursuant to section 2.1 of the agreement, funding would be provided on a revolving basis with the amount of available funding determined by TransCare's borrowing base.

36. TransCare granted Wells Fargo a blanket lien on its assets.

37. Pursuant to section 2.2 of the 2006 Intercreditor Agreement, PPAS and Wells Fargo agreed that (a) the PPAS Credit Agreement would have priority over the Wells Fargo Credit Facility with respect to TransCare's: machinery; equipment; computer equipment; inventory; cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law, and the vehicles listed in Schedule IV to the PPAS Credit Agreement, along with any tires and other appurtenances to the foregoing; capital stock with respect to the TransCare subsidiary entities; intellectual property; and books, records, products and proceeds related to this listed collateral; and (b) the Wells Fargo Credit Facility had priority over the PPAS Credit Agreement with respect to TransCare's other property.

38. Pursuant to section 2.10 of the 2006 Intercreditor Agreement, PPAS and Wells Fargo agreed that the party "with a junior Lien on any Collateral … will not, director or indirectly, (a) exercise any of its … rights or remedies upon a default or event of default … against such Collateral, or (b) seek to foreclose or realize upon … its junior Lien on such Collateral …, or (c)

… take any other action that would interfere in any respect with the rights of the Creditor with the senior Lien in such Collateral."

39. The 2006 Intercreditor Agreement was signed on behalf of TransCare by Patrick Seiler, TransCare's then-Vice President.

40. On June 4, 2012, TransCare signed a Notice of Payment Assignment which stated that TransCare had granted Wells Fargo "a first priority security interest in all payments of moneys due or to become due" under the MTA Contract. The Notice of Payment Assignment states that it was negotiated by PPAS, Wells Fargo and the MTA.

c. <u>The Ark II Credit Agreement</u>

41. The Ark II Credit Agreement provided that Ark II could make term loans totaling up to $6.5 million to TransCare for working capital and general corporate purposes.

42. Ark II never funded the full $6.5 million amount.

43. Section 2.5(b) of the Ark II Credit Agreement stated that: "The Borrower [TransCare] shall obtain the written consent of the Lender [Ark II] prior to requesting any Loan. … Notwithstanding anything herein to the contrary, any Loan made by the Lender hereunder shall (x) only be made in its sole and absolute discretion of the Lender and (y) only be made if it is in accordance with a plan approved by the Lender."

44. Section 2 of the security agreement for the Ark II Credit Agreement (the "<u>Ark II Security Agreement</u>") purported to grant Ark II a blanket security interest in TransCare's assets.

45. The 2016 Intercreditor Agreement was signed by Tilton for both PPAS and Ark II, and was signed by TransCare by Peter Wolf, as shown by JX 69.

46. Section 2.2(a) of the 2016 Intercreditor Agreement contained a payment subordination provision providing that the proceeds of the collateral for the Ark II Credit Agreement and the PPAS Credit Agreement "shall" be applied in the following manner:

a. First, to the costs of collection and enforcement relating to the Ark II Credit Agreement or incurred by Ark II;
b. Second, to the costs of collection and enforcement relating to the PPAS Credit Agreement or incurred by PPAS;
c. Third, to the payment in full of the claims under the Ark II Credit Agreement, including interest accruing after the initiation of any insolvency proceeding; and
d. Fourth, to the payment in full of the claims under the PPAS Credit Agreement, including interest accruing after the initiation of any insolvency proceeding.

47. By section 2.9(a) of the 2016 Intercreditor Agreement, PPAS and Ark II agreed that agreed that the party "with a junior Lien on any Collateral … will not, director or indirectly, (i) exercise any of its … rights or remedies upon a default or event of default … against such Collateral, (ii) seek to foreclose, enforce or realize upon … its junior Lien on such Collateral …, or (iii) … take any other action that would interfere in any respect with the rights of the party with the senior Lien in such Collateral."

3. Contentions as to TransCare's Management Structure

48. By a Written Consent of the Sole Director dated July 10, 2012, Tilton caused TransCare to adopt an authority matrix (the "Authority Matrix"), as shown by PX 3.

49. The Authority Matrix listed various actions that could be taken by a "Designated Executive" and those that could only be taken by TransCare's Board.

50. Pursuant to the Authority Matrix, various actions could only be taken by TransCare's Board, including:

a. Approving any annual or interim budget or operating plan;

b. Negotiating or committing to any potential sale of TransCare's assets;

c. Disclosing TransCare's financial information to third parties;

d. Obtaining debt financing;

e. Changing auditors;

f. Engaging legal counsel;

g. Hiring employees with salaries in excess of $100,000; and

h. Conducting any reduction in force that could reasonably be expected to require analysis under federal or state WARN laws.

51. The Authority Matrix provided that various actions could only be taken if conducted pursuant to an "Annual Plan" approved by TransCare's Board, including:

a. Committing to any capital expenditures, non-real property leases, or licensing arrangements in excess of $50,000;

b. Entering into contracts or other commitments with customers; and

c. Entering into certain non-customer contracts that either require TransCare to borrow funds or have an annual revenues contract value or required capital expenditure commitment in excess of $250,000.

52. The Authority Matrix provided that the actions listed did not constitute an exhaustive list of all actions for which the "Designated Executive" lacked authority to act.

53. Under the Authority Matrix, if no "Designated Executive" had been appointed, TransCare's Board was required to approve any actions listed on the Authority Matrix.

54. During the Relevant Time Period, TransCare had no "Designated Executive" or "Annual Plan" under the Authority Matrix.

55. Glenn Leland testified that Patriarch Partners refused to grant permission for TransCare to seek alternative sources of financing, and Tilton did not authorize anyone else to do so on TransCare's behalf.

56. Glenn Leland testified that on January 7, 2016, he met with Randy Jones, a managing director at Patriarch Partners, Jean-Luc Pelissier, a platform leader at PPMG and Michael Greenberg, a credit officer at Patriarch Partners, in order to resign as CEO. His efforts to resign on that day were rejected.

57. As testified to by Glenn Leland, on January 8, 2016, Randy Jones and John Pothin, director of Human Resources at Patriarch Partners, terminated Leland's employment and directed him to destroy his "computer records."

58. TransCare did not have a Chief Executive Officer after January 8, 2016.

59. TransCare did not have a Chief Financial Officer after September 29, 2016.

60. Brian Stephen was an attorney and the Senior Director of Legal at Patriarch Partners.

61. Brian Stephen testified that his role was to report to and support Tilton in her capacity as director of TransCare, manager of PPAS and PPMG, collateral manager, manager of Tilton's personal funds, and director of Transcendence.

62. Brian Stephen had the following relationship with TransCare:

   a. Stephen testified that the general practice at TransCare was for management to communicate all information and requests to Tilton through him.

b. Stephen testified that Leland did not have authority to hire an attorney for TransCare without Tilton's consent.

c. Jean-Luc Pelissier (described below) testified that Stephen functioned as the "guardian of the authority matrix."

d. Leland testified that Stephen was to review and comment on any contracts into which TransCare was to enter.

63. Stephen took the following acts relating to TransCare:

a. In an email dated February 5, 2015, Stephen informed Leland that, in the absence of a Designated Executive under the authority matrix, Leland was prohibited from taking preliminary steps towards actions requiring Tilton's approval, as shown by JX 11.

b. In an email dated February 5, 2015, Stephen informed Leland that any exploration of other financing sources must be acknowledged and approved by Tilton, as shown by JX 11.

c. In an email dated February 24, 2016 at 12:07am (PX 231), Stephen directed Wolf to sign a Notice of Acceptance of Collateral, procuring TransCare's consent to foreclose on (1) TransCare's the MTA contract, (2) the stock of three of TransCare's subsidiary companies, (3) two vendor contracts and (4) all of TransCare's vehicles and equipment.

d. In an email dated February 25, 2016 at 10:53pm, Stephen directed TransCare's executives to move "the most valuable assets" away from TransCare, as shown by PX 238.

64. Jean-Luc Pelissier was a platform leader at PPMG.

65. Per his deposition testimony, Pelissier's role included providing consulting advice and analytical operating skills for the management teams of certain of PPMG's portfolio companies, including TransCare.

66. Pelissier took the following acts relating to TransCare:

a. Leland testified that in March of 2015, Pelissier prohibited him from communicating directly with Tilton under any circumstance.

b. In an e-mail dated February 9, 2016, Pelissier contacted the MTA and represented that he was acting as TransCare's "ownership representative" and that TransCare wished to transfer the MTA Contract to a different entity, as shown by JX 71.

c. In an email dated February 14, 2016, Pelissier provided detailed instructions to TransCare's executives to effectuate the transfer of TransCare's paratransit and several other of TransCare's divisions to Transcendence, as shown by PX 216.

d. In an email dated February 25, 2016 at 11:23pm, Pelissier directed TransCare's executives to physically remove TransCare's accounts receivables server from TransCare's warehouse, as shown by PX 237.

67. Per his deposition testimony, Scott Whalen, Whalen is Tilton's son-in-law and a Director of Portfolio Management at PPMG.

68. Whalen testified that his role included overseeing TransCare's general financial health.

69. Whalen took the following act relating to TransCare: in an email dated July 13, 2015 Whalen instructed Leland to inform National Express that TransCare was not for sale after National Express submitted a letter of intent, as shown by JX 41.

