**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:                                                                 :
                                                                       :
                                                                       :
      TRANSCARE CORPORATION, <u>et al.</u>,                    :      Chapter 7
                                                                       :      Case No. 16-10407 (SMB)
                                                                       :      (Jointly Administered)
                    Debtors.             :

-------------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7                                       :
Trustee for the Estates of TransCare                                   :
Corporation, <u>et al.</u>,                                            :
                                                                       :
                  Plaintiff,            :
                                                                       :      Adv. Proc. No. 18-1021 (SMB)
          - against -                                 :
                                                                       :
LYNN TILTON, PATRIARCH PARTNERS                                        :
AGENCY SERVICES, LLC, PATRIARCH                                        :
PARTNERS, LLC, PATRIARCH PARTNERS                                      :
MANAGEMENT GROUP, LLC, ARK II CLO                                      :
2001-1 LIMITED, TRANSCENDENCE                                          :
TRANSIT, INC., and TRANSCENDENCE                                       :
TRANSIT II, INC.,                                                      :
                                                                       :
               Defendants.            :
                                                                       :

-------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM IN
## <u>SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STANDARD OF REVIEW .................................................................................................. 8

ARGUMENT ........................................................................................................................ 9

I.    THE TRUSTEE CANNOT PROVE A BREACH OF THE DUTY OF LOYALTY AND
GOOD FAITH BY TILTON .......................................................................................... 9

    A.   TILTON'S DECISION NOT TO EXPLORE THIRD-PARTY INDICATIONS OF
INTEREST IS PROTECTED BY THE BUSINESS JUDGMENT RULE .................... 9

    B.   THE OLDCO/NEWCO RESTRUCTURING WAS ENTIRELY FAIR ...................... 15

    C.   TILTON ACTED IN GOOD FAITH IN SEEKING TO PROVIDE WARN
NOTICE ................................................................................................................... 23

II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S
STAY VIOLATION CLAIM .......................................................................................... 25

III.  THE TRUSTEE LACKS STANDING TO ASSERT HIS CLAIM FOR PAYMENT
SUBORDINATION ........................................................................................................ 28

IV.  PPAS'S LIENS ON THE SUBJECT COLLATERAL ATTACHED PRE-PETITION
AND ARE NOT BARRED BY SECTION 552 OF THE BANKRUPTCY CODE ........... 30

V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S
CLAIM TO RECOUP POST-PETITION PROCEEDS DISTRIBUTED TO PPAS ......... 31

VI.  THERE IS NO BASIS TO EQUITABLY SUBORDINATE THE CLAIMS OF
PATRIARCH PARTNERS, PPMG, PPAS OR ARK II .................................................... 34

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ................................................................36

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*,
    120 A. 486 (Del. Ch. 1923).................................................................................22

*Arnot v. Endresen (In re Endresen)*,
    548 B.R. 258 (B.A.P. 9th Cir. 2016)...................................................................30

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 2000) ...................................................................................11

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
    563 F.2d 692 (5th Cir. 1977) ..............................................................................35

*Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*,
    Bankr. Case No. 10-34499, Adv. No. AP 12-2373, 2015 WL 5766761 (Bankr.
    D. Utah Sept. 30, 2015) .................................................................................38, 39

*Cage v. Wyo-Ben, Inc. (In re Ramba Inc.)*,
    437 F.3d 457 (5th Cir. 2006) ..............................................................................33

*Cinerama, Inc. v. Technicolor, Inc.*,
    663 A.2d 1156 (Del. 1995) .................................................................................22

*Cox v. Hess (In re Big Wheel Holding Co.)*,
    214 B.R. 945 (D. Del. 1997)...............................................................................35

*Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay
    Energy Co.)*,
    902 F.2d 1098 (2d Cir. 1990).............................................................................26

*Delbridge v. Production Credit Ass'n*,
    104 B.R. 824 (E.D. Mich. 1989).........................................................................31

*DFC Glob. Corp. v. Muirfield Value Partners, L.P.*,
    172 A.3d 346 (Del. 2017) ...................................................................................22

*Dorsagno v. Cooley*,
    No. 95-201, 1996 WL 312180 (N.D.N.Y. May 31, 1996)...................................26

ii

*Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co.),*
    53 B.R. 772 (Bankr. S.D.N.Y. 1985) ...................................................................36

*In re Allied Holdings, Inc.,*
    355 B.R. 372 (Bankr. N.D. Ga. 2006) ..............................................................27

*In re Manchanda,*
    No. 16-10222, 2016 WL 3034693 (Bankr. S.D.N.Y. May 19, 2016) ...................26

*In re Motors Liquidation Co.,*
    580 B.R. 319 (Bankr. S.D.N.Y. 2018) ..............................................................29

*In re Nine Sys. Corp. S'holders Litig.,*
    No. 3940, 2014 WL 4383127 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v.
    Wren Holdings, LLC,* 129 A.3d 882 (Del. 2015) ..............................................22

*In re Old Carco LLC,*
    500 B.R. 683 (Bankr. S.D.N.Y. 2013) ..............................................................29

*In re Walt Disney Co. Derivative Litig.,*
    825 A.2d 275 (Del. Ch. 2003) .........................................................................24

*In re Walt Disney Co. Derivative Litig.,*
    907 A.2d 693 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006) ................10, 23, 24

*In re World Parts, LLC,*
    291 B.R. 248 (Bankr. W.D.N.Y. 2003) ............................................................26

*Jedwab v. MGM Grand Hotels, Inc.,*
    509 A.2d 584 (Del. Ch. 1986) .........................................................................17

*Kahn v. Lynch Commc'n Sys., Inc.,*
    638 A.2d 1110 (Del. 1994) .............................................................................16

*Kahn v. Tremont Corp.,*
    694 A.2d 422 (Del. 1997) ..............................................................................18

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch),*
    413 B.R. 115 (Bankr. S.D.N.Y. 2008), *aff'd,* 2009 WL 2900247 (S.D.N.Y.
    Sept. 9, 2009) ...............................................................................................34

*KDW Restructuring & Liquidation Servs. LLC v. Greenfield,*
    874 F. Supp. 2d 213 (S.D.N.Y. 2012) .........................................................10, 13

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,*
    908 F.2d 1351 (7th Cir. 1990) ........................................................................36

*Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.),*
  265 B.R. 524 (Bankr. S.D.N.Y. 2001), *aff'd*, 47 F. App'x 609 (2d Cir. 2002) ........................8

*McCord v. Agard (In re Bean),*
  252 F.3d 113 (2d Cir. 2001)...............................................................................33, 34

*McGowan v. Ferro,*
  859 A.2d 1012 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005)........................................23

*Midlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Copr. (In re Mayo),*
  112 B.R. 607 (Bankr. D. Vt. 1990)........................................................................35, 40

*O'Toole v. McTaggart (In re Trinsum Grp., Inc.),*
  466 B.R. 596 (Bankr. S.D.N.Y. 2012)....................................................................10, 15

*Odyssey Partners, L.P. v. Fleming Cos.,*
  735 A.2d 386 (Del. Ch. 1999)................................................................................20

*Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,*
  No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........................................24

*Orman v. Cullman,*
  794 A.2d 5 (Del. Ch. 2002)....................................................................................10

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),*
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)......................................................................38

*Premium Mortg. Corp. v. Equifax, Inc.,*
  583 F.3d 103 (2d Cir. 2009)....................................................................................29

*Quadrant Structured Prods. Co. v. Vertin,*
  115 A.3d 535 (Del. Ch. 2015)................................................................................15

*Rockville Orthopedic Assocs., P.C. v. Kort (In re Rockville Orthopedic Assocs.,*
  *P.C.),*
  377 B.R. 438 (Bankr. D. Conn. 2007) ....................................................................35

*Rodriguez v. City of New York,*
  72 F.3d 1051 (2d Cir. 1995)....................................................................................8

*Roselink Inv'rs, LLC v. Shenkman,*
  386 F. Supp. 2d 209 (S.D.N.Y. 2004)............................................................10, 11, 15

*S. Muoio & Co. LLC v. Hallmark Entn't Invs. Co.,*
  No. 4729, 2011 WL 863007 (Del. Ch. Mar. 9, 2011), *aff'd,* 35 A.3d 419 (Del.
  2011) ..............................................................................................................18, 22

iv

*Schewe v. Fairview Estates (In re Schewe)*,
    94 B.R. 938 (Bankr. W.D. Mich. 1989)................................................26

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
    884 F.2d 688 (2d Cir. 1989)....................................................................38

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) .......................................................................23

*Thorpe v. CERBCO, Inc.*,
    No. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993)...........................17

*Toso v. Bank of Stockton (In re Toso)*,
    Nos. 05-1290, 05-1389, 06-1148, 06-1149, 2007 WL 7540985 (B.A.P. 9th
    Cir. Jan. 10, 2007).................................................................................31

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
    549 B.R. 21 (S.D.N.Y. 2016)..................................................................38

*United States v. Rauer*,
    963 F.2d 1332 (10th Cir. 1992) ..............................................................33

*Warth v. Seldin*,
    422 U.S. 490 (1975)...............................................................................29

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) .......................................................................16

*White Current Corp. v. Rural Util. Serv. (In re Vt. Elec. Generation &
    Transmission Coop., Inc.)*,
    240 B.R. 476 (Bankr. D. Vt. 1999).........................................................35

*Wood v. Baum*,
    953 A.2d 136 (Del. 2008) .......................................................................24

*Xuedan Wang v. Hearst Corp.*,
    877 F.3d 69 (2d Cir. 2017).......................................................................8

**STATUTES AND RULES**

11 U.S.C. § 105......................................................................................26

11 U.S.C. § 362......................................................................................25

11 U.S.C. § 510......................................................................................34

11 U.S.C. § 541......................................................................................33

11 U.S.C. § 542 .................................................................................................................34

11 U.S.C. § 549 ............................................................................................................32, 33

11 U.S.C. § 552 ............................................................................................................30, 31

Fed. R. Bankr. P. 7056 ...................................................................................................1, 8

Fed. R. Civ. P. 56 ...........................................................................................................1, 8

**Other Authorities**

S.Rep No. 989-95 (1977-78).............................................................................................31

Defendants[1] respectfully submit this Memorandum in Support of their Motion for Partial Summary Judgment ("Motion"), pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), incorporating Rule 56 of the Federal Rules of Civil Procedure.

