**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:                                                    :
                                                          :
                                                          :
     TRANSCARE CORPORATION, <u>et al.</u>,          :          Chapter 7
                                                          :          Case No. 16-10407 (SMB)
                                                          :          (Jointly Administered)
                          Debtors.          :

-----------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7                          :
Trustee for the Estates of TransCare                      :
Corporation, <u>et al.</u>,                               :
                                                          :
               Plaintiff,          :
                                                          :          Adv. Proc. No. 18-1021 (SMB)
        - against -                                 :
                                                          :
LYNN TILTON, PATRIARCH PARTNERS                           :
AGENCY SERVICES, LLC, PATRIARCH                           :
PARTNERS, LLC, PATRIARCH PARTNERS                         :
MANAGEMENT GROUP, LLC, ARK II CLO                         :
2001-1 LIMITED, TRANSCENDENCE                             :
TRANSIT, INC., and TRANSCENDENCE                          :
TRANSIT II, INC.,                                         :
                                                          :
               Defendants.          :
                                                          :

-----------------------------------------------------------------x

## DEFENDANTS' LOCAL RULE 7056-1(b) STATEMENT OF <u>MATERIAL FACTS NOT IN DISPUTE</u>

Pursuant to Local Bankruptcy Rule 7056-1(b), Defendants set forth the following material facts as to which no genuine issue exists to be tried. Where indicated, the documents, deposition testimony, and other materials cited in this Rule 7056-1 Statement are being submitted as exhibits to the Declaration of Michael T. Mervis in Support of Defendants' Motion for Partial Summary Judgment, dated June 20, 2019 ("Mervis Decl.").[1]

## I. TRANSCARE

1.      TransCare Corporation is a Delaware corporation and had its principal place of business in Brooklyn, New York. (*In re TransCare Corporation*, 16-10407-smb, Dkt. No. 4.) TransCare Corporation, by and through its subsidiaries[2], provided ambulance and paratransit transportation services and life support services in New York, Pennsylvania and Maryland. (*In re TransCare Corporation*, 16-01033-smb, Dkt. No. 1 ¶ 12, Dkt. No. 18 ¶ 12.)

2.      Lynn Tilton, through funds she owned and managed, purchased TransCare out of bankruptcy on or about August 4, 2003. (Ex. 1, 341 Transcript 6:23-7:6.[3])

3.      From November 2014 through June 14, 2016 (the "Relevant Time Period"), Tilton served as the sole board member of TransCare. (*Id.* at 8:1-9:2.)

4.      During the Relevant Time Period, TransCare New York provided certain services, known as "paratransit services" to the New York City Transit Authority (the "MTA"). (Ex. 2,

---

[1] Unless noted otherwise, all exhibits cited below are located in the Mervis Declaration.

[2] TransCare Corporation's subsidiaries were comprised of the following Delaware corporations: (i) TransCare New York, Inc. ("TransCare New York"), (ii) TransCare ML, Inc., (iii) TC Ambulance Group, Inc., (iv) TransCare Management Services, Inc., (v) TCBA Ambulance, Inc., (vi) TC Billing and Services Corporation, (vii) TransCare Westchester, Inc., (viii) TransCare Maryland, Inc., (ix) TC Ambulance North, Inc., (x) TransCare Harford County, Inc., (xi) TransCare Pennsylvania, Inc., (xii) TC Ambulance Corporation and (xiii) TC Hudson Valley Ambulance Corporation (together with TransCare Corporation, "TransCare"). (*In re TransCare Corporation*, 16-10407-smb, Dkt. No. 1.)

[3] Transcript of Hearing re: 341 Meeting (*In re TransCare Corporation*, 16-10407-smb) (the "341 Tr.")

Pelissier Tr.[4] 120:6-121:5; Ex. 3, Leland I Tr.[5] 86:5-11; Ex. 4, Tilton Tr.[6] 153:16-154:5.) These services were provided pursuant to Contract No. 07H9751T, dated February 27, 2009, between the MTA and TransCare New York, as amended (the "MTA Contract"). (Ex. 5, PP-TRBK0002396.)

5.      Patriarch Partners, LLC ("Patriarch Partners") is a family-owned office that supports Tilton "in [her] ownership and [her] role as manager and director of" a number of different companies ("portfolio companies"), including TransCare. (Ex. 4, Tilton Tr. 11:10-14.) During the Relevant Time period Patriarch Partners also served as the collateral manager for certain investment funds known as the Zohar Funds. As such, Patriarch Partners personnel performed collateral management duties and functions for the Zohar Funds.[7] As part of these collateral management duties, Patriarch Partners monitored and managed the secured loans made by the Zohar Funds to TransCare. (*See, e.g.*, *id.* at 63:14-23; 51:4-23; 296:25-297:9.)

6.      Brian Stephen was an employee of Patriarch Partners during the Relevant Time Period. (Ex. 6, Stephen Tr.[8] 14:8-12; Ex. 4, Tilton Tr. 178:16-17.)

7.      Michael Greenberg was an employee of Patriarch Partners from November 2014 through March 2016. (Ex. 7, Greenberg Tr.[9] 9:14-17, 30:2-9; Ex. 4, Tilton Tr. 178:18-19.)

8.      Scott Whalen was a credit officer employed by Patriarch Partners during the Relevant Time Period. (Ex. 4, Tilton Tr. 137:6-8.)

---

[4] "Pelissier Tr." refers to the transcript of the deposition of Jean-Luc Pelissier taken on October 24, 2018.

[5] "Leland I Tr." refers to the transcript of the deposition of Glenn Leland taken on November 27, 2018.

[6] "Tilton Tr." refers to the transcript of the deposition of Lynn Tilton taken on October 29, 2018.

[7] Other affiliated entities were actually designated as collateral managers for the Zohar Funds, but those other entities delegated their collateral manager duties to Patriarch Partners. *See* Ex. 4, Tilton Tr. 63:14-23.

[8] "Stephen Tr." refers to the transcript of the deposition of Brian Stephen taken on October 17, 2018.

[9] "Greenberg Tr." refers to the transcript of the deposition of Michael Greenberg taken on October 10, 2018.

9.     Patriarch Partners Management Group, LLC ("PPMG") and its employees are "involved with the [portfolio] companies" and work on "their operations and their restructurings." (*Id.* 16:18-17:13.)

10.     Jean-Luc Pelissier was an employee of PPMG during the Relevant Time Period. (*Id.* 149:8-11, 178:20-23; Ex. 2, Pelissier Tr. 17:24-18:14.)

## II.     TRANSCARE'S DEBT STRUCTURE

### *The Term Loan Agreement and Its Relevant Terms*

12.     TransCare Corporation, as borrower, the Term Loan Lenders (as defined below), as lenders, and Patriarch Partners Agency Services, LLC ("PPAS"), as administrative agent, are parties to a Credit Agreement, dated as of August 4, 2003, and as amended (the "Term Loan Agreement").  (Ex. 8, PP-TRBK0000027.)

13.     Tilton is the sole manager and owner of PPAS.  (Ex. 4, Tilton Tr. 18:8-19:22.)

14.     During the Relevant Time Period, the lenders under the Term Loan Agreement were: (i) Ark Investment Partners II, L.P. ("AIP"), (ii) Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"); (iii) Credit Suisse Alternative Capital, Inc. ("Credit Suisse"); and (iv) First Dominion Funding I and First Dominion Funding II ("First Dominion," and together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").  (*See, e.g.*, Ex. 9, PP-TRBK0099600 at PP-TRBK0099609.)

15.     The Term Loan Agreement was governed by New York law.  (Ex. 8, PP-TRBK0000027 at PP-TRBK0000102, § 12.11.)

16.     Pursuant to sections 5.1, 5.4, 5.9, 11.1 and 11.2 of the Term Loan Agreement, PPAS, as administrative agent, was required to accept interest and principal payments from TransCare and distribute those payments to repay the secured loans made by the Term Loan

Lenders.  (*Id.* at PP-TRBK0000055-60, §§ 5.1, 5.4, 5.9; *id.* at PP-TRBK0000091-92, §§ 11.1, 11.2.)

