**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re:                                                    :
                                                          :
                                                          :
      TRANSCARE CORPORATION, et al.,            :  Chapter 7
                                                          :  Case No. 16-10407 (SMB)
                                                          :  (Jointly Administered)
                           Debtors.            :
------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7         :
Trustee for the Estates of TransCare              :
Corporation, et al.,                                     :
                                                          :
                     Plaintiff,                  :
                                                          :  Adv. Proc. No. 18-1021 (SMB)
      - against -                                  :
                                                          :
LYNN TILTON, PATRIARCH PARTNERS         :
AGENCY SERVICES, LLC, PATRIARCH        :
PARTNERS, LLC, PATRIARCH PARTNERS    :
MANAGEMENT GROUP, LLC, ARK II CLO    :
2001-1 LIMITED, TRANSCENDENCE            :
TRANSIT, INC., and TRANSCENDENCE        :
TRANSIT II, INC.,                                       :
                                                          :
                     Defendants.              :
                                                          :
------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S PURPORTED EXPERT <u>JONATHAN I. ARNOLD</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1
II. ARNOLD'S REPORT .................................................................................................... 2
III. ARGUMENT .................................................................................................................. 3
    A. Arnold's Opinions Do Not Fit This Case. ............................................................ 4
    B. Arnold's Opinions Are Not Helpful to the Trier of Fact ....................................... 7
        1. Arnold's Descriptions of Operating Value and Liquidation Value are
           Unhelpful Summaries of Record Evidence................................................ 7
        2. Arnold's Use of Arithmetic to Calculate Operating Value and
           Liquidation Value is Not Based on Specialized Knowledge .................... 14
CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Andrews v. Metro N. Commuter R.R.*,
   882 F.2d 705 (2d Cir. 1989)...................................................................................................4

*Chemipal Ltd. v. Slim-Fast Nutritional Food Int'l, Inc.*,
   350 F. Supp. 2d 582 (D. Del. 2004)........................................................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ....................................................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..................................................................................................................3

*Finkelstein v. Liberty Digital, Inc.*,
   No. 19598, 2005 WL 1074364 (Del. Ch. Apr. 25, 2005) .........................................................4

*Forte v. Liquidnet Holdings, Inc.*,
   675 F. App'x 21 (2d Cir. 2017) ..............................................................................................11

*Guillory v. Domtar Indus. Inc.*,
   95 F.3d 1320 (5th Cir. 1996) ....................................................................................................5

*In re Breitburn Energy Partners LP*,
   582 B.R. 321 (Bankr. S.D.N.Y. 2018)....................................................................................14

*In re Rezulin Prods. Liab. Litig.*,
   441 F. Supp. 2d 567 (S.D.N.Y. 2006).......................................................................................4

*Jedwab v. MGM Grand Hotels, Inc.*,
   509 A.2d 584 (Del. Ch. 1986)..................................................................................................7

*LinkCo, Inc. v. Fujitsu Ltd.*,
   No. 00-7242(SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002)...........................................8

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003),
   *aff'd*, 99 F. App'x 274 (2d Cir. 2004)..............................................................................12, 14

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*,
   No. 95-3901(PKL), 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999).............................................8

*Munoz v. Orr*,
   200 F.3d 291 (5th Cir. 2000) ............................................................................................11

*Philips v. Ford Motor Co.*,
   No. 14-02989-LHK, 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016),
   *aff'd*, 726 F. App'x 608 (9th Cir. 2018)..............................................................................6

*Schwartz v. Fortune Magazine*,
   193 F.R.D. 144 (S.D.N.Y. 2000) .......................................................................................14

*Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*,
   398 B.R. 564 (Bankr. E.D. Mich. 2008) ............................................................................14

*Sullivan v. Ford Motor Co.*,
   No. 97-593(RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) ........................................4

*Thorpe v. CERBCO, Inc.*,
   No. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993).......................................................7

