**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
bamini@storchamini.com
Bijan Amini, Esq.
Avery Samet, Esq.
Jaime B. Leggett, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                                              :
                                                                   :
                                                                   :
      TRANSCARE CORPORATION, <u>et al.</u>,       :    Chapter 7
                                                                   :    Case No. 16-10407 (SMB)
                                                                   :    (Jointly Administered)
                Debtors.       :

------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7              :
Trustee for the Estates of TransCare          :
Corporation, <u>et al.</u>,                    :
                                               :
          Plaintiff,       :
                                               :    Adv. Proc. No. 18-1021 (SMB)
     - against -                      :
                                               :
LYNN TILTON, PATRIARCH PARTNERS               :
AGENCY SERVICES, LLC, PATRIARCH               :
PARTNERS, LLC, PATRIARCH PARTNERS             :
MANAGEMENT GROUP, LLC, ARK II CLO             :
2001-1 LIMITED, TRANSCENDENCE                 :
TRANSIT, INC., and TRANSCENDENCE              :
TRANSIT II, INC.,                             :
                                               :
         Defendants.       :

------------------------------------------------------------x

**<u>PLAINTIFF'S PRETRIAL MEMORANDUM</u>**

# TABLE OF CONTENTS

Table of Authorities ......................................................................................... ii

Summary of Plaintiff's Principal Case .............................................................1

I. FIRST CLAIM:  BREACH OF FIDUCIARY DUTY ............................................5

    A. IT IS DEFENDANTS' BURDEN TO PROVE THAT IT WAS ENTIRELY FAIR TO CREDIT TRANSCARE WITH AT MOST $10 MILLION FOR ITS MOST VALUABLE ASSETS .................................................................................5

    B. DEFENDANTS' OWN DOCUMENTS PROVE THE UNFAIRNESS ......................8

        1. The Transaction Was Not the Result of Fair Dealing.............................10

        2. The Transaction Was Not at a Fair Price ...........................................11

    C. PLAINTIFF'S ENTITLEMENT TO RELIEF ............................................15

II. PLAINTIFF'S OTHER CLAIMS.......................................................................16

    Plaintiff's Seventh Claim....................................................................16

    Plaintiff's Eleventh Claim...................................................................17

    Plaintiff's Tenth Claim ......................................................................17

    Plaintiff's Fourth Claim .....................................................................17

    Plaintiff's Fourteenth Claim ...............................................................18

    Plaintiff's Twelfth Claim....................................................................18

    Plaintiff's Third Claim.......................................................................20

    Plaintiff's Ninth Claim.......................................................................20

# TABLE OF AUTHORITIES

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
 722 F.2d 988 (2d Cir. 1983) ........................................................................15

*Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*,
 No. CV 2017-0453-KSJM, 2019 WL 2714331 (Del. Ch. June 28, 2019) ..............................9, 10

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
 269 F.3d 726 (6th Cir. 2001) ........................................................................17

*Boyer v. Wilmington Materials, Inc.*,
 754 A.2d 881 (Del. Ch. 1999) ........................................................................6

*Cede & Co. v. Technicolor, Inc.*,
 634 A.2d 345 (Del. 1993) ........................................................................7, 8, 12

*Cinerama, Inc. v. Technicolor, Inc.*,
 663 A.2d 1156 (Del. 1995) ........................................................................7, 9, 12

*Citron v. E.I. Du Pont de Nemours & Co.*,
 584 A.2d 490 (Del. Ch. 1990) ........................................................................10

*Duphily v. Del. Elec. Coop. Inc.*,
 662 A.2d 821 (Del. 1995) ........................................................................3

*FDIC v. Meyer*,
 781 F.2d 1260 (7th Cir. 1986) ........................................................................13

*FrontFour Capital Grp. LLC v. Taube*,
 No. CV 2019-0100-KSJM, 2019 WL 1313408 (Del. Ch. Mar. 11, 2019) ..............................8, 9

*Gesoff v. IIC Indus., Inc.*,
 902 A.2d 1130 (Del. Ch. 2006) ........................................................................11

*Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*,
 965 A.2d 715 (Del. Ch. 2008) ........................................................................14

*HMG/Courtland Properties, Inc. v. Gray*,
 749 A.2d 94 (Del. Ch. 1999) ........................................................................6

*In re Chicago, S. Shore and S. Bend R.R.*,
 146 B.R. 421 (Bankr. N.D. Ill. 1992) ........................................................................20

*In re Cornerstone Therapeutics Inc, Stockholder Litig.*,
115 A.3d 1173 (Del. 2015) ........................................................6, 9

*In re Dole Food Co., Inc. Stockholder Litig.*,
No. CV 8703-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015) ............................16

*In re Kors, Inc.*,
819 F.2d 19 (2d Cir. 1987).........................................................20

*In re Opus East LLC*,
528 B.R. 30 (Bankr. D. Del. 2015) .................................................6, 9

*In re Opus East LLC*,
698 Fed.Appx. 711 (3d Cir. 2017)...............................................5, 6, 11

*Int'l Telecharge, Inc. v. Bomarko, Inc.*,
766 A.2d 437 (Del. 2000) ..........................................................15

*Jones v. Crawford*,
1 A.3d 299 (Del. 2010) ............................................................3

*Kaufman v. William Iselin & Co.*,
272 A.D. 578, 74 N.Y.S.2d 23 (1st Dep't 1947) ....................................19

*Krys v. Sugrue (In re Refco, Inc. Secs. Litig.)*,
No. 07-mdl-1902, 2009 WL 5548666 (S.D.N.Y. Nov. 16, 2009) ............................19

*LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*,
173 F.3d 454 (2d Cir. 1999).........................................................15

