**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                                    :

                                                          :

                                                          :

       TRANSCARE CORPORATION, <u>et al.</u>,    :    Chapter 7

                                                          :    Case No. 16-10407 (SMB)

                                                          :    (Jointly Administered)

             Debtors.              :

-------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7            :

Trustee for the Estates of TransCare            :

Corporation, <u>et al.</u>,                          :

                                                          :

           Plaintiff,         :

                                                          :    Adv. Proc. No. 18-1021 (SMB)

      - against -                          :

                                                          :

LYNN TILTON, PATRIARCH PARTNERS         :

AGENCY SERVICES, LLC, PATRIARCH         :

PARTNERS, LLC, PATRIARCH PARTNERS       :

MANAGEMENT GROUP, LLC, ARK II CLO       :

2001-1 LIMITED, TRANSCENDENCE            :

TRANSIT, INC., and TRANSCENDENCE         :

TRANSIT II, INC.,                          :

                                                          :

         Defendants.          :

                                                          :

-------------------------------------------------------------x

## DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT
## <u>AND CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

Page

BASIS FOR JURISDICTION ........................................................................................ 1

FINDINGS OF FACT ................................................................................................... 2

I.      TRANSCARE, PATRIARCH PARTNERS AND PPMG ...................................... 2

II.     TRANSCARE'S DEBT STRUCTURE ................................................................. 4

III.   TRANSCARE'S LIQUIDITY AND FINANCIAL REPORTING CHALLENGES ........... 6

IV.   TRANSCARE RECEIVES UNSOLICITED INQUIRIES .................................... 7

V.    TRANSCARE MISSES PAYROLL IN JULY 2015 ........................................... 9

VI.   WELLS FARGO DECIDES NOT TO RENEW THE WELLS FARGO ABL
AGREEMENT ....................................................................................................... 9

VII.  ZOHAR FUNDS PROVIDE FUNDING TO ADDRESS TRANSCARE'S LIQUIDITY
SHORTFALLS ..................................................................................................... 10

VIII. TILTON EXPLORES A POTENTIAL SALE OF TRANSCARE .................................... 10

IX.   THE ARK II FACILITY ....................................................................................... 20

X.    OLDCO/NEWCO RESTRUCTURING ................................................................ 22

XI.   THE ARTICLE 9 FORECLOSURE .................................................................... 30

XII.  VALUING THE SUBJECT COLLATERAL ........................................................ 31

XIII. BANKRUPTCY FILING AND POST-PETITION EVENTS ............................................. 37

XIV. VALUING TRANSCARE ..................................................................................... 39

CONCLUSIONS OF LAW .......................................................................................... 49

XV.  THE TRUSTEE'S BREACH OF FIDUCIARY DUTY CLAIM ........................................ 49

XVI. THE TRUSTEE FAILED TO PROVE DAMAGES FOR THE FIDUCIARY DUTY
CLAIM ................................................................................................................... 70

XVII. EQUITABLE SUBORDINATION OF THE CLAIMS OF PPAS AND ARK II IS NOT
APPROPRIATE .................................................................................................... 81

XVIII. THE TRUSTEE FAILED TO ESTABLISH THAT AN ACTUAL FRAUDULENT TRANSFER OCCURRED ................................................................................................ 84

XIX. THE SECURITY INTEREST GRANTED TO ARK II IS VALID.................................... 85

XX.  THE TRUSTEE LACKS STANDING TO ASSERT HIS CLAIM FOR "PAYMENT SUBORDINATION"......................................................................................................... 94

XXI. THE TRANSFER OF THE AUCTION SALE PROCEEDS TO PPAS IS NOT AVOIDABLE UNDER SECTION 549 OF THE BANKRUPTCY CODE........................ 95

XXII. PPAS'S LIENS ON TRANSCARE'S ASSETS ARE NOT BARRED BY  SECTION 552 OF THE BANKRUPTCY CODE................................................................................. 97

CONCLUSION......................................................................................................................... 98

# TABLE OF AUTHORITIES

**Page(s)**

C‌ASES

*ACP Master, Ltd. v. Sprint Corp.*,
  2017 WL 3421142 (Del. Ch. July 21, 2017),
  *aff'd*, 184 A.3d 1291 (Del 2018).................................................................................61

*Agranoff v. Miller*,
  791 A.2d 880 (Del. Ch. 2001)......................................................................................78

*Allen v. Wright*,
  468 U.S. 737 (1984).....................................................................................................83

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*,
  120 A. 486 (Del. Ch. 1923)..........................................................................................67

*Arnot v. Endresen (In re Endresen)*,
  548 B.R. 258 (B.A.P. 9th Cir. 2016).............................................................................98

*Bank of Commc'ns v. Ocean Dev. Am., Inc.*,
  904 F. Supp. 2d 356 (S.D.N.Y. 2012).............................................................92, 93, 94

*Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
  2018 WL 3326693 (Del. Ch. July 6, 2018)...................................................................70

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
  269 F.3d 726 (6th Cir. 2001) .......................................................................................86

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
  563 F.2d 692 (5th Cir. 1977) .......................................................................................82

*Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*,
  2015 WL 5766761 (Bankr. D. Utah Sept. 30, 2015)...............................................83, 84

*Blackmore Partners, L.P. v. Link Energy LLC*,
  864 A.2d 80 (Del. Ch. 2004).........................................................................................59

*Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*,
  906 A.2d 27 (Del. 2006) ...............................................................................................69

*Burtch v. Opus, LLC (In re Opus East, LLC)*,
  528 B.R. 30 (Bankr. D. Del. 2015),
  *aff'd*, 698 F. App'x 711 (3d Cir. 2017)..................................................................66-67

*Cage v. Wyo–Ben, Inc. (In re Ramba Inc.)*,
  437 F.3d 457 (5th Cir. 2006) ............................................................96

*Cavalier Oil Corp. v. Harnett*,
  1988 WL 15816 (Del. Ch. Feb. 22, 1988),
  *aff'd*, 564 A.2d 1137 (Del. 1989)......................................................78

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993),
  *decision modified on reargument*, 636 A.2d 956 (Del. 1994) ...............51

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1156 (Del. 1995) ..........................................51, 53, 54, 60, 62

*Cline v. Grelock*,
  2010 WL 761142 (Del. Ch. Mar. 2, 2010)...........................................70

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*,
  385 F. Supp. 2d 449 (D. Del. 2004)....................................................71

*Cooper v. Pabst Brewing Co.*,
  1993 WL 208763 (Del. Ch. June 8, 1993).............................................71

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) .....................................................74

*Doft & Co. v. Travelocity.com Inc.*,
  2004 WL 1152338 (Del. Ch. May 20, 2004)....................................76, 79

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)........................................................................49

*Emerald Partners v. Berlin*,
  2003 WL 21003437 (Del. Ch. Apr. 28, 2003),
  *aff'd*, 2003 WL 23019210 (Del. Dec. 23, 2003) ..................................54

*Finkelstein v. Liberty Digital, Inc.*,
  2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ........................................78

*Gelfman v. Weeden Inv'rs, L.P.*,
  859 A.2d 89 (Del. Ch. 2004)............................................................54

*Geltzer v. Bloom (In re M. Silverman Laces, Inc.)*,
  404 B.R. 345 (Bankr. S.D.N.Y. 2009) .................................................68

*Gen. Motors Corp. v. New Castle Cty.*,
  2000 WL 33113802 (Del. Sup. Ct. Dec. 16, 2000) ................................73

*Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.)*,
    2009 WL 3206051 (Del. Ch. Sept. 30, 2009) .........................................................61

*Havee v. Belk*,
    589 F. Supp. 600 (W.D.N.C. 1984),
    *aff'd*, 775 F.2d 1209 (4th Cir. 1985) ..................................................................67

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ...................................................................................93

*Huff Fund Inv. P'ship v. CKx, Inc.*,
    2013 WL 5878807 (Del. Ch. Nov. 1, 2013),
    *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) ...............................................77, 78

*In re 610 W. 142 Owners Corp.*,
    219 B.R. 363 (Bankr. S.D.N.Y. 1998) ....................................................................2

*In re Aéropostale, Inc.*,
    555 B.R. 369 (Bankr. S.D.N.Y. 2016) .......................................................86, 87, 88

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ..................................................................66

*In re Cold Harbor Assocs., L.P.*,
    204 B.R. 904 (Bankr. E.D. Va. 1997) ..................................................................88

*In re Hanover Direct, Inc. S'holders Litig.*,
    2010 WL 3959399 (Del. Ch. Sept. 24, 2010) .......................................................65

*In re HH Liquidation, LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) .....................................................................70

*In re LNR Prop. Corp. S'holders Litig.*,
    896 A.2d 169 (Del. Ch. 2005) ..............................................................................64

*In re Micro–Precision Techs., Inc.*,
    303 B.R. 238 (Bankr. D.N.H. 2003) .....................................................................88

*In re Nine Sys. Corp. S'holders Litig.*,
    2014 WL 4383127 (Del. Ch. Sept. 4, 2014),
    *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015) ......58, 72

*In re Old Carco LLC*,
    500 B.R. 683 (Bankr. S.D.N.Y. 2013) .............................................................83, 95

*In re Orchard Enters., Inc.*,
    2012 WL 2923305 (Del. Ch. July 18, 2012),
    *aff'd sub nom. Orchard Enters., Inc. v. Merlin Partners LP*,
    2013 WL 1282001 (Del. Mar. 28, 2013) ........................................................76, 78

*In re Petsmart, Inc.*,
    2017 WL 2303599 (Del. Ch. May 26, 2017) ..................................................75

*In re Quigley Co.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ..........................................................83

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006)..........................................................................87

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013).....................................................50, 51, 53, 54, 59

*In re Vision Hardware Grp., Inc.*,
    669 A2d 671 (Del. Ch. 1995),
    *aff'd*, 676 A.2d 909 (Del. 1996)..................................................................65

*In re Walt Disney Co. Deriv. Litig.*,
    907 A.2d 693 (Del. Ch. 2005),
    *aff'd*, 906 A.2d 27 (Del. 2006)....................................................................68

*In re Walt Disney Co. Deriv. Litig.*,
    825 A.2d 275 (Del. Ch. 2003)......................................................................69

*Jacobs v. D'Alessandro (In re Dewey & LeBoeuf LLP)*,
    2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014)..................................94

*Johnson v. First Nat'l Bank*,
    81 B.R. 87 (Bankr. N.D. Fla. 1987) ..............................................................92

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) .............................................................................64

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
    413 B.R. 115 (Bankr. S.D.N.Y. 2008),
    *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) ....................................81

*Kohler Co. v. United States*,
    387 F. Supp. 2d 921 (E.D. Wis. 2005),
    *aff'd*, 468 F.3d 1032 (7th Cir. 2006).............................................................74

*Kronenberg v. Katz*,
    872 A.2d 568 (Del. Ch. 2004)......................................................................75

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC,*
2014 WL 5192179 (Del. Ch. Oct. 10, 2014) ...................................................71, 81

*McCord v. Agard (In re Bean),*
252 F.3d 113 (2d Cir. 2001) ...................................................................96

*MDG Int'l, Inc. v. Australian Gold, Inc.,*
2009 WL 1916728 (S.D. Ind. June 29, 2009) ......................................74

*Midlantic Nat'l Bank N., N.A. v. Borg–Warner Acceptance Corp. (In re Mayo),*
112 B.R. 607 (Bankr. D. Vt. 1990) ........................................................81

*Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.),*
207 B.R. 391 (Bankr. E.D.N.Y. 1997) ...................................................96

*Neal v. Alabama By–Prods. Corp.,*
1990 WL 109243 (Del. Ch. Aug. 1, 1990),
*aff'd,* 588 A.2d 255 (Del. 1991) ...........................................................75

*Obuchowski v. Poulin Grain, Inc. (In re Stevens),*
2000 WL 35723732 (Bankr. D. Vt. Oct. 24, 2000) ..............................82

*Official Comm. on Unsecured Creditors of Adoni Grp., Inc. v. Capital Bus. Credit, LLC (In re Adoni Grp.),*
530 B.R. 592 (Bankr. S.D.N.Y. 2015) ...................................................90

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC),* 420 B.R. 112 (Bankr. S.D.N.Y. 2009),
*aff'd,* 807 F. Supp. 2d 199 (S.D.N.Y. 2011) .................................86, 87

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),*
405 B.R. 527 (Bankr. D. Del. 2009) .......................................................49

*Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Capital Advisors, LLC (In re Katy Indus., Inc.),*
590 B.R. 628 (Bankr. D. Del. 2018) .......................................................71

*OptimisCorp v. Waite,*
2015 WL 5147038 (Del. Ch. Aug. 26, 2015),
*aff'd,* 137 A.3d 970 (Del. 2016) ......................................................70, 77

*Pereira v. Hope (In re 550 Les Mouches Fashions, Ltd.),*
24 B.R. 509 (Bankr. S.D.N.Y. 1982) .....................................................93

*Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*,
   2013 WL 3828509 (Bankr. S.D.N.Y. July 23, 2013) ............................................92

*Premium Mortg. Corp. v. Equifax, Inc.*,
   583 F.3d 103 (2d Cir. 2009)....................................................................................95

*Ravenswood Inv. Co., L.P. v. Estate of Winmill*,
   2018 WL 1410860 (Del. Ch. Mar. 21, 2018)..........................................................71

*Reis v. Hazelett Strip–Casting Corp.*,
   28 A.3d 442 (Del. Ch. 2011).............................................................50, 65, 71, 79

*Rivera v. Mendez & Compania*,
   988 F. Supp. 2d 174 (D.P.R. 2013)........................................................................74

*Roost v. Toyota Motor Credit Corp. (In re Moon)*,
   262 B.R. 97 (Bankr. D. Or. 2001)...........................................................................90

*Roselink Inv'rs, LLC v. Shenkman*,
   386 F. Supp. 2d 209 (S.D.N.Y. 2004)..............................................................51, 52

*Rubin v. Manufacturers Hanover Tr. Co.*,
   661 F.2d 979 (2d Cir. 1981)....................................................................................66

*S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*,
   2011 WL 863007 (Del. Ch. Mar. 9),
   *aff'd*, 35 A.3d 419 (Del. 2011).......................................................58, 64, 65

*Saavedra v. Eli Lilly & Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .......................................................74

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005)...........................................................84, 85, 91, 93

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*,
   337 B.R. 791 (Bankr. S.D.N.Y. 2005).....................................................................85

*Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless
   Cashways, Inc.)*, 306 B.R. 243 (B.A.P. 8th Cir. 2004),
   *aff'd*, 394 F.3d 1082 (8th Cir. 2005)......................................................................89

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) .......................................................................................68

*Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.)*,
   104 B.R. 401 (Bankr. D. Utah 1989) ................................................................90, 91

*Thorpe v. CERBCO, Inc.*,
    676 A.2d 436 (Del. 1996) ............................................................70

*Thorpe v. CERBCO, Inc.*,
    1993 WL 443406 (Del. Ch. Oct. 29, 1993) ...............................56

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
    549 B.R. 21 (S.D.N.Y. 2016) ................................................. 83-84

*United States v. McCombs*,
    30 F.3d 310 (2d Cir. 1994) ..........................................................91

*Warth v. Seldin*,
    422 U.S. 490 (1975) .....................................................................83

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) .......................................................54, 55

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017),
    *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) ...................................... 89-90

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) .................................86, 87, 88

*William Penn P'ship v. Saliba*,
    13 A.3d 749 (Del. 2011) ..............................................................73

## Statutes

11 U.S.C. § 541(a)(1) ......................................................................96

11 U.S.C. § 541(d) ..........................................................................96

11 U.S.C. § 547(b) .....................................................................89, 90

11 U.S.C. § 547(e)(2)(A) ...........................................................90, 91

11 U.S.C. § 548(a)(1)(A) .................................................................84

11 U.S.C. § 549(a) ..........................................................................95

11 U.S.C. § 552(b)(1) ......................................................................97

28 U.S.C. § 157(b)(2) ........................................................................2

28 U.S.C. § 157(c) .........................................................2, 49, 82, 98

28 U.S.C. § 1331 ................................................................................................................2

28 U.S.C. § 1334 ................................................................................................................1

N.Y. Debt. & Cred. Law § 272 ...................................................................................91, 93

N.Y. Debt. & Cred. Law § 273 .........................................................................................91

N.Y. Debt. & Cred. Law § 274 .........................................................................................91

N.Y. Debt. & Cred. Law § 275 .........................................................................................91

N.Y. Debt. & Cred. Law § 276 .........................................................................................84

Defendants[1] respectfully submit the following post-trial proposed findings of fact and conclusions of law.

1.      Plaintiff Salvatore LaMonica, the chapter 7 trustee in the above-captioned cases ("LaMonica" or the "Trustee"), brought this adversary proceeding alleging that Defendant Lynn Tilton breached her fiduciary duty of loyalty and good faith to TransCare.  The Trustee brought additional claims and claim objections against entities owned or controlled by Tilton (collectively, the "Entity Defendants"), premised on allegations that the Entity Defendants acted inequitably toward TransCare, violated the automatic stay, or otherwise engaged in conduct warranting avoidance, recharacterization, or disallowance of the Entity Defendants' claims.

2.      This Court conducted a trial on these claims on July 22–24, 2019, August 8, 2019 and August 13–14, 2019.

3.      At the conclusion of the trial, the Court dismissed the Trustee's claims for violation of the automatic stay, equitable subordination as to PPMG and Patriarch Partners and actual fraudulent transfer as to Ark II.  (Dkt. No. 131.)

4.      Having considered the evidence adduced during the trial and the arguments of the parties made during the trial, the Court makes the following findings of fact and conclusions of law.[2]

## BASIS FOR JURISDICTION

5.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C.  § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the

---

[1] The Defendants in this adversary proceeding are:  Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001–1, Limited ("Ark II"), Transcendence Transit, Inc. ("Transcendence Transit"), and Transcendence Transit II, Inc. ("Transcendence Transit II" and, together with Transcendence Transit, "Transcendence").
[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

1

"Bankruptcy Code") and pursuant to 28 U.S.C. § 1331 as it arises in part under the laws of the United States.

6.      The parties agree that Counts III, IV, VII, X, XI, XII, and XIV of the Amended Complaint (Dkt. No. 53) are statutorily "core" claims within the meaning of 28 U.S.C. § 157(b)(2). However, they dispute whether Count I—a state law claim for breach of fiduciary duty based on pre-petition conduct—is a core claim.  Defendants contend that the Trustee's claim for breach of fiduciary duty is non-core.  This Court agrees with Defendants.  *See In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 370 (Bankr. S.D.N.Y. 1998) ("Here, these state law causes of action for breach of fiduciary duty and negligence arose prepetition.  They do not involve the application of bankruptcy law and are therefore non-core.").

7.      Accordingly, on the claim for breach of fiduciary duty, the Court's findings of fact and conclusions of law will constitute proposed findings of fact and conclusions of law to be submitted to the District Court for its consideration pursuant to 28 U.S.C. § 157(c)(1).

### FINDINGS OF FACT

### I.      TransCare, Patriarch Partners and PPMG

8.      TransCare Corporation is a Delaware corporation.  (Stipulation No.[3] 1.)

9.      TransCare Corporation, by and through its subsidiaries[4], provided ambulance and paratransit transportation services in New York, Pennsylvania and Maryland.  (*Id.*)

10.     Tilton, through funds she owned and managed, purchased TransCare out of bankruptcy in 2003.  (Aug. 13 PM Tr. 19:8–13.)

---

[3] As used herein, "Stipulation No." means the undisputed facts to which the Trustee and Defendants stipulated in the Final Pre-Trial Order.  (Dkt. No. 85).

[4] TransCare Corporation's subsidiaries were Delaware corporations.  (Stipulation No. 1.)  One of the subsidiaries was TransCare New York, Inc. ("TransCare New York") (together with TransCare Corporation and the other subsidiaries, "TransCare" or the "Company").  (*Id.*)

11. Between November 2014 and February 26, 2016 (the "Relevant Time Period"), Tilton served as the sole board member of TransCare. (Stipulation No. 2.)

12. Patriarch Partners is a family office that supports Tilton in her ownership and her role as manager and director of a number of different companies ("portfolio companies"), of which TransCare was one. (*See, e.g.*, July 22 AM Tr. 15:4–10; July 23 PM Tr. 3:4–12.)

13. During the Relevant Time Period, affiliates of Patriarch Partners also served as the collateral manager for Zohar CDO 2003–1, Ltd., Zohar II 2005–1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds").[5] (Aug. 13 PM Tr. 23:1–6.)

14. As of 2015, through affiliated entities, Tilton held a majority or sole equity interest in over seventy portfolio companies and served as CEO of four of them. (*Id*. at 20:5–9.)

15. The portfolio companies were, at the time they were acquired, deeply distressed. (*Id.* at 18:22–19:5.)

16. Funding was provided to the portfolio companies, in part, by the Zohar Funds, which "invest[ed] in deeply distressed companies" and provided the necessary capital to "restructure those companies over long periods of time." (*Id.* at 22:9–23:6.)

17. Funding was also provided by certain of Tilton's personal investment funds. (JX_1.)[6]

18. PPMG "is a group of operational leaders" that serve as consultants to the portfolio companies. (Aug. 13 PM Tr. 19:21–25.)

---

[5] Tilton owned the Zohar Funds during the Relevant Time Period. (Aug. 13 PM Tr. 63:4–12.)

[6] References to (i) "DX_" are to the Defendants' exhibits that were admitted into evidence at the trial or by stipulation (Dkt. No. 131); (ii) "PX__" are to the Trustee's exhibits that were admitted into evidence at the trial or by stipulation (*id.*); and (iii) "JX__" are to the joint exhibits that were admitted into evidence at the trial.

## II.    **TransCare's Debt Structure**

19.    Throughout the Relevant Time Period, TransCare relied on funding provided through a term loan agreement and a separate working capital facility with Wells Fargo.  (JX_1; JX_2.)

*The TLA*

20.    TransCare Corporation, as borrower, the Term Loan Lenders (as defined below), as lenders, and PPAS, as administrative agent, are parties to a term loan credit agreement, dated as of August 4, 2003, as amended (the "TLA").  (JX_1.)

21.    The lenders under the TLA were: (i) Ark Investment Partners II, L.P. ("AIP"), (ii) the Zohar Funds; (iii) Credit Suisse Alternative Capital, Inc. ("Credit Suisse"); and (iv) First Dominion Funding I (together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").  (Stipulation No. 10.)

22.    PPAS, as administrative agent, held a senior secured lien on all of TransCare's assets, pursuant to a security agreement, dated as of August 4, 2003 (the "PPAS Security Agreement").  (JX_1, at PP–TRBK0000069, § 6.16.)

23.    The TLA and PPAS Security Agreement gave the Required Lenders (*i.e.*, those Lenders with credit exposure in the aggregate of more than 50%) discretion to instruct PPAS (as agent) to take certain actions on behalf of all Term Loan Lenders.  (*Id.* at PP–TRBK0000049; *id.* at PP–TRBK0000096; DX_3, at TRANSCARE00230136.)

24.    For example, under Section 12.1 of the TLA, the Required Lenders were permitted to enter into any written amendments, supplements, or modifications to the TLA or other loan documents, including the PPAS Security Agreement, subject to certain narrow exceptions.  (JX_1, at PP–TRBK0000096, § 12.1.)

4

25.     One of those exceptions was that the Required Lenders were prohibited from taking actions that "release[d] all or substantially all of the Collateral" (as defined in the PPAS Security Agreement) without the consent of each of the Term Loan Lenders.  (*Id.*)

26.     Thus, in order for TransCare's assets to be sold free and clear, all of the Term Loan Lenders needed to consent.  (*Id.*)

27.     Upon an Event of Default, Section 8 of the PPAS Security Agreement permitted PPAS to, among other things, foreclose on the Collateral on behalf of the Term Loan Lenders. (DX_3, at TRANSCARE00230136, § 8.)

28.     An Event of Default could be called by PPAS with the consent of the Required Lenders or upon their request.  (JX_1, at PP–TRBK0000090–91.)

