**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
bamini@storchamini.com
Bijan Amini, Esq.
Avery Samet, Esq.
Jaime B. Leggett, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                                       :
                                                             :
                                                             :
TRANSCARE CORPORATION, et al.,                               :     Chapter 7
                                                             :     Case No. 16-10407 (SMB)
                                                             :     (Jointly Administered)
                                        Debtors.             :
-------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                             :
Trustee for the Estates of TransCare                         :
Corporation, et al.,                                         :
                                                             :
                                        Plaintiff,           :
                                                             :     Adv. Proc. No. 18-1021 (SMB)
                  - against -                                :
                                                             :
LYNN TILTON, PATRIARCH PARTNERS                              :
AGENCY SERVICES, LLC, PATRIARCH                              :
PARTNERS, LLC, PATRIARCH PARTNERS                            :
MANAGEMENT GROUP, LLC, ARK II CLO                            :
2001-1 LIMITED, TRANSCENDENCE                                :
TRANSIT, INC., and TRANSCENDENCE                             :
TRANSIT II, INC.,                                            :
                                                             :
                                        Defendants.          :
-------------------------------------------------------------x

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................ iv

**PROPOSED FINDINGS OF FACT** ...................................................................... 1

  I. Background ........................................................................................................ 1

    A. The Debtor ................................................................................................... 1

    B. TransCare's Debt Structure........................................................................... 2

    C. Management of TransCare............................................................................. 4

    D. Events Leading up to Tilton's Decision to Sell TransCare............................ 6

  II. Events Following Tilton's Decision to Sell TransCare ...................................... 8

    A. Tilton's Decision to Sell TransCare.............................................................. 8

    B. Tilton Initially Investigated the Sale of TransCare....................................... 9

    C. Tilton Negotiates with Wells Fargo to Fund TransCare Towards a Sale .................. 13

    D. The January 7 Plan...................................................................................... 15

    E. Tilton Funds the January 7 Plan While Planning Sale................................. 16

    F. On February 10, 2016, Tilton Institutes the Transcendence Plan.............................. 19

      i.  Tilton Creates Transcendence.............................................................. 19

      ii.  Tilton Engages Bankruptcy Counsel for TransCare ............................ 20

      iii.  The New Ark II Credit Facility............................................................ 21

      iv.  The Submission of Transcendence Financials to Insurers.................... 23

    G. Between February 11 and 23, 2016, Tilton Finalizes the Transcendence Plan .......... 24

      i.  Tilton Attempts to Procure Insurance for Transcendence .................... 24

      ii.  Tilton Attempts to Obtain Credit Suisse's Consent to Subordination ................. 25

      iii.  Tilton Refines Business Model............................................................ 25

      iv.  Tilton's Team Prepares Transition Services Agreement ...................... 27

      v.  Tilton Negotiates with Wells Fargo While Preparing to Move Forward With Transcendence........................................................................................ 28

    H. The Foreclosure and Sale............................................................................ 31

    I. The February 24 Plan................................................................................... 34

    J. Events Subsequent to the Foreclosure and Sale........................................... 35

      i.  Pittsburgh ............................................................................................ 35

      ii.  Hudson Valley .................................................................................... 36

      iii.  Tilton Assigns the MTA Contract to Transcendence and Then Discontinues Service........................................................................................................ 36

    K. Until This Trial, Defendants Took the Position That the Foreclosure Had Occurred 39

ii

III. Liquidation of Assets and Claims Against the Estate ...................................................... 41

IV. Facts Relevant to Particular Claims ...................................................................................... 43

    A. Tilton Did Not Engage in a Fair Process to Arrive at the Sale Price .......................... 43

    B. Tilton Did Not Pay TransCare a Fair Price for Its Assets .......................................... 45

    C. The Defendants' Expert's Criticisms ............................................................................ 47

    D. Tilton Sold the TransCare Assets to Herself................................................................ 48

    E. The Foreclosure Plan Was Accompanied by Untruthful Statements.......................... 50

    F. Removing the MTA Contract from TransCare Ensured TransCare's Collapse and
       Liquidation ...................................................................................................................... 50

**CONCLUSIONS OF LAW** ......................................................................................................... 51

I. Claim 1: Breach of Fiduciary Duty against Lynn Tilton ....................................................... 51

    A. Liability .......................................................................................................................... 51

       i. Fair Dealing ............................................................................................................. 55

       ii. Fair Price ................................................................................................................. 57

    B. Damages.......................................................................................................................... 58

       i. Nature of the Damages............................................................................................ 58

       ii. Scope of Damages................................................................................................... 59

          a. Fair Market Value ............................................................................................ 61

          b. WARN Act Liability ........................................................................................ 64

       iii. Quantum of Damages: TransCare's Fair Market Value Prior to the Breach of
          Fiduciary Duty ....................................................................................................... 65

          a. EBITDA Projections ........................................................................................ 67

          b. EBITDA Multiplier ......................................................................................... 69

II. Claim 7: Fraudulent Transfer Against PPAS and Transcendence ..................................... 75

III. Claims 3, 4, 10, 11 and 14: Avoidance and Subordination of Ark II Lien ...................... 85

    A. Preference—Claim 10.................................................................................................... 85

    B. Constructive Fraud—Claim 11 ..................................................................................... 89

    C. Recharacterization—Claim 3 ........................................................................................ 90

    D. Equitable Subordination—Claim 4 ............................................................................... 91

    E. Ark II Should Return the $800,000—Claim 14............................................................ 92

IV. Claims 4 and 13: Subordination and Limitation of PPAS Lien........................................ 93

    A. PPAS' Security Interest Should Not Extend to the Proceeds of This Litigation—
       Claim 13.......................................................................................................................... 93

    B. Equitable Subordination of PPAS' Claim—Claim 4 .................................................. 95

V. Conclusion and Remedies....................................................................................................... 98

## TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
  722 F.2d 988 (2d Cir. 1983) ................................................................................... 59

*Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*,
  2019 WL 2714331 (Del. Ch. June 28, 2019) ......................................... 53, 54, 55, 56

*Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*,
  2018 WL 3326693 (Del. Ch. July 6, 2018) .....................................................*Passim*

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
  269 F.3d 726 (6th Cir. 2001) ................................................................................... 90

*Bomarko, Inc. v. Int'l Telecharge, Inc. ("Bomarko I")*,
  794 A.2d 1161 (Del. Ch. 1999) .....................................................................*Passim*

*Boyer v. Wilmington Materials, Inc.*,
  754 A.2d 881 (Del. Ch. 1999) ................................................................................. 59

*Carroll v. Tese–Milner (In re Red Dot Scenic, Inc.)*,
  351 F.3d 57 (2d Cir. 2003) ................................................................................ 78, 80

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) .......................................................................... 52, 57, 62

*Cede & Co. v. Technicolor, Inc.*,
  636 A.2d 956 (Del. 1994) ......................................................................................... 52

*Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley,
  Myerson, & Casey)*,
  130 F.3d 52 (2d Cir.1997) ....................................................................................... 80

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1156 (Del. 1995) ...................................................................................... 57

*Citron v. E.I. Du Pont de Nemours & Co.*,
  584 A.2d 490 (Del. Ch. 1990) ................................................................................. 55

*Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*,
  2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ........................................................... 79

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007) ................................................................................. 64

*Doft & Co. v. Travelocity.com Inc.*,
2004 WL 1152338 (Del. Ch. May 20, 2004) ............................................. 67

*Int'l Telecharge Inc. v. Bomarko, Inc. ("Bomarko II")*,
766 A.2d 437 (Del. 2000) ........................................... 59, 62, 65, 66

*FrontFour Capital Grp. LLC v. Taube*,
2019 WL 1313408 (Del. Ch. Mar. 11, 2019) ............................................. 53

*Gesoff v. IIC Indus., Inc.*,
902 A.2d 1130 (Del. Ch. 2006) ............................................. 54

*Harrah's Tunica Corp. v. Meeks (In re Armstrong)*,
291 F.3d 517 (8th Cir. 2002) ............................................. 87

*Hazout v. Tsang Mun Ting.*,
134 A.3d 274 (Del. 2016) ............................................. 64

*HBE Leasing Corp.v. Frank*,
48 F.3d 623 (2d Cir. 1995) ............................................. 82

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*,
965 A.2d 715 (Del. Ch. 2008) ............................................. 66

*HMG/Courtland Props., Inc. v. Gray*,
749 A.2d 94 (Del. Ch. 1999) ............................................. 57

*In re 360networks (USA) Inc.*,
338 B.R. 194 (Bankr. S.D.N.Y. 2005) ............................................. 87

*In re Actrade Fin. Techs. Ltd.*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005) ............................................. 85

*In re American Cartage, Inc.*,
656 F.3d 82 (1st Cir. 2011) ........................................... 94, 95

*In re Bennett Funding Grp., Inc.*,
220 B.R. 743 (Bankr. N.D.N.Y. 1997) ............................................. 84

*In re Bernard L. Madoff Inv. Sec., LLC*,
440 B.R. 243 (Bankr. S.D.N.Y. 2010) ............................................. 80

*In re Bruno Mach. Corp.*,
435 B.R. 819 (Bankr. N.D.N.Y. 2010) ........................................... 77, 78

*In re Le Café Crème, Ltd.*,
244 B.R. 221 (Bankr. S.D.N.Y. 2000) ............................................. 77

*In re Cassandra Grp.*,
338 B.R. 583 (Bankr. S.D.N.Y. 2006) ........................................................ 85

*In re Comprehensive Power*,
578 B.R. 14 (Bankr. D. Mass. 2017) ........................................................ 91

*In re Condon*,
198 F. 947 (S.D.N.Y. 1912) ........................................................ 77, 81

*In re Condon*,
209 F. 800 (2d Cir. 1913) ........................................................ 77, 81

*In re Cornerstone Therapeutics Inc. Stockholder Litig.*,
115 A.3d 1173 (Del. 2015) ........................................................ 54

*In re Del Monte Foods Co. Shareholders Litig.*,
25 A.3d 813 (Del. Ch. 2011) ........................................................ 60

*In re Dreier LLP*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ........................................................ 80

*In re DSI Renal Holdings, LLC*,
574 B.R. 446 (Bankr. D. Del. 2017) ........................................................ 57

*In re El Paso Corp. Shareholder Litig.*,
41 A.3d 432 (Del. Ch. 2012) ........................................................ 60

*In re Fan*,
132 B.R. 430 (Bankr. D. Haw. 1991) ........................................................ 93

*In re Granite Partners, LP*,
210 B.R. 508 (Bankr. S.D.N.Y. 1997) ........................................................ 91, 92, 96

*In re J.P. Morgan Chase & Co. Shareholder Litig.*,
906 A.2d 766 (Del. 2006) ........................................................ 65

*In re Kaiser*,
722 F.2d 1574 (2d Cir. 1983) ........................................................ 82

*In re Lyondell Chem. Co. ("Lyondell I")*,
554 B.R. 635 (S.D.N.Y. 2016) ........................................................ 80, 81, 83

*In re Lyondell Chem. Co. ("Lyondell II")*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017) ........................................................ 77, 79

*In re Lyondell Chem. Co.*,
585 B.R. 41 (S.D.N.Y. 2018) ........................................................ 77

*In re Manhattan Inv. Fund Ltd.*,
  397 B.R. 1 (S.D.N.Y. 2007) .................................................................. 80, 81

*In re MAXXAM, Inc.*,
  1997 WL 187317 (Del. Ch. Apr. 4, 1997) ........................................... 53

*In re Mobile Steel Co.*,
  563 F.2d 692 (5th Cir. 1977) ............................................................. 92, 96

*In re Opus East LLC*,
  528 B.R. 30 (Bankr. D. Del. 2015) .................................................... 54

*In re Opus East LLC*,
  698 Fed. App'x 711 (3d Cir. 2017) ................................................... 53, 54

*In re Orchard Enters., Inc. Stockholder Litig.*,
  88 A.3d 1 (Del. Ch. 2014) ................................................................ 59, 60

*In re Pameco Corp.*,
  356 B.R. 327 (Bankr. S.D.N.Y. 2006) .............................................. 86

*In re R&W Enters.*,
  181 B.R. 624 (N.D. Fla. 1994) .......................................................... 93

*In re Residential Capital, LLC*,
  497 B.R. 403 (Bankr. S.D.N.Y. 2013) .............................................. 94

*In re Rural Metro Corp. Stockholders Litig.*,
  88 A.3d 54 (Del. Ch. 2014) ......................................................... 52, 60, 61

*In re Saba Enters., Inc.*,
  421 B.R. 626 (Bankr. S.D.N.Y. 2009) .............................................. 85

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005) ................................................................ 82

*In re Singh*,
  434 B.R. 298 (Bankr. E.D.N.Y. 2010) .............................................. 77

*In re TerreStar Networks, Inc.*,
  457 B.R. 254 (Bankr. S.D.N.Y. 2011) .............................................. 95

*In re The Brown Schs.*,
  386 B.R. 37 (Bankr. D. Del. 2008) .................................................... 53

*In re Trados Inc. Shareholder Litig.*,
  73 A.3d 17 (Del. Ch. 2013) ............................................................... 71

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  2017 WL 82391 (S.D.N.Y. Jan. 6, 2017).................................................................. 81

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006)............................................................................................ 64

*In re White Metal Rolling and Stamp Corp.*,
  222 B.R. 417 (Bankr. S.D.N.Y. 1998) ..................................................................... 89

*In re Bayou Grp., LLC*,
  439 B.R. 284 (S.D.N.Y.2010)................................................................................... 80

*Kahn v. Household Acquisition Corp.*,
  591 A.2d 166 (Del. 1991).......................................................................................... 55

*Kahn v. Lynch Commc'ns Sys., Inc.*,
  638 A.2d 1110 (Del. 1994)........................................................................................ 53

*Kahn v. Tremont*,
  694 A.2d 422 (Del. 1977).......................................................................................... 58

*Klein v. Rossi*,
  251 F. Supp. 1 (E.D.N.Y. 1966)................................................................................ 78

*Leser v. U.S. Bank Nat'l Ass'n*,
  2013 WL 3788877 (E.D.N.Y. July 18, 2013) .......................................................... 83

*Lippe v. Bairnco Corp.*,
  249 F. Supp. 2d 357 (S.D.N.Y. 2003)....................................................................... 77

*LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*,
  173 F.3d 454 (2d Cir. 1999)...................................................................................... 60

*Matter of Kelderman*,
  75 B.R. 69 (Bankr. S.D. Iowa 1987) ........................................................................ 93

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*,
  926 F.2d 1248 (1st Cir. 1991) ................................................................................... 83

*Milbank, Tweed, Hadley & McCloy v. Boon*,
  13 F.3d 537 (2d Cir. 1994)........................................................................................ 59

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*,
  137 F. Supp. 2d 502 (S.D.N.Y. 2001)....................................................................... 53

*Open MRI Radiology Assocs. v. Kessler*,
  898 A.2d 290 (Del. Ch. 2006)........................................................................ 67, 68, 69

*Pereira v. Cogan,*
   52 Fed. App'x 536 (2d Cir. 2002) ..................................................... 53

*Pereira v. Cogan,*
   267 B.R. 500 (S.D.N.Y. 2001) ........................................................ 54

*Poole v. N.V. Deli Maatschappij,*
   243 A.2d 67 (Del. 1968) ................................................................. 62

*Priestley v. Panmedix Inc.,*
   18 F. Supp. 3d 486 (S.D.N.Y. 2014) ................................................ 78

*RBC Capital Mkts., LLC v. Jervis,*
   129 A.3d 816 (Del. 2015) ............................................................... 58

*Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc.,*
   1992 WL 251380 (Del. Ch. Sept. 29, 1992) ..................................... 65

*Reis v. Hazelett Strip-Casting Corp.,*
   28 A.3d 442 (Del. Ch. 2011) ............................................... 54, 55, 58

*Related Companies, L.P. v. Ruthling,*
   2018 WL 3315728 (S.D.N.Y. July 5, 2018) ..................................... 55

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,*
   506 A.2d 173 (Del. 1986) ............................................................... 52

*S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC,*
   568 B.R. 481 (Bankr. S.D.N.Y. 2017) ............................................. 76

*Solomon v. Armstrong,*
   747 A.2d 1098 (Del. Ch.1999) ........................................................ 54

*Solomon v. Armstrong,*
   746 A.2d 277 (Del. 2000) ............................................................... 54

*Staples v. Sisson,*
   274 A.D.2d 779 (3d Dep't 2000) ..................................................... 80

*Strassburger v. Earley,*
   752 A.2d 557 (Del. Ch. 2000) .................................................. Passim

*Summa Corp. v. Trans World Airlines, Inc.,*
   540 A.2d 403 (Del. 1988) ............................................................... 57

*Tese–Milner v. Brune (In re Red Dot Scenic, Inc.),*
   293 B.R. 116 (S.D.N.Y. 2003) ........................................................ 80

ix

*Thorpe v. CERBCO, Inc.*,
676 A.2d 436 (Del. 1996)........................................................................ 59

*Thorpe v. CERBCO, Inc.*,
1993 WL 443406 (Del. Ch. Oct. 29, 1993) ............................................. 70

*Universitas Educ., LLC v. Nova Grp., Inc.*,
2014 WL 3883371 (S.D.N.Y. Aug. 7, 2014) .......................................... 83

*Wall St. Assocs. v. Brodsky*,
257 A.D.2d 526 (1st Dep't 1999)............................................................ 82

*Weinberger v. UOP, Inc.*,
457 A.2d 701 (Del. 1983)................................................................... 52, 63

*William Penn P'ship v. Saliba*,
13 A.3d 749 (Del. 2011).......................................................................... 53

## Statutes

11 U.S.C. § 502(d)......................................................................... 77, 92, 98
11 U.S.C. § 502(j)................................................................................ 93, 99
11 U.S.C. § 510(c)............................................................................... 91, 96
11 U.S.C. § 510(c)(2)................................................................................. 98
11 U.S.C. § 544(b)............................................................................... 75, 99
11 U.S.C. § 547....................................................................................... 98
11 U.S.C. § 547(b)................................................................................... 86
11 U.S.C. § 547(c)............................................................................... 86, 87
11 U.S.C. §547(f).................................................................................... 86
11 U.S.C. § 547(g).................................................................................. 86
11 U.S.C. § 548(a)(1)(A)..................................................................... 75, 77
11 U.S.C. § 549....................................................................................... 93
11 U.S.C. § 550(a)............................................................................... 76, 78
11 U.S.C. § 551......................................................................... 85, 94, 98, 99
11 U.S.C. § 552(b).................................................................................. 99
11 U.S.C. § 552(b)(1)......................................................................... 94, 95
11 U.S.C. § 550(b).................................................................................. 78
11 U.S.C. §§ 541 and 549........................................................................ 85
N.Y. Debtor & Creditor Law § 276 ........................................ 75, 77, 78, 80
N.Y. Uniform Commercial Code § 9-102(13).......................................... 94
N.Y. Uniform Commercial Code § 9-108........................................... 94, 95
N.Y. Uniform Commercial Code § 9-204(b)(2).................................. 95
N.Y. Uniform Commercial Code § 9-619.............................................. 95
N.Y. Debtor & Creditor Law § 272(a) ................................................... 89
N.Y. Debtor & Creditor Law § 273.................................................... 89, 99
N.Y. Debtor & Creditor Law § 274.................................................... 89, 99
N.Y. Debtor & Creditor Law § 275.................................................... 89, 99

**Other Authorities**

Collier on Bankruptcy (L. King 15th ed. rev. 1997)................................................................ 84, 85

Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* (2012)............................................................................................ 58

Restatement (Second) of Torts (1963 & 1964)........................................................................ 81

Uniform Fraudulent Transfer Act ............................................................................................ 83

Plaintiff Salvatore LaMonica, as Chapter 7 Trustee (the "<u>Trustee</u>") of TransCare Corp. and its debtor-subsidiaries ("<u>TransCare</u>"), submits the following proposed findings of fact and conclusions of law.

These proposed findings and conclusions use the following citation format:

- "DX", "PX" and "JX" refer to the exhibits admitted during the trial.

- "Stipulated Fact" refers to the Stipulated Facts section of the May 14, 2016 Joint Pretrial Order (Dkt. 85) at pages 6-15.

- "Tr. Month/Day" (*e.g.*, "Tr. 7/22") refers to the official transcripts of the trial conducted on July 22, 23, 24, August 8, 13 and 14, 2019.

- "Husson Tr. (*LaMonica*)" and "Husson Tr. (*Ien*)" refer to the designated deposition testimony of John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A., taken in (i) this action and (ii) *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033, respectively, and admitted pursuant to the Joint Pretrial Order at Exhibit D.

- "Leland Tr." refers to the designated deposition testimony of Glenn Leland, TransCare's former CEO, admitted pursuant to the Joint Pretrial Order at Exhibit E.

## PROPOSED FINDINGS OF FACT

## I. <u>Background</u>

### A. The Debtor

1. TransCare is incorporated under the laws of Delaware and was headquartered in Brooklyn, New York. (Stipulated Fact 1).

2. TransCare provided ambulance services for both emergency and non-emergency patients to hospitals and municipalities, and paratransit services for individuals with disabilities to the New York Metropolitan Transit Authority (the "<u>MTA</u>"). (Stipulated Fact 1).

3.     TransCare's principal business lines were (a) ambulance services in (1) New York City, (2) Westchester, New York, (3) Hudson Valley, headquartered in Poughkeepsie, New York, (4) Pittsburgh, Pennsylvania, and (5) Maryland; and (b) its contract with the MTA to provide paratransit services for people with disabilities throughout the City of New York (the "MTA Contract").  (PX 158).

4.     At all relevant times, Defendant Lynn Tilton was the sole director on TransCare's board of directors.  (Stipulated Fact 2).

5.     Tilton owns and controls 61.3% of TransCare's equity which she holds through two personal investment funds:

        a.  55.7% through Defendant Ark II CLO 2001-1, Ltd ("Ark II"); and

        b.  5.6% through Ark Investment Partners II, L.P. ("Ark Investment").

(Stipulated Facts 6, 8, 9).

6.     Credit Suisse owns outright, or manages, 26% of TransCare's equity on behalf of five separate entities (PX 235 at 98626), and the remaining 12.7% of TransCare is owned by a variety of entities and individuals.  (Dkt. 132).

**B.     TransCare's Debt Structure**

7.     Prior to February 2016, TransCare had two credit facilities: a term loan administered by Defendant Patriarch Partners Administrative Services, LLC ("PPAS") (the "Term Loan") (JX 1) and a revolving asset-backed loan, administered by Wells Fargo, N.A. ("Wells Fargo") (the "ABL").  (JX 2).