70. Per his deposition testimony, Michael Greenberg was a credit officer at Patriarch Partners.

71. Greenberg testified that his role included financial analysis, strategic analysis, corporate strategy development, and operational and financial performance improvement for TransCare.

72. Greenberg took the following acts relating to TransCare:

a. On February 25, 2015, Greenberg executed Amendment 24 to the PPAS Credit Agreement on behalf of TransCare, as shown by PX 39, which provided for PPAS to enter into a Revolving Credit Commitment with TransCare of up to $1,100,000 to be funded by Zohar III, Limited.

b. On March 5, 2015, Greenberg executed Amendment 25 to the PPAS Credit Agreement on behalf of TransCare, as shown by PX 47 , which provided for the Revolving Credit Commitment to be increased to $1,350,000 and for the Tranche F term loan to be reduced by $1 million.

c. In an email dated October 7, 2015, Greenberg instructed Leland to issue the interest payment to Patriarch immediately, despite "the fact that the company will not have adequate funds to make payroll tomorrow," as shown by PX 93.

d. Glenn Leland testified that Greenberg, together with Pelissier, "instructed the CFO and I not to pay bills, to extend out the accounts payable as long as the supplier would tolerate, and if the supplier pushed back and it created an operational issue, to switch suppliers, but not to pay the bills" and that "this was described as the Patriarch way."

e. Glenn Leland testified that Leland was directed to meet with Michael Greenberg on a regular basis for Greenberg to review and approve which of TransCare's vendors were to be paid and when.

f. On December 18, 2015, Greenberg emailed Tilton an historic comparables chart and a list of companies "regarding transactions for ambulance companies and Air Medical companies," as shown JX 55.

g. On December 24, 2015, Greenberg emailed Wells Fargo a timeline for the sale of TransCare's assets, as shown by JX 60.

h. On December 24, 2015, Greenberg emailed Tilton a follow-up overview of ambulance transactions which listed additional investment bankers with experience in ambulance transactions, as shown by JX 61.

i. Greenberg testified that he had prepared these documents as the result of a discussion with Wells Fargo in contemplation of funding the company for a potential sale.

j. In an email dated February 10, 2016, as shown by PX 197, Greenberg directed Wolf to execute loan documents back-dated to January 15, 2016 on behalf of Ark II, including (1) the Ark II Credit Agreement, (2) the 2016 Intercreditor Agreement, (3) the Ark II Security Agreement, and (4) the related guaranty.

4. <u>Contentions As to Offers for TransCare</u>

73. Between February 2015 and February 2016, numerous parties extended expressions of interest or offers to purchase all or portions of TransCare. The offers ranged from $8 million to $80 million, although none of them could get past the initial stage because Tilton would not allow it.

74. On February 5, 2015, Leland reported to Pelissier and Brad Schneider, a Director of Portfolio Management at Patriarch Partners, that he was "approached by National Express" to acquire TransCare's paratransit contract for $15 to $18 million, and that National Express was "confident they could provide a $1.7 million deposit on Monday, if we elect to move forward," as shown by PX 20.

75. On February 10, 2015, Richmond County Ambulances Services ("RCA") sent Tilton an email "to inquire if you and the TransCare team had any interest in either a sale or management takeover to operate the company in NYC as well as outside of the NYC territory," as shown by PX 73.

76. On March 7, 2015, Leland reported to Tilton that National Express is "interested in buying our MTA business and have suggested an immediate purchase of $14 to $18 million." He also reported that "National Express is prepared to make an immediate down payment this week" and is "willing to buy all the assets of TransCare," as shown by JX 29.

77. On March 7, 2015, Leland reported to Tilton that RCA "are interested to buy TransCare and have sent an email proposing $60 to $80MM as valuation," as shown by JX 29.

78. On July 8, 2015, American Medical Response ("AMR") called Leland to buy TransCare's Westchester operations or all of TransCare's assets for an 8x EBITDA multiple, as shown by PX 85 and as testified to by Leland.

79. On July 8, 2015, RCA sent a follow-up email to Tilton "to inquire if you and the TransCare team had any interest in either a sale or management takeover to operate the company in NYC as well as outside of the NYC territory," as shown by PX 73.

80. On July 8, 2015, as shown in PX 85, Leland reported to Whalen and Greenberg that RCA had called "expressing interest in buying the company" for a "suggested [multiple] on EBITDA of 8X".

81. On July 10, 2015, National Express sent Leland Letter of Intent signed by its CEO David Duke offering to buy TransCare's paratransit contract and adult care shuttle business for $6 to $7 million, plus assumption of up to $2 million in liabilities, as shown in JX 40.

82. On July 13, 2015, Vincent DeVito, a portfolio manager at PPMG, emailed Greenberg to inform him that he had "received a call from Alluence Capital Advisors, representing a UK transport Co, National Express with an interest in acquiring TC Paratransit piece of TransCare," as shown by PX 83.

83. On July 22, 2015, Leland reported to Greenberg that Falck USA was "interested in buying all of TransCare," as shown by PX 85 and as testified to by Leland.

84. On July 22, 2015, Leland reported to Greenberg that AMR had called him to express interest in "all of TransCare," as shown by PX 85 and as testified to by Leland.

85. On December 8, 2015, Leland reported to Pelissier and Greenberg that National Express had "contacted me again this morning, to see if there is any interest in selling [the paratransit] contract," as shown by PX 113.

86. On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him "a few times" that day to reiterate that their offer to buy TransCare's paratransit contract was "still out there," as shown by PX 125.

87. On January 26, 2016, Northwell Health communicated to Carl Landeck, a Carl Marks Advisory consultant to TransCare, that it would be interested in a future potential joint venture with TransCare, as shown by PX 173.

88. On February 3, 2016, Tilton met with AMR to discuss their interest in acquiring TransCare, as shown by PX 191.

5. Contentions as to the Transcendence Transaction

89. Over the weekend of December 12-13, 2015, Tilton determined that "we would either need to sell, file for bankruptcy, unwind, or do some sort of transaction" with respect to TransCare, according to her deposition testimony.

90. On December 13, 2015, Bonilla provided Greenberg with revised 2016 financial projections for TransCare and provided updated versions of those projections to Greenberg thereafter in December 2015, as shown by PX 119.

91. By email dated December 16, 2015, Wells Fargo stated that it had learned Tilton intended to sell TransCare, as shown by PX 128.

92. On December 17, 2015, Stephen and Greenberg called Wells Fargo's counsel and proposed to fund TransCare through the Wells Fargo Credit Facility, as shown by PX 131. Their stated reasons for this proposal were to protect the funding from claims by the Zohar Funds and obtain the benefits of being part of the senior secured credit facility.

93. Wells Fargo did not approve the request to fund TransCare through the Wells Fargo Credit Facility, as shown by PX 131.

94. On December 17, 2015, Melissa Provost emailed Pelissier and Greenberg a summary of forbearance terms that had been "verbally agreed upon" that day in connection with a requested extension, as shown by PX 132.

95. On December 18, 2015, as shown by JX 55, Greenberg emailed Tilton and Pelissier to provide them with "the list we have been able to compile regarding transactions for ambulance companies and Air Medical companies," stating that the average revenue multiple was 1.8x and

the average EBITDA multiple was 10.1x and attaching a file called "Historic Comps Chart" with the following companies:

a. Rural/Metro Corp., with a revenue multiple of 1.0x and an EBITDA multiple of $10.7x;

b. Tri-State Care Flight, with a revenue multiple of 2.7x;

c. Air Medical, with an EBITDA multiple of 10.0x;

d. Envision, with a revenue multiple of 1.3x and an EBITDA multiple of 11.3x; and

e. Air Methods, with a revenue multiple of 2.3x and an EBITDA multiple of 8.2

96. Per Tilton's deposition testimony, on December 21, 2015, Pelissier and Greenberg met with Wells Fargo to discuss a possible six-month extension of the Wells Fargo Credit Facility to allow for a sale or restructuring.

97. Pursuant to a Forbearance Agreement dated December 22, 2015, Wells Fargo and TransCare agreed to extend the maturity date of the Wells Fargo Credit Facility to January 8, 2016. The agreement was executed by Leland on behalf of TransCare, as shown by PX 135.

98. On December 23, 2015 Wells Fargo informed Greenberg and Pelissier that it wanted a financial advisor for TransCare and a budget as part of any forbearance on the Wells Fargo Credit Facility, as shown by JX 59. According to its deposition testimony, Wells Fargo was willing to provide funding through to a sale of TransCare as long as it received a viable plan. Wells Fargo further testified that TransCare was severely undercapitalized and could not support the interest payments Tilton caused TransCare to pay to PPAS, and that Tilton refused Wells Fargo's repeated requests that Tilton cease causing TransCare to pay such amounts.

99. On December 24, 2015, Greenberg communicated to Wells Fargo that Patriarch had accepted Wells Fargo's request for a financial advisor for TransCare. Greenberg also provided

a schedule by which TransCare would be sold by September 30, 2016, as shown by JX 60 and JX 61.

100. On December 24, 2015, Greenberg updated Tilton on investment banks suitable to manage a sale of TransCare, reconfirmed the unsolicited calls from potential purchasers, resent the "Historic Comps Chart" file, and again stated that the average revenue multiple was 1.8x and the average EBITDA multiple was 10.1x, as shown by JX 61.

101. On January 2, 2016, Bonilla emailed an updated version of TransCare's 2016 financial projections to Greenberg and Pelissier, as shown by PX 143.