## INTRODUCTION

1.      Defendant Lynn Tilton has a long and proven track record of rehabilitating companies in distress.   Unfortunately, not all turnarounds are successful or long-lived. TransCare Corporation and its wholly-owned subsidiaries (collectively, "TransCare" or the "Company") is an example of a company that, despite significant financial support and attention from Tilton, did not survive.  There are several reasons why, but none of them make Tilton liable to TransCare.   Accordingly, for the reasons explained below, summary judgment should be granted on the claims asserted against her.

### Factual Background[2]

2.      TransCare was a medical transportation business.  (SOF ¶ 1.)  From late 2014 to early 2016 (the "Relevant Time Period"), Tilton was its sole director.  (SOF ¶ 3.)  Employees of two of Tilton's companies, Patriarch Partners and PPMG, supported her in her role as TransCare's director. [3]  (SOF ¶¶ 5–10.)

---

[1] The Defendants in this adversary proceeding are:  Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001-1, Limited ("Ark II"), Transcendence Transit, Inc. ("Transcendence Transit"), and Transcendence Transit II, Inc. ("Transcendence Transit II" and together with Transcendence Transit, "Transcendence").

[2] The undisputed facts that support this Motion are set forth in Defendants' Local Rule 7056-1(b) Statement of Material Facts Not in Dispute (the "SOF"), submitted herewith, and by the exhibits annexed to the accompanying Declaration of Michael T. Mervis, dated June 20, 2019 (the "Mervis Declaration").  Capitalized terms used but not defined herein have the meaning ascribed to them in the SOF.

[3] Employees of Patriarch Partners also supported that entity's role as a collateral manager for certain lenders (*see* n.4, *infra*).

1

3.     During the Relevant Time Period, TransCare had an asset-based secured lender, Wells Fargo, N.A. ("Wells Fargo"), which provided working capital funding under the terms of the Wells Fargo Credit Agreement.  (SOF ¶ 23.)  The Company also had a secured term loan facility (the "Term Loan Agreement") with a consortium of term lenders, some affiliated with Tilton (the Zohar Funds[4] and Ark Investment Partners II, L.P.) and others, with no affiliation to Tilton (Credit Suisse and First Dominion) (together, the "Term Loan Lenders").  (SOF ¶¶ 12, 14.)  PPAS, a Tilton-controlled entity, was the administrative agent for the Term Loan Lenders under the Term Loan Agreement.  (SOF ¶¶ 12–13.)

4.     By late 2014, TransCare faced liquidity constraints.  (SOF ¶ 31.)  The Company had not obtained an audited financial statement for the prior year and even struggled to produce timely or accurate unaudited financials.  (SOF ¶¶ 34–36.)  Due to concerns over then-management's performance, Tilton, as TransCare's sole director, hired a new CEO, Glenn Leland, to head TransCare's turnaround efforts.  (SOF ¶¶ 32–33.)  Leland and other TransCare management created a stabilization plan that modestly improved TransCare's performance in the first half of 2015.  (SOF ¶¶ 39–40.)

5.     From time to time during 2015, Tilton and Leland were contacted by other transportation companies, including competitors, about potentially purchasing some or all of TransCare's assets.  (SOF ¶ 42.)  These were "blind" inquiries, as they were made by parties that had not performed any due diligence on TransCare.  (SOF ¶¶ 48, 67.)

6.     One company, National Express, stated an interest in purchasing the Company's paratransit business under its contract with the New York City Transit Authority (the "MTA Contract").  (SOF ¶ 43.)  This specific business contributed most of the Company's EBITDA

---

[4] The Zohar Funds consist of Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd.  Patriarch Partners, as collateral manager, monitored and managed the loans made to TransCare by the Zohar Funds.  (SOF ¶ 5.)

during the Relevant Time Period. (SOF ¶ 44.) Pursuant to agreements with its secured lenders, any sale of the paratransit business would have required the consent of TransCare's secured lenders, including Wells Fargo, and the proceeds from such a sale would have to be paid to those lenders to reduce TransCare's obligations to them. (SOF ¶¶ 18, 21-22, 26–30.) Such proceeds could not, without consent of the secured lenders, be "reinvested" into the Company. (*Id.*)

7.  Apparently unaware of this restriction on the use of proceeds from an asset sale, at various times in 2015 Leland recommended engaging with National Express to sell the paratransit business. (SOF ¶¶ 43, 46–48, 50–52.) Tilton, however, understood that even if the secured lenders permitted such a transaction, TransCare would not survive stripped of its main source of revenue.[5] (SOF ¶ 45.) As a result, she declined to pursue National Express's indications of interest, or other indications of interest from TransCare's competitors. (SOF ¶¶ 45, 63.) Instead, she decided to keep the Company intact, try to stabilize it, and then try sell it "into strength" as a going concern. (SOF ¶ 63.)

8.  Despite modest improvements in the Company's performance in the first half of 2015, tension arose between TransCare and Wells Fargo and steadily increased beginning in July 2015. (SOF ¶¶ 40, 77–78.) Wells Fargo began to restrict the amount of cash available to TransCare for working capital, which exacerbated the Company's existing liquidity constraints and caused it to miss payroll in July 2015. (SOF ¶¶ 77–78.) In October 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"), pursuant to which the Wells Fargo Credit Agreement would expire in January 2016. (SOF ¶ 82.)

---

[5] The economic realities of selling the paratransit business made it extremely unlikely that the secured lenders would allow cash from such a sale to be "reinvested" rather than paid in accordance with the terms of the respective credit agreements.

9.     Tilton made efforts to repair the relationship with Wells Fargo.  By mid-December 2015, Tilton, with the support of Wells Fargo, made the decision to explore a sale of TransCare through a marketed sale process which would, if successful, ensure that Wells Fargo was repaid in full.  (SOF ¶¶ 84–88.)  In the weeks that followed, Wells Fargo and Tilton negotiated the terms of a long-term forbearance to bridge to a sale of TransCare.  (SOF ¶¶ 89–97, 103.)  Wells Fargo expressly conditioned this bridge funding on, among other things, the retention of a third-party financial advisor.  (SOF ¶¶ 90–94.)

10.    As Wells Fargo required, TransCare hired Carl Marks Advisors Group ("CMAG") in early January 2016.  (SOF ¶ 95.)  CMAG reviewed or presented several plans to Tilton, all of which required millions of dollars in new working capital funding to be contributed or loaned by Tilton in order to have any chance of succeeding.  (SOF ¶¶ 97, 103.)

11.    Tilton continued to authorize and provide emergency funding for TransCare.  The funding was provided by the Zohar Funds and through a new credit facility entered between TransCare and Ark II (Tilton's personal investment vehicle), pursuant to which Ark II agreed to commit up to $6.5 million to TransCare (the "Ark II Credit Agreement").[6]  (SOF ¶¶ 98, 107.)

12.    In February 2016, Tilton, with the assistance of TransCare's outside restructuring counsel, and in consultation with Wells Fargo and its restructuring counsel, developed a plan to restructure TransCare (the "OldCo/NewCo Restructuring").  (SOF ¶¶ 109, 111–15.)  Tilton's plan called for simultaneously: (i) forming new corporate entities (*i.e.*, Transcendence) to take over certain TransCare business lines through an Article 9 foreclosure sale, including the paratransit business under the MTA Contract, and (ii) winding down the other parts of TransCare in a bankruptcy proceeding over the course of 90 days.  (SOF ¶¶ 114–15, 117.)  The

---

[6] During the Relevant Time Period, Tilton authorized and/or made with her personal funds loans of roughly $9 million to TransCare in order to keep the Company afloat.  (*See, e.g.*, SOF ¶¶ 41, 79, 80, 106, 107.).

restructuring was designed to repay all of TransCare's indebtedness to Wells Fargo and also save 700 jobs through the operation of Transcendence as a going concern. (SOF ¶ 109.) As part of this plan, Transcendence would enter into a Transition Services Agreement (the "TSA") with the remaining TransCare (or "OldCo") businesses to provide transitional services and support to them. (SOF ¶ 120.)

13.     Despite intense negotiations over many weeks, Tilton and Wells Fargo did not reach agreement on the funding of the wind-down of the OldCo businesses and Wells Fargo ceased lending to TransCare. (SOF ¶ 134.) On February 24, 2016, the paperwork for the Article 9 foreclosure by PPAS (as administrative agent) was executed. (SOF ¶ 135–37, 142.)

14.     As part of the Article 9 foreclosure, PPAS, as administrative agent, accepted certain TransCare assets (the "Subject Collateral") in satisfaction of $10 million owing under the Term Loan Agreement. (SOF ¶ 139.) Tilton valued the Subject Collateral by (i) calculating its book value and (ii) examining the total $22 million acquisition price (*i.e.*, the $10 million credit bid plus $12 million in new funding)[7], as a multiple of projected EBITDA, which Tilton estimated at about $2.5 – $2.75 million for 2016. (SOF ¶ 140.)

15.     Later on February 24, 2016, the majority of the TransCare entities (the "Initial Debtors") filed chapter 7 petitions (the "Initial Petition Date"). (SOF ¶ 143.) Salvatore LaMonica ("LaMonica" or the "Trustee") was appointed chapter 7 trustee of the Initial Debtors' estates. (SOF ¶ 145.)

16.     On February 25–26, 2016, the parties, including LaMonica, engaged in discussions to determine whether and how the OldCo and NewCo business lines could continue to operate post-petition. (SOF ¶¶ 145–54.) By day's end on February 25, PPAS and Wells

_____

[7] The new funding was to be provided by Tilton's personal investment vehicles. (SOF ¶¶ 132–33, 141.)

Fargo were unable to reach agreement on whether and in what amount the respective secured lenders might provide payroll funding to OldCo employees.  (SOF ¶ 148.)