17.     TransCare's failure to make an interest payment within five Business Days (as defined in the Term Loan Agreement) after becoming due constituted an Event of Default (as defined in the Term Loan Agreement) under the Term Loan Agreement.  (*Id.* at PP-TRBK0000088, § 10(a).)

18.     Section 5.6(b) of the Term Loan Agreement provided in relevant part:  "Unless the Required Prepayment Lenders [*i.e.*, the holders of more than 50% of the aggregate unpaid principal amount due under the Term Loan Agreement] shall otherwise agree, if on any date the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from any Asset Sale . . . 100% of such Net Cash Proceeds shall be applied . . . toward the prepayment of the Term Loans and the reduction of the Revolving Credit Commitments . . . ."  (*Id.* at PP-TRBK0000058, § 5.6(b).)

19.     TransCare granted PPAS, as administrative agent and for the benefit of the Term Loan Lenders, a senior secured lien on all of its assets, the rights and obligations of which are set forth in a security agreement, dated as of August 4, 2003, and as amended, supplemented or modified, in favor of PPAS (the "PPAS Security Agreement").  (*Id.* at PP-TRBK0000069, § 6.16; Ex. 10, TRANSCARE00230120 at TRANSCARE00230123, § 2.)

20.     The PPAS Security Agreement was governed by New York law.  (Ex. 10, TRANSCARE00230120 at TRANSCARE00230128, § 17.)

21.     Section 5(g) of the PPAS Security Agreement provided:  "No Grantor [*e.g.,* TransCare Corporation] will sell, transfer, lease or otherwise dispose of any of the Collateral (as defined in the PPAS Security Agreement), or contract or enter into a legally binding commitment to do so . . . ."  (*Id*. at TRANSCARE00230131, § 5(g).)

22.     Section 8 of the PPAS Security Agreement permitted PPAS, on behalf of the Term Loan Lenders, and upon an Event of Default (as defined in Section 10 of the Term Loan Agreement), to "collect, receive, appropriate and realize upon the Collateral (as Defined in Section 2 of the PPAS Security Agreement) . . . and/or . . . sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing) . . . . upon such terms and conditions as it may deem advisable and at such prices as it may deem best[.]"  (*Id.* at TRANSCARE00230136, § 8.)

### *The Wells Fargo Credit Facility and Its Relevant Terms*

23.     TransCare Corporation, TransCare New York, TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc., as borrowers, and TC Ambulance Group, Inc. and TC Ambulance North, Inc., as guarantors, entered into a Loan and Security Agreement with Wells Fargo N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo"), dated as of October 13, 2006 (as amended, the "Wells Fargo Credit Agreement").  (Ex. 11, CURTIS_000736.)  The Wells Fargo Credit Agreement governed a syndicated, asset-backed revolving credit facility.  (*Id.*)

24.     The Wells Fargo Credit Agreement was governed by New York law.  (*Id.* at CURTIS_000839, § 11.1.)

25.     Under Section 5.1 of the Wells Fargo Credit Agreement, TransCare granted to Wells Fargo a security interest in "all [of its] personal and real property and fixtures, and [its] interests in property and fixtures."  (*Id.* at CURTIS_000785, § 5.1.)

26.     Section 9.7(b) of the Wells Fargo Credit Agreement prohibited the borrowers and guarantors from directly or indirectly "sell[ing], issu[ing], assign[ing], leas[ing], transfer[ing],

6

abandon[ing] or otherwise dispos[ing] of . . . any of its assets to any other Person[.]"  (*Id.* at CURTIS_000818, § 9.7.)

27.    Under Section 6.3 of the Wells Fargo Credit Agreement, the borrowers were required to directly remit to Wells Fargo all proceeds from the sale of any Wells Fargo collateral. (*Id.* at CURTIS_000792, § 6.3.)

28.    In connection with the Wells Fargo Credit Agreement, Wells Fargo, on the one hand, and PPAS, on behalf of the Term Loan Lenders, on the other hand, entered into an Intercreditor Agreement, dated October 13, 2006 (the "<u>Wells Fargo/PPAS Intercreditor Agreement</u>).  (Ex. 12, CURTIS_000001.)

29.    The Wells Fargo/PPAS Intercreditor Agreement provided for the retention by the Term Loan Lenders of first priority liens on certain equipment, inventory, vehicles, shares of capital stock of TransCare, and all of TransCare's Intellectual Property (as defined in the Wells Fargo/PPAS Intercreditor Agreement) (together, the "<u>Term Loan Priority Collateral</u>").  (*Id.* at CURTIS_000029 (setting forth the items constituting "Term Loan Priority Collateral").)  Wells Fargo maintained first-priority positions in all of TransCare's other assets and properties, including accounts receivable.  (*Id.* at CURTIS_000006, § 1.26 (defining "Revolving Loan Priority Collateral" as "all assets and properties of any Debtor, other than the Term Loan Priority Collateral").)

30.    Section 2.3(a) of the Wells Fargo/PPAS Intercreditor Agreement provided that the proceeds of any sale, disposition, or other realization upon all or any part of Wells Fargo's collateral was to be applied in the following order of priority:  first, to expenses Wells Fargo incurred in collecting and enforcing its rights under the Wells Fargo Credit Agreement; second, to

the pay down of the debt owed to Wells Fargo; and third, to the pay down of the debt owed to the Term Loan Lenders under the Term Loan Agreement.  (*Id.* at CURTIS_000008, § 2.3.)

## III.    TRANSCARE'S OPERATIONS AND EVENTS LEADING TO BANKRUPTCY

### *Turnaround Efforts in November 2014 – June 2015*

31.    In or around November 2014, TransCare was losing money.  (Ex. 2, Pelissier Tr. 28:21-29:8.)  It was at this time that Tilton discovered TransCare had not been performing as its then management had represented.  (Ex. 4, Tilton Tr. 145:24-146:10.)

32.    Accordingly, to address the situation, in or around December 2014 Tilton hired Glenn Leland to be TransCare's new CEO.  (*Id.* 145:14-23; Ex. 13, PP-TRBK0054137.)

33.    Hiring Leland was necessary because "the company was in desperate need of new leadership."  (Ex. 4, Tilton Tr. 145:14-23; *see also* Ex. 14, PP-TRBK0087830.)

34.    By the start of February 2015, Leland learned that TransCare was "about six months behind in producing financial statements."  (Ex. 15, Leland II Tr.[10] 376:23-377:12.)

35.    There were also some concerns about the accuracy of the information that was being reported.  (Ex. 4, Tilton Tr. 145:24-146:10 ("[T]he company. . . had been reporting numbers that were somewhat inaccurate."), 182:5-14 ("I do know they presented information to Wells Fargo, which [Wells Fargo's] auditors found to be inaccurate."); Ex. 15, Leland II Tr. 378:24-379:20).

36.    Moreover, as of February 2015, TransCare had no audited financial statements for 2013 or 2014.    (Ex. 16, Husson Tr.[11] 27:17-28:15; Ex. 17, PP-TRBK0069028 at PP-TRBK0069031-33.)

---

[10] "Leland II Tr." refers to the transcript of the deposition of Glenn Leland taken on January 3, 2019.

[11] "Husson Tr." refers to the transcript of the deposition of John Husson taken on November 12, 2018.

37.     In an email dated February 10, 2015, Tilton emphasized to Leland the importance of providing financial statements to Wells Fargo that were "on time" and "valid" and cautioned that "[w]e cannot lose Wells or we will not have the time and cash that we need." (Ex. 18, PP-TRBK0028514 at PP-TRBK0028514-15.)

38.     Leland responded that he "share[d] [her] concern about the bank" and testified at his deposition that, at the time, he agreed with Tilton about the importance of maintaining a good relationship with Wells Fargo. (*Id.* at PP-TRBK0028514; Ex. 15, Leland II Tr. 378:15-380:14.)