*United States v. Connolly*,
   No. 16 cr 370(CM), 2018 WL 5023785 (S.D.N.Y. Oct. 1, 2018) .....................................10

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008)............................................................................................ 7-8

*Vigil v. Burlington Northern & Santa Fe Ry.*,
   521 F. Supp. 2d 1185 (D.N.M. 2007) ...............................................................................14

*We Shall Overcome Found. v. Richmond Org., Inc.*,
   No. 16-2725(DLC), 2017 WL 3981311 (S.D.N.Y. Sept. 8, 2017).....................................3

**OTHER AUTHORITIES**

Fed. R. Evid. 702 .................................................................................................................3, 7

Defendants[1] move to exclude the purported expert witness proffered by Plaintiff Salvatore LaMonica (the "Trustee"), Jonathan I. Arnold. For the foregoing reasons, the motion should be granted.

**I.     INTRODUCTION**

1.     In his Expert Report,[2] Arnold purports to offer a "valuation" of TransCare Corporation and its affiliated entities ("TransCare" or the "Company") in January 2016 as well as a "valuation" of a portion of the Company in February 2016. Arnold's proposed testimony on these subjects is inadmissible for two reasons.

2.     *First*, Arnold's opinions do not fit the claims in this case. To that end, the Trustee alleges that Tilton breached her fiduciary duty of loyalty by failing to "monetize" TransCare while it was in the midst of a crippling liquidity crisis. To estimate the value of what such a monetization might have realized, the relevant task is to value TransCare *as it existed*. But that is not what Arnold does. Instead, he offers a purported "valuation" of TransCare as if it were a hypothetical version of the Company after a radical transformation into a totally different business. Notably, the Trustee does not allege (nor could he) that Tilton breached her duty of loyalty by not transforming TransCare into a completely different company.

3.     *Second*, Arnold's opinions do not help the Court as trier of fact. Expert evidence is admissible only if it brings some specialized knowledge to the case beyond that of the non-expert factfinder. Despite the length of the Report and the use of technical terms in it, Arnold's

---

[1] The Defendants in this adversary proceeding are: Lynn Tilton, Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Transcendence Transit, Inc., and Transcendence Transit II, Inc.

[2] *See* Declaration of Michael T. Mervis in Support of Motion to Exclude Expert Evidence ("Mervis Decl.") (submitted herewith), Ex. 1, Expert Report of Jonathan I. Arnold dated Nov. 30, 2018 (the "Report"). References herein to "Arnold Tr." are to the transcript of Dr. Arnold's deposition, taken on March 11, 2019. Cited excerpts from that transcript are annexed to the Mervis Decl. as Ex. 2.

opinions do no such thing. To arrive at TransCare's so-called "operating value," Arnold takes two pieces of evidence from the discovery record—TransCare's projected annual EBITDA from certain restructuring plans and some reported industry multiples—and performs simple arithmetic. The evidence Arnold used was preselected for him by the Trustee's counsel, and accepted by Arnold at face value without any investigation into its reasonableness or accuracy. Arnold accordingly provides no benefit to the Court, which can review the same record evidence, do the same simple math, and decide what weight (if any) to give the results.

## II. ARNOLD'S REPORT

4. The Trustee retained Arnold to offer an opinion of the "implied value" of TransCare—that is, what TransCare could have sold for in an orderly asset or going-concern sale instead of through liquidation. Arnold purports to value the Company "at four points during January and February 2016." (Report ¶¶ 4–6.)