*Milbank, Tweed, Hadley & McCloy v. Boon*,
13 F.3d 537 (2d Cir. 1994)..........................................................15

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*,
137 F. Supp. 2d 502 (S.D.N.Y. 2001)................................................6

*Pereira v. Cogan*,
52 Fed.Appx. 536 (2d Cir. 2002) ...................................................6

*Pereira v. Cogan*,
267 B.R. 500 (S.D.N.Y. 2001)........................................................6

*RBC Capital Markets, LLC v. Jervis*,
129 A.3d 816 (Del. 2015) ..........................................................3

*Reis v. Hazelett Strip-Casting Corp.*,
  28 A.3d 442 (Del. Ch. 2011)................................................................................11

*Related Companies, L.P. v. Ruthling*,
  No. 15-CV-4260 (KMK), 2018 WL 3315738 (S.D.N.Y. 2018)................................9

*Solomon v. Armstrong*,
  747 A.2d 1098 (Del. Ch.1999)..............................................................................9

*Spicer v. Osunkoya*,
  32 A.3d 347 (Del. 2011) ........................................................................................3

*Thorpe v. CERBCO, Inc.*,
  676 A.2d 436 (Del. 1996) ....................................................................................15

*Weinberger v. UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ......................................................................................5

*Williams v. Geier*,
  671 A.2d 1368 (Del. 1996) ....................................................................................6

## Statutes

11 U.S.C. § 544(b)................................................................................16, 17. 18

11 U.S.C. § 548(a)(1)(A)..............................................................................16

11 U.S.C. § 550(a)................................................................................16, 18

Del. Code § 144 ............................................................................................6

N.Y. Debt. & Cred. Law § 273................................................................17

N.Y. Debt. & Cred. Law § 274................................................................17

N.Y. Debt. & Cred. Law § 275................................................................17

N.Y. Debt. & Cred. Law § 276................................................................16

N.Y. Debt. & Cred. Law § 276-a................................................................16

N.Y. U.C.C. § 9-322(a)................................................................................19

N.Y. U.C.C. § 9-622(a)(3)................................................................................19

**Other Authorities**

Matthew W. Kavanaugh, Randye B. Soref,
Business Workouts Manual (Nov. 2018)........................................................................13

<u>**Summary of Plaintiff's Principal Case**</u>

Defendant Lynn Tilton is nobody's fool. Once she became resigned in December 2015 to a sale of TransCare as the only way forward given its debts and lack of liquidity, she also determined that she would take the opportunity to acquire its most valuable lines of business for herself. Despite negotiating a plan with Wells Fargo to explore arm's-length sales that involved retention of advisors, including an investment bank, and despite numerous third-party inquiries over the prior year, Tilton never pursued that course. Instead, she never considered a sale to anyone other than to herself, operating through Transcendence,[1] corporations that she formed specifically for the purpose of acquiring the most valuable of TransCare's assets and business lines.

On February 24, 2016, Tilton purported to transfer TransCare's valuable assets to Transcendence through a series of transactions – all with herself on both sides:

- Tilton, acting as the sole manager of PPAS, the administrative agent for the Term Loan Lenders, called a default on TransCare's most junior debt and accepted those same assets from TransCare.

- Tilton, acting as the sole director of TransCare, caused TransCare to voluntarily transfer its interests in its ambulances, most profitable contract, and the stock of three subsidiaries to PPAS, in exchange a $10 million credit off of TransCare's most junior debt. Tilton herself valued those assets as being worth at least $22 million.

- Tilton, acting as the sole director of Transcendence, "purchased" those foreclosed assets from PPAS in exchange for an unfunded promise to pay $10 million "through" Ark Angels III, LLC ("<u>Ark Angels</u>").

- Tilton, acting as the sole owner of Ark Angels, agreed to lend $10 million to Transcendence, another Tilton vehicle, for "working capital and general corporate purposes of [Transcendence] and to pay the purchase price, costs and expenses related to the Acquisition." (JX 101.)

- Tilton, as the sole owner of Ark II, claims that Ark II owns the same percentage of Transcendence as it owned of TransCare, although she cannot produce any documents proving that.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Joint Pretrial Order [Dkt. 85].

- Tilton then put what little remained of TransCare into chapter 7.

Within 48 hours, Tilton's plan had failed. Tilton first sought to obtain any available proceeds for herself by representing to the Trustee, the Court, her investors, and Credit Suisse that the assets sold by the Trustee were owned Transcendence, but later asserted – in this action for the first time – that the strict foreclosure effectively never happened at all to avoid liability. *See, e.g.*, Defendants' Memorandum in Support of Their Motion for Partial Summary Judgment [Dkt. 94] ("<u>Def. MSJ</u>") ¶¶ 49, 50 (the restructuring "never materialized," "the Subject Collateral was never physically transferred," and "it was ultimately nothing more than a paper transaction"). But in those 48 hours Tilton had cancelled TransCare's MTA Contract,[2] caused a near riot among unpaid employees, imperiled public safety, and destroyed TransCare's operating entities, reducing them to just inoperative assets to be sold in liquidation.

Once Tilton decided to sell or restructure TransCare in December 2015, it was a breach of the duty of loyalty to have failed to seek out potential arm's-length purchasers and, instead, to unilaterally attempt to transfer the valuable assets to herself for inadequate consideration and in violation of Delaware's entire fairness standard. Accordingly, as a matter of law, Tilton is responsible for the natural and foreseeable consequences to TransCare of her breach of fiduciary duty which, in this case, includes the loss of the ability to monetize all or part of TransCare as a going concern, and related costs TransCare was forced to sustain.