29.     Under the terms of the TLA, TransCare's failure to make timely interest payments constituted an Event of Default.  (*Id.* at PP–TRBK0000088, § 10(a).)

*The Wells Fargo ABL*

30.     TransCare was also party to a syndicated, asset-backed revolving credit agreement with Wells Fargo N.A. ("Wells Fargo"), dated as of October 13, 2006 (as amended, the "Wells Fargo ABL Agreement").  (JX_2.)

31.     Under Section 5.1 of the Wells Fargo ABL Agreement, Wells Fargo held a security interest in all of TransCare's assets.  (*Id.* at CURTIS_000785, § 5.1.)

32.     TransCare was prohibited from "sell[ing], issu[ing], assign[ing], leas[ing], transfer[ring], abandon[ing] or otherwise dispos[ing] of . . . any of its assets to any other Person[]" without Wells Fargo's consent.  (*Id.* at CURTIS_000818, § 9.7(b), (d).)

33.     In connection with the Wells Fargo ABL Agreement, Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "Wells Fargo/PPAS Intercreditor Agreement).  (JX_3.)

34.     The Wells Fargo/PPAS Intercreditor Agreement provided for the retention by the Term Loan Lenders of first priority liens on certain property, including equipment, inventory, and vehicles.  (*Id.* at CURTIS_000029.)

35.     Wells Fargo had a first-priority position in all of TransCare's other assets, including accounts receivable.  (*Id.* at CURTIS_000006, § 1.26.)

### III.     TransCare's Liquidity and Financial Reporting Challenges

36.     In November 2014, Tilton learned that the Company was experiencing financial difficulties.  (Aug. 13 PM Tr. 23:13–21.)

37.     In response, Tilton, among other things, asked Jean-Luc Pelissier, a platform leader at PPMG, to provide operational assistance to TransCare.  (July 23 AM Tr. 8:15–9:4, 55:21–23.)

38.     Thereafter, TransCare developed a turnaround plan.  (*Id.* at 57:1–9.)

39.     In or around November 2014, Tilton also determined to make a leadership change at TransCare.  (Aug. 13 PM Tr. 25:11–14.)

40.     Glenn Leland was subsequently hired as CEO.  (July 23 AM Tr. 57:17–19.)

41.     Shortly after arriving at TransCare, Leland reported to Tilton that the turnaround plan developed in November 2014 was not viable.  (JX_8; Aug. 13 PM Tr. 28:16–25; July 23 AM Tr. 59:16–23; JX_10.)

42.     TransCare also struggled to produce timely financial statements.  (Aug. 13 AM Tr. 52:3–6.)

43.     TransCare's liquidity and financial reporting challenges were of concern to Wells Fargo and strained TransCare's relationship with the bank.  (JX_15; DX_19.)

44.     Tilton emphasized to Leland the importance of providing financial statements to Wells Fargo that were "on time" and "valid" and cautioned that "[w]e cannot lose Wells or we will not have the time and cash we need."  (JX_15, at PP–TRBK0028514–15.)

### IV.     <u>TransCare Receives Unsolicited Inquiries</u>

45.     At various times during 2015, Leland and Tilton received inquiries from transportation companies about potentially purchasing some or all of TransCare's assets.  (*See, e.g.*, JX_12; JX_29; JX_40.)

46.     One company, National Express, expressed interest in TransCare's paratransit business, which provided services to the New York City Transit Authority (the "<u>MTA</u>") (*see, e.g.*, JX_12; JX_40) pursuant to a contract between the MTA and TransCare New York (the "<u>MTA Contract</u>").  (Stipulation No. 29.)

47.     At the time, Leland estimated that the MTA Contract produced approximately $3.5 to $4 million of annual EBITDA.  (JX_12, at TRANSCARE00004260; JX_29, at PP–TRBK0071449.)

48.     On July 10, 2015, National Express sent TransCare New York a non-binding Letter of Intent ("<u>LOI</u>") for the paratransit business (JX_40, at PP–TRBK0030759), in which it proposed a purchase price in the range of $6 to $7 million, "less an amount [National Express] determine[d] [wa]s required to operate the acquired business for 60 days."  (*Id.* at PP–TRBK0030760.)

49.     Notably, although the LOI provided that an unspecified portion of the purchase price would be "payable on closing of the transaction," the balance would be "held in retention (the 'Retention Amount')."  (*Id.*)

50. The LOI stated that "the Buyer w[ould] release payments of the Retention Amount in five equal annual installments." (*Id.*; *see also* July 22 PM Tr. 85:20–86:6 ("A portion is payable as initial consideration, and then the balance is retained but . . . National Express doesn't specify what the initial consideration is versus the retention amount . . . [a]nd it says an agreed-upon portion of the consideration shall be allocated to a five-year non-compete covenant.").)

51. Thus, the true value of the offer was less than $6–$7 million and likely considerably less when taking into account the time value of money.

52. Richmond County Ambulance ("RCA") also reached out to both Leland and Tilton. (*See, e.g.*, JX_29, at PP–TRBK0071450.)

53. In a March 7, 2015 weekly update email from Leland to Tilton, Leland included a summary of one of RCA's email inquiries "proposing $60 to $80MM as valuation" for TransCare. (*Id.*)

54. Leland did not think the inquiry was worth pursuing: "My thought on this particular opportunity is that RCA must assume TransCare has EBITDA in the $10MM range. They mentioned on the phone they are using an 8X multiple for valuations (which is high for the industry, but not outside reality). So, I think this opportunity is not likely to succeed[.]" (*Id.*)

55. RCA's inquiry was evidently premised on a significant misimpression of TransCare's current EBITDA which, on an LTM (Last Twelve Months)-basis in March of 2015, was "zero" to "maybe slightly positive." (*See* July 22 PM Tr. 84:5–13.)

56. Leland's belief that RCA's proposed price was based on its (albeit mistaken) impression of TransCare's *current* earnings is consistent with Tilton's testimony that prospective buyers look to actual earnings, not projections, when valuing a potential acquisition. (Aug. 14 AM Tr. 38:17–20.)

## V. TransCare Misses Payroll in July 2015

57. Throughout 2015, TransCare drew on the Wells Fargo asset based facility to fund the Company's payroll obligations. (Aug. 13 PM Tr. 41:2–12, 46:8–15.)

58. On or about July 2, 2015, Wells Fargo determined it was in an over-advanced position and implemented a $1.5 million reserve, resulting in TransCare not being able to make payroll the next day. (JX_33; July 22 PM Tr. 86:21–87:5; Aug. 13 PM Tr. 41:3–16; DX_64.)

59. Following the missed payroll, Tilton negotiated a resolution with Wells Fargo to unblock the reserve (Aug. 13 PM Tr. 43:20–44:5; DX_64) which involved, among other things, the Zohar Funds advancing an additional $2 million to TransCare. (DX_64; PX_227, at PP–TRBK0047615.)

## VI. Wells Fargo Decides Not To Renew the Wells Fargo ABL Agreement

60. On October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"). (DX_76.)

61. The Non-Renewal Notice stated that the Wells Fargo ABL Agreement would expire on January 31, 2016, and that Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements." (*Id.* at TRANSCARE00006336.)

62. The Non-Renewal Notice also stated that the outstanding balance had to be paid in full by TransCare by January 31, 2016 (*see id.*), something which TransCare was in no position to do. (July 22 PM Tr. 93:6–11.)[7]

63. In the weeks that followed, TransCare management, with the assistance of Pelissier and Michael Greenberg, the Patriarch Partners credit officer assigned to TransCare (July 22 AM

---

[7] The outstanding balance as of the Initial Petition Date (as defined below) totaled approximately $13 million. (July 24 Tr. 159:19–22.)

Tr. 14:10–13), tried to convince Wells Fargo to renew the Wells Fargo ABL Agreement. (DX_78, at PP–TRBK0107560; July 22 AM Tr. 30:24–31:20.)

64. During this same time period, Wells Fargo lost confidence in TransCare's management team. (*See, e.g.*, DX_88; DX_89.)

65. Throughout December 2015, Wells Fargo expressed concerns that TransCare management was not honestly calculating the borrowing base. (*See* DX_88.)

66. Wells Fargo was also troubled by TransCare management's apparent lack of candor regarding bill payment, including the payment of payroll taxes. (DX_92, at PP–TRBK0075263.)

67. Moreover, as of December 17, 2015, TransCare had failed to deliver to Wells Fargo (i) monthly unaudited financial statements for October 2015; (ii) quarterly financial statements for the first three quarters of 2015; or (iii) audited consolidated financial statements for 2014. (PX_132, at PP–TRBK0046849–50.)

## VII. Zohar Funds Provide Funding to Address TransCare's Liquidity Shortfalls

68. Between February 2015 and January 2016, the Zohar Funds advanced over $7.2 million to TransCare. (PX_227, at PP–TRBK0047615–16.)

69. Tilton authorized this funding in her role as manager of the collateral managers of the Zohar Funds. (*See, e.g.*, DX_26, at PP–TRBK0099596.)

70. The funding was to provide emergency liquidity so that TransCare could continue to operate. (Aug. 13 PM Tr. 63:4–12.)

## VIII. Tilton Explores a Potential Sale of TransCare

*Tilton Loses Confidence in TransCare Management*

71. Efforts to persuade Wells Fargo to reverse course on the renewal of the Wells Fargo ABL Agreement continued in December 2015. (JX_53.)

10

72.     As part of that effort, TransCare management had put together a model for TransCare (the "December Plan") that included a request that Tilton authorize or provide $6.5 million in new funding to TransCare.  (*Id.*)

73.     On December 12, 2015, Tilton learned that TransCare management had made Wells Fargo aware of the $6.5 million funding request in the December Plan (*id.* at PP–TRBK0084009), even though she had not approved the December Plan.  (Aug. 13 PM Tr. 47:14–18.)

74.     Although Tilton had been losing confidence in TransCare's management for some time (*id.* at 49:6–8), this was the "last straw" for her.  (*Id.* at 49:2–8.)

75.     Tilton determined to explore a potential sale of TransCare.  (JX_53, at PP–TRBK0084007–08.)

76.     Wells Fargo supported Tilton's decision to explore a sale (DX_92, at PP–TRBK0075263), but was disinclined to provide long-term funding to TransCare.  (*Id.* ("To be clear, our desire is to exit this credit facility and our appetite to support the business outside a process that leads to an exit is extremely limited.").)

*Tilton Begins to Plan for a Potential Sale Process*

77.     Tilton has a depth of experience in buying and selling companies.  (Aug. 13 PM Tr. 37:21–41:1.)

78.     She has purchased and sold more than 300 companies, including sales under Section 363 of the Bankruptcy Code.  (*Id.* at 38:1–3.)

79.     In the weeks that followed her decision to support a sale, Tilton took steps to review and analyze the Company to determine whether it was saleable.  (*Id.* at 53:3–7; July 22 AM Tr. 52:23–53:3.)

80.     Part of that process involved assessing the accuracy of TransCare's financials (Aug. 13 AM Tr. 42:4–16, 86:7–13), since any value-maximizing sale process would require valid financial information.  (Aug. 13 PM Tr. 38:20–22, 39:13–14.)

81.     Tilton also did background work so that TransCare would be in a position to hire an investment banker if it made sense to sell the Company.  (*Id.* at 53:4–7.)

82.     To that end she asked Greenberg to get her information about ambulance-company "transactions and [which investment banks] did them."  (DX_96, at PP–TRBK0001414.)

83.     Four hours later, Greenberg emailed Tilton a list of transactions for ambulance and air medical companies.  (JX_55, at PP–TRBK0041410.)

*Negotiations with Wells Fargo about Funding to Bridge through a Sale*

84.     Both Tilton and Wells Fargo understood that to engage in a sale process, TransCare would need sufficient liquidity to survive through a sale (Aug. 13 PM Tr. 38:20–21, 39:14, 39:20–24, 40:4–11; DX_98, at PP–TRBK0018258), and both were concerned about TransCare's ability to continue operating for that long.  (DX_92, at PP–TRBK0075263 ("we are highly concerned about the company's ability to survive until a sale is completed"); Aug. 13 PM Tr. 51:22–52:6 ("Wells [Fargo] was tightening their loan, the company was going further into a liquidity hole, Wells wanted out and I needed time to be able to get any sale process done.").)

85.     Wells Fargo's expectation was that Tilton, through one of her investment vehicles, would provide TransCare with the funding necessary to keep it afloat through the completion of a sale.  (DX_92, at PP–TRBK0075263 ("It would be very helpful if we could get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity challenges.").)

86.     Tilton likewise knew that TransCare would need continued working capital funding from Wells Fargo.  (Aug. 13 PM Tr. 54:8–9, 54:14–17.)

87.     On December 23, Wells Fargo transmitted to Pelissier and Greenberg a summary of proposed terms for a longer-term forbearance of Wells Fargo's rights in order to bridge to a sale.  (JX_59.)

88.     The Wells Fargo term sheet called for a sale process under which letters of interest would be received by April 1, 2016.  (*Id.* at PP–TRBK0075499.)

89.     In Greenberg's counterproposal, the proposed deadline for receipt of letters of interest was May 31, 2016.  (DX_100, at PP–TRBK0106767.)

90.     By email on December 31, 2015, Wells Fargo's John Husson told Greenberg that Wells Fargo was comfortable with the dates Greenberg had proposed so long as the sale closed by August 15, 2016.  (JX_65, at WF_TC_00000215.)

### *TransCare Hires Carl Marks*

91.     In early January 2016, Tilton retained Carl Marks Advisory Group LLC ("CMAG"), a consulting firm that specializes in corporate restructuring, as a financial advisor to assist TransCare in its restructuring efforts.  (DX_106; July 22 AM Tr. 57:14–16; Aug. 13 AM Tr. 51:22–23 ("[CMAG] came in to take control over the company").)

92.     The scope of CMAG's assignment was set forth in a consulting agreement between TransCare and CMAG (the "CMAG Consulting Agreement").  (DX_106.)

93.     The CMAG Consulting Agreement provided that "CMAG w[ould] report directly to TransCare's Board of Directors [Tilton]" and "assist TransCare by providing and overseeing the implementation process of recommendations intended to manage, secure [and] improve [TransCare's] financial performance and liquidity."  (*Id.* at PP–TRBK0043438.)

13

94. The CMAG Consulting Agreement further provided that CMAG's services were to include without limitation: (i) "[p]erform[ing] normal duties of the position of TransCare CFO"; (ii) "[a]nalyz[ing] the Company's financial and capital needs in detail"; (iii) "review[ing] and updat[ing] as necessary existing financial projections and internal budget"; (iv) "assist[ing] with further identification of actionable opportunities to improve profitability . . . intended to improve the Company's performance"; and (v) "[p]erform[ing] other tasks and duties related to th[e] engagement as are reasonably directed by the Board . . . and acceptable to CMAG." (*Id.* at PP–TRBK0043439.)

95. Tilton had hoped that CMAG "would build their own models from scratch . . . to find solutions . . . so that the [C]ompany could have a future." (Aug. 13 AM Tr. 62:8–12.)

96. The CMAG employees who participated in the engagement included Marc Pfefferle, Carl Landeck, and Jonathan Killion. (DX_106, at PP–TRBK0043438–39.)

97. One CMAG professional served as the Company's Chief Restructuring Officer and another served as the Company's Chief Financial Officer. (July 22 AM Tr. 75:2–6; *id.* at 55:1–11 ("Q: Wells Fargo wanted an outside chief restructuring officer, did they not? A: Yes. Q: Somebody who would report to not only Ms. Tilton, but to them. A: Yes. Q: And that's ultimately what Carl Marks' role became. A: Yes it is. Q And in addition to appointing at least one of their people as the outside CFO, correct? A: Yes."); *see also* PX_165, at CM_TC2018_0000927 (describing CMAG's provision to TransCare of "restructuring guidance").)

*The January 2016 Plans*

98. Throughout January 2016, Tilton's team at Patriarch Partners and PPMG, CMAG and TransCare management worked to develop a budget to be reviewed and approved by Wells Fargo—*i.e.*, step one of the sale process negotiations with the bank. (*See, e.g.*, JX_67; PX_165.)

### *The 2016 Preliminary Plan*

99.     On January 4, 2016, Tilton asked Greenberg and Pelissier to develop a scenario for TransCare to "support a sale process and minimize capital needed." (JX_67, at PP–TRBK0106572; July 22 AM Tr. 64:7–22.)

100.     To meet this request, Greenberg and Pelissier put together a revised 2016 preliminary plan (the "2016 Preliminary Plan") (JX_67, at PP–TRBK0106572) in one day. (*Id.*; July 22 AM Tr. 64:7–11; July 22 PM Tr. 105:11–17.)

101.     The 2016 Preliminary Plan described certain challenges the paratransit division was experiencing since the MTA Contract was renewed in July, including that the MTA had: (i) moved away from a commercial contract to a municipal contract, which limited profitability; (ii) imposed a rebate of $225k/month; (iii) and reduced the division's routes in the second half of 2015. (JX_67, at PP–TRBK0106572; *see also* July 22 PM Tr. 105:9–107:19.)

102.     The 2016 Preliminary Plan assumed a new money funding need of $4.5 million. (JX_67, at PP–TRBK0106574.)

103.     Tilton testified that the 2016 Preliminary Plan was essentially "just a plan to get through a sale process and what would be the minimum amount of cash needed to get through that time period." (Aug. 13 PM Tr. 57:24–58:2.)

104.     Neither Tilton nor Wells Fargo approved the 2016 Preliminary Plan. (July 22 PM Tr. 108:1–4.)

105.     On January 7, 2016, Greenberg shared the 2016 Preliminary Plan with CMAG. (PX_158.)

106.     Tilton and her team expected CMAG to review the plan and "assist[ ] in the project to stabilize the [C]ompany and prepare it for a sale." (July 22 AM Tr. 77:15–19.)

15

### *The CMAG Executive Summary*

107.    On January 13, 2016, Tilton asked CMAG to provide her with their initial analysis for the cost of a bankruptcy filing versus the cost of bridging to a sale outside of bankruptcy. (PX_165, at CM_TC2018_0000925–26; Aug. 13 PM Tr. 59:22–60:6.)

108.    Tilton asked CMAG to perform this analysis "because . . . Wells [Fargo] was only willing to stay in the credit to bridge to some sort of sale process." (Aug. 13 PM Tr. 60:8–10.)

109.    By January 14, CMAG began analyzing Tilton's request. (PX_165.)

110.    That same day, CMAG provided Tilton with a status update (*see id.*) in which CMAG's Pfefferle explained that TransCare "require[d] a substantial amount of [new money] funding *if the business [was] going to survive.*" (*Id.* at CM_TC2018_0000927 (emphasis added).)

111.    He added, "[t]hese are not wish list amounts that might have been asked of you in the past, *but absolutely necessary in order to keep the business as an ongoing enterprise.*" (*Id.* (emphasis added).)

112.    The CMAG team had also determined that "the EBITDA numbers [they] were originally given [were] significantly overstated." (*Id.* at CM_TC2018_0000925.)

113.    Tilton expressed concern to CMAG about providing funding without having a plan to restructure TransCare (*id.* at CM_TC2018_0000925–26 ("I do not want to keep funding into a black hole that cannot be filled"); Aug. 13 PM Tr. 61:12–21), which concern was shared by Pfefferle. (PX_165, at CM_TC2018_0000925.)

114.    The work CMAG performed over the next several weeks further revealed that TransCare's liquidity situation was indeed dire, and there was an imminent risk that TransCare could not continue to operate. (PX_175.)

115. On January 27, 2016, CMAG shared with Greenberg, Pelissier, and Patriarch Partners' Randy Jones a presentation CMAG had prepared (the "CMAG Executive Summary"). (*Id.*)

116. The CMAG Executive Summary stated that "TransCare is now operating at an absolute breaking point." (*Id.* at CM_TC2018_0002111.)

117. It described "strained and broken customer relationships" at TransCare, including a "[c]urrent void in Senior Management leadership" and that "*[v]irtually all key customers [were] pursuing or considering replacement options.*" (*Id.* (emphasis added).)

118. CMAG also described the (i) "strained and broken ambulance fleet"; (ii) "strained and broken vendor relationships"; and (iii) "strained and broken landlord relationships." (*Id.* at CM_TC2018_0002111–12.)

119. CMAG reported that it had been "fighting daily fires and *working to hold the business and organization together.*" (*Id.* at CM_TC2018_002118 (emphasis added).)

120. The CMAG Executive Summary cautioned that CMAG had "worked diligently to develop the most accurate financial picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting.*" (*Id.* (emphasis added).)

121. The CMAG Executive Summary included a series of action items CMAG thought TransCare could take to attempt to effect a turnaround. (*Id.* at CM_TC2018_0002114.)

122. If the action items were successfully implemented, the CMAG Executive Summary projected 2016 EBITDA of $4.97 million. (*Id.* at CM_TC2018_0002123.)

123. However, the FY 16 projections also assumed TransCare would be able to obtain at least $8.5 million of new money funding (*id.*), not including funding needed to make interest payments to the Term Loan Lenders. (*Id.* at CM_TC2018_0002114.)

124. Interest payments owed under the TLA would increase the funding need by approximately $3 million more (or in excess of $10.5 million). (Aug. 13 PM Tr. 70:16–20.)

125. Tilton understood that CMAG was making the funding request of her personally because there was no place else to get the money. (*Id.* at 69:21–23; *see id.* at 69:24–70:2 ("Nobody was going to lend into this without any visibility to a future, any projections or any plan. There was only one place that money could possibly come from and that would have been me.").)

126. CMAG also emphasized the riskiness of any additional investment in TransCare: "[T]ime has run out and the decision [for Tilton] to risk significant capital must be made before a turnaround can show meaningful positive results." (PX_175, at CM_TC2018_0002114.)

127. CMAG specifically cautioned that "[p]lan execution risk is high and therefore ultimate payback on the incremental investment [of not less than $8.5 million] is uncertain." (*Id.*)

128. CMAG did not recommend in its Executive Summary that TransCare engage in a sale process either in the short term or the medium term. (*Id.* at CM_TC2018_0002122.)

129. Nor did CMAG recommend seeking new money funding from a third-party or that CMAG should contact any third parties itself.

130. CMAG instead focused on stabilizing TransCare, assuming necessary funding would be approved or provided by Tilton. (*Id.* at CM_TC2018_0002121–22.)

131. Tilton did not approve the funding requested in the CMAG Executive Summary (Aug. 13 PM Tr. 70:24–71:3), which would have been provided by Tilton's personal investment funds because there was no availability under the Zohar Funds' loan tranches. (*Id*. at 64:6–11.)

### *The Greenberg January 28 Email*

132. The next day, Greenberg emailed himself a 2016 budget (the "<u>Greenberg January 28 Email</u>"). (PX_179.)

133. The budget required incremental funding of $6.35 million, excluding interest due under the Term Loan. (*Id.* at PP–TRBK0013265.)

134. There is no evidence that Tilton received the Greenberg January 28 Email.

135. Tilton did not approve the funding required in the Greenberg January 28 Email. (Aug. 13 PM Tr. 72:10–13.)

### Based on CMAG's Work, Tilton Determines That a Sale Process Would not be Viable

136. TransCare's cash situation continued to deteriorate in February 2016. (PX_185.)

137. On February 2, Landeck shared his concerns about TransCare's liquidity with Greenberg. (*Id.* at CM_TC2018_0002546 ("cash situation is dire and not improving").)

138. Landeck reiterated the need for a substantial cash infusion in order for TransCare to continue to operate. (*Id.* at CM_TC2018_0002544 ("We have been telling this group for some time . . . that TC could not continue operations without a significant infusion of cash").)

139. Landeck also expressed his concerns about the vacuum of senior leadership at TransCare given that TransCare was operating without a CEO. (*Id.* ("difficult to see how plan can be successfully implemented without the type of leader that can drive necessary changes and can restore customer confidence.").)

140. Landeck continued: "As far as the return [on investment], you MUST look at it as what is the return on the new money as the old money is essentially only worth what a liquidation (closure or liquidation sale) would yield after [W]ells [Fargo] takes the AR, which practically speaking is not much as it will be net of expenses." (*Id.* at CM_TC2018_0002543.)