8.     PPAS is managed and owned by Tilton.  (Stipulated Fact 3).

9.     Both the Term Loan and the ABL were secured by blanket liens on all of TransCare's assets.  (Stipulated Facts 12, 14; DX 3 at §2; JX 2 at §5.1).

10.     Pursuant to an intercreditor agreement between PPAS and Wells Fargo, PPAS had a first priority lien on TransCare's vehicles, certain other physical assets, capital stock, and intellectual property (the "Term Loan Priority Collateral"), and Wells Fargo had a first priority lien on all other assets (consisting primarily of accounts receivable) (the "ABL Priority Collateral"). (JX 3 at §§1.26, 1.35, 2.2).

11.     Pursuant to an irrevocable payment assignment, all of TransCare's receivables were paid to a lockbox controlled by Wells Fargo, including all of the payments received under the MTA Contract. (PX 2).

12.     As of 12:00 am on February 24, 2016, approximately $13 million was outstanding under the ABL (Tr. 7/24 159:19-24) and $43 million was outstanding under the Term Loan (JX 110).

13.     At all relevant points, there were six lenders under the Term Loan (the "Term Loan Lenders"): Ark Investment; Zohar CDO 2003-1 Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"), Credit Suisse Alternative Capital, Inc., and First Dominion Funding I ("First Dominion"). (Stipulated Fact 10).

14.     Tilton, through various entities, controlled the Zohar Funds as their collateral manager. She resigned from that position in early February 2016 (effective March 3, 2016). (Tr. 8/13 A.M. 7:24–8:8).

15.     Credit Suisse controlled First Dominion as its collateral manager. (JX 1 at 00106; Tr. 7/22 P.M. 30:20-23).

16.     The Zohar Funds owned over 75% of the Term Loan debt. (PX 209 (native)).

17.     Credit Suisse and First Dominion together owned approximately 18% of the Term Loan debt. (PX 209 (native)).

18. Ark Investment owned approximately 7% of the Term Loan debt. (PX 209 (native)).

**C. Management of TransCare**

19. Glen Leland served as TransCare's Chief Executive Officer from January 12, 2015 through January 8, 2016. (Stipulated Fact 24).

20. Mark Bonilla served as TransCare's Chief Financial Officer from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016. (Stipulated Fact 25).

21. Peter Wolf served as TransCare's Chief Operating Officer from November 16, 2014 through February 24, 2016. (Stipulated Fact 26).

22. Under an Authority Matrix issued by Tilton as sole director of the Board, the officers of TransCare did not have authority to: (a) approve an annual operating plan budget or any interim operating plan or budget; (b) negotiate the sale or disposition of any assets; (c) recapitalize or make other change in the capital structure; (d) disclose any financial information to any third-party; (e) enter into any contract or license agreement not contemplated by the approved Annual Plan (of which there was none); (f) enter into any financing or loan agreement; (g) dispose of any unusable asset or write off any receivable, or make a charitable contribution; (h) change auditors; (i) engage legal counsel; (j) settle or compromise any claim; (k) engage any consultant; or (l) conduct any reduction in force.[1] (PX 3; Tr. 7/23 P.M. 15:16-17:11).

---

[1] Some of the items are authorized below certain dollar amounts if authorized by a "Designated Executive" or an "Annual Plan" (PX 3); however, during all relevant periods there was no Designated Executive and no Annual Plan. (Leland Tr. 84:9-16; JX 11 ("the combination of these two factors means that many decisions need to go to the board.")).

23. Even matters that were not specifically prohibited still required Board approval: "for instance, Item 11 prohibits entering into financing transactions, but it does not specifically prohibit laying the groundwork for these types of transactions by making preliminary calls or taking other actions prior to providing financial data, which would be prohibited by Item 6. However, we are absolutely sure that Lynn would want to know and approve the company's exploration of other financing sources." (JX 11 at 87751) (Brian Stephen email).

24. Tilton managed TransCare through her employees at Patriarch (defined below):

    a. Michael Greenberg, who oversaw financial matters, payment of vendors and negotiations with Wells Fargo (Tr. 7/22 A.M. 14:10–16:15); (Leland Tr. 59:5–61:14, 144:13–145:17, 245:22–246:24).

    b. Jean-Luc Pelissier, who oversaw operational matters (Tr. 7/22 A.M. 24:11-19; Tr. 7/23 A.M. 6:7-19; Leland Tr. 46:6-47:12).

    c. Brian Stephen, an attorney, who oversaw legal matters including the scope of authority granted to the officers under the authority matrix (Tr. 7/23 P.M. 1:22–3:21; Leland Tr. 46:6-51:21); and

    d. Randy Jones, who oversaw hiring (Tr. 7/22 A.M. 24:22-24; Tr. 8/13 A.M. 53:22–54:1, Tr. 8/13 P.M. 47:23–48:2).

These Patriarch employees reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare. (*E.g.*, Tr. 7/22 A.M. 15:13-18 (Greenberg); Tr. 7/23 A.M. 7:15-17 (Pelissier); 7/23 P.M. 2:16-18 (Stephen); Leland Tr. 82:21–83:25).

25. Tilton established Defendant Patriarch Partners, LLC ("Patriarch") to provide solutions for banks that had large distressed loan portfolios by creating a financial model that allowed the banks to remove the distressed loans from their balance sheets. (Tr. 8/13 P.M. 18:23–

19:5).  Patriarch, along with a number of other Patriarch entities also owned by Tilton, is headquartered at 1 Liberty Plaza in downtown Manhattan.  (Stipulated Facts 3, 4, 5).

### D.  Events Leading up to Tilton's Decision to Sell TransCare

26.  In 2001, Tilton purchased the loans extended to TransCare from Canadian Imperial Bank, a creditor that had otherwise wanted to liquidate TransCare's assets.  (Tr. 8/13 P.M. 19:6-14).

27.  Tilton used those loans plus outside money to obtain a majority interest in TransCare and restructured it through a bankruptcy proceeding.  (Tr. 8/13 P.M. 19:10-14).

28.  Tilton testified: "For almost twelve years we had restructured this company from when it was going to be liquidated by the lenders and doing twelve to $14 million of EBITDA a year."  (Tr. 8/13 A.M. 47:22-25).

29.  Beginning in 2014 and throughout 2015, TransCare experienced difficulties in funding employee payroll and paying vendors.  (Stipulated Facts 10, 27).

30.  On July 3, 2015, TransCare missed payroll.  (Stipulated Fact 32).

31.  On July 31, 2015, Greenberg reported to Tilton on Envision Healthcare's purchase of Rural/Metro Corp., a regional ambulance operator, at a 10x multiple of EBITDA.  (DX 68 at 904469).[2]

32.  On August 4, 2015, Tilton forwarded Greenberg's analysis to Kurt Marsden, her counterpart at Wells Fargo, and told him "Just to confirm the active M&A market in the ambulance

---

[2] As Greenberg noted in his email (DX 68), Envision Healthcare's medical transportation segment was named American Medical Response ("AMR").

space.  This is why it makes sense to let TransCare make its way back to normalized EBITDA."
(DX 68 at 90469).

33.     By this statement, Tilton meant that she wanted to get TransCare back to the $12-14 million of EBITDA that it had historically earned, so she could sell it at a price that could have covered both the ABL and the Term Loan.  (Tr. 8/13 A.M. 47:22–48:3).

34.     On or about September 30, 2015, Mark Bonilla resigned as CFO of TransCare. (DX 72 at 42864; Tr. 7/22 A.M. 17:18-24).

35.     Thereafter, Tilton instructed Greenberg to take on responsibility vis-à-vis TransCare's finances.  (DX 73 at 58180; Tr. 7/22 A.M. 18:19-24).

36.     TransCare had no audited financials for 2014 and had fallen several months behind in its monthly financial reports.  (Tr. 7/22 P.M. 79:21–80:12).

37.     On October 14, 2015, Wells Fargo notified TransCare and Patriarch that it did not intend to renew the ABL when it expired on January 31, 2016.  (DX 76 at 06334; Tr. 7/22 A.M. 26:11-21).

38.     Tilton tasked Greenberg to work with management at TransCare to prepare a 2016 budget for TransCare that would be acceptable to Wells Fargo and convince them to extend the ABL.  (Tr. 7/22 A.M. 28:4-11, 31:14-20).  She also tasked Greenberg with developing the plan based upon his own assessment of TransCare's business.  (Tr. 7/22 A.M. 33:9-12).

39.     Accordingly, when Greenberg took information from TransCare management, he confirmed the assessment himself before presenting it to Tilton.  (Tr. 7/22 A.M. 38:11–40:3).

40.     Greenberg worked closely with Pelissier on the development of the plan, and Brian Stephen was involved as well.  (Tr. 7/22 A.M. 28:12-16).

41.     On November 14, 2015, Greenberg submitted a presentation for Tilton's review and approval to share with Wells Fargo on November 16, 2015.  (JX 51; Tr. 7/22 A.M. 32:6-25).

42.     The 2016 plan outlined an $8.2 million growth in revenue, resulting in 2016 EBITDA of $11.5 million, a 9% EBITDA margin.  (JX 51; Tr. 7/22 A.M. 32:6-25).

43.     Greenberg testified that the revenue growth in the plan for Wells Fargo was a conservative assumption.  (JX 51; Tr. 7/22 A.M. 34:17-24).  The plan called for 48 new ambulance leases (at $120,000 per vehicle, with a down payment of $30,000).  The plan expressly required $6.4 million in new capital ($2.8 million in lease payments, $2.8 million in new vehicle funding and $0.8 million in A/P reduction).  (JX 51 at 98489, 98535).

44.     Tilton approved the presentation to be shared with Wells Fargo, but Tilton never gave final approval to the plan and did not fund the new ambulances contemplated by the plan. (Tr. 7/22 A.M. 31:21–32:25, 102:6-9; Leland Tr. 547:13–549:9, 583:9–584:25; Tr. 7/22 P.M. 123:13-19).

## II.     Events Following Tilton's Decision to Sell TransCare

### A.     Tilton's Decision to Sell TransCare

45.     In mid-December 2015, Tilton determined to sell TransCare:

   a.   On December 14, 2015, Pelissier informed John Husson of Wells Fargo that Tilton had decided to sell TransCare, that Tilton would provide financing to bridge to a sale, but that Tilton sought to inject that financing through Wells Fargo's ABL loan facility.  (PX 126 at 03375; Husson (*LaMonica*) Tr. 44:25–45:7, 48:11–49:10).

   b.   On December 16, 2016, Kurt Mardsen of Wells Fargo wrote to Tilton: "I understand that your team updated you on this situation over the weekend and

you made a determination to sell TransCare." (PX 128 at 06004; Tr. 8/13 A.M. 50:13–51:17 (Tilton agreeing with statement)).

    c.  Tilton on deciding to sell TransCare: "I think that's correct, they [Wells Fargo] were not going to stay in past January 31 unless it was part of a sale process, so that was my best chance of effectuating a transaction that would be good for the constituents." (Tr. 8/13 A.M. 50:9-12).

**B.    Tilton Initially Investigated the Sale of TransCare**

46.    In connection with her decision to sell the company:

    a.  Tilton instructed Greenberg to obtain potential comparable transactions and comparable public companies that existed with the same or ancillary industries to TransCare. (Tr. 7/22 A.M. 42:16-23).

    b.  Tilton also instructed Greenberg to find investment bankers to market TransCare. (Tr. 7/22 A.M. 41:6-13, 42:21-23).

47.    Greenberg had experience in private equity investment and portfolio management, comparing companies within a particular set, evaluating capital structure alternatives for companies, and making strategic business assessments for companies. (Tr. 7/22 A.M. 13:17–14:2).

48.    Greenberg also had extensive experience in valuation and modeling. (Tr. 7/22 A.M. 14:7-9).

49.    On December 18, 2015, Greenberg reported his findings to Tilton. (JX 55).

50.    Greenberg located six "transaction comps," meaning comparable transactions that occurred within the same sector as TransCare or related sectors. (JX 55; Tr. 7/22 A.M. 48:2-3).

51.    For each transactions comp, Greenberg listed the date, whether it was completed or announced, and then where available, the purchase price or enterprise value, last twelve month

("<u>LTM</u>") revenue, LTM EBITDA, and the multiple of revenue/EBITDA needed to arrive at the purchase price (calculated by dividing the purchase price/enterprise value by the LTM revenue/EBITDA). (JX 55; Tr. 7/22 A.M. 48:22–50:13).

52. Although Greenberg identified six transaction comps, only two of the transaction comps had sufficient public information to calculate EBITDA multiples:

      a. AMR's (Envision's) purchase of Rural/Metro Corp. at a 10.7x multiple (the same transaction Greenberg had emailed Tilton about in August 2015 (DX 68)); and

      b. KKR's purchase of Air Medical at a 10.0x multiple. (JX 55 at 41414 (native)).

53. Greenberg also identified three "market comps" which "relate to public companies and where they're currently trading in terms of their valuation." (JX 55; Tr. 7/22 A.M. 48:3-5).

54. Under "market value" for each market comp, Greenberg listed the market value of the equity of each public company plus the outstanding debt minus the cash on the balance sheet. (JX 55; Tr. 7/22 A.M. 51:2-7). The rest of the entries were calculated in the same way as the transaction comps. (Tr. 7/22 A.M. 51:8-10).

55. Greenberg identified three market comps:

      a. Envision, trading at 11.3x multiple;

      b. Air Methods, trading at an 8.2x multiple; and

      c. PHI, trading at a 3.5x multiple.

(JX 55 at 41414 (native)).

56. Greenberg determined that PHI was an outlier, and reported the same to Tilton, because they had other business lines that were only tangentially related to TransCare (62% of PHI's business was oil and gas). (JX 55 at 41414 (native); Tr. 7/22 A.M. 51:11-22).

57.     In his cover email, reporting on these transaction and market comps, Greenberg reported that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x.  (JX 55 at 41410; Tr. 7/22 A.M. 52:2-10).

58.     Greenberg also identified several investment banks which had advised on ambulance transactions and reported the same to Tilton.  (JX 55 at 41410; Tr. 7/22 A.M. 42:24–43:11).

59.     In the same email, Greenberg also reported to Tilton that Leland had received unsolicited calls from (i) the following potential purchasers in the ambulance business: Falck, AMR, Richmond County Ambulance, and Enhanced Equity and also (ii) National Express in the transit business.  (JX 55 at 41410).

60.     In addition to Greenberg's December 18, 2015 report, the record contains the following expressions of interest:

    a.  On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division.  (JX 12 at 04260; Leland Tr. 85:9–86:14).

    b.  On March 3, 2015, Mike Weinberger, the Chief Operating Officer of Richmond County Ambulance Service ("RCA") emailed Tilton seeking to purchase all or part of TransCare.  (PX 44; Tr. 8/13 A.M. 45:7-25).

    c.  Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also offered to consider an operational management arrangement.  (PX 44 at 90486; Tr. 8/13 A.M. 45:7-25).

    d.  Following the July 3, 2015 missed payroll, Leland started to receive calls and emails from ambulance companies and ambulance company investors

regarding purchasing all or portions of TransCare, including AMR, Falck, and Rural/ Metro Corp. (Leland Tr. 171:5–172:15; 174:2-175:13).

e. For example, AMR called Leland seeking to purchase TransCare's Westchester operations. (Leland Tr. 172:17-24).

f. On July 8, 2015, Weinberger emailed Tilton again expressing RCA's interest in purchasing or operating TransCare. (PX 73; Tr. 8/13 A.M. 45:17-24).

g. On July 10, 2015, National Express emailed Leland a Letter of Intent offering to purchase the MTA Contract for $6 to $7 million and assume up to $2 million in liabilities. (JX 40).

h. On July 13, 2015, Greenberg received a message from another Patriarch credit officer that Alluence Capital Advisors representing National Express was interested in purchasing TransCare's paratransit business. (PX 83; Tr. 7/22 P.M. 74:8-17).

i. On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express called him that morning about purchasing the paratransit business, and asked whether he was authorized to enter into discussions. (PX 111; Tr. 8/14 A.M/ 26:19-27:1 (Tilton's knowledge of same)).

j. On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him "a few times" that day to reiterate that their offer to buy TransCare's paratransit contract was "still out there." (PX 124; Tr. 50:22–51:3).

*See also* Leland Tr. 178:2-180:19 (multiple inquiries by interested parties for TransCare's valuable assets); 176:2-7 (TransCare could be worth as much as $200 million "if we carried out the accelerated business plan.").[3]

61.     According to both Greenberg and Leland, Tilton specifically prohibited Leland from speaking to any of those companies, and even from entering into a non-disclosure agreement with those companies.  (Tr. 7/22 A.M. 46:25–47:19; Leland Tr. 97:11–98:25, 172:25–173:9).

62.     On December 24, 2015, Greenberg updated Tilton with more information concerning investment banks who worked on ambulance transactions, and again sent the same information as he had on December 18, 2015.  (JX 61; Tr. 7/22 A.M. 52:12–53:3).

63.     Greenberg undertook the research in JX 55 and JX 61 for the purpose of negotiating a plan with Wells Fargo to fund TransCare towards a potential sale.  (Tr. 7/22 A.M. 52:23–53:10).

## C.     Tilton Negotiates with Wells Fargo to Fund TransCare Towards a Sale

64.     Wells Fargo agreed that TransCare needed to be sold and understood that "it was a matter of self preservation" to support TransCare through to a sale.  (Husson (*Ien*) Tr. 35:24–36:20).

65.     On December 21, 2015, Greenberg met with John Husson and Bob Strack of Wells Fargo concerning a deal to extend the ABL so as to facilitate a sale of TransCare.  (DX 97; Tr. 7/22 A.M. 55:17–56:1).

66.     Prior to the meeting, Tilton requested a sixth-month time frame for the sale, or through to May or June 2016.  (Tr. 7/22 A.M. 54:20-22).

---

[3] Pelissier, to whom Leland reported most directly (Leland Tr. 46:7–47:5), agreed with that assessment although he denied that at trial.  (Tr. 7/23 A.M. 46:21–48:8).

67.     Between December 23 and December 31, 2015, Greenberg and Wells Fargo negotiated a deal to extend the ABL subject to a satisfactory budget so as to allow as sale of TransCare.

      a.   Wells Fargo agreed to a timetable for a sale to close by August 15, 2016, including dates for the submission of budgets, hiring of investment bankers, offering memorandums, and purchase documents (JX 65), and also had proposed alternative timetables in the event that the sale needed to be conducted through a section 363 sale (JX 59).[4]

      b.   Wells Fargo agreed to waive the financial covenants in the ABL in favor of TransCare's compliance with the sale budget and timetable.

      c.   Tilton agreed to submit a sale budget for TransCare.

      d.   Tilton agreed to Wells Fargo's request to hire a third-party financial consultant to which Wells Fargo could have access.

(DX 97; Stipulated Fact 35; JX 59; JX 60 at 00146-00147; JX 65 at 215).

68.     Wells Fargo never varied from its position of being willing to fund TransCare through to a sale.  (Husson (*LaMonica*) Tr. 56:14–57:6; Tr. 7/22 A.M. 63:14-20).

69.     Wells Fargo believed that a sale was in its own best interests and those of TransCare as it was a "decent company" with "great employees" and a "wonderful" market share that just needed to address its undercapitalization.  (Husson (*LaMonica*) Tr. 45:8-25).

---

[4] This timetable was longer than Tilton's initial request of six months, but shorter than Tilton's ultimate demand of September 30, 2016.

### D.    The January 7 Plan

70.     On January 4, 2016, Tilton told Greenberg to prepare a budget to support a sale process that would minimize the capital needed to be provided to TransCare.  (JX 67; Tr. 7/22 A.M. 64:12-22).

71.     On January 5, 2016, Greenberg submitted such a budget to Tilton, which Tilton subsequently directed be sent to Carl Marks two days later (the "January 7 Plan").  (JX 67).[5]

72.     Greenberg and Pelissier built the January 7 Plan by working independently from TransCare's management in order to create a scenario more consistent with Tilton's stated parameters from the day before.  (Tr. 7/22 A.M. 69:14–70:5).

73.     The January 7 Plan projected 2016 revenues of $120 million (including $2 million in new services) and EBITDA of $6.9 million.  (JX 67 at 196574).

74.     The January 7 Plan projected a peak need of $4.5 million in new capital consisting of $2.2 million in immediate payment requirements (insurance, payroll, and taxes); $1.3 million in down payments on new vehicles; and $1 million in other past due A/P payments.  (JX 67 at 196575; Tr. 7/22 A.M. 70:22–72:3).[6]

75.     On January 7, 2016, after receiving Tilton's approval, Greenberg shared the January 7 Plan with Carl Marks.  (Tr. 7/22 A.M. 77:4-9).

76.     Tilton never "approved" the January 7 Plan.  (Tr. 7/22 A.M. 80:16-21)

77.     Tilton never "approved" any plan for TransCare between November 14, 2015 and February 24, 2016.  (Tr. 7/22 P.M. 123:13-19).

---

[5] "Carl Marks" refers to the Carl Marks Advisory Group LLC engaged by Tilton for TransCare to satisfy Wells Fargo's request for a third-party financial consultant.  (Tr. 7/22 A.M. 54:23–55:11; *supra* ¶ 67).

[6] "NYSIF" is the New York State Insurance Fund.

### E. Tilton Funds the January 7 Plan While Planning Sale

78. Even though Tilton did not "approve" plans, her team still judged the company against those plans. Each of the elements of an un-approved plan still required Tilton's approval under the authority matrix. (Tr. 7/22 A.M. 80:6-15).

79. On January 12, 2016, Tilton directed Randy Jones to offer the vice-presidents in charge of TransCare's paratransit and Hudson Valley divisions (Rob Struck and Tom Fuchs) $200,000 in change of control bonuses on a sale and a $20,000 boost in salary. (DX 108 at 23057; Tr. 8/13 A.M. 54:19–55:10).

80. On January 15, 2016, Ark II wired $1,172,757.53 to PPAS for PPAS to make payments on TransCare's behalf as follows: $221,122.00 to Zurich (auto insurance); $142,993.82 to IPFS (liability insurance); $334,802.76 to Aetna (health insurance); and $473,838.94 to NYSIF (workers' compensation insurance) (collectively, the "January 15 Payments"). (DX 112 (3:58 pm email)).

81. The January 15 Payments were contemplated by the January 7 Plan and formed a portion of the $4.5 million in new capital contributions (although by this date the $4.5 million had increased to a plan of $6.5 million). (Tr. 7/22 A.M. 83:7-13; JX 67 at 06575).

82. That afternoon, Greenberg emailed Wells Fargo asking for their agreement to eight new conditions for the January 15 Payments, which Greenberg characterized as "part of a first funding under a go forward business plan being developed, of up to $6.5MM." (PX 170, 2:06 pm email). The conditions included that $6.5 million business plan be supported by a credit facility with a lien junior to Wells Fargo's lien on the collateral for the ABL, but senior to Wells Fargo's lien on the collateral for the Term Loan debt. (*Id*.).