102. As Bonilla explained to Leland in an email dated the next day, "for six weeks they have delayed, asked for more data, and finally so much time elapsed we had to refresh all the numbers…," as shown by PX 146.

103. On January 5, 2016, Greenberg sent Tilton an updated version of TransCare's 2016 financial projections, including projected revenue and EBITDA, "to address the parameters that we discussed yesterday," as shown by JX 67.

104. On January 5, 2016, per Wells Fargo's deposition testimony, Wells Fargo agreed to cover an overdraft on TransCare's payroll account to help work towards a resolution for the sale of TransCare.

105. On January 7, 2016, Greenberg sent Carl Landeck, a senior advisor at Carl Marks Advisors ("Carl Marks"), the email he sent to Tilton on January 5 concerning TransCare's 2016 financial projections, including the "business model" itself. (PX 158)

106. By engagement letter dated January 11, 2016 and shown by JX 168, TransCare engaged Carl Marks as a consultant to TransCare Corporation. The engagement letter provided

that Carl Marks "will report directly to TransCare's Board of Directors … or its authorized representatives" and "Perform normal duties of the position of TransCare CFO."

107. On January 15, 2016, PPAS wired $1,172,757.53 to four different insurance companies, as shown by PX 167 and PX 168.

108. On January 27, 2016, Carl Marks sent to Greenberg, Pelissier and Jones 2016 financial projections for TransCare along with "an account of the key assumptions, risks, opportunities and priorities currently underlying the plan", as shown in PX 175.

109. On January 28, 2016, Greenberg prepared an updated version of the financial projections provided by Carl Marks on January 27, 2016 to present to Tilton, as shown by PX 179.

110. On January 29, 2016, PPAS wired $690,168.24 to certain of TransCare's creditors, including $613,000 to the New York State Insurance Fund, as shown by PX 184.

111. On February 3, 2016, Tilton resigned as collateral manager of the Zohar Funds effective March 3, 2016, according to her deposition testimony.

112. On February 9, 2016, Pelissier emailed the MTA asking about re-issuing the MTA Contract to "a different legal entity" and explaining that he was working with "the ownership representative of TransCare and our bank…." The MTA responded that they needed a few more days to determine a final position, but were "all in agreement or support this proposal." (JX 71).

113. The following events took place on February 10, 2016:

a. Tilton caused Transcendence and Transcendence II to be incorporated under the laws of Delaware.

b. Tilton as sole director of Transcendence and Transcendence II issued written consents implementing authority matrices similar to that of TransCare. (As per PX 200).

c. Tilton as sole director of Transcendence and Transcendence II appointed Glen Youngblood as its President, as shown by PX 200 (At this same time, Youngblood served as TransCare's Vice President of Performance Excellence.)

d. Greenberg told Youngblood that Transcendence II would be taking over the MTA Contract with an estimated $25 million in revenue and its other paratransit operations with an estimated $31 million in revenue. Greenberg noted that the division operating under the MTA Contract ran 168 routes but previously ran as many as 228 routes, as shown by JX 74.

e. Greenberg forwarded the same information to Lockton Insurance, as shown by PX 199.

f. Tilton authorized TransCare to engage Curtis Mallet as bankruptcy counsel.

g. Greenberg emailed Wolf, TransCare's then highest-ranking officer, with copies of the unsigned Ark II Credit Agreement dated January 15, 2016, related guaranty, Ark II Security Agreement dated January 15, 2016, and 2016 Intercreditor Agreement dated January 15, 2016, writing: "You never did get to execute these documents," as shown by PX 197.

114. On February 11, 2016, Stephen emailed the executed Ark II Credit Agreement, related guaranty, Ark II Security Agreement, and 2016 Intercreditor Agreement to Curtis Mallet.

115. Stephen served as the main TransCare contact for Curtis Mallet.

116. Per Tilton's deposition testimony, at the time of the execution of the Ark II Credit Agreement and the Ark II Security Agreement, she "was funding into a black hole" and "providing bridge funding to get accurate information and visibility … so I could figure out if there was a way forward for this company."

117. Tilton told others she would providing all the new working capital for the new venture because the financial model for the new business made sense.

118. TransCare never made – and Ark II never demanded – any payments to Ark II under the Ark II Credit Agreement.

119. There was no sinking fund for the Ark II Credit Agreement and the agreement did not provide for one.

120. On February 11, 2016, Stephen drafted the Notice of Acceptance for the strict foreclosure of TransCare's assets. This document was not produced by the Defendants because Patriarch Partners is asserting a privilege over it, as shown in PX 289 (Defendants' Privilege Log).

121. On February 11, 2016, Greenberg emailed Wolf and directed him to execute direction letters dated December 8, 2015 and January 5, 7, 15 and 29, 2016, as shown by PX 203.

122. Wolf signed the direction letters dated January 15 and 29, 2016, but stated his refusal to sign the three others because "On those dates I had no authority," as shown in PX 203.

123. The direction letters back-dated to January 15 and 29 directed Ark II to make the payments PPAS had made on January 15 and 29, 2016.

124. On February 14, 2016, Pelissier sent a "Progress and Action List" to Patriarch and TransCare officials – including Tilton – setting forth various steps for TransCare's bankruptcy filings and the Transcendence transaction, which included "Issu[ing] Worker Adjustment and Training Notification ("WARN") notice to all Old Co employees," as shown by PX 206.

125. On February 14, 2016, counsel for Patriarch Partners drafted a Transition Services Agreement, as shown by PX 213, which provided for TransCare's (1) MTA Contract, (2) telecommunications equipment and services, (3) insurance premiums, (4) EPCR equipment and

tablets and (4) five of Hudson Valley's ambulances to be transferred to Transcendence with the assistance of various TransCare personnel.

126. On about February 15, 2016, counsel for Patriarch Partners Kevin Dell drafted a Transcendence Transit Credit Agreement in connection with the formation and organization of Transcendence.

127. The Transcendence Transit Credit Agreement, as shown in JX 101, provided for Transcendence to borrow $10,000,000 at a rate of LIBOR plus 4% on a secured basis from Ark Angels III with PPAS serving as Administrative Agent.

128. Per Tilton's deposition testimony, Ark Angels III was an entity controlled by her.

129. On February 18, 2016, TransCare – excluding the Later-Filed Debtors – signed a revised engagement agreement with Curtis Mallet to advise on a chapter 7 filing, as shown by JX 78.

130. On February 19, 2016, Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations and outstanding payroll taxes from earlier pay dates, as well as other critical expenses. In response, Tilton told Carl Marks to "make decisions on what needs to be paid." Tilton did not instruct TransCare or Carl Marks to pay the payroll taxes, as shown by JX 88.

131. The IRS filed proofs of claim against TransCare asserting $1,474,273.02 in unpaid payroll taxes, $826,111.82 in penalties and $124,096.35 in interest, for a grand total of $2,424,481.19, largely relating to the 2016 tax year.

132. On July 6, 2017, the state taxing authorities filed proofs of claim against TransCare for $34,665.71.

133. On February 19, 2016, counsel for Wells Fargo emailed Tilton to inquire about the timing of sending WARN notices to TransCare employees prior to the foreclosure. In response, Tilton told Wells Fargo's counsel that "[n]otice cannot be given prior to a foreclosure on NEWCO or there will be no NEWCO," as shown by JX 88.

134. On February 22, 2016, Pelissier emailed the MTA to request a meeting "on where we are with our plans for TransCare and the MTA, following up on our face to face meeting a few weeks ago." (JX 92).

135. On February 23, 2016, PPAS sent $593,000 by wire transfer to the New York State Insurance Fund in connection with the purchase of a workers' compensation and employers' liability policy naming Transcendence Transit, Transcendence Transit II, and TransCare Hudson Valley as the insured parties, as shown by PX 226.

136. On February 23, 2016, Pelissier emailed Tilton a summary of his trip to the Hudson Valley, where he had met with representations for each of TransCare's contracts in the region.

137. By February 24, 2016 at 12:07 a.m., Tilton received confirmation from insurance broker Willis Towers Watson that workers' compensation and auto liability insurance policies had been bound, which was required for Transcendence to operate (according to her deposition testimony). Tilton testified that the receipt of the confirmation was the point at which she decided to proceed with the strict foreclosure by PPAS.

138. On February 24, 2016 at 12:07 a.m., Stephen e-mailed the Notice of Default and a three-paragraph "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" drafted by him and dated February 24, 2016 (the "Notice of Acceptance") to Wolf, as shown by PX 231. The Notice of Default was executed by Tilton on behalf of PPAS, the Zohar Funds, and AIP.

139. The Notice of Acceptance was not sent to Wells Fargo, Credit Suisse, or any other creditor of TransCare.

140. According to their deposition testimony, neither Wells Fargo nor Credit Suisse consented to the foreclosure.

141. The Notice of Acceptance was signed by Tilton for PPAS, Zohar I, Zohar II, Zohar III and AIP.

142. The Notice of Acceptance stated that PPAS was accepting the following collateral pursuant to section 9-620 of the Uniform Commercial Code in connection with the PPAS Credit Agreement: (i) the MTA Contract, but not the stock of the performing party thereunder, TransCare New York, Inc., (ii) the stock of the Later-Filed Debtors, (iii) the master lease agreement with First Financial, (iv) a vendor contract and (iv) all of TransCare's personal property, excluding account receivables, non-enumerated contracts/ leases and the stock of the other TransCare entities.