17.    Efforts to get Transcendence up and running on February 25-26, 2016 also were frustrated and Transcendence never took control of or operated the Subject Collateral.  Among other things, LaMonica's law partner directed the incoming president of Transcendence not to move a computer server from a TransCare building that was needed in order to operate the paratransit business.  (SOF ¶¶ 151–52.)  As a result, the server was never physically transferred to Transcendence and Transcendence was not able to operate the paratransit business.  (SOF ¶ 152.)  The TransCare entities that were not Initial Debtors filed chapter 7 petitions in April 2016.  (SOF ¶ 162.)  LaMonica also was appointed chapter 7 trustee of their estates.

18.    The Court entered an order on March 25, 2016 (the "March 25 Order") by which PPAS and Transcendence authorized the Trustee to sell at auction certain assets, including the Subject Collateral (the "Personal Property Stipulation").  (SOF ¶¶ 155–57.)  The Personal Property Stipulation provided, *inter alia*, that PPAS's liens would attach to the net proceeds of sale in the same amount and priority as they existed on the Initial Petition Date.  (SOF ¶ 156.)

**Summary of Argument**

19.    Summary judgment should be granted on six of the Trustee's claims for relief for the following reasons.[8]

- Count I (Breach of Fiduciary Duty of Loyalty and Good Faith):[9]  *First*, Tilton's decision not to pursue third-party expressions of interest in TransCare's assets (i)

---

[8] In recognition of the Court's comments during the March 28, 2019 hearing concerning the Ark II Credit Agreement, the relevant Defendants are not moving for summary judgment on four of the ten pending claims for relief: (i) Count IV (Recharacterization of Debt as Equity Against Ark II); Count VII (Actual Fraudulent Transfer Against PPAS, Ark II, and Transcendence); Count X (Preferential Transfer Against Ark II); and Count XI (Constructive Fraudulent Transfer Against Ark II).  Only PPAS is moving for summary judgment on Claim XIII (Limitation on Liens).

[9] Defendants consent to the Court entering a final order, for purposes of this Motion only, on Count I (which is not a core claim).

is subject to the business judgment rule because the undisputed timeline of events shows that the decision was not motivated by self-interest; and (ii) was protected by the business judgment rule because the decision was well-informed and reasonable.

*Second*, the intended OldCo/NewCo Restructuring was the product of fair dealing and a fair price. The timing of the transaction was compelled by external forces—not any opportunism on Tilton's part. The planning of and negotiations about the OldCo/NewCo Restructuring were conducted openly with Wells Fargo, with input from the parties' restructuring counsel and CMAG. Moreover, the price for the Article 9 foreclosure was arrived at in a fair and thoughtful manner that, in any case, was higher than the liquidation value of the assets at the time. Nor is there any evidence that TransCare lost value or was otherwise harmed as a result of the Article 9 foreclosure.

*Third*, Tilton, aware of TransCare's obligations under the WARN Acts, negotiated for an orderly wind-down of the OldCo business lines over the course of 90 days in a good faith effort to ensure TransCare complied with the WARN Acts. TransCare was ultimately unable to issue WARN notices to all OldCo employees as initially planned due to the unforeseen halt in TransCare's operations. Nevertheless, communications sufficient for WARN purposes were received by TransCare employees on February 24, 2016 and February 26, 2016.

- Count IX (Automatic Stay Violation): Defendants did not resist the Trustee's purported attempts to enforce the automatic stay or otherwise cause damage to TransCare's estates. On the contrary, the evidence shows that Defendants voluntarily worked with the Trustee to secure the Subject Collateral so it could be sold at auction. None of the Defendants' actions resulted in the physical transfer of any estate property to another business, nor is there any evidence that the Subject Collateral lost value as a result of any act that is alleged to have violated the automatic stay.

- Count XII (Payment Subordination): The Trustee lacks standing to assert this claim, which is based on the Ark II Intercreditor Agreement. Neither TransCare nor the Trustee is a party to or a third-party beneficiary of that agreement and the Trustee cannot enforce its terms.

- Count XIII (Limitation on Liens): PPAS's liens attached to the proceeds from the auction sales. The "equities of the case" exception, which the Trustee invokes as the basis for this claim, does not apply because there is no evidence that the assets sold at auction increased in value after TransCare filed for bankruptcy.

- Count XIV (Avoidance and Turnover): The distribution of auction sale proceeds from the Trustee to PPAS was authorized by the Personal Property Stipulation, which was approved by Order of this Court. TransCare also held, at best, only bare legal title in the Subject Collateral (and any proceeds from the sale thereof)

because the underlying assets were fully encumbered. The secured lenders' equitable interests are not estate property and are not subject to avoidance or turnover.

- <u>Count III (Equitable Subordination)</u>: Tilton's decision not to explore third-party indications of interest and Defendants' attempt to complete the OldCo/NewCo Restructuring (including actions Defendants took post-petition) do not give rise to equitable subordination of the claims of Patriarch Partners, PPMG, PPAS or Ark II. Nor can the claims of Patriarch Partners and PPMG be equitably subordinated based on its employees informing TransCare management that the Company had to make contractually-required interest payments.

## **STANDARD OF REVIEW**

20. Federal Rule of Civil Procedure 56(c) applies to bankruptcy proceedings by application of Rule 7056 of the Federal Rules of Bankruptcy Procedure and provides that summary judgment is appropriate if the moving parties can show, by citing to particular parts of materials in the record, that there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

21. The moving party "bears the burden of establishing that no genuine issue of material fact exists," and that the undisputed facts entitle the movant to judgment as a matter of law. *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). To sufficiently rebut a request for summary judgment, "the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials." *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 529 (Bankr. S.D.N.Y. 2001), *aff'd*, 47 F. App'x 609 (2d Cir. 2002). The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Xuedan Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017) (emphasis added).

I. THE TRUSTEE CANNOT PROVE A BREACH OF THE DUTY OF LOYALTY AND GOOD FAITH BY TILTON

22. The Trustee has advanced ever-evolving theories to support his claim against Tilton for breach of the fiduciary duty of loyalty and good faith. In his pleading, the Trustee alleged that Tilton engaged in a premeditated scheme to "steal" TransCare's most valuable assets and take them for herself in a new entity she would own and control. (Am. Compl. ¶¶ 2–7, 40–47, 53–58, 108–11, 113.) In particular, he focused on certain third-party indications of interest in 2015 that Tilton chose not to pursue. Now, on the eve of trial, the Trustee appears to focus primarily, if not solely, on Tilton's conduct from December 2015 through February 2016 and contends that she took action (*i.e.*, the OldCo/NewCo Restructuring) during this narrower time period in violation of her fiduciary duties to TransCare. (Final Pre-Trial Order ("FPTO") ¶¶ 181–84.) The Trustee's muddled contentions in the Final Pre-Trial Order leave open the possibility that the Trustee is maintaining both theories. Although the Trustee is long on theories, he has no evidence to support them. At summary judgment, both theories fail.

A. TILTON'S DECISION NOT TO EXPLORE THIRD-PARTY INDICATIONS OF INTEREST IS PROTECTED BY THE BUSINESS JUDGMENT RULE

23. According to the Trustee, Tilton violated her duty of loyalty and good faith as TransCare's director because, rather than agreeing to sell (i) the paratransit business operating under the MTA Contract or (ii) TransCare's operations as a whole, she secretly planned to separate the paratransit business and several other business lines from TransCare and operate them under a different company that she would own. (Am. Compl. ¶¶ 3–4, 40–47, 52–59, 111.) The Trustee's theory suffers from two fatal flaws. First, the Trustee assumes, without evidence, that Tilton's decision not to engage in response to third-party indications of interest was

motivated by self-interest and is thus subject to review under the entire fairness standard. As will be discussed, this is easily debunked by the undisputed timeline of events. Second, Tilton had good and valid reasons for not pursuing a sale of any or all of TransCare's assets that were not motivated by her personal interests.

24.     Inherent in the business judgment rule is the presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *Roselink Inv'rs, LLC v. Shenkman*, 386 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (citing *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2002)) (applying Delaware law).[10]   A conscious decision by a corporation's directors to refrain from acting may be a valid exercise of its business judgment. *See O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 466 B.R. 596, 609 (Bankr. S.D.N.Y. 2012) (applying Delaware law); *see also In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 748 n.416 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

25.     To establish a breach of fiduciary duty under Delaware law, "a plaintiff first must prove facts sufficient to overcome" the business judgment rule presumption. *Roselink*, 386 F. Supp. 2d at 216. The presumption can be rebutted where, for example, a director is interested or lacks independence regarding the decision; acts in bad faith; lacks a rational purpose for the decision; or is grossly negligent. *KDW Restructuring & Liquidation Servs. LLC*, 874 F. Supp. 2d at 223 (S.D.N.Y. 2012) (applying Delaware law). Under Delaware law, a director is "interested" where he or she appears "on both sides of a transaction" or "derive[s] any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon

---

[10] TransCare is a Delaware corporation and thus Delaware law applies to the breach of fiduciary duty claim. *See KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012).

the corporation or all stockholders generally." *Roselink*, 386 F. Supp. 2d at 217 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 2000)).

26.     The Trustee points to the Article 9 foreclosure on February 24, 2016 and asks the Court to infer that Tilton's decision not consider a sale of TransCare's assets *many months prior* was motivated by her desire to take them for herself. There is not a shred of evidence to support such an inference.

27.     *First*, the suggestions by Leland to pursue a sale of all or parts of TransCare occurred between February and early December 2015. (SOF ¶¶ 42–74.) There is no genuine dispute, however, that Tilton's proposal to Wells Fargo to restructure TransCare and operate certain of its businesses (including the paratransit business) through Transcendence (*i.e.*, OldCo/NewCo Restructuring) was first conceived in February 2016, well *after* Leland suggested that assets be sold, and *also after* Wells Fargo made clear it was unwilling to continue as TransCare's ABL lender. (SOF ¶¶ 82, 88, 112–14.)