39.     By late February 2015, Leland developed a business plan (the "February 2015 Plan") with guidance from Tilton, Greenberg, and Pelissier. (Ex. 15, Leland II Tr. 461:25-463:15; Ex. 19, PP-TRBK0072425.)

40.     By June 2015, TransCare had implemented the first phase of the February 2015 Plan, which resulted in EBITDA improvements for Q1 2015. (Ex. 20, PP-TRBK0031307 at PP-TRBK0031309.)

41.     Between February 2015 and April 2015, the Zohar Funds, which were owned by Tilton, advanced $2.5 million to TransCare. (*See* Ex. 21, PP-TRBK0047615; Ex. 22, TRANSCARE00142997; Ex. 23, TRANSCARE00040331; Ex. 24, TRANSCARE00014062; Ex. 25, TRANSCARE00059061; Ex. 26, TRANSCARE00030152; Ex. 7, Greenberg Tr. 133:15-134:14.) These advances were drawn from additional, voluntary loan commitments made to TransCare by the Zohar Funds and memorialized through amendments to the Term Loan Agreement. (Ex. 27, PP-TRBK0003594; Ex. 28, PP-TRBK0003640; Ex. 29, PP-TRBK0098857). Tilton authorized this funding in her role as manager of the collateral managers of the Zohar Funds. (Ex. 4, Tilton Tr. 51:9-23.)

***Expressions of Interest in TransCare in 2015***

42.     At various times during 2015, TransCare received inquiries from transportation services providers expressing interest in potentially purchasing some or all of TransCare's assets. (*See, e.g.*, Ex. 30, TRANSCARE00004259; Ex. 31 TRANSCARE00195974; Ex. 32, PP-TRBK0071446 at PP-TRBK0071449-50; Ex. 33, PP-TRBK0030896; Ex. 34, PP-TRBK0030755; Ex. 35, PP-TRBK0047198.)

43.     One such company, National Express, specifically expressed interest in TransCare's paratransit business operated under the MTA Contract (*See* Ex. 30, TRANSCARE00004259; Ex. 32, PP-TRBK0071446 at PP-TRBK0071449-50; Ex. 34, PP-TRBK0030755.)

44.     The paratransit business under the MTA Contract was TransCare's most valuable and profitable business segment.  (*See* Ex. 2, Pelissier Tr. 120:6-12; Ex. 4, Tilton Tr. 154:14-156:12; Ex. 7, Greenberg Tr. 187:18-25; Ex. 15, Leland II Tr. 367:17-368:4.)  The cash flow generated by that business helped support TransCare's other business operations.  (Ex. 4, Tilton Tr. 154:14-156:12.)

45.     Given its profitability and the importance of the paratransit business to TransCare's overall cash flow, TransCare would not be able to survive as a going concern if the paratransit business under the MTA Contract were sold.  (*Id.* at 155:2-4 ("[The MTA Contract] was the only thing that provided the cash flow to keep the rest of the company alive"); *id* at 158:3-7 ("So what it would have done is paid down certain lenders, and then the rest of the company would have gone into immediate liquidation, because it would have no cash to pay its bills as due."); *id.* at 161:6-16 ("We knew that the only thing -- core was losing money, 911 was losing money, other divisions were making very little money, and the future of the company depended on MTA; it was the most important contract."); *id.* at 161:18-162:8 ("But when a company is doing $6 million of EBITDA

and three-and-a-half million of it is coming from the MTA, you know, that you're not going to run the company without its EBITDA.  It wasn't rocket science, it could be done at the back of the envelope."); *id.* at 320:21-322:6 ("if you took out the most valuable contract you had in the company . . . it was an immediate liquidation").)

46.     Leland first advised others at TransCare, Patriarch Partners and PPMG of National Express's expression of interest in a February 5, 2015 email sent to Jean Luc Pelissier, Brad Schneider, a credit officer at Patriarch Partners, and Mark Bonilla, TransCare's CFO.  In that email, Leland acknowledged that the paratransit division was "one of [TransCare's] most profitable businesses . . . The contract produces $4 million of EBITDA and has very little capital demand (fleet provided by MTA)."  (*See* Ex. 30, TRANSCARE00004259 at TRANSCARE00004260.)

47.     The next day, Leland sent a follow up email to Pelissier, Schneider, Bonilla, Stephen and Steve Berlin, a credit officer at Patriarch Partners, concerning National Express's expression of interest.  In that email, Leland included an excerpt of the MTA Contract which provided that consent of the MTA was required for contract assignment.  (*Id.* at TRANSCARE00004259.)

48.     In a weekly written update sent to Tilton on February 7, 2015, Leland represented that National Express was prepared to pay about $15 to $17 million for the paratransit business. (Ex. 36, PP-TRBK0028570 at PP-TRBK0028572.)  National Express, however, never provided a written letter of intent or even a written indication of interest reflecting a purchase price of that magnitude.  (*See* Ex. 15, Leland II Tr. 356:14-357:6.)  Nor had National Express done any due diligence of the TransCare paratransit business at that time.  (Ex. 2, Pelissier Tr. 142:8-145:5, 122:9-125:16.)

49.     In or around February 2015, National Express "was aware that TransCare was in trouble" and believed there was a possibility that the MTA would not renew the MTA Contract with TransCare.  (Ex. 3, Leland I Tr. 86:15-87:9.)

50.     Part of the reason Leland was interested in exploring a sale to National Express was his (mistaken) belief that the proceeds of such sale could be used to fund TransCare's business plans.  (*See* Ex. 30, TRANSCARE00004259 at TRANSCARE00004260; Ex. 3, Leland I Tr. 186:22-187:6; *see* ¶¶ 18, 21-22, 26-27, 30, *supra*.)

51.     Leland admitted at his deposition that "if [the proceeds] weren't reinvested in TransCare, there would be no interest on my part" in selling the paratransit business under the MTA Contract.  (Ex. 15, Leland II Tr. 505:13-506:8.)

52.     Leland further testified that he considered it was possible that TransCare's lenders might have had rights with respect to the proceeds of a sale, but he had no understanding as to what those rights were.  (*Id.* at 363:25-364:11, 505:13-509:12.)

53.     Leland also wanted to explore a transaction with National Express because, in early 2015, he believed the MTA Contract was vulnerable to non-renewal.  (*See* Ex. 32, PP-TRBK0071446 at PP-TRBK0071449; Ex. 15, Leland II Tr. 352:9-15.)  Leland admitted at his deposition that if the MTA Contract was renewed, he would "rather keep it."  (Ex. 15, Leland II Tr. 367:17-368:4.)

54.     In March 2015, as renewal negotiations with the MTA were ongoing, Leland suggested that TransCare wait to engage with National Express until the MTA responded to the results of an MTA audit of TransCare.  (*See* Ex. 32, PP-TRBK0071446 at PP-TRBK0071449-50; Ex. 15, Leland II Tr. 440:11-21.)

55. As Leland noted at the time: "Obviously a loss of the MTA contract and its $3.5MM EBITDA would be a significant impact to on-going ambulance operations." (Ex. 32, PP-TRBK0071446 at PP-TRBK0071449.)

56. The business plans Leland and TransCare's management had developed throughout early 2015 contemplated TransCare retaining the MTA Contract. (*See* Ex. 15, Leland II Tr. 351:25-352:15, 359:16-25.)

57. Leland testified at his deposition that Tilton's decision not to engage with National Express regarding a potential sale of the paratransit business under the MTA Contract in February 2015 was "a business choice" and was not motivated by ill-will. (*Id.* at 362:16-364:19.)

58. By June 2015, the negotiations with the MTA for renewal of the MTA Contract were nearly complete. (Ex. 20, PP-TRBK0031307 at PP-TRBK0031308.)

59. On July 13, 2015, Leland executed Modification No. 7 to the MTA Contract ("Modification No. 7") on behalf of TransCare New York. (Ex. 37, PP-TRBK0004457.) Pursuant to Modification No. 7, effective August 1, 2015, the MTA Contract was extended through October 31, 2019. (*Id.*)

60. After TransCare missed payroll in July 2015 (discussed in more detail in ¶¶ 76-79 below), "a lot of industry contacts started to express interest [to Leland] in TransCare's plight and ways to capitalize upon that." (*See* Ex. 3, Leland I Tr. 172:2-24; Ex. 15, Leland II Tr. 490:2-14.)