5. Throughout January and February 2016, Tilton, Patriarch Partners personnel, TransCare executives, and/or Carl Marks Advisory Group, LLC ("CMAG") personnel created various potential restructuring plans for TransCare which contained, among other things, projected annual EBITDA under each plan (the "Projections"). They created the plans in connection with negotiations between TransCare and Wells Fargo N.A. ("Wells Fargo"), TransCare's asset-based-secured lender, to determine whether and on what terms Wells Fargo would agree to a long-term forbearance of Wells Fargo's rights under its loan agreement with TransCare.[3] The restructuring plans were dated January 7, January 27, January 28, and February 24, respectively.[4]

---

[3] (Mervis Decl. Ex 3, TRANSCARE00006334 ("Notice of Non-Renewal") at TRANSCARE-00006335–36; Ex. 4, PPTRBK0002058 at PP-TRBK0002059; Ex. 5, PP-TRBK0075262 at PP-TRBK0075263; Ex. 6, PP-TRBK0083461; Ex. 7, Tilton Tr. 162:24-165:8, 168:15-170:6.)

[4] The four plans, including their respective Projections, are annexed to the Mervis Decl. as Ex. 8 ("January 7 Projection"), Ex. 9 ("January 27 Projection"), Ex. 10 ("January 28 Projection"), and Ex. 11 ("February 24 Projection").

6. The conclusions in the Report rely largely on the Projections and were derived from three simple steps:

- At step one, Arnold performed multiplication. Specifically, he multiplied the projected annual EBITDA from the Projections by an EBITDA multiple industry range he took from a discovery document that was given to him by the Trustee's counsel. The Report refers to the range of outputs from this multiplication exercise as TransCare's operating value ("Operating Value"). (Report §§ III to IV.) Based on his multiplication, Arnold "opines" that TransCare could have sold in January 2016 for between $35.3 and $86.5 million and in February 2016 for between $22.7 and $39.1 million. (Report ¶ 7.)

- At step two, Arnold performed addition. He totaled the amounts generated from the Trustee's post-petition sale of assets and collection of accounts receivable, which are reported on the main case docket. (Report at § V & Ex. 13.) Arnold "opined" that the total was $19.2 million (the "Liquidation Value"). (Report ¶¶ 74–77.)

- At step three, Arnold performed subtraction. He subtracted the Liquidation Value from the Operating Value and "opined" that by liquidating instead of selling TransCare lost $16.1 to $67.3 million in January 2016 and $17.0 to $33.4 million in February. (Report ¶ 7.)

## III. ARGUMENT

7. Under Federal Rule of Evidence 702, a qualified expert witness may provide opinion testimony only if: "(a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court acts as a "gatekeeper" to ensure the proffered expert opinion is both reliable and relevant. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Trustee must establish the admissibility of Arnold's expert testimony by a preponderance of the evidence. *We Shall Overcome Found. v. Richmond Org., Inc.*, No. 16-2725(DLC), 2017 WL 3981311, at *19 (S.D.N.Y. Sept. 8, 2017).

8. The "touchstone" for admissibility is whether the expert testimony "is helpful to the trier of fact." *Sullivan v. Ford Motor Co.*, No. 97-593(RCC), 2000 WL 343777, at *6 (S.D.N.Y. Mar. 31, 2000). To be helpful, the testimony must "fit" the factual dispute—"in other words, it must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 576 (S.D.N.Y. 2006) (citation omitted). Testimony is not helpful if it concerns matters within the knowledge or experience of the fact finder. *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989) ("For an expert's testimony to be admissible . . . it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help.").

### A. Arnold's Opinions Do Not Fit This Case.

9. Arnold's opinions are inadmissible because they do not fit this case. Courts "must" exclude expert evidence "unless they are convinced that it speaks clearly and directly to an issue in dispute in the case[.]" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995). Here, Arnold's opinions do not fit this case because they do not offer a valuation that is meaningful to this case.

10. The Trustee contends that Tilton breached her fiduciary duty of loyalty by engaging in purported self-dealing instead of "monetizing" TransCare by selling it. (*See, e.g.*, Final Pre-Trial Order [Dkt. 83] ¶ 182 ("By executing the Transcendence transaction, Defendants deprived TransCare of the ability to monetize TransCare's assets as a going concern. TransCare recovered less through liquidation sales than TransCare could have recovered had Defendants sold or restructured TransCare in a disinterested manner.").) Given the framing of the Trustee's claim, the only (potentially) relevant question to ask is what the value of TransCare would have been *as it existed at the time*, but for the alleged self-dealing. *See Finkelstein v. Liberty Digital, Inc.*, No.