While Tilton blames everyone else for TransCare's demise,[3] Delaware follows "the 'but

---

[2] *See, e.g.*, PX245. This was TransCare's most desirable asset in that it required virtually no assets or capital costs as the MTA provided the necessary equipment. National Express had repeatedly offered at least $6 to $8 million for the rights to that MTA Contract (even before TransCare had renewed it for another 4 years, though 2019). Tilton had rejected that offer outright as far too low for a contract that delivered $2.5 to $3.5 million in EBITDA in an industry where she claimed that 7 to 8 times EBITDA was the relevant measure of value.

[3] PX 251 ("If anyone is responsible for the shutdown of the company it is CMAG [Carl Marks], Wells, and the Chapter 7 Trustee, and not me.").

for' definition of proximate cause." *Spicer v. Osunkoya*, 32 A.3d 347, 351 (Del. 2011). Thus, "a proximate cause is one which in natural and continuous sequence, *unbroken by any efficient intervening cause,* produces the injury and without which the result would not have occurred." *Id. quoting Duphily v. Del. Elec. Coop. Inc.,* 662 A.2d 821, 829 (Del.1995) (emphasis in original). "[T]here may be more than one proximate cause of an injury." *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 864 (Del. 2015), *quoting Jones v. Crawford,* 1 A.3d 299, 302 (Del. 2010). Thus, Tilton's blaming others will not absolve her because they can also have been the proximate cause of the destruction without negating her own liability. "In order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor." *RBC Capital Markets,* 129 A.3d at 864, *quoting Duphily,* 662 A.2d at 829. Here, it was more than foreseeable that Tilton's scheme would destroy TransCare as a going concern; it was a virtual certainty.

Tilton acknowledged that TransCare could not operate without the assets that she transferred to Transcendence, in particular the paratransit business operated under the MTA Contract, and had previously scolded her CEO for even considering the sale of that contract because it would immediately result in the liquidation of the company. (November 27, 2018 Glen Leland Deposition Transcript at 97:11-98:25.) Defendants never acquired the MTA's consent to assignment of the MTA Contract, and it became apparent on February 26, 2016, two days after the foreclosure and bankruptcy filings, that Transcendence, despite claiming to have received an assignment of the contract, could not perform. (Stmt. ¶ 154.[4]) Neither did Transcendence even

---

[4] This factual exposition describes generally what Plaintiff will prove and sometimes cites to the Statement of Material Facts (the "Stmt.") Defendants had submitted in support of their motion for partial summary judgment [Dkt. 96] which are non-hearsay admissions of a party opponent under Fed. R. Evid. 801(2). In summarizing the outstanding claims for the Court herein, the abridged discussion of facts, law, and relief sought is not intended to be limiting or to constitute a waiver in any respect.

have accounts through which to pay employees who, by February 26, had already missed one paycheck and then worked another week that would never get paid.[5]  Transcendence had no agreement with TransCare to operate the 911 ambulances Transcendence now allegedly owned after the foreclosure, or to have its employees service the MTA Contract on its behalf, and it had no access to cash from the transferred contracts because Wells Fargo shut down any use of the accounts receivable.  (With no basis whatsoever, Tilton nevertheless claims Wells Fargo "committed" to continue funding the chapter 7 entity even though she had just purported to foreclose on the MTA Contract, its single largest source of revenue and to which Wells Fargo had all rights over accounts receivable, before and after the strict foreclosure, and even though she had tried and failed to procure its agreement previously.)  It was obvious that Plaintiff, or any chapter 7 Trustee of an estate with no productive assets and unpaid employees but no way to pay them, would not, in the first 48 hours of his appointment, and without time to investigate, agree to service public health and safety contracts Tilton had taken away from the Debtors hours before.

More importantly, Tilton's focus on the Trustee's actions and other post-foreclosure events is misguided because it puts the cart before the horse.  The transactions by which Tilton's Transcendence acquired the assets of Tilton's TransCare unquestionably constituted self-dealing on Tilton's part as she was on all sides of those transactions.  The price she allegedly paid, a $10 million credit, is less than half of what she, herself, valued the company at.[6]  Under these

---

[5] Tilton delayed her foreclosure while she obtained the necessary insurance binders which were at a very minimum absolutely necessary to the businesses she was acquiring, thereby extending the Debtors' filing date through not one, but almost two, complete unpaid payrolls.  That left her dedicated employees, 700 of whom she falsely represented she would pay for the week leading to the bankruptcy and the two days following the filing in which  they worked ostensibly for Transcendence, unpaid to this date.

[6] Tilton valued the operating businesses she was acquiring for Transcendence at $22 million and is trying to claim, as part of her purchase price, a $2 million line of credit previously extended to TransCare and $10 million of credit she intended to extend to Transcendence.  TransCare received no benefit from the credit she was extending to her other company, and the supposed $10 million was itself nothing more than a short-term bridge loan to last only until Wells Fargo was paid off and released the accounts receivable.

circumstances, it is a fundamental principle of Delaware corporate law that the self-dealing fiduciary bears the burden of proving the "entire fairness" of the transaction. Whether others were responsible for loss of TransCare's businesses is, at best, a question of damages, and damages play no part in the "entire fairness" inquiry, as discussed below.

Finally, as discussed below, in the process of attempting to take TransCare's valuable assets unfairly, Defendants violated a number of rules and statutes that are designed to prevent the denuding of debtors and which provide the Debtors' estates with additional recoveries beyond the damages resulting from the breach of loyalty.