141. In response, Greenberg observed that the projected EBITDA "forecast is low which will be an issue for all constituents . . . as valuation at end of year would not be that compelling." (*Id.* at CM_TC2018_0002544.)

142.     After reviewing the CMAG Executive Summary and meeting with the CMAG team on February 5, 2016, Tilton determined that a sale process would not be viable and should no longer be pursued. (DX_130, at PP–TRBK0028275 ("We have the plan [CMAG] presented to me on Friday [, February 5, 2016] . . . [t]hat is the plan that convinced me I could not move forward" with a sale process); Aug. 13 PM Tr. 76:10–77:2; *id.* at 40:18–24.)

## IX.     The Ark II Facility

143.     By mid-January 2016, TransCare needed to make payments on certain critical obligations, including payments to the New York State Insurance Fund ("NYSIF"), TransCare's workman's compensation insurance provider. (PX_165, at CM_TC2018_0000927.)

144.     Without workman's compensation insurance, TransCare would be forced to shut down immediately. (Aug. 13 PM Tr. 61:22–62:15.)

145.     On January 15, 2016, Tilton approved a loan from Ark II to TransCare in the amount of approximately $1.2 million to cover the insurance payments (PX_168; DX_112) and prevent the Company from going out of business. (Aug. 13 AM Tr. 57:18–24.)

146.     At the time, Tilton asked her team to "put a new credit facility together" for the Ark II funding. (*Id.* at 58:10–20.)

147.     Also on January 15, Greenberg emailed Wells Fargo personnel, stating that the funds for insurance payments were being advanced pursuant to a "new facility" of up to $6.5 million. (PX_170, at PP–TRBK0014549–50; *see also* July 22 AM Tr. 84:14–18.)

148.     On January 27, Greenberg emailed CMAG a PowerPoint slide updating his discussions with Wells Fargo about the new facility, which was to be inserted in a presentation to Tilton. (PX_177.)

149. The first bullet point on the slide stated: "A note for the new facility along with supporting documents has been drafted and presented for your [Tilton's] review." (*Id.* at CM_TC2018_0006180; July 22 AM Tr. 96:12–25.)

150. Greenberg testified that the reference to the "facility" in the bullet point was the new Ark II facility for up to $6.5 million, including "*money that had already been given out*" to TransCare. (July 22 AM Tr. 97:8–98:1 (emphasis added).)

151. As of January 27, payments were still owed by TransCare to NYSIF. (PX_175, at CM_TC2018_0002116.)

152. To avoid a shutdown, on January 29, Tilton authorized PPAS to release $690,168.24 to TransCare which was used, in part, to pay NYSIF. (Aug. 13 AM Tr. 58:21–59:8.)

153. Tilton intended for Ark II to reimburse PPAS for the advance. (Aug. 13 PM Tr. 6:3–6.)

154. When authorizing the necessary funding, Tilton emphasized that she "*need[ed] the documents first here to protect [her]*." (DX_121, at PP–TRBK0099193 (emphasis added).)

155. Tilton testified that the reference to needing "protection" meant that she needed to have properly documented credit agreements in place that gave Ark II a first priority lien. (Aug. 13 PM Tr. 5:23–6:6.)

156. Tilton explained that this documentation was important to her "[b]ecause it was . . . the only basis that [she] was willing to put in new money in a company that could end up in liquidation days later." (*Id.* at 6:7–10.)

157. On January 29, Ark II filed UCC-1 financing statements with the Delaware Department of State for TransCare, each of which provided that Ark II held a security interest in "[a]ll assets of the debtor . . . ." (JX_79, at PP–TRBK0049034–46.)

158.     On February 10, Greenberg emailed Peter Wolf (of TransCare) a copy of: (i) a Credit Agreement between TransCare and Ark II (the "Ark II Credit Agreement"); (ii) a Security Agreement in favor of Ark II (the "Ark II Security Agreement"); and (iii) an Intercreditor Agreement between Ark II and PPAS, on behalf of the Term Loan Lenders (the "Ark II Intercreditor Agreement"), all of which were dated as of January 15, 2016. (PX_197.)

159.     TransCare Corporation signed an acknowledgement to the Ark II Intercreditor Agreement expressly acknowledging that it was not a party to or beneficiary of the agreement. (JX_79, at PP–TRBK00490016.)

160.     On or about February 10–11, 2016, Wolf executed the Ark II Credit Agreement, the Ark II Security Agreement, and the Ark II Intercreditor Agreement on behalf of TransCare. (July 22 PM Tr. 21:20–22:3; *see also* JX_79.)

## X.     OldCo/NewCo Restructuring

### *Tilton and Her Team Develop OldCo/NewCo Restructuring Plan*

161.     By February 2016, TransCare's ability to continue operating was wholly dependent on Wells Fargo's willingness to continue funding from day to day. (PX_185; DX_76.)

162.     Tilton worked with her team (comprised of Patriarch Partners and PPMG personnel) to develop a thorough understanding of each TransCare division so that they "could figure out if there was something to be saved." (Aug. 13 AM Tr. 64:8–23; *see also* Aug. 13 PM Tr. 76:10–77:6; DX_123, at PP–TRBK0107343–44 ("I really need a plan on Friday on a way to move forward or a shut down plan on Trans[C]are.").)

163.     TransCare management and Landeck and Killion of CMAG worked with Tilton and her team. (*See, e.g.*, DX_127, at PP–TRBK0046297; July 23 AM Tr. 72:19–73:3.)

164.     Although this work continued for several days (DX_127; July 23 AM Tr. 73:16–24; July 22 PM Tr. 39:9–15), as of February 7 Tilton had not yet approved a restructuring plan. (DX_127, at PP–TRBK0046297; July 23 AM Tr. 73:16–24.)

165.     On February 9, 2016, Tilton reached out to Kurt Marsden (her main contact at Wells Fargo) (Aug. 13 PM Tr. 29:15–24) to discuss and determine if there was a path forward for the Company.  (DX_130, at PP–TRBK0028278.)

166.     Marsden asked that CMAG create a budget for three potential scenarios for TransCare: "(1) a forced wind down; (2) an orderly wind down; and (3) the bankruptcy scenario discussed on our earlier call."  (*Id*. at PP–TRBK0028276; Aug. 13 PM Tr. 75:18–76:1.)

167.     The bankruptcy scenario to which Marsden referred was an OldCo/NewCo Restructuring plan (the "OldCo/NewCo Restructuring"), the details of which are discussed below, which Tilton and Marsden had first discussed that day.  (Aug. 13 PM Tr. 77:10–13.)

168.     None of the three scenarios contemplated a marketed sale process of TransCare. (DX_130, at PP–TRBK0028276.)

169.     None of the three scenarios contemplated that all of TransCare continue to operate as a going concern.  (*Id.*; *see also* JX_84, at WF_TC_0000053 (transmitting the terms under which "Wells Fargo would consider financing TransCare on an orderly wind down basis").)

170.     As of February 9, Tilton believed the only alternative to the OldCo/NewCo Restructuring was the liquidation of TransCare.  (Aug. 13 PM Tr. 79:1–10.)

171.     There is no evidence that CMAG, which was then acting as TransCare's CRO, recommended a sale process after February 9, that it recommended Tilton attempt to seek third-party financing for TransCare or that it sought such financing on TransCare's behalf.

*Tilton Moves Forward with OldCo/NewCo Restructuring Plan*

172.	Under the OldCo/NewCo Restructuring, TransCare would be divided in two: (i) a new corporate entity would be formed, and would take over operations of certain TransCare business lines (*i.e.*, "NewCo") through an Article 9 foreclosure sale, and (ii) the remaining business lines (*i.e.*, "OldCo") would be wound down in an orderly manner.  (Aug. 13 AM Tr. 65:6–16; Aug. 13 PM Tr. 76:24–77:6; *id.* at 79:1–6.)

173.	The "NewCo" would do business as "Transcendence."  (Aug. 13 PM Tr. 9:20–25.)

174.	OldCo would continue to operate for 90 days.  (*Id.* at 92:2–3.)

175.	The 90-day wind-down period would give OldCo employees 90-day notice under the Worker Adjustment and Retraining Notification Act of 1988 and NY WARN Act (collectively, the "WARN Acts").  (*Id.* at 92:7–14; PX_206, at PP–TRBK0091293; July 23 AM Tr. 19:16–19.)

176.	The wind-down period would also enable TransCare's accounts receivable to be collected while the Company was operating, which Tilton believed would maximize value.  (Aug. 13 AM Tr. 65:6–16; *id.* at 43:20–44:4; Aug. 13 PM Tr. 78:1–10; *id.* at 78:17–25.)

177.	To that end, Tilton intended to hire a CRO for OldCo.  (Aug. 13 PM Tr. 78:22–25 ("[W]e were hiring our own CRO to . . . run th[e] company during the wind-down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect."); JX_84, at WF_TC_0000048; DX_147, at PP–TRBK0091631.)

178.	The OldCo business lines would also have access during the wind-down period to certain services, equipment and other supplies through a transition services agreement (the "TSA").  (*See, e.g.*, DX_132, at PP–TRBK0002317; DX_138; JX_95.)

179.	There is no evidence that Tilton contemplated an Article 9 foreclosure prior to February 9, 2016.

180.    Although the Trustee alleges that the OldCo/NewCo Restructuring was a secret plan (*see* Am. Compl. ¶ 89), the overwhelming evidence presented at trial showed that it was developed in plain sight of and with the active participation of multiple stakeholders.  (*See, e.g.*, PX_206; PX_234; DX_137; DX_163.)

181.    After first discussing the OldCo/NewCo Restructuring with Marsden on February 9, Tilton continued to engage in daily communication with Wells Fargo personnel about it.  (Aug. 13 AM Tr. 67:10–16; Aug. 13 PM Tr. 87:7–8.)

182.    Those communications concerned, among other things, the preparation and exchange of financial models, the mechanics of the planned Article 9 foreclosure, the potential purchase by Tilton of accounts receivable, issuance of WARN notices and the need for NewCo to bind insurance.  (*See, e.g.*, DX_147; JX_84; JX_86; JX_93; PX_219; Aug. 13 PM Tr. 81:7–15 ("[W]e were working together on this project to try to figure out the most elegant solution for a company in crisis."); *id.* at 83:14–84:4 ("[W]e were all looking at the exact same information to try to make the best decisions."); *id.* at 91:2–7.)

183.    TransCare and Wells Fargo were represented by separate counsel and communicated with each other throughout the two-week period preceding the Article 9 foreclosure.  (JX_77; JX_84, at WF_TC_0000051; July 23 PM Tr. 99:8–16, 149:20–150:11.)

184.    The CMAG team assisted with the analysis of the Article 9 foreclosure (DX_132, at PP–TRBK0002317 (emailing Greenberg "the current draft of the entities contemplated to be in the Article 9 transaction"); July 22 PM Tr. 114:14–115:7) and prepared financial models in connection with the OldCo/NewCo Restructuring.  (PX_206, at PP–TRBK0091292; July 23 AM Tr. 75:13–21.)

185.     CMAG and Wells Fargo personnel also interacted directly about the OldCo/NewCo Restructuring.  (July 22 PM Tr. 116:5–8.)

186.     TransCare management also participated in the OldCo/NewCo Restructuring.  (*See, e.g.*, PX_206; July 23 AM Tr. 23:14–23, July 23 PM Tr. 159:14–160:16.)

*Funding Needs*

187.     The success of the OldCo/NewCo Restructuring depended on TransCare's receipt of short-term and longer-term new money funding.  (Aug. 13 PM Tr. 95:20–22; DX_157, at WF TC_00005292 ("Transcare cannot continue to operate on a daily, discretionary basis where no one knows if the company will be evicted, operate without insurance or payroll will not be made.").)

188.     Tilton, Wells Fargo, and their respective advisors, engaged in discussions about funding for OldCo through a wind-down and from where and with what priority such funding might be provided, including possible debtor-in-possession ("DIP") financing.  (DX_195; JX_82.)

189.     On February 15, Landeck emailed Tilton a draft DIP budget which contemplated funding from one of Tilton's personal investment vehicles.  (DX_195, at PP–TRBK0078648.)

190.     Tilton responded that none of her investment vehicles would provide funding going into a bankruptcy unless it was rolled up into a first-out DIP loan.  (*Id.* at PP–TRBK0078647.)

191.     Tilton also reminded Landeck that, several days earlier, he had publicly stated that he "WOULD NOT PUT ONE PENNY OF [HIS] PERSONAL MONEY INTO THIS COMPANY. THIS IS A BLACK HOLE."  (*Id.* (emphasis in original); Aug. 13 PM Tr. 85:17–23.)

192.     Wells Fargo would not agree to subordinate its liens and indebtedness to a DIP loan.  (JX_82, at PP–TRBK0048227.)

193.     TransCare also needed sufficient liquidity to keep the lights on as the OldCo/NewCo Restructuring was refined.  (Aug. 13 PM Tr. 95:20–22; *id.* at 98:19–22; DX_157.)

194.     As discussed, by February 9, TransCare was operating at the daily discretion of Wells Fargo.  (Aug. 13 AM Tr. 23:4–6 ("The company was in a free fall with an ABL lender who was refusing to fund on a day-to-day basis."); DX_151 ("I told [W]ells . . . they should over advance today, so we have enough liquidity to properly make it to the weekend.").)

195.     During the evening on February 18, Wells Fargo told Tilton that the bank had decided to cease further funding.  (Aug. 13 PM Tr. 94:23–24.)

196.     Later that evening, Marsden informed Tilton that Wells Fargo was "changing [its] mind and wanted to work together to try to do a more graceful wind-down, as we had been previously discussing."  (*Id.* at 95:3–11; *see also* DX_150.)

*Loss of Customer Contracts*

197.     During this same time period (*i.e.*, after February 9, 2016), TransCare also struggled to maintain its already unstable customer base.  (July 22 PM Tr. 119:23–120:4.)

198.     On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore hospital and the University of Maryland.  (DX_157, at WF_TC_00005291 ("[T]he company just received a 90 day notice from Bronx Lebanon, a contract that we were taking with Newco.  This was an important and valuable contract to the new entity."); Aug. 13 PM Tr. 100:8–14.)

199.     Tilton explained that the loss of the Bronx Lebanon and Montefiore contracts were "a big hit" to the OldCo/NewCo Restructuring, as those two contracts generated about $2.5 million of EBITDA.  (Aug. 13 PM Tr. 99:18–20.)

200.     Tilton feared that TransCare might continue to lose contracts, given the "rumor mill" that had started throughout the industry and various hospitals.  (*Id.* at 101:4–12; *id.* at 100:18–100:23 (describing the loss of contracts "on a minute-by-minute basis").)

201.     Tilton, together with substantially all of Patriarch Partners' and PPMG personnel,

also worked on developing go-forward models for NewCo.  (*Id*. at 80:6–17; *id.* at 94:15–17.)

202.     The purpose was to determine the amount of new money funding that would be

required for Transcendence to operate—not to determine what Transcendence might be worth to

a third-party buyer.  (Aug. 14 AM Tr. 39:25–40:9.)

203.     As Tilton testified:

> This was purely for my purposes to see if I was willing to put up $10 million dollars
> of new money and if I had a chance of getting that money back.  No one would
> have purchased the company based on this because it's a hockey stick projection.
> When you sell a company, you sell on actuals and you sell on . . .  some sort of
> projection that people can believe in based on business.  This [the modeling work]
> was done for me so that I would be willing to put in ten million of new money.

(*Id.*)

204.     The modeling projected that Transcendence would require approximately $10

million in new money funding.  (PX_286; Aug. 13 PM Tr. 104:1–10.)

### *The OldCo Receivables*

205.     In modeling different NewCo scenarios, Tilton assumed that she would purchase

TransCare's accounts receivable from Wells Fargo, after which they would be transferred to

Transcendence so that cash was immediately coming into Transcendence as the receivables were

paid.  (PX_286; DX_166; Aug. 13 PM Tr. 9:15–25.)

206.     Tilton and TransCare's bankruptcy counsel at Curtis Mallet engaged in discussions

with Wells Fargo and its counsel regarding Tilton's potential purchase of the receivables.  (*See,

e.g.*, JX_93; JX_94; DX_171; Aug. 13 PM Tr. 102:4–103:4; *id.* at 8:24–9:25.)

207.    These negotiations continued up until "the last second" on February 23, but ultimately the receivables remained with OldCo.  (Aug. 13 PM Tr. 108:4–9; JX_94.)

*Allocation of Equity in Transcendence*

208.    Tilton and her team also performed an analysis to determine how to allocate the equity in Transcendence among the Term Loan Lenders, on the one hand, and Ark II and another of Tilton's investment vehicles, Ark Angels (which was going to provide a $10 million facility to Transcendence), on the other hand.  (PX_209; Aug. 13 PM Tr. 115:8–117:4.)

209.    On February 16, 2016, Carlos Mercado, senior controller at Patriarch Partners, prepared a spreadsheet for Tilton showing the analysis (PX_209), set forth in the below table:

| Priority | Debt | Ark II | AIP | Zohar I | Zohar II | Zohar III | Credit Suisse | First Dom | Total |
|---|---|---|---|---|---|---|---|---|---|
| **TRANSCARE** | | | | | | | | | |
| 1 | Term Loan - Ark II+Vehicles | 2,058,900.77 | - | - | - | - | - | - | 2,058,900.77 |
| 2 | All Other Loans | - | 2,905,731.99 | 3,500,000.00 | 4,967,123.26 | 24,545,142.39 | 3,537,243.56 | 4,043,858.69 | 43,499,099.89 |
| 3 | Sub Def Interest | 11,494.54 | | 5,405.40 | 13,942.90 | 79,400.35 | | | 110,243.19 |
| | **Total** | **2,070,395.31** | **2,905,731.99** | **3,505,405.40** | **4,981,066.16** | **24,624,542.74** | **3,537,243.56** | **4,043,858.69** | **45,668,243.85** |
| | | | | | | | | | |
| **TRANSCENDENCE** | | | | | | | | | |
| | A | 2,058,900.77 | | | | | | | 2,058,900.77 |
| | B | 10,000,000.00 | | | | | | | 10,000,000.00 |
| | C | - | 667,998.19 | 804,614.35 | 1,141,891.04 | 5,642,678.23 | 813,176.27 | 929,641.92 | 10,000,000.00 |
| | | | 6.7% | 8.0% | 11.4% | 56.4% | 8.1% | 9.3% | |
| | | | | | | | | | |
| | **Total** | **12,058,900.77** | **667,998.25** | **804,614.43** | **1,141,891.16** | **5,642,678.79** | **813,176.35** | **929,642.02** | **22,058,901.77** |
| | | 54.7% | 3.0% | 3.6% | 5.2% | 25.6% | 3.7% | 4.2% | |

(PX_209, at PP–TRBK0019089 ("Sheet2" Tab); Aug. 13 PM Tr. 117:1–4.)

210.    Row "A" shows the approximately $1.8 million of funds that had been previously lent to TransCare by Ark II (*see* ¶¶ 145, 152, *supra*), along with approximately $195,000 Tilton expended through another of her investment vehicles to purchase two ambulances for TransCare.  (PX_209; Aug. 13 PM Tr. 117:5–16; Aug. 13 AM Tr. 25:4–25.)

211.    Tilton intended that this approximately $2 million would be rolled over to Transcendence as part of the OldCo/NewCo Restructuring.  (Aug. 13 AM Tr. 13:19–23.)

212.    Row "B" shows the $10 million in new funding that was to be committed to NewCo through the contemplated new Ark Angels facility.  (Aug. 13 PM Tr. 117:17–118:5.)

213.     Row "C" represents the amount of the contemplated credit bid for the TransCare assets that PPAS, as agent, intended to foreclose upon.  (*Id*. at 118:6–12.)

214.     When allocated across the lender group, the analysis showed that Ark II and Ark Angels would hold a 54.7% equity interest in Transcendence, and that the Term Loan Lenders would hold a 45.3% equity interest in Transcendence.  (PX_209.)

215.     Tilton wanted to provide this potential equity upside to the Term Loan Lenders as a possible source of future recovery on the balance of their secured loan to TransCare.  (Aug. 13 PM Tr. 118:23–119:5.)

## XI.     The Article 9 Foreclosure

216.     Early on February 24, 2016, PPAS (as administrative agent) and TransCare executed the documents for the planned Article 9 foreclosure.  (JX_96.)

217.     PPAS, as administrative agent, the Zohar Funds and AIP issued a Notice of Default and Acceleration, dated February 24, 2016, to TransCare (the "Notice of Default").  (*Id.*)

218.     PPAS, as administrative agent, the Zohar Funds and AIP also issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, to TransCare (the "Notice of Acceptance").  (*Id.* at PP–TRBK0043306.)

219.     TransCare signed the Notice of Acceptance that same day.  (DX_174.)

220.     The Notice of Acceptance covered certain personal property (defined as the "Subject Collateral") in which the Term Loan Lenders held a security interest.  (*Id.* at PP–TRBK0091201.)

221.     The Notice of Acceptance provided that PPAS, as administrative agent, accepted the Subject Collateral in satisfaction of $10 million of the outstanding TLA balance.  (*Id.* at PP–TRBK0091198.)

222.     PPAS did not foreclose on TransCare's accounts receivable.  (*Id.* at PP–TRBK0091201.)

223.     PPAS also did not foreclose on TransCare's Certificates of Need ("CONs").  (*Id.*; *see also* ¶ 274, *infra* (discussing treatment of the CONs in the Personal Property Stipulation).)

224.     The Subject Collateral did include the stock of the entities that operated the Pennsylvania and Hudson Valley divisions (which were to continue operating in Transcendence).  (*Id.*; Aug. 14 AM Tr. 22:19–14.)

225.     Tilton understood that, by foreclosing on the stock of these corporations, Transcendence would be able to use their CONs even though title to the CONs would not pass to Transcendence.  (Aug. 14 AM Tr. 23:12–15.)

226.     PPAS, as administrative agent, and Transcendence also entered into a Bill of Sale, Agreement to Pay and Transfer Statement, dated February 24, 2016 (the "Bill of Sale").  (JX_102.)

227.     Wells Fargo was aware of and did not dispute the Article 9 foreclosure.  (PX_234; Aug. 13 AM Tr. 15:13–23, 76:7–21; July 24 Tr. 154:3–6.)

**XII.     Valuing the Subject Collateral**

228.     Tilton valued the Subject Collateral by: (i) calculating its book value and (ii) examining the total $22 million "acquisition price" (*i.e.*, the $10 million credit bid plus $12 million in new funding), as a multiple of projected EBITDA.  (Aug. 13 AM Tr. 16:3–17; PX_286; DX_166.)

**A.     Step 1: Book Value Calculation**

*February 13, 2016 Model*

229.     On February 13, 2016, Pelissier emailed Tilton a Transcendence Go Forward Model (the "February 13 NewCo Model").  (PX_286, at PP–TRBK0105524 ("BS" Tab).)

230.    The February 13 NewCo Model contained a combined balance sheet for Transcendence.  (*Id.*)

231.    Because it was then contemplated that NewCo would operate TransCare's Hudson Valley, Paratransit, Pennsylvania, Maryland, and Bronx 911/Montefiore 911 divisions (*id.* at PP–TRBK0105516),  the combined balance sheet consisted of a December 2015 closing balance sheet and going-forward projections for these five divisions.  (*Id.* at PP–TRBK0105524; Aug. 13 PM Tr. 104:23–105:5.)

232.    Tilton calculated the value of the Subject Collateral based on the book value of the assets of these five divisions as of December 2015, including the accounts receivable (which, at the time, she assumed she would purchase from Wells Fargo and contribute to Transcendence).  (PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 6–24); Aug. 13 PM Tr. 107:19–108:3.)

233.    Tilton believed that using the December 2015 closing balance sheet as the basis for the book value calculation was appropriate because TransCare had not closed its books after December 31, 2015.  (Aug. 13 PM Tr. 109:16–22.)