83.     Wells Fargo did not agree to terms set forth by Greenberg for the lien priority for the January 15 Payments, but instead was prepared to agree to allow the secured funding to be junior to all liens of Wells Fargo and subject to a new intercreditor agreement.  (PX 170 at 14549).

84.     As of January 26, 2016, Greenberg was still trying to negotiate the security for the January 15 Payments with Wells Fargo.  (PX 174 at 22754, 22753; Tr. 7/22 A.M. 88:1–92:7).

85.     As of that point, there was no agreement with Wells Fargo and no agreement with the Term Loan Lenders concerning the January 15 Payments.  (Tr. 7/22 A.M. 90:9-16).

86.     On January 27 and 28, 2016, Tilton met with Greenberg, Carl Marks and others to review Carl Marks' financial analysis of TransCare.  (Tr. 7/22 A.M. 98:8-12; 7/22 P.M. 4:8-12; PX 175; PX 179).

87.     On January 28, 2016, Tilton approved the purchase of two new ambulances for a total of $195,975, to be owned by Ark II and leased to TransCare.  (DX 120 at 2162; DX 121 at 99194; Tr. 7/22 P.M. 4:9–5:24).

88.     On January 29, 2016, Tilton directed PPAS to advance $690,168.24 on TransCare's behalf to pay NYSIF and certain TransCare creditors (the "January 29 Payments").  (DX 121; Tr. 8/13 A.M. 58:21–59:15).

89.     Tilton claims the January 29 Payments were attributable to Ark II.  (Tr. 8/13 A.M. 25:4-18).

90.     As of February 3, 2016, Tilton still had no agreement with either Wells Fargo or Credit Suisse for a new secured financing facility to TransCare.  (Tr. 7/22 P.M. 8:17-22, 9:20-22).

91.     On February 3, 2016, Greenberg spoke with Alex Witkes, his counterpart at Credit Suisse, to discuss obtaining Credit Suisse's approval to subordinating their security interest to a new lien.  (Tr. 7/22 P.M. 7:20–9:16; PX 189).

92.     Greenberg told Witkes that there was not yet a formal term sheet for the new loan, but that he wanted to send him a Summary of Terms for the new proposed facility.  (PX 189).

93.     The Summary of Terms included a $6.5 million facility which would have a priority junior to Wells but senior to the Term Loan Lenders on the ABL Priority Collateral and would have a priority senior to the Term Loan Lenders on the Term Loan Priority Collateral.   (PX 189; Tr. 7/22 P.M. 11:1-19).  In other words, this would place Credit Suisse and the other Term Loan Lenders in third priority position on the ABL Priority Collateral and in second position on the Term Loan Priority Collateral.  (PX 189).

94.     Greenberg reported that Credit Suisse was open to discussions concerning the new facility and wanted to see a plan showing how they would be better off agreeing to subordinate their position.  (PX 185 at 2543 (7:11 a.m. email)).

95.     Greenberg never sent Credit Suisse such a plan because Tilton never told him to do so.  (Tr. 7/22 P.M. 16:12-25).

96.     As of February 3, 2016, Wells Fargo had also not been provided with a going-forward plan for TransCare.  (Tr. 7/22 P.M. 17:23–18:6).

97.     On or about February 5, 2016, Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan for continuing a version of TransCare under a new company.  (Tr. 8/13 A.M. 64:1-16).

98.     As a result, Tilton began working on two models:  one for a "NewCo" under an Article 9 foreclosure plan and one to wind down the remaining portions of TransCare outside of bankruptcy, and then after 60-90 days putting TransCare into a chapter 7, so that receivables could be collected, employees could be given WARN notices and assets could be wound down in an orderly manner.  (Tr. 8/13 A.M. 65:3-16).  In connection with that,

a. Tilton refused to give WARN notices until she foreclosed on the assets to transfer to NewCo: "notice cannot be given prior to foreclosure on newco or there will be no Newco." (Tr. 8/13 A.M. 68:7-13; JX 87); and

b. Tilton sought a commitment from Wells Fargo to continue funding TransCare during its wind-down by over-advancing funds through the existing ABL, but (as discussed below) she ultimately rejected Wells Fargo's proposal to over-advance as insufficient. (Tr. 8/13 A.M. 68:14-19, 70:17-23).

**F.    On February 10, 2016, Tilton Institutes the Transcendence Plan**

99.    As discussed below, on February 10, 2016, Tilton set in motion a plan to sell certain of TransCare's assets to herself and to liquidate the remaining assets in a bankruptcy proceeding: (a) she created two new corporations named Transcendence, (b) she engaged bankruptcy counsel for TransCare, (c) she took a new secured position in TransCare's assets for her personal fund, Ark II, and (d) she submitted financials for the new company to insurance brokers to obtain necessary insurance for Transcendence to operate.

### i.    *Tilton Creates Transcendence*

100.    On February 10, 2016, Stephen, at Tilton's direction, caused two new corporations to be incorporated under Delaware law:  Transcendence Transit, Inc. and Transcendence Transit II, Inc.  ("Transcendence II," and collectively with Transcendence Transit, Inc., "Transcendence") (DX 133 at 15290, 15294; Tr. 7/23 P.M. 22:2–23:21).

101.    In addition, Stephen set up bank accounts, tax ID numbers, directors, and insurance for both companies.  (Tr. 7/23 P.M. 26:22–28:9, 103:4–104:23).

102.    The same day, Tilton became the sole director of Transcendence, issued a board resolution adopting the authority matrix and appointed Glen Youngblood, a senior vice president at TransCare, as President of Transcendence.  (PX 200; Stipulated Fact 7).

103.     Although both certificates of incorporation authorized the boards of Transcendence to issue 1,000 shares of common stock, no shares were ever issued for either Transcendence Transit Inc. or Transcendence II.  (Tr. 7/23 P.M. 24:5-16; DX 133 at 15290, 15294).

104.     Stephen, who was responsible for creating these entities, understood that Transcendence II was to be owned by Transcendence Transit Inc., but did not get around to issuing shares.  (Tr. 7/23 P.M. 25:10-14).

### ii.     *Tilton Engages Bankruptcy Counsel for TransCare*

105.     On the evening of February 9, 2016, Stephen contacted Curtis Mallet to prepare to file a chapter 11 bankruptcy proceeding for certain TransCare entities.  (JX 72, 10:06pm email; Tr. 7/23 P.M. 29:8–30:10).

106.     Stephen excluded two of TransCare's subsidiaries from the list of debtor entities for which Curtis Mallet would file:  TransCare Pennsylvania and TC Hudson Valley.  He did so because, already at that time, Tilton planned that "the secured lenders would foreclose on certain TransCare assets and those assets would lead to start another business, Transcendence Transit business, and the remainder of TransCare would be wound down, but it would still continue to operate."  (Tr. 7/23 P.M. 30:24–31:13).

107.     When describing TransCare's debt structure, Stephen did not identify that there were any loans outstanding from Ark II.  (JX 72 at 51882; Tr. 7/23 P.M. 32:17–33:10).

108.     Stephen described the lenders under the Term Loan as "funds managed by Patriarch Partners" and omitted the existence of Credit Suisse and First Dominion.  (JX 72 at 51882; Tr. 7/23 P.M. 32:9-16).

109.     The February 10, 2016 engagement agreement provided that Curtis Mallet "has been engaged to assist the Company with its out-of-court restructuring matters (including without limitation, in connection with efforts to restructure the Company's overall businesses and a

potential reorganization, recapitalization, refinancing, combination, sale(s) of assets, or any other restructuring), as well as any in-court involuntary or voluntary insolvency proceedings…." (JX 77 at 51777).

110. Tilton made the decision to hire Curtis Mallet. No one else from TransCare was consulted. (Tr. 7/23 P.M. 33:11-20).

111. Nevertheless, as discussed below, Curtis Mallet did not advise TransCare with respect to the negotiation of new Ark II Credit Facility and or with respect to the negotiation of the strict foreclosure documents.

### iii. *The New Ark II Credit Facility*

112. On February 10, 2016, Peter Ruffini, a lawyer at Patriarch Partners, requested that Greenberg (with a copy to Stephen) have TransCare sign four documents in connection with a new ARK/TransCare facility: (1) a credit agreement between Ark II and TransCare (the "Ark II Credit Agreement"), (2) a security agreement between Ark II and TransCare (the "Ark II Security Agreement"), (3) a guarantee agreement signed by each of TransCare's subsidiaries in favor of Ark II, and (4) an intercreditor agreement between Ark II and PPAS (the "Ark II Intercreditor Agreement") (collectively, the "Ark II Credit Facility"). (PX 197 at 47308, 11:33 a.m. email).[7]

113. Greenberg then repeatedly followed up with Peter Wolf to have Wolf sign the documents. (PX 197 at 47307).

114. Wolf, the Chief Operating Officer, was the most senior of officer at TransCare at this time. (Tr. 7/22 P.M. 20:15-24). The next most senior person was Glen Youngblood (Tr. 7/23 P.M. 81:4-12), who at this point was now also the President of Transcendence.

---

[7] There was no administrative agent on the Ark II Credit Facility and PPAS has no connection to the Ark II Credit Facility other than agreeing to the Ark II Intercreditor Agreement. (JX 197).

115.    Neither Ruffini, Greenberg, nor Stephen copied Curtis Mallet on these emails.  (PX 197).

116.    On February 11, 2016, Stephen emailed a fully executed copy of the Ark II Credit Facility documents (all dated as of January 15, 2016) to Curtis Mallet, stating only "I attach documents with a respect to another term loan for the company."  (JX 79 at 48968).

117.    The Ark II Credit Agreement provided that Ark II would make available a $6.5 million term loan facility to TransCare.  (JX 79 at 48968).  However, Section 2.5(b):

    a.  prohibited TransCare from requesting loans under the Ark II facility unless it first obtained the prior written consent of Ark II; and

    b.  provided that any loan shall "only be made at the sole and absolute discretion of the Lender" and "only be made if it is in accordance with a plan approved by the Lender."

(JX 79 at 48978).

118.    The Ark II Security Agreement granted Ark II a blanket security interest in TransCare's property (JX 79 at 49020) and authorized Ark II to file financing statements in support of the same.  (JX 79 at 49029).[8]

119.    The Ark II Intercreditor Agreement (JX 79 at 49001):

    a.  Granted Ark II both structural and payment priority over the Term Loan Lenders.  (JX 79 at 49004 (§2.2 providing that Ark II's lien would have priority over the Term Loan Lenders' lien), 49005 (§2.3 providing that the proceeds of

---

[8] The Ark II security agreement also provided that it would be subject to the terms of the Ark II intercreditor agreement.  (JX 79 at 49031).

any collateral would first be paid to Ark II, and only then to the Term Loan Lenders));

    b.   Provided that "only the party with the senior Lien in the collateral [Ark II] shall have the right to restrict, permit or approve or disapprove, the sale, transfer or other disposition" of the TransCare collateral. (JX 79 at 49007, §2.8(a));

    c.   Prohibited PPAS from exercising any of its remedies upon a default (JX 70 at 49008, §2.9(a)); and

    d.   Specifically, prohibited PPAS from conducting a strict foreclosure with respect to its TransCare collateral. (JX 79 at 49008, §2.9(a)(ii)) ("The party with a junior Lien on any Collateral… will not… seek to foreclose, enforce or realize upon (judicially or non-judicially) its junior Lien on such Collateral…").

120.    The Ark II Intercreditor Agreement was signed by Lynn Tilton as manager of Ark II and by Lynn Tilton as manager of PPAS. (JX 79 at 49015).

121.    Peter Wolf on behalf of TransCare signed an "acknowledgment" to the Ark II Intercreditor Agreement, providing that TransCare "acknowledges and agrees to the foregoing terms and conditions….[and] agrees that it will, together with its successors and assigns be bound by the provisions hereof." (JX 79 at 49016).

### iv.    *The Submission of Transcendence Financials to Insurers*

122.    On February 10, 2016, Greenberg emailed several of TransCare's insurance brokers with a request to bind new insurance policies for Transcendence, and to that end, he provided them with financial information concerning the new company. (PX 196; Tr. 7/22 P.M. 43:8–47:22).

123.    As of February 10, 2016, Greenberg told the insurance brokers that Transcendence would operate five of TransCare's business units: (1) the paratransit division; (2) Pittsburgh; (3) Hudson Valley; (4) Maryland; and (5) Westchester. (PX 196; Tr. 7/22 at 43:8–46:19).

124. Greenberg explained that the paratransit division would be operated out of Transcendence II to satisfy the MTA's concerns that their business be run out of a standalone corporate entity. (Tr. 7/22 P.M. 45:7–46:1).

125. Greenberg sent the insurance brokers financial statements for the new company which projected that Transcendence would earn $48 million in revenue during calendar year 2016, with EBITDA of $3.76 million. (PX 196; Tr. 7/22 P.M. 47:9-22).

126. The procurement of insurance for Transcendence was a necessary item for the foreclosure plan because Transcendence could not operate without first obtaining insurance. (Tr. 7/22 A.M. 71:8-18; Tr. 7/23 A.M. 20:3-16; Tr. 8/13 A.M. 25:4–26:12).

**G.** **Between February 11 and 23, 2016, Tilton Finalizes the Transcendence Plan**

**i.** ***Tilton Attempts to Procure Insurance for Transcendence***

127. On February 11, 2016, Tilton wrote to Bobby Siegel, an insurance broker, for the purpose of procuring insurance for Transcendence and explained that:

> There is a smaller, less risky transit business that we would like to continue in a new company. This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland. It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017. It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

(JX 80 at 92228; Tr. 8/13 A.M. 38:5–39:13).

128. Tilton sent this information because she understood that he needed the information to bind insurance. (Tr. 8/13 A.M. 39:5-8).

129.    On February 11, 2016, Tilton dictated an email sent by Greenberg to Credit Suisse (Tr. 7/22 P.M. 33:14-17), in which she told Credit Suisse that if they did not agree to subordinate their Term Loan position to a new $6.5 million facility, then TransCare would not be able to borrow the funds and would be forced to file for bankruptcy.  (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email)).

130.    These statements to Credit Suisse were false because (a) TransCare had already entered into the Ark II Credit Facility, which provided for borrowings up to $6.5 million in Tilton's sole discretion (*supra* ¶¶ 116-117); (b) TransCare had already retained bankruptcy counsel to file an imminent bankruptcy (*supra* ¶¶ 105-109); (c) Tilton had already formed Transcendence and was representing to insurers that Transcendence would carry on five of TransCare's business lines (*supra* ¶¶ 100, 122-125); and (d) Tilton had already executed the Ark II Intercreditor Agreement on behalf of PPAS as agent for the Term Loan Lenders (*supra* ¶¶ 119-120).

131.    Tilton also directed Greenberg to tell Credit Suisse that, as an equity holder, Credit Suisse would be responsible for paying TransCare's unpaid payroll and payroll taxes, and that its share could be between $1 million and $2 million.  (PX 249 at 77102; Tr. 7/22 P.M. 32:15–33:17).

132.    Credit Suisse asked for details about the missing payroll and financial problems, to which Greenberg never responded.  (Tr. 7/22 P.M. 34:20–35:3).

133.    No one had any contact with Credit Suisse again until Credit Suisse asked for a status update after TransCare's bankruptcy filing.  (Tr. 7/22 P.M. 35:10-19).

iii.    *Tilton Refines Business Model*

134.    On February 13, 2016, Pelissier sent Tilton and Stephen the "Transcendence Go Forward Model" that he and Greenberg were preparing.  (PX 286).  This model constituted the

assets that Tilton would be continuing as a going concern, as of that date.  (Tr. 7/22 P.M. 53:17-23).

135.    The February 13, 2016 model similarly contemplated that Transcendence would operate the following five divisions of TransCare: (1) the MTA Contract, (2) Pittsburgh; (3) Hudson Valley; (4) Maryland and (5) Westchester (including the Bronx).  (PX 286; Tr. 7/22 P.M. 54:8-13).

136.    Under this model, Greenberg (and those he was working with) projected that Transcendence would have consolidated 2016 revenues of $65 million with EBITDA of $5.1 million.  (PX 286 at 105517; Tr. 7/22 P.M. 55:1-7).

137.    Greenberg noted that Transcendence would have an "incremental funding need" of $8 million while the accounts receivable were paid (90 days for the ambulance divisions and 45 days for the paratransit division), "which can be offset if a new ABL line is secured or by cash that builds through the year."  (PX 286 at 105517; Tr. 7/22 P.M. 56:18–57:4).

138.    For this reason, the "incremental funding need" was not listed on the model cash flow statement as a capital expenditure but instead was listed as a financing adjustment.  (PX 286 at 105522; Tr. 7/22 P.M. 56:22–57:2).

139.    The cash flow statement projected virtually no capital expenditures for Transcendence in 2016.  (PX286 at 105522; Tr. 7/22 P.M. 56:13-17).

140.    The plan also assumed a further $2 million would be spent:

   a.  $1.8 million paying certain of TransCare's existing creditors from whom Transcendence would need cooperation (past due employee payroll, facility rents, and amounts owed to vehicle repair suppliers); and

   b.  $237,000 in down payments on eight new vehicles for Transcendence.

(PX 286 at 105517).

141.    At trial, Tilton testified that she derived the $10 million credit given in the February 24, 2016 strict foreclosure from several of the cells included in the February 13, 2016 Excel model. (Tr. 8/13 P.M. 105:16–106:10).    Tilton testified that column B on tab "BS" represented TransCare's "December ['15] closing balance sheet."  (Tr. 8/13 P.M. 104:23–105:12; PX 286 (native)).  She testified that she calculated the $10 million by adding the cells for (1) cash, (2) account receivables, (3) inventory, and the (4) net property, plant and equipment.  (Tr. 8/13 P.M. 105:20–106:10).  She testified that the figures in these cells represented the book value of those specific assets, although she did not know how the book value was calculated.  (Tr. 8/13 P.M. 107:8-13).

142.    During this period, Tilton had ten people making three different models to make sure she ended up with accurate numbers with no mistakes for Transcendence.  She was hoping that the models would check each other, but to eventually select one model to move forward with her decisions and projections. (Tr. 8/13 P.M. 39:17–40:7).

### iv.    *Tilton's Team Prepares Transition Services Agreement*

143.    Between February 10 and February 24, 2016, Tilton's team internally prepared a draft Transition Services Agreement ("TSA") between TransCare and Transcendence.  (Tr. 7/23 P.M. 68:4-12).

144.    Under the draft TSA (JX 95), TransCare would lease several hundred ambulances back from Transcendence for about $200,000 a month so that it could continue providing its New York ambulance services.  (JX 95 at 44011-44018 (Ex. C); Tr. 7/23 P.M. 68:25–69:13, 71:21–73:6).

145.    Under the draft TSA, TransCare would pay Transcendence for the services of its former employees.  (JX 95 at 44009 (Ex. B); Tr. 7/23 P.M. 74:4–75:19).

146.    There is no indication Tilton ever approved the TSA, and according to Stephen she had not even seen it by February 23, 2016.  (JX 95; Tr. 7/23 P.M. 70:17–71:3).

<blockquote><strong><em>v.     Tilton Negotiates with Wells Fargo While Preparing to Move Forward With Transcendence</em></strong></blockquote>

147.    On February 12, 2016, during a phone call with Tilton's representatives and Wells Fargo's lawyers, Tilton's representatives discussed the plan to foreclose on certain assets of TransCare and Wells Fargo's lawyers asked a number questions, including what entities Tilton expected to foreclose upon.  (DX 140; Tr. 7/23 P.M. 169:24–173:21).

148.    On February 14, 2016, Pelissier, at Tilton's direction, circulated the operational plan for Transcendence to Greenberg, Pelissier, Stephen, Wolf, Youngblood, and others.  (PX 206; Tr. 7/23 A.M. 17:7-9).  According to that plan:

a.  The decision and timing of the foreclosure and bankruptcy filing of TransCare would be determined exclusively by Tilton.  (Tr. 7/23 A.M.17:17-24).

b.  Curtis Mallet (bankruptcy counsel for TransCare) and Perkins Thomson (bankruptcy counsel for PPAS) had been hired.  (PX 206 at 91292).

c.  Stephen and another lawyer at Patriarch were tasked with preparing the foreclosure documents by February 11, 2016, and Stephen was to finalize the bankruptcy filing documents by February 14, 2016.  (PX 206 at 91292).

d.  Stephen would also review which contracts could be assigned to the new company.  (Tr. 7/23 A.M. 25:20–26:8).

e.  Pelissier and Youngblood, the designated President of Transcendence and the most senior person after Wolf at TransCare, would be in charge of changing remittance forms and payment lock box accounts for Transcendence on day 1. (PX 206 at 91295).

f.  Pelissier and Youngblood would also be in charge of devising a system for the new company to generate payroll checks. (PX 206 at 91296, 91297; Tr. 7/23 A.M. 24:2–25:1).

g.  Employees would need to be sent WARN notices and be transferred to Transcendence but no one had yet decided when to do so. (Tr. 7/23 A.M. 19:11-22).

149.  Between February 10 and 17, 2016, Wells Fargo requested a budget to fund the then-proposed bankruptcy. (JX 84 at 53, 51, 49 and 47). "In order for us to seek approval for a DIP Facility, a budget is necessary—even if it is in draft form initially." (JX 84 at 51).

150.  On February 16, 2016, Tilton apologized for not sending any of the models yet and told Wells Fargo that she now believed that it would "be much better for everyone" if TransCare could avoid chapter 11 and its expenses and instead wind down for a 45-60 day period and then file for chapter 7. (JX 84 at 48).

151.  On February 17, 2016, Tilton sent Wells Fargo a wind-down plan for TransCare following a foreclosure sale. (JX 86).

152.  On February 19, 2016, Wells Fargo submitted a written proposal to enter into a new $16.5 million ABL through May 31, 2016, to fund TransCare during a wind-down. (PX 219 at 3192 (native)). The proposal was conditioned on: (1) a release from Patriarch, (2) a budget, (3) consent from the Term Loan lenders, and (4) a "transition services agreement among Newco and [TransCare], as well as documents and agreement related to the formation of Newco, the transfer of assets/liabilities to Newco from certain Borrowers [TransCare]." (PX 219 at 3192 (native, last box on page)).

153. Tilton did not consider this proposal to be adequate. (Tr. 8/13 A.M. 79:23–80:7). Wells Fargo never received a release, a Newco budget, documents relating to the formation of Newco or a transition services agreement.