143. The Notice of Acceptance represents that the acceptance of the collateral was made in satisfaction of $10,000,000 owing under the PPAS Credit Agreement.

144. According to the proofs of claim filed by PPAS, the balance owing under the PPAS Credit Agreement was $34,771,873.10 "inclusive of a $10,000,000 credit as a result of a strict foreclosure carried out prepetition."

145. Per Tilton's deposition testimony, the $10,000,000 credit was based off the book value of the assets transferred via the "strict foreclosure."

146. Tilton did not engage a third-party appraiser to value the assets transferred via the "strict foreclosure."

147. Per Tilton's deposition testimony, the $10,000,000 credit had not actually been provided and that the statement in PPAS' proofs of claim that the credit had been provided "was a decision made by the lawyers."

148. Pursuant to a Bill of Sale, Agreement to Pay and Transfer Statement dated February 24, 2016 (the "<u>Bill of Sale</u>"), TransCare's assets described in the Notice of Acceptance were transferred to Transcendence, as shown by JX 102.

149. On February 24, 2016, Tilton executed a written consent authorizing Transcendence II to enter into an Assignment Agreement with TransCare New York, Inc. providing for the MTA Contract to be assigned to Transcendence II. The written consent stated that "the MTA has heretofore provided TransCare with its consent to the Assignment." (As shown by PX 240.

150. On February 24, 2016, Greenberg provided Lockton, TransCare's insurance broker, with the 2016 projected financial information for Transcendence based upon their assets' expected performance, in connection with binding the insurance for Transcendence. (PX 228)

6. <u>Contentions as to Post-Bankruptcy Filing Events</u>

151. At approximately 12:00 p.m. on February 25, 2016, Salvatore LaMonica as chapter 7 trustee met with Carl Marks, counsel for TransCare, PPAS and Wells Fargo, at Curtis Mallet's offices. Among the topics discussed were whether and how the Trustee could keep TransCare's operations going.

152. At that meeting, counsel for PPAS advised the Trustee that PPAS had conducted a strict foreclosure of the paratransit, Pittsburgh and Hudson Valley divisions and told that those divisions' assets were not part of the bankruptcy estates.

153. After the meeting on the evening of February 25, 2016, the Trustee instructed TransCare's dispatcher to tell all of the ambulance drivers return the ambulances relating to the Initial Debtors to their dispatcher locations or a local firehouse. As the employees returned with the ambulances, they were told that the business was shut down. After that point, the employees stopped coming to work.

154. At 10:53 p.m. on February 25, 2016, Stephen emailed TransCare's executives and directed them to move and secure for themselves as many as possible. He told them, the "senior lenders for TransCare foreclosed on all of its assets and those assets were sold to Transcendence Transit." (PX 238).

155. At 11:23 p.m. on February 25, 2016, Pelissier emailed a plan to Stephen, Greenberg, Jones, John Pothin (a Managing Director at Patriarch Partners) and Transcendence to take TransCare's server to allow for the continued operation of the MTA paratransit business segment and to provide for the continued operation of the Hudson Valley and Pittsburgh business segments. (PX 237)

156. At 11:37 p.m. on February 25, 2016, Stephen instructed Transcendence to inform its employees that those employees who "continue to work as scheduled" that: "If the TransCare bankruptcy estate does not make payroll for last week, Transcendence Transit will pick up that liability and pay Transcendence Transit employees for their last week of work for TransCare," as shown by JX 103.

157. Later that night, Youngblood informed the Trustee's counsel of the seizure of assets at Stephen's direction, as shown by PX 241. The Trustee's counsel informed Transcendence's President that the seizure of assets was inappropriate.

158. At 2:19 a.m. on February 26, 2016, Youngblood quoted Stephen's representation made Stephen's February 25 email (above at paragraph 151) to the employees of Hudson Valley and Pittsburgh business segments via email, as shown by PX 240.

159. At 3:26 a.m. on February 26, 2016, Youngblood resigned as President of Transcendence, as shown by PX 241.

160. As of 8:20 a.m. on February 26, 2016, the Hudson Valley business segment operations were still ongoing, as shown by PX 242.

161. At 9:15 a.m. on February 26, 2016, Greenberg promised to provide a letter to the Pennsylvania Department of Health regarding Transcendence's ownership structure so that the Pittsburgh business segment could be licensed, as shown by PX 243. The letter was never provided.

162. At 2:00 p.m. on February 26, 2016, PPAS' counsel called the Trustee's counsel to seek the Trustee's consent to the termination of the MTA Contract to allow for Transcendence II to enter into a new paratransit services agreement with the MTA, as shown by JX 105.

163. At 2:00 p.m. on February 26, 2016, PPAS' counsel emailed the Trustee to ask him to consent to the termination of the MTA Contract, as shown by JX 105.

164. At 2:09 p.m. on February 26, 2016, Stephen emailed the MTA for confirmation that Transcendence II can bill and receive payment for services while the process of issuing a new paratransit services contract to Transcendence II was completed, as shown by PX 244.

165. At 5:07 p.m. on February 26, 2016, the Trustee provided his consent to the termination of the MTA Contract to PPAS' counsel with the proviso that the termination be without prejudice to the amounts owing to TransCare under the MTA Contract, as shown by JX 105.

166. At 7:00 p.m. on February 26, 2016, Stephen emailed the MTA that Transcendence will be unable to provide services to the MTA because the employees had been told that operations were being discontinued, as shown by PX 245.

167. On February 26, 2016, the Trustee sought authorization from the Bankruptcy Court to operate the Initial Debtors on an interim basis solely to wind down their operations. On February 29, 2016, PPAS filed a response to the Trustee's motion [Dkt. 11].[12] On March 25, 2016, the Bankruptcy Court entered an order granting the Trustee's request [Dkt. 51].

168. On February 27, 2016, the Pittsburgh Operations were shut down, as shown by PX 247.

169. On February 29, 2016, Credit Suisse was informed for the first time of TransCare's bankruptcy filings when Wolf told them of the filings, as shown by PX 249. At deposition, Credit Suisse testified that it had no prior knowledge of the Transcendence transaction, the "strict foreclosure," or the $10,000,000 reduction of the obligations owing under the PPAS Credit Agreement

170. On March 3, 2016, Stephen sent an email to the New York State Insurance Fund confirming the request to cancel the workers' compensation insurance for TransCare Hudson Valley, Inc., as shown by PX 253.

171. PPAS filed numerous documents with the Bankruptcy Court attesting that the strict foreclosure had in fact occurred and that PPAS was entitled to the benefits of the same.

172. On March 17, 2016, the Trustee filed a motion asking the Bankruptcy Court to approve the stipulation and authorize the sale of the CONs and certain of TransCare's personal property, to which PPAS filed a response.

[12] Unless otherwise noted, all citations to the docket are to the docket in Case No. 16-10407.

7. Contentions as to the Postpetition Liquidation and Distribution of TransCare's Assets

173. By orders entered July 7, 2016 [Dkt. 199, 200, 201, 202, 203, 204, 205], the Bankruptcy Court approved the following sales of the CONs pursuant to which TransCare operated its ambulances in New York (as further described below): (i) No. 164 for $3,900,000, (ii) No. 470 for $1,500,000, (iii) No. 508 for $1,200,000, (iv) No. 509 for $1,300,000, (v) No. 510 for $1,300,000, (vi) No. 574 for $1,150,000 and (vii) No. 667 for $1,900,000. These amounts total to $12,250,000.

174. The costs of selling the CONs are comprised of the following: (i) a $90,000 break-up fee owing to Maler Group, LLC [Dkt. 201], (ii) the Trustee's expenses of $204,840.25 [Dkt. 379 at Ex. C, p. 153] and (iii) TransCare's Patient Care Ombudsman's expenses of $28,820 [Dkt. 381]. Of the Trustee's expenses, $2,300 related to the sale of CON No. 667.

175. By order entered March 25, 2016 [Dkt. 52], the Bankruptcy Court authorized certain of TransCare's personal property to be sold via public auction. The public auctions of such personal property resulted in proceeds of $2,354,435.45 [Dkt. 257, 258].

176. The costs of selling the personal property are comprised of the following: (i) the auctioneer's commissions of $294,304.45 [Dkt. 257, 258] and (ii) the Trustee's expenses of $149,269 [Dkt. 379 at Ex. C, p. 259].

177. The sale of personal property included the public auction of property leased pursuant to the master lease with First Financial Corporate leasing, LLC d/b/a First Financial Healthcare Solutions ("First Financial"), and such sale obtained proceeds of $73,500 (of which $40,929.52 was paid to First Financial) [Dkt. 232].

178. TransCare's account receivables were collected postpetition by Wells Fargo [Dkt. 51] and the Trustee [Dkt. 261]. These collections were as follows:

a. $2,564,362.78 in account receivables collected directly by Wells Fargo or parties other than TransCare (excluding collection costs);[13]

b. $2,430,000 paid to the Trustee in connection with a settlement agreement with the MTA and the Metropolitan Transportation Authority [Dkt. 311, 331];

c. $175,003 pursuant to a settlement agreement with Bronx-Lebanon Hospital Center [Dkt. 288];

d. $420,000 pursuant to a settlement agreement with St. Barnabas Hospital [Dkt. 288]; and

e. $88,000 paid to TransCare's estates in connection with a settlement agreement with Montefiore Medical Center, Montefiore Mount Vernon Hospital and Montefiore New Rochelle Hospital [Dkt. 329, 365].