28.     Further undermining the Trustee's "self-dealing" theory is the undisputed evidence showing that Tilton contemplated pursuing a sale process for TransCare *after* she decided not to pursue the indications of interest Leland presented but *before* conceiving the OldCo/NewCo Restructuring option. (SOF ¶¶ 84–88.) Specifically, she made this decision in mid-December 2015, with the support of Wells Fargo. (SOF ¶ 89.)[11] It defies logic that, in December 2015, Tilton would have directed her team to research potential third-party sales or negotiate the terms of a forbearance agreement with Wells Fargo to facilitate a sale process if Tilton had been in the midst of pursuing a premeditated "scheme" to "steal" those same assets.

---

[11] As part of that process, Tilton asked her team to identify recent M&A activity in the industry and research "investment firms that could assist Patriarch in selling TransCare" to a third party. (SOF ¶¶ 85–86.) In the weeks that followed, Tilton and Wells Fargo engaged in negotiations concerning the terms of a longer-term forbearance agreement to bridge to a sale of TransCare's assets to a third party by September 2016. (SOF ¶¶ 89–95.)

29. *Second*, there is no evidence to support a finding that Tilton acted irrationally in declining to consider a sale of the paratransit business or that the decision otherwise lacked a rational business purpose. There is no dispute that the paratransit operation was TransCare's most profitable business line, accounting for the lion's share of TransCare's EBITDA. (SOF ¶¶ 44–45.) Indeed, Leland recommended the sale in spite of his own belief that, as a general business strategy, "selling the good parts of the business and keeping the bad parts of the business would not be wise." (SOF ¶ 62.)

30. Moreover, the undisputed facts demonstrate that Leland's proposed reasons for wanting to pursue a sale of the paratransit business were objectively wrong or based on concerns that never came to fruition. For example, Leland testified that he believed proceeds from a sale of the paratransit business could have funded the Company's stabilization plans. (SOF ¶¶ 50–51.) However, under the plain terms of TransCare's loan agreements with its secured lenders, including Wells Fargo, TransCare could not sell any of its assets without their consent and, *even if* the secured lenders consented to a sale, the proceeds would have to be paid to the secured lenders to reduce TransCare's debt obligations to them and could not be used to support TransCare's remaining operations. (SOF ¶¶ 18–30.) Although Leland claimed he was unaware of this fact at the time, he testified that "if [the proceeds] weren't reinvested in TransCare, there would be no interest on [his] part" in selling the paratransit business. (SOF ¶¶ 51–52.)

31. Even if Leland's assumptions were accurate (which they were not), the undisputed evidence shows that such a sale would have caused TransCare to fail even earlier because the remaining business lines did not generate enough revenue to cover expenses. Leland himself stated that "a loss of the MTA Contract and its $3.5MM EBITDA would be a significant impact to on-going ambulance operations." (SOF ¶ 55.) For her part, Tilton understood the

obvious consequence of losing such a large portion of TransCare's EBITDA—an "immediate liquidation" because the remaining Company "would have no cash to pay its bills as due." (SOF ¶ 45 ("[W]hen a company is doing $6 million of EBITDA and three-and-a-half million of it is coming from the MTA . . . you're not going to run the company without its EBITDA. It wasn't rocket science, it could be done at the back of the envelope.").)[12]

32.     Leland's fears in early 2015 that the MTA Contract was vulnerable to non-renewal were also not realized. (SOF ¶¶ 53–54.) TransCare and the MTA were engaged in ongoing negotiations regarding renewal throughout this time period and the negotiations were nearly complete by June 2015. (SOF ¶ 58.) In July 2015, Leland executed an extension of the contract through October 31, 2019. (SOF ¶ 59.) Leland admitted that he only viewed a potential sale of the paratransit business to National Express "as an alternative course of action" and that if the MTA Contract were renewed, he would "rather keep it." (SOF ¶ 53.)

33.     These facts hardly suggest that Tilton was uninformed, "grossly negligent," or acting in "bad faith" when she determined that it made more sense for TransCare to hold, rather than sell, what was universally recognized as the company's most valuable asset. *See KDW Restructuring & Liquidation Servs. LLC*, 874 F. Supp. 2d at 223.

34.     The record is similarly devoid of evidence that Tilton acted in bad faith and without a rational business purpose when she chose not to explore expressions of interest about the entire Company. When Tilton and Leland received such speculative "feeler" inquiries, TransCare was publicly struggling and, according to Leland, there was industry-wide speculation

---

[12] Furthermore, even a cursory examination of the written letter of intent ("LOI") TransCare received from National Express—the only LOI that TransCare ever received from that company— demonstrates that completing a sale was far from certain, nor would it have given TransCare access to "immediate cash" as the Trustee contends and Leland apparently believed. (SOF ¶¶ 64–68.) Instead, the LOI contained numerous contingencies, such as National Express completing a satisfactory due diligence process. (*Id.*)

that the Company was "about to go under."  (SOF ¶ 61.)  Many of the companies that reached out to Leland were TransCare's direct competitors.  (SOF ¶ 70.)  In Leland's own words: "[A] lot of industry contacts started to express interest in TransCare's plight and ways to capitalize upon that."  (SOF ¶ 60).  It is undisputed that exposing TransCare's books and records to those competitors as part of the diligence process could have damaged the Company's competitive position.  (SOF ¶ 75.)

35.    What's more, these unsolicited "feelers" were made without the benefit of any due diligence and, in the case of one party, TransCare competitor RCA, premised on a misimpression of TransCare's earnings.  (SOF ¶¶ 71–73 (RCA "suggested that they thought the EBIDTA was in the 10 to 12 range.  *It was not at the time* . . .") (emphasis added).)  And even if it would have made business sense for TransCare to open its books and records to its competitors, there were no reliable or current financial statements to provide.  The undisputed facts show that during the Relevant Time Period, TransCare consistently struggled to produce timely and reliable financial statements to its Lenders.  (SOF ¶¶ 34–35, 74.)  Furthermore, the Company did not receive an audited financial statement for 2013 until April 2015 and had no audited financial statement for 2014.  (SOF ¶ 36.)  The unreliability of TransCare's financial information would have made it nearly impossible to sell the Company at a reasonable price.  (SOF ¶ 74.)

36.    Rather than making a hasty decision in response to feeler inquiries from competitors trying to "capitalize" upon "TransCare's plight," Tilton determined to keep the Company together as a whole in the hopes of one day "sell[ing] into strength" as a going concern.  (SOF ¶¶ 60, 63.)  Throughout 2015, Tilton remained steadfast in her belief that

stabilizing TransCare, and allowing the Company to return to "normalized EBITDA," was the best course of action to maximize value.  (SOF ¶ 63.)

37.     Essentially, the Trustee's allegations "boil down to a single contention:  [Tilton] made a poor decision" when she decided not to pursue a sale of TransCare's paratransit business or of TransCare as a whole in 2015 and thus failed to maximize TransCare's value.  *Roselink*, 386 F. Supp. 2d at 220–21.  However, speculative allegations regarding the wisdom of Tilton's decision not to pursue a sale, with no evidence to support them, are insufficient to rebut the business judgment rule.  *See id.*; *see also In re Trinsum Grp., Inc.*, 466 B.R. at 609–10 ("[T]he court does not consider the content of the decision where the process employed was rational and used in a good faith attempt to promote corporate interests."); *cf. Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015) ("Directors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors.").

### B.     THE OLDCO/NEWCO RESTRUCTURING WAS ENTIRELY FAIR

38.     The Trustee also frames his breach of fiduciary duty theory around a narrower set of allegations:  that is, that Tilton breached her fiduciary duties of loyalty and good faith by pursuing the OldCo/NewCo Restructuring.  (FPTO ¶¶ 181-84.)  The Trustee claims that the OldCo/NewCo Restructuring is subject to review under the "entire fairness" standard because Tilton served on the Boards of both TransCare and Transcendence and had a controlling equity stake in each.  But even under this heightened standard, the transaction easily passes muster because the actions that Tilton took to form Transcendence and foreclose on the Subject Collateral were the product of fair dealing and conducted at a fair price.  The Trustee's speculative allegations to the contrary are simply not supported by evidence.

39. Under the "entire fairness" standard, courts review a director's decision to ensure it is entirely fair to the corporation's stakeholders. To do so, courts looks at procedural fairness (fair dealing or process) and substantive fairness (fair price). *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994).

**The OldCo/NewCo Restructuring Was the Product of Fair Dealing**

40. A fair process "embraces questions of when the transaction was timed, how it was initiated, structured, [and] negotiated. . . ." *Weinberger*, 457 A.2d at 711. What the Trustee characterizes as a "secret scheme" undertaken in the dead of night was actually the subject of well documented, extensive negotiations involving Wells Fargo, CMAG, TransCare officers and employees, and restructuring counsel for both TransCare and Wells Fargo. These undisputed facts show that the timing, negotiations, and structure of the plan were fair and well known.

41. To begin with, the Trustee's entire theory falls apart given the timing of the transaction. The cornerstone of the Trustee's claim is that Tilton "deprived TransCare of the ability to monetize TransCare's assets as a going concern" when she "execut[ed] the Transcendence transaction" in February 2016. (FPTO ¶ 182.) By that time, however, it was *impossible to continue TransCare or its assets as a going concern absent voluntary working capital financing*. That is not a matter of argument, but an indisputable fact based on the evidence. For TransCare to continue as a going-concern in late 2015 and early 2016, three necessary conditions needed to be met. To start, TransCare would have needed working capital financing to continue operating, but no such financing was available. By October 2015, Wells Fargo had issued the Non-Renewal Notice to TransCare, the Wells Fargo Credit Agreement was set to expire on January 31, 2016, and Wells Fargo had no intention of continuing to fund

TransCare as a going-concern. (SOF ¶¶ 81–82, 112.) Indeed, Wells Fargo would only commit to providing bridge funding through a sale if TransCare and Tilton acquiesced to several onerous conditions, including but not limited to her agreement to provide millions of dollars in immediate funding (that, for the reasons discussed below, Tilton had no obligation to provide). (SOF ¶¶ 89–94.) Without such working capital financing, TransCare could not continue (much less be monetized) as a going concern. (SOF ¶ 103.)