61. These inquiries were fueled by industry-wide speculation that TransCare was struggling and potentially about to "go under." (*See* Ex. 3, Leland I Tr. 170:16-172:24.)

62. In a July 8, 2015 email, Leland told Whalen and Greenberg that an industry contact had approached him about a potential sale of certain of TransCare's business lines. (*See* Ex. 38, PP-TRBK0064662.) Leland represented to Whalen and Greenberg that this company was

"interested in 'cherry-picking' best market segments based on EBITDA." (*Id.*) Leland stated to Whalen and Greenberg that he told this industry contact that "no one would be interested in selling the good business units and keeping the inferior ones." (*Id.*; *see also* Ex. 15, Leland II Tr. 488:18-489:5 ("selling the good parts of the business and keeping the bad parts of the business would not be wise."); Ex. 3, Leland I Tr. 172:25-174:12.)

63.     Whalen responded to Leland: "I think for sure we should not communicate or indicate any interest in divestitures at this time. Lynn's more typical strategy is to sell into strength." (Ex. 38, PP-TRBK0064662; Ex. 39, PP-TRBK0090469 (Tilton emailing Kurt Marsden of Well Fargo an article about Envision Healthcare's purchase of Rural/Metro for $620 million and stating: "Just to confirm the active [] market in the ambulance space. This is why it makes sense to let TransCare make its way back to normalized EBITDA.").)

64.     On July 10, 2015, David Duke, Chief Executive Officer of National Express, sent a non-binding Letter of Intent ("LOI") to TransCare New York in which he expressed interest in acquiring TransCare's paratransit business and assets, including but not limited to the MTA Contract. (Ex. 34, PP-TRBK0030755.)

65.     Per the terms of the LOI, National Express proposed a purchase price for the assets "free and clear of all liens, claims and encumbrances" in the range of $6 to $7 million, "less an amount [National Express] determine[d] [wa]s required to operate the acquired business for 60 days." (*Id.* at PP-TRBK0030760.)

66.     The LOI provided that a portion of the purchase price would be "payable on the closing of the transaction," the balance would be "held in retention (the 'Retention Amount')." The LOI further provided for a five-year non-competition obligation on the part of TransCare. In

connection with that obligation, the LOI stated that "the Buyer will release payments of the Retention Amount in five equal annual installments." (*Id.*)

67.     Among the other conditions contained in the LOI were: (i) completion of customary due diligence satisfactory to National Express; (ii) negotiation, execution and delivery of an Asset Purchase Agreement; (iii) approval by the National Express board of directors; (iv) approval by the MTA; and (v) that National Express would enter into employment agreements with TransCare's paratransit employees. (*Id.* at PP-TRBK0030761.)

68.     Engaging with National Express in response to the LOI would have required "a fair amount of work," and required TransCare to open up the paratransit division's books and records to National Express. (*See* Ex. 15, Leland II Tr. 363:7-24; Ex. 34, PP-TRBK0030755 at PP-TRBK0030762-64.)

69.     During 2015, Tilton and Leland received several other inquiries from potential purchasers of TransCare. (*See, e.g.*, Ex. 33, PP-TRBK0030896.) These inquiries were usually communicated by email or through phone calls. (Ex. 3, Leland I Tr. 170:22-171:25.)

70.     One company that expressed interest in potentially purchasing all of TransCare's assets was Richmond County Ambulance ("RCA"), a TransCare competitor. (*Id.* at 113:20-114:11.)

71.     In a March 7, 2015 weekly update email from Leland to Tilton, Leland included a summary of one of RCA's inquiries. (Ex. 32, PP-TRBK0071446 at PP-TRBK0071450.) He stated that RCA "sent an email proposing $60 to $80MM as valuation." (*Id.*) Leland continued: "My thought on this particular opportunity is that RCA must assume TransCare has EBITDA in the $10MM range. They mentioned on the phone they are using an 8X multiple for valuations (which is high for the industry, but not outside reality). So, I think this opportunity is not likely to succeed

and recommend we either reject any further inquiry or ask them to make a formal 'as is' offer for a stipulated amount which exceeds negative equity." (*Id.*)

72.     On July 9, 2015, Leland presented another email inquiry from RCA to Pelissier and Greenberg. (Ex. 33, PP-TRBK0030896.)  Leland represented that RCA had "the resources to pay 8x or $80 to $96M (less debt)." (*Id.* at PP-TRBK0030897.)  There was no letter of intent from RCA reflecting this.

73.     RCA's expressions of interest were evidently premised on a misimpression of TransCare's earnings. (*See, e.g.*, Ex. 3, Leland I Tr. 174:8-10 (RCA "suggested that they thought the EBIDTA was in the 10 to 12 [million dollar] range. *It was not at the time . . . .*") (emphasis added); Ex. 32, PP-TRBK0071446 at PP-TRBK0071450; Ex. 40, PP-TRBK0030905; Ex. 7, Greenberg Tr. 229:23-230:18.)

74.     Tilton testified that, because TransCare's financials were so unreliable during the relevant time period, she questioned the validity of the proposed prices in the "offers" that Leland said he was receiving from other companies.  Tilton felt that, with respect to these offers, Leland was "full of bluff." (Ex. 4, Tilton Tr. 175:25-177:21, 320:21-321:15.)

75.     News of a potential sale could have been injurious to TransCare's reputation (Ex. 15, Leland II Tr. 363:7-24) and sharing information with competitors could have "potentially hurt the company's competitive position." (Ex. 7, Greenberg Tr. 192:7-20.)

### *TransCare Misses Payroll in July 2015*

76.     Throughout 2015, TransCare drew on the Wells Fargo revolving credit facility to fund TransCare's weekly payroll obligations. (Ex. 2, Pelissier Tr. 309:15-310:14, 311:13-24.)

77.     On or about July 3, 2015, Wells Fargo unilaterally determined it was in an over-advanced position under the terms of the Wells Fargo Credit Agreement and decided not to fund

the revolver, resulting in TransCare not being able to fund payroll. (Ex. 41, TRANSCARE00200245; Ex. 2, Pelissier Tr. 311:17-24; Ex. 15, Leland II Tr. 472:7-20; *see also* Ex. 42, PP-TRBK0042651.)

78.     Wells Fargo also implemented a $1.5 million reserve (Ex. 43, WF_TC_00000386 at WF_TC_00000389), which further constrained TransCare's liquidity.

79.     In direct response to Wells Fargo's actions, the Zohar Funds loaned TransCare in excess of $2.1 million. (*See* Ex. 21, PP-TRBK0047615; Ex. 44, TRANSCARE00153332; Ex. 45, PP-TRBK0098922; Ex. 46, PP-TRBK0098928; Ex. 47, TRANSCARE00155495; Ex. 48, PP-TRBK0063354.) Of this $2.1 million, roughly $1.75 million was used to fund TransCare's payroll. (*See, e.g.*, Ex. 49, PP-TRBK0030959 at PP-TRBK0030960; Ex. 47 TRANSCARE00155495.) These advances were drawn from an additional and voluntary loan commitment of $4.15 million made to TransCare by the Zohar Funds and memorialized through an amendment to the Term Loan Agreement. (Ex. 51, PP-TRBK0049638.) Tilton authorized this funding in her role as manager of the collateral managers of the Zohar Funds. (Ex. 4, Tilton Tr. 51:9-23.)

### Tilton and Wells Fargo Consider a Possible Sale of TransCare

80.     In October 2015, the Zohar Funds again advanced funds to TransCare, this time in the amount of $750,000 to fund payroll and TransCare's worker's compensation insurance premium. (Ex. 52, PP-TRBK0108125; Ex. 53, PP-TRBK0056115; Ex. 21, PP-TRBK0047615.) These advances were drawn from the aforementioned voluntary loan commitment of $4.15 million. (Ex. 51, PP-TRBK0049638.)