19598, 2005 WL 1074364, at *17 (Del. Ch. Apr. 25, 2005) (excluding expert because "rather than addressing the operative reality of Liberty Digital, as required by law, [the expert] imagines an ideal world for Liberty Digital and values [its assets] on that basis"). *Cf. Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all.").

11. But Arnold does not answer that question. Although his Report purports to value TransCare "at four points during January and February 2016," Report ¶ 4, Arnold admitted at his deposition that he actually valued what TransCare *possibly could be,* not what it actually was. (*See* Arnold Tr. 172:9–19 (emphasis added) ("I think that -- that TransCare as it was anticipated to be in the future was going to be *a decidedly different firm than it had been in the past.* So while in some cases, recent history is . . . a good predictor of the future, I think that's not going to be the case here, *especially given the significant changes that . . . people were modeling* and believed were appropriate for the firm going forward."). In other words, the Report proffers the "value" of a hypothetical, fully restructured, future TransCare; *not* of TransCare as it existed when the restructuring plans were created.

12. Arnold had to concede that he valued a hypothetical TransCare because that was the purpose of the Projections. The Projections, which were developed in January and February 2016 during negotiations between TransCare and Wells Fargo, attempt to calculate what TransCare *could be* worth in the future if fundamental changes were made to the Company. (*See* ¶ 5, *supra*.) The assumptions therein show that the Projections attempted to value TransCare after a significant revamp. They assumed, for example, that TransCare would (i) buy dozens of additional vehicles, (ii) move the locations of vehicle facilities, (iii) fix broken customer and employee relationships; (iv) hire a new senior management team; (v) obtain millions of dollars in

5

capital investments; and (vi) convince Wells Fargo to continue as TransCare's primary lender. (Jan. 7 Projection at CM_TC2018_0003370; Jan. 27 Projection at CM_TC2018_0002111–12; Feb. 24 Projection at PP-TRBK0086219.) For the Projections to be meaningful, Arnold acknowledged, each of these "significant" overhauls would "need to go right." (Arnold Tr. 97:10–22, 172:16.) As a result, the TransCare Arnold values—i.e., TransCare with new management, a new vehicle fleet, happy customers, content employees, cheaper maintenance facilities, millions in new capital, and an ongoing lender relationship—is not the TransCare for which Tilton served as Director in January and February 2016.[5]

13. Rather, there is no dispute that the TransCare that actually existed in the winter of 2016 lacked these attributes. To take just one example, by January 2016, Wells Fargo had already issued a Notice of Non-Renewal to TransCare stating that its credit agreement with TransCare would expire on January 31, 2016 and that Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements." (Ex. 3, Notice of Non-Renewal at TRANSCARE-00006335–36.) Wells Fargo executive Kurt Marsden had explained to Tilton that Wells Fargo had concerns about TransCare and its management team. (*See, e.g.*, Ex. 4, PPTRBK0002058 at PP-TRBK0002059; Ex. 5, PP-TRBK0075262 at PP-TRBK0075263; Ex. 6, PP-TRBK0083461.) And Tilton had similarly lost confidence in the TransCare management team. (*See* Tilton Tr. at 164:24–165:8.)

14. In this regard, it should be emphasized that the Trustee's duty of loyalty claim is not based on an alleged failure by Tilton to transform TransCare into a different business. Indeed,

---

[5] This is not the first time Arnold's opinion failed to fit the plaintiff's theory of the case. *See Philips v. Ford Motor Co.*, No. 14-02989-LHK, 2016 WL 7428810, at *19–22 (N.D. Cal. Dec. 22, 2016) (excluding Arnold because he "does not provide a model of damages that conforms to Plaintiffs' legal theory," and finding it "ironic" that, "after stating what a proper damages model would look like, Dr. Arnold then offers an entirely different model"), *aff'd*, 726 F. App'x 608 (9th Cir. 2018).