## I.    FIRST CLAIM: BREACH OF FIDUCIARY DUTY

### A.    IT IS DEFENDANTS' BURDEN TO PROVE THAT IT WAS ENTIRELY FAIR TO CREDIT TRANSCARE WITH AT MOST $ 10 MILLION FOR ITS MOST VALUABLE ASSETS

One of the bedrock principles of Delaware corporate law is the business judgment rule which insulates a director's actions from scrutiny except in certain limited circumstances, one such circumstance being self-dealing as occurred here. Self-dealing is not *per se* wrongful, but it necessarily carries one consequence: it eliminates the protection of the business judgment rule and imposes on the self-dealing fiduciary the burden of proving the transaction to have been entirely fair. "It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have 'the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.'" *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983) ("There is no 'safe harbor' for such divided loyalties in Delaware."); *In re Opus East LLC*, 698 Fed.Appx. 711, 718 (3d Cir. 2017) ("A plaintiff alleging a breach of this duty need only show that the director was on both sides of a challenged transaction… The burden then shifts to the director to 'demonstrat[e] the entire fairness of the transaction.'"), *citing In re The Brown Schs.*, 386 B.R.

37, 47 (Bankr. D. Del. 2008) and *quoting William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011), *aff'g*, 2016 WL 1298965 (D. Del. Mar. 31, 2016*), aff'g*, 528 B.R. 30 (Bankr. D. Del. 2015); *Pereira v. Cogan*, 52 Fed.Appx. 536, 538 (2d Cir. 2002) ("Under Delaware law, a controlling shareholder 'standing on both sides of a transaction' … 'bears the burden of proving its entire fairness."), *quoting Kahn v. Lynch Comm'ns Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 137 F. Supp. 2d 502, 508 (S.D.N.Y. 2001) ("'Where a controlling shareholder stands on both sides of a transaction, the standard ordinarily is that the controlling shareholder (and the directors who are subject to that control) will bear the burden of proving the entire fairness of the transaction.'"), *quoting In re MAXXAM, Inc.*, 1997 WL 187317, at *13 (Del. Ch. Apr. 4, 1997).   Directors will be found to have acted with entire fairness where they "'demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.'" *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 898 (Del. Ch. 1999). *See*, *e.g.*, *Opus East*, 698 Fed.Appx. at 719 ("The entire fairness standard is 'exacting,' and requires the director to show that the deal was objectively fair, not just that he believed it to be so."). *See also Pereira v. Cogan*, 267 B.R. 500, 508-09 (S.D.N.Y. 2001); *In re Cornerstone Therapeutics Inc, Stockholder Litig.,* 115 A.3d 1173, 1181 (Del. 2015); *Williams v. Geier,* 671 A.2d 1368, 1384 (Del. 1996).   "[B]oth the business judgment rule as traditionally interpreted and § 144 point toward the entire fairness standard as the appropriate form of review." *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 113 (Del. Ch. 1999). *See also* Del. C. § 144 (providing safe harbors when independent parties provide assurances of fairness).

It is, therefore, incumbent upon Tilton to carry her burden to satisfy the entire fairness test. Here, the contested transaction was the substantive equivalent of a sale of the company's operating subsidiaries, after consideration of whether to sell the Company as a whole or apparently in parts,

and, where "the contested action is the sale of a company, the 'fair price' aspect of an entire fairness analysis requires the board of directors to demonstrate 'that the price offered was the highest value reasonably available under the circumstances.'" *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1163 (Del. 1995), *quoting Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993), *on reargument,* 636 A.2d 956 (1994). To date, Defendants have never attempted to actually prove that.

Defendants have acknowledged that what Tilton did is to be evaluated under the "entire fairness" standard (although they have not acknowledged that the burden of proof falls to them). *See, e.g.,* Def. MSJ at ¶¶ 38-39. *See also id.* ¶ 25 (recognizing that the business judgment rule does not protect an "interested" director "on both sides of a transaction"). But they also seemingly contend that it should not matter whether the transactions satisfied that standard because they were "never fully 'effectuated' insofar as the assets at issue were never physically transferred to Transcendence and were 'given back' to the Trustee to sell through an auction process." *Id.* ¶ 50 n.13. Thus, they contend that "there is no evidence that the Article 9 foreclosure devalued [TransCare]." *Id.* ¶ 49. That argument is wrong as a matter of both law and fact.

It should be rejected as a matter of law because the argument is premature and irrelevant to the dispositive issue here. "[I]njury or damages becomes a proper focus only after a transaction is determined *not* to be entirely fair." *Cinerama,* 663 A.2d at 1166 (italics in original). In *Cinerama,* the Delaware Supreme Court reiterated:

> To inject a requirement of proof of injury into the [business judgment] rule's formulation for burden shifting purposes is to lose sight of the underlying purpose of the rule. Burden shifting does not create *per se* liability on the part of the directors; rather, it is a procedure by which Delaware courts of equity determine under what standard of review director liability is to be judged. To require proof of injury as a component of the proof necessary to rebut the business judgment presumption would be to convert the burden shifting

> process from a threshold determination of the appropriate standard
> of review to a dispositive adjudication on the merits.

*Id. quoting Cede & Co.,* 634 A.2d at 371. Moreover, diminution in value is not the sole damage sustained by the estates.

The contention should be rejected as a matter of fact because the transactions were consummated. The foreclosure agreements were executed at Tilton's direction, as was the attempted assignment of the MTA Contract and other assets, and Defendants' asserted rights to the foreclosed assets to the exclusion of the Trustee. Among other acts, the MTA Contract was purportedly terminated by Brian Stephen, an employee of Tilton's Patriarch Partners, acting on behalf of Transcendence as assignee, on February 26, 2016. (*See* Stmt. ¶ 6; PX 245.) PPAS received an interim distribution of 80% of the net proceeds from the sale of assets only because it claimed ownership of 100% of the proceeds by reason of the foreclosure. The fact that Defendants purported to unwind the transactions does not mean that they never happened or did not have consequences.