234.    The assets identified on the opening balance sheet included: (i) cash and cash equivalents; (ii) accounts receivable; (iii) inventory; (iv) prepaid and other current assets; (v) net property, plant and equipment ("PP&E"); (vi) goodwill; and (vii) "other assets".  (PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 6–24).)

235.    In calculating the value of the Subject Collateral, Tilton used only what she believed were the "real assets"—*i.e.*, cash and cash equivalents, receivables, inventory, and net PP&E—which "would have been the opening balance sheet for the new business, had [NewCo] taken these five entities."  (Aug. 13 PM Tr. 106:1–2, 106:19, 107:12–13.)

236. As set forth in the below table, the sum of these asset values totaled $9,996,000.60, which Tilton rounded up to $10 million:

| CURRENT ASSETS | Dec-15 (millions) |
|---|---|
| Cash and cash equivalents | 56.7 |
| Patient Account Receivables (OldCo) | 8,165.5 |
| Patient Account Receivables (NewCo) | – |
| Inventory | 623.1 |
| PP&E (net) | 1,151.3 |
| **TOTAL** | **9,996.6** |

(PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 7–11, 17); Aug. 13 PM Tr. 106:3–7.)

237. As noted, Tilton did not ultimately purchase the receivables from Wells Fargo. (Aug. 13 PM Tr. 108:4–9; *see* ¶¶ 205–207, *supra.*)

238. Tilton did not update the book value calculation to reflect that the receivables did not transfer to NewCo but, had she done so, the value of the Subject Collateral would have been reduced from $10 million to approximately $1.7 million. (Aug. 13 PM Tr. 108:11–16.)

239. Tilton did not include the prepaid and other current assets, negative goodwill or "other assets" in the book value calculation of the Subject Collateral. (*Id.* at 106:13–15.)

240. She excluded them because (i) she did not know what they were; (ii) they were not needed for the NewCo business; or (iii) she did not think it appropriate for the Term Loan Lenders and Transcendence to receive the benefit of including their value in the calculation (*i.e.*, including negative goodwill would have significantly depressed the amount of the credit bid). (*Id.* at 106:13–19, 107:4–18.)

241. The book value of all assets (*i.e.,* the assets of the five divisions, including good will and "other assets") as of December 2015 totaled approximately $6.855 million, more than $3 million less than the $10 million credit bid amount. (PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 6–24); Aug. 13 PM Tr. 106:3–7.)

242.    On February 22, 2016, Vikram Agrawal, a credit officer with Patriarch Partners (Aug. 13 PM Tr. 121:8–10), emailed to Tilton an updated version of the NewCo model (the "February 22 NewCo Model").  (DX_166.)

243.    The February 22 NewCo Model consisted of the three divisions that were being modeled for NewCo as of that date (*i.e.*, Hudson Valley, Paratransit and Pennsylvania) given the loss of contracts in the other divisions between February 13 and February 22.  (Aug. 13 PM Tr. 122:19–21; *see* ¶¶ 197–200, *supra*.)

244.    The February 22 NewCo Model contained a combined opening balance sheet for these three divisions.  (DX_166, at PP–TRBK0110489 ("NewCo Financial Model" Tab; Col. K, Rows 59–80).)

245.    Had Tilton used the opening balance sheet in the February 22 NewCo Model to calculate the value for the Subject Collateral, she would have included in the calculation the same "real assets"—*i.e.*, cash and cash equivalents, receivables, inventory, and net PP&E—that she used for the February 13 NewCo Model.  (Aug. 13 PM Tr. 123:12–15.)

246.    As set forth in the table below, the sum of these inputs totals $6.244 million (more than $3.5 million less than the $10 million credit bid):

| CURRENT ASSETS | Opening (as of 2/21) (millions) |
|---|---|
| Cash and cash equivalents | – |
| Patient Account Receivables (OldCo) | – |
| Patient Account Receivables (NewCo) | 5,209.6 |
| Inventory | 677.9 |
| PP&E (net) | 356.9 |
| **TOTAL** | **6,244.4** |

(DX_166, at PP–TRBK0110489 ("NewCo Financial Model" Tab; Col. K, Rows 61–80).)

247.    The February 22 NewCo Model also assumed that Tilton would purchase the receivables from Wells Fargo.  (*Id*. at PP–TRBK0110489; Aug. 13 PM Tr. 124:6–10.)

248.    The effect of excluding the receivables from the book value calculation would reduce the value of the Subject Collateral from approximately $6.25 million to just over $1 million. (Aug. 13 PM Tr. 124:12–15.)

249.    Thus, the $10 million credit bid was "far more than book value because [TransCare] lost two divisions and [Transcendence] didn't take the receivables."  (Aug. 13 AM Tr. 17:17–19.)

250.    Tilton did not reduce the $10 million credit bid to $6.25 million (to reflect changes on the NewCo balance sheet from February 13 to February 22).  (Aug. 13 PM Tr. 124:16–20.)

251.    Because the equity in Transcendence was allocated based, in part, on the Term Loan Lenders' *pro rata* share of the credit bid (*see* ¶¶ 213–215, *supra*) reducing the amount of the credit bid would have given Ark II (*i.e.*, the new money) a greater percentage of equity in Transcendence relative to the Term Loan Lenders.  (Aug. 13 PM Tr. 125:8–13.)

252.    Tilton thought sticking with a credit bid that gave the Term Loan Lenders a larger equity stake in Transcendence was fairer to the Term Loan Lenders.  (*Id.* at 124:23–125:15.)

### B.    Step 2: Check Based on Cash Flow

253.    As a check on the book value calculation, Tilton also compared the total "acquisition price" of approximately $22 million (*i.e.*, the $10 million credit bid and the $12 million in debt funding) against the EBITDA that Tilton and her team projected could be generated by NewCo during the balance of 2016.  (Aug. 13 AM Tr. 16:3–17; Aug. 14 AM Tr. 26:16–18 ("[we] use[d] that EBITDA . . . to do a check to make sure that the price was fair").)

254.    As Tilton explained, expressing value as a multiple is appropriate in a "healthy situation, where people are buying cash flow."  (Aug. 13 AM Tr. 17:13–16.)

255.     The February 13 NewCo Model showed combined projected EBITDA for the Paratransit, Pennsylvania and Hudson Valley divisions of approximately $2.57 million. (PX_286.)[8]

256.     The projected EBITDA on the February 13 NewCo Model profit and loss statement did not include the cost of corporate overhead.  (Aug. 13 PM Tr. 113:3–7, 113:20–22, 114:12–15.)

257.     Tilton expected the cost of corporate overhead to range from about $500,000 to $750,000.  (Aug. 13 AM Tr. 14:24–25; Aug. 14 AM Tr. 34:24–35:1.)

258.     The effect of including the expenses associated with corporate overhead on the February 13 NewCo Model profit and loss statement would be to reduce the projected EBITDA from $2.57 million to approximately $1.8–$2.1 million.

259.     The February 22 NewCo Model showed combined projected EBITDA for the Paratransit, Pennsylvania and Hudson Valley divisions of approximately $3.2 million.  (DX_166, at PP–TRBK0110489 ("NewCo Financial Model" Tab at Col. DD, Row 44).)

260.     The February 22 NewCo Model did not include "any expenses/charges related to corporate overhead at the NewCo level, any one time transaction costs, or any pre-payment/down payment for insurance."  (*Id.*; *see also* Aug. 13 PM Tr. 121:23–122:3 (the model had "no corporate overhead[,] transaction costs or any insurance payments that would need to be made up front.").)

261.     The effect of including those expenses on the February 22 NewCo Model profit and loss statement would be to reduce the projected EBITDA from $3.2 million to approximately $2.5–$2.75 million.  (Aug. 13 AM Tr. 14:24–25; Aug. 14 AM Tr. 34:24–35:1.)[9]

---

[8] The February 13 NewCo Model showed projected EBITDA for the (i) Paratransit division of $1.2 million (PX_286, at PP–TRBK0105524 ("TS–P&L" Tab, Col. O, Row 47)); (ii) Pennsylvania division of $200,000 (*Id.* ("PA–P&L" Tab, Col. O, Row 47)); and (iii) Hudson Valley division of $1.173 million.  (*Id.* ("HV–P&L" Tab, Col. O, Row 47).)

[9] This reduction in projected EBITDA does not include transaction costs or the costs of upfront insurance payments, both of which were excluded from the February 22 NewCo Model.  (DX_166, at PP–TRBK0110489.)

262.     Without accounting for the costs of corporate overhead and other operating expenses, the transaction implied a multiple of approximately 7–8.5x based on a $22 million "purchase price" and EBITDA of $2.57–$3.2 million.  (PX_286; DX_166.)

263.     Taking into account the cost of corporate overhead and other operating expenses, the transaction implied a multiple of roughly 8–12x based on a $22 million "purchase price" and EBITDA of $1.8–$2.75 million.  (Aug. 13 AM Tr. 14:11–14 (explaining that the purchase price ended up being "almost ten times the combined EBITDA of the three entities"); *see id.* at 16:15–17 ("So, if you take [the EBITDA] down to the two to two and a half, then it's 9 to 11 times").)

264.     Tilton testified that applying a 7–8x multiple to cash flow could be appropriate in the case of a healthy company—"not a company that was in free fall, losing contracts every day." (Aug. 13 AM Tr. 17:5–16.)

265.     Thus, this check on her book value calculation confirmed to Tilton that the price she calculated was fair.  (*Id.* at 16:3–12.)

**XIII.    Bankruptcy Filing and Post-Petition Events**

266.     TransCare Corporation and certain of its subsidiaries filed voluntary chapter 7 petitions in this Court on February 24, 2016 (the "Initial Petition Date").  (Stipulation No. 44.)

267.     On February 25, 2016, LaMonica was appointed as the interim Chapter 7 Trustee. (Stipulation No. 45.)

268.     That same day, LaMonica and several of his colleagues met with counsel for TransCare (Curtis Mallet), counsel for PPAS (Randy Creswell), Wells Fargo and its counsel, and a CMAG representative at the offices of Curtis Mallet.  (July 24 Tr. 132:11–133:4.)

269.     At no point during the meeting did Wells Fargo dispute the Article 9 foreclosure or transfer of the Subject Collateral to Transcendence.  (*Id.* at 154:2–6.)

270. At no point during the meeting did Wells Fargo propose to LaMonica that the paratransit business continue to operate as a going concern. (*Id.* at 156:3–8.)

271. LaMonica testified that as of February 25–26, 2016, the TransCare estates lacked sufficient funding to operate as a going concern absent a voluntary cash infusion from Wells Fargo or one of Tilton's investment vehicles. (*Id.* at 156:9–157:8.)

272. Ultimately, Transcendence was unable to operate, including because the Trustee would not consent to the use of a computer server that was necessary to operate at least one of the divisions. (Aug. 13 AM Tr. 26:3–12.)

273. On March 10, 2016, the Trustee, PPAS and Transcendence Transit entered into a stipulation (the "Personal Property Stipulation") concerning the sale of certain property at auction, including the property PPAS foreclosed upon on behalf of the Term Loan Lenders (the "Foreclosed Personal Property Assets"). (*In re TransCare Corporation*, 16–10407–smb, Dkt. No. 52.)

274. Consistent with the fact that PPAS did not foreclose on the CONs, the Personal Property Stipulation provided that the Foreclosed Personal Property Assets did not include any of the CONs. (*Id.*, Personal Property Stipulation at 3.)

275. PPAS and Transcendence consented to the Trustee's sale of the Foreclosed Personal Property Assets. (*Id.*, Personal Property Stipulation ¶ 1.)

276. On March 25, 2016, the Bankruptcy Court entered an order approving the Personal Property Stipulation (the "March 25 Order"). (*Id.*)

277. The March 25 Order authorized the Trustee to employ an auctioneer to conduct auction sales of the Tangible Personal Property Assets (as defined in the March 25 Order) (*see id.* ¶ 6), including the Foreclosed Personal Property Assets. (*Id*. ¶ 3.)

278. Auction sales were thereafter conducted. (*In re TransCare Corporation*, 16–10407–smb, Dkt. Nos. 257, 258.)

279. On or about July 14, 2016, the Trustee distributed $600,000.01 from the auction proceeds to PPAS. (*In re TransCare Corporation*, 16–10407–smb, Dkt. No. 407–1.)

280. On or about September 13, 2016, the Trustee distributed an additional $200,000.00 from the auction proceeds to PPAS. (*Id.*)

281. None of the proceeds from the sale of the CONs was paid to PPAS. (*In re TransCare Corporation*, 16–10407–smb, Dkt. No. 379.)

## XIV. Valuing TransCare

282. In an effort to prove damages, the Trustee presented an expert witness, Dr. Jonathan I. Arnold, to opine on a reasonable range of value of TransCare as of four days in January and February 2016: January 7, January 27, January 28, and February 24 (the "Valuation Dates") (July 24 Tr. 7:5–20) that had been identified for Arnold by the Trustee's counsel. (*Id.* at 7:19–24.)

283. As of each of the Valuation Dates, Arnold calculated a range of alleged values for TransCare as a whole (or "WholeCo") and/or NewCo relative to their respective liquidation values. (*Id.* at 12:4–13:14.)[10]

284. Arnold applied a "market approach," using what are known as the comparable company and precedent transaction valuation methods. (*Id.* at 13:18–14:4.)

285. To calculate the ranges, Arnold relied on financial projections from four documents: (1) a version of the 2016 Preliminary Plan that Greenberg emailed to CMAG on January 7, 2016 (the "January 7 Preliminary Plan"); (2) the CMAG Executive Summary; (3) the

---

[10] Arnold opined that the liquidation value was $19.2 million for WholeCo and $5.7 million for NewCo. (July 24 Tr. 13:8–14.)

Greenberg January 28 Email; and (4) an email from Greenberg to Todd Trent of Lockton on February 24, 2016, containing metrics for NewCo (the "February 24 Plan" and together with the three other documents, the "Plans"). (*Id.* at 12:4–13:7.)

286. Defendants offered expert testimony from Jeffrey Dunn to rebut Arnold's testimony. (Aug. 8 Tr. 8:2–7.)

## A. Arnold Did Not Provide His Own Value Opinion of TransCare

287. At trial, Arnold first claimed that he was retained to "determine[ ] the range of values that TransCare could reasonably expect to obtain in an open market transaction based on the analyses that were done at various points in time in January and February 2016." (July 24 Tr. 7:9–12.)

288. On cross-examination, however, he clarified that he was *not* actually engaged to give *his own opinion of* value, but rather only to calculate "value" based on work that was done by "the people within Patriarch" in January and February 2016. (*Id.* at 106:15–107:1.)

289. Arnold testified:

> [I]n this matter I was asked to address what is a reasonable range for value of TransCare **given what the people within Patriarch were doing in January and February. That does not require me to do a deep dive into the comparables or the precedent transactions because I'm not giving, I'm not putting my own value on TransCare**. I instead am trying to get insight into the, to answer the question of what is reasonable for TransCare and Patriarch to expect to get in a range based on **their** analyses both of TransCare itself on a going forward basis and the companies that **they believe** were comparable or represented precedent transactions.

(*Id.* (emphasis added); *see also id.* at 29:19–23 ("[T]he valuation ranges that I report are implied by the contemporaneous market values of comparables and precedent transactions combined with the forecast[ed] EBITDA that are embedded in" the Patriarch Partners and CMAG Plans).)

290.     In other words, Arnold's calculations were based solely on what "*Carl Marks and the Patriarch people believed* the EBITDA for 2016 would be and what the value for TransCare is that [was] implied by those beliefs." (*Id.* at 57:10–13 (emphasis added); *see id.* at 35:18–21 (the projections "give[ ] the best insights as of that date as to what Patriarch's view of [what] the future performance of TransCare could be. And that's the basis on which [he] did [his] analysis.").)

291.     Although Arnold's calculations rely entirely on projections of future EBITDA performance in the Plans developed by Patriarch Partners and CMAG, he did not independently assess the Plans (July 24 Tr. 39:10–49:24) or even form a view on the reasonableness of the projected EBITDA in the Plans. (*Id.* at 60:13–61:13; *see id.* at 57:9–10 ("I don't know whether it is a reasonable estimate. I didn't undertake that analysis.")

292.     Arnold similarly did not find his own comparable companies or transactions; rather, he relied on two companies—Envision and Air Methods—identified by Greenberg in a December 18, 2015 email to Tilton (*see* ¶ 83, *supra*). (July 24 Tr. 16:18–17:6, 90:8–17.)[11]

293.     The evidence adduced at trial did not support Arnold's uncritical reliance on the work that was done by "the people within Patriarch."

294.     *First*, although Arnold testified that the Plans "appear to be end points of various analytical processes that occurred within Patriarch" (July 24 Tr. 7:25–8:2), the evidence shows the opposite.

295.     For example, the January 7 Preliminary Plan was, as its name would suggest, *preliminary*.

---

[11] Because Arnold did not think it necessary to do a "deep dive," he also did not consider whether TransCare's financial condition was stable enough to even survive a sale process, a concern of both Tilton and Wells Fargo at or around the Valuation Dates (*see* ¶ 84, *supra*). (July 24 Tr. 74:8–78:16.) Notably, Arnold admitted that any sale would not happen overnight; at a minimum, "there's still going to be a diligence period." (*Id.* at 75:8–76:12.)

296. To that point, Greenberg and Pelissier developed the plan after working on it for only one day. (PX_158, at CM_TC2018_0003369 ("updates to 2016 preliminary plan based on yesterday's discussion"); *see id.* ("Jean Luc and I worked all night to arrive at a scenario to address the parameters we discussed yesterday"); *see* ¶¶ 99–100, *supra*).)

297. The evidence also shows that the CMAG Executive Summary and Greenberg January 28 Email were draft documents that Tilton did not believe were true restructuring plans and did not approve. (*See* ¶¶ 131, 134–135, *supra*.)

298. The February 24 Plan was also not an "end point." (Aug. 13 AM Tr. 40:11–18.)

299. Tilton testified:

> It was a dynamic model, and everything was changing by the minute. So, ultimately, to get the foreclosure done, I had to make decisions in the minute, and *certainly things were not settled because contracts were being lost and people were being lost every minute.* But I got as comfortable *as I could* to make a decision that would try to save as much of this company and as many jobs as I could.

(*Id.* (emphasis added).)

300. *Second*, each of the Plans depended on the realization of a series of assumptions and action items. (PX_158, at CM_TC2018_0003370; PX_175, at CM_TC2018_0002114; PX_179, at PP–TRBK0013260; DX_166, at PP–TRBK0110489; July 24 Tr. 46:8–21.)

301. Although Arnold acknowledged that the Plans called for TransCare to make changes so "significant" that it would result in "a decidedly different company" (July 24 Tr. 35:2–14, 86:2–8, 88:3–6), he did not investigate the feasibility of the assumptions and action items in the Plans. (*Id.* at 39:10–49:24, 59:3–60:12, 64:15–17, 72:17–73:24.)

302. The authors of the Plans, however, understood the high risk that those assumptions or action items would not be achieved. (*See, e.g.*, PX_175, at CM_TC2018_0002114 ("[p]lan execution risk is high and therefore ultimate payback on the incremental investment is uncertain.");

Aug. 13 PM Tr. 126:23–25 ("[G]iven the condition the [C]ompany was in and the continued loss of people and contracts, it was a very high-risk transaction.").)

### B. The Analysis Arnold Performed is Inconsistent with that of a Valuation Professional

303.    Dunn offered three primary critiques of Arnold's analysis, all of which centered on the appropriate methodology a valuation professional must employ when performing a valuation. (Aug. 8 Tr. 11:15–25:25, 26:1–30:15.)

304.    *First*, Dunn explained that, unlike Arnold, valuation professionals must offer their own opinion of value by assessing the risk that projections will not be realized; that is, whether the projections are reasonable.  (*Id*. at 25:5–15.)

305.    As explained by IRS Revenue Ruling 59–60, a generally accepted source among valuation professionals, "The value of shares of stock of a company with very uncertain future prospects is highly speculative.  The business appraiser ***must exercise his judgment as to the degree of risk attaching to the business*** of the corporation [that] issued the stock, but that judgment must be related to all of the other factors effecting value."  (*Id.* at 26:21–27:2 (emphasis added).)

306.    Dunn further explained that an independent assessment of risk is critical because projections are necessarily *not* valuations.  (*Id.* at 69:9–16.)

307.    A plan contains projections, the realization of which assume certain risks are overcome.  (*Id.* at 68:13–69:16.)

308.    A valuation, on the other hand, "*assess[es]* the risk"—*i.e.*, how possible is it that the company will overcome those risks.  (*Id.* at 69:9–16 (emphasis added).)

309.     The range of what is possible (and the value of that range) is what distinguishes a valuation from a projection.  (*Id.*)

310.     Arnold acknowledged that he did not perform a risk assessment of the Plans.  (*See, e.g.*, July 24 Tr. 64:4–17.)

311.     Moreover, in performing a risk assessment, a valuation professional must take into account the historical performance of the business that is being valued.  (Aug. 8 Tr. 28:14–29:8.)

312.     Dunn discussed IRS Revenue Ruling 59–60, which "require[s]" valuation experts to focus on historical context: "[t]he history of a corporate enterprise will show it's [sic] past stability or instability, its growth or lack of growth, the diversity or lack of diversity of its operations, and other facts needed to form an opinion of the degree of risk involved in the business . . . The detail to be considered should increase with approach to the required date of appraisal since recent events are of greatest help in predicting the future."  (*Id.* at 29:9–20.)

313.     Arnold, however, ignored TransCare's recent historic performance—including at least two years of downward trending revenue (from $131 million in 2014 to $8 million in December 2015) and EBITDA (from $488,000 in 2014 to -$552,000 in December 2015)—while uncritically accepting that the Company would achieve EBITDA of $6.9 million by the end of 2016.  (July 24 Tr. 80:1–84:11; PX_158, at CM_TC_2018_0003376 ("Summary Table" Tab).)

314.     Arnold also ignored TransCare's unsuccessful attempts to implement at least one turnaround plan.  (July 24 Tr. 67:21–68:6.)

315.     Not only did Arnold assume the projections in the Plans would be realized without performing a risk assessment, his opinions of value assume that a buyer would similarly accept the projections in the Plans without performing its own independent analysis or testing the assumptions on which the success of the Plans relied.  (Aug. 8 Tr. 24:8–12 ("Arnold assumes that

. . . a potential investor in TransCare, would assume that the turnaround plan [and the projections in the plan] w[ere] achieved without considering the risk to that actually occurring.").)[12]

316.    *Second*, when utilizing the comparable companies method, as Arnold did here, a valuation professional must test the differences between purported comparables and the company being valued and, if warranted, adjust the multiples from the comparables accordingly.  (July 24 Tr. 102:10–24 (referencing *Valuation: Measuring and Managing the Value of Companies*).)

317.    Arnold, however, did not analyze the comparability of the guideline companies he used to TransCare.  (*Id.* at 102:8–103:3; Aug. 8 Tr. 32:15–25.)

318.    He thus committed what a valuation treatise Arnold himself cited identifies as a "common flaw": comparing a subject company to comparison companies without accounting for "difference in their performance."  (July 24 Tr. 101:10–23 (quoting from *Valuation: Measuring and Managing the Value of Companies*).)

319.    As Dunn explained, such differences in performance manifest when comparing the companies' respective operations and financial performance and metrics.  (Aug. 8 Tr. 31:23–32:6.)

320.    Because Arnold committed the "common flaw," however, he did not assess the following differences between TransCare and the comparison companies:

321.    Unlike TransCare, which engaged only in ground transportation, Envision operated two business segments, one of which involved staffing of acute care and surgical centers and which accounted for 66% of Envision's total revenue.  (*Id.* at 33:19–34:13.)