154. At some point after February 19, Tilton entered into negotiations with Wells Fargo now directed at purchasing TransCare's outstanding receivables for Pittsburgh, Hudson Valley and the MTA Contract, then being paid to a Wells Fargo lockbox under the ABL. (Tr. 8/13 A.M. 73:3-15).

155. Tilton never reached agreement with Wells Fargo on a purchase price for the receivables. (Tr. 8/13 A.M. 15:1-12).

156. At the same time, Tilton continued waiting for the insurance to be bound for Transcendence to set the foreclosure in motion. (Tr. 8/13 A.M. 74:5-7; DX 170, 3:49 P.M. email; DX 171, 4:44 P.M. email). Pelissier explained, "if we cannot insure, we cannot operate." (Tr. 7/23 A.M. 30:8-24).

157. On February 23, 2016, without an agreement with Wells Fargo, Tilton directed PPAS to pay $593,000 to NYSIF for Transcendence's workers' compensation insurance. (PX 226; Tr. 8/13 A.M. 75:6-15). As discussed below, Tilton applied these funds to a new revolving loan extended from Ark Angels III (another of her personal investment funds) to Transcendence. (*Id.*)

158. Tilton authorized the foreclosure at 12:07 a.m. on February 24, 2016 because she had received the insurance for Transcendence that she had been waiting for. (Tr. 8/13 A.M. 6:16-19).

**H.    The Foreclosure and Sale**

159.    At 12:07 a.m. on February 24, 2016, Stephen, at Tilton's direction, provided TransCare with (a) a Notice of Default and Acceleration (JX 96 at 43311) and (b) a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligations (JX 96 at 43306).

160.    Stephen did not send the Notice of Default or Notice of Acceptance to Curtis Mallet.  (JX 96; Tr. 7/23 P.M. 50:24-51:21).

161.    Both the Notice of Default and the Notice of Acceptance were signed by Tilton, on behalf of PPAS, the Zohar Funds, and Ark Investment, but not by Credit Suisse or First Dominion. (JX 96 at 43308, 43313).

162.    In the Notice of Default, PPAS declared a default arising from TransCare's failure to pay interest and accelerated all of TransCare's payment obligations under the Term Loan.  (JX 96 at 43311).

163.    By the Notice of Acceptance, PPAS accepted certain of TransCare's collateral in satisfaction of $10 million outstanding under the Term Loan:

> Pursuant to Section 9-620 of the Uniform Commercial Code, notice is hereby given of the Agent's acceptance of the subject collateral identified on Schedule A attached hereto in partial satisfaction of the undersigned entities' Obligations under the Credit Agreement (the "Subject Collateral"). The Subject Collateral is accepted by Agent in satisfaction of $10,000,000 of the Obligations, which represents a partial satisfaction of the Obligations.

(JX 96 at 43307).

164.    According to Schedule A, the Subject Collateral consisted of:

a.    "All of Debtors' personal property of every kind and description…;"

b.    Three contracts, including the MTA Contract; and

c. The stock of (i) TransCare Pennsylvania, Inc., (ii) TC Hudson Valley Ambulance, Inc., and (iii) TC Ambulance Corp.;[9]

d. <u>But not</u> any Accounts, as defined in the Security Agreement.

(JX 96 at 43310).

165. At Tilton's direction, Peter Wolf, the Chief Operating Officer of TransCare, executed the Notice of Acceptance. (DX 174; Stipulated Fact 41).

166. On the morning of February 24, 2016, PPAS, as administrative agent, and Transcendence, entered into a Bill of Sale, Agreement to Pay and Transfer Statement. (JX 102; Stipulated Fact 43).

167. Tilton made all the decisions for PPAS and the Term Loan Lenders and came up with terms for the transaction. (Tr. 8/14 A.M. 18:10-11 ("I was responsible for all the lenders as the agent and I came up with the terms.")).

168. The Bill of Sale (JX 102) provided that the Subject Collateral was sold, assigned, transferred and delivered from PPAS to Transcendence. (*See* Recital D ("TransCare tendered… and the Lenders accepted"); Recital F (PPAS "now desires to sell, assign, transfer and deliver the Subject Collateral, tendered by TransCare pursuant to the Foreclosure Notice (the "<u>Purchased Assets</u>") to [Transcendence], and [Transcendence] desires to purchase, accept, acquire and take the Purchased assets."); Section 1 (PPAS "hereby sells, assigns, transfers and delivers to [Transcendence] all of its and the Lenders' respective rights, title and interest in the Purchased Assets…"); Section 2 ("[T]he purchased assets are hereby transferred 'as-is, where is' and in its

---

[9] TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp. each held a certificate of need ("<u>CON</u>") issued by the New York Department of Health to operate medical ambulance services in specified counties. (Dkt. 201-1 at 1; Dkt. 202-1 at 1).

present condition and state of repair, with all faults, limitations and defects."); and Section 5 ("This Bill of Sale constitutes a 'transfer statement' for purposes of Section 9-619 of the UCC.")).

169.    As consideration for the Subject Collateral, Transcendence agreed to pay $10,000,000 to Ark Angels III.  (JX 102 (Bill of Sale)):

    a.  Recital E ("The consideration for the transfer of the Subject Collateral to [Transcendence] pursuant to this Bill of Sale shall be $10,000,000 such amount to be financed by Ark Angels III, through [Transcendence's] agreement to pay, under the terms of the Purchaser Credit Agreement as such term is defined below, a portion of the amounts outstanding in respect of the Loans as of the date hereof as described below."); and

    b.  Section 3 ("[Transcendence] hereby agrees to pay $10,000,000, constituting a portion of the principal amount outstanding of under the TransCare Credit Agreement as of the date hereof prior to giving effect to the foreclosure described in the Foreclosure Notice… (the "<u>Closing Date Obligations</u>").  Such Closing Date Obligations shall be owing by [Transcendence] on and after the date hereof and will be governed exclusively by the Credit Agreement, dated as of the date hereof, by and between Administrative Agent, the lenders party thereto and [Transcendence] (the "<u>Purchaser Credit Agreement</u>")...")

170.    The Purchaser Credit Agreement is structured as a syndicated loan to Transcendence with PPAS as the administrative agent and Ark Angels III as the sole lender thereto. (JX 101 at 8674, 8742; Tr. 8/13 A.M. 23:9-16).  Tilton testified that the Ark Angels III loan would be secured only by Transcendence's receivables.  (Tr. 8/14 A.M. 43:14–44:10).

171.    Tilton testified that the Ark Angels III loan funds would be used to either (a) purchase TransCare's receivable from Wells Fargo or (b) "go in or about day one as soon as cash was needed."  (Tr. 8/13 A.M. 22:23–23:8).

172.    Defendants have not produced an executed copy of the Purchaser Credit Agreement, but (a) Tilton testified that she committed to this loan and (b) Transcendence borrowed $658,000 under the Purchaser Credit Agreement to pay NYSIF and the lease of the paratransit

facility on Foster Avenue. (JX 101 at 8673; Tr. 7/22 P.M. 59:13–60:10, 8/13 A.M. 24:15-24). These borrowing were charged to the Ark Angels III loan. (Tr. 7/22 P.M. 61:7-8).

173. Greenberg told Todd Trent, an insurance broker at Lockton, that part of the $10 million purchase price for Transcendence would be the unfunded Ark Angels IIII revolving loan. (PX 228, Tr. 7/22 P.M. 63:8-24).

174. Thus, under the written documents constituting the strict foreclosure:

    a. TransCare received a $10 million credit off the Term Loan;

    b. Transcendence received the foreclosed assets;

    c. Transcendence promised to borrow from and repay $10 million to Ark Angels III; and

    d. The Term Lenders received nothing.

**I.     The February 24 Plan**

175. On February 24, 2016, Tilton directed Greenberg to send Transcendence's projected 2016 financials to Lockton for the purpose of procuring insurance. (PX 228; Tr. 7/22 P.M. 62:15–63:7).

176. The projected 2016 financials were a 10-month projection, not a full year, because they started on February 21, 2016 and ended on December 31, 2016. (PX 228 at 86223; Tr. 7/22 P.M. 64:7-15; PX 233; Tr. 7/22 P.M. 68:13-18).

177. The 2016 financials showed projected revenues of $37 million and projected EBITDA of $3.2 million ($3,204,500) in that ten-month period. (PX 228 at 86223; Tr. 7/22 P.M. 64:4-18). Tilton admitted that EBITDA would increase to $4 million if annualized over a full twelve months. (Tr. 8/14 A.M. 38:4-12).

178. The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million EBITDA shown on the earlier forecast (PX

286) resulted from the loss of the Maryland business in the meantime and "possibly also a slight difference in timing in terms of the beginning of the forecast."  (Tr. 7/22 P.M.65:4-8).

## J.  Events Subsequent to the Foreclosure and Sale

179.   As discussed below, Transcendence operated the MTA paratransit business, the Pittsburgh business, and the Hudson Valley business on February 24, 25, and 26, 2016.  Tilton, not the Trustee, gave the order for these operations to shut down on February 26, 2016.

### i.  *Pittsburgh*

180.   On the morning of February 24, 2016, Transcendence owned TC Pennsylvania, Inc. as a wholly-owned subsidiary.  (Tr. 7/22 P.M. 70:11-14).  TC Pennsylvania, Inc. owned the Pittsburgh business assets. (Tr. 7/22 P.M. 46:2-4).

181.   Its manager, Earl Kossuth, reported up through Glen Youngblood (the president of Transcendence) to individuals at Patriarch, including Greenberg and Pelissier.  (Tr. 7/22 P.M. 70:15–71:3).

182.   For example, on Friday morning, February 26, 2016, Kossuth reported to Greenberg, Youngblood, Pelissier, Stephen, and Kevin Dell (another lawyer at Patriarch) that he needed to provide a letter describing the ownership of the new company to the Pennsylvania Department of Health or else "we will be forced to stop operating."  (PX 243).  Greenberg responded that he would get the letter that day. (PX 243; Tr. 7/22 P.M. 71:4-10). The letter was ultimately provided to Kossuth. (Tr. 7/22 P.M. 71:11-12).

183.   TC Pennsylvania, Inc. continued to operate until midnight on February 26, 2016, after which Kossuth reported to Pelissier that the last ambulances returned to base, he notified customers of the shutdown and locked-up all narcotics.  (PX 247; Tr. 7/23 A.M. 44:14–45:16).

184.     The Trustee took no action with respect to the assets of the Pittsburgh operation until after TC Pennsylvania, Inc. filed for bankruptcy several weeks later and he conducted an auction in Pittsburgh.  (Tr. 7/24 144:16–145:5).

### ii.     *Hudson Valley*

185.     On the morning of February 24, 2016, Transcendence owned TC Hudson Valley Ambulance, Inc. as a wholly-owned subsidiary.  (Tr. 7/22 P.M. 67:l–68:3).

186.     TC Hudson Valley Ambulance, Inc. owned the CON necessary to operate ambulances in the Hudson Valley.  (Tr. 8/14 A.M. 23:1-7; Dkt. 201-1 at pg. 1 of 8).

187.     Tilton did not put TC Hudson Valley Ambulance Inc. or TC Ambulance Corp. (which held a separate CON for Westchester) into bankruptcy until April 2016.  (Stipulated Facts 50; Dkt. 202-1 at pg. 1 of 8).

188.     TC Hudson Valley Ambulance, Inc. controlled its own intake, computer mapping (CAD) and dispatch systems necessary for the dispatch and tracking of ambulances so it could operate without anything else from TransCare.  (Tr. 7/23 A.M. 20:14–21:11).

189.     The Trustee took no action with respect to the assets of the Hudson Valley operation until that entity filed for bankruptcy several weeks later and he conducted an auction in Poughkeepsie.  (Tr. 7/24 144:16–145:9).

### iii.     *Tilton Assigns the MTA Contract to Transcendence and Then Discontinues Service*

190.     On February 24, 2016, Pelissier forwarded the paperwork necessary to assign the MTA Contract, which he had requested from the MTA, to Stephen, Greenberg, Jones, Wolf and Fuchs.  (JX 100 (1:34 p.m. email)).

191.     Pelissier told them that the MTA "sounded positive and expects the documents back to move forward expeditiously."  (*Id.*)

192.    On February 24, 2016, Tilton signed a written consent as the sole board member of TransCare New York, Inc. directing the Chief Operating Officer of TransCare to assign the MTA Contract to Transcendence II.  (PX 229).

193.    The written consent stated that "the MTA has heretofore provided the Company with its consent to the Assignment."  (PX 229).

194.    At 8:27 p.m. on February 24, 2016, Stephen circulated an executed Agreement of Assignment for the MTA Contract (the "MTA Assignment"), stating that the financial disclosures would need to be completed by someone else.  (JX 100).

195.    The MTA Assignment was executed on behalf of TransCare by Peter Wolf and on behalf of Transcendence II by Glen Youngblood.  (JX 100 at 77168).

196.    The MTA Assignment was also accompanied by a Consent to Assignment, also signed by Wolf and Youngblood.  (JX 100 at 77169).  That Consent provided that TransCare guaranteed the "full performance" of Transcendence II under the MTA Contract.  (JX 100 at 77169 (Term No. 2)).

197.    Counsel for TransCare was not consulted on procuring TransCare's consent to transferring the MTA Contract, nor on executing the MTA Assignment and Consent to Assignment.  (Tr. 7/23 P.M. 81:16-23, 85:20-23).

198.    On February 25, 2016, Stephen confirmed to the MTA that TransCare had transferred everything necessary for servicing the MTA Contract to Transcendence and that nothing prevented Transcendence from servicing the MTA Contract, representing that:

    a.  The secured lenders of TransCare foreclosed on the MTA Contract on February 24, 2016 and immediately thereafter sold the MTA Contract to Transcendence;

b. They were able to do so because they had a security interest in TransCare's general intangibles and the MTA Contract constituted such an intangible;

c. "All of the 390 drivers and other TransCare employees necessary for Transcendence Transit II to continue to provide services under the Agreement were transferred to Transcendence Transit II at the time of the foreclosure and are now employees of Transcendence Transit II[;]"

d. Transcendence had the necessary auto, liability and workers' comp insurance; and

e. "The bankruptcy of TransCare has no impact on Transcendence Transit II's ability to provide uninterrupted service to the MTA in accordance with the terms of the Agreement." (emphasis in original).

(PX 244 at 43521-22 (8:49 p.m. email)).

199.    Tilton approved the above email for Stephen to the MTA.  (Tr. 7/23 P.M. 99:2-7).

200.    In the same email, Stephen also told the MTA that the Trustee would not impede the transfer of the MTA business to Transcendence ("The bankruptcy trustee does not have the power and authority to unwind the foreclosure—nor has he expressed any misgivings or concerns about the foreclosure.") (PX 244 at 43522 (emphasis in original)).[10]

201.    On February 26, 2016, Stephen wrote to the MTA asking them to agree on a "new agreement" with Transcendence II with certain conditions, including that the MTA terminate the MTA Contract with TransCare.  (PX 236).

---

[10] In addition, Tilton told the employees of Transcendence that she would pay their wages for their last week of work at TransCare in the event the Trustee did not pay them, a promise she did not keep.  (JX 103; Tr. 7/23 P.M. 132:4-17).

202. Stephen told the MTA that absent agreement to the new terms "we will, unfortunately, be forced to discontinue service at 5:00PM today." (PX 236).

203. At the same time, Randy Creswell asked the Trustee to consent to termination of the MTA Contract. (JX 105).

204. The Trustee consented to terminating the MTA Contract as long as it was without prejudice to amounts due to TransCare. (JX 105).

205. At 7:01 p.m., Stephen told the MTA that, after speaking with Tilton, Transcendence would not be continuing to provide services. (PX 245).

206. In that same email, Stephen provided the MTA with the termination notice that had been sent to Transcendence's employees that day. (PX 245 at 43517). The notice informed the employees that Transcendence had shut down operations effective "immediately" and instructed them to "secure your vehicles and operations and await further instruction from the court appointed Trustee." (*Id.*).

**K.  Until This Trial, Defendants Took the Position That the Foreclosure Had Occurred**

207. At the initial February 25, 2016 meeting with the Trustee, and other parties in interest, Randy Creswell, the attorney for PPAS, told the Trustee that the strict foreclosure had occurred the day before and that the only remaining business lines for the Trustee to oversee were the New York and Bronx/Westchester ambulance operations, headquartered out of Hamilton Avenue in Brooklyn and Mount Vernon. (Tr. 7/24 133:22–134:22).

208. Creswell further told the Trustee that PPAS had foreclosed on the paratransit business and the assets located at Maryland, Pittsburgh, and Poughkeepsie and that business lines located at those locations were being operated by a new company. (Tr. 7/24 136:20–137:9).

209.     As a result, the Trustee did not seek to exercise any control over those operations, until much later when they were also filed into bankruptcy.  (Tr. 7/24 137:10-22).

210.     Creswell further told the Trustee that PPAS had foreclosed on all of the ambulances pursuant to the strict foreclosure, but that if the Trustee decided to operate there would have to be an agreement reached with PPAS.  (Tr. 7/24 134:15–135:6).

211.     On February 25, 2016, Brian Stephen told the attorney for the MTA that the foreclosure had occurred, and that Transcendence was operating the paratransit division.  (PX 244 at 43521, 43522).

212.     On February 26, 2016, Creswell again wrote to the Trustee (and his partner) stating that "Transcendence Transit II has been providing services under the MTA Contract above since the filing date."  (JX 105, 2:00 pm email); Tr. 7/24 13:18–14:7).

213.     On February 29, 2016, PPAS filed a response in this Court asserting that PPAS "consummated a strict foreclosure" on "all of Debtors' personal property, vehicles (*i.e.*, ambulances), certain contracts, certain certificates for operation, and the shares of stock in certain non-filing subsidiaries of Transcare Corporation."  (Dkt. 11 at ¶ 6).

214.     On March 23, 2016, PPAS filed a responsive pleading with this Court claiming that the foreclosure had occurred and all legal title and equitable interests in the foreclosed property had transferred to Transcendence.  (Dkt. 49 at ¶¶ 9, 12, 13).

215.     On September 1, 2016, PPAS wrote the Trustee complaining about the administration of the estate and stating that had it known about the Trustee's actions, PPAS "never would have agreed to the sale of its assets by the Trustee.  It would have simply liquidated such assets outside of the bankruptcy process as they never became property of the estate in the first place in light of the prepetition strict foreclosure."  (Dkt. 284-2 at ¶ 4).

216.    Similarly, at trial, Defendants admitted that TransCare's ambulances belonged to PPAS and then to Transcendence following the strict foreclosure:

a. Stephen admitted that TransCare's ambulances became Transcendence's ambulances on February 24, 2016 (Tr. 7/23 P.M. 72:9-21);

b. Tilton admitted that all of TransCare's ambulances had been transferred to Transcendence as part of the sale of the strict foreclosure.  (Tr. 8/13 A.M. 36:25–37:7).

217.    Finally, in response to the Court's direct inquiry at trial, defense counsel conceded that nothing more was required under state law to effectuate a transfer of personal property than delivering the bill of sale.  (Tr. 8/13 A.M. 32:24–33:9).

## III.    Liquidation of Assets and Claims Against the Estate

218.    At the time of the bankruptcy filing, TransCare owed Wells Fargo approximately $13 million, which was paid in full as a result of the liquidation of assets.  (Tr. 7/24 159:16-24).[11]

219.    The Trustee realized approximately $19.2 million through the liquidation of TransCare's ambulances, equipment, accounts receivable and CONs.  (Tr. 7/24 13:10-14).   The Trustee attributes $5.7 million of those liquidation sales to the foreclosed-upon assets.  (Tr. 7/24 27:23-25).

---

[11] The initial TransCare debtors filed their bankruptcy petitions on February 24, 2016.  (Stipulated Fact 44).  The Trustee was appointed on February 25, 2016.  (Stipulated Fact 45).  The three debtor entities sold to Transcendence filed their bankruptcy petitions on April 25, 2016 and were merged into the estate.  (Stipulated Facts 50-51).

220.     While the Trustee received $3.2 million for the sale of the two CONs which PPAS foreclosed upon,[12] the Trustee was unable to realize a return from the sale of the paratransit division because Tilton had already closed it down on February 26, 2016.

221.     Pursuant to the March 25, 2016 stipulation and order, the Trustee distributed $800,000 to PPAS as agent for the Term Loan Lenders from the proceeds of the auctions. (Stipulated Fact 49; Tr. 8/13 A.M. 36:13-24).

222.     PPAS did not credit the $800,000 it received from the Trustee to the Term Loan. (JX 110 at pg. 9 of 9).

223.     Instead, PPAS turned the $800,000 over to Ark II, and Ark II applied the $800,000 to Ark II's secured claim against the estate.  (Tr. 8/13 A.M. 36:19-24; JX 109 at pg. 5 of 9).

224.     On March 1, 2016, employees of TransCare filed several class action suits against the estate and others seeking unpaid wages for the period February 13 to 24, 2016, as well as amounts due under the federal and state WARN acts, which have been consolidated as *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033 (collectively, the "WARN Act Liability").

225.     On October 9, 2017, PPAS, as Administrative Agent for the Term Loan Lenders, filed proofs of claim against TransCare seeking $35 million, including $1.5 million in accrued interest, postpetition attorneys' fees and agency fees and also including a $10 million credit for "Acceptance of Collateral."  (Stipulated Fact 54; JX 110 at pg. 9 of 9).

---

[12] As discussed *supra* ¶ 164, PPAS foreclosed on the stock of TC Hudson Valley Ambulance Inc. and TC Ambulance Corp.  By orders dated July 6, 2016, the Trustee sold these CONs issued to these two entities for $1.2 million and $1.9 million, respectively.  (Case No. 16-10407, Dkt. Nos. 201 and 202).

226.   On October 9, 2017, Ark II filed proofs of claim against TransCare's estate seeking $1.1 million, claiming that it had reduced its $1.9 million claim by applying the $800,000 it received from PPAS.  (Stipulated Fact 53; JX 110 at pg. 9 of 9).

## IV.   Facts Relevant to Particular Claims

### A.   Tilton Did Not Engage in a Fair Process to Arrive at the Sale Price

227.   There was never an appraisal of TransCare's assets prior to February 24, 2016.  (Tr. 7/22 P.M. 51:24–52:1).

228.   Greenberg was never tasked with finding a replacement for the ABL.  (Tr. 7/22 P.M. 123:7-12).  Leland was prohibited from seeking any financing.  (Leland Tr. 77:2–78:23, 101:13–101:20).

229.   Tilton never approved a plan for TransCare between November 14, 2015 and February 24, 2016.  (Tr. 7/22 P.M. 123:13-19).[13]

230.   As a result, no plan could be sent to Wells Fargo to satisfy its condition for further financing.  (Tr. 7/22 P.M. 123:20-24).