179. Pursuant to the Personal Property Stipulation, the Trustee paid out $600,000.01 to PPAS on about July 14, 2016 and $200,000 to PPAS on an interim basis on about September 13, 2016. The stipulation provided that "nothing herein shall be deemed to waive any and all claims … which the Trustee and the Debtors' estates have, had, may ever have or may ever claim to have against any third parties including, but not limited to, PPAS, [the lenders to the PPAS Credit Agreement], and/or Transcendence…."

[13] This amount is calculated by subtracting the amounts paid to Wells Fargo from the Wells Fargo loan balance of $13,383,573 as of February 24, 2016. The Wells Fargo loan was paid in full, as reflected by the proof of claim filed by Wells Fargo. Postpetition, Wells Fargo was paid (i) $595,003 in connection with the settlement agreements with Bronx-Lebanon Hospital Center and St. Barnabas Hospital [Dkt. 288], (ii) $8,451,770.53 in connection with the sale of the CONs [Docs. 367, 370] and (iii) $1,772,436.69 in connection with the sale of the CONs and the settlement with the MTA and the Metropolitan Transportation Authority [Docs. 474, 329 at ¶¶24-26]. These amounts total to $10,819,210.22, and $13,383,573 minus $10,819,210.22 is equal to $2,564,362.78.

180. The proofs of claim filed by Ark II on about October 7, 2017 state that the balance owing under the Ark II Credit Agreement was reduced by the foregoing $800,000 amount.

8. Contentions as to TransCare's Legal Claims

a. Contentions Common to all Claims

181. At its core, this case concerns Lynn Tilton's actions, as the sole director of TransCare, once she determined to sell or reorganize TransCare. Beginning on or about December 12, 2015, and culminating in the transactions of February 24, 2016 —a 12:07 am foreclosure notice from PPAS, a transfer of TransCare's profitable businesses to Transcendence, Tilton's new company, and a Chapter 7 filing of TransCare's remaining businesses, all within 18 hours of each other — Tilton effectively sold and reorganized TransCare for her own benefit. Tilton personally conducted or directed these actions in her own self-interest and standing on all sides of the transaction. As such, the Transcendence transaction is subject to the entire fairness standard. Nevertheless, Tilton has offered no basis on which to conclude the transaction was either the product of fair dealing, or undertaken at a fair price.

182. By executing the Transcendence transaction, Defendants deprived TransCare of the ability to monetize TransCare's assets as a going concern. TransCare recovered less through liquidation sales than TransCare could have recovered had Defendants sold or restructured TransCare in a disinterested manner.

183. Had TransCare's assets been sold as a going concern, either in whole or in part, TransCare would have recovered more for the assets than it received in liquidation.

b. Contentions Specific to specific claims

184. Breach of Fiduciary Duty Against Lynn Tilton

a. Tilton owed fiduciary duties of loyalty and good faith to TransCare.

b. *The Transcendence Transaction*

i. Because Tilton was on both sides of the Transcendence transaction, the transaction is subject to the entire fairness test under Delaware law.

ii. The Transcendence transaction was not the result of fair dealing and not at a fair price.

iii. Tilton breached her fiduciary duties to TransCare through the Transcendence transaction.

iv. As of result of the breach, TransCare suffered damages equal to the lost going concern value that otherwise could have been realized.

c. *WARN Act/ Payroll Tax Liabilities*

i. Tilton had an obligation under the duty of loyalty and good faith not to cause TransCare to violate the law.

ii. Tilton was advised of TransCare's obligations under the WARN Acts and federal/ state payroll tax laws and took no steps to comply.

iii. To the extent TransCare is found liable for any violation of the WARN Act or failure to pay payroll taxes, any damages that flow therefore were caused by Tilton's breach.

185. Actual Fraudulent Transfer Against PPAS, Ark II, Transcendence and Transcendence II

a. On February 24, 2016, Tilton caused the following property to be transferred to PPAS and then to Transcendence and Transcendence II: (i) the MTA Contract, (ii) the stock of the Later-Filed Debtors, (iii) the master lease agreement with First Financial, (iv) a vendor contract and (iv) all of TransCare's personal property.

b. Tilton did so for the benefit of herself and her companies and with the actual intent to hinder, defraud or delay TransCare's then present and future creditors.

c. The Trustee is entitled to recover the value of the transferred assets pursuant to Bankruptcy Code section 548(a)(1)(A) and New York Debtor & Creditor Law section 276, because the transfer deprived TransCare of the ability to monetize them as a going concern. The Trustee seeks the value of these assets on the date of the transfer, which Tilton herself valued at least $22 million, and which the Trustee's expert values at $23 to $39 million, less the approximate $6 million obtained by the Trustee for these assets in liquidation.

d. As a result, PPAS' and Ark II's proofs of claim should be disallowed pursuant to Bankruptcy Code section 502(d) until said value is recovered.

e. The Trustee incurred reasonable attorneys' fees avoiding and recovering the subject transfer and, accordingly, is entitled to recover such fees pursuant to New York Debtor & Creditor Law section 276-a.

186. <u>Equitable Subordination Against PPAS, Ark II, PPMG and Patriarch Partners</u>

a. PPAS, Ark II, PPMG and Patriarch Partners exercised were insiders of TransCare by virtue of Tilton's common ownership or control of all of the foregoing entities.

b. The Transcendence transaction consummated by PPAS, Ark II, PPMG and Patriarch Partners amounted to inequitable conduct towards TransCare and its creditors.

c. Said conduct resulted in injuries to TransCare's creditors and sought to confer an unfair advantage on their common owner's behalf.

d. Subordinating their claims advances the goals of bankruptcy.

e. In particular, subordination of PPAS's claim to Ark II's claim is equitable because PPAS agreed to payment and structural subordination to Ark II in connection with the Transcendence transaction and Tilton's bankruptcy planning for TransCare.

f. Equitable subordination is also appropriate due to Defendants' violations of the automatic stay.

g. The proofs of claim asserted by PPAS, Ark II, PPMG and Patriarch Partners should be subordinated to unsecured creditors and any corresponding security interests should be transferred to TransCare's estates pursuant to Bankruptcy Code section 510(c). In addition, PPAS's claim should be subordinated to that of Ark II.

187. <u>Claims Against Ark II Secured Claim</u>

a. The Trustee asserts three claims in the alternative seeking to avoid the Ark II security interest and preserve it for the benefit of the estate. Either (a) it should be re-characterized as an equity investment, because that was its actual intent, (b) to the extent not intended as equity, it should be avoided as a constructive fraudulent

transfer because it was granted without consideration, or (c) to the extent there was consideration, it should be avoided as a preference because it was made on account of antecedent debt and enabled Ark II to recover more than it otherwise would have recovered.

b. Debt Recharacterization Against Ark II

i. Ark II did not anticipate that the Ark II Credit Agreement would be repaid from TransCare.

ii. Ark II did not intend for the Ark II Credit Agreement to be a true loan.

iii. The correlation between Ark II's equity ownership amount in TransCare and in Transcendence indicates that the Ark II Credit Agreement was intended to be an equity contribution.

iv. The Ark II Credit Agreement was an equity infusion in economic substance.

v. The proofs of claim asserting rights to payment under the Ark II Credit Agreement should be disallowed under Bankruptcy Code section 502.

vi. The purported security interest granted by the Ark II Credit Agreement should be preserved for the benefit of TransCare's estates pursuant to Bankruptcy Code sections 506(d) and 551.

c. Constructive Fraudulent Transfer Against Ark II

i. Ark II was an insider of TransCare.

ii. Ark II gave nothing to TransCare in exchange for the grant of a security interest under the Ark II Security Agreement.

iii. The purported grant of the security interest via the Ark II Security Agreement was made at a time when TransCare was engaged and was about

to engage in business for which its remaining property constituted unreasonably small capital.

iv. The purported grant of the security interest via the Ark II Security Agreement was made at a time when TransCare intended and believe that it would incur debts beyond its ability to pay as they came due.

v. The purported grant of the security interest via the Ark II Security Agreement can be avoided pursuant to New York Debtor & Creditor Laws sections 273, 274, and/ or 275, with the lien preserved for the benefit of TransCare's estates pursuant to Bankruptcy Code section 551 and Ark II's proofs of claim disallowed pursuant to Bankruptcy Code section 502(d) until said lien is so transferred.

d. Preferential Transfer Against Ark II

i. To the extent Ark II actually advanced funds to TransCare's creditors on January 15 and 29, 2016 and, by doing so, obtained an unsecured claim against TransCare, then TransCare's grant of a security interest to Ark II on February 10 or 11, 2016, was made in respect of an antecedent debt.

ii. The grant was made within two weeks of the bankruptcy filing while TransCare was presumptively and actually insolvent.

iii. If the resulting lien were not avoided, Ark II would receive more than it would otherwise receive in a chapter 7 liquidation had the transfer not been made.

iv. Said grant can be avoided pursuant to Bankruptcy Code section 547, with the lien preserved for the benefit of TransCare's estates pursuant to

Bankruptcy Code section 551 and Ark II's proofs of claim disallowed pursuant to Bankruptcy Code section 502(d) until said lien is so transferred.

188. Automatic Stay Violation Against All Defendants

a. The Defendants were aware of TransCare's February 24, 2016 bankruptcy filings.

b. After the bankruptcy filing, the Defendants, or individuals working on their behalf, actively interfered with the Trustee's ability to marshal estate property so that they could capture said value for the benefit of Tilton and her companies.