42.     For another thing, there is no evidence that TransCare could have attracted capital at the time Tilton was pursuing the OldCo/NewCo Restructuring. TransCare's assets were already pledged in full to multiple secured lenders: Wells Fargo and the Term Loan Lenders. (SOF ¶¶ 19, 25, 29.) There was nothing to offer a new lender as collateral. Even if an outside lender could get past that fact, it would then discover that TransCare did not have timely or accurate financial statements and had no audited financial statements for 2014 or 2015. (SOF ¶¶ 34–36.) Under these circumstances, the idea that some 'White Knight' would jump in and save TransCare defies reason and has no evidentiary support.

43.     Finally, the only possible financing CMAG or Wells Fargo proposed was from *Tilton herself*, or entities she owned or controlled. (SOF ¶¶ 91, 103.) But Delaware law is clear that Tilton had no fiduciary obligation to provide any money to TransCare, let alone the many millions of dollars necessary for it to continue operations. *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) ("[T]he law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation. . . ."). *Thorpe v. CERBCO, Inc.*, No. 11713, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993). ("[C]ontrolling shareholders, while not allowed to use their control over corporate

property or processes to exploit the minority, are not required to act altruistically towards them.").

44. Based on the undisputed record, no reasonable factfinder could conclude that Tilton opportunistically timed the OldCo/NewCo Restructuring. *See S. Muoio & Co. LLC v. Hallmark Entn't Invs. Co.*, No. 4729, 2011 WL 863007, at *11 (Del. Ch. Mar. 9, 2011) (finding timing was fair because "there was no tangible way that Crown would be able to meet its debt obligations when they were due, and that Crown had no real options other than a recapitalization or bankruptcy. Given the fact that Crown's debt crisis had developed over the years with unprofitable and not-promising operations, it is evident that Crown did not have a solution that would provide a better opportunity for future value than a recapitalization."), *aff'd,* 35 A.3d 419 (Del. 2011).

45. The timing of a transaction is important to fair dealing for a specific reason: a transaction could be unfair if the director orchestrated the timing in order to benefit herself, and if the timing was "prejudicial" to the company. *Kahn v. Tremont Corp.*, 694 A.2d 422, 431 (Del. 1997) (finding timing was fair even though the controlling shareholder "obtained a significant financial advantage in the timing of the purchase" because he "did not do so at the expense of [the controlled company]"). Neither occurred here. The undisputed timeline shows that the exigent circumstances motivating the OldCo/NewCo Restructuring were not brought about by Tilton, deliberately or otherwise. There is no dispute that *before* Tilton conceived the OldCo/NewCo Restructuring: (i) TransCare faced significant liquidity constraints for over a year, (ii) TransCare faced external issues for many months that limited its ability to stabilize, such as Wells Fargo's decision to constrict its calculation of TransCare's borrowing base and, later, its decision not to extend the Wells Fargo Credit Agreement beyond January 31, 2016, and

(iii) these external issues persisted even though, over the course of many months, Ark II and the Zohar Funds injected millions of dollars of emergency funding into the Company so it could continue to operate. (*See* SOF ¶¶ 31, 77–78, 82; *see also* n.6, *supra*.) Moreover, there is no evidence showing how the timing of the OldCo/NewCo Restructuring prejudiced TransCare, which was experiencing an existential liquidity crisis when the restructuring was conceived. Thus, none of the red flags that suggest unfair timing are present here.

46.     The Trustee asserts that Tilton and her team "endeavored to keep this plan secret." (Am. Compl. ¶ 89.) But the undisputed evidence does not support this bizarrely counterfactual contention either. Numerous documents and witnesses' testimony show that Tilton and her team engaged in an open and coordinated effort with TransCare management, CMAG, Wells Fargo and its counsel, and TransCare's restructuring counsel, to create a viable restructuring plan for TransCare. (*See, e.g.*, SOF ¶¶ 109, 123.) After Wells Fargo made clear to Tilton that it intended to terminate the Wells Fargo Credit Agreement, the record demonstrates that Tilton designed the OldCo/NewCo Restructuring to *benefit* Wells Fargo by enabling it to exit the credit "at 100 cents on the dollar." (SOF ¶ 109.) Throughout February 2016, Tilton shared with Wells Fargo wind down models and budgets prepared by her team, CMAG, and TransCare management. (SOF ¶¶ 113, 125, 127.) For example, on February 17, 2016, Tilton sent Wells Fargo a draft of a wind-down plan, writing: "This shows the wind-down is pretty much break even. It needs more refinement but I hope this gives you some comfort." (SOF ¶ 125.) Wells Fargo encouraged the restructuring efforts, indicating to Tilton that it shared her desire to "find a joint solution to unwind more gracefully." (SOF ¶ 129.) Moreover, TransCare's restructuring counsel was engaged in a continued dialogue with counsel to Wells Fargo regarding the carve-out of the NewCo assets. (SOF ¶¶ 126, 130.) The record shows that CMAG also developed budgets for

the NewCo business, analyzed the proposed Article 9 foreclosure, and assisted Tilton's team with the refinement of the NewCo models. (SOF ¶¶ 122, 127.) Together, these undisputed facts demonstrate that there was nothing secretive about Tilton's negotiating process.

47.     The OldCo/NewCo Restructuring was also structured fairly. As step one, PPAS (as administrative agent) would foreclose on and recover certain TransCare collateral (*i.e.*, the Subject Collateral) and transfer those assets to Transcendence. (SOF ¶¶ 114, 135.) Thereafter, Tilton, as the director of Transcendence, would, through her own voluntary financing, save jobs by operating new business lines with the Subject Collateral. (SOF ¶¶ 114, 132–133, 142.) At the same time, TransCare's outstanding obligations to Wells Fargo would be satisfied through its continued collection of accounts receivable. (SOF ¶ 125.) Importantly, in this plan, the OldCo business lines would be supported during the wind-down period by having access through the TSA to certain services, equipment and other supplies that were to be transferred to Transcendence. (SOF ¶ 120.) The OldCo business lines were also designed to wind down over 90 days to allow TransCare to issue notice to OldCo employees in accordance with the WARN Acts. (SOF ¶¶ 117–119.)

48.     Central to the Trustee's theory is that the Article 9 foreclosure was unfair to TransCare. But PPAS, as administrative agent for the Term Loan Lenders, plainly had a right to foreclose on the Subject Collateral. A creditor is "not constrained by fiduciary duties when acting as a creditor in relation to [a] foreclosure sale." *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 413–15 (Del. Ch. 1999) (approving interested director's foreclosure sale and noting "[f]iduciary obligation does not require self-sacrifice. More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions

giving rise to the fiduciary obligation in the first instance."). At the time of the foreclosure, TransCare was in default of its obligations under the Term Loan Agreement. (SOF ¶ 108.) Pursuant to Section 8 of the PPAS Security Agreement, upon an Event of Default PPAS, as administrative agent, was permitted to foreclose upon TransCare's assets, and did just that with respect to the Subject Collateral. (SOF ¶¶ 17, 22, 135.)

49. Lastly, although the Trustee claims the OldCo/NewCo Restructuring was "executed" in an unfair way, *see* FPTO ¶ 182, the reality is that it was ultimately nothing more than a paper transaction. Although the paperwork for the Article 9 foreclosure was executed and TransCare was credited $10 million under the Term Loan Agreement, the Subject Collateral was never physically transferred. (SOF ¶¶ 152–54.) There is no evidence that the Trustee was unable to secure the Subject Collateral and liquidate or otherwise dispose of those assets pursuant to the Personal Property Stipulation. In other words, this is not a case where an insider spun off valuable assets from a debtor and then made millions operating them outside the reach of the debtor's creditors. On the contrary, the assets were transferred only on paper. Critically, there is no evidence that the Article 9 foreclosure devalued the Subject Collateral. Without working capital financing, the Subject Collateral had only liquidation value on the petition date and it *still* had only liquidation value when the assets were auctioned off a few months later.

**The Price Paid for the Subject Collateral Was Fair**

50. The Trustee also claims the price paid for the Subject Collateral was not fair. That argument is a red herring. The price could not be unfair because, other than on paper,

TransCare never lost control of the Subject Collateral. Simply put, the OldCo/NewCo Restructuring never materialized. That is not in dispute. (*See, e.g.*, Am. Compl. ¶ 5).[13]

51. In any event, the Trustee's claim could not survive summary judgment even if the price were relevant because Tilton calculated the price fairly. She employed two valuation methods—a computation of book value and an assessment of prospective cash flow based on a multiple of EBITDA—and cross-checked those numbers to ensure the amount made sense. (SOF ¶ 140.)[14] Tilton's "use [of] multiple valuation methodologies" that "independently reach[ ] results that f[a]ll within the same range" were consistent with the steps a "rational participants in any sale process" would take. *DFC Glob. Corp.*, 172 A.3d at 369; *S. Muoio & Co. LLC*, 2011 WL 863007, at *17.

52. Moreover, the Trustee's only factual challenge to the price is the argument that the $10 million credit bid for the Subject Collateral was not subjected to independent valuation. (FPTO ¶¶ 145-46.) But that alone is not evidence that the price was unfair. In other words, the Trustee cannot simply allege a price is unfair in the abstract; he must provide evidence that the price is unfair relative to some higher price "reasonably available" on the open market. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1177 (Del. 1995). He has no evidence with which to do so.

---

[13] Courts inquire into the payment price because it reveals whether directors "effectuated the transaction" of an asset "at a price that is below current market value." *In re Nine Sys. Corp. S'holders Litig.*, No. 3940, 2014 WL 4383127, at *27 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015). Here, however, the OldCo/NewCo Restructuring was never fully "effectuated" insofar as the assets at issue were never physically transferred to Transcendence and were "given back" to the Trustee to sell through an auction process.

[14] These are sound ways to calculate a sale price. *See also DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 369 (Del. 2017) ("[E]conomics and corporate finance instruct rational participants in any sale process that they should base their bids on their assessments of the corporation's ability to generate further free cash flows[.]"); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 495 (Del. Ch. 1923) ("It may readily be conceded" that "book value[] may, however, be in excess of fair market value.").

C.     TILTON ACTED IN GOOD FAITH IN SEEKING TO PROVIDE WARN NOTICE

53.     The Trustee also alleges that Tilton breached her fiduciary duty of loyalty and good faith to TransCare by consciously disregarding the Company's duty to comply with its obligations under the federal WARN Act and the New York WARN Act, which in certain cases require an employer to provide 60 or 90 days' notice, respectively, to affected employees if there is a mass layoff or plant closing.  The Trustee's allegations are belied by the undisputed facts.