81.     The Wells Fargo Credit Agreement was set to automatically renew on January 31, 2016. (Ex. 54, TRANSCARE00205383.)

82.     However, on October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"). (Ex. 55, TRANSCARE00006334 at TRANSCARE-00006335.) The Non-Renewal Notice stated that the Wells Fargo Credit Agreement would expire on January 31, 2016 and that Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements." (*Id.* at TRANSCARE00006336.)

83.     On December 10, 2015, Wells Fargo executive Kurt Marsden explained to Tilton that Wells Fargo had concerns about TransCare and its management team. (*See, e.g.*, Ex. 56, PP-TRBK0002058 at PP-TRBK0002059 ("I'm reaching out to you today because I just learned that Transcare's liquidity is extremely tight and we are skeptical that the company will hit the plan that was shared with us a few months ago."); Ex. 57, PP-TRBK0075262 at PP-TRBK0075263 ("[W]e discovered today that the company is significantly behind on payroll taxes to the tune of $1.2 million not the $400k that the CFO represented to my team earlier today. This discovery is highly concerning especially since we have been clear that this is an area of sensitivity for us, and *it frankly appears that management has not been completely forthright.*") (emphasis added); Ex. 58, PP-TRBK0083461.)

84.     By mid-December 2015, Tilton made the decision to explore a sale, restructuring or other reorganization of TransCare. (Ex. 4, Tilton Tr. 162:24-165:8, 168:15-170:6.) The primary driver of Tilton's decision was her loss of confidence in the TransCare management team. (*See id.* at 164:24-165:8 ("I made a determination that we could not continue with the current management team, and we would either need to sell, file for bankruptcy, unwind, or do some sort of transaction, because the current management team could not continue to run this company properly."); *see id.* ("There were many factors leading up to it, but most of it was my loss of

confidence of this team to provide information, accurate information, or run the company properly.”))

85.     On December 18, 2015, Tilton asked Greenberg to get her information about ambulance-company “transactions and bankers who did them.”  (Ex. 59, PP-TRBK0001414.)

86.     Later that day, Greenberg emailed Tilton a list of transactions for ambulance companies and air medical companies.  (Ex. 60, PP-TRBK0041410.)  In a follow up email on December 24, 2015, Greenberg emailed Tilton “smaller deals” and investment banks who worked on “middle market ambulance transactions.”  (Ex. 61, PP-TRBK0022044.)

87.     Tilton testified that any decision to sell TransCare was contingent upon a review and analysis of credible information about the business.  (Ex. 4, Tilton Tr. 168:15-170:6 (“[W]e had to figure out what TransCare actually looked like, and what might be possible to be sold, once we dug in ourselves and tried to look at the numbers and contracts.”); *see id.* at 172:11-174:13 (“I was doing all the background work so that if I could get the proper information and it made sense to sell, that I would have [investment bankers] to reach out to, to move very quickly[.]”).)

88.     Wells Fargo was aware of Tilton’s decision to explore a sale of TransCare.  (*See, e.g.*, Ex. 57, PP-TRBK0075262 at PP-TRBK0075263.)  Marsden explained that Wells Fargo was disinclined to provide long-term funding to TransCare outside a sale process.  (*Id.* (“To be clear, our desire is to exit this credit facility and our appetite to support the business outside a process that leads to an exit is extremely limited.”).)

89.     On December 23, 2015, Wells Fargo transmitted to Pelissier and Greenberg a summary of proposed terms, for discussion purposes only, for a longer-term forbearance of Wells Fargo’s rights in order to bridge to a sale of all or substantially all of TransCare’s business.  (Ex.

62, PP-TRBK0075497; *see also* Ex. 64, PP-TRBK0022003 at PP-TRBK0022005 (proposing close of sale of assets by September 2016).)

90.     Wells Fargo's willingness to continue funding through a sale of TransCare was contingent upon several conditions.  (Ex. 62, PP-TRBK0075497 at PP-TRBK0075498-99.)

91.     First, Wells Fargo required that Tilton or an entity controlled or owned by Tilton provide TransCare with an immediate and substantial cash infusion.  (*Id.* at PP-TRBK0075498 ("Additional funding to be provided by Patriarch Partners in an amount not less than $___TBD___ to help TransCare finance [critical expenses]."); Ex. 57, PP-TRBK0075262 at PP-TRBK0075263 ("[w]e are highly concerned about the company's ability to survive until a sale is completed . . . It would be very helpful if we could get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity challenges.").)

92.     Second, Wells Fargo required TransCare to obtain a letter of intent and asset purchase agreement that were acceptable to Wells Fargo.  (*See* Ex. 63, PP-TRBK0012096 ("If for example you are unable to obtain an LOI/APA that is acceptable to Wells Fargo then we would not consent to the sale or release of liens and therefore sale process is obviously stalled.  If there is not a viable sale process that Wells is comfortable with then we require right to stop lending.")).

93.     Third, Wells Fargo required TransCare to engage a third-party financial advisor. (Ex. 64, PP-TRBK0022003 at PP-TRBK0022004.)  The financial advisor was to be selected from a list provided by and acceptable to Wells Fargo.  (Ex. 62, PP-TRBK0075497 at PP-TRBK0075498.)  The financial advisor would also be permitted to freely communicate with Wells Fargo.  (*Id.*)

94. Fourth, Wells Fargo required TransCare to provide a budget to Wells Fargo, which was to be reviewed by the financial advisor. (*Id.* at PP-TRBK0075497.) Any variance in TransCare's actual performance under the budget that adversely deviated from the projections in the budget would constitute an event of default. (*Id.* at PP-TRBK0075498.)

95. On January 7, 2016, in order to satisfy Wells Fargo's conditions, TransCare and Carl Marks Advisory Group LLC ("CMAG") entered into a consulting agreement, which was signed on January 11, 2016. (Ex. 65, PP-TRBK0043438.) Wells Fargo had suggested CMAG as a potential consultant. (*See, e.g.*, Ex. 66, PP-TRBK0018108 ("John Husson [of Wells Fargo] provided the following list of consultants," including Mark Pfefferle of Carl Marks).)

96. The CMAG employees who participated in the engagement were Mark Claster, Marc Pfefferle, Carl Landeck, and Jonathan Killion. (Ex. 65, PP-TRBK0043438.)

97. On January 7, 2016, Greenberg shared a working budget for TransCare with Landeck and Killion. (Ex. 67, CM_TC2018_0003369.) The budget contemplated an incremental funding need of $4.5 million. (*Id.* at CM_TC2018_0003370.)

98. TransCare and Ark II CLO 2001-1, Limited ("Ark II"), entered into a Credit Agreement, dated as of January 15, 2016 (the "Ark II Credit Agreement"). (Ex. 68, PP-TRBK0048966, at PP-TRBK0048967-92).) The Ark II Credit Agreement is governed by New York law. (*Id.* at PP-TRBK0048988, § 7.12.)

99. In connection with the Ark II Credit Agreement, TransCare executed a Security Agreement, dated as of January 15, 2016, in favor of Ark II (the "Ark II Security Agreement"). (Ex. 69, PP-TRBK0049018.)

100.    In connection with the Ark II Credit Agreement, Ark II and PPAS entered into an intercreditor agreement, dated as of January 15, 2016 (the "Ark II Intercreditor Agreement").  (Ex. 68, PP-TRBK0048966 at PP-TRBK0049001-16.)

101.    The Ark II Intercreditor Agreement was governed by New York law.  (*Id.* at PP-TRBK0049013, § 3.10.)

102.    TransCare Corporation signed an acknowledgement to the Ark II Intercreditor Agreement in which it expressly acknowledged that it is not a party to or beneficiary of that agreement.  The acknowledgement provides TransCare Corporation "acknowledges and agrees that (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement[.]"  (*Id.* at PP-TRBK00490016.)