6

the cases are clear that she had no obligation to finance such a transformation. *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) ("[T]he law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation . . . ."); *Thorpe v. CERBCO, Inc.*, No. 11713, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993). ("[C]ontrolling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them.").

15. In sum, because Arnold values a hypothetical, fundamentally changed TransCare when he should have valued TransCare as it actually existed at times at which he purported to value the Company, his expert testimony should be excluded.

### B. Arnold's Opinions Are Not Helpful to the Trier of Fact

16. Even if Arnold's opinions fit the claims in this case, they are still inadmissible because they are not helpful to the trier of fact. In his Report, Arnold opines on TransCare's "implied value," a figure consisting of two inputs: TransCare's Operating Value and Liquidation Value. (Report ¶ 4.) In doing so, Arnold's "valuations rely on models and projections prepared by" TransCare, Patriarch Partners, and CMAG. (*Id.*) On its face, Arnold's Report does little more than describe the cherry-picked evidence he received from Trustee's counsel and accepted at face value without further investigation. Arnold then uses basic arithmetic to arrive at his "values." This proposed testimony should be excluded for two reasons: first, it does not meet the helpfulness criteria of Rule 702; and second, it does not draw on any specialized knowledge or expertise.

#### 1. *Arnold's Descriptions of Operating Value and Liquidation Value are Unhelpful Summaries of Record Evidence.*

17. An expert's testimony is admissible only if it concerns matters that a non-expert fact finder "is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d

179, 194 (2d Cir. 2008); *see id.* (citation omitted) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average [fact finder]."). Expert testimony is thus inadmissible if it merely reiterates fact evidence. Instead, it is "far more appropriate" to admit such evidence through the "testimony of fact witnesses" because "the expert witness's secondhand knowledge [is] unnecessary for the edification of the jury." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242(SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (alteration omitted) (citation omitted). *See also Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95-3901(PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (where expert's testimony "is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties," the expert's testimony "may not take the place of that of the individuals who actually negotiated the deal").

18. As the Report explains, Arnold arrived at his Operating Value range by multiplying TransCare's projected annual EBITDA (projected as part of a restructuring plan) by a multiples range. (Report ¶¶ 43–60 & Exhs. 12a to 12d.) Yet these inputs were not devised by Arnold himself. The projected EBITDA figures were simply lifted from the Projections. (Report ¶¶ 47–60.) Arnold used the Projections without independently testing the inputs that underpinned them. Those Projections provided him with the first of two inputs—projected annual EBITDA of $6.9, $5.0, and $5.2 million on January 7, 27, and 28 respectively; and $3.2 million on February 24. (*See* Report ¶¶ 49, 55, 58, 60.)[6]

---

[6] To be clear, these EBITDA figures are *projected future* earnings, as per the restructuring plans. They are not TransCare's *actual* EBITDA at any point in time.

19. The same is true for the EBITDA multiples. Arnold purports to apply four methods: (i) comparable companies; (ii) precedent transactions; (iii) reliance on alleged prior expressions of interest in TransCare in 2015; and (iv) reliance on multiples purportedly identified by Tilton. (Report ¶¶ 66–70.) But Arnold does not generate these methods on his own; he merely reiterated them as they were conducted by other people in 2015 and 2016:

- For a comparable-company approach, Arnold merely used two firms "identified by [Patriarch Partners'] Mr. Greenberg in [a] market comparable companies analysis" he provided to Tilton. (Report ¶ 67.)

- For a precedent-transaction approach, Arnold "rel[ied] on the two transaction comparables and the EV/EBITDA multiples identified by Mr. Greenberg." (Report ¶ 68.)

- For an expression-of-interest approach, Arnold "rel[ied] on the 8.0x EV/EBITDA offered by [TransCare competitor] RCA" in 2015. (Report ¶ 70.)[7]

- For Tilton's alleged approach, Arnold "rel[ied] on" the EBIDTA multiple "identified by Ms. Tilton during her deposition." (Report ¶ 69.)