## B.     DEFENDANTS' OWN DOCUMENTS PROVE THE UNFAIRNESS

Plaintiff has no obligation to prove Defendants' transactions to have been unfair because the burden of proof rests with Defendants. While their failure to carry that burden alone will be dispositive, the facts relied upon by Defendants as undisputed when moving for summary judgment render the unfairness self-evident. *See, e.g., Pereira,* 267 B.R. at 509 ("[defendant] presented no evidence of how a 'wholly independent' board would have acted. [Defendant] has thus failed, as a matter of law, to meet his 'entire fairness' burden.").

"Entire fairness review arises 'when the board labors under actual conflicts of interest,' such as when a controlling stockholder [or other "controller"] stands on both sides of a challenged transaction." *FrontFour Capital Grp. LLC v. Taube*, 2019 WL 1313408, at *20 (Del.

Ch. Mar. 11, 2019) (footnotes omitted).  It is "'Delaware's most onerous standard' of review." *Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *17 (Del. Ch. June 28, 2019) (footnote omitted); *accord Opus East*, 528 B.R. at 65. "If entire fairness is triggered, Defendants bear the burden of proving by a preponderance of the evidence that the Proposed Transactions are entirely fair."   *Taube,* 2019 WL 1313408 at *21.   "The burden of proving entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but not invariably, results in a finding of liability." *Pereira,* 267 B.R. at 508, *quoting Solomon v. Armstrong,* 747 A.2d 1098, 1138 n.39 (Del. Ch.1999), *aff'd,* 746 A.2d 277 (Del. 2000).

"The concept of fairness has two basic aspects: fair dealing and fair price."  *Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21 (footnote omitted); *accord*, *Related Companies, L.P. v. Ruthling*, 2018 WL 3315738, at *14 (S.D.N.Y. 2018).  As the Delaware Court of Chancery recently summarized their interplay:

> Fair dealing addresses "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."  Fair price concerns "the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."  "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."

*Arkansas Teacher Ret. Sys.,* 2019 WL 2714331 at *21 (footnotes omitted, underlining added). *See also Cinerama,* 663 A.2d at 1172 (discussing the elements considered in greater detail).  "Indeed, as to the interested party itself, a finding of unfairness after trial will subject it to liability for breach of the duty of loyalty regardless of its subjective bad faith." *Cornerstone Therapeutics,* 115 A.3d at 1181 (footnote omitted).

### 1. The transaction was not the result of fair dealing

This inquiry encompasses the timing, initiation and negotiation of the transaction, as well as how approval of the board and stockholders were obtained. *Arkansas Teacher Ret. Sys.*. 2019 WL 2714331 at *21. Only the first three elements are relevant inasmuch as there were no approvals by independent board members (there were none) or stockholders.

There can be no reasonable dispute that the February 24, 2016, transactions lacked any procedural safeguards that would tend to protect the company and ensure a fair transaction. *Cf. Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490, 504 (Del. Ch. 1990) ("Built into the process by which the merger terms were set were procedural protections that tended to assure a fair result and to approximate what independent parties would have arrived at in an arm's length bargain.") Thus, here:

- These were not arms-length, third-party transactions. Lynn Tilton was in control as the sole director of TransCare, the sole director of Transcendence, the sole manager of PPAS, and the sole owner of Ark II and Ark Angels.

- The timing – both in terms of delay and then the chaotic execution on February 24 – was driven by Tilton's need to have insurance in place in order for Transcendence to be able to assume the businesses. *See supra* p. 4 n.5.

- There were no appraisers or investment bankers or any independent parties to advise as to fair price. The sale price was unilaterally set by Tilton and not even properly documented anywhere.

- For an entire year, if not longer, TransCare received *bona fide* third-party inquires and Tilton was adamant that they not be explored or even responded to. *See* Stmt. ¶¶ 43, 62, 69, 74.

- Once Tilton decided to sell TransCare's profitable business lines, after having rebuffed all third-party offers, she did not solicit third-party offers or ever consider selling the assets to anyone other than Transcendence, the entity she created specifically to assume the businesses.

- The February 24, 2016, transactions were structured as a foreclosure on the stock of certain entities and most physical assets of all the entities, consummated the same day as she put all other entities into chapter 7. As a result of her actions, the newly appointed Trustee was faced with an operational ambulance and transport

10

care provider that suddenly had no assets with which to undertake actual operations or sources of income with which to pay for them.

The transaction was classic self-dealing by Lynn Tilton, hurriedly executed and without any effort to ensure a fair price.

## 2.    The transaction was not at a fair price

The $10 million consideration allegedly provided to TransCare in exchange for the MTA, Hudson Valley, and Pittsburgh operations, as well as virtually all of TransCare's physical assets, was determined solely by Tilton's fiat. Even at Tilton's alleged $22 million price, for which neither she nor any of her companies parted with any actual cash or anything even approximating such values, the price was facially unfair.

"Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 459 (Del. Ch. 2011), *quoting Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del.Ch.2006). *See also Opus East,* 698 Fed.Appx. at 719. When a self-dealing fiduciary attempts to retroactively justify a price that had not been contemporaneously vetted through a fair process, it is not sufficient that the price merely be shown to have been "within the range" of what would be expected in an arms-length transaction. The Delaware Chancery Court has explained:

> Once again, I believe the defendants misconceive their burden. On the record before me, I obviously cannot conclude that HMG received a shockingly low price in the Transactions or that the prices paid were not within the low end of the range of possible prices that might have been paid in negotiated arms-length deals. In that narrow sense, the defendants have proven that the price was "fair." But that proof does not necessarily satisfy their burden under the entire fairness standard.