---

[12] Notably, Arnold acknowledged the likelihood that a buyer would ignore the Patriarch Partners models altogether. (July 24 Tr. 63:18–23 ("They [a prospective buyer] may have their own thought that they can make twelve cents of EBITDA on the dollar and ***who cares what the people at Patriarch and TransCare are doing because they're going to do it their way.  That's pretty common in M&A transactions that the buyer imposes their model on the acquirer.  That is common.***") (emphasis added).)  Moreover, although Arnold did not account for TransCare's recent historic struggles, he expected that a third-party buyer would "use it as a point of negotiation and leverage [it]" to drive the price down.  (*Id.* at 68:18–21.)

322.    Similarly, Air Methods principally operated helicopter transportation services and had no ground-based transportation services.  (*Id.* at 34:14–35:6.)

323.    Arnold also failed to account for the following sizable differences in financial metrics between TransCare and those companies:

- In the last twelve months prior to the valuation dates ("LTM"), TransCare generated revenue of $114 million compared to Envision's $5 billion and Air Method's $1 billion of revenue (*id.* at 36:1–10);

- TransCare's LTM EBITDA was $1.4 million compared to Envision's $582 million and Air Method's $284 million (*id.* at 36:11–20);

- TransCare's LTM EBITDA margin (that is, the ratio of EBITDA to revenue that indicates profitability) was 1.2% compared to Envision's 11.4% and Air Method's 26.8% (*id.* at 36:21–37:1; PX_283 at Ex. 1); and

- TransCare's EBITDA growth (*i.e.*, a calculation of established, historic trends in improving or declining profitability and thus relative riskiness) from 2012 to 2015 was -46.4% compared to Envision's +13.8% and Air Method's +3.4%. (Aug. 8 Tr. 37:2–37:18; PX_283, at Ex. 1.)

324.    Moreover, while TransCare was operating "at the absolute breaking point," Arnold admitted that Envision and Air Methods were healthy, stable companies with no sign of distress. (July 24 Tr. 94:13–95:7.)

325.    As Dunn explained, any market participant interested in purchasing TransCare "would need to take these differences into account" by "lowering the applied multiple or the observed multiple" of Envision and Air Methods.  (Aug. 8 Tr. 38:9–22.)

326.    Simply put, the greater the risk in an investment, the lower a potential buyer will pay for the investment.  (*Id.* at 82:5–15.)

327.    As applied here, an investment in TransCare was indisputably riskier than one in Envision and Air Methods, so a potential third-party buyer would lower the multiple it applied to the projected EBITDA and, by extension, the price it would reasonably pay.  (*Id.* at 38:24–39:11.)

328.     Dunn further explained that a market participant might even decide not to apply *any* EBITDA multiple to TransCare if the buyer concluded it was unlikely that the Company could continue as a going concern.  (*Id.* at 60:17–61:10.)[13]

329.     *Third*, Dunn testified that a valuation professional must take into account the capital needs of the business it is valuing because, as a general matter, any third-party buyer looking to purchase a company would factor into the sale price the cash the buyer would need to contribute to keep the company operating.  (*Id.* at 22:12–23:14.)

330.     In this case, if a valuation professional were to determine TransCare's going-concern value (if any) in January or February 2016, he would be required to deduct any capital needed to maintain TransCare as a going concern on the Valuation Dates.  (*Id.* at 23:15–20.)

331.     Arnold did not do so.  (*Id.* at 23:5–24:5.)

### C.     Arnold's Rebuttal Testimony

332.     The Trustee recalled Arnold to offer rebuttal testimony in which he claimed to have investigated certain of Dunn's critiques involving his use of Envision and Air Methods as comparable companies.

333.     Specifically, Arnold looked for new guideline companies and compared their multiples to Envision and Air Methods.  (Aug. 14 AM Tr. 48:4–49:24.)

334.     Arnold explained that this consisted of selecting from a database companies that he claimed were in "TransCare's industry," filtering those companies down to a group of 69 based on

---

[13] Arnold's reliance on the multiples implied by certain purported indications of interest in TransCare in 2015 was similarly inappropriate.  Arnold acknowledged that the so-called expressions of interest in TransCare from 2015 did not actually inform his views.  (July 24 Tr. 116:24–117:8.)  Even if they did, National Express's LOI for the paratransit business indicated a purchase price of, at most, $6 to $7 million for a business that was producing $3.5 to $4 million of EBITDA (*see* ¶¶ 47–48, *supra*), thus implying a multiple of only 1.7x to 1.75x.

certain filtering "rules," and then further filtering the companies to a group of 34. (*Id.* at 48:4–24, 60:9–15, 64:21–65:1.)

335. With the group of 69 and smaller set of 34 companies, Arnold set further filtering "rules" to find subsets of those companies that met Arnold's definition of being either smaller, distressed, low operating, or undercapitalized. (*Id.* at 52:19–53:25.)

336. Arnold concluded that "the range of multipliers emerging from Mr. Greenberg's analysis is . . . confirmed by looking at the" multiples of companies in the various subsets. (*Id.* at 54:19–55:1.)

337. There are several serious flaws with Arnold's rebuttal work:

338. *First*, although Arnold claimed the 69 companies are a "broader set of comparable guideline companies," he later admitted that, in fact, he has "no opinion, one way or the other, as to whether *any* of these 69 [companies, including any of his subset of 34] *actually are* comparable guideline companies for TransCare." (*Id.* at 64:21–65:22 (emphasis added).)

339. Indeed, only *one* of the 69 was an ambulance company. (*Id.* at 62:18–63:3.)

340. Simply put, an expert cannot give an opinion based on supposed comparable company metrics when he has no opinion about whether those companies *actually are* comparable to the one being valued.

341. *Second*, Arnold claimed to select the filters and subsets based on some "rule," but he admitted on cross examination that he created the "rule" himself and that the rule was really any criteria that he "felt" was reasonable. (*Id.* at 63:14–64:20.)

342. *Third*, TransCare's financial condition was often far worse than all (or nearly all) of the companies in a given subset. (*Id.* at 68:5–76:5.)

## CONCLUSIONS OF LAW

### XV.    The Trustee's Breach of Fiduciary Duty Claim[14]

343.    Directors of a Delaware corporation owe a "triad" of duties.  *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (internal citation omitted).[15]  "This triad is composed of the duty of care, the duty of loyalty, and the duty to act in good faith."  *Id.*

344.    The Trustee does not assert that Tilton breached her duty of care (nor could he).  As detailed below, Tilton exercised great care in evaluating a potential third-party sale of TransCare, including by retaining CMAG, negotiating with Wells Fargo and ultimately concluding—based in large part on CMAG's analysis—that TransCare could not survive a sale process.

345.    The Trustee instead asserts a claim for breach of the duties of loyalty and good faith based on: (i) Tilton's alleged conduct in pursuing the OldCo/NewCo Restructuring and (b) Tilton's alleged failure to take steps to ensure TransCare complied with its obligations under the WARN Acts and federal/state payroll tax laws.[16]  (Final Pre-Trial Order ("FPTO") ¶ 184.)  As set forth below, this Court finds that Tilton did not breach either duty.

### A.    Tilton's Actions Prior to February 9, 2016 Were a Proper Exercise of Her Fiduciary Duties

346.    As a threshold matter, the Trustee contends that the "entire fairness" standard applies to Tilton's actions from the moment she determined to explore a sale or restructuring of

---

[14] Because the Trustee's breach of fiduciary duty claim is non-core, the conclusions of law stated herein are proposed conclusions.  28 U.S.C. § 157(c).

[15] The Trustee's breach of fiduciary duty claim arises under Delaware law because TransCare is a Delaware corporation.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

[16] In the Amended Complaint, the Trustee's breach of fiduciary duty claim was also focused on certain third-party inquiries about TransCare's assets in 2015 that Tilton chose not to pursue.  (Am. Compl. ¶¶ 3–4, 40–47, 52–59.)  The Trustee has since abandoned this theory of liability, and so the Court will not address it.  (Aug. 14 PM Tr. 20:16–21.)

TransCare in mid-December 2015 through February 24, 2016, the date on which the Article 9 foreclosure documents were executed.  (FPTO ¶ 181.)  The Trustee, however, misstates the law in this regard.  A review of Delaware fiduciary duty jurisprudence, and the testimony and documents presented at trial, demonstrate that the entire fairness standard only applies to Tilton's conduct on and after February 9.  That is because, as discussed below, before February 9, Tilton took steps to put the Company in a position to be sold to a *third party*, including retaining an outside restructuring firm to help guide TransCare through the process, engaging in a continuing dialogue with Wells Fargo about the bank providing the financing TransCare needed to continue operating as a going concern through a sale process and reviewing stabilization plans and budgets prepared by CMAG and others, with the assistance of TransCare management.  Those actions simply cannot be viewed as self-interested, a pre-requisite condition to the application of entire fairness review.

### i. *Standard of Review*

347.    Breach of fiduciary duty claims are evaluated under standards of review and conduct.  *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013).  "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care.  The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.  It describes what a plaintiff must first plead and later prove to prevail."  *Id.* at 35–36.

348.    There are three levels of review when evaluating corporate fiduciary decision-making: the business judgment rule, enhanced scrutiny, and entire fairness.[17]  *Reis v. Hazelett Strip–Casting Corp.,* 28 A.3d 442, 457 (Del. Ch. 2011).

---

[17] Neither side contends that the Court should apply enhanced scrutiny review here.

349. Inherent in the business judgment rule is the presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *Roselink Inv'rs, LLC v. Shenkman*, 386 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (citation omitted) (applying Delaware law).

350. "[T]he business judgment presumption is a *rule of evidence* that places the initial burden of proof on the plaintiff." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). To rebut the business judgment rule, the plaintiff must introduce evidence showing a director confronted actual conflicts of interest in making the challenged decision or otherwise acted in her own self-interest. *Trados,* 73 A.3d at 36; *Roselink*, 386 F. Supp. 2d at 217. If the plaintiff fails to meet this burden, the business judgment rule will attach to protect the director's decision, unless that decision "cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citation omitted), *decision modified on reargument*, 636 A.2d 956 (Del. 1994). Only if the business judgment rule has been rebutted can a court examine a director's decision under the "entire fairness" standard.

### ii. *Tilton's Actions Prior to February 9 Are Subject to and Protected by the Business Judgment Rule*

351. The Trustee has not carried his burden of proving that, before February 9, Tilton was on both sides of a transaction at issue in his fiduciary duty claim or otherwise acted in her self-interest at the expense of TransCare. *Trados,* 73 A.3d at 36; *Roselink*, 386 F. Supp. 2d at 217.

352. Instead, the evidence shows that Tilton engaged in two distinct decision-making processes during this time period. First, from mid-December 2015 through February 5, 2016, Tilton explored engaging in a marketed sale process to a third-party buyer. (Proposed Findings of Fact ("PFOF") ¶¶ 71–142.) To that end, she retained CMAG as TransCare's financial advisor

(reporting directly to her as TransCare's director) and was informed by CMAG's conclusions and recommendations. (PFOF ¶¶ 91–97, 107–31, 136–42.) That work, and other work performed by Patriarch Partners and PPMG personnel, revealed the magnitude of TransCare's financial and operational crisis and that it could not continue operating without an immediate and substantial new cash infusion. (PFOF ¶¶ 99–142.) By February 5, after having explored and evaluated a potential sale process, Tilton determined based on CMAG's work that a sale of TransCare was not feasible, due in large part to the rapidly deteriorating condition of the Company—it simply could not survive until a sale. (PFOF ¶¶ 136–42.)

353.     It was only *after* Tilton made this decision that she and her team, along with CMAG and TransCare senior executives, began working on a "bottom up" plan that took out the "losing contracts" and was built around TransCare's profitable business divisions—*i.e.*, the beginning of the process through which the OldCo/NewCo Restructuring was developed. (PFOF ¶¶ 162–63.) Tilton had not approved of any restructuring plan for TransCare as of February 7. (PFOF ¶ 164.) The earliest evidence of Tilton approving of, or sharing the OldCo/NewCo Restructuring with a third party, is her communications with Wells Fargo on February 9. (PFOF ¶¶ 165–67.)

354.     Tilton could not have been acting in her own self-interest or standing on all sides of the OldCo/NewCo Restructuring before February 9 because, prior to that date, the transaction had not yet been developed (much less pursued). It follows then that the business judgment rule applies to Tilton's actions before that date. *Roselink*, 386 F. Supp. 2d at 216–17.

355.     Tilton's decision to explore, but ultimately not move forward with, a sale process prior to February 9 was a reasonable exercise of her business judgment. The evidence supports Tilton's conclusion (on February 5) that TransCare could not survive a sale process. For example, by January 14, CMAG (the acting CRO and restructuring experts) concluded that TransCare

"require[d] a substantial amount of [new money] funding *if the business [was] going to survive*," and that such funding was "absolutely necessary in order to keep the business as an ongoing enterprise." (PFOF ¶¶ 110–11 (emphasis added).)

356. Likewise, in its January 27 Executive Summary, CMAG cautioned that the plan it was then recommending, in addition to requiring millions in new cash from Tilton, had a high "execution risk" and that "ultimate payback on the incremental investment [was] uncertain." (PFOF ¶¶ 123–27.) Wells Fargo was also skeptical of the Company's ability to survive through a sale process and shared in Tilton's ultimate conclusion that a sale was not viable. (PFOF ¶¶ 84, 165–69.)

357. In sum, Tilton, working with CMAG and others, appropriately pursued a potential sale of TransCare until it became apparent – based largely on CMAG's work—that the Company would not be able to continue as a going concern for long enough to sell it for value. It was only *then* (starting on February 9) that she determined—again working with CMAG, Wells Fargo and others—to pursue the idea of the OldCo/NewCo Restructuring.

**B.     Tilton's Dealings in Respect of the OldCo/NewCo Restructuring Satisfy the "Entire Fairness" Standard**

358. The parties do not dispute that the OldCo/NewCo Restructuring is subject to review under the entire fairness standard and that Tilton had the burden of demonstrating entire fairness. The evidence presented by Tilton was sufficient to satisfy that burden.

359. Under the entire fairness standard, the court reviews a director's decision to ensure it is entirely fair to the corporation's stakeholders. *See Cinerama, Inc.*, 663 A.2d at 1163. "A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability." *Trados*, 73 A.3d at 55 (internal quotation and citation omitted).

360.    In examining entire fairness, courts look at two component pieces: procedural fairness (fair dealing or process) and substantive fairness (fair price).  *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).  Whether a transaction is entirely fair depends heavily on the facts of a particular case.  *Cinerama, Inc.,* 663 A.2d at 1140.  The Court is ultimately called upon to make a unitary fairness conclusion based upon the totality of the circumstances.  *Emerald Partners v. Berlin*, 2003 WL 21003437, at *22 (Del. Ch. Apr. 28, 2003), *aff'd*, 2003 WL 23019210 (Del. Dec. 23, 2003).  Indeed, entire fairness can be found notwithstanding a court's conclusion that a director did not follow a fair process.  *Trados*, 73 A.3d at 76–78 (transaction entirely fair, notwithstanding that directors did not follow a fair process, where evidence showed that deeply distressed company could not have obtained better result for stakeholders).

361.    Here, the set of circumstances in which the Court must evaluate the fairness of the OldCo/NewCo Restructuring is atypical.  That is because much of the Delaware fiduciary duty jurisprudence involves an assessment of the entire fairness of a transaction involving relatively healthy companies.  *See, e.g.*, *Weinberger*, 457 A.2d at 704–08 (involving the merger of two publicly traded companies and a transaction of millions of shares at $21 per share); *Gelfman v. Weeden Inv'rs, L.P.*, 859 A.2d 89, 94 (Del. Ch. 2004) (assessing fairness of transaction made by directors "at a time when [the Company] was thriving" and "when no exigency required" it).

362.    But that was simply not TransCare's reality in February 2016.  TransCare was in substantial distress.  Indeed, by January, CMAG described its work for TransCare as "fighting daily fires and working to hold the business and organization together."  (PFOF ¶ 119.)  When viewed, as the Court must, against this backdrop of a rapidly failing company, the evidence shows that Tilton's actions in forming Transcendence and foreclosing on the Subject Collateral were entirely fair.

**The OldCo/NewCo Restructuring Was the Product of Fair Dealing**

363.    A fair process "embraces questions of when the transaction was timed, how it was initiated, structured, [and] negotiated." *Weinberger*, 457 A.2d at 711.  The cornerstone of the Trustee's claim is that Tilton "deprived TransCare of the ability to monetize TransCare's assets as a going concern" when she "execut[ed] the Transcendence transaction" in February 2016.  (FPTO ¶ 182.)  This contention assumes that TransCare could in fact continue to operate as a going concern at the time of the transaction absent new money funding that Tilton was not required to personally provide and absent continued funding that, despite Tilton's efforts, Wells Fargo was unwilling to provide.

364.    The weight of the evidence presented at trial supports the opposite finding.  At the time of the transaction, TransCare had lost its ABL lender, was in default under its loan agreements, was about a million dollars behind on payroll taxes and had no cash available to independently make payroll.  (PFOF ¶¶ 60–61, 66, 161, 187, 193–94.)

*Timing of the Transaction*

365.    By late 2015 and into 2016, TransCare lacked sufficient capital to continue operations absent new working capital financing.  (PFOF ¶¶ 60–61, 72, 110–11, 114–16, 136–38.) The evidence shows that such financing was not available for at least three reasons.  *First*, TransCare could no longer rely on Wells Fargo.  By October 2015, Wells Fargo had issued the Non-Renewal Notice to TransCare, the Wells Fargo ABL Agreement was set to expire on January 31, 2016 (on which date *the entire outstanding balance of approximately $13 million would be due and owing*), and Wells Fargo had no intention of continuing to fund TransCare as a going-concern.  (PFOF ¶¶ 60–62, 76, 169.)

366. *Second*, the only new money financing CMAG (TransCare's acting CRO) or Wells Fargo proposed was from *Tilton herself*. (PFOF ¶¶ 85, 123–25 (PX_175, at CM_TC2018_0002114 ("To have a chance of a turnaround, TransCare needs an immediate incremental pledge of support *from Patriarch* totaling $7.5M+ excluding 2016 term [loan] interest" (emphasis added)).); *see also* JX_82, at PP–TRBK0048227 (indicating that Wells Fargo "expect[ed] that any past due payroll and payroll taxes w[ould] be funded *by Patriarch*") (emphasis added).) But Delaware law is clear that Tilton had no fiduciary obligation to provide any money to TransCare, let alone the many millions of dollars necessary for it to continue operations. *See Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993) ("[C]ontrolling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them.").

367. Moreover, implicit in the CMAG plan requiring new money financing from Tilton and *only* Tilton was that firm's understanding that third-party financing was not a viable option, particularly as Tilton, her team at Patriarch Partners and PPMG, TransCare management and CMAG were engaged only in preliminary discussions about whether and how TransCare could effect a turnaround. (PFOF ¶ 125 ("Nobody was going to lend into this without any visibility to a future, any projections or any plan. There was only one place that money could possibly come from and that would have been me.").) Notably, there is no evidence that CMAG recommended to Tilton that TransCare should seek financing from a third party or that CMAG ever sought to do so on TransCare's behalf. This is not surprising given that, in mid-February 2016, CMAG's Landeck told Tilton and others that he "WOULD NOT PUT ONE PENNY OF [HIS] PERSONAL MONEY INTO THIS COMPANY. THIS IS A BLACK HOLE." (PFOF ¶ 191 (DX_195, at PP–TRBK0078647 (emphasis in original)); *see also* Aug. 13 PM Tr. 85:17–23.) Again, the fact that

CMAG was retained by Tilton for its restructuring expertise and acted as TransCare's CRO cannot be overstated. Its views and recommendations, and what it did *not* recommend or do itself, are a critical part of the circumstances in which entire fairness must be judged.

368. *Third*, no evidence was presented to indicate that TransCare could have attracted third-party financing during the two weeks Tilton was pursuing the OldCo/NewCo Restructuring (*i.e.*, the period during which the entire fairness standard applies). TransCare's assets were already pledged in full to multiple secured lenders. (PFOF ¶¶ 22, 31, 158.) Thus, there was nothing to offer a new lender as collateral. TransCare was also in default of the Wells Fargo ABL Agreement and the TLA. (PFOF ¶¶ 67, 217.) Moreover, a prospective new lender would also discover that TransCare did not have timely or accurate financial statements and had no audited financial statements for 2014 or 2015. (PFOF ¶¶ 42, 67.) Indeed, TransCare's failure to maintain accurate and timely financials contributed heavily to the deterioration of the relationship with Wells Fargo. (PFOF ¶¶ 42–44, 67.) CMAG also understood the limits of TransCare's financial reporting systems, cautioning that it had "worked diligently to develop the most accurate financial picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting*." (PFOF ¶ 120 (emphasis added).) It requires an impossible stretch of imagination to believe that a new lender would be willing to lend in a subordinated position on an emergency basis based on dated and unreliable financials.

369. Additionally, by February 9, TransCare's business was in dire straits, as CMAG repeatedly noted. (PFOF ¶¶ 110–30, 136–141 (PX_185, at CM_TC2018_0002546 ("cash situation is dire and not improving"); *see id.* at CM_TC2018_0002544 ("We [at CMAG] have been telling this group for some time . . . that TC could not continue operations without a significant infusion of cash").) The CMAG Executive Summary also described the "[c]urrent void in Senior

57

Management leadership" and that "[v]irtually all key customers [were] pursuing or considering replacement options." (PFOF ¶ 117.)

370. Moreover, *the entire outstanding loan balance* on the Wells Fargo ABL Agreement could be called on a moment's notice. (PFOF ¶ 62.) Thus, a new lender would have had to *both* refinance the Wells Fargo ABL Agreement *and* extend millions of dollars in immediately available funds just to keep TransCare alive. (PFOF ¶¶ 62, 110–11, 136–38.) All of this would have been clear to a prospective third-party financing source from even minimal diligence. Under these circumstances, the notion that a 'White Knight' lender might "risk significant capital . . . before a turnaround c[ould] show meaningful positive results" has no evidentiary support. (PFOF ¶ 126.)

371. At bottom, fairness must be measured in context. *See, e.g.*, *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *11 (Del. Ch. Mar. 9), *aff'd*, 35 A.3d 419 (Del. 2011); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014) ("[E]ntire fairness standard of review is principally *contextual.* That is, there is no bright-line rule on what is entirely fair") (emphasis in original), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015). Here, that requires that the Court take into account the economic realities facing TransCare at the time of the OldCo/NewCo Restructuring; that is, a company in deep distress, operating at the daily discretion of its ABL lender, and losing key customers on a nearly daily basis. (PFOF ¶¶ 187–200.) In this context, Tilton developed a fair plan to salvage as much of TransCare as possible and maximize value for stakeholders. *See S. Muoio & Co.*, 2011 WL 863007, at *11 (finding fair process because "there was no tangible way that Crown would be able to meet its debt obligations when they were due, and that Crown had no real options other than a recapitalization or bankruptcy. Given the fact that Crown's debt crisis had developed over the

years with unprofitable and not-promising operations, it is evident that Crown did not have a solution that would provide a better opportunity for future value than a recapitalization.").

372.    Indeed, the evidence shows that, by February 9, *liquidation was the Company's only available option*.  (PFOF ¶¶ 140 (PX_185, at CM_TC2018_0002543 ("the old money is essentially only worth what a liquidation (closure or liquidation sale) would yield")), 170.)  *See Trados*, 73 A.3d at 77 (finding fair process where company "did not have a realistic chance of generating sufficient return to escape the gravitational pull of the large liquidation preference and cumulative dividend," "face[d] risks," and "external threats were becoming more serious"); *Blackmore Partners, L.P. v. Link Energy LLC,* 864 A.2d 80, 85–86 (Del. Ch. 2004) (recognizing that entire fairness standard could be met if defendants could prove that "there was no future for the business and no better alternative for the unit holders").