231.   Greenberg never gave Credit Suisse a plan so that Credit Suisse could consider subordination to a new facility.  (Tr. 7/22 P.M. 16:12-25).

232.   Tilton forbade her team at Patriarch and her executives at TransCare from contacting the parties who had expressed interest in TransCare, as discussed *supra* ¶ 61.  (*See* JX 15 at 28516; Tr. 7/22 A.M. 46:9–47:8).

233.   As a result, Tilton never fully engaged with any potential purchasers.  (Tr. 7/22 P.M. 124:5-9).

---

[13] In fact, despite the necessity for such a plan, Tilton did not approve a plan for TransCare during all of 2015.  (Leland Tr. 80:4-6).

234. Tilton alone initiated and structured the foreclosure and sale to Transcendence, as discussed *supra* ¶¶ 99, 141, 158.

235. Tilton did not provide minority shareholders with advance information concerning the foreclosure and sale, and in fact provided some of them with misleading information, as discussed *supra* ¶¶ 129-133.

236. Tilton offered no contemporaneous document memorializing how she calculated the foreclosure price. (Tr. 8/14 A.M. 20:17–21:22).

237. Tilton testified that she used the book value reflected on TransCare's December 2015 balance sheet, as shown in PX 286, to arrive at the $10 million credit bid on the foreclosure. (Tr. 8/13 P.M. 103:12–106:10).

238. That book value did not accurately reflect TransCare's assets:

    a. Tilton admitted that the book value did not provide any valuation for TransCare's intangible assets, including the MTA Contract and the two CONs included in the foreclosed assets. (Tr. 8/14 A.M. 24:7-9 (Tilton did not take any steps to value TransCare's CONs); Tr. 8/14 A.M. 24:10-12, 26:5-7 (Tilton did not take any steps to value the intangibles); Tr. 8/14 A.M. 26:8-11 (balance sheet did not include MTA Contract)).[14]

    b. Tilton claims to have obtained the book value from TransCare's "December ['15] closing balance sheet" (Tr. 8/13 P.M. 104:25–106:10), however, the record indicates the last financial statement prepared for TransCare was October 2015. (Tr. 8/13 P.M. 129:1-6).

---

[14] As described *supra* ¶ 164, Tilton sought to foreclose upon two CONs and the MTA Contract. In any event, Tilton admitted that she used the book value of assets that did not correspond with the assets she ultimately foreclosed upon. (Tr. 8/13 P.M. at 107:7–108:9).

239.     Stephen, who sent the default and acceptance notice, could not explain why he sent them at 12:07 a.m. on the morning of February 24, 2016.  (Tr. 7/23 P.M. 52:8–53:7).

**B.     Tilton Did Not Pay TransCare a Fair Price for Its Assets**

240.     Tilton gave TransCare a $10 million credit against the now-subordinated Term Loan in exchange for assets which she valued at $22,058,901.77.  (Tr. 8/13 A.M. 13:9–14:14; Tr. 8/13 P.M. 12:8–13:22).[15]

241.     Defendants did not offer any expert valuation of TransCare's assets, or the assets PPAS foreclosed upon and sold to Transcendence.  (Tr. 8/8 45:6-15 (no opinion regarding the value of TransCare at any time in January or February 2016)).

242.     The Trustee's expert, Dr. Jonathan Arnold, used four approaches to value TransCare based upon four business plans prepared by Tilton, or those working for her, between January 5 and February 24, 2016.  Dr. Arnold selected those valuation approaches from what he found "evident in the testimony and in the ordinary course of Patriarch's work in managing and supervising TransCare."  (Tr. 7/24 13:15-21):

   a.  EBITDA multiples of comparable companies;

   b.  EBITDA multiples for precedent transactions analysis;

   c.  EBITDA multiples identified by Tilton and her staff; and

   d.  EBITDA multiples contained in the expressions of interest.

(Tr. 7/24 13:22–14:4).

243.     Using the comparable company analysis, Dr. Arnold used the two companies identified by Greenberg as those most similar to TransCare.  (Tr. 7/24 16:18–17:6).

---

[15] At trial, after stating that the $22 million was generous, Tilton testified it was "an equitable purchase price for future for the old lenders and the new lenders."  (Tr. 8/13 A.M. 14:7-14).

a. First, Dr. Arnold determined that EBITDA multiples were "quite clearly, the relevant multiple in this industry. The record is replete from Mr. Leland, Mr. Pelissier, Mr. Greenberg, and offers from third-parties. So it is—what one sees is offers that are expressed in terms of an EBITDA multiple." (Tr. 7/24 17:7-14).

b. Next, Dr. Arnold calculated the forward EBITDA multiples of the comparable companies on the dates of each of the four business plans. Dr. Arnold used forward EBITDA because "Patriarch was in the process of restructuring or modeling what a [re-]structured TransCare would look like with a different management and a different process going forward. And anyone buying the company would be buying the future, not the past. So, for that reason, forward EBITDA is a very common concept…. And it is a standard way of thinking about EBITDA in this context." (Tr. 7/24 18:3-11).

a. Applying that analysis to the January 7 Plan prepared by Greenberg, Dr. Arnold determined that the value of TransCare would fall between $51.1 and $86.5 million. Applying that analysis to the January 27 and 28 plans, Dr. Arnold determined that the value of TransCare would fall between $35.3 and $62.6 million. And finally, applying that analysis to the Newco model provided by Greenberg to Lockton on February 24, 2016, Dr. Arnold determined that the value of the Newco assets would fall between $22.7 and $39.1 million. (Tr. 7/24 19:6-22).

244. Using the precedent transaction analysis, Dr. Arnold used the two recent precedent transactions identified by Greenberg (Envision's acquisition of Rural/Metro and KKR's

acquisition of Air Medical Group) and computed the enterprise value to EBITDA multiples underlying those transactions. (Tr. 7/24 21:11-17). Dr. Arnold obtained valuation multiples in the same range as those obtained using the comparable company method. (Tr. 7/24 21:18-22). Specifically, he obtained valuation multiple ranges of 10.0x to 10.7x. (DX 196 at 27).

245.    Dr. Arnold also noted that the EBITDA multiples contained in the expressions of interest for TransCare's assets also fell within the same range:  8x.  (Tr. 7/24 21:14–22:3 (describing expressions of interest from two potential suitors, AMR and RCA)).

246.    Finally, Dr. Arnold noted that Tilton, Greenberg and Leland each testified that an EBITDA multiple range of 7 to 10 times EBITDA would be appropriate for TransCare. (DX 196 at 26). (Greenberg at Tr. 7/22 P.M. 77:1-17; Leland at PX 75; Tilton at Tr. 8/13 A.M. 14:5-14, 16:13–17:4).

247.    Based on Tilton's business plans, the Trustee's expert opined that TransCare's value exceeded $10 million under any of Tilton's business plans. (DX 196 at 37).

**C.    The Defendants' Expert's Criticisms**

248.    The Defendants' expert, Mr. Jeffrey Dunn, criticized one of these analyses:  the comparable company analysis:

> a.    Mr. Dunn agreed that the two comparable companies used by Dr. Arnold were the most comparable companies to use in analyzing TransCare. (Tr. 8/8 48:9-25).
>
> b.    However, Mr. Dunn opined that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would result in TransCare fetching lower multiples than those market comparables. (Tr. 8/8 55:20–56:2, 56:22–57:2, 57:25–58:13, 59:3-20).

c.  Mr. Dunn did not analyze any data to support his hypothesis that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would actually have resulted in a lower multiple using a market company approach. (Tr. 8/8 56:3-7, 58:17-20, 60:1-16, 62:24–63:2).

d.  In rebuttal, Dr. Arnold performed such an analysis and determined that the market data in TransCare's market showed that size, undercapitalization, distressed history, and low EBITDA margins would not have any observable effect on the EBITDA multiples used to value companies within the health care space. (Tr. 8/14 A.M. 49:15-24; DX 196 at 35). In fact, in each case, Dr. Arnold found that adjusting for these factors would actually lead to higher multiples. (Tr. 8/14 A.M. 54:1-58:1; DX 196 at 35).

249.  Mr. Dunn did not criticize Dr. Arnold's valuation of TransCare using the precedent transaction approach.

250.  Mr. Dunn was unaware of the Transcendence transaction and Tilton's sale, including if any assets were foreclosed upon, if Transcendence purchased assets, what price was paid for the assets, and how the price was calculated. (Tr. 8/8 71:4–72:1).

251.  Mr. Dunn criticized Dr. Arnold's use of the expressions of interest because the parties expressing interest in TransCare were unable to view information about TransCare's financials and business plans. (Tr. 8/8 77:12-23).

252.  Mr. Dunn had no opinion as to whether a hypothetical buyer would consider TransCare's business plans to be reasonable. (Tr. 8/8 69:17-22).

**D.  Tilton Sold the TransCare Assets to Herself**

253.  Tilton sold the assets to Transcendence, which she controlled as the sole board member. (JX 102, Stipulated Fact 7).

254. Tilton, as the sole board member of Transcendence, never issued stock to anyone. (Tr. 7/23 P.M. 23:17–24:16).

255. Tilton claimed to have intended to negotiate an LLC agreement with the other Term Loan Lenders such that they would become members of a new LLC governing Transcendence. (Tr. 8/14 AM 5:21–6:8, 9:7-12).

256. Tilton claimed to have intended to distribute some portion of the equity in Transcendence to the Term Loan Lenders.

    a. Tilton claimed that her intention was reflected on an internal spreadsheet which recited that (a) Ark II would receive 55% of Transcendence and (b) the Term Loan Lenders, 45%. (PX 209; Tr. 8/14 A.M. 4:19-25).

    b. Tilton also claimed that this internal spreadsheet inaccurately recited her intention: where it claimed that Ark II would receive 54.7%, actually Tilton intended Ark Angels III to receive 51% and Ark II to receive 3.7%. (Tr. 8/14 A.M. 4:25–15:17).

257. Stephen, who was responsible for creating Transcendence, was unaware of any records at any Patriarch entity that would indicate to whom the shares of Transcendence were to be issued. (Tr. 7/23 P.M. 24:25–25:6).

258. Stephen testified that Tilton never instructed him to whom to issue Transcendence shares and never communicated to him who would receive shares in Transcendence. (Tr. 7/23 P.M. 25:18-21, 26:6-8).

259. As of February 25, 2016, the planned ownership of Transcendence continued to be a moving target that continued to change. (PX 235; Tr. 7/23 P.M. 91:13–94:22).

260.     As discussed above, the formal documentation for the sale did not provide the Term Loan Lenders with equity in Transcendence.  (JX 102).

### E.     The Foreclosure Plan Was Accompanied by Untruthful Statements

261.     Tilton and those operating at her direction made untruthful statements to a government agency, the MTA, to effectuate the foreclosure plan.  (*See* PX 244 (Stephen email to MTA, at Tilton's direction, stating that all Transcendence employees had health benefits and direct deposit); Tr. 7/23 P.M. 102:3–103:8).

262.     Tilton and those operating at her direction made untruthful statements to Credit Suisse.  (*See* PX 249 (Greenberg's email to Credit Suisse, dictated by Tilton, stating that TransCare would have to file bankruptcy because of Credit Suisse's unwillingness to allow a loan that in fact had already been extended); Tr. 7/22 P.M. 30:15–33:17).

263.     Tilton and those operating at her direction made untruthful statements to the employees of Transcendence.  (*See* JX 103 (Stephen's email to all Transcendence employees, at Tilton's direction, promising that Transcendence would pay all Transcendence employees for their last week of work at TransCare if the estate could not pay them); Tr. 7/23 P.M. 132:4-17).

### F.     Removing the MTA Contract from TransCare Ensured TransCare's Collapse and Liquidation

264.     Tilton recognized that TransCare would immediately fail if severed from the foreclosed assets, specifically, the MTA Contract.  (Tr. 8/13 A.M. 49:11-17; 8/13 A.M. 48:8-11; 8/14 A.M. 26:19–27:1).

265.     The MTA Contract was a government contract, which paid in full on 45 days (far faster than the 90 days paid to the ambulance divisions by their customers).  (PX 286 at 105517; JX 93 at 51381).

266.     TransCare had recently renewed the MTA Contract until October 2019.  (JX 51 at 98518, Tr. 7/22 A.M. 37:17-20).

267.     The MTA Contract was desirable because there was virtually no need for capital investment as the vehicles were provided by the MTA.  (Tr. 7/22 A.M. 38:3-10; JX 51 at 98518) ("Since there is almost no capital investment the ROI is highly desirable.").

268.     Greenberg reported to Tilton that conservative estimates of revenue indicated that the MTA Contract would generate EBITDA of $1.87 million, $2.73 million, $2.77 million and $2.81 million over the four years, respectively, between November 2015 and October 2019.  (JX 51 at 985518; Tr. 7.22 A.M. 38:11–39:14).

269.     Numerous suitors were interested in acquiring TransCare's paratransit business and MTA Contract, with National Express reiterating their $8-9 million offer on December 16, 2015. (*Supra* ¶ 60; PX 124).

270.     Sometime prior to 7:00 p.m. on February 26, 2019, Tilton made the decision to cease all operations at the paratransit transit division, notified the employees of the same and directed Stephen to notify the MTA.  (PX 245).

## CONCLUSIONS OF LAW

I.     **Claim 1: Breach of Fiduciary Duty against Lynn Tilton**

    A.     **Liability**

271.     As the sole director of TransCare, a Delaware corporation, Tilton owed fiduciary duties of loyalty and care to the corporation and, by extension, to its shareholders and creditors. *E.g., In re Rural Metro Corp. Stockholders Litig.,* 88 A.3d 54, 80 (Del. Ch. 2014), *decision clarified on denial of reargument sub nom.*, 2014 WL 1094173 (Del. Ch. Mar. 19, 2014).

272.     Tilton's fiduciary duties encompassed the duty of loyalty which, *inter alia*, requires that she subordinate her personal interests to those of TransCare.  *Cede & Co. v. Technicolor, Inc.,*

634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."), *decision modified on reargument,* 636 A.2d 956 (Del. 1994).

273.     Once Tilton determined, no later than December 15, 2015, that TransCare would have to be put up for sale, "[t]he duty of the board had thus changed from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit…. The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc*., 506 A.2d 173, 182 (Del. 1986).

274.     The February 24, 2016, strict foreclosure was a "self-dealing" transaction in that Tilton was on both sides of the transactions by which Transcendence acquired TransCare's valuable assets. *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983).[16]

275.     Because the February 24 transactions constituted self-dealing, Tilton is liable for breach of the fiduciary duty of loyalty unless she had been able to prove at trial, by a preponderance of evidence, that the transactions were "entirely fair." "It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have 'the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.'" *Weinberger,* 457 at 710 (internal citations omitted). "There is no 'safe harbor' for such divided loyalties in

---

[16] This is true whether the transfer of assets from TransCare to PPAS, and then from PPAS to Transcendence are viewed as separate transactions, or whether they are collapsed, the view the Court indicated that it was inclined to take (Tr. 8/14 P.M. 6:13-20). *See, e.g., Strassburger v. Earley*, 752 A.2d 557, 570-71 (Del. Ch. 2000) (when two transactions were part of a single, unified plan, even the non-self-interested transaction was subject to entire fairness review with the burden of proof resting on defendants).

Delaware." *Id.*; *In re Opus East LLC*, 698 Fed. App'x 711, 718 (3d Cir. 2017) ("A plaintiff alleging a breach of this duty need only show that the director was on both sides of a challenged transaction… The burden then shifts to the director to 'demonstrat[e] the entire fairness of the transaction.'"), citing *In re The Brown Schs.*, 386 B.R. 37, 47 (Bankr. D. Del. 2008) and quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011); *Pereira v. Cogan*, 52 Fed. App'x 536, 538 (2d Cir. 2002) ("Under Delaware law, a controlling shareholder 'standing on both sides of a transaction'…'bears the burden of proving its entire fairness."), quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 137 F. Supp. 2d 502, 508 (S.D.N.Y. 2001) ("'Where a controlling shareholder stands on both sides of a transaction, the standard ordinarily is that the controlling shareholder (and the directors who are subject to that control) will bear the burden of proving the entire fairness of the transaction.'"), quoting *In re MAXXAM, Inc.*, 1997 WL 187317, at *13 (Del. Ch. Apr. 4, 1997); *FrontFour Capital Grp. LLC v. Taube*, 2019 WL 1313408, at *20 (Del. Ch. Mar. 11, 2019) ("Entire fairness review arises 'when the board labors under actual conflicts of interest,' such as when a controlling stockholder [or other "controller"] stands on both sides of a challenged transaction." (footnotes omitted)). *See also* Del. C. § 144 (providing safe harbors when independent parties provide assurances of fairness).

276. "Entire fairness" is "'Delaware's most onerous standard' of review." *Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *17 (Del. Ch. June 28, 2019) (footnote omitted); *accord In re Opus East LLC*, 528 B.R. 30, 65 (Bankr. D. Del. 2015). "The burden of proving entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but not invariably, results in a finding of liability." *Pereira v. Cogan,* 267 B.R. 500,

508 (S.D.N.Y. 2001), quoting *Solomon v. Armstrong,* 747 A.2d 1098, 1138 n.39 (Del. Ch.1999), *aff'd,* 746 A.2d 277 (Del. 2000).

277.    The Court need not find that Tilton intentionally did anything wrong to find that the transaction was not proven to have been entirely fair; the Court can find that Tilton was sincerely trying to salvage value from TransCare, but in doing so "with blinders" such that she focused solely on how much she personally was willing to contribute to the company, and on what terms, she thereby breached her duty of loyalty.  "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness.  Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 459 (Del. Ch. 2011), quoting *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del. Ch. 2006).  "The entire fairness standard is 'exacting,' and requires the director to show that the deal was objectively fair, not just that he believed it to be so." *See*, *e.g.*, *Opus East*, 698 Fed. App'x at 719.  "Indeed, as to the interested party itself, a finding of unfairness after trial will subject it to liability for breach of the duty of loyalty regardless of its subjective bad faith." *In re Cornerstone Therapeutics Inc. Stockholder Litig.*, 115 A.3d 1173, 1181 (Del. 2015).  A director's sin in breaching the duty of loyalty is not necessarily one of venality, "but, rather, of indifference to their duty to protect the interests of the corporation and its minority shareholders." *Strassburger*, 752 A.2d at 581.

278.    In order to have carried her burden to prove entire fairness, Tilton was required to show both fair dealing *and* fair price.  *Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21 (footnote omitted); *accord*, *Related Companies, L.P. v. Ruthling*, 2018 WL 3315728, at *14 (S.D.N.Y. July 5, 2018).  She proved neither.

### i. *Fair Dealing*

279.    Fair dealing addresses "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21. Here, Tilton alone initiated and structured the transactions; there was no negotiation, disclosure or approvals. *See Strassburger*, 752 A.2d at 576-77 ("there was no fair dealing because there was no advocate committed to protect the minority's interests…"). *Cf. Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490, 504 (Del. Ch. 1990) ("Built into the process by which the merger terms were set were procedural protections that tended to assure a fair result and to approximate what independent parties would have arrived at in an arm's length bargain."). Tilton had no evidence of fair dealing.

280.    The $10 million credit bid (the price TransCare received for its assets transferred to Transcendence) was not a negotiated number and was not set based on third party advice as to value.   There was no contemporaneous documentation detailing how the $10 million was calculated.   Even at trial, the explanation did not quite add up:   Tilton asserted it represented TransCare's "book value" but (a) Tilton presented no evidence that book value was an appropriate measure of value of the assets transferred[17]; and, even if she could and had, (b) the evidence showed that her calculation failed to credit assets of very substantial value, namely the MTA

---

[17] As the Court noted, book value is an accounting construct that, among other things, deducts depreciation and has no necessary connection to market value.   (Tr. 8/14 6:14-16).   Valuation based on book value "arguably" makes sense where, unlike TransCare, "a business…derives significant value from its physical assets," *Reis*, 28 A.3d at 476.   Even then, naked "book value" is rarely, if ever, accepted as a valuation without adjustment, at least an adjustment to the lower of cost or market so that, after deducting associated costs, it produces a liquidation value and, thus, "a floor value of the business." *Id.* at 477. *See, e.g., Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 173 (Del. 1991).

Contract and the CONs.[18]  (Facts ¶¶ 141, 238).  More importantly, the determination that "book value" is the appropriate amount Tilton should pay is, itself, the antithesis of fair process when it is just decided unilaterally by Tilton's fiat.

281.    Tilton was the sole director and the majority shareholder of TransCare, but she was not the sole shareholder. (Facts ¶¶ 4-6).  Rather than obtaining the consent of disinterested shareholders, which would have been consistent with fair process, *e.g.*, *Arkansas Teacher Ret. Sys.*, 2019 WL 2714331, at *21, Tilton concealed this information from the next largest shareholder, Credit Suisse.  (Facts ¶¶ 129-133.)

282.    There was ample evidence of third-party interest in acquiring all or some of TransCare while it was still a going concern, and Tilton had recognized that there was an "active [] market in the ambulance space."  (Facts ¶¶ 32-33, 59-60).   Fair dealing would have involved, as the Court noted (Tr. 8/14 P.M. 29:25–30:7), at least "picking up the phone" to inquire whether third parties were still interested and willing to pay more than "book value."  *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999) ("Bomarko I") (holding that director's interference with company's attempts to obtain outside funding constituted unfair dealing) *aff'd*, *Int'l Telecharge Inc. v. Bomarko, Inc.*, 766 A.2d 437 (Del. 2000) ("Bomarko II").

283.    The timing of the strict foreclosure and the failure to give a WARN Act notice was itself driven solely by Tilton's self-dealing because Tilton waited to consummate her strict foreclosure until February 24, until the eve of the company defaulting on its payroll, only because she was waiting for Transcendence's vehicle liability insurance to be bound.  (Facts ¶¶ 156, 158).

---

[18] While Tilton did not investigate the value of the MTA Contract or the CONs (Facts ¶ 238(a)), the evidence showed that (a) there were several unsolicited offers for the MTA Contract, including National Express which offered $15-18 million in February 2015 and $6-8 million in July and December 2015, and (b) the Trustee liquidated the two CONs sold to Transcendence for $3.2 million.  (Facts ¶¶ 60, 220).

Moreover, she knew that she was obligated to give a WARN Act notice and intentionally avoided doing so because she did not want the employees to leave. (Facts ¶¶ 98(a), 148(g)).