189. Contractual Payment Subordination Against PPAS

a. Under section 2.2 of the 2016 Intercreditor Agreement and Bankruptcy Code section 510(a), PPAS is not entitled to receive distributions on account of its proofs of claim unless and until Ark II is paid in full on account of its proofs of claim.

b. The Trustee has standing to enforce this provision because TransCare was a party to the 2016 Intercreditor Agreement. TransCare signed the agreement, undertook affirmative obligations pursuant to the agreement and the agreement was entered into for TransCare's purported benefit. Any provision in the 2016 Intercreditor Agreement to the contrary is both unenforceable and at odds with the agreement itself.

190. Limitation on Liens Against PPAS and Ark II

a. PPAS's and Ark II's inequitable conduct caused TransCare to liquidate to the detriment of its other creditors. Therefore, the equities of the case exception in

Section 552(b) applies, and their blanket liens should not extend to postpetition proceeds of their collateral.

191. Turnover and Avoidance Against PPAS and Ark II

a. The Trustee paid $800,000.01 to PPAS out of amounts received by the Trustee's liquidation sales of estate assets, pursuant to the Personal Property Stipulation. PPAS transferred those funds to Ark II pursuant to the 2016 Intercreditor Agreement, to satisfy Ark II's claim against TransCare.

b. PPAS failed to disclose that Ark II held a senior lien (or any lien) on the assets and failed to disclose that the $800,000.01 would be used to pay down Ark II's claim.

c. The transfer of the $800,000.01 to Ark II was not authorized by a court order or the Bankruptcy Code, and can be avoided pursuant to Bankruptcy Code section 549.

d. PPAS was not entitled to receive the $800,000.01 distribution from the Trustee for all of the reasons set forth herein and must return $800,000.01 to the Trustee. PPAS' proofs of claim must be disallowed pursuant to Bankruptcy Code section 502(d) until said amount is returned.

e. Ark II was not entitled to receive the $800,000.01 distribution from the Trustee for all the reasons set forth herein and must return $800,000.01 to the Trustee. Ark II's

proofs of claim must be disallowed pursuant to Bankruptcy Code section 502(d) until said amount is returned.

f. The transfer can be recovered pursuant to Bankruptcy Code section 550(a), with Ark II either the initial transferee (because PPAS was a mere conduit) or the subsequent transferee.

B. Defendants' Contentions

1. Defendants object to the "facts" set forth in sections IV.A.1-7 of the "Plaintiff's Contentions." The "facts" are inappropriate to include in a pretrial order and consist largely of irrelevant, inadmissible and/or false statements.

2. Claim 1 – Breach of Fiduciary Duty against Lynn Tilton

    a. The Trustee cannot prove Ms. Tilton breached her fiduciary duties of loyalty or good faith to TransCare.

    b. What the Trustee refers to in conclusory fashion as the "Transcendence transaction" is actually a conflation of multiple events that occurred over the course of a year. The proposed restructuring of TransCare involving Transcendence was first developed in February 2016, only after Wells Fargo made clear that it was unwilling to continue to provide access to funding as the Debtors' asset-based lender. Thus, events that occurred, and decisions that Ms. Tilton made, before February 2016 had nothing to do with the Transcendence plan.

    c. The Trustee will not be able to prove any breach of loyalty based on Ms. Tilton's decision not to pursue a sale of the paratransit business under MTA

Contract or other TransCare assets throughout 2015. There were a number of sound business reasons why a sale of the paratransit business made no sense, none of which implicated Ms. Tilton's personal interests. It is undisputed that the paratransit business was TransCare's most valuable business line and contributed the majority of TransCare's positive EBITDA. Had that business been sold, TransCare's EBITDA would have immediately turned negative, rendering the company unsustainable as a going concern. TransCare's management, and Mr. Leland in particular, did not account for this fact or provide any actionable plan for addressing it. Moreover, although Mr. Leland apparently assumed that proceeds from such a sale could be used by TransCare to fund the company's capital needs, per the plain terms of the Wells Fargo Credit Facility, PPAS Credit Agreement, and Ark II Credit Agreement, the proceeds could not be used for that purpose, but rather would have to be paid to TransCare's secured lenders to reduce TransCare's debt obligations. Likewise, the evidence will show that there were never any actionable offers to purchase TransCare's entire business and, in any case, Ms. Tilton's decision not to try to sell the company during 2015 given its unstable financial condition was entirely reasonable, as such a sale would not be value maximizing.

d. Ms. Tilton did not breach her fiduciary duties of loyalty or good faith to TransCare in proposing to Wells Fargo a restructuring of TransCare in February 2016, including actions taken in respect of the formation of Transcendence and the foreclosure of the Subject Collateral (as defined in

the Notice of Acceptance). There is no evidence that any of the steps she took were motivated by anything other than a desire to save the jobs of many TransCare employees while providing for an orderly wind down of TransCare's unprofitable business lines so that Wells Fargo could be made whole. The Subject Collateral was never ultimately transferred to Transcendence. Nor was it "stolen" or "kept" by PPAS or the Term Loan Lenders. Rather, through negotiations between counsel and a court-endorsed stipulation (described in greater detail below), some of the Subject Collateral was auctioned off by the Trustee during the course of these cases.

e. Nor can the Trustee prove that any breach of the duty of loyalty by Ms. Tilton resulted in any WARN or tax liability to TransCare. As already explained, Ms. Tilton did not act disloyally and, regardless, nothing she did or did not do led to the failure of either TransCare as a going concern or her proposed plan to restructure the company. If anything, the evidence will show that she worked diligently to save jobs but, ultimately, was unable to do so without the cooperation of Wells Fargo and the Trustee

f. Even if Ms. Tilton breached her fiduciary duties to TransCare (she did not), the Trustee will not be able to prove any damages to TransCare because the Trustee's expert's damages calculations are unreliable for many reasons, including that they rely on the counterfactual assumption that TransCare had a going concern value on his valuation dates that was higher than the liquidation value.

3. Claim 3 – Equitable Subordination against PPAS, Ark II, PPMG and Patriarch Partners

    a. PPAS, Ark II, PPMG, and Patriarch Partners (the "Defendant Creditors") are not insiders or fiduciaries of TransCare because they did not exercise day-to-day control over TransCare or otherwise control its finances.

    b. Moreover, the Trustee cannot prove any inequitable conduct by the Defendant Creditors, including any action taken by the Defendant Creditors in respect of the Ark II Credit Agreement.

    c. To the extent the conduct complained of by the Trustee had any impact, it would have been on one or more of the Term Loan Lenders or Wells Fargo. There was no injury to the estate itself. The Trustee lacks standing to assert a claim for equitable subordination based on any conduct of the Defendant Creditors that allegedly injured any of the Term Loan Lenders or Wells Fargo (which has been paid in full in any event), as the alleged injury would be particularized to them and not shared by the general body of creditors.

    d. The Trustee has the burden of showing both unfair advantage to the Defendant Creditors and harm to TransCare or its creditors as a whole. Here, the alleged conduct of the Defendant Creditors did not confer upon them an unfair advantage nor result in injuries to TransCare or TransCare's creditors.

    e. Subordinating the claims of the Defendant Creditors is inconsistent with the Bankruptcy Code.

    f. The proofs of claim filed by the Defendant Creditors should not be subordinated to general unsecured claims and any corresponding security

interests should not be transferred to TransCare's estates pursuant to 11 U.S.C. § 510(c) of the Bankruptcy Code.

4. Claim 4 – Debt Recharacterization against Ark II

   a. Ark II advanced approximately $1.9 million to TransCare. Ark II and TransCare intended for the advances to be repaid. The funds were advanced pursuant to a valid loan agreement—the Ark II Credit Agreement—that contained a maturity date and provided for the repayment of principal as well as accrued interest.

   b. The funds advanced by Ark II were secured through priority interests in Collateral (as defined in the Ark II Security Agreement). Ark II perfected its security interests in the Collateral through the filing of UCC statements.

   c. The Ark II advances were used for working capital and general corporate purposes.

   d. The funds Ark II advanced to TransCare were not made in proportion to its equity investment in TransCare. No other beneficial or record equity-holder of TransCare is alleged to have advanced the funds that are the subject of Ark II's proof of claim.

   e. The Trustee cannot establish the vast majority of the eleven factors set forth in *In re AutoStyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001) in order to recharacterize the Ark II Credit Facility as equity. Accordingly, the proofs

of claim asserting rights to payment under the Ark II Credit Agreement should be allowed under 11 U.S.C. § 502 of the Bankruptcy Code.