54.     As a subsidiary element of the duty of loyalty, a breach of fiduciary duty may be found when the fiduciary has failed to act in good faith.  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  To succeed on a claim for the breach of the duty of good faith, a plaintiff must demonstrate that a fiduciary either:  (1) "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation"; (2) "act[ed] with the intent to violate applicable positive law"; or (3) "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *Disney*, 906 A.2d at 67.  Further, "[b]ad faith is 'not simply bad judgment or negligence,' but rather 'implies the *conscious* doing of a wrong because of *dishonest purpose or moral obliquity* . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will.'"  *McGowan v. Ferro,* 859 A.2d 1012, 1036 (Del. Ch. 2004) (emphasis added), *aff'd*, 873 A.2d 1099 (Del. 2005).

55.     As a threshold matter, there can be no serious dispute that Tilton's decisions concerning the provision of notice to employees were not "motivated by an actual intent to do harm" to TransCare.  *Disney*, 906 A.2d at 64.  Likewise, the Trustee does not allege—and there is no evidence—that Tilton "act[ed] with intent [for TransCare] to violate" the WARN Acts.  *Id.* at 67.

23

56.     The Trustee instead focuses his "bad faith" theory on the contention that Tilton "knew or should have known of the requirements of the [WARN Acts]" and failed to take action to comply with the laws' requirements.  (Am. Compl. ¶ 112.)  In other words, that Tilton acted with "conscious disregard for [her] responsibilities."  *Disney*, 906 A.2d at 64.

57.     A party that bases a breach of fiduciary duty claim on a fiduciary's conscious disregard of her duties bears a heavy burden of proof; the Trustee must show that Tilton's conduct was "qualitatively more culpable than gross negligence."  *Id.* at 66.  In addition, the Trustee must also show that Tilton acted with scienter; that is, that Tilton had "actual or constructive knowledge that [her] conduct was legally improper."  *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008); *Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,* No. 20228, 2004 WL 1949290, at *17 n.92 (Del. Ch. Aug. 24, 2004) (explaining that actions "taken with intentional and conscious disregard of a board's duties" are not just "beyond unreasonable" but are "irrational").  Delaware courts describe a conscious disregard of fiduciary duty as equivalent to "adopting a 'we don't care about the risks' attitude."  *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

58.     There is no evidence to support a finding that Tilton understood TransCare's obligations under the WARN Acts, but nonetheless adopted a "we don't care about the risks attitude."  Instead, the evidence shows exactly the opposite:  Tilton designed and negotiated an orderly wind-down of the OldCo businesses lines over the course of 90 days in an effort to *ensure* compliance with the WARN Acts.  (SOF ¶¶ 117–19.)  The "Progress and Action list" Tilton's team developed and discussed with her provided for the timely issuance of WARN notices to all OldCo employees.  (SOF ¶ 123.)  Tilton also discussed the issue with representatives of Wells Fargo in connection with the parties' negotiations concerning Wells

Fargo's continued funding of TransCare during the wind-down. (SOF ¶¶ 127–28.) Indeed, the first assumption in the proposed wind-down budget Tilton provided to Wells Fargo was that "[a]ll 911 and Core [*i.e.*, OldCo business lines subject to WARN] contracts terminate on 90 day notice period." (*Id.*)

59. TransCare was ultimately unable to issue WARN notices to all OldCo employees as initially planned due to the unforeseen halt in TransCare's operations on or around February 24, 2016.[15] However, where, as here, Tilton took active steps to *avoid* the risks to TransCare of potential liability under the WARN Acts, the Trustee's "bad faith"-based liability theory is untenable, and Tilton is entitled to summary judgment on it.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S STAY VIOLATION CLAIM

60. The Trustee seeks (i) to hold Defendants in "civil contempt" and (ii) an award of "sanctions" for alleged violations of section 362(a) of the Bankruptcy Code, which automatically stays, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The Trustee's claim for violation of the automatic stay is based on the temporal proximity between PPAS's foreclosure on certain of TransCare's assets and negotiations with the MTA about transferring the MTA Contract to Transcendence, on the one hand, and the filing of chapter 7 petitions by the Initial Debtors, on the other hand. (Am. Compl. ¶ 140.) But even assuming, *arguendo* and for purposes of this Motion only, that the assets at issue (*i.e.*, the MTA Contract, ambulances, and equipment (including servers)) were property of the Initial Debtors' estates, and

---

[15] Communications that were sufficient for WARN purposes were received by TransCare's employees on February 24, 2016 and February 26, 2016. *See* Non-Debtors Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 28, Adv. Proc. No. 16-01033-smb.

that Defendants made efforts to exercise control over them, summary judgment is still warranted because Defendants' alleged actions caused no actual damage to the Initial Debtors' estates.

61.     "A Bankruptcy Court has the power to issue contempt orders pursuant to statute." *Dorsagno v. Cooley*, No. 95-CV-201, 1996 WL 312180, at \*2 (N.D.N.Y. May 31, 1996) (citing 11 U.S.C. § 105(a)).  In the Second Circuit, a willful stay violation may be sanctionable under the court's contempt power.  *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1104 (2d Cir. 1990).  "The purpose of civil contempt is never punitive, but 'to coerce compliance with a court order or to compensate an injured party for losses suffered by reasons of the contemptuous behavior.'"  *In re World Parts, LLC*, 291 B.R. 248, 253–54 (Bankr. W.D.N.Y. 2003).

62.     In interpreting the contours of the contempt power in the context of violations of the automatic stay, courts have consistently held that a debtor must establish injury by reason of the violator's actions to be entitled to a finding of contempt.  *In re Manchanda*, No. 16-10222, 2016 WL 3034693, at \*4 (Bankr. S.D.N.Y. May 19, 2016) (rejecting debtor's attempt to hold defendant in contempt because debtor had not established that he was injured by reason of defendant's actions); *Schewe v. Fairview Estates (In re Schewe)*, 94 B.R. 938, 948 (Bankr. W.D. Mich. 1989) (finding of contempt not warranted where debtor failed to present any evidence regarding damages suffered).

63.     Here, there is no evidence that this Court was required to "coerce" Defendants to comply with the automatic stay.  Instead, the uncontested evidence shows that Defendants voluntarily worked with the Trustee to secure the Foreclosed Personal Property Assets[16] for the

---

[16] Foreclosed Personal Property Assets is defined in the Personal Property Stipulation as "certain of Debtors' personal property, including equipment, inventory, vehicles, and certain contracts" that PPAS accepted on behalf of the Term Loan Lenders and as set forth in the Notice of Acceptance.  (SOF ¶ 155.)

Trustee. (SOF ¶¶ 149–53.) Indeed, the Trustee testified that none of the Defendants refused to turn over any assets that were the subject of the Article 9 foreclosure. (SOF ¶ 153.)

64. Moreover, there is simply no evidence that the Initial Debtors' estates suffered any damages as a result of the Defendants' alleged actions. *First*, as discussed, Defendants worked cooperatively with the Trustee without the need for any court intervention. *Cf. In re Allied Holdings, Inc.*, 355 B.R. 372, 379 (Bankr. N.D. Ga. 2006) (finding compensatory damages appropriate where violator's actions required that debtor file emergency motion to hold violator in contempt and to seek an order compelling violator to refrain from any collection attempts).

65. *Second*, there is no evidence that any damage inured to the Initial Debtors as a result of Defendants' efforts to "consummate the 'strict foreclosure.'" (Am. Compl. ¶ 140.) The evidence shows that on the morning of February 24, 2016, *prior* to the filing of the Initial Debtors' bankruptcy petitions, PPAS, as administrative agent for the Term Loan Lenders, foreclosed upon the Subject Collateral pursuant to the Notice of Default and Notice of Acceptance, and consistent with its and the Term Loan Lenders' rights under the Term Loan Agreement. (SOF ¶¶ 17, 22, 135, 137.) Post-petition, Defendants attempted, but *failed*, to secure assets they believed in good faith had been part of the already completed Article 9 foreclosure, including a server, the MTA Contract, and other equipment and vehicles necessary for Transcendence's operations. (SOF ¶¶ 149–54.)

66. With respect to the equipment and vehicles, to the extent Defendants attempted to secure assets of the NewCo business lines, those assets were not property of the estate and were not subject to the automatic stay. As to equipment and vehicles that might have been property of the Initial Debtors' estates, there is no evidence of physical transfer of any assets to Transcendence or another business. Furthermore, with respect to the MTA Contract, the

evidence shows that representatives of certain of the Defendants continued discussions with the MTA after the Initial Debtors filed their chapter 7 petitions about assigning the MTA Contract from TransCare New York to Transcendence. (SOF ¶ 154.) However, those discussions stalled and the MTA Contract was never assigned to Transcendence. (*Id.*) The Initial Debtors were not injured by any of these actions in any way.

67.     *Third*, there is no evidence that the assets at issue lost value as a result of any claimed violation of the automatic stay. The Foreclosed Personal Property Assets were sold pursuant to the Personal Property Stipulation at auctions held on several dates from April 2016 through June 2016. (SOF ¶¶ 155–59.) There is no evidence that the assets sold at auction, including the Foreclosed Personal Property Assets, were worth less when auctioned than they were on February 24-25, 2016, when the alleged stay violations took place.

68.     Absent evidence sufficient to show the Initial Debtors were damaged as a result of any alleged stay violation, Defendants are entitled to summary judgment on Claim IX.

## III.     THE TRUSTEE LACKS STANDING TO ASSERT HIS CLAIM FOR PAYMENT SUBORDINATION

69.     Through Claim XII, the Trustee seeks to subordinate payment of amounts owed to PPAS and the Term Loan Lenders, as set forth in PPAS's filed proofs of claim. (Am. Compl. ¶¶ 161–67.) Relying on Section 2.2 of the Ark II Intercreditor Agreement,[17] which concerns relative priority of liens as between PPAS (as agent for the Term Loan Lenders) and Ark II, the Trustee contends that PPAS may not receive payment on account of claims arising under the Term Loan Agreement unless and until Ark II is paid in full on account of its claim. (*Id.*) But in

---

[17] The Ark II Intercreditor Agreement is governed by New York law. (SOF ¶ 101.)

order to obtain this relief, the Trustee must first demonstrate that he or TransCare has standing. There is no evidence to support such a finding.