103.    On January 27, 2016, Pfefferle shared with Killion, Greenberg, Pelissier, and Randy Jones of Patriarch Partners a "2016 Plan Executive Summary" presentation prepared by CMAG.  (Ex. 70, CM_TC2018_0002108.)  The presentation explained: "[t]o have a chance of a turnaround, TransCare needs an immediate incremental pledge of support from Patriarch totaling $7.5M+ excluding 2016 term [loan] interest."  (*Id.* at CM_TC2018_0002114.)  The presentation further provided:  "Unfortunately time has run out and the decision [for Tilton] to risk significant capital must be made before a turnaround can show meaningful positive results."  (*Id.*)

104.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███  (Ex. 71, WF_Tilton_00000115.)  ████████████████████

█████████████████████████████████████████████
███████████████████████████ (*Id.*)

105.     By late January 2016, Tilton determined to attempt to stabilize TransCare before pursuing a sale process.  Wells Fargo was aware of Tilton's decision.  (*Id.* ("Patriarch had originally communicated the intention to sell the Company, however, it has since been decided if additional funding was provided to Transcare it would be used to stabilize the business for a better sale result (or ultimate retention of the business may be decided following stabilization).").)

106.     From December 8, 2015 through January 7, 2016, the Zohar Funds advanced funds to TransCare in the amount of $1,703,401.84.  (Ex. 72, TRANSCARE00231409; Ex. 73, PP-TRBK0099430;  Ex.  74,  TRANSCARE00138081;  Ex.  75,  PP-TRBK0098916;  Ex.  76, TRANSCARE00024535; Ex. 77, TRANSCARE00231415; Ex. 78, TRANSCARE00231421; Ex. 21, PP-TRBK0047615-16.)  These advances were drawn from the aforementioned additional and voluntary loan commitment of $4.15 million made to TransCare by the Zohar Funds.  (Ex. 51, PP-TRBK0049638.)

107.     In January 2016, PPAS advanced funds to TransCare on behalf of Ark II in the amount of $1,862.925.77, in the following tranches:  (i) January 15, 2016: $1,172,757.53 and (ii) January 29, 2016:  $690,168.24.  (Ex. 79, PP-TRBK0015408; Ex. 80, PP-TRBK0008416; Ex. 81, PP-TRBK0099192;  Ex.  82,  PP-TRBK0043417;  Ex.  21,  PP-TRBK0047615  at  PP-TRBK0047616.)   These advances were drawn from the $6.5 million in funds that had been committed to TransCare by Ark II and memorialized in the Ark II Credit Agreement.  (Ex. 68, PP-TRBK0048966; Ex. 82, PP-TRBK0043417.)  The advanced funds were used, in part, to fund a settlement with NYSIF Worker's Compensation Insurance.  (Ex. 82, PP-TRBK0043417 at PP-

TRBK0043421.)  Without active worker's compensation insurance coverage, TransCare would have been forced to shut down.  (Ex. 83, TRANSCARE00026216.)

108.    In December 2015 and January 2016, TransCare failed to make interest payments to PPAS as required under the Term Loan Agreement.  (Ex 4, Tilton Tr. 283:10-20.)

### Transcendence

109.    Throughout February 2016, Tilton worked together with CMAG and Wells Fargo "on a day-to-day basis . . . on trying to analyze the company, contract by contract, entity by entity, to try to understand how to restructure it around the profitable contracts."  (*See* Ex. 1, 341 Tr. 36:15-37:10.)  The purpose was "to save as much of the company as possible, as many jobs as possible, and get Wells [Fargo] out  . . . at 100 cents on the dollar."  (Ex. 4, Tilton Tr. 84:12-15; *see also* Ex. 84, PP-TRBK0022332 ("we are dealing in crisis mode and trying to make sure as much is saved as possible.  A forced liquidation of this company will not serve any party"); Ex. 85, PP-TRBK0003859 at PP-TRBK0003863 ("We are also working here to try to save some of our company and our people.  That will make your recovery better.").)

110.    On February 9, 2016, Tilton discussed with Marsden of Wells Fargo different potential restructuring scenarios, including (i) a forced wind down, (ii) an orderly wind down, and (iii) a bankruptcy scenario.  (Ex. 86, PP-TRBK0028275 at PP-TRBK0028276.)

111.    On February 10, 2016, TransCare engaged the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to advise on an out-of-court restructuring or in-court proceeding.  (Ex. 87, PP-TRBK0051777.)

112.    On February 10, 2016, Robert Strack of Wells Fargo emailed Tilton a list of financing discussion points regarding "the proposed terms and conditions on which Wells Fargo would consider financing TransCare on an orderly wind down basis" – *not* as a going concern. (Ex. 88, WF_TC_00005264 at WF_TC_00005272.)

113. On February 11, 2016, representatives of Wells Fargo and their attorneys from the law firm of Otterbourg P.C. ("Otterbourg") met with Patriarch Partners and PPMG personnel, the CMAG team, and TransCare personnel to go through the different proposed wind down scenarios. (Ex. 84, PP-TRBK0022332; Ex. 121, PP-TRBK0012999.)

114. Ultimately, Tilton, in consultation with CMAG, Wells Fargo and its advisors, developed a plan (the "OldCo/NewCo Restructuring") pursuant to which TransCare would be divided in two: (i) a new corporate entity would be formed, and would take over operations of certain TransCare business lines, including the paratransit business (*i.e.*, "NewCo"), through an Article 9 foreclosure sale, and (ii) the remaining business lines (*i.e.*, "OldCo") would be wound down in an orderly manner. (*See* Ex. 4, Tilton Tr. 83:5-14, 236:14-239:10, 255:8-21; Ex. 16, Husson Tr. 75:19-76:18, 127:16-128:9; Ex. 89, PP-TRBK0006471.)

115. The "NewCo" would do business as "Transcendence". (Ex. 90, PP-TRBK0015288.)

116. On February 10, 2016, Transcendence Transit, Inc. ("Transcendence Transit") and Transcendence Transit II, Inc. ("Transcendence II" and, together with Transcendence Transit, "Transcendence") were incorporated under the laws of Delaware. (*Id.*) Tilton was the sole director of Transcendence. (*See* Ex. 91, PP-TRBK0096148 ("The sole director [of Transcendence Transit, Inc.] will be Lynn Tilton . . . .").)

117. Under the OldCo/NewCo Restructuring, TransCare's "911 and core business" would continue to operate as part of OldCo during a 90-day wind-down period until a full cessation of operations. (*See* Ex. 4, Tilton Tr. 83:5-14; Ex. 6, Stephen Tr. 68:3-69:23.)

118. Tilton planned for TransCare to simultaneously (i) announce the orderly wind-down plan, and (ii) send notice to affected employees in accordance with the Worker Adjustment

and Retraining Notification Act of 1988 and NY WARN Act (collectively, the "WARN Acts"). (Ex. 4, Tilton Tr. 322:7-11, 255:14-21.)

119.     The proposed 90-day wind-down period was intended to give OldCo employees 90-day notice under the WARN Acts. (*Id.* at 255:14-21.)

120.     Under the OldCo/NewCo Restructuring plan, the OldCo business lines would have access during the wind-down period to certain services, equipment and other supplies that were to be transferred to Transcendence. Transcendence would provide these services and support necessary for the continuing operation of the OldCo business lines through a transition services agreement (the "TSA"). (*See, e.g.*, Ex. 92, PP-TRBK0086412; *see also* Ex. 93, PP-TRBK0051817.)

121.     Wells Fargo and its representatives understood "that an Article 9 Sale [was] contemplated for the assets of some of the TransCare entities." (Ex. 94, PP-TRBK0046279 at PP-TRBK0046280; *see also* Ex. 95, WF_Tilton_00007079 ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████

122.     The CMAG team assisted with the analysis of the Article 9 foreclosure that was intended to facilitate the OldCo/NewCo Restructuring. For example, on February 10, 2016, Killion emailed Greenberg and Landeck "the current draft of the entities contemplated to be in the Article 9 transaction." (Ex. 96, PP-TRBK0002317.) Then, on February 11, 2016, Greenberg emailed Killion regarding additional contracts to add to the "go forward plan" for NewCo as contemplated on that date. (Ex. 97, PP-TRBK0016055.)