20. Arnold arrived at his "opinion" of Liquidation Value the same way; he combined sales of assets and collections of accounts receivable that were reflected in submissions in the main case docket and six documents produced in this litigation. (*See* Ex. 13 to Report (listing sources for Liquidation Value).) He performed no additional analysis or review of these sales or collections numbers, but simply gathered record evidence.

21. Thus, Arnold's Report is essentially a book report; he blindly accepted data points, which were given to him by the Trustee's counsel or taken from the case docket, and performed arithmetic. The Court, as finder of fact in this bench trial, is well-suited to review the Projections

---

[7] What Arnold describes as an "offer" was merely an unsolicited feeler inquiry made without the benefit of any diligence. (Mervis Decl. Ex. 12, Leland I Tr. 113:20–114:11, 174:8–10; Ex. 13, PP-TRBK0071446 at PP-TRBK0071450; Ex. 14, PP-TRBK0030896 at PP-TRBK0030896–97; Ex. 15, PP-TRBK0030905; Ex. 16, Greenberg Tr. 229:23–230:18; Tilton Tr. 175:25–177:21, 320:21–321:15.)

9

and any evidence about them and determine what weight (if any) to give them. The same is the case with regard to the evidence from which Arnold took his multiples. Indeed, Bankruptcy Courts are ideally positioned to understand the Projections and multiples without a proffered expert. Depending on how the Trustee presents his case, this Court may have an opportunity to observe and question the fact witnesses who prepared the Projections and the plans in which they are contained—indeed, the Final Pre-Trial Order identifies as fact witnesses to be called by the Trustee individuals who authored or participated in the creation of the plans and Projections (*e.g.*, Michael Greenberg, Carl Landeck, Glenn Leland, and Mark Bonilla).[8]

22. To be clear, it is not just Arnold's reliance on record evidence that is problematic; it is his failure to vet the reliability of what was given to him by counsel or apply any expertise. As Arnold admitted in his deposition, he blindly relied on Trustee's counsel to decide what evidence to review, what assumptions to accept, and what inconsistencies to let lie without further investigation. He focused on the four dates in January and February 2016, the foundation of his Report, because Trustee's counsel *told him to*, not because his expertise informed their significance. (*See, e.g.*, Arnold Tr. 43:22–24 ("The four dates I used are the four dates that were identified to me by counsel as being relevant."), 45:18–23 (explaining he used the Projections because that "was the time period that counsel asked me to focus on").) Similarly, when Arnold received the Projections from the Trustee's counsel, he did not independently verify the data or test the underlying assumptions therein. (*See, e.g.*, Arnold Tr. 78:23–86:4, 95:21–101:10 (testifying he took no efforts to investigate key assumptions in Jan. 7 Projection); Arnold Tr.

---

[8] Arnold has tried previously to testify about facts outside an expert's ken. In October 2018, Chief Judge McMahon criticized Arnold's attempt testify to what documents the opposing counsel produced in the case. *United States v. Connolly*, No. 16 Cr 370(CM), 2018 WL 5023785, at *1 (S.D.N.Y. Oct. 1, 2018) ("Dr. Arnold cannot testify about the Government's failure to provide discovery.").

115:15–118:6 (admitting he did not investigate Jan. 27 Projection because "that level of granularity was not something that I investigated and assessed and pressure tested. Rather, I'm using the numbers that are the outcome of [the authors'] informed judgment . . . Look, I reviewed this document, but I didn't undertake an analysis beyond that").)