*HMG/Courtland*, 749 A.2d at 116-17. As noted above, the Delaware Supreme Court has held that in the context of a self-dealing fiduciary a "fair" price is the "the highest value reasonably available

under the circumstances." *See supra* p. 7, *quoting Cinerama,* 663 A.2d at 1163, *quoting Cede & Co.,* 634 A.2d at 361. See also *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 472 (D. Del. Bankr. 2017) (defendants' failure to seek the highest value reasonably available for the company during the sales process supported the inferences that the Defendants breached the duty of loyalty by, *inter alia*, engaging in a self-interested decision-making process or by acting with gross negligence.)

Here, by Defendants' own documents and reckonings, the $10 million price TransCare was allegedly paid for the profitable businesses, including the paratransit business which held the just-renewed MTA Contract, was grossly inadequate. The February 24, 2016 projections for Transcendence that Defendants were relying on reflect an enterprise value of approximately $22 million according to Tilton herself. (*See* October 29, 2018 Tilton Deposition Transcript ("Tilton Tr.") at 118:11-120:17, available at Dkt. 113-4.) Plaintiff's expert, Dr. Jonathan Arnold, confirmed that as the lowest value that would be supported by the projections Tilton utilized, based on the 7x-8x multiplier she claimed to use, and using the same accepted valuation formula. *See* Arnold's Expert Report Ex. 12d, available at Dkt. 107-1.

Tilton, contends that the "purchase price" for the assets transferred to Transcendence was $22 million, consisting of a "credit bid [of] $10 million because that was the [book] value of the assets that we took" (Tilton Tr. 119:19-12), and "$12 million of new money" that Tilton was to make available as a line of credit to Transcendence. (Tilton Tr. 116:18-117:3; 120:18-121:8.)[7] Neither contention is defensible.

The $10 million of PPAS debt that Defendants credit-bid for TransCare's choicest assets was, according to Tilton, selected because it represented the book value of the assets to be

---

[7] The $12 million "new money" was intended to encompass $2 million that Ark II had previously contributed to TransCare (and which, therefore, was not "new money" at all and which Defendants have claimed was still owed by TransCare), and a $10 million credit line for Transcendence which was never funded. (Stmt. ¶¶ 132-33.)

foreclosed upon and transferred, although Tilton was unable to identify any documentation supporting that asserted book value. (Tilton Tr. 125:2-129:18.) But even if it could be shown to have been a valid calculation of book value, it would not matter because even Tilton recognized that book value was not the appropriate measure of fair value – she is claiming to have paid a $22 million "purchase price" for the assets acquired by Transcendence, equal to the book value *plus* "$12 million of new money." That $22 million figure is just below the low-end of the valuation range suggested by Defendants' own forecasts and assumptions. *See supra* p. 12.[8]

The biggest problem for Tilton is that she was never actually paying a $22 million purchase price. Rather, by her own admission, the seller (*i.e.*, the Debtor) was receiving at most $10 million and then not as cash, but as a credit against debts that that would not have been paid anyway before Transcare was liquidated and effectively dissolved in the bankruptcy.[9] In fact, as a matter of law, a junior lienor cannot credit-bid and must bid in cash until senior lenders have been fully paid in cash. *E.g.*, *FDIC v. Meyer*, 781 F.2d 1260 (7th Cir. 1986); Matthew W. Kavanaugh, Randye B. Soref, Business Workouts Manual at § 37:21 (Nov. 2018). Of the other $12 million, $10 million was to be supplied as a line of credit to Tilton's new entity, Transcendence, presumably secured and bearing healthy interest in her favor. (Tilton Tr. 120:18-121:16 (as noted above, the remaining $2 million had previously been given to TransCare).) The Debtor, in receiving a $10 million credit of no value for what Defendants themselves calculated to be worth $22 million, did not by any stretch receive "fair value." Indeed, Tilton herself admitted the MTA Contract alone was worth in

---

[8] "Book value tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations." *Reis,* 28 A.3d at 476-77. It is particularly inappropriate for valuing entities that do not depend heavily on physical assets, *id.*, and, as Tilton testified, "[r]emember that MTA Transit [the paratransit business] has no assets, right. It uses other people's vehicles." Tilton Tr. 118:19-20.

[9] There are several additional distinct problems with the claimed $10 million credit bid. It was agreed to consensually at Tilton's direction even though by doing so both PPAS and TransCare were violating related loan agreements with the company's lenders; there is no written consideration for it in any document produced in this case; it was never registered or reported to the Term Loan Lenders or their trustee; and it remains to this date undersecured with little if any recovery available on it even had it remained a valid debt. In short, even that amount was illusory.

excess of the $6-8 million National Express had repeatedly offered for it in an industry that she claims trades at 7-8 times EBITDA values.  (Tilton Tr. 321:22-322:6; 120:11-17; 118:22-119:5.)

Moreover, Tilton is trying to equate the amount of her "investment" with the value received by the Debtor.  Those are two very different things. Tilton made two separate investments: (1) she acquired TransCare's assets, for Transcendence's use, by foreclosing and credit-bidding $10 million of the $43 million the Term Lenders were owed by TransCare; and (2) through Ark Angels, she committed an unfunded short-term bridge loan of up to $10 million to  Transcendence.  (Stmt. ¶ 133.)  One investment had nothing to do with the other: Tilton could have purchased the assets and a third-party could have made the loan, or *vice versa*. [10]  Or the loans could have been capital contributions.  Or TransCare could have been bought by an already-operating company that did not require any additional working capital.  It does not matter when EBITA is used to value a business – as both Arnold and Tilton have used it – precisely because "EBITDA is independent of capital structure[.]"  *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 740 (Del. Ch. 2008).