### *OldCo/NewCo Restructuring Negotiations*

373.    Moreover, the manner in which the OldCo/NewCo Restructuring was developed was fair.  The evidence shows that Tilton and her team engaged in an open, coordinated, and arms-length process involving Wells Fargo and its counsel, TransCare's restructuring counsel, TransCare management, and CMAG, to create a viable restructuring plan for TransCare.  (*See, e.g.*, PFOF ¶¶ 180–86; JX_84, at WF TC_00000052 ("If you would like to send any of your Wells people or your own financial advisors to work with us, we would welcome them here.").)  From February 9 through February 24, Tilton engaged in almost daily discussions with Wells Fargo and shared with Wells Fargo wind-down models and budgets prepared by her team, with the input of CMAG and TransCare management.  (PFOF ¶¶ 181–82, 184–86, 205–07.)  TransCare's counsel was also engaged in continued dialogue with Wells Fargo's counsel.  (PFOF ¶¶ 183, 206; DX_147, at PP–TRBK0091632 ("We also are having Otterbourg continue their dialogue with Curtis

regarding the legal process/structure of carving out the proposed Newco entities.").)  The evidence shows that the negotiations were intense and adversarial, with Wells Fargo holding and exercising considerable bargaining power.  (PFOF ¶¶ 181–83, 188, 192, 195–96, 205–07.)

### *Structure of the Transaction*

374.    The OldCo/NewCo Restructuring was also structured fairly.  As step one, PPAS (as administrative agent) would foreclose on and recover the Subject Collateral, as it had a right to do under the operative loan agreements because TransCare was in default, and then transfer those assets to Transcendence.  (PFOF ¶ 172.)  Thereafter, Tilton would, through her own voluntary personal financing, save jobs by operating certain business lines with the Subject Collateral. (PFOF ¶¶ 172, 202–04; JX_93 ("We are trying to save 700 jobs").)  The Term Loan Lenders would also receive a *pro rata* equity stake in Transcendence, which would provide them a potential upside to stem the losses on their loan to TransCare.  (PFOF ¶¶ 208–15.)  At the same time, TransCare's obligations to Wells Fargo would be satisfied through its continued collection of accounts receivable and the value of OldCo assets would be maximized through an orderly wind-down to be run by a chief restructuring officer.  (PFOF ¶¶ 176–78; *id.* ¶ 177 ("[W]e were hiring our own CRO to . . . run th[e] company during the wind-down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect.").)

### *Tilton's Decision Not to Cold Call Potential Third-Party Buyers*
### *Did not render the Process Unfair*

375.    At trial, the Trustee argued that the process was unfair because Tilton did not make phone calls to see if any third party was interested in buying TransCare.  In so arguing, the Trustee ignores that a process need not be perfect in order to be fair.  *See Cinerama*, 663 A.2d at 1179 (citation omitted) ("'Perfection is not possible, or expected' as a condition precedent to a judicial

determination of entire fairness."); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, *29 (Del. Ch. July 21, 2017) ("The outcome had blemishes, even flaws, but it was entirely fair."), *aff'd*, 184 A.3d 1291 (Del. 2018). "In any event, claims of flawed process are properly brought as duty of care, not loyalty, claims," *Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.)*, 2009 WL 3206051, at *7 (Del. Ch. Sept. 30, 2009), and here the Trustee did not sue Tilton for breaching her duty of care.

376.    Moreover, implicit in the Trustee's argument on this point is the assumption that a traditional sale process was unnecessary because TransCare could have been sold as a going concern for reasonable value on an expedited basis, without any marketing of the Company or allowing time for buyer diligence. *But there is no record evidence whatsoever to support that assumption.*

377.    To begin with, any sale process required the support of TransCare's secured lenders because TransCare's assets could not be sold free and clear without their consent. (PFOF ¶¶ 24–25, 32.) Notably, however, by February 9, none of the scenarios under which Wells Fargo was contemplating providing continued financing to TransCare included a marketed sale process or, for that matter, TransCare continuing to operate as a going concern. (PFOF ¶¶ 165–69; JX_84, at WF_TC_0000053 (transmitting the terms under which "Wells Fargo would consider financing TransCare on an orderly wind down basis").)

378.    Moreover, for the same reasons why it was unreasonable to believe a third-party lender would have provided funding to the Company at this time (as just discussed), it was also unrealistic to think a 'White Knight' would buy TransCare in the near term, particularly "*given the limitations of the Company's accounting systems and financial reporting.*" (PFOF ¶ 120 (emphasis added).) As the Trustee's expert, Arnold, admitted, buyers need valid numbers. (July

61

24 Tr. 73:25–74:4 ("Q: Because if you're a buyer, and you're doing diligence, and you're trying to figure out whether the investment is worth it you need to know that you have reliable numbers, right? A: You certainly want reliable numbers. I totally agree.").) *See Cinerama*, 663 A.2d at 1140–41 (finding process entirely fair because, "while the company was not shopped[,] there is no indication in the record that more money was possible from [a controlling stockholder] or likely from anyone else").

379.   To be sure, TransCare received certain expressions of interest in some or all of TransCare throughout 2015. However, the notion that any of these companies would have been ready and willing to immediately purchase TransCare (without due diligence) for an amount materially greater than liquidation value is simply not plausible. *First*, the 2015 inquiries were "blind"; they were made by parties that had not performed any due diligence on TransCare. (PFOF ¶¶ 54–55; JX_40, at PP–TRBK0030761 (contemplating the "[c]ompletion of customary due diligence").) Any due diligence process would have taken weeks, if not months, and would have revealed that, even with a substantial cash infusion, the projected EBITDA "forecast [was] low" and "valuation at end of year would not be that compelling." (PFOF ¶ 141.) On that point, the Trustee's expert, Dr. Arnold, admitted that any sale would not happen overnight; at a minimum "there's still going to be a diligence period." (PFOF ¶ 292.)

380.   *Second*, there is no evidence CMAG recommended to Tilton that she divert resources to looking for prospective third-party purchasers, including those who had previously made inquiries of TransCare, for what would have amounted to an emergency sale. There is similarly no evidence that CMAG itself was making such inquiries during this two-week period. Indeed, CMAG did not recommend in its Executive Summary that TransCare engage in a sale process either in the short term or the medium term. (PFOF ¶ 128.)

381.    There is also no evidence that, by not 'picking up the phone,' Tilton was trying to benefit herself or putting her own interests before those of other stakeholders.  On the contrary, the evidence shows that the actions taken by Tilton were believed to be in the best interests of all stakeholders.  (PFOF ¶¶ 176–77 (Aug. 13 PM Tr. 78:22–25 (CRO would "run th[e] company during the wind-down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect.")), 182, 215; *see also* JX_93, at PP-TRBK0051380 ("We are trying to save 700 jobs and pay [Wells Fargo] cash").)  Moreover, in order for the three divisions that were to continue as NewCo to operate, the divisions would require the support of its vendors and thus would need to pay them any amounts then due and owing.

382.    The Trustee asks the Court to assess the fairness of Tilton's decision not to divert critical resources to cold calling potential buyers in a vacuum.  The Court, however, cannot ignore that the Company was essentially in a death spiral during the two-week period at issue.  (PFOF ¶¶ 187–200.)  Tilton provided convincing testimony that simply keeping TransCare together was a daily challenge that even with the required devotion of extensive resources by her and her team continued to freefall.  (Aug. 13 AM Tr. 23:4–6 ("The company was in a free fall with an ABL lender who was refusing to fund on a day-to-day basis."); Aug. 13 PM Tr. 94:11–17 (describing the "35 to 40 people" who "had been working for weeks" trying to save TransCare); *id.* at 99:18–20 (describing the loss of two contracts during the two-week period as a "big hit" because they generated about $2.5 million of EBITDA).)  CMAG's reports even prior to February 9 also reflected severely distressed conditions.  (*See, e.g.*, PFOF ¶ 119 (CMAG was "fighting daily fires and working to hold the business and organization together"); *see also* July 22 AM Tr. 119:23–120:4.)  In the context of what was actually happening at TransCare during the relevant two-week period in February, the evidence compels the conclusion that Tilton's decision was entirely fair.

\* \* \* \* \*

383. In sum, whether or not a process was fair is dictated by the specific facts and context of each case. This case does not present a situation where insiders made millions by engineering a self-dealing transaction through false or misleading pretenses or cooked books. Tilton, in fact, *lost* millions and there is simply no evidence that she favored her own interests over those of other stakeholders. On the contrary, the evidence is uniform that she undertook the OldCo/NewCo Restructuring in an effort to save jobs and otherwise maximize value for TransCare's creditors. Most importantly, the evidence demonstrates beyond doubt that the only other option she had was to liquidate the Company. In this regard, the fact that the outside restructuring professionals who acted as TransCare's CRO—CMAG—did not recommend any other course of action that did not involve Tilton funding millions of her own money into what CMAG repeatedly acknowledged was a 'black hole' compels the conclusion that Tilton acted fairly here.

**The Price Paid for the Subject Collateral Was Fair**

384. TransCare also received a "fair price" for the Subject Collateral. Fair price "relates to the economic and financial considerations relied on when valuing the purchase price" of the assets. *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 n.52 (Del. Ch. 2005). A fair price is one that falls within the range of reasonable values, even "at the lowest level in a broad range of fairness." *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997).

385. Elements that affect fair price include the financial condition of the company whose assets are being valued. *S. Muoio & Co*, 2011 WL 863007, at \*16. Put otherwise, an assessment of fair price must take into consideration "the economic reality" which TransCare faced—*i.e.*, a business on the brink of liquidation. *Id.* at \*17 ("[T]reating Crown as if it had no liquidity crisis would require me to ignore the credible evidence adduced at trial. This I cannot do.").

386.    This concept is well-understood under Delaware law.  *See, e.g.*, *In re Vision Hardware Grp., Inc.*, 669 A.2d 671, 677 (Del. Ch. 1995) ("[T]he evidence shows conclusively that but for the TCW proposal and its effectuation, Better Vision was a going concern heading immediately into bankruptcy and, unless new credit was made available, liquidation.  This fact has very basic importance in determining the fair value of Better Vision stock."); *In re Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at *3 (Del. Ch. Sept. 24, 2010) ("[T]he company was in fact 'under water' at the time of the merger.  Accordingly, a merger price above $0.00 (in this case, $0.25 per share) was entirely fair.")[18]; *S. Muoio & Co.*, 2011 WL 863007, at *16 ("[A]bsent the Recapitalization [the challenged transaction], Crown would not have survived long enough to realize any future value, much less value above the level of Hallmark's debt.  Thus, without a recapitalization, Crown was facing insolvency and its equity was worthless.").

387.    As discussed, on February 24, 2016, TransCare could not continue operating as a going concern absent a substantial voluntary cash infusion.  (*See, e.g.*, PFOF ¶¶ 110–11, 136–38, 187–94.)  As such, the Subject Collateral necessarily could not have been worth more than liquidation value.  *See S. Muoio & Co.*, 2011 WL 863007, at *16–17 (explaining that, because company "was on the brink of bankruptcy and had no ability to refinance its debt," the "corporation's long-term, 'going concern' value becomes irrelevant and instead its value in bankruptcy becomes the relevant metric for determining fair value").  That being the case, the $2.4 million that the Trustee obtained through liquidating the Subject Collateral reflects a fair price for the assets.  (*See In re TransCare Corporation*, 16–10407–smb, Dkt. Nos. 57, 58; PX_282, at Exhibit 13).  Because Tilton's price ($10 million) was nearly five times that amount, it was fair.

---

[18] Although *Hanover* considered fair value in the context of an appraisal action, "the 'fair price' aspect of the unitary entire fairness standard is widely regarded as requiring a valuation analysis equivalent to the 'fair value' inquiry in an appraisal."  *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 461 (Del. Ch. 2011).

388.     An assessment of the approach Tilton employed to arrive at the $10 million figure similarly shows it was fair.  (PFOF ¶¶ 228–65.)  Tilton determined what price to pay for the Subject Collateral based on the combined balance sheet for NewCo as of February 13, 2016.  (PFOF ¶¶ 229–36.)  At that time, it was assumed that NewCo would continue operations of five business divisions; thus, the combined balance sheet included all five divisions.  (PFOF ¶¶ 231–32.)  The February 13 NewCo Model showed a balance sheet book value of NewCo assets based on cash and cash equivalents, receivables (which Tilton intended to purchase from Wells Fargo and contribute to NewCo), inventory, and net PP&E of just under $10 million.  (PFOF ¶¶ 232, 236.)

389.     Given the rapidly deteriorating situation on the ground, by February 24 NewCo would operate three divisions—not five—thus reducing the book value of the Subject Collateral, including receivables, to approximately $6.25 million.  (PFOF ¶¶ 243–46.)  Ultimately, however, Tilton and Wells Fargo were unable to reach a deal on the purchase of receivables and those receivables were excluded from the transaction.  (PFOF ¶¶ 205–07, 237.)  This further reduced the book value calculation to just over $1 million.  (PFOF ¶ 248.)  Tilton did not adjust the price to reflect these changed circumstances.  (PFOF ¶¶ 238, 248, 249.)  As a result, $10 million represented an overpayment of the actual book value by a factor of 10.

390.     This Court has previously held that book value may not equate to fair market value.  *In re Breitburn Energy Partners LP*, 582 B.R. 321, 344 (Bankr. S.D.N.Y. 2018) (Bernstein, J.).  However, book value may reflect a fair price depending on the circumstances.  *Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 995 (2d Cir. 1981) (emphasis added) (Although the "market value of particular property may" not match "its book value, and the market value of certain . . . assets may" be "greater *or less* than their book value.")  Indeed, courts have recognized that book value can actually overstate market value or fair value.  *See, e.g.*, *Burtch v. Opus, LLC*

*(In re Opus E., LLC)*, 528 B.R. 30, 88 (Bankr. D. Del. 2015) (finding valuation of contracts and physical assets' book value was fair), *aff'd*, 698 F. App'x 711 (3d Cir. 2017).[19] The $10 million purchase price was actually 10x the book value of the Subject Collateral, so any concern that the book value understated market value is misplaced in this instance.[20, 21]

391.    The finding that Tilton's book value calculation was fair is bolstered by the fact that she understood the limits of book value as a measure of fair market value. Thus, she also used a check based on projected cash flow. Specifically, Tilton compared the total acquisition price of approximately $22 million against the EBITDA that Tilton and her team projected could be generated by the three NewCo divisions during the balance of 2016. (PFOF ¶¶ 253–65.)

392.    The EBITDA projections that informed Tilton's check were derived from the February 13 NewCo Model and the February 22 NewCo Model, adjusted to account for operating expenses that had been excluded from the models, resulting in a projected EBITDA range of $1.8–$2.75 million. (PFOF ¶¶ 255–263.) When compared against the $22 million "purchase price," the transaction implied a multiple of 8 to 12x. (PFOF ¶ 263.) This multiple range exceeds the multiple Tilton thought generally applied to a healthy company in the industry (7–8x) and further validates that $10 million was a fair price where TransCare "was in a free fall, losing contracts every day," and operating "at the absolute breaking point." (PFOF ¶¶ 116, 194, 264–65.)

---

[19] *See also Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 495 (Del. Ch. 1923) ("book value[] may, however, be in excess of fair market value."); *Havee v. Belk*, 589 F. Supp. 600, 605 (W.D.N.C. 1984) (finding fair price for company lacking liquidity was "about 65% of book value"), *aff'd*, 775 F.2d 1209 (4th Cir. 1985).

[20] To be sure, the book value of the assets included considerable depreciation. But there is no evidence that those values were understated. On the contrary, the record is replete with evidence that TransCare's ambulance fleet was old. (PFOF ¶¶ 118, 99–100 (JX_67, at PP–TRBK0106573).)

[21] A draft of the TSA (JX_95) contained monthly rates that NewCo would charge to OldCo during the wind-down period for the use of certain ambulances, ranging from $525 to $1,700. (*Id.* at PP–TRBK0044011–18.) Those charges do not shed light on whether Tilton's book value calculation of the Subject Collateral was too low. There is no record evidence about the basis for the charges, much less any evidence that Wells Fargo agreed to pay them. Indeed, Wells Fargo was not willing to make *any* payment to NewCo for the use of NewCo assets during the wind-down period. (JX_87.) Thus, it cannot be said that the monthly rates in the draft TSA are probative of the value of the vehicles.

393.     The fairness of the $10 million price is also corroborated by other record evidence. In particular, the offer for the paratransit division in the LOI from National Express was $6 to $7 million (only a portion of which was proposed to be paid at closing) for a business that generated roughly $3.5 to $4 million in EBITDA at the time the LOI was received.  (PFOF ¶¶ 47–51.)  That proposal thus implied a multiple of no more than 1.75x (and likely less given the time value of money)—far less than the 8–12x implied by the Article 9 foreclosure.  (PFOF ¶¶ 263, 328.)[22]

### C.     Tilton Acted in Good Faith in Seeking to Have TransCare Issue WARN Notice

394.     Finally, Tilton also acted in good faith in taking steps to comply with TransCare's obligations under the WARN Acts.

395.     As a subsidiary element of the duty of loyalty, a breach of fiduciary duty may be found when the fiduciary has failed to act in good faith.  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  To succeed on a claim for the breach of the duty of good faith, a plaintiff must demonstrate that a fiduciary either: (1) "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation"; (2) "act[ed] with the intent to violate applicable positive law"; or (3) "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

---

[22] As a general intangible, the MTA Contract was not included in the book value of the three divisions.  (Aug. 14 AM Tr. 26:8–9.)  It was not unfair for Tilton to exclude the value of the MTA Contract from her book-value calculation because it had value only if the Company produced cash flow as a going concern.  *See Geltzer v. Bloom (In re M. Silverman Laces, Inc.)*, 404 B.R. 345, 358 (Bankr. S.D.N.Y. 2009) (rejecting Trustee's theory that intangible asset had value, finding asset's worth "was premised on SL's having a positive going concern value" but it was "clear" that SL "could not have survived as a going concern").  Moreover, the evidence shows that Tilton did value the MTA Contract when cross-checking the book value against the total $22 million "purchase price" (*i.e.*, the $10 million *plus* the $12 million in new working capital to operate Transcendence as a going concern).  (Aug. 14 AM Tr. 26:9–11 ("The MTA contract was not on the balance sheet but the revenues and the income were in the income statement which was also used to value."); *id.* at 27:6–11 ("The value of the [MTA] contract was valued in the value of New Co . . . which was $22 million dollars of capital being put up to buy a little over . . . two million of EBITDA.").)

68

396. Here, the Trustee contends that Tilton "was advised of TransCare's obligations under the WARN Acts . . . and took no steps to comply" with the laws' requirements. (FPTO ¶ 184(c).) In other words, that Tilton acted with "conscious disregard for [her] responsibilities[.]" *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 64 (Del. 2006).

397. A party that bases a breach of fiduciary duty claim on a fiduciary's conscious disregard of her duties bears a heavy burden of proof; the Trustee had to show that Tilton's conduct was "qualitatively more culpable than gross negligence . . . ." *Id.* at 66. Delaware courts describe a conscious disregard of fiduciary duty as equivalent to "adopting a 'we don't care about the risks' attitude." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

398. There was no evidence presented at trial to support a finding that Tilton adopted a "we don't care about the risks attitude." Instead, the testimony and documents presented show the opposite: Tilton designed and negotiated an orderly wind-down of the OldCo business lines over the course of 90 days in an effort to *ensure* compliance with the WARN Acts. (PFOF ¶¶ 175, 182.) The "Progress and Action list" Tilton's team developed provided for the timely issuance of WARN notices to OldCo employees. (PX_206, at PP–TRBK0091293.) Tilton also discussed the issue with representatives of Wells Fargo in connection with the parties' negotiations. (PFOF ¶ 182.) Although TransCare was ultimately unable to issue WARN notices to all OldCo employees as planned due to the sudden halt in TransCare's operations, Tilton took active steps to *avoid* the risks to TransCare of potential liability under the WARN Acts. Thus, the Trustee failed to meet his burden that Tilton knowingly failed to take steps to comply with the WARN Acts.[23]

---

[23] The Trustee similarly failed to prove that Tilton was advised of TransCare's obligations under federal/state payroll tax laws and adopted an "I don't care about the risks attitude."

### XVI. The Trustee Failed to Prove Damages for the Fiduciary Duty Claim[24]

399. Although Tilton is not liable for breach of fiduciary duty, even if such a breach had been proven the Trustee failed to prove damages. Courts will not award a "meaningful remedy" unless the plaintiff shows (1) "that a sufficiently convincing causal linkage exists between the breach of duty and the remedy sought," and (2) "harm to the beneficiary[.]" *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018).

400. "It is well settled that a plaintiff alleging a breach of fiduciary duty claim must prove its damages by a preponderance of the evidence." *In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018). A finding of breach does not guarantee a monetary remedy. *OptimisCorp v. Waite*, 2015 WL 5147038, at *73 (Del. Ch. Aug. 26, 2015) ("Having found that breach [of loyalty], however, I am not convinced that it warrants a monetary or equitable remedy."), *aff'd*, 137 A.3d 970 (Del. 2016); *Cline v. Grelock*, 2010 WL 761142, at *2 n.11 (Del. Ch. Mar. 2, 2010) (stating that one may "expect that a self-interested breach of fiduciary duty . . . should be remedied by damages," but "the Court has not been provided any basis for a rational award of damages.").

401. Moreover, a Plaintiff is not entitled to damages if he offers only speculative damages calculations. *OptimisCorp*, 2015 WL 5147038, at *81. Although Delaware law allows courts to sometimes "loosen normally stringent requirements of causation and damages," *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (citation omitted), the Court "cannot award damages that are based on mere speculation or conjecture . . . ." *In re HH Liquidation, LLC*, 590 B.R. at 273. While a damage award does not require "mathematical certainty," the difference

---

[24] For the reasons discussed *infra*, the Court concludes that the Trustee failed to prove his claim for actual fraudulent transfer (Count VII). (*See* Section XVIII, *infra*.) Even if the Trustee had established the necessary elements of the claim, he would not be entitled to damages because the conclusions herein apply equally to Count VII.

between a speculative and a sufficient showing of damage is whether the court "has a basis to make a responsible estimate of damages." *Reis*, 28 A.3d at 466. *See also Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *12–13 (Del. Ch. Oct. 10, 2014) (distinguishing reasonable estimate from speculation and awarding only nominal damages). In the absence of such a basis, an award of damage is, "as a matter of law, improper." *Ravenswood Inv. Co v. Estate of Winmill*, 2018 WL 1410860, at *20 (Del. Ch. Mar. 21, 2018).[25]

### A.      The Trustee Failed to Prove Causation

402.      In order to obtain a monetary remedy against Tilton, the Trustee had to show that Tilton's alleged breach of fiduciary duty actually caused the alleged damage. *See Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 n.9 (D. Del. 2004) (citation omitted) (stating director may suffer "monetary damages for any harm he causes"); *Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Park Cap. Advisors, LLC (In re Katy Indus., Inc.)*, 590 B.R. 628, 639 (Bankr. D. Del. 2018) (dismissing fiduciary duty of loyalty claim for failure to allege causation of harm).

403.      Here, evidence of causation is lacking because although the Trustee seeks "damages equal to the lost going concern value" of TransCare (FPTO ¶ 184(b)(iv), 72 ¶ 1(a)), he failed to prove that TransCare would have had any going-concern value but for the challenged transaction. As discussed at length *supra*, in January and February 2016 TransCare was "operating

---

[25] Although fiduciary duty and appraisal claims under Delaware law overlap in many ways, a key difference arises for damages calculations. In an appraisal case, neither party has the burden of proof, so the court may disagree with both parties' valuations and pick an amount as it sees fit. *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) ("When . . . none of the parties establishes a value that is persuasive, the Court must make a determination based upon its own analysis."). In a fiduciary duty case, however, if the plaintiff fails to meet his burden of proof of damages, the plaintiff is not entitled to compensatory damages. *Ravenswood Inv. Co.*, 2018 WL 1410860, at *2 (although court had broad discretion to fashion a remedy "it cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking."). Here, because, the Trustee failed to prove a reasonable damage award, the Court may not propose its own award.

at an absolute breaking point" and could not continue without an immediate new money infusion. (PFOF ¶ 116; *see also id.* ¶¶ 110–38.)  Moreover, all of the Plans upon which Arnold's calculations are based, including the February 24 Plan, required a significant infusion of new money.  (PFOF ¶¶ 102, 123–24, 133, 202–04.)  But neither Tilton nor any other party had an obligation, or had agreed, to provide such a life-saving infusion and there is no evidence there would have been one but for the Article 9 foreclosure.  Thus the Trustee failed to prove that any lost going-concern value was caused by the foreclosure.  *See In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *51 (finding disloyal conduct caused no harm and refusing to conclude that such conduct, "when the Company's equity was worth nothing[,] should now be remedied by an award of damages in the tens (or hundreds) of millions of dollars"; "In other words, but for the [challenged transaction], there is little evidence to suggest the Company would have been worth any amount approaching what the Plaintiffs seek in damages").