### ii. *Fair Price*

284.    "[T]he 'fair price' aspect of an entire fairness analysis requires the board of directors to demonstrate 'that the price offered was the highest value reasonably available under the circumstances.'" *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1163 (Del. 1995), quoting *Cede & Co.,* 634 A.2d at 361. Tilton made no effort to ascertain whether a better price was available from third parties at the time, and made no effort to prove, at trial, that the amount paid by Tilton was reasonable, let alone the highest value that could be realized. It was and is not Plaintiff's burden to prove that a higher price was available; it was Tilton's burden to prove that one was not. *E.g., Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 408 (Del. 1988). *Bomarko I,* 794 A.2d at 1161 ("I realize that this involves proving a negative and is a difficult burden for [defendant] to meet. Yet it is the only fair way to proceed….").

285.    It would not be enough for Tilton to show (not to say that she did) that her $10 million credit bid based on book value was reasonable and within the range of what she would have expected from an arms-length transaction. *See, e.g., HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 116-17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio…. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *In re DSI Renal Holdings, LLC,* 574 B.R. 446, 472 (Bankr. D. Del. 2017) (defendants' failure to seek the highest value reasonably available for the company during the sales process supported the inferences that the Defendants breached the duty of loyalty by, *inter alia,* engaging in a self-interested decision-making process or by acting with gross negligence.); *Reis,* 28 A.3d at 467 (when the "price is

entirely fair, but the process is faulty," plaintiff can be entitled to a "fairer" price). Where as "here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result" under the entire fairness test. *Bomarko I*, 794 A.2d at 1183, quoting *Kahn v. Tremont*, 694 A.2d 422, 432 (Del. 1977).

286.    Tilton failed to carry her burden to prove that the strict foreclosure transactions, by which the Debtor received just a $10 million credit in exchange for its most valuable assets, was entirely fair to the Debtor and, therefore, she is liable for breach of the fiduciary duty of loyalty.

### B.    Damages

#### i.    *Nature of the Damages*

287.    As a general matter, the Trustee is entitled to recover all damages proximately caused by Tilton's culpable conduct, defined under Delaware law as those losses which would not have occurred "but for" the breach of duty "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 864 (Del. 2015).

288.    However, "the Delaware Supreme Court has suggested on more than one occasion that rescissory damages are the preferred remedial measure where a transaction fails to pass the test of entire fairness…." *Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC,* 2018 WL 3326693, at *49 n.513 (Del. Ch. July 6, 2018), quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.04[b] (2012).  *See also, e.g.*, *Strassburger*, 752 A.2d at 576-77 ("Rescissory damages…may be recovered only for a breach of the duty of loyalty").  "Rescissory damages are 'the monetary equivalent of rescission' and may be awarded when 'the equitable remedy of rescission is impractical.'" *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014)

("The remedy is available for an adjudicated breach of the duty of loyalty, such as cases involving self dealing or where a fiduciary puts personal interests ahead of the interests of its beneficiary."). Thus, TransCare should be restored to the position it was in prior to Tilton's breach of the duty of loyalty and her strict foreclosure transactions, and the $10 million credit bid should be rescinded. *E.g., Bomarko II*, 766 A.2d at 440-41 (affirming Chancellor's conclusion that rescissory damages for breach of loyalty in connection with a corporate merger was "at a minimum, what [plaintiffs'] shares would have been worth at the time of the Merger if [the director] had not breached his fiduciary duties," and noting that the damages remedy has "a different focus" from appraisal which looks to what they were actually worth at the time), quoting *Bomarko I*, 794 A.2d at 1184 (Del. Ch. 1999).

### ii.   *Scope of Damages*

289.    "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996). "[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir. 1994). That is so because "the strict imposition of penalties under Delaware law are designed to discourage disloyalty," (*Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 906 (Del. Ch. 1999), quoting *Thorpe*, 676 A.2d at 445), and the award of damages is not merely compensatory but "should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Bomarko II*, 766 A.2d at 441. "An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999), quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 955-96 (2d Cir. 1983).

290.    This analysis is in contradistinction to the price component of the entire fairness standard which was to be evaluated by reference to "the highest value [otherwise] reasonably available under the circumstances." (*See supra* ¶ 284).    "Under the entire fairness test, the fair price measure would operate as an aspect of the standard of review; it would not inherently require a damages award in that amount."  *Orchard Enters.,* 88 A.3d at 43.

291.    Tilton's breach of fiduciary duty caused TransCare's affairs to unfold differently than they otherwise would have, and while no one can say what would have happened, a disinterested board of TransCare had numerous opportunities to achieve a superior result.  As explained in *Rural Metro*:

> RBC's self-interested manipulations caused the Rural process to unfold differently than it otherwise would have. *See [In re Del Monte Foods Co. Shareholders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011)]* ('But for Barclays' manipulations, the Del Monte process would have played out differently'). RBC's actions led to an ill-timed sale of Rural that did not capture value attributable to its acquisition strategy; (ii) a mismanaged sale process that generated only one final bid by a bidder that knew it had the upper hand in bidding and price negotiations; and (iii) uninformed board approval based on manipulated valuation analyses. To be sure, '[n]o one can tell what would have happened had unconflicted parties negotiated the Merger. That is beyond the capacity of humans.' *In re El Paso Corp. Shareholder Litig.*, [41 A.3d 432, 447 (Del. Ch. 2012)]. Nevertheless, but for RBC's actions, a fully-informed Board would have had numerous opportunities to achieve a superior result.

*Rural Metro*, 88 A.3d at 101.  *Bomarko I,* 794 A.2d at 1185 (adopting measure of damages that resolved uncertainties in plaintiff's favor by assuming that the company had been successfully restructured without the breach of loyalty).  A disinterested board would have engaged valuation advisors or potential suitors.  *Cf. Rural Metro*, 88 A.3d at 101 ("a disinterested board…would have received valuation materials periodically throughout the process, rather than getting a valuation deck for the first time after 9:30 p.m…and approving the merger shortly after midnight.").

292.     Because the transactions cannot be unwound to restore TransCare's *status quo ante*

as an operating business that could be restructured, and because the assets transferred to

Transcendence were subsequently returned to the Estate in a non-operating state and subsequently

liquidated, completion of the rescission requires (a) awarding rescissory damages consisting of the

difference between the fair market value of the company as a going concern before the breach of

fiduciary duty began, and its value today, namely the $19.2 recovered in liquidation of its assets

and (b) granting judgment declaring that Tilton must pay any judgment imposed upon TransCare

for having failed to pay salaries or ceased operations abruptly in violation of the WARN Act.

a.     Fair Market Value

293.     Where fiduciaries acquire property through self-dealing, and "through a

combination of the taking and their subsequent use of the property, destroy[] its value entirely[,]"

they are liable for the value the property would have had absent the breach of loyalty, not just its

value immediately before the breach:

> Through the Executive Committee, Georgetown froze out the Company's
> other directors, managed the Company unilaterally and in Georgetown's
> own interest, and then demanded that the directors periodically ratify
> everything that had been done.  During this period, Georgetown engaged in
> self-dealing and continued to reject offers of third-party capital so as to
> maintain its position of control. Given this course of conduct and the
> ultimate result, the plaintiffs have not sought to tie
> specific damages amounts to specific decisions.  Instead, they have sought
> what I regard as an apt remedy for the defendants' behavior.
>
> The award differs from the usual concept of rescissory damages.
> Traditionally in Delaware, rescissory damages could come into play when
> a defendant fiduciary wrongfully took control of property, and the value of
> the property went up during the period of the fiduciary's control.  In that
> setting, ***the law does not limit the plaintiff beneficiary to the value of the
> property at the time of the taking, plus an award of interest.  The plaintiff
> beneficiary is entitled to recover the property itself or a measure of its full
> value.  In this case, the plaintiffs have invoked the reciprocal of these
> principles***.   The defendant fiduciaries wrongfully took control of the
> property and, through a combination of the taking and their subsequent use
> of the property, destroyed its value entirely.  In both settings, the same

> overarching principle governs: The disloyal fiduciary who wrongfully takes property from the beneficiary is liable for changes in value while the wrongfully taken property is under the disloyal fiduciary's control.

*Basho*, 2018 WL 3326693, at *50 (emphasis added). Defendants are entitled to the value that TransCare would have had if it had been successfully restructured without a breach of fiduciary duty. *See Bomarko II*, 766 A.2d at 440-41.

294. In this case, the "reciprocal of these principles" highlighted in *Basho*, above, means that the "full value" recoverable by the Trustee is not merely what a third-party sale would likely have produced if Tilton sold under desperate circumstances, but its fair market value defined as the hypothetical "price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances, after consideration of all available uses and purposes, without any compulsion upon the seller to sell or upon the buyer to buy." *Poole v. N.V. Deli Maatschappij,* 243 A.2d 67, 70 n.1 (Del. 1968).[19] *Cf. Cede & Co.,* 634 A.2d at 371 (in a duty of care claim in connection with a merger, "we emphasize that the measure of any recoverable loss by Cinerama under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings. Under *Weinberger,* the Chancellor may 'fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages.' 457 A.2d at 714. The Chancellor may incorporate

---

[19] In *Poole*, the Delaware Supreme Court held that in calculating damages from a fraudulently induced sale, the assets should be valued at market value rather than "going concern value" because market value recognizes that the assets might be put to a "higher and better use" whereas going concern value required that the assets continue to be valued as deployed in the existing manner. 243 A.2d at 71-72. To be clear, the Trustee refers herein to valuing TransCare as a going concern not to limit the valuation of its assets to their then-current use as in *Poole*, but because the market value of TransCare was higher as an operating business even if the highest and best use of the assets would ultimately involve the strategic break up of the business.

elements of rescissory damages into his determination of fair price, if he considers such elements: (1) susceptible to proof; and (2) appropriate under the circumstances. *Id.*").

295. Here, the damages are recoverable as the natural and foreseeable consequences of Tilton's actions sale of the assets to herself, without a process to ensure that the transactions were were fair and without getting consent from all participants. To wit:

a. Over the prior year, TransCare had received over nine unsolicited inquiries from at least six different potential strategic purchasers and Tilton rebuffed them all. (Facts ¶¶ 59-60).

b. Once Tilton decided to sell, she did not attempt to contact a single person that had expressed an interest in purchasing TransCare (several of them repeatedly) (Facts ¶¶ 232-233), and even though she expressly recognized that there was an active market in the ambulance space (Facts ¶ 32).

c. Tilton was paying, through a credit bid, just $10 million for the most desirable of TransCare's assets that she, herself, valued at $22 million. (Facts ¶ 240).

d. Tilton never sought a replacement for the ABL or any other third-party funding. (Facts ¶ 228), and provided no reason not to expect that "new money" would have been readily available from third-parties on the same terms, if not better, than the terms upon which Tilton was committing to provide Transcendence with $10 million in credit.

e. Wells Fargo had indicated that it was prepared to continue funding TransCare pending a sale provided that Tilton had presented it with a plan to effectuate the sale in the reasonable future, which Tilton never did (Facts ¶¶ 229-230); there is no evidence suggesting that Wells Fargo had ever been informed of those third party offers, nor any evidence that it (or for that matter a new short-term lender) would not have been willing to continue funding in the face of a serious expression of interest by a strategic purchaser who would be willing to pay fair value for the operating entities.

f. Despite having been planned for weeks, the self-dealing strict foreclosure was effectuated without the necessary planning (with respect to, for example, the computer systems and the failure to have in place a transition agreement) that would have enabled Transcendence to function supported by TransCare's employees and would have enabled TransCare to wind down in an orderly fashion without, *inter alia*, potential WARN Act Liability.

g. By her own statements, Tilton understood that removing the paratransit division would cause the remainder of the company to be immediately liquidated. (Facts

¶ 264.) On top of that, she foreclosed on all of TransCare's ambulances the day before payroll was due. (Facts ¶¶ 164, 216).

296. But for Tilton's refusal to seek third-party funding or an arms-length purchaser while she attempted to acquire TransCare's best assets for herself, it is more likely than not that TransCare would not (a) have been destroyed as an operating entity when her attempted self-dealing fell apart, and (b) now be facing WARN Act Liability by reason of shutting down abruptly when Tilton's strict foreclosure did not work out as planned.

### b.    WARN Act Liability

297. Tilton is also responsible for indemnifying the estate for the WARN Act Liability for three independent reasons. First, as an element of rescission, because TransCare had no such liability prior to Tilton's breach of loyalty and Tilton thus must bear that liability in order to put TransCare back to where it was prior to the breach. Second, the WARN Act Liability was also a natural and foreseeable consequence of Tilton's actions (for the same reasons discussed *supra* ¶ 295).

298. Finally, under Delaware law, a corporate officer or director who knowingly causes the corporation to violate the law necessarily fails to act in good faith and thereby breaches her fiduciary duty of loyalty. *Hazout v. Tsang Mun Ting.*, 134 A.3d 274, 283 (Del. 2016), relying on *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). "In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused." *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007). Tilton intentionally did not issue a WARN Act notice because she did not want TransCare's employees to be looking for new jobs (one of the purposes of the Act is, of course, to give employees an opportunity to find new jobs). (Facts ¶ 98(a)).

299. The consequential WARN Act Liability TransCare faces has not yet been liquidated in the proceeding where the question is pending. Accordingly, the appropriate relief with respect to the WARN Act damages is a declaratory judgment directing Tilton to promptly pay any judgment imposed upon TransCare as employer. *See Strassburger*, 752 A.2d at 582 ("To address these problems, and undo the harm caused…the remedy must therefore include elements that go beyond a rescissory damages award.").

### iii. *Quantum of Damages: TransCare's Fair Market Value Prior to the Breach of Fiduciary Duty*

300. The final question is the quantum of damages to award based on the value of TransCare before the breach that resulted in the strict foreclosure transaction. In that regard, as long as damages are "logically and reasonably related to the harm or injury for which compensation is being awarded," then "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Basho*, 2018 WL 3326693, at *50 (footnotes omitted citing *In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 766, 773 (Del. 2006) and *Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)). A court "has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty than it would when assessing fair value in an appraisal proceeding." *Bomarko II*, 766 A.2d at 441.

301. The Trustee's expert, Dr. Arnold, who was qualified without objection (Tr. 7/24 6:1–7:2), utilized standard valuation methodology to calculate a range of reasonable estimates for TransCare's market value, or Enterprise Value ("EV"), in January 2016—after Tilton had determined to sell TransCare, but prior to Tilton's preparations for the sale to Transcendence (*id.*

7:8–11:9). Dr. Arnold also calculated a range of reasonable estimates for the subset of TransCare's businesses sold to Transcendence on February 24, 2016. (*Id.* 11:10-15; *see also id.* 11:16–14:4).

302. Dr. Arnold calculated a market value, or EV, for TransCare by multiplying an appropriate EV-to-EBIDTA ratio against TransCare's EBIDTA projected by management as of the three preparation dates—January 7, 27 and 28, 2016, all dates prior to Tilton's breach of fiduciary duty (if one adopts the conservative assumption that she did not plan to self-deal through the strict foreclosure until she actually began to put the plan in motion on February 7, 2016). (Facts ¶¶ 243(b)-(c)). In addition, he did the same calculation based on the February 24, 2016, forecast that Tilton's team put together for the subset of assets that Tilton assembled into Transcendence. (*Id.*). This was accepted methodology that Tilton did not impugn and that courts have noted has the benefit of providing a valuation without the need to adjust for different capital structures because "EBITDA is independent of capital structure[.]" *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 740 (Del. Ch. 2008).

303. Dr. Arnold explained why he could not use a discounted cash flow approach, an explanation that was not challenged by Defendants. The data was simply not there. (Tr. 7/24 14:5–15:20). In fact, Tilton testified that as of December 2015, TransCare had no audited financials for 2014 and was not current in its monthly unaudited financials. (Tr. 8/13 A.M. 52:3–53:1). For example, the October 2015 monthly financials were not circulated until February 2016. (PX 191 at 4695; Tr. 8/14 A.M. 129:1-6). *See, e.g., Bomarko I*, 794 A.2d at 1185 (finding the discounted cash flow methodology "too unreliable" when the expert had to extrapolate from management's one-year forecast). Tilton as the sole board member (with the authority matrix) was responsible for this state of affairs. Thus, the only reliable data from which to determine the value of TransCare or its separate business lines were the very models prepared by Tilton's staff

in connection with a plan to stabilize TransCare for a sale. Therefore, Dr. Arnold used the data that Tilton had available to arrive at a reasonable estimate of TransCare's value based on such data. (Tr. 7/24 106:14–107:4). "[I]t is not a sufficient remedy to award plaintiffs their pure out-of-pocket damages, at least as measured … by the fair market value of [the company] at the time of the Merger without giving effect to the debt restructuring." *Bomarko I*, 794 A.2d at 1184.

304. There are two elements to Dr. Arnold's valuation analysis: EBITDA projections and an appropriate EV-to-EBITA multiplier.

a. EBITDA Projections

305. Management's projections are the preferred projections to use, when available, in valuing a company, and Tilton offered no alternative, let alone one that would arguably be better. *See, e.g.*, *Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 332 n.108 (Del. Ch. 2006) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations."), quoting *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004).

306. Tilton's team prepared numerous 2016 projections for TransCare after she decided to sell TransCare in December 2015. (Facts ¶¶ 71, 86, 97-98, 125, 127, 134, 175-178). Dr. Arnold examined four projections that were shared with or produced by third-parties. (Facts ¶¶ 71, 86, 175, 242). These projections were the best data available concerning the reasonable earnings of TransCare, and they were only data Tilton had when she advanced money to TransCare during January 2016 (and to Transcendence in February 2016).[20] These projections already accounted for the risk TransCare was facing. (Tr. 7/22 P.M. 122:16–123:2). Finally, Tilton gave the Court

---

[20] For Tilton advancing money, *see* Facts ¶¶ 79, 80, 81, 87, 88, 157, 172; for lack of financials, *see* Facts ¶¶ 36, 78.

no reason to prefer any other projection.  (*See* Facts ¶ 254 (Tilton's expert, Dunn, had no opinion as to the reasonableness of the business plans relied upon by Dr. Arnold)).

307.    Delaware law gives great weight to contemporaneous projections sent to third parties, especially when management intends those third-parties to rely on those projections.  *Del. Open MRI Radiology Assocs.,* 898 A.2d at 332 ("[t]hat is especially so when management provides estimates to a financing source and is expected by that source (and sometimes by positive law) to provide a reasonable best estimate of future results.  Therefore, we have regarded with rightful suspicion attempts by parties who produced such projections to later disclaim their reliability, when that denial serves their litigation objective.").  The February 24 Plan was given to Lockton to bind insurance and the January 7 Plan was shared with Carl Marks at Wells Fargo's request for visibility into TransCare.  (Facts ¶¶ 175, 67-71).

308.    In fact, the February 24 projections are an extension of the January 7 projections, adjusted for the the loss of the Maryland and Bronx/Westchester businesses in the interim:

      a.  The February 24 forecast projected a $3.2 million EBITDA over only ten months and Tilton acknowledged that the annualized EBITDA would be at least $4 million.  (Tr. 8/14 A.M. 38:4-20).

      b.  Greenberg acknowledged that the $3.2 million estimate had been $3.7 million, $500,000 higher, just before the loss of the University of Maryland contract.  (Tr. 7/22 P.M. 64:16–65:8).

      c.  Tilton testified that the Bronx/Westchester operations had generated an additional $2.5 million EBIDA per year.  (Tr. 8/13 P.M. 99:11-20).

      d.  Tilton testified that the projections omitted necessary salaries totaling between $500,000 to $750,000.  (Tr. 8/13 A.M. 14:15-25; 8/14 A.M. 34:15–35:1).

      e.  $4 million + $500,000 + $2.5 million – $500,000 = $ 6.5 million, very close to the $6.9 million EBITDA projected for the company as a whole on January 7.  (Facts ¶ 73).

309.    Therefore, the January 7 projections are consistent with the February 24 projections that Tilton was relying on herself, and do not require further adjustments to approximate the value

of the lost Maryland and Bronx/Westchester businesses, so it is reasonable to rely on the January 7 projections for the appropriate EBITDA to value TransCare as a whole, namely $6.9 million.

b. EBITDA Multiplier

310. The appropriate multiplier to use in valuing TransCare based on the January 7, 2016, projections is 12.5x:

a. Dr. Arnold analyzed the data available to Tilton to derive a range of appropriate multipliers based on two recognized methodologies: looking at the market value of comparable public companies produced a range of approximately 7.0x–12.5x (Tr. 7/24 23:4–24:2); looking at precedent transactions produced a range at almost the midpoint of the foregoing, 10.0x–10.7x (*id.*). Third-party offers to buy the company (which Tilton ignored) referenced an 8x multiple as an opening bid. (*Id.*). Tilton's expert acknowledged that the number produced by the precedent transactions involved the most comparable companies (Facts ¶ 248(a)), and Greenberg, Tilton's financial analyst assigned to and very familiar with this credit, acknowledged that the industry average multiple in fact was approximately 10.1x (Facts ¶ 57).

b. Therefore, anything below the mid-point, 10.1x, would be the wrong multiplier to use. Whether comparable companies had multiples evenly distributed within the range of 7.0x–12.5x, or the distribution followed a bell-curve, using the mid-point would evenly distribute the risk that the valuation, and hence the damages award, is over- or under- stated. Stated another way, the likelihood of the use of 10.1x resulting in too low a damages award is equal to the chances of it resulting in one that is too high. That is inconsistent with the principle of Delaware law that "once a breach of duty is established, uncertainties in

awarding damages are generally resolved against the wrongdoer." *Basho*, 2018 WL 3326693, at *50 (footnote omitted citing *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993). The appropriate multiplier should, accordingly, be *at least* 10.1x in order for the Defendants to bear the majority of the uncertainty.

c.  But in a breach of loyalty context, there is no reason that the wrongdoer should not bear the entire uncertainty—at any multiple below 12.5x there is a possibility that Tilton will be paying less than her just and fair share of the damage that her actions caused. Tilton and her expert did not objectively dispute that 12.5x is a reasonable multiplier for TransCare based upon a comparable company analysis, relying instead on Mr. Dunn's testimony that Dr. Arnold did not use a "standard of value that's recognized by business professionals." (Tr. 8/8 18:5-17). In fact, Defendants and their expert failed to identify any value for TransCare or even what standard of value applied. (*Id*. 44:23–45:15). Tilton never identified what she would contend to be a more appropriate multiplier under the circumstances, and Mr. Dunn's general criticism that Dr. Arnold's conclusions as to the range of appropriate multiples was inflated because the companies Tilton originally relied on were not truly comparable, was debunked when Dr. Arnold subsequently did the analysis that Mr. Dunn suggested (but did not do himself) which showed that the range of "more comparable" multipliers thus calculated was ***higher***. (Facts ¶ 248(b)-(d)).