5. Claim 7 – Actual Fraudulent Transfer against PPAS, Ark II, Transcendence, and Transcendence II

    a. The Trustee cannot prove the first element of a cause of action under 11 U.S.C. § 548(a)(1)(A) because none of the Subject Collateral (as defined in the Notice of Acceptance) was physically transferred to PPAS, Ark II, or Transcendence. To the extent there was a transfer of title on paper, no value was actually lost by TransCare. For the same reasons, the Trustee is not entitled to relief under § 276 of the New York Debtor Creditor Law ("DCL").

    b. If the Court were to determine that some or all of the Subject Collateral was transferred to PPAS, Ark II, or Transcendence, the Trustee cannot establish the actual fraudulent intent of the transferor/debtor required to avoid the transfers under 11 U.S.C. § 548(a)(1)(A) or § 276 of the DCL, made applicable through 11 U.S.C. § 544(b) of the Bankruptcy Code.

    c. If the Court were to determine that some or all of the Subject Collateral was transferred to PPAS, Ark II, or Transcendence and that such transfers are avoidable, recovery by the Trustee would constitute a windfall to the estate and a prohibited double recovery under 11 U.S.C. § 550(d) because the Subject Collateral was in the physical control of the Trustee and sold by him in connection with the Stipulation Approving the Sale of Certain Personal Property [Docket No. 52].

d. In any case, no value was lost by TransCare as a result of the alleged transfers. The Subject Collateral was worth no less to the Debtors as a result of the foreclosure than it would have been absent the foreclosure.

e. A claim for attorneys' fees under Section 276-a of the DCL must be based on a successful claim to recover a fraudulent transfer under Section 276 of the DCL. Because the Trustee will be unable to establish that he is entitled to recover anything, he cannot recover attorneys' fees under Section 276-a of the DCL.

6. Claim 9 – Automatic Stay Violation against all Defendants

a. The Trustee is not entitled to a judgment holding the Defendants in contempt or the imposition of sanctions against Defendants because the Trustee cannot establish that the Debtors were injured by any purported violation of the automatic stay.

b. None of the Subject Collateral lost value as a result of the alleged violation of the automatic stay.

c. At all relevant times, the estate held, at best, only legal title to the Subject Collateral, which had been pledged as security to the Debtors' secured lenders.

d. The order entered by the Court approving the Personal Property Stipulation [Docket No. 52] resulted in the sale of Subject Collateral and specified what the Trustee's rights would be in the event PPAS's foreclosure was ultimately found to be invalid, thus mooting any technical violation of the automatic stay.

7. Claim 10 – Preferential Transfer against Ark II

   a. The Trustee cannot avoid TransCare's grant of a security interest to Ark II (the "Ark II Security Interests") because the Trustee cannot demonstrate by a preponderance of the evidence that the Ark II Security Interests enabled Ark II to receive more than it would receive if Ark II received payment on the debt in a chapter 7 liquidation, rather than through the transfer. Under the Ark II Security Agreement, Ark II is fully secured with liens on all of the assets of the Debtors. Payments to a fully-secured creditor are not preferential because the creditor would receive the full value of its collateral in a chapter 7 liquidation.

   b. If the Court nonetheless considers the Trustee's preference claim, Ark II has a defense pursuant to 11 U.S.C. § 547(c)(1) in that (i) TransCare contemporaneously received new value from Ark II in exchange for the Ark II Security Interests; (ii) Ark II and TransCare intended for the exchange to be contemporaneous; and (iii) the exchange was substantially contemporaneous.

   c. The claim under 11 U.S.C. § 502(d) of the Bankruptcy Code should be dismissed because Ark II did not receive a transfer avoidable under 11 U.S.C. § 547 of the Bankruptcy Code.

8. Claim 11 – Constructive Fraudulent Transfer against Ark II

   a. TransCare granted Ark II a security interest in the Collateral (as defined in the Ark II Security Agreement) in exchange for cash advances totaling $1,862.925.77.

b. The Trustee cannot prove by a preponderance of the evidence that (i) Ark II did not give equivalent value in exchange for the Ark II Security Interests or (ii) Ark II did not receive the Ark II Security Interests in good faith.

c. Ark II is not an insider of TransCare because it did not exercise day-to-day control over TransCare or otherwise control its finances. In any event, Ark II's alleged status as an insider is irrelevant because the Ark II Security Interests secured a contemporaneous advance of funds, not a pre-existing debt.

d. The Ark II Security Interests cannot be avoided pursuant to 11 U.S.C. § 544 and §§ DCL 273 – 275.

9. Claim 12 – Payment Subordination against PPAS

a. The Trustee lacks standing to bring this claim on behalf of the TransCare estates under New York law because the claim seeks to enforce the terms of the 2016 Intercreditor Agreement and TransCare is not a party to the 2016 Intercreditor Agreement.

b. The Trustee lacks standing to bring this claim on behalf of the TransCare estate because under the plain terms of the 2016 Intercreditor Agreement, TransCare is not a third-party beneficiary of the 2016 Intercreditor Agreement. *See* 2016 Intercreditor Agreement, Section 3.13. Indeed, TransCare signed an acknowledgement to the 2016 Intercreditor Agreement

in which it expressly acknowledged, among other things, that it is not a beneficiary of that contract.

10. Claim 13 – Limitation on Liens against PPAS and Ark II

a. The equities of the case exception is not applicable and does not merit a judgment that the security interests of PPAS and Ark II do no reach to the post-petition proceeds of certain TransCare property. The equities of the case exception is to be applied narrowly to prevent a secured creditor from reaping a windfall from collateral that has appreciated in value as a result of the trustee's use of other estate assets. Here, there is no evidence that the Subject Collateral (which was sold pursuant to the terms of the Personal Property Stipulation) appreciated in value post-petition.

b. Even if the Trustee could establish some appreciation in value of the Subject Collateral (and he cannot), there is no evidence that the Trustee invested any unencumbered funds to enhance their value. Instead, pursuant to the terms of the Personal Property Stipulation, the costs and expenses incurred in selling the property were carved-out of and paid from the gross proceeds from the sale of those assets. Moreover, pursuant to the Personal Property Stipulation, 20% of the net proceeds from the sale were carved-out and paid to the Trustee for the benefit of the Debtors' estates.

11. Claim 14 – Turnover and Avoidance against PPAS and Ark II

a. Section 549 of the Bankruptcy Code is not applicable to the transfer of $800,000.01 in proceeds from the sale of the Subject Collateral (as such sale was authorized in the Personal Property Stipulation) from PPAS to Ark II

because the proceeds were no longer property of the estate after the Trustee transferred them to PPAS. Moreover, because the Trustee only held (at best) legal title to, but not an equitable interest in, the Subject Collateral, the estate's interest (if any) was limited to the legal title transferred to the purchaser pursuant to the sale at auction.

b. Because the proceeds from the sale in the hands of PPAS was not estate property, they are not subject to avoidance under Section 549.

c. The $800,000.01 in proceeds from the sale of the Subject Collateral are not subject to turnover under Section 542(b) of the Bankruptcy Code as against PPAS or Ark II because the proceeds do not constitute a "debt" within the meaning of Section 542(b) (which applies only to the collection of a matured debt, payable on demand or payable on order).

d. Because the $800,000.01 in proceeds from the sale of the Subject Collateral are not subject to turnover under Section 542(b) of the Bankruptcy Code as against PPAS or Ark II, neither PPAS' or Ark II's proofs of claim can be disallowed under Section 502(d) of the Bankruptcy Code.

e. If the Court determines that the transfer is avoidable, the Trustee is limited to a single recovery under 11 U.S.C. § 550(d).

## V. ISSUES TO BE TRIED

The parties submit that the following issues are to be tried at trial:

1. Claim 1 – Breach of Fiduciary Duty against Lynn Tilton

   a. Did Ms. Tilton breach her duties of loyalty and good faith to TransCare under Delaware law?

b. If the Court finds liability on the Trustee's breach of fiduciary duty claim against Ms. Tilton, did the breach result in damages to TransCare, and if so, in what amount?

2. Claim 3 – Equitable Subordination against PPAS, Ark II, PPMG and Patriarch Partners

    a. Have PPAS, Ark II, PPMG or Patriarch Partners engaged in conduct such that it warrants subordination of any of their claims against the Debtors under 11 U.S.C. § 510(c)?

    b. If the claims of PPAS, Ark II, PPMG or Patriarch Partners are subject to subordination, to what extent should their proofs of claims be subordinated under 11 U.S.C. § 510(c)?

3. Claim 4 – Debt Recharacterization against Ark II

    a. Should the Ark II Credit Agreement be recharacterized as an equity investment under the test set forth in *Bayer Corp. v. MascoTech, Inc*. (*In re AutoStyle Plastics, Inc*.), 269 F.3d 726 (6th Cir.2001)?

4. Claim 7 – Actual Fraudulent Transfer against PPAS, Ark II, Transcendence and Transcendence II

    a. Was the Subject Collateral (as defined in the Notice of Acceptance) transferred to PPAS and Transcendence on or about February 24, 2016?

    b. To the extent the property was transferred, did TransCare act with actual fraudulent intent under 11 U.S.C. § 548(a)(1)(A) or under DCL § 276?

    c. May the Trustee recover the value of the property when transferred pursuant to 11 U.S.C. § 550(a) and, if so, in what amount?

    d. May the Trustee recover fees pursuant to Section 276-a of the DCL?

5. Claim 9 – Automatic Stay Violation against all Defendants
    a. Did the Defendants take action in violation of the automatic stay provisions of 11 U.S.C. § 362(a)?
    b. If the Defendants took action in violation of 11 U.S.C. § 362(a), is the Trustee entitled to a judgment holding Defendants in contempt and/or an award of sanctions?
6. Claim 10 – Preferential Transfer against Ark II
    a. Has the Trustee proven that TransCare's grant of a security interest to Ark II is avoidable as a preferential transfer under 11 U.S.C. § 547(b)?
    b. To the extent the Trustee proves that TransCare's grant of a security interest to Ark II is avoidable as a preferential transfer under 11 U.S.C. § 547(b), has Ark II established that the grant of a security interest is not avoidable on the grounds of the new value affirmative defense under 11 U.S.C. § 547(c)?
    c. May the Trustee recover from Ark II the grant of a security interest to Ark II under 11 U.S.C. § 550(a) of the Bankruptcy Code?
7. Claim 11 – Constructive Fraudulent Transfer against Ark II
    a. Has the Trustee proven that TransCare's grant of a security interest to Ark II is avoidable as a constructive fraudulent transfer under DCL § 273, made applicable through 11 U.S.C. § 544(b) of the Bankruptcy Code?
    b. May the Trustee recover from Ark II the grant of a security interest to Ark II under 11 U.S.C. § 550(a) of the Bankruptcy Code?