70.     The party invoking federal jurisdiction bears the burden of demonstrating prudential standing.  *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (Bernstein, J.).  To establish prudential standing, a "plaintiff generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

71.     In the context of enforcing a contract, only parties to the contract or third-party beneficiaries of the contract have prudential standing to litigate issues related to that contract.  *In re Motors Liquidation Co.*, 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018); *Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir. 2009) ("A non-party to a contract . . . lacks standing to enforce the agreement in the absence of terms that clearly evidence an intent to permit enforcement by the third party in question.") (alteration and quotation marks omitted).

72.     Neither TransCare nor the Trustee was a party to the Ark II Intercreditor Agreement, which sets forth the parties as only Ark II and PPAS.  (SOF ¶ 100.)  Nor do the terms of the Ark II/PPAS Intercreditor Agreement "clearly evidence an intent to permit enforcement" by TransCare or the Trustee.  *Premium Mortg. Corp.*, 583 F.3d at 108.  On the contrary, the acknowledgement TransCare Corporation executed in connection with the Ark II Intercreditor Agreement provides, in relevant part, that "[a]lthough it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement."  (SOF ¶ 102; *see also* SOF ¶ 100, § 3.13 ("[T]his Intercreditor Agreement is solely for the benefit of [Ark II and the Term Loan Lenders] and their respective successors, participants and assigns, and no

other person shall have any right, benefit, priority or interest wider, or because of the existence of, this Intercreditor Agreement.").)

73.     Because TransCare and the Trustee are not parties to or third-party beneficiaries of the Ark II Intercreditor Agreement, the Trustee lacks standing to maintain his payment subordination claim, and summary judgment should be entered in PPAS's favor.

## IV.     PPAS'S LIENS ON THE SUBJECT COLLATERAL ATTACHED PRE-PETITION AND ARE NOT BARRED BY SECTION 552 OF THE BANKRUPTCY CODE

74.     In Count XIII, the Trustee argues that PPAS's liens should not extend to post-petition proceeds of the Foreclosed Personal Property Assets because PPAS engaged in "inequitable conduct caus[ing] TransCare to liquidate to the detriment of its other creditors." (FPTO ¶ 190.)   The Trustee's claim misconstrues the "equities of the case exception" upon which the claim is based, is not supported by evidence and should be dismissed.

75.     Under section 552(b)(1) of the Bankruptcy Code, if a creditor and debtor have a pre-petition security agreement that extends to the proceeds, product, offspring or profits of the underlying collateral, the terms of that agreement will be enforced under applicable non-bankruptcy law, "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."   *See* 11 U.S.C. § 552(b)(1).   The term "equities of the case" is not defined in the Bankruptcy Code nor has the Second Circuit assigned a meaning to it. Nevertheless, several courts of appeal have held that "the principal purpose of the equities of the case exception is to prevent secured creditors from reaping unjust benefits from an increase in the value of collateral during a bankruptcy case resulting from the (usually) reorganizing chapter 11 debtor's use of other assets of the estate or from the investment of non-estate assets."   *Arnot v. Endresen (In re Endresen)*, 548 B.R. 258, 274 (B.A.P. 9th Cir. 2016) (collecting cases from the

First, Third, Fourth, and Fifth Circuits).  *See also Toso v. Bank of Stockton (In re Toso)*, Nos. -05-1290, 05-1389, 06-1148, 06-1149, 2007 WL 7540985, at *13 (B.A.P. 9th Cir. Jan. 10, 2007) (analyzing the cases interpreting the equities of the case exception and determining that "[n]o circuit case law attributes a different meaning to this phrase").

76.     As the court in *Delbridge v. Production Credit Association,* 104 B.R. 824 (E.D. Mich. 1989) explained:

> The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which would normally would go to general creditors) to cause the appreciated value. For example, if a creditor had a security interest in raw materials worth one million dollars and the debtor invested $100,000 from the general estate funds to convert those materials into a manufactured good worth 1.5 million dollars, it may be inequitable to let the secured creditor benefit from the entire proceeds of the sale, since the general creditors contributed to the appreciated value.

104 B.R. at 826 (citing S.Rep No. 989-95 (1977-78)).

77.     As an initial matter, PPAS's interest in TransCare's assets extends to proceeds of the underlying collateral.  *See* 11 U.S.C. § 552(b)(1); (SOF ¶¶ 18–19, 30.)  Indeed, the Trustee concedes that the "[c]ash proceeds of [the auction sales] constitutes proceeds, products, and offspring of . . . PPAS's prepetition collateral under section 552(b)."  (Am. Compl. ¶ 172.) Furthermore, there is no evidence that the Foreclosed Personal Property Assets increased in value from the Initial Petition Date through the dates of the auction sales, a necessary pre-requisite to application of the equities of the case exception.  (*See* Section II, *supra*.)  As such, the narrow contours of the "equities of the case" exception do not apply to the undisputed facts.

V.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE TRUSTEE'S CLAIM TO RECOUP POST-PETITION PROCEEDS DISTRIBUTED TO PPAS

78.     The Trustee also contends, in Claim XIII, that the distribution to PPAS, and from

PPAS to Ark II, of proceeds from the sale of the Foreclosed Personal Property Assets is subject to avoidance under section 549 of the Bankruptcy Code. Section 549 provides in relevant part that a trustee may avoid a transfer of property of the estate that occurs after the petition date that is not authorized by the Bankruptcy Code or by the court. 11 U.S.C. § 549. The Trustee's claim fails for two reasons.

79. *First*, the distribution of the sale proceeds from the Trustee to PPAS was authorized by the Personal Property Stipulation. The Personal Property Stipulation provides in relevant part that the auctioned assets, including the Foreclosed Personal Property Assets, would be sold free and clear of all liens, encumbrances and interests in the assets "with any such Liens, claims or encumbrances to attach to the net proceeds of sale in the same amount and priority as they existed as of the date the Debtors filed their petitions for relief with this Court." (SOF ¶ 156.) As of the Initial Petition Date, PPAS, on behalf of the Term Loan Lenders, held liens in the Foreclosed Personal Property Assets, which were preserved in the Personal Property Stipulation. (SOF ¶¶ 19, 156.)

80. The Trustee does not dispute that the March 25 Order provided for the transfer of the sale proceeds to PPAS. Instead, the Trustee argues that the transfer of proceeds from PPAS to *Ark II* was not authorized by the March 25 Order. (FPTO ¶ 191.) But what PPAS did with the proceeds after receiving them from the Trustee is between PPAS and the Term Loan Lenders, for which it served as the administrative agent. To put it bluntly, it is none of the Trustee's business. To the extent the Term Loan Lenders may take issue with PPAS's distribution of the proceeds to Ark II, that hypothetical dispute lies between the lenders and their agent and has no bearing on TransCare's estates.

81.     *Second*, section 549 is not applicable to the transfer of proceeds to PPAS or Ark II because the proceeds were not property of the estate at the time of the transfer.  A trustee is allowed to avoid only "a transfer of property of the estate."  11 U.S.C. § 549(a).  Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  *Id.* § 541(a)(1).  Although the scope of section 541(a)(1) is broad, property in which the debtor holds only legal title and not an equitable interest becomes property of the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."  *Id.* § 541(d).

82.     *McCord v. Agard (In re Bean)*, 252 F.3d 113 (2d Cir. 2001), is instructive.  There, a chapter 7 trustee filed an action under section 549, seeking to avoid a post-petition transfer of proceeds.  The trustee alleged that the debtor sold certain real property post-petition.  The debtor used those proceeds to satisfy two old mortgages and turned over the balance of the proceeds to the trustee.  The trustee sought to avoid the transfers to the mortgagees.  The Second Circuit held that the "property of the estate" was limited to the debtor's equity in the property on the petition date.  *Id.* at 117 ("Any portion of a debtor's property that is unencumbered by mortgage – the equity – is part of the bankrupt's estate.") (citing *United States v. Rauer*, 963 F.2d 1332, 1337 (10th Cir. 1992)).  Because the trustee was entitled to recover only the equity the debtor held in the property as of the petition date, and because the debtor had already turned over the excess proceeds (*i.e.*, the equity) to the trustee, the court held that the trustee was not entitled to recover the proceeds distributed to the mortgagees in satisfaction of the old mortgages.  *Id.*; *see also Cage v. Wyo-Ben, Inc. (In re Ramba Inc.)*, 437 F.3d 457, 460–61 (5th Cir. 2006) (rejecting avoidance claim where "Ramba had no interest in the transferred property other than bare legal title").

83. The holdings of *Bean* and *Ramba* should be applied in this case. Here, it is undisputed that as of the Initial Petition Date, all of TransCare's assets, including the Foreclosed Personal Property Assets, were subject to the security interests of Wells Fargo, and PPAS as administrative agent for the Term Loan Lenders. (SOF ¶¶ 19, 25.) The Trustee does not contend (nor could he establish) that the assets were worth more than the secured lenders (*i.e.*, Wells Fargo and the Term Loan Lenders) were owed. As such, even assuming the Initial Debtors held legal title to the Foreclosed Personal Property Assets (and any proceeds from the sale thereof), they had no equitable title to the proceeds generated from any sale of the those assets because the assets were fully encumbered by the secured lenders' security interests.

84. Finally, the sale proceeds are not subject to turnover under section 542(b) of the Bankruptcy Code. Turnover proceedings apply to "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order." *See* 11 U.S.C. § 542(b). The Trustee's turnover claim hinges upon a finding by the Court that the proceeds are estate property. For the reasons stated in the immediately preceding paragraph, the Trustee cannot make that showing, and section 542(b) is thus inapplicable.