123. On February 14, 2016, Pelissier emailed Patriarch Partners and PPMG personnel, as well as members of TransCare management, concerning certain "action items" that had either been completed or would need to be reviewed with Tilton, including: (i) preparing for an Article 9 foreclosure; (ii) retaining bankruptcy counsel; (iii) developing financial models and budgets for OldCo and NewCo; (iii) establishing bank accounts for OldCo and NewCo; (iv) disseminating employment and benefits communications, including issuing WARN notices to all OldCo employees; and (v) securing insurance for NewCo. (Ex. 98, PP-TRBK0097632.)

124. Tilton, together with substantially all of the senior team at Patriarch Partners and PPMG, worked on developing budgets for the wind-down period for OldCo and go-forward budgets for NewCo. (*See* Ex. 4, Tilton Tr. 131:24-134:5.)

125. On February 17, 2016, Tilton shared a draft of a "wind down plan on Core and 911" [which were to be OldCo businesses] with Wells Fargo. (Ex. 99, PP-TRBK0091631; Ex. 100, PP-TRBK0097459.) Tilton stated, "[i]t assumes that there is a foreclosure sale on the other entities. The assumption is that you [Wells Fargo] will collect all the receivables as they come due from Newco. This shows the wind down is pretty much break even. It needs more refinement but I hope this gives you some comfort." (Ex. 99, PP-TRBK0091631 at PP-TRBK0091632.)

126. By return email, Strack told Tilton that Wells Fargo's legal counsel "continue[d] their dialogue with Curtis [Mallet] regarding the legal process/structure of carving out the proposed Newco entities." (*Id.*)

127. Later that evening, Tilton sent Wells Fargo a further revised wind down model for the 911 and Core businesses in New York and consented to Wells Fargo sharing the document with CMAG. (Ex. 101, PP-TRBK0044615; Ex. 102, PP-TRBK0044607-09.)

128.    The wind-down model Tilton transmitted to Wells Fargo identifies a series of assumptions.  (Ex. 101, PP-TRBK0044615 at PP-TRBK0044617.)  The first assumption was that "[a]ll 911 and Core contracts terminate on 90 day notice period."  (*Id.*)

129.    Tilton testified at deposition that on the evening of February 17, 2016 or February 18, 2016, Marsden informed her that Wells Fargo wanted to continue to work with Tilton on an orderly plan of reorganization.  (Ex. 4, Tilton Tr. 250:24-251:12; *see also* Ex. 103, PP-TRBK0052107 ("I received a call from Kurt Marsden.  Wells has decided they would like to find a joint solution to unwind more gracefully.").)

130.    ███████████████████████████████████████████████
███████████████████████████████████████████████ (Ex. 104,
WF_TC_00004343.) ███████████████████████████████████
███████████████████ (Ex. 16, Husson Tr. 131:8-15.)

131.    At the same time that Tilton was engaging in discussions with Wells Fargo, Tilton and her team at Patriarch Partners and PPMG continued to refine the NewCo model.  (*See, e.g.*, Ex. 105, PP-TRBK0110746; Ex. 106, PP-TRBK0110451; Ex. 107, PP-TRBK0099137.)  Copies of the model were shared with TransCare management and employees.  (*See, e.g.*, Ex. 108, PP-TRBK0046182, Ex. 109, PP-TRBK0004679.)

132.    These modeling exercises projected that Transcendence would require up to approximately $10 million in funding.  (*See e.g.,* Ex. 105, PP-TRBK0110746; Ex. 4 Tilton Tr. 115:16-25.)  Tilton intended to provide Transcendence with this funding through a revolving credit facility with Ark Angels III, [LLC], one of Tilton's personal investment vehicles.  (Ex. 4, Tilton Tr. 116:3-6, 166:19-167:22.)  Tilton testified that she was prepared to make this investment from her personal funds "to try to save as much of [TransCare] as possible."  (*Id*. at 167:10-12.)

133.     In addition to the $10 million she planned to commit through Ark Angels III, Tilton also intended to roll over approximately $2 million in funding from the Ark II Credit Agreement into Transcendence, for a total of approximately $12 million.  (*See* Ex. 110, PP-TRBK0019088 at PP-TRBK0019089; Ex. 4, Tilton Tr. 79:23-80:7, 109:3-10, 74:24-75:3.)

134.     Despite ongoing negotiations between Wells Fargo and Tilton, the parties were unable to agree to terms on funding the wind-down of the OldCo business lines.  (*See* Ex. 4, Tilton Tr. 82:12-83:4.)

135.     On the morning of February 24, 2016, PPAS, as administrative agent, the Zohar Funds and AIP issued a Notice of Default and Acceleration, dated February 24, 2016, to TransCare (the "Notice of Default").  (Ex. 111, PP-TRBK0043305 at PP-TRBK0043311.)

136.     The Notice of Default provided that TransCare's failure to pay interest when due under the Term Loan Agreement constituted an event of default under Section 10(a) of that agreement.  (*Id.*)

137.     In connection with the Notice of Default, on February 24, 2016, PPAS, as administrative agent, the Zohar Funds and AIP issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, to TransCare (the "Notice of Acceptance").  (*Id.* at PP-TRBK0043306.)  TransCare signed the Notice of Acceptance that same day.  (Ex. 112, PP-TRBK0091197 at PP-TRBK0091200.)

138.     The Notice of Acceptance covered certain personal property, including equipment, inventory, vehicles and certain contracts (defined as the "Subject Collateral") in which PPAS, as administrative agent, the Zohar Funds and AIP held a security interest.  (*Id.* at PP-TRBK0091201.)

139.     The Notice of Acceptance provided that PPAS, as administrative agent, accepted the Subject Collateral in satisfaction of $10 million of the outstanding Term Loan Agreement balance.  (*Id.* at PP-TRBK0091198.)

140.     Tilton valued the Subject Collateral in two ways.  First, she calculated the value of the Subject Collateral using the book value of the assets of the MTA paratransit, Hudson Valley and Pennsylvania business lines.  (Ex. 4, Tilton Tr. 123:5-8, 116:7-16, 116:18-117:3, 118:14-21, 122:5-12, 129:3-10.)  The book value of the combined assets of the three business lines totaled approximately $10 million, less the receivables.  (*Id.* at 116:7-14, 118:11-21, 127:11-22.)  This approximate $10 million figure is reflected on the opening balance sheet for Transcendence.  (*Id.* at 127:11-25; *see, e.g.*, Ex. 107, PP-TRBK0099137 at PP-TRBK0099143.)

141.     Second, Tilton examined the $10 million credit bid, along with the $12 million in new funding that she had committed to provide through her personal investment vehicles, as a multiple of EBITDA.  In other words, Tilton and her team compared the $22 million figure against the about $2.5 – $2.75 million of EBITDA that Tilton and her team projected would be generated by the three businesses going forward.  (Ex. 4, Tilton Tr. 117:14-22; *see, e.g.*, Ex. 113, PP-TRBK0112325 at PP-TRBK0112326 (showing projected EBITDA for NYC MTA, Pittsburgh and Hudson Valley business lines of $2.43MM).)  This implied a multiple of around 8.0x Transcendence's projected EBITDA for 2016, which Tilton testified was a generous multiple for a distressed business.  (Ex. 4, Tilton Tr. 118:22-119:5, 119:9-15, 120:12-17.)

142.     Also on February 24, 2016, PPAS, as administrative agent, and Transcendence, entered into a Bill of Sale, Agreement to Pay and Transfer Statement, dated February 24, 2016 (the "Bill of Sale").  (Ex. 114, PP-TRBK0091202.)  The Bill of Sale provided in relevant part that PPAS would transfer the Subject Collateral to Transcendence in exchange for $10 million.  (*Id.*)

***TransCare's Bankruptcy Filings and Post-Petition Events***

143.    TransCare Corporation and certain of its subsidiaries (the "<u>Initial Debtors</u>") filed voluntary chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") on February 24, 2016 (the "<u>Initial Petition Date</u>").[12]

144.    (Ex. 115, WF_TC_00000369.). (*Id.*)

145.    On February 25, 2016, Plaintiff Salvatore LaMonica ("<u>LaMonica</u>" or the "<u>Trustee</u>") was appointed as the interim Chapter 7 Trustee. (*See,* note 13, *supra*.)