23. In short, he received this cherry-picked evidence, accepted it as accurate, and then did basic arithmetic. Arnold thus had no real idea how reliable or accurate the numbers were in the neat package of evidence he was given by counsel. That alone is grounds to reject Arnold's opinions. *See Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 23–24 (2d Cir. 2017) ("[The plaintiff's expert] did not independently verify any of the data he used in the report—he simply input the numbers he was given by [counsel] and used them to calculate pay discrepancies. A failure to validate data by itself can constitute grounds for excluding an expert report."); *Munoz v. Orr*, 200 F.3d 291, 301–02 (5th Cir. 2000) (noting that expert's reliance on data provided by a plaintiff, without conducting independent verification, gives rise to "common-sense skepticism" of the expert's evaluation); *Chemipal Ltd. v. Slim-Fast Nutritional Food Int'l, Inc.*, 350 F. Supp. 2d 582, 589–91 (D. Del. 2004) (rejecting testimony where the expert "adopted" with "blind reliance" a marketing report "without reviewing its underpinnings" and performed no independent analysis to demonstrate the data's reliability).

24. Had Arnold dug deeper, he would have discovered that his failure to investigate the pre-selected evidence was in error. For one, when pressed at his deposition, Arnold acknowledged that the January 7 Projection contained an internal inconsistency in one of its "major assumptions." (*See* Jan. 7 Projection at CM_TC2018_0003370.) In one place, the January 7 Projection based TransCare's potential restructuring on the assumed ability to buy 118 ambulances; in another it assumed the Company needed only 40 to 60. (*Compare id. with id.* at 0003376.) Arnold, however,

11

did nothing to investigate the difference or reconcile the numbers, even though he admitted that, for the projected EBITDA to be accurate, all of the assumptions "would have to go right." (Arnold Tr. 93:2–15, 97:10–17; 97:23–101:10.)

25. In another example, Arnold accepted two comparator companies "that Mr. Greenberg identified" in correspondence from December 2015. (Arnold Tr. 190:11–19, 194:4–13 (accepting the two companies selected by Greenberg without "do[ing] anything else" to find a comparator).) He admitted he "rel[ied] on Lynn Tilton and her executives' [including Greenberg's] view that these are the most comparable companies" and "did not independently vet" their views by reviewing for variables. (Arnold Tr. 200:4–201:17.) Arnold simply accepted Greenberg's comparators, and made no adjustments to the multiples they yielded, even though Arnold acknowledged the comparators differed from TransCare in material ways, including that they were financially stable whereas TransCare was "operating in the absolute breaking point." (Arnold Tr. 113:8–114:16; Jan. 27 Projection at CM_TC2018_0002111.) Arnold's indifference to such contradictory evidence renders his testimony inadmissible. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 693 (S.D.N.Y. 2003) (excluding valuation expert's testimony of comparator companies and noting "companies are not completely comparable merely because they are in the same industry, and often factors such as product and geographic markets, size, growth rates, profit margins, and other industry and economic considerations warrant adjustments"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

26. Moreover, what minimal "diligence" Arnold conducted did not draw on his expertise, but on ordinary lay judgment. When asked, for example, why he relied upon the Projections, he gave simplistic answers: they were finalized reports instead of drafts; they were created by "senior people" at TransCare, Patriarch Partners, and CMAG; the authors appeared to

have "knowledge" of what they were writing about; and Wells Fargo reviewed them. (Arnold Tr. 47:14–48:2, 72:16–73:5, 109:8–111:8.) The same inferences could be reached by a non-expert fact finder with basic business knowledge. And Arnold admits that many of his judgment calls were "self-evident," meaning they require no specialized expertise. (*See* Arnold Tr. 86:5–91:20 (relying on a scenario in a plan containing a higher projected EBITDA over another scenario in the same plan containing lower one without comparing scenarios' feasibility, claiming "it's self-evident" that "management is going to choose the path of the scenario that is most valuable"), Arnold Tr. 200:4–10 (admitting he did not review annual EBITDA for comparison companies because it is "self-evident" that the EBITDA will be large given that the multiplier was large), Arnold Tr. 116:3–117:12 (admitting he did not investigate the Jan. 27 Projection because "they have a detailed deck here that describes their views; so it seems self-evident that they took a look at [the inputs]").)[9]

27. At a minimum, these answers reveal Arnold's blind obedience to counsel's instructions without regard for the reliability of the results. (*See* Arnold Tr. 48:3–5 (admitting the Projections "are believed by counsel to have sufficient reliability to . . . inform the [valuation] process."), Arnold Tr. 158:3–8 (emphasis added) ("I was asked [by Trustee's counsel] to compute" the Operating Value "based on the numbers contained in the [February 24 Projection]. *It's up to others to make a conclusion as to its reliability*.").)