But even if Tilton actually paid $22 million for the assets, and even if that were a "fair price" such that it was within the range of what a third-party might expect to pay in an arms-length transaction, the absence of a fair procedure, as discussed above, would still prevent the transaction from being "entirely fair" absent proof that no third-party would have been willing to pay more. *See, e.g., HMG/Courtland,* 749 A.2d at 116-17 (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a

---

[10] In support of their summary judgment motion, Defendants asserted (improperly shifting the burden) that "there is no evidence that TransCare could have attracted capital at the time Tilton was pursuing the OldCo/NewCo Restructuring.  TransCare's assets were already pledged in full to multiple secured lenders….  There was nothing to offer a new lender as collateral." Def. MSJ at p. 17 ¶ 42.  It is not true that there "was nothing to offer."  Tilton agreed to loan $6.5 million (through Ark II) "as of" January 2016 only because Tilton, acting through the PPAS ostensibly on behalf of the Term Loan Lenders, agreed to subordinate their own liens to her own and thereby ensure that she was fully secured with respect to her "new money."  (*See* JX 79 (2016 Intercreditor Agreement).)

materially higher value for Wallingford and the Grossman's Portfolio . . . . That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Reis,* 28 A.3d at 467 (when the "price is entirely fair, but the process is faulty," plaintiff can be entitled to a "fairer" price).

## C.    <u>PLAINTIFF'S ENTITLEMENT TO RELIEF</u>

As discussed above, it is only once the Court finds that Defendants failed to satisfy their burden by proving the transaction to have been entirely fair does the Court consider damages and the relief to award. Self-dealing is a breach of the fiduciary duty of loyalty and, as such, "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc.,* 676 A.2d 436 (Del. 1996). "[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir. 1994). That is so because "the strict imposition of penalties under Delaware law are designed to discourage disloyalty" and not merely to compensate for the injury or damage incurred. *Boyer,* 754 A.2d at 906, *quoting Thorpe*, 676 A.2d at 445. "An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999), *quoting ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 955-96 (2d Cir. 1983).

Thus, under Delaware law, a court's remedial powers are very broad and doubts as to damages are to be resolved against the disloyal fiduciary:

> "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.,* 766 A.2d 437,

440 (Del. 2000). "The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.,* 1992 WL 251380, at *7 (Del.Ch. Sept. 29, 1992) (Allen, C.). "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc.,* 1993 WL 443406, at *12 (Del.Ch. Oct. 29, 1993).

*Reis,* 28 A.3d at 466. *See also In re Dole Food Co., Inc. Stockholder Litig*., 2015 WL 5052214, at *44 (Del. Ch. Aug. 27, 2015).

Here, once Tilton decided to sell TransCare in December 2015, until February 26, 2015, when she admittedly killed TransCare's business by terminating the MTA Contract, TransCare could have been sold as an operating business without WARN act liability, or even outstanding payroll-related claims, for a higher price than its assets fetched in liquidation. *See*, *e.g.*, Stmt. ¶ 63 (Tilton's acknowledgement that there was an "active [] market in the ambulance space"). TransCare was damaged at least to that extent by Tilton's aborted attempt to acquire TransCare.

## II.     PLAINTIFF'S OTHER CLAIMS

Plaintiff's remaining claims apply bankruptcy law to aspects of the transactions by which Tilton violated her fiduciary duties to TransCare.

Tilton clearly intended to hinder, delay or defraud other creditors in favoring herself through the strict foreclosure transactions and, therefore, they constituted actual fraudulent conveyances (**Plaintiff's Seventh Claim**) under Bankruptcy Code §§ 544(b), 548(a)(1)(A), and 550(a), and N.Y. Debtor & Creditor Law §§ 276 and 276-a. The Trustee is thus entitled to recover the value of the assets immediately prior to the transfers on February 24, 2016, when TransCare was still an operating business, and attorneys' fees, from the initial transferee and all mediate and intermediate transferees, namely Transcendence, PPAS and Ark II, insofar as none of them could

have acted in good faith due to Tilton's control.

Moreover, Tilton's pre-foreclosure transfer of a security interest to Ark II — via the Security Agreement, executed after February 10 but dated as of January 15, 2016 — was a transfer made to an insider when, even according to Tilton, Transcare had unreasonably small capital and could not pay its creditors. It was not transferred in good faith and for fair consideration and, thus, constituted at least constructively fraudulent conveyances under N.Y. Debtor & Creditor Law §§ 273, 274, and 275, and Bankruptcy Code §§ 544(b), 550(a). (**Plaintiff's Eleventh Claim**.)

At a minimum, the security interest retroactively granted to Ark II under the Ark II Security Agreement was an avoidable preferential transfer under Bankruptcy Code section 547(b) (**Plaintiff's Tenth Claim**) inasmuch as it was a transfer of interest on account of an antecedent debt while the Debtors were insolvent (to the extent not recharacterized as equity under the fourth claim).

Alternatively, **Plaintiff's Fourth Claim** asks the Court to recharacterize the $1.9 million Ark II contributed to TransCare on the ground that the Ark II Credit Agreement (PX 118) was a *post hoc* and ineffective attempt to recast an equity infusion as a loan, and an attempt to exchange Ark II's worthless equity interest in TransCare for a more valuable interest in Transcendence. In previously refusing to dismiss this claim, the Court recognized that it poses an "intensely factual" question to be evaluated at trial under the *AutoStyle* factors delineated in *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001). April 30, 2018, Memorandum Decision [Dkt. 78] at p. 18.