404.  Arnold testified that a hypothetical market participant (*i.e.*, someone with a shovel looking to buy a silver mine) could have reviewed the Plans and found value.  (July 24 PM Tr. 40:3–13.)  This analogy is misguided.  Unlike a silver mine, which has inherent value based on untapped reserves whether it is operating or not, TransCare only had more than liquidation value if it operated.  But at the time of the Plans, TransCare was on the brink of being shut.  Thus, not only would a market participant have had to purchase TransCare's assets, it would also have had to infuse, on an emergency basis, millions in fresh capital just to have the option of continuing the business as a going concern.[26]

---

[26] TransCare's assets could not be sold free and clear without the agreement of both Wells Fargo and the Term Loan Lenders to release their liens.  (PFOF ¶¶ 24–25, 32.)  Thus, if the total purchase price was less than the full amount of the secured debt (approximately $58 million), one or more of the Term Loan Lenders could veto the sale.  (PFOF ¶¶ 62, 209 (PX_209, at PP–TRBK0019089 ("Sheet 2" Tab, Rows 1–2).)  (This is in contrast to the Article 9 foreclosure, which Tilton, by virtue of her then control over the Required Lenders, could effectuate without the consent of all the

405.    Moreover, those interested in a silver mine would presumably be able to make an informed decision as to whether it would be prudent to make the capital investment for the necessary "shovel" based on technical reports or other objective assessments of the likely value of the silver reserves and the cost of extracting them.  The Plans and their projections were, in contrast, subjective assessments that contained numerous risky assumptions.

### B.    Arnold's Calculations are Irrelevant and Unduly Speculative

406.    Even if the Trustee had proved causation, Arnold's calculations would not be entitled to any weight, thereby leaving the Trustee without any proof to support a damage award.

### Arnold Failed to Provide a Fair Market Valuation

407.    Arnold's "valuations" are not entitled to any weight because they are not *his* (or anyone else's) valuations of TransCare's (or NewCo's) fair market value.  During trial, Arnold admitted "***I'm not putting my own value on TransCare***."  (PFOF ¶ 289 (July 24 Tr. 106:15–107:1 (emphasis added).)  Rather, Arnold provided a "range for value of TransCare *given what the people within Patriarch were doing in January and February"* 2016.  (*Id.* (emphasis added).)  However, an opinion about what "people within Patriarch" believed TransCare could generate in future EBITDA is not the same thing as what price TransCare would have fetched in the market but for the Article 9 foreclosure.  The only relevant question is the latter one, *see William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) (affirming damages analysis based on "value at which the property would likely have sold as a result of a fair bidding process in the open market"), ***but Arnold explicitly offered no opinion on it***.  That renders his calculations legally meaningless.  *See Gen. Motors Corp. v. New Castle Cty.*, 2000 WL 33113802, at *6 (Del. Super. Ct. Dec. 16, 2000)

Term Loan Lenders.)  Although it is possible that Credit Suisse would have consented to release its liens for no consideration, that is hardly a certainty and was not likely to happen overnight (thus requiring someone to make an emergency capital infusion to keep the doors open while Credit Suisse assessed the situation).

(finding "[expert] obviously did not consider how the property would have [fared] in an arms-length sale between a willing buyer and willing seller, which is the proper standard for fair market value" and instead considered only GM's "subjective" view of the property).[27]

408.    Perhaps because the "valuations" were not Arnold's own, he testified that he was "not require[d] . . . to do a deep dive" into the inputs that went into any of the projections upon which the values he calculated were based.  (PFOF ¶¶ 288–90.)  As Arnold admitted, counsel for the Trustee provided him with the Plans containing the projections, the Greenberg email containing the market multiples, and the Valuation Dates; and Arnold never assessed, and does not know, whether those inputs were reasonable.  (PFOF ¶¶ 282, 291.)  That falls well below the mark for an expert.  *See MDG Int'l, Inc. v. Australian Gold, Inc.*, 2009 WL 1916728, at *4–5 (S.D. Ind. June 29, 2009) (stating "An expert must independently verify facts given to him, rather than 'accepting [them] at the word of . . . counsel'" in case where expert relied "on assumed 'facts' that he never verified" and "did not independently review any of the key data underlying his valuation"); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546–47 (D.N.J. 2004) (finding expert relied on counsel's "highly filtered version of events").[28]

409.    Nor, as he admitted, did Arnold form an opinion about whether the projections themselves were reasonable.  (PFOF ¶¶ 291, 301.)[29]  It almost goes without saying that "methods

---

[27] *See also Kohler Co. v. United States,* 387 F. Supp. 2d 921, 926 (E.D. Wis. 2005) ("Implicit in 'fair market' value is objectivity, not the subjective value attributed by individual parties."), *aff'd*, 468 F.3d 1032 (7th Cir. 2006); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) (making same point); *Rivera v. Mendez & Compania*, 988 F. Supp. 2d 174, 178 (D.P.R. 2013) (explaining difference between "subjective willingness or valuations of the parties" and "the objective fair market value . . . .")

[28] *MDG* and *Crowley* involve questions of admissibility under *Daubert* instead of weight.  Nonetheless, if expert opinion is so unreliable that it must be excluded, the same testimony would necessarily be granted no weight at trial.

[29] To illustrate how unusual it is for an expert to admit that he did not assess the reasonableness of the data on which he relied, the Court is aware of no written opinion that even discusses such a circumstance let alone explains why expert testimony of that type could be proper.

of valuation" are "only as good as the inputs to the model. . . . So the relevant question is . . . how correct was the input or datum that produced the answer." *Neal v. Alabama By–Prods. Corp.*, 1990 WL 109243, at *9 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991). In consequence, the Court cannot rely on Arnold's "value" opinions to award damages with a "reasonable degree of precision." *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004).

410. Arnold responded that he did not have to evaluate the Plans or their projections because the people preparing them must have believed they were accurate and they were closest to the facts. (PFOF ¶ 290.) However, the record shows that neither Tilton nor Wells Fargo ever approved any of the WholeCo Plans. (*See* PFOF ¶¶ 104–05, 131, 134–135.) And Tilton was clear that even the February 24 Plan involved substantial risk. (*See* PFOF ¶¶ 299, 302.)

411. In this regard, the projections at issue were not—as is often the case in valuation disputes—regular management projections created in the ordinary course of business. On the contrary, all of the projections in the Plans assumed a substantial restructuring of TransCare's business and were not prepared for the purpose of facilitating normal business planning. (PFOF ¶¶ 103, 121, 130, 132, 201–03.) Delaware courts have repeatedly rejected expert testimony based on management projections where, as here, they were prepared outside the ordinary course of business. *In re PetSmart, Inc.*, 2017 WL 2303599, at *33-34 (Del. Ch. May 26, 2017) (rejecting management projections as unreliable because they were "not created in the ordinary course of business" but rather "specifically to aid PetSmart in its pursuit of strategic alternatives"). Moreover, although TransCare management was involved, the projections Arnold relied on were not actually prepared by management; rather, the Plans and the projections in them were prepared by Patriarch Partners and PPMG personnel or CMAG. (PFOF ¶¶ 100, 115, 132, 201.)

412.     Moreover, as Dunn persuasively explained, projections are not valuations.  (*See* PFOF ¶¶ 306–09.)  Projections propose what a company could achieve if certain assumptions are realized.  (PFOF ¶ 307.)  A valuation, on the other hand, assesses the risk that the assumptions will occur (*e.g.*, is it impossible, conceivable, reasonable, likely?) and places a dollar value on that risk.  (PFOF ¶¶ 308–09.)  Such an assessment is where the specialized judgment of a skilled valuation professional comes in.  To perform the assessment correctly, the expert must get his or her "hands deep in the dough of the projections used in the . . . valuation report."  *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *20 (Del. Ch. July 18, 2012) (crediting opinion of expert who "had his hands deep in the dough of the projections used in the fairness opinion and then in his valuation report").  Arnold, however, got his hands nowhere near the dough; he did no risk assessment whatsoever.  (*See* PFOF ¶¶ 291, 301.)

**In Any Case, Arnold's Calculations Are Unduly Speculative**

413.     For related reasons, even if Arnold's calculations could be viewed as actual valuations of TransCare (or NewCo) and he had opined on the reasonableness of the projections on which the calculations were based (as just explained, he did not), his opinions are still unduly speculative and should be given no weight for that reason.  *See Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *7 (Del. Ch. May 20, 2004)  (granting expert's valuation no weight because "the record clearly shows that, in the absence of reasonably reliable contemporaneous projections, the degree of speculation and uncertainty characterizing the future prospects" of the subject company give the analysis "marginal utility").

*Projected EBITDA*

414.     In each of the Plans, the projected EBITDA for 2016 was, as Tilton described the projections in the February 24 Plan, a "hockey stick projection" (PFOF ¶ 203; *see also* PX_283,

at 8 (containing chart of projections)), meaning that, graphically, the sudden and dramatic uptick in profits resembled the shape of a hockey stick blade. The Trustee presented no evidence that the projected near-term explosions of profit depicted in the Plans were likely to occur, particularly when viewed against TransCare's dismal performance over the immediately preceding years. *See OptimisCorp*, 2015 WL 5147038, at *81 (finding projections speculative because prior projections were not "remotely in the ballpark" and "egregiously overstated future performance"); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *10 (Del. Ch. Nov. 1, 2013) (finding expert's use of "projections based on a $20 million increase in [television show's] revenue leads to a speculative DCF valuation" where projected increase depended on outcome of future negotiation).

415.     The January 7 Preliminary Plan, for example, projected compound annual revenue growth of 14.3% despite declining revenue over the prior two years.     (PX_158, at CM_TC2018_0003370.)     Notably, CMAG determined that the January 7 Preliminary Plan's EBITDA numbers were "significantly overstated[.]"     (PFOF ¶ 112.)     Similarly, the CMAG Executive Summary predicted an EBITDA increase to $5 million in one year (a 257% increase in 2016 over the actual $1.4 million EBITDA in 2015), the Greenberg January 28 Email predicted a single-year EBITDA increase to $5.2 million (a 271% increase), and the February 24 Plan projected EBITDA of $3.2 million for NewCo alone (a 128% increase over actual 2015 WholeCo EBITDA).[30] These dramatic near-term spikes in profitability also ignored TransCare's failure to achieve its prior turnaround plans. (PFOF ¶ 41.)

416.     The authors of the Plans were appropriately cautious about them.  (*See, e.g.*, PFOF ¶¶ 300, 302.)  As noted, CMAG rejected the EBITDA projection in the January 7 Preliminary Plan

---

[30] (*See* PX_158, at CM_TC2018_0003370 (showing EBITDA for 2015); PX_175, at CM_TC2018_0002123; PX_179, at PP–TRBK0013260; DX_166, at PP–TRBK0110489.)

as artificially high and warned Tilton that the projection in the CMAG Executive Summary had a high level of execution risk that made return on investment uncertain. (PFOF ¶¶ 112, 126–27.) Greenberg also expressed concerns with the CMAG Executive Summary. (PFOF ¶ 141.) And, as discussed, Tilton similarly considered the February 24 Plan's projections "hockey stick projections" that had considerable risk. (PFOF ¶¶ 203, 299, 302.)

417.    Arnold's value opinions thus improperly ignored the many issues that cast doubt on TransCare or NewCo's ability to achieve the projections in the Plans. *See Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *14 (Del. Ch. Apr. 25, 2005) (calling a valuation analysis a "Fantasy Island approach" because it failed "to consider the actual circumstances facing [the subject company] as of the merger date"); *Huff Fund*, 2013 WL 5878807, at *10 ("Simply ignoring . . . fundamental uncertainty does not make it disappear.").

*EBITDA Multiples*

418.    Even if the Trustee had proven that Arnold's reliance on the projections in the Plans was not unduly speculative, his calculations would still be too speculative because of the EBITDA multiples he used. That is because Arnold took multiples derived from guideline companies and precedent transactions identified by Greenberg in a single email without "adjusting [them] to account for the differences from the company being valued and the comparables . . . ." *Agranoff v. Miller,* 791 A.2d 880, 892 (Del. Ch. 2001). A credible analysis must evaluate the comparable risk and reflect it in a multiple that "would be accepted by a disinterested mind." *Orchard Enters.*, 2012 WL 2923305, at *10; *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *31 (Del. Ch. Feb. 22, 1988) (finding "sufficient uncertainty" in comparable company approach because the guideline company's "business risks and earnings results . . . were unrelated to the risks of the [subject company]"), *aff'd*, 564 A.2d 1137 (Del. 1989).

419. Arnold applied market multiples for Envision and Air Methods, two thriving, multi-billion dollar companies that engaged in ground-based medical transportation only partially or not at all, to TransCare, a ground-based ambulance company that was in deep financial distress. (PFOF ¶¶ 321–24.) Arnold's failure to consider the differences in actual circumstances and business segments renders the multiples from his comparable companies and precedent transactions unreliable as applied to TransCare.[31] Indeed, courts have given no weight to expert valuations that failed to account for such differences. *See Doft & Co.*, 2004 WL 1152338, at *9 (rejecting comparable company analysis as "unduly optimistic" because the expert's analysis "is too speculative when compared to the clear evidence in the record that [the subject company] still faced significant challenges" compared to its comparator company); *Reis*, 28 A.3d at 477 (rejecting expert's comparable companies analysis because "[t]he selected companies have stable earnings and have achieved consistent growth over the past five years. During the same period, [the subject company's] earnings have been erratic, and the company has suffered losses. I lack sufficient confidence in the comparability of the selected companies to use the comparable company method, even with adjustments to reflect their differences from [the subject company].").

420. Arnold testified that other record evidence verified his use of the multiples of *healthy* companies. The Court disagrees. He relied, for example, on the testimony of Tilton and Greenberg concerning industry multiples; however, they merely testified to multiples that *could* apply to TransCare *if it were a healthy company*, not to TransCare as it stood in January and February 2016. (PFOF ¶¶ 254, 264; *see also* July 22 AM Tr. 52:2–11 (noting the EBITDA averages of certain *healthy* companies).)

---

[31] This was not cured by his rebuttal testimony because, as Arnold admitted, he was not opining that *any* of the additional companies he looked at were actually appropriate comparables for TransCare. (PFOF ¶¶ 338–40.)

421.     Nor do the so-called indications of interest in 2015 support Arnold's EBITDA multiples.  First, with the exception of the National Express LOI, these inquiries were at best informal and, in the case of RCA, based on a serious misimpression of TransCare's earnings.  (PFOF ¶¶ 53–55.)  What's more, although Leland noted that RCA was purportedly using an 8x multiple for valuations, he also reported that this multiple was "high for the industry."  (PFOF ¶ 54.)  *A company on the brink of liquidation was not likely to command a multiple TransCare's CEO already acknowledged was high*.

422.     Second, as previously discussed, the National Express LOI offered $6 to $7 million (to be paid out over time) for the paratransit division, which produced $3.5 to $4 million EBITDA at the time—in other words, the LOI implied a multiple of 1.7x to 1.75x (at most), several factors lower than the multiples Arnold used in his calculations.  Indeed, the multiple implied by the LOI is arguably the most probative evidence of the appropriate EBITDA multiple to apply to TransCare (or at least NewCo) since it reflected actual market evidence for TransCare itself.

423.     Finally, the Trustee failed to demonstrate why it would be proper to rely on the use of a multiple at all.  As Dunn explained, because the market multiple's purpose is to value years-ahead cash flow, it applies only if the business being valued will continue to generate cash flow.  (PFOF ¶ 328.)  Conversely, it is inappropriate to apply any multiple to a business that, like TransCare, was at serious risk of not continuing as a going concern on the valuation date and could not do so absent a substantial infusion of new cash that no one was obligated to provide.

### *Arnold's Wildly Overbroad Ranges*

424.     Further illustrating the speculative nature of Arnold's calculations is the breadth of the value ranges he offered.

425. In particular, Arnold calculated the supposed difference between his WholeCo "operating value" and WholeCo's liquidation value at $16.1 million at the low end and $67.3 million at the high end. (PX_282, at Exhibit 14.) Thus, his high end calculation is ***more than four times that*** of his low end calculation.

426. Likewise, Arnold calculated the supposed difference between his NewCo "operating value" and NewCo's liquidation value at $17.0 million at the low end and $33.4 million at the high end (nearly twice the amount of his low end number). (*Id.*)

427. Arnold offered no opinion as to what point in these broad ranges was the most reliable or accurate, leaving it to the Court to guess or pick a number at random.

428. Such calculations are far too speculative to form the basis of a damage award. *See Lake Treasure*, 2014 WL 5192179, at *12 (finding that "plaintiffs failed to provide a basis for a responsible estimate of damages" where expert's "wide range of potential results provides little guidance, essentially inviting the court to pick a number between $2.3 million and $29 million").

**XVII. Equitable Subordination of the Claims of PPAS and Ark II Is Not Appropriate**

429. The Trustee also seeks to have the Court reorder the priorities of PPAS and Ark II through equitable subordination. (FPTO ¶ 186.) The Trustee failed to prove this claim.

430. "Equitable subordination is an extraordinary remedy that is to be used sparingly." *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009). "The goal of the doctrine is not to punish the offending creditor for the wrongful conduct, but rather, is to offset the harm done to other creditors. The doctrine is remedial and not penal." *MidAtlantic Nat'l Bank N., N.A. v. Borg–Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 650 (Bankr. D. Vt. 1990).

431.     Courts apply the three-pronged test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977) to analyze equitable subordination claims: (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is consistent with bankruptcy law. *Id.* at 700.

432.     Although the Trustee has put forth numerous theories, the only asserted basis remaining for the Court's consideration is that "[t]he Transcendence transaction consummated by PPAS [and] Ark II . . . amounted to inequitable conduct towards TransCare and its creditors." (FPTO ¶ 186(b).)[32]  The Court has already concluded that the OldCo/NewCo Restructuring was the product of fair dealing and was at a fair price—in other words, that the transaction itself was fair.  (*See supra* Section XV.B.)  It is axiomatic that the purported conduct of PPAS and Ark II in respect of an equitable transaction cannot support equitable subordination.[33]

433.     The Trustee's claim for equitable subordination also fails for other reasons.  As to PPAS, it is not "inequitable" for a creditor to enforce its contractual rights under loan documents upon an event of default, particularly where the creditor does not take actions beyond the scope of its authority under those documents.  *See, e.g.*, *Obuchowski v. Poulin Grain, Inc. (In re Stevens)*, 2000 WL 35723732, at *11 (Bankr. D. Vt. Oct. 24, 2000).

434.     Here, TransCare was in default on its obligations under the TLA.  (PFOF ¶ 217 (JX_96, at PP–TRBK0043311).)  The TLA expressly authorized PPAS to take action to realize

---

[32] The Trustee also contended that equitable subordination was warranted due to Defendants' "inequitable conduct in attempting to secure TransCare's assets for Transcendence."  (FPTO ¶ 186(f) (seeking equitable subordination for violation of the automatic stay).)  Because the Court has dismissed the Trustee's claim for alleged violation of the automatic stay (Dkt. No. 131), it follows that this alleged conduct cannot support equitable subordination.

[33] Although the Court's conclusion is a proposed one (pursuant to 28 U.S.C. § 157(c)) with respect to the Trustee's fiduciary duty claim, it can support the entry of final judgment with respect to the equitable subordination claim.

upon the Subject Collateral upon an Event of Default. (PFOF ¶¶ 27–28.) PPAS, as administrative agent, took the following actions (and *only* the following actions) in connection with the OldCo/NewCo Restructuring: (i) executed and issued the Notice of Default; (ii) executed and issued the Notice of Acceptance to TransCare; and (iii) entered into the Bill of Sale. (PFOF ¶¶ 216–18, 226.) As such, PPAS acted within the scope of its authority.

435. As to Ark II, the Trustee contends that the Ark II Credit Agreement was "illusory" and executed for the purpose of "ensur[ing] that [Tilton] would own the assets transferred to [Transcendence]." (*See, e.g.*, Am. Compl. ¶¶ 77, 85.) As a threshold matter, the Trustee lacks prudential standing to seek equitable subordination in respect of the Ark II Credit Agreement, including in respect of PPAS's agreement to payment and structural subordination to Ark II. *See, e.g.*, *Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*, 2015 WL 5766761, at *16 (Bankr. D. Utah Sept. 30, 2015). Prudential standing is a "threshold determinant[] of the propriety of judicial intervention," *Warth v. Seldin*, 422 U.S. 490, 518 (1975), and places a limit "on the exercise of federal jurisdiction." *Allen v. Wright,* 468 U.S. 737, 751 (1984). The party invoking federal jurisdiction bears the burden of demonstrating prudential standing. *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (Bernstein, J.). To establish prudential standing, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *In re Quigley Co.*, 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008) (quoting *Warth*, 422 U.S. at 499).

436. Courts considering standing in the context of equitable subordination claims have determined that a claim belongs solely to an individual creditor where the harm suffered was "particularized." *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 549 B.R. 21, 42

(S.D.N.Y. 2016) ("[A] claim belongs to individual creditors—and not to a debtor's trustee—when the harm suffered was particularized to those creditors, rather than to all creditors as a whole[.]").

437.     Here, the allegation of inequitable conduct is premised on the contention that the Term Loan Lenders suffered an injury when Ark II primed them.  Because this is a particularized injury (*i.e.*, to, allegedly, the Term Loan Lenders and *only* the Term Loan Lenders), the Trustee lacks standing to assert a claim.  *See, e.g.*, *DigitalBridge*, 2015 WL 5766761, at *16 (emphasis added) (explaining that while "a trustee [could] bring a general equitable subordination claim on behalf of the estate as a whole, and individual creditors can assert equitable subordination claims if they allege particularized injury, *a trustee cannot assert an equitable subordination claim on behalf of individual creditors.*").

438.     Moreover, even assuming the Trustee had prudential standing, for the reasons discussed *infra* (at Section XIX), the Ark II Credit Agreement was not illusory and was not executed to help Tilton with the OldCo/NewCo Restructuring.

## XVIII. The Trustee Failed to Establish That an Actual Fraudulent Transfer Occurred

439.     The Trustee's actual fraudulent transfer claim is based on the Article 9 foreclosure and the subsequent transfer of the Subject Collateral from PPAS to Transcendence.  (FPTO ¶ 185.) The Trustee has failed to adduce a shred of evidence of actual fraud.

440.     To avoid a transaction under section 276 of New York's Debtor and Creditor Law ("DCL") or Section 548 of the Bankruptcy Code, a plaintiff must show that the challenged transfer was made with actual intent to hinder, delay or defraud creditors.  DCL § 276; 11 U.S.C. § 548(a)(1)(A).  The burden of proving actual intent is on the plaintiff.  *Sharp Int'l Corp. v. State St.*

*Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). Courts often rely on circumstantial evidence, or "badges of fraud," to infer the debtor's fraudulent intent. *Id.*[34]

441. The Trustee presented two facts that could rise to a "badge of fraud"—*i.e.*, that the transfer of assets was made to an insider and that TransCare was insolvent at the time of the transfer—which were readily admitted. Notably, the Trustee did not prove that the Article 9 foreclosure was conducted in secrecy. (*See* Section XV.B, *supra*.) The evidence showed the polar opposite: Wells Fargo, CMAG, TransCare, Patriarch Partners and PPMG personnel were aware of and participated in the development of the OldCo/NewCo Restructuring. (*See* PFOF ¶¶ 180–86.)