311.     Similarly, Mr. Dunn's reasoning—that market multiples should be adjusted downward or upward based upon a subjective analysis of the riskiness of a business plan—actually militates *in favor of* using a higher multiple for the Transcendence assets under the February 24, 2016 projection:

a. The unimpeached (and strengthened through attempted impeachment) testimony is that the range of multipliers for comparable companies is 7.0x to 12.5x, if not higher.[21]  Consistent with Mr. Dunn's argument that the appropriate multiplier is one adjusted for risk (Facts ¶ 248(b)), Transcendence was deserving of a multiplier at the highest end of that range: Transcendence represented Tilton's expert cherry-picking of the safest and most profitable of the assets of TransCare, acquired debt-free but for a promised $10 million short-term line of credit that Tilton intended to extend to Transcendence herself.[22] Indeed, TransCare's most profitable business, the MTA paratransit business, required virtually no capital investment because the City provided the vehicles and the business was guaranteed by contract through October 2019.  (Facts ¶¶ 265-269; Tr. 7/22 A.M. 38:3-10 ("Since there is almost no capital investment the ROI is highly desirable.")).  Even the computer that Tilton mistakenly

---

[21] Dr. Arnold's comparable company analysis is conservative in inherently understating the range of resulting multiples to the extent reliance on stock price builds in a minority discount, whereas the purchaser of the entire company is generally subject to a control premium.  *See, e.g., In re Trados Inc. Shareholder Litig.*, 73 A.3d 17, 70 & n.46 (Del. Ch. 2013).  *See also Bomarko I,* 794 A.2d at 1185-86 (approving addition to value of "a 30% premium to account for the minority discount inherent in comparable companies analysis").

[22] There is no security agreement for the Ark Angels III loan, but Tilton testified that she intended to be secured only by Transcendence's accounts receivable.  (Facts ¶ 170).

identified as being at TransCare's offices, was an MTA-owned asset and at the location of the vehicles on Foster Avenue.  (Tr. 7/24 165:12-22).

b. Tilton testified that she was paying $22 million for the subset of assets incorporated into Transcendence and that her "cross-check" on the reasonableness of the price she contended she was paying was that it translated into a multiple of approximately 10.0x based on the projected EBITDA she assumed to be $2.2 million (Tr. 8/13 A.M. 14:5-14). [23]   Tilton's own "reasonableness check" showed that she was undervaluing Transcendence in settling on a price that reflected a multiple at the very riskiest end of the range for the business she described as "less risky." (JX 80 at 92228).  (*See* Facts ¶ 128; Tr. A.M. 45:8-24; 47:1-20).

c. The earlier January 7 projection of a $6.9 million EBITDA was based on the same assets as the February 24 projections for Transcendence, *plus* the additional assets that were not incorporated into Transcendence and which were in fact later liquidated for $13.5 million, *plus* the Maryland and Bronx/Westchester businesses that were subsequently lost before Transcendence could assume them in the strict foreclosure.  (*See supra* ¶ 308). There is no reason—and Tilton certainly has not articulated one—to not attribute to the January 7 TransCare the same risk profile and, hence, same 12.5x multiplier, as to the Transcendence entity alone.

---

[23] Dr. Arnold used Tilton's deposition testimony of an 8.0x multiple of $2.5-2.75 million when conducting his analysis.  (Tr. 7/24 23:18-19).

312. Thus, resolving doubts against the wrongdoer, *see, e.g.*, *Basho,* 2018 WL 3326693, at *50, pre-breach TransCare was worth 12.5 x $6.9 million,[24] or $86.25 million. Value of $19.2 million was recovered from the assets in liquidation resulting in rescissory damages of $67.05 million.

313. In reaching the foregoing conclusion, there is no need to deduct the $10 million in credit that Tilton intended to extend to Transcendence through Ark Angels III.

  a. As noted above, the projected EBITDA from the February 24 Plan was essentially the same as that produced by the January 7 Plan once adjusted for the Maryland and Bronx/Westchester businesses lost in the interim. But the two Plans were very different in one important aspect: the January 7 Plan was for the entirety of TransCare, and required an additional $4.5 million, a capital investment of $1.3 million in down payments on new vehicles, and $3.2 million for payment of outstanding debts, whereas the February 24 Plan contemplated wind-down of the less productive businesses, required no payment of TransCare's debt,[25] and required no new capital investment at all. In short, by restructuring to create Transcendence and thereby shedding assets and debt, the reorganized company would be able to project similar EBITDA without the need for additional capital.

---

[24] Given that all doubts are to be resolved against the wrongdoer, the Trustee does not believe the $4.5 million in new capital that was incorporated into the January 7 Plan should be deducted from the value. (Tr. 8/14 A.M. 78:9–79:22). As Dr. Arnold testified the proposed capital was in the form of a loan. (*Id.* 79:11-14). That capital need subsequently increased to $6.5 million, and ultimately became the $6.5 million Ark II Credit Facility. (Facts ¶¶ 81-82, 117).

[25] Tilton inexplicably claims Transcendence assumed responsibility for $2 million that Tilton's Ark II had previously lent to TransCare, a different company entirely.

b. The evidence showed that the $10 million in the February 24 Plan merely served as a short-term replacement for a standard ABL line of credit like that which Wells Fargo had extended to TransCare but had terminated. Tilton's original intent was to use that money to buy back the Wells Fargo debt so as to release the lien on TransCare's (now Transcendence's) accounts receivable to permit Transcendence to use those assets to secure an ABL loan. When that failed, she simply agreed to loan the same money ("up to" $10 million) to Transcendence to tide it over until Wells Fargo had been fully paid from the accounts receivable. (Facts ¶¶ 137-139, 154-155, 171).

c. Tilton did not show that a $10 million ABL loan, or a short-term bridge loan until the ABL was in place, would result in a capital structure that was in any way unusual in the industry. Also, as Dr. Arnold testified in response to a question from the Court, there might be situations where permanent capital has to be injected to "buy ambulances and refresh rolling stock," for example, and therefore justifies the deduction of some portion of that from a valuation, but this is not that case:

> But if the idea that we're going to put it in [the $10 million loan] but in ten months a company is going to be generating four or five hundred thousand of EBITDA a month, in eleven months and that money can be returned, it's more in the form of a short to mid-term loan which costs the shareholders some amount of money, but it's not a dollar for dollar dilution.

(Tr. 8/14 A.M. 79:17-22). Even Tilton's expert did not contend that such deductions were appropriate. In short, the Court was presented no more reason to deduct loans from Transcendence's enterprise value than to deduct the amount of outstanding credit from every company's valuation.

314.     However, in the event the Court determines the Trustee is not entitled to a recovery based upon the value of the whole company, but only upon that of the foreclosed assets, the Trustee would still be entitled to no less than $44.3 million under the same principles.  The Trustee arrives at that amount by multiplying the $4 million EBITDA that results from a full year application of the February 24 Plan (Facts ¶ 177) times the upper multiple of 12.5, less the $5.7 million recovered by the Trustee in liquidation sales.  As discussed above, the Court should rescind the $10 million credit bid and not deduct it from the damages.[26]

315.     Nevertheless, measuring the damages solely by the value of the foreclosed assets provides zero value for the remainder of TransCare's assets, despite the evidence showing that there were numerous suitors for those assets.  Damages on the Trustee's first claim, for breach of fiduciary duty, should therefore be awarded against Tilton in the amount of $67.05 million and judgment entered declaring that Tilton is obligated to pay any WARN Act liability imposed upon TransCare.

## II.     Claim 7: Fraudulent Transfer Against PPAS and Transcendence

316.     The Trustee asserts a claim for actual fraudulent transfer against PPAS and Transcendence under 11 U.S.C. §548(a)(1)(A) and N.Y. Debtor & Creditor Law ("NYDCL") sections 276 and 276-a, made applicable by 11 U.S.C. §544(b), to recover the value of the assets TransCare transferred to each of them, respectively, on February 24, 2016, together with attorneys' fees.

317.     Under 11 U.S.C. §550(a), the Trustee may recover for the benefit of the estate the property transferred, or, if the Court so orders, the value of such property.  "The purpose of §

---

[26] Unlike the January 7 Plan, as shown at trial, the February 24 Plan had no provision for additional capital, relying solely on a revolving loan secured by accounts receivable for its additional cash needs.  (Facts ¶¶ 137-138, 170-171).

550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017). By this claim, the Trustee seeks the value of the paratransit, Pittsburgh, and Hudson Valley business lines prior to their transfer to PPAS and then to Transcendence, when they were still operating entities.

318. Based on Tilton's plan, Dr. Arnold concluded those assets had a fair market value of between $22 and $39 million. For purposes of this claim (which involves different standards), the Court should apply the 10.1 multiple reported by Greenberg as the average of all the EBITDA-multiple data points. The Court should apply this multiple against the $4 million annual EBITDA projection in the February 24 Plan that Tilton directed Greenberg to provide to Lockton.[27] For purposes of this claim, the Court may deduct the value of the $10 million credit provided by PPAS for the assets.

319. After shutting down those three business lines and terminating the employees, Transcendence returned the hard assets to the estate when it filed the three transferred TransCare entities into bankruptcy on April 25, 2016. (Facts ¶¶ 206, 218, n.9). The Court should therefore subtract the $5.7 million liquidation value of those assets from any award on this claim, for a total of $16.62 million. (Tr. 8/14 A.M. 13:8-14).

320. In addition, this claim seeks attorneys' fees under NYDCL section 276-a and disallowance of PPAS' claim pursuant to 11 U.S.C. §502(d), until the amount for which PPAS has been found liable is satisfied.

---

[27] The plan itself was only for 10 months and indicated EBITDA of $3.2 million, which Tilton admitted would increase to $4 million if annualized over a full twelve months. (Facts ¶ 177).

321. To the extent that liability under this claim duplicates liability on the breach of fiduciary claim, the Trustee can have but one recovery. The breach of fiduciary duty damages subsume the fraudulent transfer damages, while the fraudulent transfer damages are just a subset of the fiduciary duty damages.

322. Under NYDCL section 276 and under 11 U.S.C. §548(a)(1)(A), a transfer made with actual intent to "hinder, delay, or defraud" creditors is avoidable regardless of insolvency or whether fair consideration was provided. If a transfer is actually fraudulent under New York law, it will likewise be actually fraudulent under Bankruptcy Code section 548(a)(1)(A). *In re Singh*, 434 B.R. 298, 298 (Bankr. E.D.N.Y. 2010); *In re Le Café Crème, Ltd.*, 244 B.R. 221 (Bankr. S.D.N.Y. 2000). A clear and convincing standard of proof has been applied with respect to fraudulent intent under New York State law, but some District Courts within this Circuit have applied a preponderance of the evidence standard to the fraudulent transfer claim under the Bankruptcy Code. *See, e.g., In re Lyondell Chem. Co.,* 567 B.R. 55, 142 n.38 (Bankr. S.D.N.Y. 2017) ("Lyondell II"), *aff'd,* 585 B.R. 41 (S.D.N.Y. 2018). The Trustee has satisfied both standards.

323. To be liable for an actual fraudulent transfer under NYDCL section 276, a transferor need not intend actually to defraud, it is sufficient that the transferor merely intended to hinder or delay creditors. *E.g., Lippe. v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003); *In re Bruno Mach. Corp.*, 435 B.R. 819 (Bankr. N.D.N.Y. 2010). As Judge Learned Hand explained over a hundred years ago: "the fraudulent intent which the law requires need not necessarily involve moral obliquity. The ancient phrase 'to hinder, delay, or defraud,' has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud." *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912), *aff'd,* 209 F. 800 (2d Cir. 1913). "Initial transferees

are strictly liable for recovery of preferentially transferred property. *Carroll v. Tese–Milner (In re Red Dot Scenic, Inc.),* 351 F.3d 57, 58 (2d Cir. 2003) (citing 11 U.S.C. § 550(a)). Immediate or mediate transferees, however, may assert a good faith defense to recovery. *In re Red Dot Scenic,* 351 F.3d at 58 (citing 11 U.S.C. § 550(b)). *In re Bruno Mach. Corp.,* 435 B.R. at 848.

324. Thus, for example, in *Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 503–04 (S.D.N.Y. 2014), the court held that a transfer was actually fraudulent even though the intent was not to enrich insiders but to save the company:

> In one respect, this is an unusual fraudulent conveyance case. In the paradigmatic such case, a debtor corporation denudes the company of assets by giving them away to preferred insiders or creditors, frustrating the rightful demands of other creditors. Here, in contrast, the debtor corporation's intent in displacing the rightful creditor was, apparently, to keep operating, because the creditor's claim was upon the corporation's few remaining productive assets (*e.g.,* its patents). To do this, the company sought to place the claims of its insider-creditors (its officers and directors, their relatives, and outside counsel) ahead of that creditor, with the aim perhaps of blocking the creditor from taking those assets and thereby fortifying the company, rather than enriching these insider-creditors. But the law equally forbids such a conveyance as fraudulent. Petitioner Priestley has provided overwhelming indicia of fraud, and the respondents have failed utterly to demonstrable a bona fide purpose for the Security Agreement, other than to block and hinder Priestley from getting at corporate assets to which she was lawfully entitled. The Security Agreement is, therefore, a fraudulent conveyance within the meaning of DCL § 276.

325. In *Klein v. Rossi*, 251 F. Supp. 1, 2–3 (E.D.N.Y. 1966), the court explained why that is so:

> A debtor is not free to transfer selected property for the specific purpose of putting it beyond his creditors' reach, and his retention of enough illiquid assets to pay his debts, but only after delay for liquidation, does not relieve the transfer of its inherently fraudulent nature. A solvent man may, perhaps deal with his property as he will; it may be that his creditors must take the risks of his impulses of generosity as they have the advantage of his acumen in increasing his means. They do not take the risk that he will, without receiving executionable assets in exchange, put part of his property where his creditors cannot reach it for the very purpose of defeating their writs of execution against that property and of confining them to extending their

executions on other property if the obtain judgments against him that he does not promptly pay. Such transfers are frauds because, however contingently they may do it, they are by their very nature calculated to hinder, delay and defeat the collection of a known debt; they are characterized as fraudulent by the dominance of the intention to withdraw the particular executionable asset from the reach of process. …The words 'hinder' and 'delay' have separate significance: they embrace, although within the general framework of 'fraudulent' purpose…, the solvent person's deliberate effort to stave off creditors by putting property beyond their reach even when the purpose of that is not to cheat them of ultimate payment but only to wrest from them time to restore the debtor's affairs.

(Citations omitted.)

326.    Although the Court indicated at trial that it was inclined to collapse the strict foreclosure transactions such that Transcendence would be viewed as the initial transferee, doing so would obscure the role of PPAS, which effectuated both the initial transfer from TransCare to the Term Lenders, as well as the transfer from the Term Lenders to Transcendence. PPAS would argue that it was acting merely as the agent for the Term Lenders, which is a doubtful proposition given that the Term Lenders such as Credit Suisse were not controlling PPAS and were not even aware of what PPAS had been doing, but that nevertheless would not stop PPAS from being the "initial transferee." "Agency requires that '[t]he alleged agent must have acted (1) for the benefit of, (2) with the knowledge of, (3) with the consent of, and (4) under the control of, the principal.'" *Lyondell II,* 567 B.R. at 147, quoting *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, 2016 WL 7188792, at *8 (S.D.N.Y. Dec. 2, 2016). Agent or not, PPAS was no mere conduit, but was the driving force behind the transfers: PPAS, acting through Tilton, determined what assets would be foreclosed upon, how much TransCare would receive, how the assets would nominally pass through the hands of the Term Lenders, that they would ultimately rest with Transcendence, and decided that the Term Lenders were allegedly going to receive membership interests in some limited liability company Tilton intended to create. Under the "mere conduit test" as applied by the Second Circuit, PPAS qualifies as the initial transferee because it exercised dominion over the

transferred assets.  *E.g*., *In re Manhattan Inv. Fund Ltd.,* 397 B.R. 1, 15 (S.D.N.Y. 2007); *Tese–Milner v. Brune (In re Red Dot Scenic, Inc.),* 293 B.R. 116, 119 (S.D.N.Y. 2003) (citing *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey),* 130 F.3d 52, 57-58 (2d Cir.1997)), *aff'd,* 351 F.3d 57 (2d Cir. 2003).  None of the other Defendants on this claim can succeed on a good faith defense because all acted through Tilton and, therefore, necessarily knew what TransCare knew.[28]

327.   As noted above, the necessary scienter on the part of the transferor, TransCare, need only be to "hinder or delay" creditors, there need not be an intent to commit actual fraud for there to be liability for actual fraudulent conveyance.  (*See supra*, ¶ 322).   "The debtor's actual intent to defraud "need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor." *In re Lyondell Chem. Co.,* 554 B.R. 635, 650 (S.D.N.Y. 2016) ("Lyondell I"), quoting *In re Bayou Grp., LLC,* 439 B.R. 284, 304 (S.D.N.Y.2010).  In *Lyondell*, Judge Cote held that "[a]n actual intent to…hinder or delay may not be presumed" per the tort doctrine that a person intends the natural consequences of her actions. *Cf. Staples v. Sisson*, 274 A.D.2d 779, 781 (3d Dep't 2000) (upholding jury verdict finding intentional tort because "a jury could infer that defendant intended the natural and probable consequences of [his actions].").  Instead, per *Lyondell I*, there must be proof of an added element, the "mental apprehension of those consequences."   554 B.R. at 650, quoting the Honorable Learned Hand in *In re Condon*, 198 F. at 950.  Stated another way, there must be "proof of a desire

---

[28] Some courts have also required a plaintiff to plead the transferee's fraudulent intent under NYDCL section 276.  *See, e.g., In re Dreier LLP,* 452 B.R. 391, 429-35 (Bankr. S.D.N.Y. 2011); *In re Bernard L. Madoff Inv. Sec., LLC,* 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010).  Although most courts have determined that there is no obligation to prove the transferee's intent in order to recover under section 276, such intent still must be proven to recover attorneys' fees under section 276-a.  *E.g., Dreier,* 452 B.R. at 435.  Here, no such issue of proof arises because the transferor and transferee necessarily shared the same intent in that they both were being controlled by Tilton.

to cause harm or a belief that such harm is substantially certain to occur." *Lyondell I*, 554 B.R. at 651. "Knowledge to a substantial certainty constitutes intent in the eyes of the law." *In re Tribune Co. Fraudulent Conveyance Litig.,* 2017 WL 82391, at *11 (S.D.N.Y. Jan. 6, 2017), quoting *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 n.16 (S.D.N.Y. 2007), citing Restatement (Second) of Torts § 8A (1963 & 1964). Here, Tilton may not have desired to cause harm, but she certainly was aware that such harm was substantially certain to occur.

    a.   *Lyondell I* recognized that "proof of the natural consequences of one['s] acts may serve as circumstantial evidence that one appreciated those consequences." 554 B.R. at 651 n.17.

    b.   Here, the natural consequence of the strict foreclosure was also its express purpose: to free TransCare's most valuable assets from the claims of all creditors other than Tilton herself. *See In re Condon*, 198 F. at 951 ("Now here the respondent intended to hinder and delay his creditors, for that was the very purpose of his acts. He thought he had the right to do so, because he thought that the whole of the property was exempt. That was a mistake as to the extent of his rights, and I suppose it answers the claim that he intended to defraud them, for common usage would limit the word 'fraud' to some act which was directed to depriving another of what the actor knew to be his rights. However, it would be a wholly new rule that a conveyance intended to prevent creditors from pursuing their legal remedies was not within the statute, because the debtor supposed he could do it.").

    c.   Finally, Tilton understood TransCare would likely fail after losing the assets she intended to foreclose upon (Facts ¶ 264), especially in February 2016 when

TransCare had unpaid payroll and payroll taxes (Facts ¶ 129) and lacked availability to pay its immediate bills (JX 88).

328. Additionally, actual intent was independently proven by means of the "badges of fraud":

> "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Wall St. Assocs. v. Brodsky,* 257 A.D.2d 526, 529 [] (1st Dep't 1999) (internal citations and quotation marks omitted). These "badges of fraud" may include (*inter alia*): "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration;…and retention of control of the property by the transferor after the conveyance." *Id.; see also HBE Leasing Corp.[v. Frank,* 48 F.3d 623, 639 (2d Cir. 1995)] ("Actual fraudulent intent…may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."); *In re Kaiser,* 722 F.2d 1574, 1582–83 (2d Cir. 1983).

*In re Sharp Int'l Corp.,* 403 F.3d 43, 56 (2d Cir. 2005). A more extensive, but still not exhaustive list of such "badges" was presented in *Lyondell*:

> (1) the transfer or obligation was to an insider;

> (2) the debtor retained possession or control of the property transferred after the transfer;

> (3) the transfer or obligation was disclosed or concealed;

> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

> (5) the transfer was of substantially all the debtor's assets;

> (6) the debtor absconded;

> (7) the debtor removed or concealed assets;

> (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Lyondell I,* 554 B.R. at 652-53 (quoting Uniform Fraudulent Transfer Act section 4). "While '[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.'" *Lyondell I,* 554 B.R. at 653, quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254-55 (1st Cir. 1991). "Absence of these indicators—'evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control'—suggests that no fraudulent intent was present." *Universitas Educ., LLC v. Nova Grp., Inc.*, 2014 WL 3883371, at *10 (S.D.N.Y. Aug. 7, 2014), quoting *Leser v. U.S. Bank Nat'l Ass'n,* 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013).

329. Here, there was no absence of indicators; multiple badges were proven:

a. The transfer was to an insider;

b. Tilton had possession and control of the property in the hands of the Debtor and continued to have possession and control as it was transferred through PPAS and after it came to rest with Transcendence;

c. The strict foreclosure was effectuated in the dead of night (at 12:07am) and, with the exception of Wells Fargo, which did not agree to such foreclosure, there is no evidence that any of TransCare's creditors or stockholders were

aware that it had been planned; the evidence in fact showed that Credit Suisse, which was both a Term Lender and a substantial shareholder, had been kept entirely in the dark.  And the transaction was both hasty and unusual.

    d.   TransCare had no counsel negotiating the strict foreclosure, despite the fact that TransCare had engaged Curtis Mallet as restructuring counsel;

    e.   As discussed above in connection with fair value, the $10 million credit TransCare received was not even close to the value of the assets transferred;

    f.   TransCare was insolvent or at least was rendered insolvent by the transaction; and finally,

    g.   The debtor transferred the essential assets of the business to a lienor (the Term Lenders) who transferred the assets to an insider of the debtor (Tilton's company, Transcendence).