8. Claim 12 – Payment Subordination against PPAS
    a. Does the Trustee have standing to assert a claim of payment subordination against PPAS?
    b. To the extent the Trustee has standing to assert a claim of payment subordination against PPAS, is PPAS entitled to any distribution from the TransCare estates prior to payment in full of the proof of claim filed by Ark II?
9. Claim 13 – Limitation on Liens against PPAS and Ark II
    a. Should the pre-petition security interests of PPAS and Ark II extend to proceeds acquired by the TransCare estates after the commencement of cases under Section 552(b) of the Bankruptcy Code?
10. Claim 14 – Turnover and Avoidance against PPAS and Ark II
    a. Is the transfer of $800,000.01 in proceeds from the sale of the Subject Collateral pursuant to the Personal Property Stipulation avoidable under 11 U.S.C. § 549?
    b. If so, is the value of the transfer recoverable under 11 U.S.C. § 550(a) from either PPAS or Ark II?
    c. Are the proceeds from the sale of the Subject Collateral subject to turnover to the Trustee pursuant to Section 542(b) of the Bankruptcy Code?

## VI. EXHIBIT LISTS; STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Annexed as Exhibit A hereto is the list of the Trustee's exhibits, other than impeachment exhibits, with stipulations to admissibility or any objections to each exhibit, including the basis of all objections to each document. Any objections not set forth in this order will be considered waived absent good cause shown.

Annexed as Exhibit B hereto is the list of the Defendants' exhibits, other than impeachment exhibits, with stipulations to admissibility or any objections to each exhibit, including the basis of all objections to each document. Any objections not set forth in this order will be considered waived absent good cause shown.

Annexed as Exhibit C hereto is the list of the parties' joint exhibits.

The parties continue to negotiate in good faith concerning stipulations to particular exhibits and will update the Court in advance of trial should they arrive at an agreement.

No exhibit not listed by Plaintiff or Defendants may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown. Each side shall list all exhibits it intends to offer on its case in chief. All exhibits shall be pre-marked with each exhibit bearing a unique number or letter (numbers for plaintiff and letters for defendant), with the prefix PX for Plaintiff's exhibits and DX for Defendants' exhibits. Each party must supply a loose-leaf bound book of pre-marked exhibits separated by dividers and containing an index to the Court, his or her adversary and the witness stand at the commencement of the trial.

## VII. PLAINTIFF'S WITNESS LIST

Any witness who is not identified in accordance with this order shall not be permitted to testify on either party's case in chief absent good cause shown. Each party shall list the witnesses it intends to call on its case in chief and, if a witness's testimony will be offered by deposition, shall designate by page and line numbers the portions of the deposition transcript it intends to offer. Each party shall set forth any objections it has to deposition testimony designated by the other and the basis therefor. Each party reserves the right to call the witnesses identified by the other party.

The Plaintiff intends to call the following fact witnesses:

1. Michael Greenberg
2. Jean Luc Pelissier
3. Brian Stephen
4. Lynn Tilton
5. Scott Whalen
6. Carl Marks
7. Carl Landeck
8. Mark Claster
9. Glen Youngblood
10. Alexander Witkes
11. Glenn Leland
12. Mark Bonilla
13. Salvatore LaMonica

The Plaintiff intends to offer the following testimony by deposition:

1. John Husson, as designee of Wells Fargo
    a. See Exhibit D
2. Glenn Leland
    a. See Exhibit E

The Plaintiff objects to the inclusion of Lynn Harrison, Cindi Giglio, and Randy Creswell as witnesses pursuant to Federal Rules 26(a)(1)(A)(i), 26(e)(1) and 37(c).

## VIII. DEFENDANTS' WITNESS LIST

The Defendants intend to call the following fact witnesses:

1. Lynn Tilton

2. Jean Luc Pelissier

3. Brian Stephen

4. Michael Greenberg

5. Scott Whalen

6. Glenn Leland

7. John Husson

8. Salvatore LaMonica

9. Lynn Harrison

10. Cindi Giglio

11. Randy Creswell

The Defendants intend to offer the following testimony by deposition:

12. John Husson, as designee of Wells Fargo

    a. See Exhibit F

13. Glenn Leland

    a. See Exhibit G

    b. Defendants agree that Plaintiff has the right to object and make counter-designations to Defendants' Designations of the Deposition of Glenn Leland.

## IX. PLAINTIFF'S EXPERT WITNESS

Jonathan Arnold, expert report dated November 30, 2018. Dr. Arnold will testify concerning the value of TransCare.

## X. DEFENDANTS' EXPERT WITNESSES

Jeffrey R. Dunn, expert report dated February 11, 2019. Mr. Dunn is expected to testify regarding the expert report submitted by Jonathan I. Arnold, Ph.D., including Mr. Dunn's

observations regarding the methodology, assumptions, and conclusions Dr. Arnold reached in his report.

Any expert witness who is not identified in accordance with this order shall not be permitted to testify on either party's case in chief absent good cause shown.

## XI. RELIEF SOUGHT

Plaintiff seeks the following relief with respect to each claim:

1. Claim 1 – Breach of Fiduciary Duty against Lynn Tilton
    a. Damages against Tilton in the amount of no less than approximately $17 million and as much as $67 million.
    b. Damages against Tilton for TransCare's liability in the WARN Proceeding and relating to the unpaid payroll taxes.
2. Claim 3 – Equitable Subordination against PPAS, Ark II, PPMG and Patriarch Partners
    a. Subordination below general unsecured claims of claims asserted by PPAS, Ark II, PPMG and Patriarch Partners.
    b. Transfer to TransCare's estates of liens associated with claims asserted by PPAS and Ark II.
3. Claim 4 – Debt Recharacterization against Ark II
    a. Recharacterization as equity of claim asserted by Ark II.
    b. Disallowance of claim asserted by Ark II.
    c. Preservation of lien asserted by Ark II for benefit of TransCare's estates.

4. Claim 7 – Actual Fraudulent Transfer against PPAS, Ark II, Transcendence and Transcendence II
    a. Damages against PPAS, Ark II, Transcendence and Transcendence II in the amount of between $17.0 million and $33.4 million – reflecting the value of the transferred assets immediately before the transfer, minus the value obtained by the Trustee for such assets postpetition – plus the Trustee's reasonable attorneys' fees and expenses.
    b. Disallowance of claims asserted by PPAS and Ark II.
5. Claim 9 – Automatic Stay Violation against all Defendants
    a. Sanctions against all Defendants.
6. Claim 10 – Preferential Transfer against Ark II
    a. Avoidance of security interest asserted by Ark II.
    b. Preservation and recovery of lien asserted by Ark II for benefit of TransCare's estates.
    c. Disallowance of claim asserted by Ark II.
7. Claim 11 – Constructive Fraudulent Transfer against Ark II
    a. Avoidance of security interest asserted by Ark II.
    b. Preservation and recovery of lien asserted by Ark II for benefit of TransCare's estates.
    c. Disallowance of claims asserted by Ark II.
8. Claim 12 – Payment Subordination against PPAS
    a. Judgment that PPAS's claims are junior to Ark II and not entitled to payment until Ark II has been paid in full in accordance with the 2016 Intercreditor Agreement.

9. Claim 13 – Limitation on Liens against PPAS and Ark II
    a. Judgment that security interests asserted by PPAS and Ark II do not extend to postpetition proceeds of estate assets.
10. Claim 14 – Turnover and Avoidance against PPAS and Ark II
    a. Avoidance and recovery of $800,000.01 from either Ark II or PPAS.
    b. Turnover of $800,000.01 from either Ark II or PPAS.
    c. Disallowance of claims asserted by PPAS and Ark II until such payment is made.
11. Pre- and post-judgment interest on all claims, and such other and further relief as this Court deems just and proper.

## XII. ESTIMATED TIME OF TRIAL

Plaintiff estimates that it will take 20 hours to complete the presentation of his direct case, excluding deposition designations.

Defendants' estimate that it will take approximately 16 hours to complete the presentation of its case-in-defense, excluding deposition designations.

Dated: May 3, 2019

*s/ Avery Samet*________________________
Bijan Amini, Esq.
Avery Samet, Esq.
Jaime B. Leggett, Esq.
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10018
Main Line: (212) 490-4100
*Counsel for Plaintiff*

*s/ Michael T. Mervis*________________
Michael T. Mervis
Timothy Q. Karcher
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Main Line: (212) 969-3000

Nicole A. Eichberger (admitted *pro hac vice*)
PROSKAUER ROSE LLP
650 Poydras Street
Suite 1800
New Orleans, LA 70130
Main Line: (504) 310-2024
*Counsel for Defendants*

Dated: ___________________

**IT IS SO ORDERED:**

________________________________
**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**