VI. THERE IS NO BASIS TO EQUITABLY SUBORDINATE THE CLAIMS OF PATRIARCH PARTNERS, PPMG, PPAS OR ARK II

85. Finally, the Trustee seeks to have the Court reorder the otherwise applicable priorities of Patriarch Partners, PPMG, PPAS and Ark II by application of the principles of equitable subordination as set forth in the Bankruptcy Code. 11 U.S.C. § 510. That provision permits the Bankruptcy Court to subordinate one claim to another. *Id.* § 510(c)(1).

86. "Equitable subordination is an extraordinary remedy that is to be used sparingly." *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008),

*aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009). "The goal of the doctrine is not to punish the offending creditor for the wrongful conduct, but rather, is to offset the harm done to other creditors. The doctrine is remedial and not penal." *Midlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 650 (Bankr. D. Vt. 1990).

87. When considering if the equitable subordination doctrine applies, courts uniformly apply the three-pronged test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977): (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is consistent with bankruptcy law. *Id.* at 700. Both injury and unfair advantage must be demonstrated to satisfy the second *Mobile Steel* prong. *See White Current Corp. v. Rural Util. Serv. (In re Vt. Elec. Generation & Transmission Coop., Inc.)*, 240 B.R. 476, 485 (Bankr. D. Vt. 1999); *In re Mayo*, 112 B.R. at 651.

88. Summary judgment is warranted here, as it is clear from the undisputed facts that the Trustee cannot satisfy each prong of the conjunctive *Mobile Steel* test. *See, e.g.*, *Rockville Orthopedic Assocs., P.C. v. Kort (In re Rockville Orthopedic Assocs., P.C.)*, 377 B.R. 438, 445 (Bankr. D. Conn. 2007) (granting summary judgment where the alleged conduct did not constitute "inequitable conduct"); *Cox v. Hess (In re Big Wheel Holding Co.)*, 214 B.R. 945, 953 (D. Del. 1997) (granting summary judgment where, even assuming the conduct was inequitable, "no reasonable trier of fact could conclude that defendants' actions were detrimental to the creditors . . . or created an unfair advantage for defendants in the bankruptcy process").

89. The Amended Complaint alleges that Patriarch Partners, PPMG, PPAS, and Ark II engaged in the following "inequitable conduct": (i) prohibited TransCare from negotiating a sale of TransCare and/or its assets to third parties in 2015 (Am. Compl. ¶¶ 35-36, 41-44, 56-58,

67); (ii) directed TransCare to make monthly interest payments to PPAS (*id.* ¶¶ 49-50, 64-65); and (iii) took actions in furtherance of the OldCo/NewCo Restructuring in order to facilitate the transfer of assets from TransCare to Transcendence, including after the Initial Petition Date (*id.* ¶¶ 80, 83-84, 87, 89-91, 95, 98, 105-06). The Trustee's allegations are not supported by the facts and cannot be sustained as a matter of law.

90.    *First*, Patriarch Partners and PPMG did not act inequitably in respect of Tilton's decision not to explore asset sales to third parties throughout 2015.[18] For the reasons described in Section I.A *supra*, Tilton—the sole decision-maker—acted in good faith and with a rational business purpose in deciding not to pursue these "offers." (*See* Section I.A, ¶¶ 29–36.) At its core, "inequitable conduct" is "enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (Bernstein, J.) (citing *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co.)*, 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985)). Where, as here, there is no evidence that Tilton's decision was "unconscionable, unjust, [or] unfair," no reasonable fact-finder could logically conclude that the conduct of Patriarch Partners or PPMG employees in simply relaying that decision to TransCare management or otherwise taking actions consistent with or in support of Tilton's decision is somehow inequitable. *Id.*

91.    *Second*, Patriarch Partners and PPMG did not act inequitably by "directing" TransCare to make monthly interest payments to PPAS. The simple fact is that TransCare was contractually obligated to make these payments under the Term Loan Agreement. (SOF ¶¶ 16–17.) Insisting on compliance with a contractual obligation, without any evidence of overreaching

---

[18] The Amended Complaint does not allege that PPAS and Ark II took any actions with respect to these third-party expressions of interest (nor did they).

on the part of the party enforcing its contractual rights, is not "inequitable conduct." *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990) (rejecting the argument that a creditor acts unfairly or inequitably when "compl[ying] with all contractual requirements" because "[c]ontracts specify the duties of the parties to each other, and each may exercise the privileges it obtained"). If enforcing contractual requirements, without more, cannot constitute inequitable conduct for purposes of subordination, neither can the mere act of informing TransCare management of the Company's obligation to fulfill those requirements. That is all Patriarch Partners and PPMG employees are alleged to have done. Moreover, neither PPMG nor Patriarch Partners' actions conferred any advantage upon them, as it is undisputed that they were not parties to the Term Loan Agreement. (SOF ¶¶ 12, 14.)[19]

92.     *Third*, the conduct of Patriarch Partners, PPMG, Ark II, and PPAS in connection with the OldCo/NewCo Restructuring cannot sustain an equitable subordination claim. As discussed in Section I.B, the restructuring was the product of entirely fair dealing. With respect to PPMG and Patriarch Partners, the discovery record demonstrates that neither entity would be enriched by the OldCo/NewCo Restructuring; Patriarch Partners and PPMG (i) were not equity holders in or lenders to either TransCare or Transcendence (SOF ¶¶ 2, 12, 14, 133); and (ii) did not receive (and were not the intended recipients of) any of the Foreclosed Personal Property Assets (SOF ¶¶ 142, 152–54).

93.     Furthermore, the conduct of PPAS and Ark II in respect of the Ark II Credit Agreement, including PPAS's agreement to payment and structural subordination to Ark II, do

---

[19] To the extent the Trustee alleges that PPAS's acceptance of the interest payments and distribution of those payments to the Term Loan Lenders constitutes "inequitable conduct," this Court has already recognized, through the dismissal of the constructive fraudulent conveyance claim asserted against PPAS, that PPAS was required to accept and disburse those payments in accordance with the terms of the Term Loan Agreement. Mar. 28, 2019 Hr'g Tr. 42:23-24, 43:9-44:10.

not provide a basis to subordinate the claims of PPAS or Ark II. Here again, the Trustee lacks standing to maintain a claim for equitable subordination arising from Ark II's priming the Term Loan Lenders under the Ark II Credit Agreement.

94.     Consistent with black letter principles of prudential standing, discussed in Section III, *supra*, courts considering standing in the context of equitable subordination claims have held that a trustee may assert an equitable subordination claim if the alleged inequitable conduct caused harm to the *debtor* or to the *entire body of creditors*. *See Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 159 (Bankr. S.D.N.Y. 2014) (Bernstein, J.). *See also St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim[.]")

95.     Conversely, a claim belongs solely to an individual creditor, not a trustee for the debtor's estate, where the harm suffered was "particularized." *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 549 B.R. 21, 42 (S.D.N.Y. 2016) ("[A] claim belongs to individual creditors—and not to a debtor's trustee—when the harm suffered was particularized to those creditors, rather than to all creditors as a whole[.]").

96.     The notion that the Trustee has standing to pursue subordination of claims based on injury to individual creditors has been squarely rejected. *See, e.g., Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*, Bankr. Case No. 10-34499, Adv. No. AP 12-2373, 2015 WL 5766761, at *16 (Bankr. D. Utah Sept. 30, 2015). In *DigitalBridge*, DigitalBridge borrowed funds from a group of three equity holders (the "Equity Lenders"). *See id.* at *1. DigitalBridge agreed to file the Equity Lenders' UCC financing statements, but erroneously filed the financing statements in the wrong state, leaving the Equity Lenders' interests unperfected (the "perfection

38

issue"). *Id.* at *1–2. DigitalBridge then entered into a credit agreement with SKR Credit ("SKR"), which properly perfected its security interest (thus giving it priority over the Equity Lenders). *Id.* at *2–3. The trustee sought to subordinate SKR's claim, arguing that it acted inequitably by obtaining a priority position when SKR had knowledge of the perfection issue at the time the SKR loan was made. *See id.* at *1–3, *15–16.

97. The court rejected the subordination claim in relevant part because the trustee "lack[ed] standing in this case to the extent he [wa]s asserting another person's legal rights, namely those of the Equity Lenders concerning their claim for a particularized injury." *Id.* at *16. The court explained that while "a trustee [could] bring a general equitable subordination claim on behalf of the estate as a whole, and individual creditors can assert equitable subordination claims if they allege particularized injury, ***a trustee cannot assert an equitable subordination claim on behalf of individual creditors***." *Id.* (emphasis added). Thus, because "[t]he Equity Lenders' claim for equitable subordination [wa]s based on an alleged injury to three specific secured creditors," the trustee did not have standing to pursue that claim. *Id.*

98. Here, the Trustee essentially alleges that the Term Loan Lenders suffered an injury when Ark II jumped ahead of and primed them. This is precisely the type of particularized injury (*i.e.*, to, allegedly, the Term Loan Lenders and *only* the Term Loan Lenders) that the court considered in *DigitalBridge* and determined the trustee lacked standing to assert. And for good reason: the allocation of payment between different secured lenders has no impact on the debtors or the unsecured creditor body writ large.

99. *Finally*, to the extent any effort by Patriarch Partners, PPMG, PPAS, or Ark II to secure any of the Foreclosed Personal Property Assets post-petition violated the automatic stay, any such violation did not cause injury to TransCare or its creditors. *See supra* Section II. An

absence of harm is fatal to the subordination claim. *In re Mayo*, 112 B.R. at 651 ("Without the harm there would be no reason to apply equitable subordination to the claim.").

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants respectfully request that the Court enter an order granting partial summary judgment in favor of Defendants and dismissing the Trustee's claims in Counts I, III, IX, XII, XIII and XIV and granting such other and further relief as the Court deems just and proper.

Dated: June 20, 2019

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY 10036-8299
Tel.: (212) 969-3000
Fax: (212) 969-2900
Email: mmervis@proskauer.com
tkarcher@proskauer.com

Nicole A. Eichberger (*pro hac vice*)
650 Poydras Street
Suite 1800
New Orleans, LA 70130-6146
Tel.: (504) 310-2024
Fax: (504) 310-2022
Email: neichberger@proskauer.com

*Attorneys for Defendants*