146.    That same day, LaMonica and several of his law partners met with counsel for TransCare, counsel for PPAS, representatives of Wells Fargo and its counsel, and a representative of CMAG at the offices of Curtis Mallet. (Ex. 116, LaMonica Tr.[13] 12:6-13:3, 13:23-17:9.)

147.    At no point in the meeting did Wells Fargo propose to LaMonica that the paratransit business continue to operate as a going concern. (*Id.* at 84:14-18.) LaMonica testified that as of February 25-26, 2016, the TransCare estates lacked sufficient funding to operate the paratransit

---

[12] *See In re TransCare Corp.* (16- bk-10407-smb); *In re TransCare New York, Inc.* (16- bk-10408-smb); *In re TransCare ML, Inc.* (16- bk-10409-smb); *In re TC Ambulance Group, Inc.* (16- bk-10410-smb); *In re TransCare Management Services, Inc.* (16- bk-10411-smb); *In re TCBA Ambulance, Inc.* (16- bk-10412-smb); *In re TC Billing and Services Corporation* (16- bk-10413-smb); *In re TransCare Westchester, Inc.* (16- bk-10414-smb); *In re TransCare Maryland, Inc.* (16- bk-10415-smb); *In re TC Ambulance North, Inc.* (16- bk-10416-smb); and *In re TransCare Harford County, Inc.* (16- bk-10417-smb).

[13] "<u>LaMonica Tr.</u>" refers to the transcript of the deposition of Salvatore LaMonica taken on October 23, 2018.

business as a going concern absent debtor-in-possession financing or funding from one of the secured lenders.  (*Id.* at 81:3-23.)

148.    During the February 25, 2016 meeting, Randy Creswell, as counsel to PPAS, Wells Fargo (and its counsel) discussed whether and in what amount the respective secured lenders might provide payroll funding.  PPAS's counsel and Wells Fargo were unable to reach agreement on funding.  (*Id.* at 24:3-25.)

149.    Thereafter, LaMonica issued orders for all employees to return ambulances.  (Ex. 117, PP-TRBK0043510.)  LaMonica testified that he was concerned about securing any narcotics or other potentially dangerous items on the vehicles.  (Ex. 116, LaMonica Tr. 31:13-33:10.)  He further testified that he engaged in efforts to ensure the vehicles, and the items on the vehicles, were secured.  (*Id.*)  Tilton and Stephen shared LaMonica's concern.  (Ex. 6, Stephen Tr. 246:23-247:20; Ex. 4, Tilton Tr. 317:5-9.)

150.    Later that evening, Stephen sent an e-mail to employees of TransCare Hudson Valley, TransCare Pennsylvania and TC Ambulance Corporation (*i.e.*, the three business lines that had not filed for bankruptcy on February 24, 2016) and certain Patriarch Partners and PPMG employees about the need to secure the ambulances and other assets that Stephen understood now belonged to Transcendence.  (Ex. 118, PP-TRBK0076690 at PP-TRBK0076693-94; Ex. 6, Stephen Tr. 246:8-11, 246:19-21, 248:16-249:11.)

151.    In an email reply, Pelissier relayed to the group a plan to secure a computer server that would be needed in order to continue operating the paratransit business.  His idea was  to pick up the server from the TransCare building at which it was located and move it to the MTA facility so that it could be reconnected on time for the MTA paratransit division to "do their early morning routing" the following day.  (Ex. 118, PP-TRBK0076690 at PP-TRBK0076692.)

152. However, that same evening Gary Herbst, Mr. LaMonica's law partner, instructed Glen Youngblood, a TransCare employee who was slated to become the president of Transcendence, not to move the server. (Ex. 119, PP-TRBK0076698.) As a result of Mr. Herbst's directive, the server was not moved from the TransCare building at which it was located and was never physically transferred to Transcendence. (*Id*.; *see also* Ex. 118, PP-TRBK0076690 at PP-TRBK0076690-91; Ex. 120, PP-TRBK0114996 at PP-TRBK0115011-12, PP-TRBK0115024-25 (LaMonica explaining that the MTA retrieved its property post-petition, including its servers).)

153. LaMonica testified that he felt reasonably comfortable that all of the ambulances of two OldCo business lines were secured by the morning of February 26, 2016. (Ex. 116, LaMonica Tr. 51:10-52:17.) He further testified that the ambulances from two other OldCo business lines were secured within a week of the petition date. (*Id.* at 52:18-22.) LaMonica did not recall any instance where any of the [Defendants] declined or refused to turn over any assets of the estates of the Initial Debtors. (*Id*. at 53:19-25.)

154. On February 26, 2016, Stephen engaged with Diane Morgenroth of the MTA concerning the MTA and Transcendence entering into a new long-term agreement. Those discussions were unsuccessful and the MTA Contract was never assigned from TransCare New York to Transcendence. (Ex. 50, PP-TRBK0043516.)

155. On March 10, 2016, the Trustee, PPAS, and Transcendence Transit entered into a Stipulation Respecting the Sale of Certain Personal Property (the "Personal Property Stipulation"), which concerned the sale of certain property at auction, including the property PPAS foreclosed upon on behalf of the Term Loan Lenders (the "Foreclosed Personal Property Assets"). (*In re TransCare Corporation*, 16-10407-smb, Dkt. No. 52.)

156.     Pursuant to Paragraph 1 of the Personal Property Stipulation, PPAS and Transcendence consented to the Trustee's sale of the Foreclosed Personal Property Assets, free of encumbrances.  (*Id.*, Personal Property Stipulation ¶ 1.)  Paragraph 1 further provided that any security interests in the Foreclosed Personal Property Assets would attach to the proceeds of a sale "in such order, entitlement, and priority as they existed immediately prior to the Petition Date." (*Id.*)

157.     On March 25, 2016, the Bankruptcy Court entered an order approving the Personal Property Stipulation (the "March 25 Order").  (*Id.*)

158.     The March 25 Order authorized the Trustee to employ and retain Maltz Auctions, Inc. ("Maltz Auctions") as his auctioneer to conduct the auction sales of the Tangible Personal Property Assets (as defined in the March 25 Order).  (*Id.* ¶ 6.)

159.     Maltz Auctions conducted auction sales on April 20, 2016, May 4, 2016, May 6, 2016, May 11, 2016, May 12, 2016 and June 21, 2016 of both PPAS and non-PPAS assets.  (*In re TransCare Corporation*, 16-10407-smb, Dkt. Nos. 257, 258.)

160.     On or about July 14, 2016, the Trustee distributed $600,000.01 to PPAS.  (*In re TransCare Corporation*, 16-10407-smb, Dkt. No. 379.)

161.     On or about September 13, 2016, the Trustee distributed an additional $200,000.00 to PPAS.  (*Id.*)

162.     TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation filed voluntary chapter 7 bankruptcy petitions in the Bankruptcy Court on April 25, 2016.[14]

---

[14] *See TransCare Pennsylvania, Inc.* (16- bk-11057-smb); *TC Hudson Valley Ambulance Corp.* (16- bk-11058-smb); and *TC Ambulance Corporation* (16- bk-10410-smb).

Dated: June 20, 2019

<div style="margin-left: 40%;">

/s/ Michael T. Mervis
Michael T. Mervis
Timothy Q. Karcher
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Main Line: (212) 969-3000

Nicole A. Eichberger (admitted *pro hac vice*)
PROSKAUER ROSE LLP
650 Poydras Street
Suite 1800
New Orleans, LA 70130
Main Line: (504) 310-2024

*Counsel for Defendants*

</div>