---

[9] Even a cursory review of the record shows that Arnold's "self-evident" facts are false. For example, Arnold claims it is "self-evident" that management would have chosen the scenario he used in the January 7 Projection because it has the highest projected EBITDA. But after reviewing that same Projection, CMAG rejected it because the "EBITDA numbers" seemed "significantly overstated." (*See* Mervis Decl. Ex. 17, CM_TC2018_0001031, at CM_TC2018_0001032.) For another example, Arnold assumes that the positive projected EBITDAs in the restructuring plans means "there was a consensus" that TransCare had value. (Report ¶ 46.) But Arnold later admitted he did not know if Tilton, Wells Fargo, or anyone for that matter agreed with the Projections. (*See, e.g.*, Arnold Tr. 110:19–111:20.)

### 2. *Arnold's Use of Arithmetic to Calculate Operating Value and Liquidation Value is Not Based on Specialized Knowledge*

28. Arnold's only "independent" contribution to Operating Value and Liquidation Value was the performance of addition, subtraction, and multiplication. But an expert does not elevate fact evidence into expert evidence just by performing arithmetic.

29. Simple arithmetical calculations are inadmissible expert evidence because they require no "scientific, technical, or other specialized knowledge" and do not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 398 B.R. 564, 576 (Bankr. E.D. Mich. 2008). Basic math calculations are within the fact finder's "common knowledge and experience." *Vigil v. Burlington Northern & Santa Fe Ry.*, 521 F. Supp. 2d 1185, 1205 (D.N.M. 2007). As such, courts routinely exclude such testimony because it is plainly unhelpful. *See Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (excluding testimony as unhelpful because it was "not generated based on any specialized knowledge, but rather involved basic calculations").

30. It is particularly noteworthy that Arnold decided not to employ a discounted cash flow analysis to value TransCare. (Report ¶ 65.) In contrast to the basic arithmetic he actually performed, a discounted cash flow analysis would have required Arnold to exercise a level of specialized skill, knowledge and judgment beyond basic arithmetic. *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 331 (Bankr. S.D.N.Y. 2018) (Bernstein, J.) (explaining that "forward-looking discounted cash flow analysis" requires "subjective" judgment because "[i]t involves predicting future revenues and expenses, and therefore requires assumptions regarding future prices and future costs"); *Lippe*, 288 B.R. at 689 (excluding expert for, *inter alia*, failing to use DCF method, noting "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow method.").

31. Because the record contained all the relevant inputs Arnold used to calculate Operating Value and Liquidation Value, Arnold simply performed three straightforward calculations using arithmetic. Such basic calculations require no more skill than the ability to use a calculator.

*****

32. In sum, Arnold's opinions are doubly inadmissible. He offers the wrong type of opinion for this case by valuing a hypothetical, future TransCare instead of TransCare as it existed in January and February 2016. And the opinions he does offer involve summaries of cherry-picked evidence, basic math, and no actual expertise. His opinions should be excluded.

## CONCLUSION

Defendants respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: July 8, 2019
      New York, New York

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000
Fax: (212) 969-2900
Email: mmervis@proskauer.com
       tkarcher@proskauer.com

Nicole A. Eichberger (admitted *pro hac vice*)
650 Poydras Street
Suite 1800
New Orleans, LA 70130-6146
Tel.: (504) 310-2024
Fax: (504) 310-2022
Email: neichberger@proskauer.com