Ark II in fact received an interim distribution of $800,001 in the bankruptcy because of its claimed lien under the Security Agreement which would be invalidated by the Trustee's prevailing on any of his Plaintiff's Fourth, Tenth or Eleventh Claims. Pursuant to Stipulation dated March

10, 2016 [Dkt. 37-1], between the Trustee, Transcendence and PPAS, "acting for itself and the [Term Loan] Lenders," and implementing Order dated March 25, 2016 [Dkt. 52], it was agreed that the Trustee (reserving all rights to challenge the validity of the strict foreclosure and various liens asserted) would sell the assets which PPAS, acting on behalf of the Term Loan Lenders, had purported to strictly foreclose upon, and that 80% of the net proceeds (which percentage turned out to be $800,000.01) would be paid as an interim distribution to PPAS. But rather than distribute the proceeds to PPAS's principals, the Term Loan Lenders, PPAS distributed the proceeds to Tilton's personal investment vehicle, Ark II, citing as justification the lien PPAS claimed to grant pursuant to the 2016 Intercreditor Agreement.[11] Neither the Bankruptcy Code nor the Bankruptcy Court authorized a distribution to Ark II and the Trustee is seeking to avoid Ark II's asserted $1.9 million lien and to preserve it for the benefit of the bankruptcy estate—if he succeeds in avoiding the lien, there was no justification for Ark II having been paid $800,000 ahead of the Term Loan Lenders. Therefore, Plaintiff's **Fourteenth Claim** seeks, pursuant to Bankruptcy Code Section 549, to recover the funds Ark II was never authorized by the Bankruptcy Code or the Court to receive.

While Defendants are relying on the 2016 Intercreditor Agreement to try to justify Ark II's retention of the $800,000 it received, on the basis that PPAS agreed to subordinate the Term Loan Lenders to Ark II, Defendants are simultaneously denying that the Term Loan Lenders cannot be paid until Ark II is paid in full, the very definition of "subordination." **Plaintiff's Twelfth Claim** seeks to enforce that subordination pursuant to Bankruptcy Code § 510. In their summary judgment motion, Defendant argued that the Trustee did not have standing to hold PPAS to its agreement because it specifically provides that "although [TransCare] may sign this Intercreditor

---

[11] Pursuant to Bankruptcy Code §§ 544(b), 547, and 550(a), the Trustee seeks to avoid, and preserve for the benefit of the Estate, the full $1.9 million prepetition lien Ark II asserted, not merely the $1.1 million postpetition lien it claims after receiving the $800,000.

Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement." (Stmt. ¶ 102.)

But in making this argument Tilton is standing basic contract principles on their head by using the 2016 Intercreditor Agreement (itself a progeny of self-dealing) to improve her position relative to TransCare's creditors, while escaping her own obligations under the same agreement. *Krys v. Sugrue (In re Refco, Inc. Secs. Litig.)*, 2009 WL 5548666, at *9 (S.D.N.Y. Nov. 16, 2009) ("It is well-settled that a party seeking to obtain the benefits of a contract must also accept its burdens"); *Kaufman v. William Iselin & Co.*, 272 A.D. 578, 582, 74 N.Y.S.2d 23, 26 (1st Dep't 1947) ("it is proper to hold that having taken steps to adopt the terms of the contract he had assumed the obligations as well as the rights thereunder").

The 2016 Intercreditor Agreement improved Tilton's position, because the security interest of her personal investment vehicle, Ark II, was subordinate to that of PPAS, under N.Y. U.C.C. § 9-322(a), the former having been granted second-in-time. Tilton executed the subject agreement on behalf of both parties, PPAS and Ark II, prior to consummation of the strict foreclosure, specifically to avoid extinguishment of Ark II's security interest under N.Y. U.C.C. § 9-622(a)(3). As such, Ark II and thus Tilton unfairly benefited from this self-dealing transaction, because Ark II received an interim distribution of $800,000 in asset sale proceeds on account of its asserted senior security interest resulting from the Ark II Credit Agreement that it otherwise would not have received.

Further, the Ark II Intercreditor Agreement contains more than just the typical further assurances clause which debtors sign onto in intercreditor agreements without becoming a party. Such clauses impose no obligation beyond executing such documents, and taking such action, as

may be necessary or desirable to effectuate the agreement's purposes. *See, e.g.*, The Committee on Commercial Finance, ABA Business Law Section, Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force, 65 Bus. Law. 809 (May 2010).  In contrast, this agreement (by Tilton on both sides of the transaction) purported to also impose an affirmative obligation on TransCare to pay expenses incurred by Ark II in turning over collateral to PPAS (Section 3.6), while nevertheless expressly denying that TransCare was a "party" with any rights.  Given that TransCare assumed substantive obligations under, and agreed to be bound by, the Ark II Intercreditor Agreement as set forth above, then at a minimum it must be "part of" the agreement (*In re Kors, Inc.*, 819 F.2d 19 (2d Cir. 1987)), with an interest in the same (*In re Chicago, S. Shore and S. Bend R.R.*, 146 B.R. 421, 427 (Bankr. N.D. Ill. 1992)), for purposes of Bankruptcy Code section 510(a), such that the Trustee is entitled to enforce it.

**Plaintiff's Third Claim** seeks to equitably subordinate Defendants' claims, pursuant to Bankruptcy Code § 510(c), by reason of their inequitable conduct in attempting to secure TransCare's assets for Transcendence to the detriment of the Debtors and their creditors.  Finally, **Plaintiff's Ninth Claim** seeks to hold Defendants in contempt for their post-petition conduct in attempting to obtain property of TransCare that belonged to the Debtors' Estate including, without limitation, negotiations to obtain the MTA Contract and then the termination of that contract, efforts to consummate the "strict foreclosure," and other efforts to obtain estate property, in violation of the automatic stay provided for in section 362(a) of the Bankruptcy Code.

Dated: New York, New York  
       July 15, 2019

Respectfully submitted,

*/s/ Bijan Amini*
_____
Bijan Amini
Avery Samet
Jaime B. Leggett
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 490-4100
Fax: (212) 490-4208
bamini@storchamini.com
asamet@storchamini.com
jleggett@storchamini.com

*Special Counsel to Plaintiff Salvatore LaMonica, as Chapter 7 Trustee*