442. Furthermore, for the reasons discussed above, the Trustee did not prove that TransCare received less than fair value for what it transferred. (*See* Section XV.B, *supra*.)

443. Finally, the overwhelming evidence presented at trial showed that in the weeks leading up to the Article 9 foreclosure, Tilton acted with honest intention in a good faith attempt to save as many TransCare jobs as possible, maximize the value of OldCo's assets and get TransCare's senior lender paid. (PFOF ¶¶ 172–78.)

## XIX. The Security Interest Granted to Ark II is Valid

444. The Trustee "asserts three claims in the alternative seeking to avoid the security interest granted to Ark II by TransCare in connection with the Ark II Credit Agreement." (FPTO ¶ 187(a).) At trial, he did not meet his burden on any of them.

---

[34] The "badges of fraud" include: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).

## A. The Funds Advanced to TransCare Pursuant to the Ark II Credit Agreement Were Not Capital Contributions

445.     In Count IV of his Amended Complaint, the Trustee seeks to recharacterize as equity the funds lent by Ark II to TransCare.  (*Id.* ¶ 187(b).)  "Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*."  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) (citation omitted), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).  "In contrast to equitable subordination, 'recharacterization claims turn on *whether a debt actually exists*—not on whether the claim should be equitably subordinated or disallowed.'"  *BH S&B Holdings LLC*, 420 B.R. at 157 (emphasis added) (citation omitted).

446.     Courts within this District have adopted the eleven-factor test utilized by the Sixth Circuit in *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001) (known as the "*AutoStyle* factors") to analyze recharacterization claims.  *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 93 (Bankr. S.D.N.Y. 2016).[35]  Courts in this District also look to other "indicia of intent" to determine whether recharacterization is warranted, including looking at "what [the parties] do through their actions, and . . . [t]he economic reality of the surrounding circumstances."  *Id.* at 101 (citation omitted).  The Trustee has the burden of demonstrating that recharacterization is appropriate by "establish[ing] the vast majority of the *AutoStyle* factors[.]"  *See In re Aéropostale, Inc.*, 555 B.R. 369, 421 (Bankr. S.D.N.Y. 2016).

---

[35] These factors are (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any, for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.  *Lyondell*, 544 B.R. at 93–94.

447. At trial, the Trustee presented evidence sufficient to establish only two of the eleven *AutoStyle* factors: undercapitalization (Factor 5) and the corporation's ability to obtain outside financing (Factor 8). With respect to the former, courts have cautioned that this factor should be given modest weight because "all companies in bankruptcy are in some sense undercapitalized." *BH S&B Holdings*, 420 B.R. at 159. The evidence showed that the advances to TransCare were made for critical insurance payments to keep its doors open and, it was hoped, eventually stabilize the Company. (PFOF ¶¶ 143–45, 147, 151–52.) On these facts, it is "inappropriate to penalize [Ark II] for lending to a distressed company." *Aéropostale, Inc.*, 555 B.R. at 422.

448. As to the latter, the evidence shows that "a reasonable outside creditor would [not] have made a loan to the debtor on similar terms." *Lyondell*, 544 B.R. at 99 (citation omitted). However, this factor is entitled to only modest weight because as an investment vehicle of the controlling equity holder in TransCare (*see* Stipulation No. 8), Ark II was, at least in part, "looking to protect" Tilton's investment in the Company. *Id.* ("[W]hen existing [equity holders] make loans to a distressed company, they are trying to protect their [investment] and traditional factors that lenders consider . . . do not apply as they would when lending to a financially healthy company." (quoting *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006)).

449. By contrast, there was substantial evidence that Ark II intended the advances to be debt. The funds advanced by Ark II were documented as loans under the Ark II Credit Agreement (Factor 1) (PFOF ¶ 160 (JX_79, at PP–TRBK0048967)), which set the maturity date for repayment (Factor 2) (*id.* at PP–TRBK0048973), and contained provisions regarding the rate of interest, the calculation of interest and a schedule for interest payments (Factor 3) (*id.* at PP–TRBK0048977–78, § 2.4). Moreover, the Ark II Security Agreement granted Ark II a blanket security interest in TransCare's assets (Factor 7) (*id*. at PP–TRBK0049020–21, §§ 2.1–2.2), which had priority over

the interests of the Term Loan Lenders under the Ark II Intercreditor Agreement (Factor 9). (*Id.* at PP–TRBK0049004–05, § 2.) The advances were used "to meet the daily operating needs of the corporation"—critical insurance payments to sustain operations—not for the purchase of capital assets (Factor 10). *Lyondell*, 544 B.R. at 100 (citation omitted); (PFOF ¶¶ 143–45, 151–52).[36]

450.    The delay in executing the Ark II loan documents does not compel a different conclusion. *In re Micro–Precision Techs., Inc.*, 303 B.R. 238, 247 (Bankr. D.N.H. 2003) (declining to recharacterize loan as equity contribution, although "[t]he principals admitted that . . . when funds were loaned, the loan was not documented" where testimony was consistent that, "from the outset of the transaction," the funds were considered to be a loan). As detailed in the next paragraph, the evidence shows that Tilton intended the funding to be made on a secured basis pursuant to a binding loan agreement. (PFOF ¶¶ 145–50, 153–56.) Moreover, the delay was only a matter of weeks. (PFOF ¶¶ 145, 152, 157, 160.) *Compare In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 916 (Bankr. E.D. Va. 1997) (finding unexplained *seven month* delay in creating and delivering promissory notes "casts doubt upon the actual intent of the parties at the time of the transaction"). Notably, the delay was reflective of the chaotic freefall in which TransCare was operating in January and February 2016. (PFOF ¶¶ 110–20, 125–130, 136–39.) Indeed, the Ark II loan documents were not the only ones TransCare was delayed in executing: as of February 12, 2016, direction letters documenting the December 8, January 5, and January 7 advances from the Zohar Funds to TransCare also had not been executed. (*See* PX_203, at PP–TRBK0092128.)

---

[36] Factor 11 (the presence or absence of a sinking fund to provide repayments) is "irrelevant" to the recharacterization analysis where, as here, the advances were "secured by liens over substantially all of the Debtors' assets." *Aéropostale, Inc.*, 555 B.R. at 422–23; (PFOF ¶ 160 (JX_79, at PP–TRBK0049020–21, §§ 2.1–2.2).). Factor 6 (identity of interest between the creditor and stockholder) is also largely inapplicable because the advances in question were made by a single lender, as opposed to a situation "when several stockholders extend the funds, and one can measure the proportion of the contribution of each against the stock ownership of each." *Lyondell*, 544 B.R. at 98.

451.     Beyond the Trustee's failure to establish a majority of the *AutoStyle* factors, an examination of other "indicia of intent" confirms that Ark II and TransCare intended for the advances to be made pursuant to a new credit facility between Ark II and TransCare, including without limitation: (i) Tilton's testimony that on January 15, the same day the initial advance was made, she had asked her team to "put a new credit facility together for this agreement"; (ii) on or before January 27, copies of the loan documents for the new facility had been drafted and sent to Tilton; (iii) as of January 29, Tilton continued to emphasize the need to have in place "credit agreements under which [Ark II] would have a first priority lien and be documented properly"; and (iv) on that same day, Ark II filed separate UCC–1 financing statements. (PFOF ¶¶ 146, 148–50, 152–57.) At trial, Tilton reinforced that the loan documentation was important to her because it was "the only basis that [she] was willing to put in new money in a company that could end up in liquidation days later." (PFOF ¶ 156 (Aug. 13 PM Tr. 6:7–10); *see also* July 22 AM Tr. 89:2–7 (confirming that Tilton intended the January 15 funding to "have a certain priority.").)

### B.     The Security Interest Granted to Ark II is Not Avoidable as a Preference

452.     The Trustee also seeks to avoid Ark II's security interest as a preference pursuant to § 547(b) of the Bankruptcy Code (FPTO ¶ 187(d)), which authorizes a trustee:

> to avoid a transfer made to or for the benefit of a creditor for or on account of an antecedent debt if the transfer occurred within 90 days of the date of the bankruptcy filing, on the date of the transfer the debtor was insolvent or became insolvent as a result thereof, and the creditor received more on account of such transfer than it would have received in a Chapter 7 liquidation.

*Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.)*, 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004) (citing 11 U.S.C. § 547(b)). The Trustee has the burden of proving each element by a preponderance of the evidence. *Weisfelner v. Blavatnik (In re Lyondell Chem.*

*Co.)*, 567 B.R. 55, 118 (Bankr. S.D.N.Y. 2017). The Trustee has failed to meet this burden because the security interest TransCare granted to Ark II was not on account of an antecedent debt.

453. Section 547(e) of the Bankruptcy Code defines "when a transfer is made," in part to determine "whether or not [a] transfer was on account of an antecedent debt as required in § 547(b)(2)." *Roost v. Toyota Motor Credit Corp. (In re Moon)*, 262 B.R. 97, 102 (Bankr. D. Or. 2001). Pursuant to § 547(e)(2)(A), a transfer is made: "(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time . . . ." 11 U.S.C. § 547(e)(2)(A). If perfection occurs within this 30-day window, then the transfer is not "on account of an antecedent debt" for purposes of § 547(b)(2). *See Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.)*, 104 B.R. 401, 403 (Bankr. D. Utah 1989). Instead, "if perfection of a security interest occurs within ten days [now 30 days] of the incurrence of indebtedness, perfection relates back to the time of the indebtedness." *Id.*

454. The evidence shows that Ark II perfected its security interest in TransCare's assets within the 30-day safe harbor. The sequencing of events is as follows: on January 15 and January 29, respectively, Ark II advanced funds to TransCare that were intended to be, and were, a part of the Ark II facility of up to $6.5 million. (PFOF ¶¶ 145–50, 152–56.) On January 29, Ark II filed UCC–1 financing statements for TransCare and its subsidiaries. (PFOF ¶ 157.) Then, on February 10–11, the Ark II Credit Agreement and Ark II Security Agreement were executed. (PFOF ¶ 160.)

455. By February 11, Ark II's security interest in TransCare's assets was properly perfected.[37] The lapse in time between the initial advance of funds on January 15 and the execution

---

[37] TransCare's execution of the Ark II Security Agreement authorized and ratified the financing statements filed on January 29, 2016 as a matter of law. *Official Comm. of Unsecured Creditors of Adoni Grp., Inc. v. Capital Bus. Credit LLC (In re Adoni Grp.)*, 530 B.R. 592, 597–601 (Bankr. S.D.N.Y. 2015).

of the loan documents on February 11 totals 26 days and falls within the 30-day safe-harbor period. *See* 11 U.S.C. § 547(e)(2)(A). Therefore, the transfer "relates back to the time of the indebtedness"—*i.e.*, January 15 and January 29. *Telecash Indus., Inc.*, 104 B.R. at 403.

## C. The Security Interest Granted to Ark II is Not Avoidable as a Constructive Fraudulent Transfer

456. The Trustee also seeks to avoid Ark II's security interest as a constructive fraudulent transfer pursuant to §§ 273, 274, and 275 of the DCL. (FPTO ¶ 187(c).) "[A] conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,'" and if one of the following conditions is met: "(i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275." *Sharp*, 403 F.3d at 53.

457. Because TransCare was insolvent at the time it granted Ark II a security interest, the Trustee's constructive fraudulent transfer claim hinges upon whether the Trustee proved that TransCare did not receive fair consideration for the transfer. Consideration for property is fair if: (1) "in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied"; or (2) the property is "received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property . . . obtained." DCL § 272. "[W]hat constitutes fair consideration under section 272 must be determined upon the facts and circumstances of each particular case." *United States v. McCombs,* 30 F.3d 310, 326 (2d Cir. 1994) (citation omitted).

458.     The evidence shows that Ark II received a security interest in TransCare's assets in good faith to secure a contemporaneous advance of funds to TransCare.  (*See* Section XIX.B, *supra*.)  As already discussed, at the time of the transfer TransCare was delinquent on insurance payments to NYSIF, among other insurers.  Ark II advanced nearly $1.8 million to avoid cancellation of critical insurance policies so that TransCare could continue to operate.  (PFOF ¶¶ 145, 152.)  The loans were also meant to give TransCare breathing room for a potential turnaround.  (PX_185, at CM_TC2018_0002542.)  *Bank of Commc'ns v. Ocean Dev. American, Inc.*, 904 F. Supp. 2d 356, 361–62 (S.D.N.Y. 2012) (transfer that gave debtor "more time to turn around its business" indicative of good faith).

459.     In an attempt to prove that the exchange lacked fair value, the Trustee contends that "Ark II gave nothing to TransCare in exchange for the grant of a security interest under the Ark II Security Agreement" in all of TransCare's assets.  (FPTO ¶¶ 44, 187(c).)  This wholly ignores the $1.8 million in value TransCare received from Ark II.  (*See* Section XIX.B, *supra*; PFOF ¶¶ 145, 152.)  It also fails as a matter of law because the Trustee improperly assumes that the value of the collateral pledged must be proportionate to the amount of the debt secured.  But, "the grant of collateral does not expand the amount of a creditor's debt and only prioritizes the payment of the debt from specific assets."  *Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*, 2013 WL 3828509, at *4 (Bankr. S.D.N.Y. July 23, 2013).  In other words, "the extent of the interest transferred is only the amount of the loan secured by the [collateral], not the value of the property encumbered." *Id.* (quoting *Johnson v. First Nat'l Bank*, 81 B.R. 87, 89 (Bankr. N.D. Fla. 1987)).  Therefore, the "extent of the interest transferred" is $1.8 million, *i.e.*, the amount of the loan secured by TransCare's assets, not the value of *all* of TransCare's assets.  By definition, the amount lent to

TransCare cannot be "disproportionately small as compared with the value of the" property it pledged to Ark II when those amounts are the same.  DCL § 272.

460.     Even if the Court were to compare the value of all of the collateral to the value of the funds lent to TransCare, the Trustee would still be unable to show that the $1.8 million advances were "disproportionately small."  Ark II had a lien in all of TransCare's assets, but critically, it only had a first priority position in TransCare's personal property.  (JX_79, at PP–TRBK0049004–05, § 2.)  The liquidation value of TransCare's personal property was $2.4 million (PX_282, at Exhibit 13), which constitutes only 25% more than the Ark II debt.  Courts have held that debt is not disproportionately small as compared with the value of collateral where the collateral was worth, for example, between 43–52% more than the debt—far in excess of the 25% difference here.  *See Pereira v. Hope (In re 550 Les Mouches Fashions, Ltd.)*, 24 B.R. 509, 516 (Bankr. S.D.N.Y. 1982) (citing cases).

461.     The Trustee also contends that because Ark II is an "insider," the transfer was in bad faith.  (FPTO ¶ 187(c).)  This fails for two reasons.

462.     *First*, the Trustee's contention assumes that the "insider" exception applies to *any* transaction between an insolvent corporation and a corporate insider, but that is "too broad a reading of the case law."  *Ocean Dev. Am., Inc.*, 904 F. Supp. 2d at 361.  Instead, the "insider" exception only applies when the transfer is on account of an antecedent debt—not to a contemporaneous exchange of value.  *See Sharp*, 403 F.3d at 54 (limiting "insider" exception to transfers made on account of antecedent debt).  That is because "[c]ontemporaneous advance[s] of funds" cannot be found to be fraudulent because "a present advance of commensurate value does not ordinarily prejudice other creditors" and thus does not trigger a presumption of an absence of good faith.  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634–35 (2d Cir. 1995).  As discussed above,

the exchange here was intended to be contemporaneous and was, in fact, reasonably contemporaneous. (*See* ¶¶ 450–51, 454, *supra*.) Moreover, the funds Ark II advanced to TransCare created *new value* for the Company, including by allowing TransCare to avoid the cancellation of insurance policies. On these facts, the "insider" exception does not apply.

463. *Second*, even if the "insider" exception applied, it only creates a rebuttable presumption of bad faith. *See Jacobs v. D'Alessandro (In re Dewey & LeBoeuf LLP)*, 2014 WL 4746209, at *12 (Bankr. S.D.N.Y. Sept. 23, 2014) (questioning the breadth of the presumption that finds transfers to insiders "per se" in bad faith); *Ocean Dev. Am., Inc.*, 904 F. Supp. 2d at 361–62 (holding irrebuttable presumption or "per se" categorization of bad faith was improper as a matter of law where transfer to insider was made in exchange for an asset sale at a fair price).

464. At trial, Ark II overcame any presumption of bad faith with respect to the grant to Ark II of a security interest in TransCare's assets. The evidence shows that Ark II advanced the funds for a legitimate purpose; so that TransCare would not immediately shutter and at least have a chance of effecting a turnaround. (PFOF ¶¶ 143–45, 152.) Given TransCare's dire condition at the time and the riskiness of the loan, it is hardly surprising (or evidence of bad faith) that Ark II would and did seek a security interest. There is also no evidence that the loan was made for the purpose of obtaining a security interest.

## XX. The Trustee Lacks Standing to Assert His Claim for "Payment Subordination"

465. Relying on Section 2.2 of the Ark II Intercreditor Agreement, which concerns relative priority of liens as between PPAS (as agent for the Term Loan Lenders) and Ark II, the Trustee contends that PPAS may not receive payment unless and until Ark II is paid in full. (FPTO ¶ 189(a).) The Trustee lacks standing to assert this claim.

94

466.     As discussed *supra* (at Section XVII), the party invoking federal jurisdiction must demonstrate prudential standing.  *Old Carco*, 500 B.R. at 690.  In the context of enforcing a contract, only parties to the contract or third-party beneficiaries have prudential standing to litigate issues related to it.  *Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir. 2009) (citation omitted) ("A non-party to a contract . . . lacks standing to enforce the agreement in the absence of terms that 'clearly evidence an intent to permit enforcement by the third party[.]'").

467.     Neither TransCare nor the Trustee is a party to the Ark II Intercreditor Agreement.  Nor do the terms of the Ark II Intercreditor Agreement "clearly evidence an intent to permit enforcement" by TransCare or the Trustee.  *Premium Mortg. Corp.*, 583 F.3d at 108 (citation omitted).  On the contrary, the acknowledgement TransCare Corporation executed in connection with the Ark II Intercreditor Agreement provides, in relevant part, that "[a]lthough it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement." (PFOF ¶ 159 (JX_79, at PP-TRBK000490016).)   This dooms the Trustee's "payment subordination" claim.

### XXI.  The Transfer of the Auction Sale Proceeds to PPAS Is Not Avoidable Under Section 549 of the Bankruptcy Code

468.     The Trustee seeks to avoid and recover the distribution to PPAS, and from PPAS to Ark II, of proceeds from the sale of the Foreclosed Personal Property Assets under Section 549 of the Bankruptcy Code (the "Sale Proceeds").  Section 549 provides in relevant part that a trustee may avoid a transfer of property of the estate that occurs after the petition date that is not authorized by the Bankruptcy Code or by the court.  11 U.S.C. § 549.  The Trustee failed to prove this claim.

469.     A trustee may avoid only "a transfer of property of the estate." 11 U.S.C. § 549(a).
Property of the estate includes "all legal or equitable interests of the debtor in property as of the
commencement of the case." 11 U.S.C. § 541(a)(1).  At trial, it was the Trustee's burden to prove
that TransCare held a property interest in the Sale Proceeds.  *Musso v. Brooklyn Navy Yard Dev.
Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391 (Bankr. E.D.N.Y. 1997).  The
Trustee did not carry his burden for at least two reasons.

470.     *First*, as of the commencement of these chapter 7 cases, TransCare held no legal or
equitable title in the Foreclosed Personal Property Assets because, by virtue of the Article 9
foreclosure, the Foreclosed Personal Property Assets belonged to Transcendence—not TransCare.
(PFOF ¶ 226.)   The fact that Transcendence ultimately did not use the Foreclosed Personal
Property Assets and instead consented to their sale by the Trustee does not change this fact.  (PFOF
¶¶ 272–81.)  Because the assets were not property of the estate, neither were the Sale Proceeds.

471.     *Second*, even if the Foreclosed Personal Property Assets had not been transferred
from TransCare prior to the distribution of the Sale Proceeds to PPAS, the Sale Proceeds would
still not constitute property of the estate at the time of the distribution.  That is because although
the scope of section 541(a)(1) is broad, property in which the debtor holds only legal title and not
an equitable interest becomes property of the estate "only to the extent of the debtor's legal title to
such property, but not to the extent of any equitable interest in such property that the debtor does
not hold."  11 U.S.C. § 541(d); *see McCord v. Agard (In re Bean)*, 252 F.3d 113, 117 (2d Cir.
2001) ("Any portion of a debtor's property that is unencumbered by mortgage—the equity—is
part of the bankrupt's estate."); *Cage v. Wyo–Ben, Inc. (In re Ramba Inc.)*, 437 F.3d 457, 460–61
(5th Cir. 2006) (rejecting avoidance claim where "Ramba had no interest in the transferred
property other than bare legal title").  As of the Initial Petition Date, all of TransCare's assets,

including the Foreclosed Personal Property Assets, were subject to the security interests of Wells Fargo, PPAS, as administrative agent for the Term Loan Lenders, and Ark II. (PFOF ¶¶ 22, 31, 33, 35, 160.) The Foreclosed Personal Property Assets were certainly not worth more than the secured lenders were owed (*i.e.*, approximately $58 million). As such, even assuming the Initial Debtors held legal title to the Foreclosed Personal Property Assets (and any proceeds from the sale thereof), they had no equitable title to the Sale Proceeds because the assets were fully encumbered by the secured lenders' security interests.

## XXII. PPAS's Liens on TransCare's Assets Are Not Barred by <u>Section 552 of the Bankruptcy Code</u>

472. The Trustee contends that PPAS's liens should not extend to post-petition proceeds of the Collateral (as defined in the PPAS Security Agreement) because PPAS engaged in "inequitable conduct caus[ing] TransCare to liquidate to the detriment of its other creditors." (FPTO ¶ 190.)[38] On this basis, the Trustee asks this Court to apply the "equities of the case" exception under section 552(b)(1) of the Bankruptcy Code to limit PPAS's liens. That section provides that if a creditor and debtor have a pre-petition security agreement that extends to the proceeds, product, offspring or profits of the underlying collateral, the terms of that agreement will be enforced under applicable non-bankruptcy law, "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." *See* 11 U.S.C. § 552(b)(1). The Court has already observed that PPAS's conduct in respect of the Article 9 foreclosure was fair. That conduct, therefore, cannot serve as the basis to limit PPAS's otherwise valid liens.

473. The Trustee's claim also fails because it misconstrues the narrow contours of the "equities of the case" exception. It is well understood that "the principal purpose of the equities

---

[38] The Trustee does not dispute that PPAS's interest in TransCare's assets extends to proceeds of the underlying collateral. (Am. Compl. ¶¶ 169–70.)

of the case exception is to prevent secured creditors from reaping unjust benefits from an increase in the value of collateral during a bankruptcy case resulting from the (usually) reorganizing chapter 11 debtor's use of other assets of the estate or from the investment of non-estate assets." *Arnot v. Endresen (In re Endresen)*, 548 B.R. 258, 274 (B.A.P. 9th Cir. 2016) (collecting cases from the First, Third, Fourth, and Fifth Circuits). At trial, the Trustee presented no evidence that the Collateral increased in value after the Initial Petition Date, a necessary pre-requisite to application of the equities of the case exception.

## CONCLUSION

474. For the reasons stated above, the Court finds in favor of Defendants with respect to all of the Trustee's claims. For all claims except the claim for breach of fiduciary duty, the Court will enter judgment in favor of Defendants.

475. With respect to the fiduciary duty claim, the Court will submit its findings of fact and conclusions of law to the District Court for its consideration pursuant to 28 U.S.C. § 157(c)(1).

Dated: September 18, 2019

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
Michael T. Mervis
Timothy Q. Karcher
Marissa Tillem
Eleven Times Square
New York, NY 10036-8299
Tel.: (212) 969-3000
Fax: (212) 969-2900
Email: mmervis@proskauer.com
tkarcher@proskauer.com
mtillem@proskauer.com

*Attorneys for Defendants*