A leading treatise identifies other badges that are satisfied here, including "the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor" and "the creation by an oppressed debtor of a closely-held corporation to receive the transferred property."  *In re Bennett Funding Grp., Inc.,* 220 B.R. 743, 755 (Bankr. N.D.N.Y. 1997), quoting 5 Collier on Bankruptcy ¶ 548.04[2][b] at 548–24, 25-26 (L. King 15th ed. rev. 1997)

    330.   "A single badge of fraud has been held sufficient to support actual fraudulent intent. *In re Cassandra Grp.,* 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (absence of fair consideration). "In the present case, however, several badges of fraud are present, and the existence of several badges of fraud constitutes 'clear and convincing evidence of actual intent.'"  *In re Saba Enters.,*

*Inc.,* 421 B.R. 626, 644 (Bankr. S.D.N.Y. 2009), quoting *In re Actrade Fin. Techs. Ltd.,* 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (citing 4 Collier On Bankruptcy ¶ 548.04[2]).

331. Accordingly, the Trustee is entitled to judgment against PPAS, Transcendence and Transcendence II in the amount $16.62 million on the fraudulent transfer claim.

### III.   Claims 3, 4, 10, 11 and 14:  Avoidance and Subordination of Ark II Lien

332. TransCare's grant of a security interest to Ark II on February 10, 2016 can be avoided or subordinated under four alternative theories:

    a.  Preference (to the extent TransCare previously incurred debt to Ark II);

    b.  Constructive Fraud (to the extent TransCare did not incur debt to Ark II);

    c.  Recharacterization as equity (to the extent Tilton intended the transaction as an equity investment); and

    d.  Equitable subordination.

333. To the extent the Ark II lien is avoided or subordinated, the lien should be preserved for the benefit of the estate pursuant to 11 U.S.C. §551, and the $800,000 received by Ark II on account of its lien should be returned to the estate pursuant to 11 U.S.C. §§541 and 549.

### A.   Preference—Claim 10

334. To the extent Ark II advanced $1.9 million to TransCare in January 2016, with the understanding that the funds were to be repaid to Ark II, TransCare's February 10, 2016 grant of a security interest to secure that debt can be avoided as a preference pursuant to 11 U.S.C. §547(b).

335. Under such circumstances, the February 10, 2016 transfer of a blanket security interest in TransCare's property satisfies all of the elements of any avoidable transfer under 11 U.S.C. §547(b).  The transfer:

    a.  was made for the benefit of a creditor, Ark II;

b. was made on account of an antecedent debt, the Ark II payments on January 15 and 29, 2016;

c. was made while TransCare was insolvent, as TransCare is presumed to be pursuant to §547(f) and, in any event, TransCare was not paying its debts in the ordinary course;

d. was made within two weeks before the petition date (and to an insider); and

e. enabled Ark II to receive more than it would have received if the case were under chapter 7, the transfer had not been made and the creditor received payment as provided by the bankruptcy code. Had the transfer of the security interest not been granted to Ark II, Ark II would otherwise have been a general unsecured claimant, and such claimants are likely to receive nothing in this case. Instead, Ark II has already received $800,000, and claims that it is first in line to receive an additional $1.1 million.

336. Ark II has raised the affirmative defense of contemporaneous new value pursuant to 11 U.S.C. §547(c). Ark II bears the burden of proving this defense. *See* 11 U.S.C. §547(g); *In re Pameco Corp.*, 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) ("A creditor against whom a preference suit is sought has the burden of proving one of the defenses in §547(c) by a preponderance of the evidence.").

337. Ark II cannot satisfy its burden because:

a. TransCare did not in fact contemporaneously receive anything from Ark II when it granted Ark II a security interest on February 10, 2016—no new funds or other benefits were given to TransCare in exchange for granting the security interest to secure unsecured debts.

b. Until February 10, 2016, neither Tilton, nor anyone at TransCare, knew what security agreement or under lending agreement would be entered into, if any, between Ark II and TransCare.

c. The exchange was not substantially contemporaneous.

338. "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *In re 360networks (USA) Inc.*, 338 B.R. 194, 208-09 (Bankr. S.D.N.Y. 2005), quoting *Harrah's Tunica Corp. v. Meeks (In re Armstrong),* 291 F.3d 517, 525 (8th Cir. 2002).

339. Tilton authorized the January 15 and 29, 2016 payments to TransCare's creditors on an emergency basis because TransCare had immediate needs. After advancing the funds, she later to tried to allocate and structure the funding. Between January 15 and February 10, 2016, Tilton negotiated with Wells Fargo and Credit Suisse and worked with her own team, and with Carl Marks to devise a go forward strategy for TransCare. (Facts ¶¶ 80-98).

340. Not until February 10, 2016 did she determine to characterize the January 15 and 29, 2016 payments as secured lending from Ark II to TransCare under a new credit, security, guarantee and intercreditor agreement. (Facts ¶ 112).

341. At multiple points between January 15, 2016 and February 10, 2016, Tilton's people confirmed that there was no agreement on the security interest:

a. On January 15, 2016 Greenberg asked Wells Fargo for an agreement on the terms of a potential lending arrangement and provided no less than eight separate terms. Wells Fargo did not agree. (Facts ¶¶ 82-83).

b. As of January 26, 2016, Greenberg again confirmed that there was no agreement on the security interest, but told Wells Fargo that they expected to provide a budget shortly. (Facts ¶ 84).

c. As of February 3, 3016, Greenberg confirmed to Credit Suisse that there was not even a term sheet for the proposed lending to TransCare but only a summary of terms, such as the lending entity, the interest rate, the amount of the loan, the fees, as well as the priority of the security for the new loan. (Facts ¶¶ 90-93; *see also* PX 189).

d. As of February 9, 2016, Stephen did not include any Ark II debt in his summary of TransCare's debt structure that he provided to Curtis Mallet. (Facts ¶ 107).

342. The first time an Ark II secured lending facility was provided to TransCare was February 10, 2016, after TransCare had already engaged bankruptcy counsel for an imminent filing. (Facts ¶¶ 99, 105-111). Nevertheless, the Ark II documents were not negotiated through counsel and not even shared with counsel until after they were executed. (Facts ¶ 116; JX 79 ("I attach documents with respect to another term loan for the company.")).

343. TransCare did not sign the Ark II lending facility documents until February 11, 2016.

344. Importantly, Tilton did not give any testimony concerning her intent on January 15, and January 29, 2016 to structure the payments as secured loans to TransCare. Instead, she testified that she paid the funds on an emergency basis because TransCare had immediate needs. (Tr. 8/13 A.M. 25:13-18).

345. Finally, TransCare was contractually prohibited from granting a priority security interest to Ark II under both the ABL and the Term Loan on January 15 and 29, 2016. (*See* JX 2

at §9.8 (ABL covenant of TransCare prohibiting additional grants of security interests in collateral); JX 1 at §9.3 (Term Loan covenant of TransCare prohibiting grant of additional security interests in collateral)).

346.    For all these reasons, Ark II cannot meet its burden to prove that the parties intended the February 10 or 11, 2016 grant of a security interest to Ark II to be contemporaneous exchange for new value.

### B.    Constructive Fraud—Claim 11

347.    The Trustee also seeks to avoid the grant of a security interest to Ark II as a constructive fraudulent transfer under the NYDCL sections 273, 274 and 275.

348.    Under NYDCL section 272(a), consideration provided for a transfer must (a) have a value fairly equivalent to what the debtor gave and (b) be conveyed in good faith.  However, "[a] transfer made by an insolvent debtor to an affiliate or insider in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent."  *In re White Metal Rolling and Stamp Corp.*, 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998).

349.    Ark II was an insider because it was the majority shareholder of TransCare and Tilton's personal investment account.  (Facts ¶ 5).

350.    Therefore, to the extent TransCare granted the blanket security interest to Ark II on February 11, 2016 in satisfaction of an antecedent debt to Ark II (*i.e.*, some unwritten obligation to repay the January 15 and 29, 2016 fundings to Ark II), such transfer was not made in good faith and is constructively fraudulent.

351.    To the extent TransCare granted the blanket security interest to Ark II on February 11, 2016 not in satisfaction of any antecedent debt, then the transfer was obviously constructively fraudulent because it was made without fairly equivalent value.

## C. Recharacterization—Claim 3

352. "Recharacterization of a claim from debt to equity is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." Memorandum Decision dated April 30, 2019 (Dkt. 78 ("April 30 Order") at 14), quoting *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747-48 (6th Cir. 2001).

353. Courts in this circuit have adopted the eleven-factor analysis set forth in *AutoStyle*. *See* April 30 Order at 14-15 (listing factors). No one factor is controlling. The ultimate question for the court is whether the parties called an instrument one thing but intended something else. *Id*. at 15.

354. In the April 30 Order, the Court recognized that "the recharacterization question is intensely factual" and could not be decided on a motion to dismiss. (*Id*. at 18.) In identifying the factual issues, however, the Court noted the numerous *AutoStyle* factors that appeared, based on the pleaded allegations, to weigh in favor of recharacterization of the Ark II loan as equity. (*Id*. at 16-18.) The Trustee respectfully submits that the trial has now established as fact what was previously mere allegation and that recharacterization is justified.

355. In January 2016, Tilton authorized the payments on an emergency basis, without written documentation and without a clear plan as to how the funding would be structured. Between January 15 and February 10, 2016, Tilton attempted to (a) negotiate such a structure with TransCare's other secured lenders and equity holders, Wells Fargo and Credit Suisse and (b) create a go-forward business model for how she would restructure TransCare. (Facts ¶¶ 80-98; *cf*. April 30 Order at 16-17).

356. On February 10, 2016, Tilton decided to characterize the January fundings as the first $1.9 million of a $6.5 million senior secured credit facility. This facility was part and parcel of Tilton's corporate reorganization of TransCare: the same day Tilton hired bankruptcy counsel

for TransCare, formed Transcendence and told insurers that Transcendence would continue TransCare's business lines. (Facts ¶ 99; *cf.* April 30 Order at 18).).

357.     Tilton did not reasonably expect that TransCare would repay Ark II. Instead, she testified that she intended for Transcendence to assume TransCare's debt to Ark II and testified that in exchange for this assumption she intended to issue either 54.7% or 3.7% of Transcendence's equity to Ark II. *See In re Comprehensive Power*, 578 B.R. 14, 27 (Bankr. D. Mass. 2017) (sustaining recharacterization claim where the claimant "was implementing a unique 'loan-to-own' transaction rather than establishing a true lender-borrower relationship"). Tilton did not provide any documentation or contemporaneous recordings of these intended transactions.

358.     In truth, it is Tilton who is seeking to recharacterize, as a loan, what had previously been by all indications just an emergency cash infusion and, in doing so, attempting to further her own interests over those of the other creditors.

### D.     Equitable Subordination—Claim 4

359.     Under 11 U.S.C. §510(c), the Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of a claim to all or part of another claim. *In re Granite Partners, LP*, 210 B.R. 508, 513 (Bankr. S.D.N.Y. 1997).

360.     The Trustee is entitled to prevail on equitable subordination if (a) the claimant engaged in some type of inequitable conduct, (b) the misconduct caused injury to creditors or conferred an unfair advantage on the claimant, and (c) equitable subordination is consistent with bankruptcy law. *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir. 1977).

361.     The level of proof required to prevail is lower for insiders of the debtor. *Granite Partners*, 210 B.R. at 514.

362.    Inequitable conduct has been found in cases involving (a) breaches of fiduciary duty, fraud, or illegality, (b) undercapitalization or (c) control or use of the debtor as an alter ego for the benefit of the claimant. *Id.*

363.    By obtaining for itself a senior secured position for no value and also doing so as part of the Transcendence scheme, Ark II engaged in inequitable conduct.

364.    Ark II's conduct caused injury to the creditors of TransCare by reducing the amount of unencumbered assets available to them and by preventing TransCare from realizing TransCare's full value.

365.    In particular, Ark II obtained the senior secured position in order to enable Tilton to step ahead of other creditors and position herself as majority owner of Transcendence.

366.    Also, Ark II deceived Credit Suisse by falsely telling them that Credit Suisse needed to consent to Ark II's senior secured position in order to prevent a bankruptcy filing, which was already being planned along with Transcendence.  (Facts ¶¶ 129-130).

### E.    Ark II Should Return the $800,000—Claim 14

367.    Ark II received a distribution of $800,000 from the Trustee's sale of estate assets. (Facts ¶¶ 220-223, 226).

368.    Once the Ark II security interest is avoided or subordinated, Ark II has no entitlement to distribution on its claim and the $800,000 should be returned to the estate. *See* 11 U.S.C. §502(d) (disallowance of claim until creditor pays the amount for which it is liable); §542(a) (turnover of estate property).

369.    Ordinarily when a creditor has received distributions pursuant to a court order on a claim which is subsequently disallowed, thereby leaving the creditor with excess distributions, the Trustee may employ 11 U.S.C. §502(j) to recover such excess payments from the creditor. *In re R&W Enters.*, 181 B.R. 624, 648 (N.D. Fla. 1994) (§502(j) "specifically allows the Trustee to

recover from a creditor any excess payment or transfer made to such creditor."); *Matter of Kelderman*, 75 B.R. 69, 70-71 (Bankr. S.D. Iowa 1987) (noting that §502(j) "recogniz[es] the trustee's right to recover any excess payments of dividends" and holding bankruptcy courts have an "ancient and elementary power to reconsider prior orders" that allows reconsideration of distribution orders) (citations and quotation omitted).

370.    Here, Ark II did not receive distributions pursuant to a court order.  Instead, PPAS claimed an entitlement to the $800,000 on the grounds that they either had "first-priority security interests" or alternatively, owned the property outright as a result of the strict foreclosure.  (Dkt. 49 at ¶ 9; Facts ¶¶ 214, 221).  The Trustee stipulated to—and the Court so ordered—the distribution to PPAS from the sale proceeds subject to the Trustee's reservation of rights.  (Facts ¶ 221; Dkt. 52).  Later, and without notice to the Trustee, PPAS paid the funds to Ark II, which applied it to its own claim.  (Facts ¶ 223).  Importantly, PPAS did <u>not</u> apply the $800,000 to PPAS' claim. (Facts ¶ 222; JX 110 at pg. 9 of 9).

371.    Thus, the $800,000 is also avoidable from Ark II pursuant to 11 U.S.C. §549 because it was property transferred (a) after the commencement of the case and (b) not authorized under by the Bankruptcy Code or by the Court.  *See In re Fan*, 132 B.R. 430, 432-33 (Bankr. D. Haw. 1991) (avoiding transfer under §549 as not authorized by court order where debtor made "deceptive" representations to court, including failing to disclose transferee's insider status).

## IV.    Claims 4 and 13: Subordination and Limitation of PPAS Lien

### A.    PPAS' Security Interest Should Not Extend to the Proceeds of This Litigation—Claim 13

372.    At the August 14, 2016 conference, the Court asked Defendants whether they would stipulate that PPAS' lien would not extend to proceeds of this litigation.  They would not do so.

373.     PPAS has not explained how its lien extends to proceeds from the Trustee's breach of fiduciary duty claim.[29]

374.     Under 11 U.S.C. §552(b)(1), pre-petition security interests extend to proceeds acquired post-petition only insofar as applicable under non-bankruptcy law, unless the Court orders otherwise based on the equities of the case.

375.     The breach of fiduciary duty claim is a Commercial Tort Claim under the New York Uniform Commercial Code (the "NY UCC") §9-102(13) (defining a commercial tort claim as a tort claim where the claimant is an organization); *In re American Cartage, Inc.*, 656 F.3d 82, 88 (1st Cir. 2011) (breach of fiduciary claims are commercial tort claims).

376.     Under the NY UCC, security interests only extend to commercial tort claims that are specifically described.  NY UCC §9-108(e)(1) ("A description only by type of collateral defined in this chapter is an insufficient description of … a commercial tort claim."); *id.* at §9-108, Cmt. 5 ("Subsection (e) requires greater specificity of description in order to prevent debtors from inadvertently encumbering certain property.").  The breach of fiduciary claim against Tilton is not described.

377.     Also, the NY UCC provides that security interests do not extend to commercial tort claims that were not in existence at the time of the security agreement.  NY UCC §9-204(b)(2) ("A security interest does not attach under a term constituting an after-acquired property clause to … (2) a commercial tort claim"); *id.* at §9-204, Cmt. 4 ("In order for a security interest in a tort claim to attach, the claim must be in existence when the security agreement is authenticated."); *id.* at §9-108, Cmt. 5 ("Under Section 9-204, an after-acquired collateral clause in a security agreement will

_____

[29] PPAS' lien does not extend to proceeds of the fraudulent transfer claim and the avoidance/subordination of the Ark II lien.  *See* 11 U.S.C. §§ 551 and 552(a); *In re Residential Capital, LLC*, 497 B.R. 403, 414-15 (Bankr. S.D.N.Y. 2013).

not reach future commercial tort claims."). The breach of fiduciary claim did not exist when the security agreement for the Term Loan was authenticated in 2003.

378. Even if the security interest extended to the breach of fiduciary duty claim against Tilton, the equities of this case do not support granting PPAS a lien in the proceeds of that claim. *See* 11 U.S.C. §552(b)(1); *In re TerreStar Networks, Inc.*, 457 B.R. 254, 270 (Bankr. S.D.N.Y. 2011) (explaining that the equities of the case exception is not narrowly applied, although it is generally applied to situations where the secured lender would unjustly benefit from the estate's expense of resources to increase the value of collateral).

379. In any event, the equities of this case do not support distributing the proceeds of the breach of fiduciary duty claim to PPAS because:

> a. PPAS should not benefit from the breach of fiduciary duty committed by its sole owner and manager, Tilton, especially when Tilton employed PPAS to commit her tort; and
>
> b. PPAS should not benefit from the liquidation of the claim which it did not support and indeed opposed when litigating this action.

**B.      Equitable Subordination of PPAS' Claim—Claim 4**

380. As discussed above, the Court may equitably subordinate claims to all or part of other claims pursuant to 11 U.S.C. §510(c). *See Mobile Steel Co.,* 563 F.2d at 692; *Granite Partners,* 210 B.R. at 514.

381. By engaging in the strict foreclosure in particular and the Transcendence scheme in general, PPAS committed inequitable conduct.

382. As discussed throughout, PPAS' conduct sought to confer an unfair advantage on its owner and manager, Tilton.

383. In addition to the damages caused by the fraudulent transfer (*supra* Section II), PPAS' conduct caused TransCare to immediately cease operations such that employees could not be paid on the payday scheduled for the day after the strict foreclosure and employees could not be given WARN notices.

384. PPAS has filed a proof of claim on behalf of its itself and as administrative agent for the Term Loan Lenders in the amount of $35,090,492.76. (Stipulated Fact 54; JX 110). The proof of claim recites that this amount includes $568,119.66 incurred directly by PPAS in "Postpetition Attorneys' Fees" and "Agency Fees." (JX 110 at pg. 9 of 9).

385. Even though the Term Loan Lenders include Credit Suisse and First Dominion (two lenders who did not participate in the strict foreclosure), the PPAS credit agreement gave Tilton the right to act on their behalf:

> Q: You didn't negotiate those terms with any of the lenders. These are the terms that you came up with on your own; correct?
> A: Which lenders?
> Q: Any lenders.
> A: I was responsible for all the lenders as the agent and I came up with the terms.
> Q: That would include Credit Suisse and First Dominion?
> A: Yes, I was entitled under the agency agreement to operate for fifty-one percent of the lenders and make those decisions…

(Tr. 8/14 A.M. 18:5-15).

386. As Defendants have argued, Credit Suisse may or may not have claims against PPAS for its actions in this case, but that is not the Trustee's concern.

387. PPAS' claim should be subordinated to the claims of allowed general unsecured creditors so that PPAS will recover after the priority claims of TransCare's employees.

388.    Subordination is also fair because PPAS voluntarily agreed to lien and payment subordination of its then-$45 million secured claim to Ark II, even after TransCare had engaged bankruptcy counsel and in exchange for no new consideration to TransCare or PPAS.

389.    Finally, subordination is also fair to prevent PPAS from obtaining a lien over the proceeds, if any, of this litigation (*supra* ¶ 379).

## V.    **Conclusion and Remedies**

390.    Therefore, the Trustee is entitled to relief as follows:

<u>Claim 1</u>:    Judgment on the breach of fiduciary duty claim against Defendant Tilton (a) for damages no less than $67.05 million and (b) a declaration that Tilton must indemnify the estate for any liability incurred in the *Ien* adversary proceeding, including the attorneys' fees incurred to date in that case, plus pre- and post judgment interest.

<u>Claim 3</u>:    An Order recharacterizing Defendant Ark II's claims against TransCare's estates as equity interests, and preserving Ark II's lien for the benefit of the estate pursuant to 11 U.S.C. §551.

<u>Claim 4</u>:

(1)    An Order subordinating Defendant Ark II's claims against TransCare's estates to the claims of the allowed general unsecured creditors and preserving Ark II's lien for the benefit of the estates pursuant to 11 U.S.C. §510(c)(2).

(2)    An Order subordinating Defendant PPAS' claims against TransCare's estates to the claims of the allowed general unsecured creditors and preserving Ark II's lien for the benefit of the estates pursuant to 11 U.S.C. §510(c)(2).

<u>Claim 7</u>:    Judgment for fraudulent transfer against Defendants PPAS, Transcendence and Transcendence II of no less than $16.62 million, plus (a) the Trustee's reasonable attorneys' fees and expenses; (b) pre- and post-judgment interest; and (c) an Order disallowing PPAS' claims against the estate until Judgment is satisfied, pursuant to 11 U.S.C. §502(d).

<u>Claim 10</u>:    Judgment avoiding TransCare's pre-petition grant of a security interest to Ark II pursuant to 11 U.S.C. §547 and preserving Ark II's lien for the benefit of TransCare's estates pursuant to 11 U.S.C. §551.

<u>Claim 11</u>:     Judgment avoiding TransCare's pre-petition grant of a security interest to Ark II as a constructive fraudulent transfer pursuant to NYDCL sections 273, 274 and 275, and 11 U.S.C. §544(b), and preserving Ark II's lien for the benefit of TransCare's estates pursuant to 11 U.S.C. §551.

<u>Claim 13</u>:     An Order directing that the liens asserted by Ark II and PPAS do not extend to any proceeds of this litigation, pursuant to 11 U.S.C. §552(b).

<u>Claim 14</u>:     Judgment and Order directing Ark II to return the $800,000 it received on account of its purported claims against TransCare's estates, pursuant to 11 U.S.C. §§502(j), 542, 549 and 550(a), plus pre- and post-judgment interest.

Dated: New York, New York
      September 18, 2019

Respectfully submitted,

*/s/ Bijan Amini*
Bijan Amini
Avery Samet
Jaime B. Leggett
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017

Tel: (212) 490-4100
Fax: (212) 490-4208
bamini@storchamini.com
asamet@storchamini.com
jleggett@storchamini.com

*Special Counsel to Plaintiff Salvatore*
*LaMonica, as Chapter 7 Trustee*